HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
Iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
Sappel@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California  94111
Telephone:  (415) 354-0100
Facsimile:    (415) 391-7124

Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Defendants. | Case No.  C 07-02748 MHP<br><br>**DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

I, Mark Lillge, declare as follows:

1.      I am over the age of eighteen years.  I make this declaration freely and of my own personal knowledge.  If I were called as a witness, I could and would competently testify to the matters set forth.

2.      I am the owner of Creative Marketing Concepts ("CMC"), a California sole proprietorship with its principal place of business in San Francisco, California.  CMC is an industry leading full service advertising specialty and corporate apparel firm with over half a million promotional products which sells businesses goods branded with the latter's corporate logo.  Such

1    goods may be coffee cups, pens, shirts, or a countless number of items.  In fact, CMC has over

2    500,000 such types of products that it may custom brand for its customers.

3         3.    I founded Creative Marketing Concepts ("CMC") in 1992.  In 2006, it realized

4    approximately $4,000,000 in gross revenue, selling to over 500 top clients and over 1,200 clients

5    total.

6         4.    CMC's list of approximately 1,200 existing customers is a small number relative to

7    the field of potential customers for both CMC and its competitors, as the universe is virtually

8    limitless.  Such potential customers for company branded goods number in the hundreds of

9    thousands, if not millions, and include any organization, institution, company, or individual, which

10   attends trade shows, provides such goods to its employees or distributors, has customers or

11   prospective customers to whom it wishes to provide such goods, holds special events, or has any

12   other reasons to supply goods bearing a company logo to others.

13        5.    The market for CMC and its competitors is substantial, with an estimated industry

14   revenue of over $18 billion in 2006.  From financial institutions to realtors, from law firms to

15   software companies, from educational institutions to food and beverage companies, the list of

16   potential customers is almost endless.  CMC's own customer niche out of the list of potential

17   customers is the merest sliver, approximately .02% of the total market based on its annual gross

18   revenue in comparison with total industry revenue.

19        6.    One of the keys to CMC's success is the way it develops its books of business, and the

20   confidential and proprietary information that it subsequently develops for each of its existing and

21   prospective customers.  Detailed customer information is a required element for the success of any

22   company in this industry.  For example, I previously acquired a competitor, and one very important

23   source of value in that transaction was the competitor's customer information, which was not

24   otherwise generally available.

25

26

27

28

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TRO

7.     In contravention of the industry standard, the CMC customer list and potential warm leads are typically not established by its sales personnel,[1] nor do these sales personnel bring in "books" of business when CMC hires them.  Rather, CMC independently develops this proprietary information and distributes it as necessary to its sales personnel.

8.     This confidential information includes, but is not limited to, the pricing which CMC charges its customers, based a complex pricing formula employed by CMC; CMC's desired and actual profit margin for each customer; CMC's strategic plans, including which customers and industries it wishes to target (and not target); CMC's marketing plans; the sales volume of each customer's business, including the knowledge of when a customer will be due for replenishment/re-order based upon its purchase and transaction history with CMC; the knowledge of their customers' particular buying habits, needs and dislikes; specific customer requirements, preferences, and limitations; negative knowledge regarding goods that customers are not interested in or no longer wish to purchase; CMC's proprietary forms that it uses to prompt and interact with existing and potential clients; financial plans, proposals and projections; and key managerial contacts at the customers, including which individuals have decision making authority, their own individual preferences and characteristics, and the levels of such authority (collectively, the "CMC Confidential Information").

9.     This CMC Confidential Information has been developed over a lengthy period of time. It begins by way of CMC's extensive marketing efforts through trade shows, telemarketing, direct mail campaigns, e-mail blasts, signage, website exposure, newspaper ads, yellow page advertising, and a prestigious San Francisco showroom location in the city's financial district (where open houses also occur).  Once customer contact is made, CMC typically follows up with a substantive dialogue and exchange of information, tailoring its approach regarding the customer's needs.  CMC typically spends about five percent of its annual gross revenue (approximately $200,000) on such marketing efforts, which it would not otherwise do if such information was freely available to it and its competitors in the field.  CMC provides its employees with the necessary customer information,

---

[1] There is one ex-employee who has assisted CMC in developing its customer list through his prospecting efforts. However, he is not a party to this action.

1    which includes by definition the CMC Confidential Information, in order for the employees to call

2    upon these customers and most effectively perform their job requirements.

3           10.    The CMC Confidential Information is not generally known to the public or CMC's

4    competitors, and CMC derives independent economic value from the CMC Confidential Information

5    which it has developed through substantial time, effort and expense over the past fifteen years.

6           11.    CMC takes reasonable efforts to maintain the secrecy of this proprietary information,

7    including restricting access to, and distribution of, the CMC Confidential Information and generally

8    marking such information as "PRIVATE" and/or "CONFIDENTIAL." CMC also maintains separate

9    shredding bins, employs a shredding service, and consistently shreds proprietary documents. CMC

10   frequently instructs and converses with its employees, both verbally and in written handbooks and

11   agreements, about the need for this information to be confidential. A true and correct copy of CMC's

12   Employee Handbook is attached hereto as Exhibit A.

13          12.    The CMC Confidential Information would be of substantial value to CMC's

14   competitors if it became known to them.

15          13.    In April 2001, CMC hired Andrew Verity as Sales Manager. Mr. Verity is a Canadian

16   citizen, and accordingly, CMC sponsored an H1-B visa for Verity so that he could legally reside in

17   the United States provided that he was employed.

18          14.    When hired by CMC, Verity, as the Sales Manager, originally reported only to me,

19   and all sales representatives reported to Verity. As a necessary function of his role at CMC, up until

20   the end of his employment at CMC, Verity had access to all CMC Confidential Information,

21   including but not limited to financial records (used in part to prepare financial forecasts), client lists

22   and purchasing history, supplier lists, and pricing information (all of which Verity was solely

23   responsible for with respect to creating and applying this information on CMC's behalf). Verity was

24   the only person, in addition to me, who had keys to the company safe, and was the only other

25   signatory (in addition to me) on CMC's checking account.

26          15.    In January 2005, CMC hired Christina Chang, Verity's wife. Chang is a Canadian

27   citizen, and CMC similarly sponsored an H1-B visa for her so that she could legally reside in the

28   United States while working for CMC.

16.    At all times Verity and Chang were at-will employees.

17.    Chang originally started in accounting for CMC.  As part of her job tasks, Chang prepared financial statements for the company, and had access to all customer account information. The following year Chang moved over to sales.  Subsequently, between Verity and Chang, they, in their respective sales functions, serviced clients and prospects assigned to them by CMC and accounting for approximately one third of CMC's revenue in 2006.

18.    In approximately early 2006, CMC tasked Verity with the obligation to work with CMC's counsel to develop a nondisclosure agreement for company employees to sign.  Verity accepted the task, and had substantial communications back and forth with the company attorney, and played a substantive role in drafting the terms of, and editing and revising this document, confirming that he was well familiar with the substance of the document, including the employees' obligations regarding trade secrets and confidential information.

19.    CMC instructed Verity to have each employee sign this agreement agreeing to not improperly use CMC Confidential Information, and to not solicit employees/customers for a finite period of time.  (A true and correct copy of this agreement is attached hereto as Exhibit B.)  Verity advised CMC that he had obtained signed copies of the agreement from all employees, and that he himself had signed the document.  Verity reported that the only exception was his wife (Chang), who was out of the office on maternity leave at the time.  Verity stated that she would sign the agreement when she returned from maternity leave.  Verity, on at least two occasions after Chang returned to work, committed to CMC that he would have Chang sign the agreement.  CMC subsequently saw certain executed copies of these agreements.  These agreements were maintained by Verity, as a result of his management position at CMC.

20.    During Verity's employment at CMC he displayed a mercurial personality and frequently erupted in angry outbursts, initiating confrontations with me, other CMC employees, suppliers, vendors, a banker, our consultants, and CMC clients.  CMC made several attempts to discuss the matter with Verity both verbally and in writing, and even contracted with three different business consultants to try to resolve these issues.  In January 2006, I advised Verity that he was required to undergo anger management counseling as a condition of his continued employment.

1   Verity did not act on this requirement, so CMC ultimately retained an anger management counselor

2   in the fall of 2006 to work with Verity on a weekly basis for a period of several months.  Ultimately

3   CMC, with the help of all these consultants, was unable to remedy the situation.  In late December

4   2006, and early January 2007, after yet two additional incidents, it became apparent to me that

5   Verity's temperament would preclude him from advancing in the company, and CMC so advised

6   Verity.

7          21.    In March 2007, CMC and Verity began discussions regarding Verity's transition from

8   the company.  For about a month we attempted to negotiate a final compensation package acceptable

9   to both sides.   During these negotiations, Verity made several references to his belief that my

10  company would start losing its clients once he left the company.  Verity also made several threats of a

11  lawsuit that he would file against CMC regarding the compensation he believed to be entitled

12  regarding his alleged ownership percentage in CMC.

13         22.    CMC eventually agreed to the material terms of everything Verity had originally

14  asked for, only to see him then substantially increase his demand.  The parties were then unable to

15  come to an amicable resolution.

16         23.    After Verity's departure from CMC in late April, I learned that all of the

17  confidentiality agreements, signed by the employees, were missing.  I did in fact search Verity's

18  (former) filing cabinets and desk, in addition to the safe and the office premises for these documents,

19  but did not locate them.  CMC immediately made a written inquiry to Verity about the status of the

20  missing documents, but he never responded.  A true and correct copy of CMC's letter to Mr. Verity is

21  attached hereto as Exhibit C.

22         24.    Despite Verity's departure, CMC remained willing to employ Chang, on the condition

23  that she agree to sign a new confidentiality/non-solicitation agreement, as was required of all

24  remaining employees, in light of the mysterious disappearance of the prior agreements.   After

25  initially indicating that she would sign the agreement, Chang refused to do so, even though it resulted

26  in her termination from CMC.  CMC terminated Chang on May 11, 2007.

27         25.    Immediately prior to her departure, Chang made statements to her fellow employees to

28  the effect that, "CMC would soon be losing its clients."

26.     Immediately after Chang's departure, one of CMC's suppliers advised CMC that Verity and Chang had opened up their own directly competitive business offering promotional branded products. This supplier also said that Defendants had told him that another CMC employee would soon be leaving to join Defendants. This statement was not true, but I believe it to be Defendants' attempt to give others in the industry a negative impression about the current state of CMC in order to further Defendants' own new business, and to also create some dissension within the CMC office. On or about May 20, 2007, just over a week after Chang's departure, CMC learned that Verity and/or Chang had just called upon and solicited one of CMC's top twenty customers by speaking with one of CMC's contacts at the client, leaving samples (which Defendants must have acquired in advance). Verity and Chang are in possession of CMC Confidential Information regarding this client, which has made extensive purchases from CMC previously. This longstanding client of CMC, originally brought on board by me, was in the process of negotiating a $20,000 purchase from CMC at the time of Defendants' solicitation. In fact, Chang, who had been assigned this client by CMC, had called upon this very client up to her departure, and she was aware of the pending deal between the client and CMC because she was the one conducting the negotiation on CMC's behalf. The CMC Confidential Information of which Defendants were in possession regarding this customer included, but was not limited to, the fact that CMC was currently negotiating a $20,000 transaction with this customer, the exact budget that the client had available for this project, the pricing that CMC intended to charge this customer based on CMC's relatively complex pricing formula, the "bottom line" pricing that CMC needed to charge this customer in order to ensure a profit, this customer's purchasing history, the types of products that CMC believed would best fit the customer's needs based on their intended use, the price sensitivity and other requirements of this specific customer, and what additional goods to suggest/propose based upon this customer's purchasing history. CMC now expects, and the client has so indicated, that the client will not consummate the transaction with CMC as a result of Defendants' conduct from last week.

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TRO

1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2  is true and correct and that this declaration was executed this 29th day of May, 2007, in San

3  Francisco, California.

4

5                                                    _____

6                                                              Mark Lillge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TRO