1 | HARVEY SISKIND LLP
IAN K. BOYD (SBN 191434)
2 | Email: iboyd@harveysiskind.com
SETH I. APPEL (SBN 233421)
3 | Email: sappel@harveysiskind.com
Four Embarcadero Center, 39th Floor
4 | San Francisco, CA 94111
Telephone: (415) 354-0100
5 | Facsimile: (415) 391-7124
6 |
7 | Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts
8 |

E-filing

9 |
10 |               IN THE UNITED STATES DISTRICT COURT
11 |           FOR THE NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
12 |
13 |
14 | MARK LILLGE d/b/a CREATIVE          Case No.
MARKETING CONCEPTS
15 |                                     **COMPLAINT FOR**
            Plaintiff,                  **MISAPPROPRIATION OF TRADE**
16 |                                     **SECRETS; CALIFORNIA UNFAIR**
                                        **COMPETITION; UNJUST ENRICHMENT;**
17 |     v.                              **INTENTIONAL INTERFERENCE WITH**
                                        **PROSPECTIVE ECONOMIC**
18 | ANDREW VERITY and CHRISTINA CHANG   **ADVANTAGE**
19 |            Defendants.              **JURY TRIAL DEMANDED**
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

COMPLAINT

1.     Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("CMC") for its complaint against defendants Andrew Verity and Christina Chang (collectively, "Defendants") alleges:

## JURISDICTION AND VENUE

2.     This is an action seeking damages and injunctive relief for misappropriation of trade secrets under California Civil Code Section 3426 *et seq.*, unfair competition under California Business and Professions Code Sections 17200 *et seq.*, common law unjust enrichment, and interference with prospective economic advantage.

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332 (a)(2), since the amount in controversy exceeds $75,000 and plaintiff and defendants are citizens of different states.  Venue properly lies within the Northern District of California pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here.

## INTRADISTRICT ASSIGNMENT

4.     This action arises in San Francisco County and should be assigned to the San Francisco Division of this Court pursuant to Civil Local Rule 3-2(c).

## PARTIES

5.     CMC is a California sole proprietorship with its principal place of business in San Francisco, California.  CMC is an industry leading full service advertising specialty and corporate apparel firm with over half a million promotional products which businesses can brand with their corporate logo.

6.     On information and belief, Defendant Andrew Verity is a United Kingdom citizen with a Canadian passport illegally residing in California as a result of a withdrawn H1-B visa, who is not admitted for permanent residence in the United States.  On information and belief, Defendant Christina Chang is a Taiwanese citizen with a Canadian passport illegally residing in California as a result of a withdrawn H1-B visa, who is not admitted for permanent residence in the United States. Both Verity and Chang are former employees of CMC.

-1-
COMPLAINT

# FACTUAL BACKGROUND

7.     CMC sells custom branded products to its customers, who use their company's logo on the goods. CMC has over 500,000 types of such products that it sells to its customers.

8.     CMC was founded in January 1992 by Mark Lillge. In 2006, it realized approximately $4,000,000 in gross revenue, selling to over 300 top clients and over 1200 clients total.

9.     While the fact that any of CMC's actual customers might be willing to purchase promotional goods is information possibly available to CMC's competitors, there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through substantial time, effort and expense.

10.     CMC takes reasonable efforts to maintain the secrecy of this proprietary information, including restricting access to, and distribution of, this confidential information and generally marking such information as "PRIVATE" and/or "CONFIDENTIAL." CMC also maintains separate shredding bins and shreds proprietary documents, including the envelopes in which this information arrives, and converses with its employees about the need for this information to be confidential, in addition to distributing employee handbooks and nondisclosure agreements which reiterate that such information is to be kept secret.

11.     This confidential information includes, but is not limited to, the pricing which CMC charges its customers; CMC's desired profit margin for each customer; CMC's strategic plans regarding which customers it wishes to target; CMC's marketing plans; the sales volume of the customer's business, including the knowledge of when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; the knowledge of their customers' particular buying habits, needs and dislikes; specific customer requirements, preferences, and limitations; the customer's purchasing history; negative knowledge regarding goods that certain customers were not interested in or no longer wish to purchase; and key managerial contacts at the customers regarding the ultimate decision maker (collectively, the "CMC Confidential Information"). The CMC Confidential Information is not generally known, and is maintained in confidence by CMC, with limited access provided to sales personnel on a

1  need to know basis. CMC has at all times taken reasonable steps to protect such confidential information

2  from being stolen and misused. The CMC Confidential Information would be of substantial value to

3  CMC's competitors if it became known to them.

4       12.    CMC provides its employees with all customer information, which includes by definition

5  the CMC Confidential Information, in order for the employees to call upon these customers and most

6  effectively perform their job requirements. It is important to note that in contravention of the industry

7  standard, the CMC customer list is not developed by its sales personnel, nor do these personnel typically

8  bring in books of business when they arrive at CMC. Rather, CMC independently develops this

9  proprietary information and distributes it as necessary to its sales personnel. This CMC Confidential

10 Information has been developed over a lengthy period of time initiated by way of CMC's extensive

11 marketing efforts through trade shows, telemarketing, direct mail campaigns, e-mail blasts, signage,

12 website exposure, yellow page advertising, and a prestigious San Francisco show room location, and

13 upon customer contact, CMC typically follows up with a substantial dialogue and exchange of

14 substantive information regarding what the customer is (and is not) looking for. CMC estimates that it

15 typically spends about five percent of its gross revenue (approximately $200,000) on such marketing

16 efforts, which it would not otherwise do if such information was freely available to it and its competitors

17 in the field.

18      13.    Despite the fact that CMC's customer list exceeds 1200 customers, this is a relatively

19 paltry number compared to the field of potential customers for both CMC and its competitors, as the

20 universe is virtually limitless. Such potential customers number in the hundreds of thousands, and

21 include any organization, institution, or company which attends trade shows, provides gifts to its

22 employees or distributors, has customers or prospective customers to whom it wishes to provide such

23 goods, holds special events, or has any other reason to supply goods bearing a company logo to others.

24 As would be expected, the market for CMC and its competitors is substantial, with an estimated industry

25 revenue of over $18 billion in 2006. From financial institutions, to realtors, to law firms, to software

26 companies, to educational institutions, to food and beverage companies, the list of potential customers is

27 almost endless.

28

14.     In April 2001, CMC hired Andrew Verity ("Verity") as its Sales Manager.  CMC is informed and believes that Mr. Verity is a U.K. citizen, and accordingly, CMC sponsored an H1-B visa for Verity so that he could legally reside in the United States provided that he was employed.

15.     When hired by CMC, Verity, as the Sales Manager, originally reported only to the owner, Mark Lillge, and all sales representatives reported to Verity.  As a necessary function of his role at CMC, up until his termination date, Verity had access to all CMC Confidential Information, including but not limited to financial records (to prepare financial forecasts), client lists and purchasing history, supplier lists, and pricing information.  Mr. Verity also had keys to the company safe, and was a signatory on CMC's checking account.

16.     In January 2005, CMC hired Christina Chang ("Chang"), the wife of Verity.  Chang is also a Taiwanese citizen, and CMC similarly arranged for an H1-B visa for Chang so that she could legally reside in the United States while working for CMC.  At all times Verity and Chang were at-will employees.

17.     Chang originally started in accounting for CMC, but later shifted over to sales.  As part of her job tasks, Chang prepared financial statements for the company, which took into account CMC Confidential Information.  In addition, between Verity and Chang, they, in their respective sales functions, called on clients accounting for approximately one third of CMC's revenue in 2006.

18.     In approximately early 2006, CMC tasked Verity with the obligation to work with CMC's counsel to develop a nondisclosure agreement for company employees to sign.  Verity had substantial conversations back and forth with the company attorney, and played a substantive role in editing and revising this document, confirming that he was well familiar with the substance of the document.  Verity was instructed to have each employee sign this agreement agreeing to not improperly use CMC Confidential Information, and to not solicit employees/customers for a finite period of time.  Verity advised CMC that he had obtained signed copies of the agreement from all employees (including himself), with the exception of his wife (Chang), and that she would be signing the agreement.  CMC subsequently saw certain executed copies of these agreements.  These files were kept in a secured

-4-

COMPLAINT

1 │ location, to which Verity, as a result of his management position at CMC, was one of few people who

2 │ had access. Among other things, the agreement which Verity and Chang were to sign stated:

3 │ "2.    Definition of Confidential Information. *I realize that my position with the*

4 │ *Company creates a relationship of high trust and confidence with respect to Confidential*

5 │ *Information owned by the Company, its clients or suppliers that may be learned or*

6 │ *developed by me while employed by the Company. I further acknowledge that my access*

7 │ *to such Confidential Information is contingent upon my execution of this Agreement. For*

8 │ *purposes of this Agreement, 'Confidential Information' includes all information that the*

9 │ *Company desires to protect and keep confidential or that the Company is obligated to*

10 │ *third parties to keep confidential, including but not limited to 'Trade Secrets' to the full*

11 │ *extent of the definition of that term under California law. It does not include 'general*

12 │ *skills, knowledge and experience' as those terms are defined under California law.*

13 │ 3.    Examples of Confidential Information. *Confidential Information includes, but is*

14 │ *not limited to: computer programs; unpatented inventions, discoveries and*

15 │ *improvements; marketing, manufacturing, organizational, operating and business plans;*

16 │ *the Company's internal system guides; strategic models; research and development; the*

17 │ *Company policies and manuals and standard operating procedure; sales forecasts;*

18 │ *personnel information (including the identity of the Company employees, their*

19 │ *responsibilities, competence and abilities, and compensation); medical information*

20 │ *about employees; pricing and nonpublic financial information; information and lists*

21 │ *regarding any current and prospective clients, vendors, suppliers employees or*

22 │ *contractors of the Company, as well as any clients that I know the Company is actively*

23 │ *pursuing; information concerning planned or pending acquisitions or divestitures; and*

24 │ *information concerning purchases of major equipment or property."*

25 │ A true and correct copy of the agreement is attached hereto as Exhibit A.

26 │ 19.    During Verity's employment at CMC, he displayed a mercurial personality and

27 │ frequently erupted in angry outbursts, initiating confrontations with his fellow employees, the CMC

28 │

1    principal (Mark Lillge), suppliers, vendors, bankers, consultants, and CMC clients.  CMC made several

2    attempts to discuss the matter with Verity both verbally and in writing, and even brought in anger

3    management counselors and advisors, but was ultimately unable to remedy the situation.     In

4    approximately January 2007, after yet another incident, it became apparent to CMC that Verity's

5    temperament would preclude him from advancing in the company, and it so advised Verity.

6            20.     As a result, in March 2007, the parties began discussions regarding Verity's transition

7    from the company.  For about a month the parties attempted to negotiate a final compensation package

8    acceptable to both sides.  During these negotiations, Verity made several references to his belief that

9    CMC would start losing its clients once Verity left the company.  Verity also made several threats of a

10   lawsuit that he would file against CMC regarding compensation he believed he was entitled to regarding

11   a perceived ownership in the company.  CMC eventually agreed to offer Verity everything that he had

12   originally asked for, only to see Verity then substantially increase his demand (including a demand that

13   he be paid the remainder of his 2007 salary in exchange for a promise of non-solicitation regarding

14   CMC's client after he left the company).   The parties were then unable to come to an amicable

15   resolution.

16          21.     In early April 2007, CMC discovered that Verity's computer had been purposefully

17   disconnected from the automatic back-up system in place at the company. · Accordingly, all uses of

18   Verity's computer, including e-mails sent and received, company information downloaded and printed,

19   and other documents copied or created, were not backed up on CMC's information systems.  Verity had

20   almost a week to work in an unmonitored environment before CMC's information technology consultant

21   advised CMC of what had occurred and remedied the problem.

22          22.     After Verity's departure from CMC in late April, CMC learned that all of the

23   confidentiality agreements signed by the employees (including Verity, based on his representations to

24   CMC) were missing.  CMC immediately made a written inquiry to Verity about the status of the missing

25   documents, but he never responded.

26          23.     Despite Verity's departure, CMC remained willing to employ Chang, on the condition

27   that she agree to sign a new confidentiality/non-solicitation agreement, as was required of all remaining

28

1  employees, in light of the mysterious disappearance of the prior agreements.  After initially indicating

2  that she would sign the agreement, Chang refused to do so, even though it resulted in her termination

3  from CMC.  CMC terminated Chang on May 11, 2007.

4       24.    Prior to her departure, Chang made statements to her fellow employees that CMC would

5  soon be "losing its clients."

6       25.    Immediately after Chang's departure, one of CMC's suppliers advised CMC that Verity

7  and Chang had opened up their own business offering promotional branded products.  On or about May

8  20, 2007, just over a week after Chang's departure, CMC learned that Verity and/or Chang had just

9  called upon and solicited one of CMC's top customers by speaking with one of CMC's contacts at the

10  client, leaving samples which Defendants must have acquired in advance.  This was a client which

11  Chang herself called on while at CMC, and Chang was well aware that this client was negotiating a

12  $20,000 deal with CMC at the time of her departure from CMC.  Verity and Chang are in possession of

13  CMC Confidential Information regarding this client, which has made extensive purchases from CMC

14  previously.

15       26.    CMC is informed and believes, and on that basis alleges, that Verity and Chang have

16  begun operating a business directly competitive to CMC and plan to raid CMC's customers using CMC

17  Confidential Information in order to unjustly enrich themselves at CMC's expense through a result of

18  Defendants' trade secret misappropriation, unfair competition, unjust enrichment, and intentional

19  interference with CMC's prospective economic advantages, such as with the client described above.

**CLAIM ONE**

**[MISAPPROPRIATION OF TRADE SECRETS]**

**(Against all Defendants)**

23       27.    CMC incorporates by reference the allegations of paragraphs 1 through 26.

24       28.    On April 27, 2007, Defendant Andrew Verity and CMC terminated their relationship.

25  On May 11, 2007, CMC terminated Chang over her refusal to sign a standard nondisclosure and

26  confidentiality agreement.  CMC is informed and believes, and on that basis alleges, that prior to

27  these dates, and while still paid employees of CMC, Verity and Chang took covert steps to launch a

1  new business that would serve as a direct competitor to CMC. CMC is further informed and believes,

2  and upon said basis herein, further alleges that Verity and Chang willfully used improper means, as

3  such are defined in Civil Code 3426.1(a), to acquire and misappropriate various non-public,

4  proprietary, and protected trade secrets of CMC to further Verity's and Chang's new directly

5  competitive business venture, including but not limited to, misappropriation of the CMC Confidential

6  Information. CMC is informed and believes, and on that basis alleges, that Defendants' improper

7  acts included, but were not limited to, disabling the backup procedure on Verity's computer so that he

8  could download and obtain CMC Confidential Information, and the theft of the confidentiality

9  agreements from CMC's offices so as not to evidence the fact that Verity and Chang either never

10  signed such agreements, or removed them from CMC's offices upon leaving the company.

11      29.    CMC is informed and believes, and on that basis alleges, that Verity and Chang willfully

12  and intentionally used their employment with CMC, and the trust, authority and access afforded them by

13  CMC and its management, along with other improper means, to obtain and misappropriate CMC

14  Confidential Information with the intent and desire to use and profit from such information and trade

15  secrets as a direct competitor of CMC, and to use such trade secrets regarding CMC's customers to call

16  on and solicit these very same customers, notwithstanding that Defendants could have fairly applied

17  their general skills, knowledge and experience in soliciting a much larger universe of non-CMC

18  customers. Moreover, at all relevant times, Verity and Chang knew or had reason to know that all such

19  information constituted CMC trade secrets, in part because of the information disclosed to them in the

20  original confidentiality agreement attached hereto as Exhibit A, regardless of whether they ever signed

21  such an agreement, or destroyed signed copies of said agreements after the fact.

22      30.    Among other matters, CMC is informed and believes that Defendants have:

23          a.    Used Defendants' detailed knowledge of CMC Information, including

24  specifics of client accounts and customers to plan and execute Defendants' strategies with respect to

25  such customers and by positioning Defendants favorably against CMC in an unjust attempt to obtain

26  CMC's customers;

27

28

1     b.  Made improper use of Defendants' detailed knowledge of CMC Confidential

2 Information, including but not limited to CMC's costs, pricing, negotiation, and pricing strategies to

3 compete unfairly against CMC for CMC's existing customers;

4     c.  Devised Defendants' sales, marketing, pricing, targeted customers, and sales

5 strategies based on Defendants' knowledge of CMC Confidential Information; and

6     d.  Avoided the expenditure of time and resources on non-productive sales leads,

7 accounts and customer contacts by making use of such negative trade secrets learned by Defendants

8 while employed at CMC.

9   31.  CMC is informed and believes that each Defendant, while still a paid employee of

10 CMC, planned to act as a competitor to CMC.  CMC is further informed and believes, and upon said

11 basis herein further alleges, that each Defendant willfully and knowingly used improper means, as

12 such are defined in California Civil Code Section 3426.1(a), to acquire and misappropriate various

13 non-public, proprietary and protected trade secrets of CMC to further Defendants' business,

14 including, but not limited to, misappropriation of CMC Confidential Information, including but not

15 limited to detailed customer information, pricing and requirements, purchase cycles and purchase

16 dates, and other CMC Confidential Information.

17   32.  CMC is informed and believes, and upon that basis alleges, that unless enjoined and

18 restrained, Defendants will continue their illegal efforts and scheme to exploit CMC's Confidential

19 Information.  The actions of Defendants have caused CMC actual damage well in excess of $75,000

20 and threaten to cause continuing and ongoing damage unless such actions are enjoined by the Court.

21   33.  The actions of Defendants constitute actual and threatened misappropriation of CMC's

22 trade secrets under California Civil Code Section 3426, *et seq.*  Unless enjoined by this Court,

23 Defendants threaten to, and will continue to, misappropriate and use CMC Confidential Information and

24 other proprietary information, causing damage to CMC.  CMC is informed and believes, and on that

25 basis alleges, that Defendants' actions are willful and malicious, entitling CMC to exemplary damages

26 under California Civil Code Section 3426.3(c).

27

28

34.    As a direct and proximate result of Defendants' acts of misappropriation, CMC has suffered damages to its business, reputation and goodwill, including lost sales and customer opportunities.

35.    Because of Defendants' misappropriation of CMC's trade secrets, CMC is entitled to recover from Defendants all damages it has and will continue to sustain, including attorneys' fees pursuant to California Civil Code Section 3426.4, and any profits and advantages wrongfully gained by Defendants as a result of their misappropriation.

**CLAIM TWO**

**[CALIFORNIA STATUTORY UNFAIR COMPETITION]**

**(Against all Defendants)**

36.    CMC incorporates by reference the allegations of paragraphs 1 through 35.  CMC is informed and believes, and on that basis alleges, that Defendants' aforementioned conduct was unlawful, unfair, and fraudulent.

37.    CMC is informed and believes, and upon that basis alleges, that Defendants, while working for and being paid significant sums of wages and employment benefits as employees of CMC, owed a duty of care and legal obligation of loyalty and confidentiality as mandated upon them by California law, including but not limited to Cal. Civil Code Section 3426, *et seq.*  Within said duty of care and legal obligation of loyalty, and while each Defendant remained a trusted employee of CMC, each Defendant was obligated not to misappropriate, disclose, or improperly use CMC Confidential Information. Relying upon said duty of loyalty and confidentiality, and being uninformed of Defendants' intent to go into business in direct competition with CMC, CMC continued to provide the Defendants, while still employed by CMC, with access to CMC's most current and important non-public proprietary information and trade secrets.  Until the end of their employment with CMC, each Defendant was allowed to remain in CMC's confidence and, thus, was allowed to obtain and use CMC's most recent and relevant trade secrets and CMC Confidential Information to unjustly benefit Defendants in their efforts to directly compete with CMC.

38.    Defendants' conduct constitutes unfair competition and deceptive practices under California Business & Professions Code Sections 17200 *et seq.*

39.    As a direct and proximate result of Defendants' conduct, CMC has and will continue to suffer damages to its business, reputation and goodwill, unless Defendants are enjoined from such conduct.

## CLAIM THREE
## [UNJUST ENRICHMENT]
### (Against all Defendants)

40.    CMC incorporates by reference the allegations of paragraphs 1 through 39.

41.    As a result of the aforementioned conduct of Defendants, they have been unjustly enriched at the expense of CMC, resulting in damages to CMC.

## CLAIM FOUR
## [INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE]
### (Against all Defendants)

42.    CMC incorporates by reference the allegations of paragraphs 1 through 41.

43.    CMC has had and continues to enjoy relationships with existing and prospective customers for its various products and services. The Defendants, through their former employment with CMC, have extensive knowledge of those relationships, as reflected by the fact that they collectively called on a customer base constituting one third of CMC's business, and had access to all CMC financial and customer information per their job duties at CMC. Defendants know the history of said relationships in detail, including which of these relationships contain the probability of future economic benefit to CMC, when, and on what terms, by reasons of CMC's ongoing marketing and sale of its products and services to these customers.

44.    The aforementioned conduct by Defendants was designed and intended to disrupt, and has in fact disrupted, CMC's economic relationships with its existing and prospective customers and has adversely affected, and will continue to adversely affect, CMC's ongoing relationships with these

1  customers.    Said conduct accordingly constitutes interference with CMC's prospective economic

2  advantage.

3      45.    Defendants' aforementioned conduct was willful and malicious, and intended to induce

4  or cause a termination of CMC's customer relationships and expectancies.

5      46.    As a direct and proximate result of Defendants' acts, CMC has suffered damage to its

6  business, reputation, and good will in an amount to be established at trial, well in excess of $75,000.

7      47.    CMC is informed and believes, and on that basis alleges, that Defendants' acts were

8  performed with oppression, fraud and malice, entitling CMC to an award of punitive damages in an

9  amount to be established at trial.  CMC has no adequate remedy at law for the continuing violations of

10  its rights as set forth above.

11  **PRAYER FOR RELIEF**

12      WHEREFORE, CMC prays:

13      1.    That each of the Defendants, and their officers, agents, employees, representatives,

14  shareholders, affiliates and all persons acting or claiming to act on their behalf, be preliminarily and

15  permanently enjoined and restrained from:

16          a.    Using, copying, dealing with, trading, and otherwise exploiting or

17              misappropriating CMC's Confidential Information, including but not limited to CMC's

18              trade secrets and other confidential and proprietary information, including, specifically,

19              but without limitation, such information concerning CMC's customer history and their

20              specialized needs and requirements; and

21          b.    Otherwise engaging in unfair competition with CMC.

22      2.    That this Court order Defendants to disgorge all of its profits from their unlawful acts,

23  and all other sums constituting Defendants' unjust enrichment from their unlawful conduct, in

24  accordance with California Civil Code Section 3426.3(a);

25      3.    For an award of compensatory damages according to proof;

26      4.    For an award of exemplary damages for willful and malicious trade secret

27  misappropriation, in accordance with California Civil Code Section 3426.3(c);

28

1    5.    For an award of punitive damages, according to proof;

2    6.    An award of CMC's reasonable attorneys' fees and costs (including expert costs)

3    pursuant to Civil Code Section 3426.4; and

4    7.    Such other and further relief as the Court deems just and proper.

5    Dated: May 25, 2007                    Respectfully submitted,

6                                           HARVEY SISKIND LLP
                                           IAN K. BOYD
7                                           SETH I. APPEL

8

9                                           By: _____
                                                    Ian K. Boyd
10

11                                          Attorneys for Plaintiff
                                           MARK LILLGE d/b/a CREATIVE
12                                          MARKETING CONCEPTS

13

14                              **JURY TRIAL DEMAND**

15    Plaintiff Mark Lillge d/b/a Creative Marketing Concepts hereby demands trial by jury of all
      issues so triable.
16

17    Dated: May 25, 2007                    Respectfully submitted,

18                                           HARVEY SISKIND LLP
                                           IAN K. BOYD
19                                           SETH I. APPEL

20

21                                          By: _____
                                                    Ian K. Boyd
22

23                                          Attorneys for Plaintiff
                                           MARK LILLGE d/b/a CREATIVE
24                                          MARKETING CONCEPTS

25

26

27

28
                                           -13-

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2       Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named

3   parties, there is no such interest to report.

4

5   Dated:  May 25, 2007                              Respectfully submitted,

6                                                     HARVEY SISKIND LLP

7                                                     IAN K. BOYD
                                                      SETH I. APPEL

8

9                                                     By:  _____

10                                                         Ian K. Boyd

11                                                    Attorneys for Plaintiff,
                                                      MARK LILLGE d/b/a CREATIVE
12                                                    MARKETING CONCEPTS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## AGREEMENT REGARDING CONFIDENTIAL

## INFORMATION, INTELLECTUAL PROPERTY NON-SOLICITATION

In consideration of my employment or continued employment by Creative Marketing Concepts or any parent, division, subsidiary, affiliate, successor or assignee thereof (collectively the "Company"), and the compensation and benefits paid to me from time to time by the Company, I agree as follows:

1. *Competitive Employment.*  While I am employed by the Company, I agree that, other than for the Company, I will not, either directly or indirectly, either as a principal, agent, employee, employer, partner or shareholder or in any other capacity, engage in any manner in the business conducted by the Company or any of its divisions, subsidiaries or affiliates.

2. *Definition of Confidential Information.*  I realize that my position with the Company creates a relationship of high trust and confidence with respect to Confidential Information owned by the Company, its clients or suppliers that may be learned or developed by me while employed by the Company. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement.  For purposes of this Agreement, "Confidential Information" includes all information that the Company desires to protect and keep confidential or that the Company is obligated to third parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under California law.  It does not include "general skills, knowledge and experience" as those terms are defined under California law.

3. *Examples of Confidential Information.*  Confidential Information includes, but is not limited to: computer programs; unpatented inventions, discoveries and improvements; marketing, manufacturing, organizational, operating and business plans; the Company's internal system guides; strategic models; research and development; the Company policies and manuals and standard operating procedure; sales forecasts; personnel information (including the identity of the Company employees, their responsibilities, competence and abilities, and compensation); medical information about employees; pricing and nonpublic financial information; information and lists regarding any current and prospective clients, vendors, suppliers employees or contractors of the Company, as well as any clients that I know the Company is actively pursuing; information concerning planned or pending acquisitions or divestitures; and information concerning purchases of major equipment or property.

4. *General Skills, Knowledge and Experience.*  If I leave the Company, I may take with me and use the general skills, knowledge and experience that I have learned or developed in my position or positions with the Company or others.  However, for the avoidance of any doubt, I hereby agree and acknowledge that the Company considers any information and lists regarding any current and prospective clients, vendors, suppliers employees or contractors of the Company to be both its Confidential Information and Trade Secrets, and does not constitute general skills, knowledge and experience.

5. *Confidentiality Obligations.*  During and after my employment with the Company, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of the Company or to any employees of the Company not authorized to receive such information (including, but not

© 2006 Creative Marketing Concepts, Private & Confidential                                                                                      1

limited, any future employer or contractor) or (b) use any Confidential Information other than as may be necessary to perform my duties at the Company. **In no event, at any time, will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier, vendor or client of the Company, whether on behalf of myself, any subsequent employer, or any other person or entity.**

6. *Duration.* With respect to Trade Secrets, my obligations under paragraph 5 shall continue indefinitely or until such Trade Secret information has been made available generally to the public either by the Company or by a third party with the Company's consent or is otherwise not considered a Trade Secret under California law. With respect to Confidential Information which is not a Trade Secret (herein referred to as "Proprietary Information"), my obligations under paragraph 5 shall continue in duration until the first to occur of the following: (a) five (5) years has elapsed since termination of my employment with the Company for any reason, or (b) the Proprietary Information has been made available generally to the public either by the Company or by a third party with the Company's consent.

7. *Geographic Scope.* I understand that the Company has sales and operations facilities throughout the United States and in a number of foreign countries, that it purchases equipment and materials from suppliers located throughout the world, and that it expects to expand the scope of its international activities in the future. I therefore agree that my obligations under paragraph 5 shall extend worldwide.

8. *Former Employers.* I acknowledge that the Company expects me to respect and safeguard the trade secrets and confidential information of my former employers. I have not and will not disclose to the Company, use in the Company's business, or cause the Company to use, any information or material that is confidential to any former employer, unless such information is no longer confidential or the Company or I have obtained the written consent of such former employer to do so.

9.  *Return of Property.*  Upon termination of my employment with the Company or upon the Company's request, I will deliver to the Company all the Company's property in my possession, including notebooks, reports, manuals, programming data, listings and materials, customer, vendor and supplier lists and contact information, engineering or patent drawings, patent applications, any other documents, file or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by the Company.

10. *Restrictive Covenants.*

(a)  <u>Non-Solicitation of Employees</u>.  While employed by the Company and for a period of twenty-four (24) months from the date of termination of my employment with the Company for any reason, I shall not directly or indirectly solicit, induce or encourage any the Company employee(s) to terminate their employment with the Company or to accept employment with any competitor, supplier or client of the Company, nor shall I cooperate with any others in doing or attempting to do so. As used herein, the term "solicit, induce or encourage" includes, but is not limited to, (i) initiating communications with a the Company employee relating to possible employment, (ii) offering bonuses or additional compensation to encourage the Company's employees to terminate their employment with the Company and accept employment with a competitor, supplier or client of the Company, or (iii) referring the Company's employees to personnel or agents employed by competitors, suppliers or clients of the Company.

(b)<u>Non-Solicitation of Customers, Vendors and Suppliers</u>.  For a period of twenty-four (24) months from the date of termination of my employment with the Company for any reason, I shall not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, either solicit or engage in the business engaged in by the Company as of the date of termination of my employment ("CMC Business") with any current or prospective client, vendor or supplier which was a current or prospective client, vendor or supplier, of the Company within the twelve (12) months immediately preceding my termination.

(c) I acknowledge that the restrictions set forth in this paragraph will not prevent me from obtaining gainful employment following termination of my employment with the Company.

(d)In the event that any provision of this paragraph is held to be unreasonable, a court may modify such provision in any manner which results in an enforceable restriction.

11. *Injunctive Relief.*  I acknowledge that my violation of the foregoing confidentiality, non-solicitation and non-competition obligations will cause the Company irreparable harm.  I agree that the Company is entitled to protection from such violations, including protection by injunctive relief, in addition to other remedies available under the law.

12. *Definition of Developments.* For purposes of this Agreement, "Developments" shall mean all inventions, discoveries, developments, improvements, works of authorship and computer programs, ideas, concepts, enhancements, writings, graphics, designs, models, artwork, code, routines, compilations and related documentation (collectively, "Developments") that are or have been made, conceived, first reduced to practice or learned by me either solely or jointly with another or others while employed by the Company, including prior to the date hereof, whether or not they are patentable, copyrightable or subject to trade secret protection.

13. *Disclosure of Developments.* I will disclose promptly to the Company all Developments, including, to the extent not already done so, any Development made, conceived, first reduced to practice or learned by me either solely or jointly with another or others both prior to or after the date of this Agreement.

14. *Ownership of Developments.* I agree that, except as otherwise provided in paragraph 16 hereof, all Developments shall be the sole and exclusive property of the Company. Any Development for which copyright protection is available shall be considered a work made for hire. I agree to assign and do hereby assign, convey and transfer to the Company, or to some other legal entity ("Assignee") designated by the Company, all of my right, title and interest in and to all Developments in all media throughout the world in perpetuity. Without limiting the foregoing, I hereby assign, convey and transfer to the Company or an Assignee all of my right, title and interest in and to any Developments (other than Excluded Developments, as defined below) created prior to this Agreement. I further agree to waive any moral or similar rights to the Developments.

15. *Protection of Developments.* The Company or Assignee shall have the right to use the Developments and obtain Letters Patent, Copyrights (as author or assignee) or other statutory or common law protections for Developments in any and all countries. I will provide the Company or Assignee such assistance as may be requested in order for the Company to obtain or otherwise secure, and from time to time enforce, U.S. or foreign Letters Patent, copyrights or other statutory or common law protections for Developments, including the execution of any and all documents that the Company or Assignee may wish to use or obtain or otherwise secure or enforce such rights, together with any assignments thereof to the Company or Assignee, and to the successors and assigns of the Company or Assignee, transferring all of my right, title and interest in any Development, and the right to apply for or otherwise obtain any such rights. the Company or Assignee shall have the sole right to determine what action, if any, to take with respect to any Development. If I am unavailable for any reason, I hereby appoint the Company, as my agent and attorneys-in-fact, to execute and file any document(s) and to do all other acts to establish the Company's or Assignees ownership in, and further the prosecution, issuance, enforcement and maintenance of, any Development. All expenses incurred in obtaining and enforcing rights in Developments owned by or assigned to the Company shall be borne by the Company.

16. *Post-Employment Assistance.* If I am no longer employed by the Company, the Company or Assignee shall compensate me at a reasonable rate for time actually spent by me at the request of the Company or Assignee on the assistance referred to in paragraph 14. Such rate shall be determined by the Company and shall be based on my compensation at the time my employment with the Company was terminated. the Company or Assignee shall also reimburse me for pre-approved traveling and personal expenses incurred in complying with such request.

17. *Employee Inventions.* I understand that, as provided by California Labor Code § 2870, the provisions of paragraphs 12, 13 and 14 of this Agreement do not apply to an invention that I develop entirely on my own time and to which all of the following apply: (i) no equipment, supplies, facilities or trade secret information of Company are used, (ii) it is not related to Company's business or Company's actual or demonstrably anticipated research and development, and (iii) it does not result from any work performed by me for Company.

18. *Pre-Existing Developments.* I have identified at the end of this Agreement all Developments that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment with the Company and that I desire to exclude from operation of this Agreement ("Excluded Developments"). If there are no Developments listed, I represent that I have made no such Developments. If I incorporate or have prior to the date of this Agreement incorporated any Excluded Developments into any Company product or service or otherwise use or have used an Excluded Development for the Company's benefit as part of my Company employment activities, the Company is hereby granted and shall have a fully paid, nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable and sublicensable license to make, have made, modify, create derivative works, reproduce, use, offer to sell, sell, import and distribute such Excluded Developments (as may be improved or enhanced by or for Company) and any Company product or Company service incorporating such Excluded Developments.

19. *Payments.* With respect to any Development for which the Company seeks to obtain U.S. or foreign Letters Patent, the Company will pay me the sum of Five Hundred Dollars ($500) when I execute an assignment of the Development to the Company, or when I execute the first patent application and assignment covering the Development, whichever occurs first. Divisional or continuation-in-part applications shall be considered to cover separate Developments. The payment of the sum of One Hundred Dollars ($100) shall relieve the Company of any obligation it may have had to make any further payments to me with respect to such Development. If there are several co-inventors, this sum shall be divided equally between them.

20. *Identification of Authorship.* The Company, its assignees and licensees are not required to designate me as the author of any Developments created as a work made for hire or assigned under this Agreement when any such work is distributed publicly, nor to make any such public distribution or any use thereof.

21. *Subsidiaries and Affiliates.* I understand and agree that this Agreement is executed by the Company on its own behalf and on behalf of each of its subsidiaries and affiliates, that my obligations under this Agreement shall apply equally to each of the Company's subsidiaries and affiliates and that such subsidiaries and affiliates may enforce this Agreement in their own names and if they were parties to this Agreement.

22. *Prior Agreements.*  This Agreement supercedes all previous agreements relating to the same subject matter, including the Prior Agreement, except that the provisions of such previous agreements shall remain in effect with respect to any Developments disclosed by me to the Company prior to the date of this Agreement and this Agreement shall modify according to the terms hereof, but not terminate, any license or transfer of rights effected pursuant to such agreements.  Any Development made or conceived during the term of such previous agreement but not disclosed until after the date of this Agreement shall be governed by the terms of this Agreement.  The terms of this Agreement may only be modified in a writing signed by a senior officer of the Company.

23. *Severability.*  If any provisions of this Agreement are held by a court to be void or unenforceable for any reason, the remaining provisions of this Agreement shall continue in full force and effect.  If a court is of the opinion that any part of this Agreement is unreasonable, it may modify this Agreement to make it reasonable and enforceable in all respects.

24. *Recovery of Expenses.*  I agree to pay to the Company the costs and reasonable attorney's fees incurred by the Company if it prevails in enforcing any or all of the terms of this Agreement.

25. *Survival of Obligations.*  The provisions of paragraph 2-15 and 17-23 of this Agreement shall survive its termination.

26. *Assignment.*
    (a) By the Employee.  I understand and agree that my duties and responsibilities under this Agreement are personal in nature and that this Agreement shall not be assigned, transferred or shared by me with any other person or entity without the prior written notification to and written approval of the Company, which approval may be withheld in the sole discretion of the Company.

    *(b)* By the Company.  I acknowledge and agree that this Agreement and the rights and obligations of the Company hereunder may be assigned by the Company to an affiliate or successor by purchase or otherwise of the Company without my prior written approval, upon notice to me.

27. *Notification of New Employer.*  If I leave Company for any reason, I consent to Company notifying my new employer of my rights and obligations under this Agreement.

28. *Governing Law.*  This Agreement shall be construed in accordance with laws governing contracts made and to be performed in the State of California, without regard to its conflict of laws principles.

_____        _____
**EMPLOYEE**                                Date

**CREATIVE MARKETING CONCEPTS**

By: _____        _____

Date

The following are pre-existing Developments not covered by paragraphs 12-14, in which I have any right, title or interest, and which were conceived or written either wholly or in part by me prior to my employment with the Company, but neither published nor filed in any Patent Office.

## DESCRIPTION OF DOCUMENTS AND PATENTS (if applicable)

| Title of Document | Date of Document | Name of Witness Document |
|---|---|---|
| _____ | _____ | _____ |