1  HARVEY SISKIND LLP
   IAN K. BOYD (State Bar No. 191434)
2  Iboyd@harveysiskind.com
   SETH I. APPEL (State Bar No. 233421)
3  Sappel@harveysiskind.com
   Four Embarcadero Center, 39th Floor
4  San Francisco, California  94111
   Telephone:  (415) 354-0100
5  Facsimile:   (415) 391-7124
6
7  Attorneys for Plaintiff
   Mark Lillge d/b/a Creative Marketing Concepts
8
9
10              IN THE UNITED STATES DISTRICT COURT
11          FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                   SAN FRANCISCO DIVISION
13

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, | Case No.  C 07-2748 MHP |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| vs. | |
| ANDREW VERITY and CHRISTINA CHANG., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ............................................................................ 2

    A.    CMC ............................................................................................ 2

    B.    Defendants ................................................................................... 4

ARGUMENT ............................................................................................ 9

    A.    Plaintiff Meets the Legal Standard for Injunctive Relief .................. 9

    B.    CMC is Likely to Prevail on the Merits ........................................ 10

        1.  The CMC Confidential Information Constitutes Protectable Trade Secrets ........ 10

        2.  The CMC Confidential Information Derives an Independent Economic Value from Not Being Generally Known ........................... 10

        3.  The CMC Confidential Information is the Subject of Efforts that are Reasonable Under the Circumstances to Maintain Its Secrecy ............... 13

    C.    Defendants Knew That They Were Not to Misappropriate the CMC Confidential Information, and Their Covert Conduct Confirms This Awareness .......................... 14

    D.    CMC Will Suffer Irreparable Injury if a TRO is Not Granted ................... 17

    E.    The Balance of Hardships Tips Sharply in CMC's Favor ......................... 18

    F.    Granting a TRO is in the Public Interest ...................................... 19

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION    CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

1

# TABLE OF AUTHORITIES

Page(s)

2

3

## Cases

4

*American Loan Corp. v. California Commercial Corp.*
211 Cal. App. 2d 515 (1963)............................................................... 16

5

*American Paper & Packaging Products, Inc. v. Kirgan*
183 Cal. App. 3d 1318, 1323-1324 (1986) ....................................... 10

6

7

*Corporate Express Document & Print Management v. Coons*
2000 U.S. Dist. LEXIS 22243 (C.D. Cal. 2000) ............................. 17

8

9

*Courtesy Temporary Service, Inc. v. Camacho*
222 Cal. App. 3d 1278 (1990)....................................................... 11, 12

10

11

*Foy v. Schantz, Shatzman & Aaronsonk*
108 F.3d 1347, 1349 (11th Cir. 1997)................................................. 5

12

*Funygin v. Yukos Oil Company*
2005 U.S. Dist. LEXIS 43352 (S.D. Tx. 2005) ................................. 5

13

14

*Gable-Leigh, Inc. v. North American Miss*
2001 U.S. Dist. LEXIS 25614 (C.D. Cal. 2001) ......................... 18, 19

15

16

*George v. Burdusis*
21 Cal. 2d 153, 160 (1942) .............................................................. 11

17

18

*Greenly v. Cooper*
77 Cal. App. 3d 382 (1978)........................................................ 16, 17

19

*Kato v. County of Westchester*
927 F. Supp. 714, 716 (S.D.N.Y. 1996)............................................. 5

20

21

*Kewanee Oil Co. v. Bicron Corp.*
416 U.S. 470, 483 (1974).................................................................. 19

22

23

*Klamath-Orleans Lumber, Inc. v. Miller*
87 Cal. App. 3d 458, 463 (1978)...................................................... 17

24

*Liberty Mutual Insurance Co., v. J. Gallagher & Co.*
1994 U.S. Dist. LEXIS 18412 (N.D. Cal. 1994)............................... 19

25

26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung*
2001 U.S. Dist. LEXIS 18270............................................................ 19

27

28

–ii–

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION     CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

1

*Paisa, Inc. v. N & G Auto*
  928 F. Supp. 1004, 1007 (C.D. Cal. 1996) ........................................................... 9, 10

2

*Stanley v. University of Sothern California*
  13 F.3d 1313, 1319 (9th Cir. 1994)..................................................................... 9, 10

3

4

*Western Electro-Plating Co. v. Hennes*
  180 Cal. App.2d 442 (1960)................................................................................... 11

5

6

**STATUTES**

7

California Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq.* ................................. *passim*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION     CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

1      Within the last week Plaintiff has learned that defendants Andrew Verity and Christine Chang

2    have initiated a flagrant and textbook case of trade secret misappropriation.  They have stolen their

3    former employer's confidential information and used it to covertly set up a directly competitive

4    business targeting the same clients as those currently doing business with Plaintiff.

5      As demonstrated below, Defendants, who have just begun their attempt to raid Plaintiff's

6    customers within the past week, should be temporarily enjoined from appropriating Plaintiff's trade

7    secrets and soliciting their customers:

8         ●     Plaintiff has a probable success on the merits in this action – the customer information

9    at issue here, which goes far beyond a simple customer list, qualifies as a trade secret under the

10    California Uniform Trade Secrets Act;

11         ●     Plaintiff will be irreparably harmed if the requested relief is not granted – even after

12    only a week of exploiting Plaintiff's trade secrets for their own unjust gain, Defendants have already

13    caused an existing customer of Plaintiff to back out of a pending $20,000 transaction with Plaintiff.

14         ●     Defendants' own conduct, specifically its threats that Plaintiff would "lose all of its

15    customers" once Defendants left Plaintiff's employ, and Defendants' spoliation of evidence while

16    still employed by Plaintiff (including stealing signed nondisclosure documents from Plaintiff and

17    disconnecting desktop computers from Plaintiff's backup server so as to further Defendants'

18    appropriation of Plaintiff's trade secrets), raises serious questions both as to the merits of Plaintiff's

19    claims and as to Defendants' bad faith and knowledge that they are not legally permitted to use the

20    trade secrets at issue.

21         ●     The balance of hardships tips sharply in Plaintiff's favor – there are literally hundreds

22    of thousands, if not millions, of prospective customers for Defendants to solicit and sell to without

23    utilizing Plaintiff's trade secrets.  Conversely, if the Court denies the requested relief, Defendants'

24    threats will be realized, and they will be able to irreparably damage Plaintiff and 15 years of hard

25    work.

26      The Court should immediately enjoin Defendants' conduct before further harm is done to

27    Plaintiff's business, and before further exploitation and dissemination of Plaintiff's trade secrets by

28    Defendants.

## STATEMENT OF FACTS

**A.    CMC**

Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("CMC") is a California sole proprietorship with its principal place of business in San Francisco's financial district.  CMC is an industry leading full service advertising specialty and corporate apparel firm with over half a million promotional products.  CMC sells businesses goods branded with its clients' corporate logo.  Such goods may be coffee cups, pens, shirts, or a countless number of items.  In fact, CMC has over 500,000 such types of products that it may custom brand for its customers.  [Declaration of Mark Lillge (hereinafter "Lillge Decl."), ¶2]

CMC was founded in January 1992 by Mark Lillge.  After fifteen years of hard work and steady growth, CMC realized approximately $4,000,000 in gross revenue in 2006 from a customer list of approximately 1200.  [Lillge Decl., ¶3]

Yet despite the fact that CMC's customer list exceeds 1200 clients, this is a relatively paltry number compared to the field of potential customers for both CMC and its competitors, as the universe is virtually limitless.  Such potential customers for company branded goods number in the hundreds of thousands, if not millions, and include any organization, institution, or company which attends trade shows, provides such branded goods to its employees or distributors, has customers or prospective customers to whom it wishes to provide such branded goods, holds special events, or has any other reason (of which there are a multitude) to supply goods bearing a company logo to others, internally or externally.  [Lillge Decl., ¶4]

Accordingly, the market for CMC and its competitors is substantial, with an estimated industry revenue of over $18 billion in 2006.  From financial institutions to realtors, from law firms to software companies, from educational institutions to food and beverage companies, from health care providers to government organizations, the list of potential customers is almost endless.  Indeed, CMC's own customer niche is the merest sliver of the available market, approximately .02% of the total market based on its annual gross revenue in comparison with total industry revenue.   [Lillge Decl., ¶5]

As with any company engaged in sales, one of the keys to CMC's success is the way it develops its books of business and customer relationships, and the confidential and proprietary information that it

1  subsequently develops both regarding its own business (e.g. confidential pricing) and for each of its

2  existing customers.  [Lillge Decl., ¶6]

3       In contravention of the industry standard, the CMC customer list and specific customer

4  information is not developed by its sales personnel, nor do these sales personnel typically bring in

5  "books" of business when CMC hires them.  Rather, CMC independently develops this proprietary

6  information and distributes it as necessary to its sales personnel.  [Lillge Decl., ¶7]

7       This confidential information includes, but is not limited to, the pricing which CMC charges its

8  customers and CMC's actual and desired profit margin for each customer, relying in CMC's complex

9  pricing formula;[1] CMC's strategic plans regarding which customers it wishes to target (and not target);

10 the purchasing history of CMC's customers and respective sales volume, including the knowledge of

11 when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; the

12 knowledge of CMC's customers' particular buying habits, needs and dislikes; specific customer

13 requirements, preferences, and limitations; negative knowledge regarding goods that certain customers

14 have refused to purchase or no longer wish to purchase; confidential information about actual or

15 prospective customers, suppliers and business partners; and CMC's confidential business, sales,

16 marketing and financial plans, proposals and projections (collectively, the "CMC Confidential

17 Information"). [Lillge Decl., ¶8]

18      CMC has developed the CMC Confidential Information over a substantial period of time (fifteen

19 years) at tremendous expense.  It is initiated by way of CMC's extensive marketing efforts through trade

20 shows, telemarketing, direct mail campaigns, e-mail blasts, signage, website exposure, yellow page

21 advertising, and a prestigious San Francisco show room location in the city's financial district (where

22 open houses also occur).  Once customer contact is made, CMC typically follows up with the customer

23 via a substantive dialogue and exchange of information regarding what the customer needs (and equally

24 as important, what the customer does not need).  CMC typically spends about five percent of its annual

25 gross revenue (approximately $200,000) on such marketing efforts.  It is important to note that CMC

26 would not incur such extensive time and expense if such customer information was freely and efficiently

27

28 [1] Although certain pricing is listed in various catalogs, it is customary for CMC to deviate from this list based on the specifics of the client's needs, including timing and volume.

–3–

1  available to it (and its competitors in the field) simply by working its way through a phone book.  [Lillge
2  Decl., ¶9]

3       CMC provides its employees with all customer information, which includes by definition the
4  CMC Confidential Information, in order for the employees to call upon these customers and most
5  effectively perform their job requirements.  [Lillge Decl., ¶9].

6       Given the ubiquity of the potential $18 billion customer base, the fact that any of CMC's actual
7  customers might be willing to purchase branded promotional goods is information possibly available to
8  CMC's competitors.  However, there are many details regarding CMC's relationships with its existing
9  customers which are not generally known to the public or CMC's competitors, and CMC derives
10  independent economic value from the CMC Confidential Information which it has developed through
11  substantial time, effort and expense.  [Lillge Decl., ¶10]

12       CMC takes reasonable efforts to maintain the secrecy of this proprietary information, including
13  restricting access to, and distribution of, the CMC Confidential Information and generally marking such
14  information as "PRIVATE" and/or "CONFIDENTIAL."  CMC also maintains separate shredding bins
15  for proprietary materials, consistently shreds proprietary documents, and frequently converses with its
16  employees both verbally and in writing about the need for this information to be confidential.[2]  The
17  CMC Confidential Information would be of substantial value to CMC's competitors if it became known
18  to them.   [Lillge Decl., ¶¶11-12]

19  **B.**   **Defendants**

20       In April 2001, CMC hired Andrew Verity ("Verity") as Sales Manager.  Mr. Verity is a Canadian
21  citizen, and accordingly, CMC sponsored an H1-B visa for Verity so that he could legally reside in the
22  United States provided that he was employed by CMC.  [Lillge Decl., ¶13]

23       When hired by CMC, Verity, as the Sales Manager, originally reported only to the owner, Mark
24  Lillge, and all sales representatives reported to Verity.  As a necessary function of his role at CMC, up to
25  the end of his employment at CMC, Verity had access to all CMC Confidential Information, including

26
27  [2] As noted *infra*, CMC has provided its employees with an Employee Handbook regarding its proprietary
information, and had each employee sign a document entitled "Agreement Regarding Confidential
28  Information, Intellectual Property Non-Solicitation."  All originals of the latter document, which Mr. Verity
and other CMC employees signed, turned up missing when Defendants left CMC.

but not limited to financial records (used in part to prepare financial forecasts), client lists and purchasing history, supplier lists, and pricing information.  Mr. Verity was also the only person in addition to Mr. Lillge to both have the keys to the company safe and be a signatory on CMC's checking account.  [Lillge Decl., ¶14]

In January 2005, CMC hired Christina Chang ("Chang"), Verity's wife.  Chang is also a Canadian citizen, and CMC similarly sponsored an H1-B visa for her so that she could legally reside in the United States while working for CMC.[3]  [Lillge Decl., ¶15]

At all times Verity and Chang were at-will employees.  [Lillge Decl., ¶16]

Chang originally started in accounting for CMC.  As part of her job tasks, Chang prepared financial statements for the company, and had access to all customer account information.  The following year Chang transitioned to sales.  Subsequently, between Verity and Chang, they, in their respective sales functions, called on clients accounting for approximately one third of CMC's revenue in 2006.  [Lillge Decl., ¶17]

In approximately early 2006, CMC tasked Verity with the obligation to work with CMC's counsel to develop a nondisclosure agreement for company employees to sign.  Verity accepted the task, and had substantial communications back and forth with the company attorney, playing a substantive role in editing and revising this document.  Verity's acts confirm that he was well familiar with the substance of the document and the employees' obligations regarding the trade secrets and confidential information.  [Lillge Decl., ¶18]

CMC instructed Verity to have each employee sign this agreement agreeing to not improperly use CMC Confidential Information, and to not solicit employees/customers for a finite period of time.[4]

---

[3] Putting aside that neither defendant is currently residing legally in the United States, the fact that neither defendant has been granted permanent residence in the U.S. creates diversity jurisdiction for this action.  *See, e.g., Foy v. Schantz, Shatzman & Aaronson*k, 108 F.3d 1347, 1349 (11th Cir. 1997) ("we hold that the permanent resident alien provision of § 1332(a) applies only to aliens who have received permission from the INS to remain permanently in the country.").  *See also Funygin v. Yukos Oil Company*, 2005 U.S. Dist. LEXIS 43352 (S.D. Tx. 2005) (individual present in U.S. by virtue of H1-B visa considered alien for purposes of diversity jurisdiction since he was "[not] admitted to the United States for permanent residence."); *Kato v. County of Westchester*, 927 F. Supp. 714, 716 (S.D.N.Y. 1996) ("As a Japanese citizen present in the United States on an E-2 visa, Isao Kato is not admitted for permanent residence in the United States.  Therefore, he is treated as an alien for diversity purposes.").

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION    CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

Verity advised CMC that he had obtained signed copies of the agreement from all employees, including, importantly, <u>himself</u>. Verity stated that the only exception to date was his wife (Chang), who was out of the office on maternity leave at the time, and that she would be signing the agreement once she returned. Verity, on at least two distinct occasions after Chang returned to work, committed to CMC that he would have Chang sign the agreement. [Lillge Decl., ¶19]

CMC subsequently saw certain executed copies of these agreements by various employees. The agreements were maintained by Verity as a result of his job responsibility at CMC. [Lillge Decl., ¶19]

Among other things, the agreement that Verity represented that he had signed, and that Chang was to sign, stated:

"2.     Definition of Confidential Information. *I realize that my position with the Company creates a relationship of high trust and confidence with respect to Confidential Information owned by the Company, its clients or suppliers that may be learned or developed by me while employed by the Company. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement. For purposes of this Agreement, 'Confidential Information' includes all information that the Company desires to protect and keep confidential or that the Company is obligated to third parties to keep confidential, including but not limited to 'Trade Secrets' to the full extent of the definition of that term under California law. It does not include 'general skills, knowledge and experience' as those terms are defined under California law.*

3.     Examples of Confidential Information. *Confidential Information includes, but is not limited to: computer programs; unpatented inventions, discoveries and improvements; marketing, manufacturing, organizational, operating and business plans; the Company's internal system guides; strategic models; research and development; the Company policies and manuals and standard operating procedure; sales forecasts; personnel information (including the identity of the Company employees, their responsibilities, competence and abilities, and compensation); medical information*

---

[4] A true and correct copy of this document is attached as Exhibit B to the Declaration of Mark Lillge.

–6–

> *about employees; pricing and nonpublic financial information; information and lists*
> *regarding any current and prospective clients, vendors, suppliers employees or*
> *contractors of the Company, as well as any clients that I know the Company is actively*
> *pursuing; information concerning planned or pending acquisitions or divestitures; and*
> *information concerning purchases of major equipment or property."*

[Ex. B to Lillge Decl.]

During Verity's employment at CMC he displayed a mercurial personality and frequently erupted in angry outbursts, initiating confrontations, at various times, with his fellow employees, the CMC principal (Mark Lillge), suppliers, vendors, bankers, consultants, and CMC clients. CMC made several attempts to discuss the matter with Verity both verbally and in writing, and contracted with three different business consultants specifically for the purpose of resolving this issue. In January 2006 CMC advised Verity that he was required to undergo anger management counseling as a condition of his continued employment. Verity did not act on this requirement, and CMC hired an anger management counselor in fall 2006 to work with Verity on weekly basis for a period of several months. Ultimately CMC, even with the help of these counselors and advisors, was unable to remedy the situation. In late December 2006, and early January 2007, after yet two additional incidents, it became apparent to CMC that Verity's temperament would preclude him from advancing in the company, and it so advised Verity. [Lillge Decl., ¶20]

As a result, in March 2007, CMC and Verity began discussions regarding Verity's transition from the company. For about a month they attempted to negotiate a final compensation package acceptable to both sides. During these negotiations, Verity made several references to his belief that CMC would start losing its clients once Verity left the company. Verity also made several threats of a lawsuit that he would file against CMC for the compensation he believed he was entitled regarding his alleged ownership percentage in the company.[5] [Lillge Decl., ¶21]

---

5 CMC fully expects that Defendants will attempt to distract the Court with an argument regarding its pending counterclaim regarding Mr. Verity's claimed (and disputed) ownership in CMC. However, any such claim is a red herring with respect to the immediate need for injunctive relief.

–7–

1    CMC eventually agreed to the material terms of what Verity had originally asked for, as a show

2    of CMC's good faith, only to see Verity then substantially increase his requirements. The parties were

3    then unable to come to an amicable resolution. [Lillge Decl., ¶22]

4        In early April 2007, CMC discovered that Verity's computer had been purposefully disconnected

5    from the automatic back-up system in place at the company. Accordingly, all uses of Verity's computer,

6    including e-mails sent and received, company information downloaded and printed, and other documents

7    copied or created, were not backed up on CMC's information systems during this time. Verity had up to

8    a week to work and appropriate information in an unmonitored environment before CMC's information

9    technology consultant discovered, and remedied, the problem. [Declaration of Dr. Richard Beery, ¶¶4-5]

10       After Verity's departure from CMC in late April, CMC learned that all of the confidentiality

11   agreements that had been signed by the employees (including Verity) were missing. CMC immediately

12   made a written inquiry to Verity about the status of the missing documents, but tellingly he never

13   responded. [Lillge Decl., ¶23, and Exhibit C thereto]

14       Despite Verity's departure, CMC remained willing to employ Chang, on the condition that she

15   sign a new confidentiality/non-solicitation agreement, as was required of all remaining employees, in

16   light of the mysterious disappearance of the prior agreements. After initially indicating that she would

17   sign the agreement, Chang refused to do so, even though it resulted in her termination from CMC. CMC

18   terminated Chang on May 11, 2007. [Lillge Decl., ¶24]

19       Just prior to her departure, Chang made statements to her fellow employees to the effect that

20   CMC would soon be "losing its clients." [Lillge Decl., ¶25]

21       Immediately after Chang's departure, and within the last week, one of CMC's suppliers advised

22   CMC that Verity and Chang had opened up their own directly competitive business offering promotional

23   branded products. On or about May 20, 2007, just over a week after Chang's departure, CMC learned

24   that Verity and/or Chang had just called upon and solicited one of CMC's top customers by speaking

25   with one of CMC's contacts at the client, leaving samples (which Defendants must have acquired in

26   advance, possibly while still employed at CMC). [Lillge Decl., ¶26]

27       Defendants' solicitation of this CMC customer is a prime example of the harm that Defendants

28   can and will do to CMC if not immediately enjoined. Defendants were in possession of CMC

–8–

Confidential Information regarding this customer, including the fact that CMC was currently negotiating a $20,000 transaction with this customer, the pricing that CMC intended to charge this customer based on CMC's relatively complex pricing formula, the "bottom line" pricing that CMC needed to charge this customer in order to ensure a profit, this customer's purchasing history, the types of products that CMC believed would best fit the customer's needs based on their intended use, the price sensitivity and other requirements of this specific customer, and what additional goods to suggest/propose based upon this customer's purchasing history.  [Lillge Decl., ¶26]

Verity and Chang are thus in possession of CMC Confidential Information regarding this client, which has made extensive purchases from CMC previously.  Indeed, CMC previously assigned Defendant Chang to this customer account, and she was negotiating with this very customer on behalf of CMC and at CMC's direction, just before her departure from the company.  *This client is now expected to not consummate the transaction with CMC as a result of Defendants' misappropriation.*    [Lillge Decl., ¶26]

In sum, Verity and Chang have covertly begun operating a business directly competitive to CMC. It is apparent that Defendants plan to raid CMC's customers using CMC Confidential Information in order to unjustly enrich themselves at CMC's expense through a result of Defendants' trade secret misappropriation, unfair competition, unjust enrichment, and intentional interference with CMC's prospective economic advantages, putting CMC's fifteen years of hard work at risk.

The Court should immediately enjoin Defendants from further irreparable harm to CMC.

## ARGUMENT

### A.    Plaintiff Meets the Legal Standard for Injunctive Relief

In the Ninth Circuit, a party seeking temporary injunctive relief must meet one of two tests. *Stanley v. University of Sothern California*, 13 F.3d 1313, 1319 (9th Cir. 1994).  These tests apply whether the party is seeking a temporary restraining order or a preliminary injunction.  *Paisa, Inc. v. N & G Auto*, 928 F. Supp. 1004, 1007 (C.D. Cal. 1996).

Under the traditional test, a court may issue temporary injunctive relief if it finds that (1) the moving party will suffer irreparable injury if the relief is not granted; (2) the moving party will "probably" prevail on the merits; (3) in balancing the equities, the non-moving party will not be

harmed more than the moving party is helped by the relief, and (4) granting the relief is in the public interest. Under the alternative test, a court may issue preliminary injunctive relief if the moving party demonstrates <u>either</u> (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in his favor. *Stanley*, 13 F.3d at 1319; *Pasia*, 928 F. Supp. at 1007.

CMC readily satisfies both tests.

**B.    CMC is Likely to Prevail on the Merits**

**1.    The CMC Confidential Information Constitutes Protectable Trade Secrets.**

The Uniform Trade Secrets Act ("UTSA") defines a "trade secret" as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process,[6] that:
   (1)  Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
   (2)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code §3246.1(d).

As shown below, the CMC Confidential Information constitutes CMC's trade secrets under UTSA.

**2.    The CMC Confidential Information Derives Independent Economic Value from Not Being Generally Known.**

CMC has developed and refined the CMC Confidential Information through years of hard work, substantial expense, and expertise.  It has worked tirelessly not only to develop an impressive list of clients, but also to foster good relationships with clients' contact people and other key personnel; to develop client-specific strategies; to learn clients' special needs; to determine the most profitable pricing strategies and appropriate methods of price markup; and to otherwise advance clients' interests in its own unique fashion.

---

[6] This list is non-exhaustive. *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1323-1324 (1986) ("The very language of Civil Code section 3426.1, subdivision (d), is inclusive, not exclusive.").

1    The CMC Confidential Information gives CMC a crucial edge over its competitors.  If these

2    competitors were to find out the CMC Confidential Information, CMC would lose this edge regarding

3    these customers.

4    *Western Electro-Plating Co. v. Hennes*, 180 Cal. App.2d 442 (1960) is illustrative.  Western

5    was a business that chrome-plated automobile accessories.  It employed defendants (Henness and

6    McCormick) as salesmen, assigned them certain territories, and, just like CMC here, gave them a list

7    of Western's customers in those territories.

8    Defendants eventually decided to join another chrome-plating business (Whetnall), a

9    competitor of Western.  The defendants told Western's "more valuable and preferred customers"

10   about their plans, and many of these customers became customers of Whetnall.  The trial court issued

11   a permanent injunction, and the appellate court affirmed, prohibiting defendants from soliciting

12   Western's customers.  *Id*. at 450-51.

13   The appellate court found that "[t]he identity of certain of plaintiff's customers called upon by

14   Henness and McCormick did not constitute secret information," <u>but</u> *"[t]he value of the various*

15   *accounts of customers and knowledge of the amount of business transacted by and between said*

16   *customers and plaintiff did constitute secret information of plaintiff*."  *Id*. at 445 (emphasis added).

17   The appellate court noted:

18       It is not merely the knowledge of the identity of the customers, but the friendly contact
         with them which is important to the solicitors.  Their personal acquaintance with
19       customers and knowledge of their respective places of residence, their peculiar likes
         and fancies and other characteristics, a knowledge of which would greatly aid them in
20       securing and retaining the business of said former customers, is sufficient to invoke
         equitable protection against the subsequent use by a former employee of such
21       information.

22   *Id*. at 448 (*quoting George v. Burdusis*, 21 Cal. 2d 153, 160 (1942)).

23

24   *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990) has many

25   similarities to the present case.[7]  Courtesy, a temp agency, alleged trade secret misappropriation after

26   _____

27   [7] While *Hennes* and certain other cases cited herein pre-date the Uniform Trade Secrets Act (enacted in 1985),
     it is worth noting that "the Uniform Trade Secrets Act is meant to codify" these earlier cases by applying a
28   "<u>broader definition</u>" of the term "trade secret" than found under the Restatement of Torts (First) definition, the

–11–

one of its employees (Camacho) left to start his own competing business, Transworld Temporaries. Courtesy contended, as CMC avers in the instant action, that defendants misappropriated its confidential customer list, "including such information as the volume of the customer's business, specific customer requirements, key managerial customer contacts and billing rates for use in [defendants'] competing business." The appellate court held that Courtesy was entitled to a preliminary injunction restraining defendants from using Courtesy's customer information.[8] *Id.* at 1292.

The court summarized the relevant facts as follows:

> In order that [defendants] might effectively carry out their employment duties, Courtesy necessarily revealed to [defendants] confidential and proprietary information regarding Courtesy's customers, including their sales volume, profit margins, special employment needs, particular likes and dislikes and pay rates and markups.
> …
> [Defendants] were … intent upon diverting all of Courtesy's preferred and valuable customers' business to Transworld Temporaries. During the course of his deposition, Camacho produced a … customer list which he prepared and used to solicit business for his new company. The first two pages of this list contain the names of all of Courtesy's major customers. In each instance, for a Courtesy customer, the list contains a person to contact in such company for temporary personnel needs. … [Defendants'] list also includes billing rates and/or markup percentages for Courtesy's customers and only Courtesy's customers.
> …
> [U]tilizing Courtesy's confidential and proprietary information regarding the amount of business transacted by and between said customers and Courtesy, and Courtesy's mark up of these various accounts, defendants' have solicited all of Courtesy's more valuable and preferred customers.

*Id.* at 1283-85.

Based on very similar facts to the instant action, that court readily found trade secret misappropriation. It noted that "the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors." *Id.* at 1288.

---

latter of which was traditionally used for trade secret cases prior to the enactment of the UTSA. *Camacho*, 222 Cal. App. 3d at 1287 (emphasis added).

[8] The trial court had previously issued a temporary restraining order.

This is the very same type of confidential and proprietary information of CMC currently in the hands of Defendants. They have already used this information to target Plaintiff's top clients within just a week of forming their new directly competitive venture, and have in fact disrupted a transaction that was almost completed between CMC and its customer. Defendants were only aware of this pending transaction as a result of their possession of CMC Confidential Information.

**3.** **The CMC Confidential Information is the Subject of Efforts that are Reasonable under the Circumstances to Maintain its Secrecy.**

CMC reasonably maintains the secrecy of the CMC Confidential Information. For example, CMC restricts access to, and distribution of, the CMC Confidential Information and generally marks such information as "PRIVATE" and/or "CONFIDENTIAL." It maintains secure shredders and frequently reminds its employees, both verbally and in writing, of the need for secrecy.

Moreover, CMC requires every employee to sign an agreement (the "Confidentiality Agreement") confirming that he or she will not improperly use the CMC Confidential Information, or solicit CMC's customers for a finite period of time. The Confidentiality Agreement provides:

> I realize that my position with the Company creates a relationship of high trust and confidence with respect to Confidential Information owned by the Company, its clients or suppliers that may be learned or developed by me while employed by the Company. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement. For purposes of this Agreement, "Confidential Information" includes all information that the Company desires to protect and keep confidential or that the Company is obligated to third parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under California law. It does not include "general skills, knowledge and experience" as those terms are defined under California law.
> …
> During and after my employment with the Company, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of the Company or to any employees of the Company not authorized to receive such information (including, but not limited, any future employer or contractor) or (b) use any Confidential Information other than as may be necessary to perform my duties at the Company.

Exhibit B to Lillge Declaration.

The Confidentiality Agreement includes a non-exhaustive list of examples of confidential information, which includes "information and lists regarding any current and prospective clients." It adds that "for the avoidance of any doubt, I hereby agree and acknowledge that the Company

–13–

considers any information and lists regarding any current and prospective clients, vendors, suppliers employees or contractors of the Company to be both its Confidential Information and Trade Secrets."[9]

Protecting trade secrets is also a key issue in CMC's Employee Handbook (the "Handbook"), and not just with respect to CMC's own trade secrets.   The Handbook states:

> [I]t is prohibited to hire an employee of a competitor to gain access to that competitor's trade secrets or proprietary information.  Similarly, an employee or former employee is prohibited from providing such confidential information to our competitors.

[Exhibit A to Lillge Decl.]

The Handbook also notes that "written authorization is needed to take customer files home and/or to forward company emails."

**C.    Defendants Knew That They Were Not to Misappropriate the CMC Confidential Information, and Their Covert Conduct Confirms This Awareness.**

UTSA defines "misappropriation" to include the following:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
> …
>   (B)  At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> …
>       (ii)  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

Cal. Civ. Code §3246.1(b)(2).

Defendants acquired the CMC Confidential Information as a result of their employment at CMC.  As discussed above, CMC shields this information from its competitors and the public at large.

---

[9] With these concerns in mind, the Confidentiality Agreement requires employees, upon termination of their employment or upon CMC's request, to deliver to CMC "all the Company's property in my possession, including … customer vendor and supplier lists and contact information … [and] any other documents, files or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by the Company."

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION        CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

CMC was expressly concerned with employees and former employees using the Confidential Information to solicit CMC's clients. The Handbook states:

> CMC policy is that the company has invested significant resources to make contact with actual and potential clients. You will be required to sign a non-solicitation agreement to cover these relationships.

Defendants' duty to maintain the secrecy of the CMC Confidential Information has never been in doubt. Defendants have always been well aware that the CMC Confidential Information is an invaluable part of CMC's success, and that it gives CMC an edge over its competitors.

Defendants were uniquely familiar with the Confidentiality Agreement and Handbook. Defendant Verity was in charge of ensuring that employees signed the Confidentiality Agreement, and he represented to CMC that he himself had signed the Confidentiality Agreement (which he himself helped revise and draft), and that Defendant Chang would sign the Confidentiality Agreement upon return from her maternity leave. Verity either lied to CMC about his execution of the Confidentiality Agreement, or he stole the agreement from CMC (along with the other signed employee agreements) when he left. Either way, he and Defendant Chang were without question on notice of their obligations.

Notwithstanding the above, Defendants are using the CMC Confidential Information to solicit CMC's clients and erode CMC's customer base.

All of the evidence points to the fact that in early April 2007 Defendant Verity purposefully disconnected his employee computer from the automatic back-up system in place at CMC. Accordingly, all uses of Verity's computer, including e-mails sent and received to his personal e-mail account, company information downloaded and printed, and other documents copied or created, were not backed up on CMC's information systems.

After Verity's departure from CMC in late April, CMC learned that all of the Confidentiality Agreements signed by the employees were missing. CMC immediately made a written inquiry to Verity about the status of the missing documents, but he never even responded. By stealing all the signed employee agreements from CMC, Defendants clearly hoped to hide the fact that Verity and Chang had either never signed the Confidentiality Agreement, or had signed the Confidentiality Agreement, but no

1  longer wished to be held accountable to their legal obligations under the Confidentiality Agreement, in

2  light of their future plans.

3      In addition, at the time of Verity's departure, Chang began telling her co-workers that CMC

4  would soon be "losing its clients."  Shortly thereafter, Chang voluntarily chose to be terminated from her

5  job simply because she refused to sign a non-solicitation agreement (despite earlier representations that

6  she would sign it).

7      On approximately May 20, 2007, just over a week after Chang's departure, CMC learned from a

8  supplier that Verity and Chang had already begun competing with CMC, and then learned from a top

9  twenty customer (a customer that CMC assigned to Chang while she was at CMC and with whom the

10 week before she had been negotiating a deal on CMC's behalf) that it had just been solicited by Verity

11 and/or Chang, resulting in the customer calling off the pending deal with CMC.

12     Accordingly, unless restrained, Defendants are ready to steal this client, and raid many others

13 using the CMC Confidential Information, to its unfair advantage.

14      Moreover, Defendant's conduct just prior to leaving CMC's employ – disconnecting Verity's

15 computer to hide his activity, stealing the Confidentiality Agreements, bragging of their plans to steal

16 CMC's clients – supports a ruling in CMC's favor.

17     *Greenly v. Cooper*, 77 Cal. App. 3d 382 (1978) and the California Supreme Court case on

18 which it relies, *American Loan Corp. v. California Commercial Corp.*, 211 Cal. App. 2d 515 (1963),

19 are illustrative.  Cooper and Weinberger, employees of Greenly's mortgage loan brokerage business,

20 left Greenly's employ to form their own competing firm. Greenly brought suit alleging that

21 defendants, among other things, "appropriated for their own use certain confidential lists and

22 information regarding customers."  *Id*. at 385.  The trial court issued a TRO and then a preliminary

23 injunction.  The appellate court affirmed.  It rejected defendants' contention that the information

24 contained in Greenly's customer lists was not a protectable trade secret.  It reasoned:

25      [T]he evidence that defendants had a secretary make copies of the lists shortly before
        they left the business, that they misrepresented the purpose of making such copies, and
26      that they took such copies with them when they left permits the inference that the
        information contained in the lists was secret and not readily available elsewhere.  As
27      noted in American Loan in reference to nearly identical circumstances, "if the list was
        easily obtainable there could have been no reason for him to be at pains to take

28

duplicate copies . . . ." [] It would also be reasonable to infer from such evidence and evidence that some of the customers on the list were approached by defendants that defendants took the information intending to use it to the prejudice of their former employer and did so.

*Id.* at 392-93. *See also Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 463 (1978) (injunction granted).

Similarly here, if Defendants intended to compete fairly with Plaintiff and abide by the confidentiality/non-solicitation agreements, there would have been no reason for Defendants to remove and/or destroy such documents. In addition, if Defendants simply planned to use information generally available in the trade to compete against Plaintiff, there would have been no need for Mr. Verity to disconnect his computer from CMC's backup system so that he could work in an unmonitored environment just before his departure.

For the reasons discussed above, CMC is likely to prevail on the merits concerning its trade secret misappropriation claim (as well as its other claims).

**D.    CMC Will Suffer Irreparable Injury if a TRO is Not Granted.**

It is well-established that actual or threatened disclosure of trade secrets can constitute irreparable injury justifying preliminary injunctive relief. *See*, *e.g.*, *Corporate Express Document & Print Management v. Coons*, 2000 U.S. Dist. LEXIS 22243 (C.D. Cal. 2000) (granting preliminary injunction because "intangible injuries, such as damage to a business' goodwill, may support a finding of irreparable injury"). Indeed, UTSA expressly provides for injunctive relief. Cal. Civ. Code §3426.2(a) ("Actual or threatened misappropriation may be enjoined.")

There is no question that CMC will suffer irreparable injury if Defendants disclose or use the CMC Confidential Information. In fact, the Handbook states: "I acknowledge that my violation of the foregoing confidentiality, non-solicitation and non-competition obligations will cause the Company irreparable harm. I agree that the Company is entitled to protection from such violations, including protection by injunctive relief. ..." More importantly, Defendants have already disrupted a key relationship with one of CMC's top clients, solely because Defendants knew that CMC was in negotiations with that client as a result of their employment at CMC.

–17–

1    Defendants have already made arrangements to take one of CMC's largest clients away from

2    it.  If Defendants are allowed to continue using the CMC Confidential Information, more will surely

3    follow, and Defendants will be able to realize their threats of shutting CMC down.

4    **E.**    **The Balance of Hardships Tips Sharply in CMC's Favor.**

5    As discussed above, CMC will suffer severe financial hardships and at minimum reductions

6    in revenue and workforce, if Defendants are permitted to use the CMC Confidential Information to

7    solicit CMC's clients, by exploiting CMC's confidential future plans, pending deals, and pricing to

8    CMC's detriment.  On the other hand, Defendants will endure no just harm if they are temporarily

9    prohibited from soliciting CMC's clients.

10    Despite the fact that CMC's client list at issue exceeds 1200 customers, this is a relatively

11    paltry number compared to the field of potential customers for both CMC and its competitors.  Their

12    universe of clients is virtually limitless.  As noted previously, CMC's customers constitute only .02%

13    of the available market.  Why should CMC be forced to put 15 years of hard work, and the well being

14    of its employees, at risk when Defendants' brand new company can fairly compete by going after

15    hundreds of thousands, if not millions, of customers who have no relationship with CMC?

16    *Gable-Leigh, Inc. v. North American Miss*, 2001 U.S. Dist. LEXIS 25614 (C.D. Cal. 2001) is

17    illustrative.  Gable-Leigh organized and operated the "Miss Junior America Pageant."  Dorris Bevis,

18    Gable-Leigh's manager, eventually decided to launch her own beauty pageant, North American Miss.

19    She sent materials about her pageant to customers with whom she had dealt at Gable-Leigh,

20    prompting Gable-Leigh to assert trade secret misappropriation under UTSA.  The court granted

21    Gable-Leigh's motion for a preliminary injunction, prohibiting defendants "from doing business with

22    those girls who have been wrongfully solicited, and from soliciting individuals whose names appear

23    on Gable-Leigh's customer lists."  *Id*. at *68.

24    The court found that the balance of hardships tipped in Gable-Leigh's favor.  It explained:

25    Gable-Leigh maintains that absent an injunction against use of the customer list, it will
      likely lose a significant portion of its customer base to North American Miss – a direct

26    competitor – and suffer severe financial hardship as a result. Defendants, by contrast,
      will not be precluded from identifying contestants for their pageant if restrained.

27    Gable-Leigh's customer list contains the names of fewer than 10,000 girls who reside

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION       CASE NO. C 07-2748 MHP
FOR TRO AND OSC WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

in the western part of the United States. There are thus hundreds of thousands of potential customers defendants may solicit.

*Id*. at \*67.  *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung*, 2001 U.S. Dist. LEXIS 18270, at \*15 (C.D. Cal. 2001) ("The balance of hardships tips heavily in favor of granting injunctive relief because an injunction merely prohibits Defendants from misappropriating the trade secrets of Merrill Lynch. … An injunction will not prevent the Defendants from continuing their employment in the securities industry, will not interfere with their ability to acquire even a fairly limited number of … the thousands of potential clients in the area, or from working for Smith Barney in the community in which Defendants have chosen to work"); *Liberty Mutual Insurance Co., v. J. Gallagher & Co.*, 1994 U.S. Dist. LEXIS 18412, at \*18 (N.D. Cal. 1994) ("The balance of hardships also tips sufficiently in Liberty's favor.  This group of customers is sufficiently small in relation to the whole of Wickstrom's potential customers that he will not be significantly harmed by being denied the opportunity to compete for their business.  Liberty, on the other hand, faces the potential erosion of a significant portion of its local business").

**F.     Granting a TRO is in the Public Interest.**

Allowing an individual to unfairly use his or her former employer's trade secrets to put the former employer out of business certainly is not in the public interest.  The Supreme Court recognizes that "it is hard to see how the public would be benefited by disclosure of customer lists or advertising campaigns; in fact, keeping such items secret encourages businesses to initiate new and individualized plans of operation, and constructive competition results."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974).  *See also Gable-Leigh*, 2001 U.S. Dist. LEXIS 25614 at \*69 ("The issuance of an injunction on Gable-Leigh's trade secrets claim will promote the public interest because it is in the public interest that trade secret customer lists be protected."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung*, 2001 U.S. Dist. LEXIS 18270, at \*7 ("The court recognizes that there is a strong public interest in favor of protecting trade secrets.")

Public policy dictates that businesses such as CMC be allowed to reap the benefits of the efforts, hard work, and capital that they put into creating and fostering client relationships, determining how to most efficiently and effectively run its business, and accommodate clients'

special needs.  This is particularly true where, as here, the Defendants can still make a very good living in this very industry through their general skills and expertise without reliance on Plaintiff's trade secrets.

Defendants are free to expend their own time, expertise and resources to develop relationships with hundreds of thousands, if not millions, of businesses.  CMC seeks merely to protect its relationships with its own customers, and to not let its former employees unjustly enrich themselves at CMC's expense, as has already occurred.

If Defendants, contrary to their conduct to date, truly wish to compete fairly with CMC, they will suffer no hardship from the requested relief.  Conversely, Plaintiff will have everything to lose if the Court denies the injunction.  Even over the course of the next few weeks, Defendants will have the ability to do substantial damage to Plaintiff in the absence of the requested relief, as Defendants know such things as which deals are in the works with CMC's customers, and CMC's pricing for its customers.  This is why Plaintiff filed suit the very week it learned of Defendants' infractions, and why it immediately brings this application for a temporary restraining order.

Accordingly, Plaintiff respectfully requests that the Court grant the desired relief and set this matter over for a hearing on a preliminary injunction.

Dated:  May 29, 2007                              Respectfully submitted,

                                                  HARVEY SISKIND LLP
                                                  IAN K. BOYD
                                                  SETH I. APPEL


                                                  By:  _____/s/_____
                                                           Ian K. Boyd

                                                  Attorneys for Plaintiff,
                                                  MARK LILLGE d/b/a CREATIVE
                                                  MARKETING CONCEPTS