**EXHIBIT A**

CONFIDENTIAL TESTIMONY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

MARK LILLGE d/b/a CREATIVE )
MARKETING CONCEPTS, )
                            )
        Plaintiff, )
vs. )   No. C 07-02748 MHP
                            )
ANDREW VERITY and CHRISTINA )
CHANG, )
                            )
        Defendants. )
_____)

**CERTIFIED COPY**

**CONFIDENTIAL**

DESIGNATED CONFIDENTIAL

Deposition of

MARK RAYMOND LILLGE

WEDNESDAY, JUNE 6, 2007

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

925-846-8831

Reported by:
DENISE WHEELER, CSR NO. 8254

1

CONFIDENTIAL TESTIMONY

1   the general nature of the product that they bought.
2           So pens would come under the category of writing
3   instruments as I understand it on how our data is compiled.
4   So we could go in and find out who has bought a writing
5   instrument, which would include pens, obviously.
6           MR. WARD:  Q.  Okay.  If you had to identify one
7   key employee creating -- Creative Marketing Concepts who is
8   most knowledgeable about your company's customer list
9   database, who would that person be?
10          A.  Andy -- well, ex-employee.  By a factor of 10 or
11  something, huge.
12          Q.  So Mr. Verity would understand your customer list
13  database, how it works, how it was compiled, better than
14  anybody else?
15          A.  He -- he would have all of the -- or most all of
16  the detailed information.
17          Q.  So is the answer, yes, he would understand how your
18  database was compiled and how it works better than anyone
19  else?
20          A.  I should think so, yes.
21          Q.  Are your customer files, are they physically kept
22  in file cabinets?
23          A.  Yes.
24          Q.  Is there any labeling on the outside of the file
25  cabinet to identify the contents as private or confidential?

CONFIDENTIAL TESTIMONY

```
1    this machine intact, and nobody is re-ghosting it or
2    anything like that?
3            MR. BOYD:  That's -- that's my understanding.
4            MR. WARD:  Okay.
5        Q.  Do you ever yourself ask for your customer list to
6    be printed out for you or reported to you in any particular
7    format?
8        A.  Yes.
9        Q.  In what format do you ask for your customer list to
10   be provided to you?
11       A.  Various ways.  One would be alphabetically.  One
12   would be by sales in descending order.  Another would be by
13   product buys.
14           Those would be a few of the most primary ways I
15   would request that information.
16       Q.  Is there anything about the way that the customer
17   list information is reported to you that you consider to be
18   confidential business information?
19           MR. BOYD:  Are you referring to the arrangement of
20   the customer list?
21           MR. WARD:  Yes.
22       Q.  In other words, is there anything about how you ask
23   for it to be arranged into a report that you consider to be
24   unique and confidential to your business rather than that of
25   your competitors?
```

CONFIDENTIAL TESTIMONY

```
 1      A.  I -- I don't know.
 2      Q.  Would you agree that getting a report of your
 3  customer list in alphabetical order is not something that
 4  would be unique and secret to your organization?
 5      A.  Probably not.
 6      Q.  Would you agree that getting your customer list
 7  arranged in order of gross sales most to least is not
 8  something that would be unique and confidential to your
 9  business?
10      A.  Most likely not.
11      Q.  Would you agree that organizing your customer list
12  into a report based on what types of products they order is
13  not something that would be unique and special to your
14  business?
15      A.  Could be.
16      Q.  In what way?
17      A.  We -- we do a lot of mailers.  And we will
18  sometimes target a specific buying group.  So people that
19  buy pens, we might target them.  Or people that buy other
20  types of products, we might target them for a mailer.
21      Q.  Okay.  Turning to the second item that's identified
22  on the identification of trade secrets, and it states, "The
23  pricing which CMC charges for each specific customer."
24  Where is this pricing information physically maintained?
25      A.  Both in the computer and would be in the hard copy,
```

29

CONFIDENTIAL TESTIMONY

```
 1        Q.  Okay.  And of the four days that you would be in
 2   the office, about how many hours on average would you be in
 3   the office on any given day?
 4        A.  Six to nine.
 5        Q.  Now, getting back to the issue of pricing, is it
 6   correct that there -- when you -- strike that.  Let me back
 7   up.
 8            When you look at a catalog like this Bullet Line
 9   catalog, there are suggested retail prices; is that correct?
10        A.  Yes.
11        Q.  Okay.  And those don't reflect what Creative
12   Marketing Concepts actually pays to the -- pays to the
13   manufacturer for that merchandise; is that correct?
14        A.  There's codes that tell us what the cost is.  And
15   then we get special pricing from some of the supplier
16   vendors of ours.
17        Q.  There are industry standard letter codes in these
18   catalogs with regard to pricing; isn't that correct?
19        A.  Correct.
20        Q.  And they establish a certain percentage of markup
21   for the distributor on these items; isn't that correct?
22        A.  Yes.
23        Q.  And those are industry standards for all
24   distributors who are selling branded merchandise in your
25   business; is that correct?
```

41

CONFIDENTIAL TESTIMONY

```
 1        A.   Yes.
 2        Q.   Okay.  So what about the pricing is different at
 3   Creative Marketing Concepts from the industry standard which
 4   has these coded letters in the catalog which determine what
 5   the markup will be for these items?
 6             MR. BOYD:  You're referring to the pricing that
 7   Creative Marketing Concepts charges its customers, or the
 8   pricing that Creative Marketing pays for -- pays to its
 9   suppliers?
10             MR. WARD:  Let me -- let me back up and be clear.
11        Q.   Let's just take a look at this Bullet Line catalog.
12   Let's see if this is a good one.
13             This has the letters in it, right?  Is that what
14   the Cs and Gs are?
15             MR. VERITY:  The G after that and --
16             MR. WARD:  Q.  Okay.  All right.  If you could,
17   let's take a look at page 106 of this Bullet Line catalog.
18             MR. BOYD:  Do you know what the codes in
19   the catalog --
20             THE COURT REPORTER:  Page what?
21             MR. WARD:  Page 106.
22             THE WITNESS:  Do you mind if I take a second to
23   explain to my attorney what --
24             MR. BOYD:  Why don't we -- we've been going for
25   about an hour, why don't we take a five-minute break if
```

42

CONFIDENTIAL TESTIMONY

```
1       A.   Yes.
2       Q.   Okay.  Do some of your clients inform you that they
3  have a better price available from another distributor?
4       A.   Sometimes.
5       Q.   And so does Creative marketing Concepts --
6            THE COURT REPORTER:  Whoa, whoa.
7            (Pause in proceedings.)
8            MR. WARD:  Okay.  Can we resume?
9            THE COURT REPORTER:  (Nodding head)
10           MR. WARD:  Q.  So I believe the last question and
11  answer is I asked you whether sometimes Creative Marketing
12  Concepts' customers inform you that they have been quoted a
13  better price by a competitor?
14      A.   Yes.
15      Q.   And when a customer asks Creative Marketing
16  Concepts to provide a better price than the suggested retail
17  price that's been quoted to them, what is the procedure for
18  Creative Marketing Concepts, in that situation?
19      A.   So what's your hypothetical?  So we've quoted
20  somebody a job?
21      Q.   Well, let -- let's do this as a hypothetical:
22  Let's say that you've got a customer who wants travel mugs,
23  and you've told him that you can get this customer a
24  thousand of them for $3.25.  The customer says we want to be
25  able to buy it for $3.  We don't want to pay 3.25.
```

```
 1            Is there any procedure within Creative Marketing
 2   Concepts as to how the sales rep is supposed to respond to a
 3   request from a client like that?
 4       A.   Again, we try to price for perfection.  So we would
 5   treat it on a case-by-case basis, as a rule, with a minor
 6   difference like that where the job would still be
 7   profitable.
 8            A lot of times the -- we would give a very fast yes
 9   to the -- to the rep to make that distinction.  Although --
10   to make that -- that discount.  Although we might, in fact,
11   say if the client's asking for that, you know what, let's
12   give them even a better price than that.
13       Q.   What does price for perfection mean?
14       A.   Price for perfection means that you understand all
15   of the -- the influences that you can understand that are
16   coming to bear on that particular job.
17            So, again, is it how motivated is the client to
18   act?  Are any a rush?  Or do they have three months to get
19   the product?
20            Are they --
21       Q.   These -- I'm sorry, go ahead.
22       A.   Are they a client that is not price sensitive, and
23   they only care about good service?  Is there someone else at
24   that client company that might come cross this pricing that
25   could be embarrassing to us because we've charged them one
```

CONFIDENTIAL TESTIMONY

```
1   price, and we've charged the other person at this client
2   firm another price?
3           There's a lot of -- how much do they like us is an
4   important component to determining the price.
5       Q.  These considerations that go into pricing for
6   perfection, does Creative Marketing Concepts have a list
7   somewhere that identifies what the components to pricing for
8   perfection are?
9       A.  We have a first draft, a working draft, that we've
10  introduced at a sales meeting to lay out the key -- the
11  initial key areas that we would want considered relative to
12  a prospect or a new -- or -- or an existing client.
13      Q.  Now, these considerations that go into pricing for
14  perfection, are they developed based on the relationship
15  between the sales rep and the customer contact?
16          MR. BOYD:  To clarify, are you referring to the --
17  the specific points that would be taken into account on --
18  on sort of a case-by-case basis?  Or are you referring to
19  the actual working draft document that Mr. Lillge is
20  referring to.
21          MR. WARD:  I'm not referring to the working draft.
22      Q.  I'm going back to some of the criteria that you
23  identified earlier --
24      A.  Yes.
25      Q.  -- for example, the time sensitiveness of the --
```

49

CONFIDENTIAL TESTIMONY

```
 1    them for $3.20, and you've talked about pricing for
 2    perfection.  Who makes the ultimate decision on whether you
 3    will sell this travel mug to that hypothetical client at
 4    less than the suggested retail price?
 5        A.  So the reps are authorized to sell at catalog
 6    price, as a rule.
 7            The -- if they go off book -- would be one way to
 8    talk about this concept that you're describing -- then at a
 9    certain dollar amount they would be -- and depending on the
10    experience of the rep, that dollar amount changes -- they
11    would be required to talk to their manager.
12        Q.  Okay.  So they have some discretion to go off book,
13    off the suggested retail price in the catalog?
14        A.  Correct.
15        Q.  Within a certain limit?
16        A.  Correct.
17        Q.  And that limit varies from sales rep to sales rep?
18        A.  Correct.
19        Q.  Based on their level of experience and trust that
20    you have in them?
21        A.  Yes.
22        Q.  Okay.  Who determined the amounts by which the reps
23    could go off book in terms of pricing?
24        A.  Management.
25        Q.  Okay.  Who specifically did that?
```

CONFIDENTIAL TESTIMONY

1    A.    That would be Andy and myself.

2    Q.    Okay. And is -- is there a list maintained somewhere that identifies by sales rep the percentage to which they're allowed to go off book in pricing?

5    A.    I'm sure in the notes that we've talked about this that there would be that kind of record. I don't know if there's an actual hard document to that effect that is part of the SOP. But -- but there -- I -- I think there is actually. I think it is in the SOP at what dollar amount they are able to -- that they need to see their manager.

11   Q.    Okay.

12   A.    Or in some memorandum that's been distributed.

13   Q.    Let's assume that the pricing that is being requested by the client is outside the discretion of the manager -- excuse me -- outside the discretion of the sales rep, and the sales rep needs to get management approval to make that sale, what is the procedure for getting authorization to make that sale?

19   A.    The rep would go to the manager and explain the circumstances. And the manager would then, hopefully, make sure that all the right questions were asked so that we're figuring out all the real considerations in the job. And then the manager would coach the rep on a dollar amount at the end of that discussion.

25   Q.    Okay. So the manager might, for example, suggest a

53

CONFIDENTIAL TESTIMONY

```
1    counteroffer at a slightly higher number?
2        A.  Higher than?
3        Q.  Well, let's take the hypothetical of the customer
4    who wants a thousand travel mugs for $3?
5        A.  Yes.
6        Q.  Would one possible occurrence be that the manager
7    saying go back to them at $3.05?
8        A.  Yeah, it's possible.
9        Q.  Okay.  So something that is outside the discretion
10   of the sales rep becomes a discretionary decision of the
11   sales manager; isn't that the case?
12       A.  Yes.
13       Q.  Okay.  There's no template or formula that you use
14   to decide whether you're going to make a certain sale at a
15   certain price, is there?
16           MR. BOYD:  Object to the extent that I believe it
17   misstates the witness' testimony.
18           THE WITNESS:  I'm not sure I understand the
19   question.
20           MR. WARD:  Q.  Okay.  Pricing for perfection is
21   not a formula, is it?
22       A.  I -- I -- I don't know.  It's -- it's not -- I
23   don't know.  I don't know how to classify formula.
24       Q.  Okay.  Pricing for perfection means that someone
25   within the company makes a subjective decision based on a
```

54

CONFIDENTIAL TESTIMONY

```
1    number of considerations; isn't that the case?
2         A.   Yes.
3         Q.   Pricing for perfection does not involve any sort of
4    a template or formula that allows you to input data and
5    determine what the pricing will be, correct?
6         A.   I don't necessarily agree with that.
7         Q.   Okay.
8         A.   There's a lot of real considerations that go into
9    these jobs.  And, again, if the manager is doing -- in this
10   case -- his job right, he should capture those -- those
11   issues.
12        Q.   Okay.  But --
13        A.   Those considerations.
14        Q.   Pricing for perfection, however, requires a manager
15   to make a decision; is that correct?
16        A.   Yes.
17        Q.   There is no system in place that would allow
18   pricing for perfection to occur without a manager exercising
19   his or her discretion; is that correct?
20             MR. BOYD:  Your question pertains to a situation
21   where it's outside the authority of the representative?
22             MR. WARD:  Correct.
23             THE WITNESS:  Yes, I think -- I think understand
24   your question.  And, yes, if I understand it correctly.
25             MR. WARD:  Q.   Okay.  Now, can you estimate for me
```

55

CONFIDENTIAL TESTIMONY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

| | | |
|---|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, | ) ) ) | |
| Plaintiff, | ) | |
| vs. | ) ) | No. C 07-02748 MHP |
| ANDREW VERITY and CHRISTINA CHANG, | ) ) ) | |
| Defendants. | ) ) | |

CERTIFIED COPY

CONFIDENTIAL

VOLUME II

DESIGNATED CONFIDENTIAL

Deposition of

MARK RAYMOND LILLGE

FRIDAY, JUNE 22, 2007

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

925-846-8831

Reported by:

DENISE WHEELER, CSR NO. 8254

143

CONFIDENTIAL TESTIMONY

```
 1                  MARK LILLGE,
 2      having been duly sworn, testified as follows:
 3                   EXAMINATION BY:
 4      MR. WARD:  Q.  Good morning, Mr. Lillge.
 5      A.  Good morning.
 6      Q.  Are you aware of any sales that Creative Marketing
 7  Concept would have obtained from customers because of
 8  anything done by Andrew Verity or Christina Chang?
 9      A.  Can you clarify as to timeframe?
10      Q.  Since they left employment of your company?
11      A.  I can only speculate at this point.
12      Q.  Okay.  So any observations that you would have
13  about potential lost sales to Christina Chang or Andrew
14  Verity would be speculation?
15      A.  Correct.
16      Q.  So as far as you know your business has not lost
17  any money because of the competitive efforts of Christina
18  Chang and Andrew Verity; is that correct?
19      A.  Perhaps.  By deduction I might be able to take
20  exception to that.  But as far as evidence as of right this
21  moment while we're here, no.
22      Q.  In the past month -- let's take May 2007, which
23  would be the last complete month -- has there been any
24  discernible drop-off of sales volume for your business in
25  the prior month?
```

147

```
 1   Christina Chang was one of the top salespeople as Creative
 2   Marketing Concepts?
 3        A.  Yes.  Yes.
 4        Q.  So one of the circumstances your business has had
 5   to deal with over the last couple of months is the loss of a
 6   top salesperson in Christina Chang and the loss of your
 7   operations manager Andy Verity?
 8        A.  Correct.
 9        Q.  And can you attribute, in your mind, what among the
10   discernible drop in sales since their departure is
11   attributable to competitive loss in the marketplace versus
12   simply having lost two key employees who you haven't
13   replaced yet?
14        A.  No -- no way to measure that.
15        Q.  Okay.  Now, I want to turn specifically to
16   something you told me about in terms of when you identify a
17   product out of one of these catalogs for your customers.
18            And one of the things that you told me in the first
19   session of your deposition is that when you write the
20   invoice for that client, you do not identify specifically
21   the type of merchandise.
22            And by that I mean when we went through the example
23   of the Calder mug, you would not identify to the client that
24   it is a Calder mug from the Bullet Line catalog; is that
25   correct?
```