HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
sappel@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone: (415) 354-0100
Facsimile: (415) 391-7124

Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,

Plaintiff,

vs.

ANDREW VERITY and CHRISTINA CHANG.

Defendants.

Case No. C 07-02748 MHP

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**Date: August 27, 2007**
**Time: 2:00 p.m.**
**Court: Honorable Marilyn Hall Patel**

**TABLE OF CONTENTS**

Page


1. CMC Has Protectable Trade Secrets ........ 1

2. CMC Has Taken Reasonable Efforts to Keep Its Confidential Information Secret ........ 4

   A. Defendant Christina Chang's E-Mail Confirms CMC's Efforts to Keep Its Confidential Information Secret ........ 4

   B. Plaintiff Required Its Employees to Sign Nondisclosure Agreements ........ 4

   C. CMC's Employee Handbook Confirms That Its Customer Information is Proprietary Information to be Kept Confidential ........ 5

   D. CMC Has Undertaken Other Reasonable Efforts to Ensure Its Suppliers Maintain the Secrecy of Its Customers and Contacts ........ 5

3. The Balance of Hardships Tips Sharply in Plaintiff's Favor ........ 6

4. Defendants' Conduct Confirms Injunctive Relief is Appropriate ........ 8

   A. The Original Nondisclosure Agreements Are Still Missing ........ 8

   B. Defendant Verity's Efforts to Cover Up His Computer Activity Just Prior to Leaving CMC ........ 8

   C. Defendant Appears to Have Stolen Plaintiff's Customer Artwork ........ 9

   D. Defendants Are Soliciting Plaintiff's Customers, Resulting in Lost Sales to Plaintiff ........ 9

CONCLUSION ........ 11

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Aetna Building Maintenance Co, Inc. v. West*
39 Cal. 2d 198, 205 (1952) .................... 3

*American Credit Indemnity Co. v. Sacks*
213 Cal. App. 3d 622, 631, 636 (1989).................... 4, 6

*Continental Car-Na-Var Corp. v. Moseley*
24 Cal. 2d. 104 (1944) .................... 3

*Courtesy Temporary Service, Inc. v. Camacho*
222 Cal. App. 3d 1278 (1990).................... 3

*IT Corp. v. County of Imperial*
35 Cal. 3d 63, 73 (1983) .................... 6

*Lockwood v. Wolf Corp.*
629 F.2d 603, 611 (9th Cir. 1980).................... 2

*Readylink Healthcare v. Cotton*
126 Cal. App. 4th 1006, 1023 (2005) .................... 8

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*
739 F.2d 1415, 1422 (9th Cir. 1984).................... 6

### RULES

Federal Rules of Civil Procedure, Rule 8(d).................... 2

Federal Rules of Civil Procedure, Rule 65(b).................... 1

### STATUTES

California Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq.* .................... 3

### MISCELLANOUS

Schwarzer, *et al.*, *California Practice Guide: Federal Civil Procedure Before Trial*
§§14:188-189 at 14-60.14-15 (The Rutter Group 2007).................... 2

At the May 31 hearing on Plaintiff's application for a Temporary Restraining Order, the Court enjoined Defendants and ruled that "there is to be no transmission or use of – and defining these terms as broadly as possible – of trade secret information in the pursuing of [Defendants'] own business and in pursuing clients and so forth." The Court further held that Defendants were not to "initiate contact" with CMC's clients until further order of the Court, and that "they are not to solicit customers of CMC" during this time.[1]

The issue before the Court now is whether this existing Temporary Restraining Order should be converted into a Preliminary Injunction Order to maintain the status quo until a full trial on the merits.[2] The arguments in Defendants' Opposition do not in any way support altering the status quo. To the contrary, the evidence that has come to light since the May 31 hearing, including Defendants' own admissions, writings, and testimony, only further confirms the urgency and propriety of continuing the equitable relief.

## 1. CMC Has Protectable Trade Secrets

The CMC trade secrets at the heart of this case revolve around CMC's customer information. This list of customers and contacts, developed by CMC over fifteen years with the devotion of substantial time and effort, and at the expense of several hundred thousand dollars, is the keystone of CMC's success.[3] Tellingly, Defendants do not dispute this point.

In their Answer, Defendants "admit" that "there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through

---

[1] May 31, 2007 Transcript of Proceedings (hereinafter "Hearing Transcript"), 16:5-17:4, attached as Exhibit A to Supplemental Declaration of Ian K. Boyd in Support of Plaintiff's Motion for Preliminary Injunction ("Boyd Supp. Decl.").

[2] As stated in the Court's July 20, 2007 Order continuing the hearing date on this matter to August 27, 2007, the parties have stipulated to continue the Temporary Restraining Order until such time as the Court rules on Plaintiff's application for a preliminary injunction. F.R.C.P. 65(b).

[3] Lillge Decl., ¶¶6-12.

substantial time, effort and expense." [Complaint, ¶9; Answer and Counterclaim, ¶9][4] [Boyd Supp. Decl., ¶3 and Ex. B attached thereto]

Moreover, *Defendants refused to testify in deposition regarding the identity of their own customers, and their respective contacts, purchasing history, preferences, requirements, and other customer information, unless Plaintiff agreed to a protective order*. Defendants went so far as to insist on disclosing their current customers and contacts whom did not originate from CMC on an "Attorneys' Eyes Only" basis.[5]

Defendants cannot have their cake and eat it too. If they so explicitly acknowledge the potential harm that could befall them from this information falling into a competitor's hands, such as CMC, they are estopped from claiming that CMC's customer information should not be afforded similar protections.

There can be no clearer confirmation that CMC's customer information derives substantial independent economic value from not being generally known, and that third parties would obtain economic value from such disclosure, than Defendants' refusal to testify as to their own customer information without a designation of Attorneys' Eyes Only.[6]

---

[4] No additional evidence is required on an allegation where the opposing party admits the assertion against it in a complaint. *See Lockwood v. Wolf Corp.* 629 F.2d 603, 611 (9th Cir. 1980). ("[Defendant's] failure to deny the allegation in its answer to the [Plaintiff's] complaint constitutes an admission. F.R.C.P. 8(d). Therefore, no evidence on this element was required."); *see also Schwarzer, et al.*, *California Practice Guide: Federal Civil Procedure Before Trial*, §§14:188-189 at 14-60.14-15 (The Rutter Group 2007) ("Defendant's failure to deny allegations of a complaint constitutes a judicial admission of the matters alleged (FRCP 8(d)). No additional evidence is required to prove the matters so admitted.").

[5] Boyd Supp. Decl., ¶5.

[6] Under the Northern District's form Protective Order, which the parties signed and filed on June 29, 2007, a party is to designate testimony on an Attorneys' Eyes Only basis only where "the disclosure to another Party or non-party would create a substantial risk of serious injury that could not be avoided by less restrictive means."

Plaintiff's opening brief cited authority confirming that such customer information may qualify as trade secrets under the UTSA.[7] The authority cited by Defendants in response only strengthens Plaintiff's case.

Defendant cites two pre-UTSA cases, *Aetna Building Maintenance Co, Inc. v. West*, 39 Cal. 2d 198, 205 (1952) and *Continental Car-Na-Var Corp. v. Moseley*, 24 Cal. 2d. 104 (1944). Neither supports Defendants' argument.

First, the applicability of these pre-UTSA cases is in question. "The Uniform Trade Secrets Act is meant to codify" these pre-1985 cases by applying a "broader definition" of the term "trade secret" than found under the Restatement of Torts (First) definition, the latter of which was traditionally used for trade secret cases prior to the UTSA's enactment. *Camacho*, 222 Cal. App. 3d at 1287.

Second, to the extent that *Aetna* remains applicable, it only supports Plaintiff's position. That court acknowledged that "[e]quitable protection may be invoked against the subsequent use by a former employee of knowledge of the 'peculiar likes and fancies and other characteristics' of the former employer's customers where such knowledge will aid him in securing and retaining their business. This rule … has also been applied to situations involving knowledge of the customer's desire for specialized information, his preference for certain products, and his buying habits." 39 Cal. 2d at 205. These examples are precisely the kinds of information at issue here, as confirmed by Defendant Chang's own testimony, *infra*.

Similarly, in *Continental Car-Na-Var Corp.*, the court confirmed that "equity will intervene to restrain an employee from divulging confidential information in the course of his employment or using such information to his employer's prejudice. The courts regard as unfair competition, and will enjoin, the use by an employee to the prejudice of his former employer of the confidential information gained by the employee during his prior employment as to the business secrets of such employer." 24 Cal. 2d at 110. That is the relief sought by Plaintiff here.

---

[7] *See, e.g.*, *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990).

**2. CMC Has Taken Reasonable Efforts to Keep Its Confidential Information Secret**

Defendants have failed to provide any evidence in support of any contention that CMC does not undertake reasonable efforts to keep this customer information confidential. To the contrary, Defendants' own writings confirm the existence of CMC's efforts.

**A. Defendant Christina Chang's E-Mail Confirms CMC's Efforts to Keep Its Confidential Information Secret**

As recently as January 31, 2007, while still employed by CMC, Defendant Christina Chang sent an e-mail to Plaintiff's principal Mark Lillge stating that she was "shocked!!!" to come across "2 pages of call-in [information] with tons of pertinent client project/quote info" in a recycling bin, as a "lot of pertinent info was written all over for an important client of ours …. I thought it is mandatory to shred all outdated artwork & paper containing client info."

Ms. Chang's thoughts are correct. She accurately confirmed CMC's company policy on such matters.[8]

**B. Plaintiff Required Its Employees to Sign Nondisclosure Agreements**

Defendants do not dispute that CMC asked its employees to sign nondisclosure agreements, and that they were aware of the existence of these agreements. While the parties do dispute whether Defendants stole the NDAs signed by other CMC employees in a misguided attempt to exculpate themselves, what is relevant for purposes of this analysis is that Defendants were on notice of CMC's efforts. *See, e.g., American Credit Indemnity Co. v. Sacks*, 213 Cal. App. 3d 622, 631 (1989) (reasonable steps to insure the secrecy of a trade secret found where the company required its employees to sign nondisclosure agreements, and the court stated that the employee-defendant's claim that she never signed any such agreement "does not alter our analysis").

---

[8] Supplemental Declaration of Mark Lillge in Support of Plaintiff's Motion for Preliminary Injunction ("Lillge Supp. Decl."), ¶3 and Ex. A attached thereto.

### C. CMC's Employee Handbook Confirms That Its Customer Information is Proprietary Information to be Kept Confidential

CMC's Employee Handbook expressly states that "CMC policy is that the company has invested significant resources to make contact with actual and potential clients. You will be required to sign a non-solicitation agreement to cover these relationships."[9] Regarding the Employee Handbook, Defendant Verity testified: "It was my understanding it applied to everyone's conduct at the company."[10] Defendant Chang testified that while she never took the time to read the entire handbook, she also believed that it applied to all of CMC's employees.[11]

### D. CMC Has Undertaken Other Reasonable Efforts to Ensure Its Suppliers Maintain the Secrecy of Its Customers and Contacts

In addition to instructing its employees both verbally and in writing to keep such information confidential, as evidenced above, CMC also undertakes efforts with its suppliers to ensure that its competitors do not learn what types of products are purchased by CMC's customers. For example, CMC has actively taken steps to preclude its suppliers from displaying samples of CMC customer orders at industry trade shows. Mr. Verity confirmed that he himself had removed such samples at trade shows on behalf of CMC in furtherance of this objective.[12]

CMC also does not permit its suppliers to produce any overruns. Its purchase orders state: "Client does not want over-run pieces to be used and/or distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior written consent." Thus it does not allow its suppliers to place CMC's product orders in these suppliers' catalogs.[13]

Plaintiff undertakes reasonable efforts to maintain the secrecy of this information. Defendants have not submitted any evidence to the contrary. Moreover, Defendant Chang's own e-mail confirms

---

[9] Ex. A. to Lillge Decl.

[10] Deposition of Andrew Verity ("Verity Depo."), Vol. I, 73:1-5.

[11] Deposition of Christina Chang ("Chang Depo."), 163:18-25.

[12] Verity Depo., Vol. I, 126:16 – 127:10.

[13] Lillge Supp. Decl., ¶¶4-5 and Ex. B and C thereto.

the existence of these efforts and policies by CMC, and Defendants' knowledge of same. CMC has met its burden to establish protectable trade secrets.

**3. The Balance of Hardships Tips Sharply in Plaintiff's Favor**

"The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause." *IT Corp. v. County of Imperial*, 35 Cal. 3d 63, 73 (1983). *See also Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (on a preliminary injunction, trial court is to exercise its discretion "in such a way as to minimize the risk that a litigant will suffer an irreparable loss of legal rights in the period before final resolution of that dispute.").

Plaintiff, with some assistance from Defendants, has met its evidentiary threshold. The parties also agree that Defendants had access to this information in the course of their job duties while employed by CMC.[14]

The hardship to Plaintiff if Defendants are not enjoined from soliciting its customers and contacts, and exploiting the customer-specific information, is apparent. It is the same hardship that caused Defendants to insist on an Attorneys' Eyes Only designation regarding their own customer information. Defendants know the customers of CMC, the contacts at these customers, their purchasing history, likes and dislikes, times of year they wish to purchase items, the types of items they typically purchase, and typical budget allotted for such purchases.

For example, when Ms. Chang left CMC, she advised her employer of certain customer information that she had developed over time in servicing her accounts, such as "buyer characteristics," and "who is the key buyer, what do they like?" To cite just one instance, Ms. Chang advised that based on her interactions with a certain customer, and her familiarity with its purchasing

---

[14] Defendants contend that Defendants were responsible for being two of CMC's top sales representatives while employed by CMC. First, these accounts were handed down to Defendants by CMC. Moreover, "the fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue. Providing personal service to a customer whose identity is a trade secret does not thereafter render that customer fair game. In fact, it is against those very employees who personally service such customers that employers are most in need of protection." *American Credit Indemnity Co*, 213 Cal. App. at 636.

history, this customer would likely have a need to place an order in June that would be "easily $15,000. It's a no-brainer."[15] Provided, of course, that one knows of the customer's need for such an order and the specifics thereof, and knows at that time. This is just one example of the type of information, and its value, at issue in this litigation.

Defendants will critically and irreparably damage Plaintiff's business if they are permitted to appropriate such trade secrets. As the Court stated at the May 31 hearing: "Once the cat is out of the bag, you can't get it back in … . [O]nce the damage is done, it's too late to try to recoup it or do something about it after the fact."[16]

Conversely, Defendants have offered no evidence of any hardship if the Court maintains the status quo. Defendants' counsel offers only a cursory statement in the Opposition that "the ability of Verity and Chang to earn a living would be harmed by the injunction sought by Plaintiff." [Opposition, 3:4-6] However, neither Defendant testifies in his or her declaration to this effect. Defendants offer no other documentation or evidence on this point, despite having now been enjoined in this manner for two months. Moreover, it is Defendants' position that they will suffer no hardship whatsoever if enjoined.

Defendant Verity testified in his declaration that he had "reviewed Plaintiff's Identification of Trade Secrets ("Identification") submitted by Plaintiff in this action. I have not used any of the purported trade secrets identified in my new business."[17] When asked at his deposition why he had not used any of the purported trade secrets, Mr. Verity replied: "I think they're irrelevant to my business."[18]

If Mr. Verity's testimony is true, then the preliminary injunction will have no impact on Defendants. Conversely, if Mr. Verity provided false testimony under oath here, it is further

---

15 Chang Depo., 46:22 – 48:16.

16 Hearing Transcript, 16:18-23, Ex. A to Boyd Supp. Decl.

17 Verity Decl., ¶6.

18 Verity Depo., Vol. I, 144:15 – 146:4.

confirmation that Defendants pose an even greater risk to CMC's business, and Defendants should be enjoined. *See Readylink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1023 (2005).

**4. Defendants' Conduct Confirms Injunctive Relief is Appropriate**

There are several instances regarding Defendants' conduct which further give rise to serious questions and support injunctive relief.

**A. The Original Nondisclosure Agreements Are Still Missing**

Plaintiff's Motion detailed Plaintiff's discovery of the missing nondisclosure agreements at the time when Defendants left CMC.[19] At his deposition, Mr. Verity suggested that "they just need to look harder" for the missing documents in the filing cabinet.[20] To date these agreements have still not been found, despite the fact that CMC has looked "very hard" for these documents.[21]

**B. Defendant Verity's Efforts to Cover Up His Computer Activity Just Prior to Leaving CMC**

Plaintiff also detailed in its opening brief the mysterious occurrence of Mr. Verity's computer becoming disconnected from the backup server. In his deposition, Mr. Verity attempted to (falsely) play off this situation as quite common at CMC. Mr. Verity testified:

> [T]he back up would fail frequently. They were so bad, every time I saw Dr. Beery, I would ask him to check the backup, which he would do every time he visited the office every one to two weeks, and probably 25 to 30 percent of the time he would report there was such a disconnection. It was a very common occurrence.
> Q: So it's your belief that Dr. Beery discovered on several occasions computers that were disconnected from the backup in the same fashion?
> A: Yeah.[22]

Mr. Verity is incorrect. In his supplemental declaration, Dr. Beery testifies that the disconnect at issue was a one-of-a-kind occurrence, done deliberately. As a result, any computer activity by Mr.

---

[19] Plaintiff's Memorandum in Support of Its Ex Parte Application for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue, 8:10-14.

[20] Verity Depo., Vol. I, 124:2.

[21] Lillge Supp. Decl., ¶6.

[22] Verity Depo., Vol. I, 134:3-14.

Verity which he deleted on his computer prior to Dr. Beery's discovery of the disconnection would not have been backed up by CMC's server once Mr. Verity's computer was re-connected.[23]

**C. Defendant Appears to Have Stolen Plaintiff's Customer Artwork**

Plaintiff retained a forensic expert to review the Mac Mini hard drives used by Defendants while CMC employed them. This expert's analysis has confirmed that on the morning of April 11, 2007, Mr. Verity's next-to-last day at CMC, he downloaded approximately 240 CMC customer art files onto his computer over the course of that morning.[24]

This customer artwork is typically provided by the client to CMC in confidence. There is absolutely no legitimate work reason for Mr. Verity to be accessing and retrieving this information in general, and certainly no reason for him to do so just prior to his departure.[25] However, if Mr. Verity wished to compete unfairly against CMC regarding its clients, this artwork would of course prove useful.[26]

**D. Defendants Are Soliciting Plaintiff's Customers, Resulting in Lost Sales to Plaintiff**

At the May 31 hearing, the Court advised Defendants of the gravity of this matter by advising them that they must keep a meticulous paper trail regarding their pre-existing contacts with CMC's customers:

> They had just better be able to have business records and accounts that they can account for all of this at the end of the day, if, in fact, it turns out those representations are not true, so they better keep good books and records. The

---

[23] Supplemental Declaration of Dr. Richard Beery in Support of Plaintiff's Motion for Preliminary Injunction, ¶¶2-7. Dr. Beery's expertise is not in dispute. As Defendant Chang testified regarding this issue, "nobody would know other than Dr. Beery." Chang Depo., 181:21.

[24] Declaration of Jon Berryhill in Support of Plaintiff's Reply Brief Re Motion for Preliminary Injunction, ¶6.

[25] Mr. Verity confirmed in his deposition that after receiving his termination notice on April 6, he transitioned his accounts to others in the office, further reducing the need for him to access any client artwork during this time. Verity Depo., Vol. I, 99:4-100:14.

[26] Lillge Supp. Decl., ¶8. In his deposition, Mr. Verity could not explain why such activity occurred on his computer. Verity Depo., Vol. I, 186:19-187.4

> failure to do so will, in fact, be interpreted against them when in doubt. So they're sitting here, and I trust that they will understand that.[27]

Despite the Court's warning, Defendants have taken a very broad view not of Plaintiff's trade secrets, as instructed, but rather as to what does not constitute solicitation. In her declaration, Defendant Christina Chang testifies: "On behalf of our new business, I have not solicited any customer of CMC that did not contact me first. For example, Chevron Federal Credit Union contacted me after I was fired by CMC. In response to that contact, I offered to sell products to Chevron Federal Credit Union."[28]

First, as Ms. Chang's own declaration confirms, she was actually contacted by Chevron while still employed at CMC. Second, this "contact," as detailed in Ms. Chang's original declaration, was simply Ms. Lee asking Ms. Chang to call her in response to Mr. Chang's e-mail notifying Ms. Lee that it was her last day at CMC.[29] This was the contact to which Defendants, in response, "offered to sell products to Chevron Federal Credit Union." This contact from Ms. Lee, while CMC still employed Ms. Chang, was not a request from Ms. Lee that Defendants' company provide Chevron with a quote or otherwise do business with it.

Ms. Chang even had the temerity to send unsolicited product samples to Ms. Lee on behalf of Defendants regarding the same project for which Ms. Chang had been working with Chevron Federal Credit Union while at CMC. Ms. Chang only knew of this specific customer need and potential $20,000 order because she had been servicing this account (an account provided to her by CMC), for this specific project, while at CMC. When asked if Ms. Lee had requested that Ms. Chang send her these samples, Ms. Chang testified that Ms. Lee "didn't ask me" but "[*s]he didn't not ask me to either*" (emphasis added).[30] As a result of Defendants' interference, Plaintiff lost the pending sale.

It is extremely alarming that Defendants appear to simply equate any response to their notification, no matter how benign, as an invitation to solicit, or that they believe that they can solicit

---

[27] Hearing Transcript, 20:25 – 21:6.

[28] Chang Decl., ¶5.

[29] Ex. E to Boyd Supp. Decl.

[30] Chang Depo., 185:5-14.

CMC accounts provided that the contact "doesn't not ask them to" be solicited. Such conduct would be in violation of the Court's Order, especially where any failure on their part to fully document their contacts with CMC's customers will "be interpreted against them when in doubt."[31]

**CONCLUSION**

Plaintiff's customer information constitutes trade secrets. Defendants' own admissions and writings, coupled with their own insistence that *Defendants'* customer information be maintained as confidential, only confirm this fact. As evidenced in part by Ms. Chang's e-mail, CMC's Employee Handbook, and CMC's Nondisclosure Agreement, Plaintiff took reasonable steps to maintain this information as confidential, and Defendants were on notice of such efforts.

Defendants contend that the trade secrets at issue are "irrelevant" to their business. Accordingly, they will incur no hardship if enjoined until a full trial on the merits. They are free to prospect among a huge potential client base that has nothing to do with CMC. Conversely, the harm to Plaintiff is irreparable if Defendants are not enjoined.

Defendants have every right to earn a fair living. But it must be a fair one.

Dated: July 30, 2007

Respectfully submitted,

HARVEY SISKIND LLP
IAN K. BOYD
SETH I. APPEL

By: /s/
Ian K. Boyd

Attorneys for Plaintiff,
MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS

---

[31] Plaintiff will issue subpoenas and otherwise take the necessary third-party discovery regarding Defendants' contacts with all of the applicable CMC customers to confirm the extent of Defendants' conduct. Should Plaintiff confirm that Defendants have been soliciting CMC's customers, despite their representations to the contrary, then Plaintiff will seek appropriate relief, including sanctions for contempt.