CHANDLER, WOODS, HARRINGTON & MAFFLY
RICHARD HARRINGTON (Bar #28099)
One Maritime Plaza, 4th Floor
San Francisco, CA 94111
Telephone: (415) 421-5484
Facsimile: (415) 986-4874

SHARTSIS FRIESE LLP
ROBERT CHARLES WARD (Bar #160824)
One Maritime Plaza, Eighteenth Floor
San Francisco, CA 94111
Telephone: (415) 421-6500
Facsimile: (415) 421-2922
Email: rward@sflaw.com

Attorneys for Defendants
ANDREW VERITY and CHRISTINA CHANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Defendants. | Case No. C 07-02748 MHP<br><br>**SUPPLEMENTAL DECLARATION OF ANDREW VERITY IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: August 27, 2007<br>Time: 2:00 p.m.<br>Dept: 15, Hon. Marilyn Hall Patel |

I, ANDREW VERITY, declare as follows:

1. My name is Andrew Verity.

2. I have read the reply papers, including the supplemental declarations, of Plaintiff Mark Lillge dba Creative Marketing Concepts ("Plaintiff" or "CMC"). I have the following observations.

3. In case it was not clear enough in my previous declaration, my wife and I will have a very difficult time earning a living if the preliminary injunction sought by Plaintiff is granted. We are depending on our income from our new business, Branding Boulevard, to support

- 1 -

ourselves and our child. Christina and I were both fired on relatively short notice. Given our experience in the promotional products industry, the best opportunities for both of us are in that industry. When I learned I was being fired, I applied for employment with a number of Bay Area companies. I have received no job offers. For Christina Chang and I and our young child to be able to afford to remain living in the Bay Area, we need to be able to operate Branding Boulevard, with the same free and open access to the marketplace as other businesses in the promotional products industry.

4. The supplemental declarations regarding my office computer at CMC remain red herrings. Dr. Beery claims that the back-up could only have failed by a deliberate human act. The reality was that the back-ups would frequently fail at CMC and he could not explain why. In December 2004, I lost my whole computer hard drive. The back-up Dr. Beery installed failed to back it up. Dr. Beery was unable to explain why his system failed. In the second half of 2006, Ms. Chang's email program lost its "sent mail" data on three separate occasions. On the first occasion, no back-up was available. Dr Beery said he did not know why both the computer had failed and why the back-up failed. In the fall around late August/ September, the same thing happened again. On that occasion, Dr Beery was able to restore data that was approximately 2 months out of date despite that the fact the back-up was supposed to back-up weekly. The back-up system Dr. Beery installed was supposed to by reliable instead it was so unreliable that I took to asking Dr. Beery to check its functionality every time I saw him. Dr. Beery's declarations have proven only that he does not know why the back-up failed, as was the case on a frequent number of other occasions. Additionally Dr. Beery fails to note that the back-up system was password protected. I never had access to the passwords that I would have needed to "disconnect" my computer from the back-up system.

5. It should also be noted that the issue with the back-up was discovered on April 5. I was terminated on April 6. Until the afternoon of April 6, I was under the understanding that Mr. Lillge's promise of employing me through the whole year would hold. Plaintiff has tried to make relevance about the timing of the back-up incident being so close to my leaving the company. In fact, it was before I learned of my termination so the timing can only help prove my

- 2 -

Case No. C 07-02748 — SUPPLEMENTAL DECLARATION OF ANDREW VERITY IN OPPOSITION TO MOTION FOR TRO

point that the issue of the back-up system is pointless.

6. It should also be understood what information was on my computer. It contained mailing lists, business plans and emails. Dr Beery earlier declared that it contained transactional data. That was not the case. All transactions were held on the accounting system which was located in the bookkeeper's office and in the paper files. Mr. Boyd has claimed that the back-up system monitored employees. This was incorrect. In fact, when the back-up system worked, it made a copy of the files on everyone's computer every Saturday. The back-up therefore provided a once-a-week snapshot rather than a monitoring system.

7. It is a red herring to claim that the failure of the back-up is of any relevance. I have freely admitted that, of the information CMC is claiming as trade secrets, I had some mailing lists and business plans in my possession on my home computer. At the request of CMC, I deleted all computer data on my home computer. The claim that I disconnected the back-up to steal information that was already legitimately in my possession does not stand up to scrutiny.

8. To further reiterate, I did not take any CMC computer data with me. At the request of CMC, I deleted all CMC computer data on my home computer. I am not in possession of a single computer file of any kind from CMC – no mailing list, no artwork, not a single byte of data. The statement that my computer system was somehow "disconnected" from CMC's automated backup system means nothing. So what? There is no evidence that I copied CMC computer files, or emailed them outside my office – because I did not do so.

9. The declaration of Jon Berryhill is equally as meaningless. CMC has paid this computer forensics expert to look at my computer. If I had taken CMC data presumably Mr. Berryhill would have found evidence of copying or transmitting on my office computer. Mr. Berryhill's declaration says nothing to that effect. Rather, he states only that some artwork was downloaded to my CMC office computer – the computer that I left behind with CMC. I did not download any such artwork. Where am I supposed to have downloaded it from? All other computers and networks in the office were password protected. CMC changed the passwords so that I stopped having access to any data.

10. Furthermore, such artwork is not claimed to be a trade secret by CMC on its

- 3 -

| Case No.<br>C 07-02748 | SUPPLEMENTAL DECLARATION OF ANDREW VERITY IN<br>OPPOSITION TO MOTION FOR TRO |

1  disclosure of trade secrets. Nor could it be claimed as a trade secret, because such downloaded
2  artwork is available in the public domain. Corporate logos and other artwork are widely available
3  for purchase over the internet. In short, the only evidence offered by these purported computer
4  experts is that I <u>might</u> have been able to take data but there is absolutely no evidence offered by
5  them that I did take data. Given that I declare under penalty of perjury that I took no CMC
6  computer data, I do not understand how the Court can find the declarations of Dr. Beery and Mr.
7  Berryhill relevant or persuasive.

8        11.     The temporary restraining order has seriously hindered my new business, Branding
9  Boulevard, by preventing us from initiating contact with professional contacts whom I have
10 cultivated over the years simply because they are known CMC customers. CMC's customers are
11 concentrated in the Bay Area and represent a substantial percentage of the Bay Area market for
12 promotional merchandise. In their request for a preliminary injunction, Plaintiff stated that the
13 potential customers for promotional products "number in the hundreds of thousands." In fact,
14 promotional products are typically sold to customers in a local geographical area. At his
15 deposition, Mr. Lillge stated that at least 75% of CMC's customers are in the Bay Area. I
16 recently purchased a mailing list for purposes of a generic mailer and discovered that the number
17 of customers with revenue of over $1 million is less than 10,000. Additionally, many customers
18 are locked in to other vendors. This makes the percentage of customers that CMC has in the local
19 marketplace as very significant.

20       12.     Additionally, many of CMC's customers could be one-off sales where the
21 customer remains loyal to other vendors. Moreover, the larger customers at CMC all either used
22 or had access to multiple vendors. The temporary restraining order prevents us from earning a
23 living by competing on business that CMC is not currently enjoying.

24       13.     Branding Boulevard remains a small and struggling business and may be destroyed
25 altogether if the temporary restraining order becomes a preliminary injunction. Based on other
26 actions taken by Mark Lillge, destroying our fledgling business appears to have been the goal of
27 Plaintiff and this litigation from the start.

28       14.     Mr. Lillge wrote a letter to a number of the suppliers in the industry. A copy of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 4 -

Case No.
C 07-02748

SUPPLEMENTAL DECLARATION OF ANDREW VERITY IN
OPPOSITION TO MOTION FOR TRO

one of these letters is attached as Exhibit A. Mr. Lillge followed up the letters to many suppliers with telephone calls. For example Mr. Lillge told the president of Custom HBC that he should not do business with us. These calls have undoubtedly damaged our business. A customer service rep at Sabina refused to quote us on business despite the fact that it was an order for a client that had never purchased from CMC. We had to elevate the issue to the sales manager. Mr. Lillge is trying to convince suppliers not to sell merchandise to us. First, the identity of CMC's suppliers is no secret, as I discussed in my previous declaration. Furthermore, absolutely no trade secret information could be involved in dealings with suppliers. They are third parties to CMC, anything suppliers know could not be considered a CMC trade secret. There are no nondisclosure agreements in place between CMC and its suppliers. The majority of plants believe that the artwork and information they hold is owned by the end customer and not the distributor. As such they will release the artwork to another distributor with a letter from the end customer and will return the printing screens to the end customer upon request. This is a common practice in the industry and was explained to me by Mr. Lillge when I joined CMC.

15. In the plaintiff's reply brief it is claimed that CMC does not permit its suppliers to produce any overruns. This is a factually incorrect statement. On CMC's purchase order a large box with the title "Please mail samples" is present. It was CMC's practice on many of its jobs to order overruns. I would estimate this happened on 30-50% of orders. These pieces would often go on public display at CMC's showroom at 572 Market Street, San Francisco. Additionally samples would be mailed to customers and prospects interested in similar products. Until recently CMC even displayed such pieces in its showroom window on Market Street. CMC therefore did not treat these products as a trade secret. It is misleading to claim that it did.

16. It is hard for me to understand how Plaintiff can claim that samples produced by vendors could ever be secret. Marketing items by their nature are designed for public distribution. For example, one job we did at CMC was to produce over 400,000 sticky notes that went on the front of the San Francisco Chronicle newspaper. I am sure that many competitors saw this piece.

17. Mr. Lillge's communications with suppliers in the industry seems simply to be an

attempt to strong-arm Branding Boulevard out of business. That he is misusing this litigation in furtherance of that goal is demonstrated by the aggressive overstatement of the terms of the Court's temporary restraining order.

18. Mr. Lillge is also trying to strong-arm customers into not purchasing from us, which is exactly why our attorney asked for a protective order in connection with our disclosure of our limited number of customers. Branding Boulevard is a new business, with only around 30 customers at this time. We do not believe the identity of our customers is a trade secret. But we are in a position in which a Court order prevents us from profiting from long-standing professional contacts if those contacts were ever CMC's customers. CMC has a dominant market share of Bay Area customers, numbering well over a thousand, with whom we are not allowed to initiate contract, while there is no reciprocal restriction on CMC contacting our small number of customers. This leaves us very vulnerable while the temporary restraining order remains in place. That is why, as a matter of fairness, our counsel asked for a protective order before allowing me to disclose the names of our customers.

19. Our concern seems to have been justified. Mr. Lillge has contacted at least one person about whom I testified at my deposition. On August 1, Mr. Lillge called Heidi Hua, of Federal Occupational Health, whom Lillge learned was a customer of ours at deposition. Ms. Hua told me that Mr. Lillge stated that we were not allowed to contact her and questioned her as to why she would want to do business with us over CMC. His conversation with the customer violates the stipulation that his lawyer agreed to at our deposition, that Mr. Lillge would not specifically target customers he learned about during from the deposition to target them back for the benefit of CMC. These conversations come on top of conversations Mr. Lillge is known to have had with other of our customers where he misrepresented the situation. For example, he told a contact at Bingham McCutcheon that Ms. Chang's visa ran out and she had to leave the country. He repeated this claim in several phone conversations. With only 30 customers at this time, Mr. Lillge would find it far easier to act to destroy our business than anything we could do against CMC, and appears to be attempting to do exactly that.

20. In his reply brief Plaintiff continues to claim that the company NDA agreements

- 6 -

Case No. C 07-02748 — SUPPLEMENTAL DECLARATION OF ANDREW VERITY IN OPPOSITION TO MOTION FOR TRO

are missing. I once again reiterate that I was never asked to sign an NDA nor signed one. The agreements were in the filing cabinet by my desk when I stopped work at CMC.

21. On May 1, Bruce Molloy asked Christina to sign an agreement with non-competition and non-disclosure provisions and told her she would be fired if she did not sign it. On May 2 Mr. Molloy wrote to me asking where the original CMC NDA agreements were. I do not know why Plaintiff is now claiming that they only asked Christina to sign a new NDA because they could not find the old ones and I did not respond to their letter. I did not receive the request from them until several days after they had threatened to terminate Christina for not signing a new agreement.

22. It is not clear to me why Mr. Lillge is concerned with Branding Boulevard as a competitor. He made the decision to terminate both Christina Chang and myself in full knowledge that CMC would lose sales because of this even if we did not stay in the industry.

23. The reality of the marketplace is that customers are loyal to the sales rep. CMC had a motto, which was "people buy from people they like and respect, in that order". When a sales rep leaves for any reason, the customer's loyalty is to their next favorite sales rep, who will most likely be with a different distributor.

24. For example, when Ms. Chang sent out the email announcing her departure she received a response from Celine Rose at Delta Dental stating, "If they fired you or laid you off we won't use them anymore." Delta Dental had multiple distributors.

Executed this 10th day of August 2007 at Berkeley, California.

*/s/ Andrew Verity*
ANDREW VERITY

7475\001\RWARD\1451722.3