1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
sappel@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California  94111
Telephone:  (415) 354-0100
Facsimile:    (415) 391-7124

Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Defendants.<br><br>———————————————<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Counterclaimants,<br><br>v.<br><br>MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, and DOES 1-10,<br><br>Counterdefendants. | Case No.  C 07-02748 MHP<br><br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**[FED. R. CIV. PRO. 56]**<br><br><br>**Date:    March 3, 2008**<br>**Time:   2:00 p.m.**<br>**Court:  Hon. Marilyn Hall Patel** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

CONCISE STATEMENT OF UNDISPUTED FACTS ................................................. 2

    A. CMC ................................................................................................................... 2

    B. Defendants ......................................................................................................... 5

ARGUMENT ................................................................................................................. 7

    I.    CMC DID NOT WRONGFULLY TERMINATE DEFENDANT CHANG
           PURSUANT TO SECTION 16600 BECAUSE CMC WAS TAKING
           NECESSARY MEASURES TO PROTECT ITS TRADE SECRETS ........................... 8

          A. The Nondisclosure Agreement Was Necessary
             To Protect CMC's Trade Secrets ..................................................................... 8

          B. The CMC Confidential Information Constitutes
             A Trade Secret under Section 3426.1 .............................................................. 9

              1.  Defendants Admit that CMC Meets the First Component of the UTSA ........ 9

              2.  CMC Takes Reasonable Efforts Under the Circumstances
                   To Maintain the Secrecy of the CMC Confidential Information .................. 10

    II.   DEFENDANT CHANG IS NOT ENTITLED TO
           ANY ADDITIONAL VACATION PAY BECAUSE
           SHE FAILED TO PROVIDE CONSIDERATION ......................................... 13

    III.  MS. CHANG'S TERMINATION FROM CMC DOES NOT
           ESTABLISH AN UNFAIR BUSINESS PRACTICE ................................... 14

    IV.  DEFAMATION ............................................................................................ 14

          A. CMC's June 27, 2007 Letter to Suppliers ................................................... 15

          B. CMC's September 7, 2007 E-mail to Customers ......................................... 16

          C. Alleged Verbal Misrepresentations to Defendants' Customers ................... 16

    V.    COUNTERCLAIMANTS FAIL TO MEET THEIR BURDEN OF PROOF
           REGARDING THEIR CLAIMS FOR INTENTIONAL INTERFERENCE
           WITH PROSPECTIVE ECONOMIC ADVANTAGE ................................. 17

    CONCLUSION ........................................................................................................ 20

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT    Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

1

**TABLE OF AUTHORITIES**

Page(s)

2

**Cases**

3

*American Credit Indemnity Company v. Sacks*

4
213 Cal.App.3d 622, 631 (Cal. Ct. App. 1989) ............................................................... 12

5

*American Paper & Packaging Products, Inc. v. Kirgan*

6
183 Cal. App. 3d 1318, 1323-1324 (1986) ...................................................................... 9

7

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*
47 Cal. App. 4th 464, 476 (1996) ............................................................................ 18, 19

8

9

*Barnes-Hind, Inc. v. Superior Court*
181 Cal.App.3d 377, 382 (Cal. Ct. App. 1986) ............................................................. 14

10

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*

11
52 Cal.App.4th 867, 880 (Cal. Ct. App. 1997) ......................................................... 19, 20

12

*Blank v. Kirwan*

13
39 Cal. 3d 311, 330-31 (1985) ..................................................................................... 18

14

*Celotex Corp. v. Catrett*
477 US 317, 322-24, 106 S.Ct. 2548, 2552-53 (1986)................................................... 7

15

*Courtney v. Canyon Television & Appliance Rental, Inc.*

16
899 F.2d 845 (9th Cir. 1990)......................................................................................... 16

17

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*

18
11 Cal. 4th 376, 392-93 (1995) ................................................................................... 18

19

*Dow v. River Farms Co.*

20
110 Cal. App. 2d 403 (1952)........................................................................................ 13

21

*Forsher v. Bugliosi*
26 Cal. 3d 792 (1980).................................................................................................. 17

22

*Fowler v. Varian Assocs., Inc.*

23
196 Cal.App.3d 34 (Cal. Ct. App. 1987)........................................................................ 8

24

*Gordon v. Landau*
49 Cal.2d 690, 694 (1958) ............................................................................................ 8

25

26

*Heffelfinger v. Electronic Data Systems, Corp.*
2008 U.S. Dist. LEXIS 5296, *67 (C.D. Cal. Jan 7, 2008)............................................ 14

27

28

–ii–

*Hollingsworth Solderless Terminal Co. v. Turley*
  622 F.2d 1324, 1338 (9th Cir. 1980) ........................................................... 8

*Korea Supply Co. v. Lockheed Martin Corp.*
  29 Cal.4th 1134, 1153-54, 1164-65 (2003) .................................................. 18

*Lockwood v. Wolf Corp.*
  629 F.2d 603, 611 (9th Cir. 1980) ................................................................ 9

*Lujan v. National Wildlife Federation*
  497 U.S. 871, 885, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990) ..................... 7

*MAI Systems Corporation v. Peak Computer, Inc.*
  991 F.2d 511, 521 (9th Cir. 1993) .............................................................. 12

*Matull & Assocs., Inc. v. Cloutier*
  194 Cal.App.3d 1049, 1054-55 (Cal. Ct. App. 1987) .................................... 8

*Morlife, Inc. v. Perry*
  56 Cal.App.4th 1514 (Cal. Ct. App. 1997) ............................................. 10, 12

*Passante v. McWilliam*
  53 Cal. App. 4th 1240, 1249 (1997) ........................................................... 13

*Simmons v. Cal. Institute of Technology*
  34 Cal. App. 2d 318 (1949) ......................................................................... 13

*Smith v. Maldonado*
  72 Cal. App.4th 637, 646 (Cal. Ct. App. 1999) .......................................... 14

*Walker v. Boeing Corp.*
  218 F. Supp. 2d 1177 (C.D. Cal. 2002) ...................................................... 17

*Wilson v. City of Zanesville*
  954 F.2d 349, 351 (6th Cir. 1992) ................................................................ 7

*Xerox Corp. v. Precision Transp. Co.*
  2004 U.S. Dist. LEXIS 18046, *4 (N.D. Cal. Sept. 3 2004) ......................... 10

*Youst v. Longo*
  43 Cal.3d 64, 71 (1987) .............................................................................. 18

## Rules

Rule 801(d)(2) of the Federal Rules of Evidence ........................................... 10

Rule 8(d) of the Federal Rules of Civil Procedure ...................................... 9, 10

–iii–

Rule 56 of the Federal Rules of Civil Procedure ........................................................ 7

**Statutes**

California Business and Professions Code § 16600 ........................................................ 8, 13

California Business and Professions Code § 17200 ........................................................ 1, 14

California Uniform Trade Secrets Act,
 California Code of Civil Procedure § 3426, *et seq.* .......................................... 9, 10, 13

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

Case No. C 07-02748 MHP

**INTRODUCTION**

Plaintiff and counterclaim defendant Mark Lillge d/b/a Creative Marketing Concepts ("CMC") moves for summary judgment as to certain counterclaims asserted by defendants and counterclaimants Andrew Verity and Christina Chang ("Defendants").

Summary judgment is appropriate regarding:

- Christina Chang's claim for wrongful termination because it is not a violation of public policy to terminate an employee who refuses to sign a noncompetition agreement where the employer seeks to protect trade secrets. For these same reasons, summary judgment is appropriate regarding Christina Chang's claim for violation of Business and Professions Code Section 17200 seeking to enjoin such business practices.

- Christina Chang's claim for unpaid vacation pay, and related waiting time penalties, because she did not provide any consideration in exchange for this alleged promise of additional vacation time from CMC.

- Defendants' claims for defamation because not only do the alleged oral statements both fail to give rise to a claim for slander and constitute merely hearsay, but Defendants have failed to establish any damages or loss regarding these alleged statements.

- Defendants' claims for intentional interference with prospective economic advantage, because Defendants cannot point to any actual disruption of a business relationship for which they had the actual expectancy of an actual future economic benefit, nor can they point with the required degree of specificity to any economic harm arising from such alleged conduct.

No genuine issue of material fact exists as to these counterclaims. The Court may and should decide these matters in CMC's favor as a matter of law.

///

///

///

///

1

## CONCISE STATEMENT OF UNDISPUTED FACTS

2      CMC moves for summary judgment as to Defendants' Fifth, Sixth, Seventh, Eighth, Tenth

3   and Eleventh causes of action against CMC.[1]

4   **A.    CMC**

5      Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("CMC") is a California sole

6   proprietorship with its principal place of business on the 500 block of Market Street in San Francisco,

7   California.  CMC is an industry-leading full-service advertising specialty and corporate apparel firm

8   that sells businesses goods branded with the latter's corporate logo.  Such goods may be coffee cups,

9   pens, shirts, or a countless number of items.  CMC has over 500,000 such types of products that it

10  may custom brand for its customers.  Mark Lillge founded CMC in January 1992.  In 2006, it realized

11  approximately $4,000,000 in gross revenue.  CMC typically spends approximately five percent of its

12  annual gross revenue ($200,000) on such marketing efforts to assist in developing its customer base.[2]

13     CMC's customer list and specific customer information is not developed by its sales personnel.

14  While there are exceptions, these sales personnel typically do not bring in "books" of business when

15  CMC hires them.  Rather, CMC independently develops this information and distributes it as necessary

16  to its sales personnel.[3]

17     This confidential information includes, but is not limited to:  1)  the contact information for

18  certain customers, including key decision makers, who CMC knows actually buy such products; 2) the

19  purchasing history of certain customers and respective sales volume, including the knowledge of when a

20  customer will be due for replenishment/re-order based upon its prior transactions with CMC; 3) the

21  knowledge of CMC's customers' particular requirements and buying habits, including needs, likes,

22  dislikes, and limitations; and 4) the pricing which CMC charges its customers.[4]

23

24

----

25  [1] Defendants' Sixth and Seventh causes of action allege failure to pay Ms. Chang both overtime and
    vacation pay.  This motion seeks to address only the demand for vacation pay regarding these
26  respective counterclaims.
    [2] Declaration of Mark Lillge ("Lillge Decl."), ¶2.
27  [3] Lillge Decl., ¶3.
    [4] Lillge Decl., ¶4.

28                                     –2–

For example, when Defendant Chang left CMC, she advised CMC of certain customer information that she had developed over time in servicing these accounts on behalf of CMC, such as "buyer characteristics," and "who is the key buyer, what do they like?"  This was information not readily available.  To cite just one instance, she advised that based on her interactions with a certain customer, and her familiarity with its purchasing history, this customer would likely have a need to place an order in June that would be "easily $15,000.  It's a no-brainer."[5]  This is just one example of the numerous pieces of CMC confidential information that it is at issue in this litigation regarding hundreds of such customers of CMC.

Accordingly, in its complaint, CMC alleged:  "While the fact than any of CMC's actual customers might be willing to purchase promotional goods is information possibly available to CMC's competitors, there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through substantial time, effort and expense."[6]  Defendants admit this allegation in their Answer.[7]

CMC provides its employees with an Employee Handbook that highlights the importance of protecting CMC's trade secrets.  It sets forth rules addressing the issue of trade secret theft, such as a prohibition on taking home customer files or forwarding company emails without prior written authorization.  The CMC Employee Handbook expressly states that "CMC policy is that the company has invested significant resources to make contact with actual and potential clients.  You will be required to sign a non-solicitation agreement to cover these relationships."[8]

---

[5] Deposition of Christina Chang ("Chang Depo.") 46:22 – 48:16, attached to Declaration of Ian K. Boyd ("Boyd Decl.") as Exh. B.
[6] Complaint, ¶9, attached to Boyd Decl. ¶3, Exh. C.
[7] Answer, ¶9.  *See* Boyd Decl., ¶3; Exh. C.
[8] A true and correct copy of the CMC Employee Handbook is attached to Lillge Decl., ¶5 as Exh. A.

–3–

1    Regarding the Employee Handbook, Defendant Verity testified: "It was my understanding it

2    applied to everyone's conduct at the company."[9]  Defendant Chang testified that she also believed that

3    the Employee Handbook applied to all of CMC's employees.[10]

4    CMC requires every employee to sign an agreement that he or she will not improperly use the

5    CMC confidential information ("Confidentiality Agreement"), or solicit CMC's customers for a limited

6    period of time, entitled "Agreement Regarding Confidential Information, Intellectual Property Non-

7    Solicitation."[11]

8    To further ensure that it reasonably precludes this information from becoming available to third

9    parties, CMC maintains separate shredding bins for proprietary materials, consistently shreds proprietary

10    documents, and frequently converses with its employees both verbally and in writing about the need for

11    this information to be confidential.[12]  Defendants' own conduct before the initiation of this litigation

12    confirms that there is no genuine issue of material fact regarding CMC's efforts in this regard.  For

13    example, as recently as January 31, 2007, while still employed by CMC, Defendant Christina Chang

14    sent an e-mail to Plaintiff's principal Mark Lillge stating that she was "shocked!!!" to come across "2

15    pages of call-in [information] with tons of pertinent client project/quote info" in a recycling bin, as a "lot

16    of pertinent info was written all over for an important client of ours . . . . I thought it is mandatory to

17    shred all outdated artwork & paper containing client info."[13]  At a time when Ms. Chang had no reason

18    other than to be completely objective and candid about CMC's actual policies, she accurately conveyed

19    such policies.

20    In addition to instructing its employees to maintain CMC's trade secrets inviolate, as evidenced

21    above, CMC also undertakes efforts with its suppliers to ensure that CMC's competitors do not learn

22    what specific types and models of products are purchased by CMC.  For example, CMC has actively

23    taken steps to preclude its suppliers from displaying samples of CMC customer orders at industry trade

24

25    [9] Deposition of Andrew Verity ("Verity Depo."), Vol. I, 73:1-5, attached to Boyd Decl. ¶2 as Exh. A.
      [10] Chang Depo., 163:18-25.

26    [11] Lillge Decl., ¶6.
      [12] Lillge Decl., ¶7.

27    [13] A true and correct copy of Ms. Chang's e-mail to Mr. Lillge is attached hereto as Exhibit C to
      Lillge Decl. ¶8.

28                                    –4–

1  shows.  Mr. Verity confirmed that he himself had removed such samples at trade shows on behalf of

2  CMC in furtherance of this objective.[14]

3      To further protect the secrecy of its trade secrets, CMC does not permit its suppliers to produce

4  any overruns.  CMC's purchase orders state:  "Client does not want over-run pieces to be used and/or

5  distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior written

6  consent."  CMC, therefore, does not allow its suppliers to place CMC's product orders in these suppliers'

7  catalogs.[15]

8      **B.    Defendants**

9      In April 2001, CMC hired Andrew Verity as Sales Manager.  In  January  2005,  CMC  hired

10  Christina Chang, Mr. Verity's wife.  Ms. Chang started in accounting for CMC.  As part of her job tasks,

11  Ms. Chang prepared financial statements for the company, and had access to all customer account

12  information.  The following year, Ms. Chang transitioned to sales.  At all times Ms. Chang was an at-will

13  employee.[16]

14      In April 2007, CMC and Mr. Verity parted ways.  Upon Mr. Verity's departure, CMC was unable

15  to locate confidentiality agreements that had been signed by its employees.[17]

16      After Mr. Verity's departure, CMC asked Ms. Chang to sign a confidentiality agreement, as was

17  required of all remaining employees, especially in light of the disappearance of the prior agreements.

18  Ms. Chang ultimately refused to sign the agreement.  CMC terminated Ms. Chang's at-will employment

19  on May 11, 2007.[18]

20      Ms. Chang does not dispute that she has now received all of her vacation pay that she accrued

21  while at CMC, pursuant to CMC's company policy.  However, she contends that CMC then "threw" in

22  an additional five days of vacation pay upon her termination, which came as a "surprise" to her:

23

24  _____

25  [14] Lillge Decl., ¶9; Verity Depo., Vol. I, 126:16-127:10.
    [15] Lillge Decl., ¶10; Exh. D.

26  [16] Lillge Decl., ¶11.
    [17] Letter from CMC to Verity attached as Exh. E to Lillge Decl. ¶12.

27  [18] Lillge Decl., ¶13.  A true and correct copy of the document that Ms. Chang refused to sign is
    attached as Exhibit B to Lillge Decl.

28                                                          –5–

Q: So it was your understanding that these five additional days were days that you hadn't necessarily earned pursuant to CMC's policy, but it was something that Mr. Molloy [CMC's General Manager] agreed to add on to your termination?

A: Yes[19]

* * *

Q: And was it during this conversation with Mr. Molloy where he agreed to essentially grant you five days of additional vacation pay?

A: No.

Q: When did he actually agree to do that?

A: The additional five days?

Q: Right.

A: [In] the termination e-mail that I requested of him.

Q: Prior to receiving that e-mail, did you request that he grant you those additional five days or –

A: No.

Q: Was that a surprise to you?

A: It was a surprise, yeah.[20]

* * *

Q: So in the e-mail that [Mr. Molloy] sent to you later that Friday, he agreed to pay you for the five days of vacation pay that you said you were entitled to, and your understanding is that he threw an additional five days on top of that?

A: Yes.[21]

Since leaving CMC, Defendants Andrew Verity and Christina Chang have made numerous sales to customers who formerly did business with CMC prior to Defendants' departure. Defendants first disclosed the identities of these customers to CMC at the depositions of Andrew Verity and Christina Chang on July 24, 2007. Neither Mark Lillge, nor any other representative of CMC, was present at these depositions, with the exception of CMC's counsel. Defendants subsequently produced documentation regarding these transactions with former customers of CMC.[22]

On June 1, 2007, the Court entered a Temporary Restraining Order against Defendants. On October 2, 2007, the Court issued a Preliminary Injunction against Defendants[23]. On November 13,

---

[19] Chang Depo., 153:18 – 153:22.
[20] Chang Depo., 164:24 – 165:13.
[21] Chang Depo., 168:18 – 168:23.
[22] Boyd Decl., ¶6.
[23] Boyd Decl., ¶4, Exh. D.

2007, the Court entered an Order confirming the scope of the Temporary Restraining Order and Preliminary Injunction.[24]

On November 2, 2007, Defendants filed an amended counterclaim. The Eleventh Count alleges that "Counterdefendant CMC has used the pending litigation to obtain the identities of customers of [sic]. CMC has contract [sic] those customers and falsely informed them that there is a court order forbidding them to do business with ." [sic] However, as of November 2, 2007, neither Mark Lillge, Bruce Molloy, nor any other CMC personnel was aware of those individuals identified by Defendants as their customers in discovery.[25]

## ARGUMENT

When the facts merit, it is in the interests of the parties, the Court and the jurors that an action be decided via dispositive motion. Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating the lack of any genuine issue of material fact as to plaintiff's claims. *Celotex Corp. v. Catrett*, 477 US 317, 322-24, 106 S.Ct. 2548, 2552-53 (1986). To do so, CMC need not disprove Defendants' counterclaims, but rather must merely demonstrate the absence of any real issue of fact as to one or more elements essential to support such claims. *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992). The moving party is further not required to support its motion with evidence negating the non-moving party's claim. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 885, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *See Celotex*, 477 U.S. at 323.

///

---

[24] Boyd Decl., ¶5; Exh. E.
[25] Boyd Decl., ¶6; Lillge Decl., ¶16.

1  **I.    CMC DID NOT WRONGFULLY TERMINATE DEFENDANT CHANG PURSUANT TO SECTION 16600 BECAUSE CMC WAS TAKING NECESSARY MEASURES TO PROTECT ITS TRADE SECRETS**

Defendants' Fifth Cause of action alleges that CMC terminated Defendant Chang in violation of public policy, pursuant to California Business and Professions Code Section 16600, because she would not sign an agreement precluding her from using CMC's trade secrets to compete against CMC.[26]  Here summary judgment is appropriate because the confidentiality agreement was necessary to protect CMC's trade secrets.  As a matter of law, if CMC establishes that it has trade secrets, then its termination of Ms. Chang is not in violation of Section 16600.

**A.    The Nondisclosure Agreement Was Necessary To Protect CMC's Trade Secrets**

Section 16600 does not invalidate covenants not to compete where necessary to protect the employer's trade secrets.  *Fowler v. Varian Assocs., Inc*., 196 Cal.App.3d 34 (Cal. Ct. App. 1987) (stating "agreements designed to protect an employer's proprietary information do not violate section 16600."); *Gordon v. Landau*, 49 Cal.2d 690, 694 (1958) (holding Section 16600 does not void a noncompetition and nonsolicitation agreement necessary to protect plaintiff's trade secrets); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1338 (9th Cir. 1980) (holding "if the information used by the former employee is confidential or his solicitation activity constitutes unfair competition, then contracts with language similar to [defendants' nonsolicitation and noncompetition agreement] have been enforced by California law.")

While the issue of whether such information constitutes a trade secret is generally a question of fact, here there is no genuine issue of material fact as to whether CMC has trade secrets.   The agreement only prohibits Ms. Chang from unfairly competing with CMC by using CMC's proprietary information (such as her knowledge of the impending $15,000 order).  *See Matull & Assocs., Inc. v. Cloutier*, 194 Cal.App.3d 1049, 1054-55 (Cal. Ct. App. 1987) ("A former employee's use of

---

[26] For purposes of this motion, CMC is not disputing that Ms. Chang was fired for her refusal to sign the confidentiality agreement.  However, CMC reserves the right to provide additional evidence as to the reasons for Ms. Chang's termination.

–8–

confidential information obtained from [her] former employer to compete with [her] old employer and to solicit the business of [her] former employer's customers is regarded as unfair competition.").

### B. The CMC Confidential Information Constitute a Trade Secret Under Section 3426.1

In order to establish that it has trade secrets, CMC must meet a two-part test. California has adopted the Uniform Trade Secrets Act ("UTSA"), which defines a "trade secret" as follows:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process,[27] that:
>   (1)  Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>   (2)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code §3426.1(d).

### 1. Defendants Admit that CMC Meets the First Component of the UTSA

In their Answer, Defendants admit that:

> While the fact that many of CMC's actual customers might be willing to purchase promotional goods is information publicly available to CMC's competitors, there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through substantial time, effort and expense.

Answer ¶9.

Due to this express admission, CMC need not submit further evidence to prove the allegations of Paragraph 9. *See* Fed. R. Civ. Pro. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980) ("The party moving for summary judgment must offer evidence sufficient to support a finding upon every

---

[27] This list is non-exhaustive. *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1323-1324 (1986) ("The very language of Civil Code section 3426.1, subdivision (d), is inclusive, not exclusive.").

–9–

element of his claim for relief, except those elements admitted by his adversary. ... [Defendant's] failure to deny the allegation in its answer to the [plaintiff's] complaint constitutes an admission. Fed.R.Civ.P. 8(d). Therefore, no evidence on this element was required."); *see also Xerox Corp. v. Precision Transp. Co.*, 2004 U.S. Dist. LEXIS 18046, *4 (N.D. Cal. Sept. 3 2004) ("Admissions in the opposing party's pleadings (even if unverified) are admissible evidence under Federal Rule of Evidence 801(d)(2) and therefore can serve as the basis for summary judgment.")

Accordingly, as a matter of law, CMC has satisfied the first prong of Section 3426.1.

### 2.    CMC Takes Reasonable Efforts Under the Circumstances to Maintain the Secrecy of the CMC Confidential Information

Turning to the second prong of Section 3426.1, the evidence also establishes that there is no genuine issue of material fact as to whether CMC reasonably maintains the secrecy of the CMC Confidential Information. *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514 (Cal. Ct. App. 1997) is illustrative as to what types of steps must be taken under such circumstances. *Id*. at 1523. The Court held:

> Based upon the facts of this case, there is no doubt that Morlife intended its customer information to remain secret and undertook reasonable steps to secure that end. ... [C]ustomer information was stored on computer [sic] with restricted access. Moreover, in its employment contract signed by Perry, Morlife included a confidentiality provision expressly referring to its customer names and telephone numbers. The Morlife employee handbook contained an express statement that employees shall not use or disclose Morelife secrets or confidential information subsequent to their employment including 'lists of present and future customers.'

*Id*.

CMC similarly ensures the secrecy of the CMC confidential information. Protecting trade secrets is a key issue in CMC's Employee Handbook (the "Handbook"), and not just with respect to CMC's own trade secrets. And as noted *supra*, Defendants do not dispute that the Handbook pertained to their conduct while at CMC.

The Handbook states:

> [I]t is prohibited to hire an employee of a competitor to gain access to that competitor's trade secrets or proprietary information. Similarly, an employee or

–10–

1    former employee is prohibited from providing such confidential information to
2    our competitors.

3        The Handbook also notes that "written authorization is needed to take customer files home
4    and/or to forward company emails."[28]

5        CMC requires every employee to sign the Confidentiality Agreement, which confirms that he
6    or she will not improperly use the CMC Confidential Information, or solicit CMC's customers for a
7    finite period of time.  The Confidentiality Agreement provides:

8        I realize that my position with the Company creates a relationship of high trust
     and confidence with respect to Confidential Information owned by the
9    Company, its clients or suppliers that may be learned or developed by me while
     employed by the Company.  I further acknowledge that my access to such
10   Confidential Information is contingent upon my execution of this Agreement.
     For purposes of this Agreement, "Confidential Information" includes all
11   information that the Company desires to protect and keep confidential or that the
     Company is obligated to third parties to keep confidential, including but not
12   limited to "Trade Secrets" to the full extent of the definition of that term under
     California law.  It does not include "general skills, knowledge and experience"
13   as those terms are defined under California law.
     …
14   During and after my employment with the Company, I will not (a) disclose,
     directly or indirectly, any Confidential Information to anyone outside of the
15   Company or to any employees of the Company not authorized to receive such
     information (including, but not limited, any future employer or contractor) or (b)
16   use any Confidential Information other than as may be necessary to perform my
17   duties at the Company.[29]

18

19       The Confidentiality Agreement includes a non-exhaustive list of examples of confidential
20   information, which includes "information and lists regarding any current and prospective clients."  It
21   adds that "for the avoidance of any doubt, I hereby agree and acknowledge that the Company
22   considers any information and lists regarding any current and prospective clients, vendors, suppliers

23

24

25

26   _____

27   [28] Exhibit A to Lillge Decl.
     [29] Exhibit B to Lillge Decl.

28                                      –11–

employees or contractors of the Company to be both its Confidential Information and Trade Secrets."[30]

CMC maintains secure shredders and frequently reminds its employees of the need for secrecy.  Indeed, as recently as January 31, 2007, while still employed by CMC, Defendant Christina Chang sent an e-mail to Plaintiff's principal Mark Lillge stating that she was "shocked!!!" to come across "2 pages of call-in [information] with tons of pertinent client project/quote info" in a recycling bin, as a "lot of pertinent info was written all over for an important client of ours .…  I thought it is mandatory to shred all outdated artwork & paper containing client info."  As noted, Ms. Chang accurately confirmed CMC's company policy on such matters.

Here, CMC has taken even greater precautions to maintain the secrecy of the CMC confidential information than was taken in *Morlife*.  California law of course does not require absolute secrecy, and courts frequently find that reasonable steps have been taken when an employer requires its employees to sign a nondisclosure agreement.  *See e.g.*, *MAI Systems Corporation v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (holding that the employer took reasonable steps to insure the secrecy of its trade secrets where it "required its employees to sign confidentiality agreements respecting its trade secrets.").

Further, the parties do not dispute that CMC asked its employees to sign nondisclosure agreements.  *See American Credit Indemnity Company v. Sacks*, 213 Cal.App.3d 622, 631 (Cal. Ct. App. 1989) (reasonable steps to insure the secrecy of trade secret information found where the company required its employees to sign nondisclosure agreements, and the court stated that the employee-defendant's claim that she never signed any such agreement "does not alter our analysis.")

---

[30] With these concerns in mind, the Confidentiality Agreement requires employees, upon termination of their employment or upon CMC's request, to deliver to CMC "all the Company's property in my possession, including … customer vendor and supplier lists and contact information … [and] any other documents, files or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by the Company."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT          Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

Under the applicable case law, there is no genuine issue of material fact as to whether CMC takes reasonable measures to protect the secrecy of its trade secrets. Accordingly, CMC has met both prongs under CUTSA. Therefore, as a matter of law, CMC's termination of Ms. Chang for refusing to sign the Confidentiality Agreement did not violate Section 16600.

## II. DEFENDANT CHANG IS NOT ENTITLED TO ANY ADDITIONAL VACATION PAY BECAUSE SHE FAILED TO PROVIDE CONSIDERATION

Defendant Chang seeks an additional five days of vacation pay from CMC, and related waiting time penalties. However, she confirmed that had not earned these days pursuant to CMC's policy regarding earned vacation time. She never requested this vacation pay from CMC, and the purported offer of it from CMC came to her as a "surprise." In short, Ms. Chang had no expectation whatsoever of these five additional days of vacation pay when she rendered her services to CMC.

Accordingly, even if CMC did offer five additional days of vacation to Ms. Chang,[31] this "promise" was not bargained for, and is therefore legally unenforceable. It is a fundamental tenant of contract law that consideration must result from a bargain. *See Simmons v. Cal. Institute of Technology*, 34 Cal. App. 2d 318 (1949) ("But the consideration for a promise must be an act or a return promise, bargained for and given in exchange for the promise."); *Dow v. River Farms Co.*, 110 Cal. App. 2d 403 (1952) (corporate resolution to pay executive $50,000 in consideration of past services held unenforceable given absence of any expectation of payment when services were rendered). Where there is "no expectation of payment by either party when the services were rendered, the promise is a mere promise to make a gift and not enforceable." *Passante v. McWilliam*, 53 Cal. App. 4th 1240, 1249 (1997). Here, Ms. Chang's unequivocal testimony (p.6, *supra*) confirms that she had absolutely no expectation of additional vacation pay above what she had earned pursuant to CMC's stated policies.

---

[31] CMC reserves the right to assert that it never did in fact offer Ms. Chang these five additional days of vacation, and that her perception of this gift was merely a miscommunication with Bruce Molloy, the General Manager of CMC.

–13–

1     Therefore the Court should dismiss Defendant Chang's claims for vacation pay, and related

2  waiting time penalties, as a matter of law.

3  **III.    MS. CHANG'S TERMINATION FROM CMC DOES NOT ESTABLISH AN UNFAIR**
4  **BUSINESS PRACTICE**

5     Ms. Chang's eighth counterclaim is for violation of Business and Professions Code Section

6  17200.  Her claim is based upon the allegation that "CMC has engaged in an unlawful business

7  practice by demanding that its employees as a condition of continued employment agree to covenants

8  not to compete."  This claim seeks to enjoin the same conduct giving rise to Ms. Chang's wrongful

9  termination claim, except that Ms. Chang seeks an injunction to prohibit this practice regarding

10  prospective employees of CMC.  For the reasons set forth above, this employment practice by CMC

11  is not unlawful as a matter of law.  In addition, Ms. Chang lacks standing to bring this claim.  *See*

12  *Heffelfinger v. Electronic Data Systems, Corp.*, 2008 U.S. Dist. LEXIS 5296, *67 (C.D. Cal. Jan 7,

13  2008) ("Plaintiffs are no longer employed by [defendant] and they have presented no evidence

14  suggesting that they intend to seek re-employment.  As a result, they do not have standing to request

15  prospective injunctive relief under the UCL . . . .")

16  **IV.    DEFAMATION**

17     "In all cases of alleged defamation, whether libel or slander, the truth of the offensive

18  statements or communication is a complete defense against civil liability, regardless of bad faith or

19  malicious purpose."  *Smith v. Maldonado*, 72 Cal. App.4th 637, 646 (Cal. Ct. App. 1999).  Moreover,

20  "[d]efamatory language not libelous on its face is not actionable unless the plaintiff alleges and

21  proves that he has suffered special damages as a proximate result thereof."  *Barnes-Hind, Inc. v.*

22  *Superior Court*, 181 Cal.App.3d 377, 382 (Cal. Ct. App. 1986).

23     In their interrogatory responses, Defendants identify three different categories of

24  communications that they believe were "false and misleading statements" giving rise to their

25  defamation claim:  A) a June 27, 2007 letter from CMC to its suppliers; B) a September 7, 2007 e-

26  mail from CMC to its customers; and C) certain alleged oral statements made by CMC regarding

27

28
                                    –14–

1  Defendants.  As noted below, Defendants fail to meet their burden of proof to establish that any of the

2  above communications were defamatory.

3  **A.  CMC's June 27, 2007 Letter to Suppliers**

4  On June 27, 2007, CMC sent a letter to its suppliers.[32]

5  The June 27 letter states in relevant part:

6  "This is to put you on notice that on June 1, 2007, Judge Marilyn Hall Patel,
   of the United States District Court for the Northern District of California, San

7  Francisco Division, granted a Temporary Restraining Order to prevent Andrew
   Verity and Christina Chang, former employees of Creative Marketing Concepts,

8  from soliciting our clients or misappropriating any of CMC's trade secrets.

9  As you may be aware, Mr. Verity and Ms. Chang have established their own
   promotional products business, which they have every right to do.  We believe

10 the name of the company is Branding Boulevard.  However, CMC filed a
   lawsuit against Mr. Verity and Ms. Chang because we have reason to believe that

11 they have used or threatened to use CMC trade secret information to solicit
   CMC's clients and acquire information about jobs that CMC has done in the

12 past.

13 Accordingly, we ask that you inform the appropriate people in your
   organization that:  1) Mr. Verity and Ms. Chang are no longer employees of

14 CMC and do not represent CMC in any way; 2) Mr. Verity and Ms. Chang are
   not entitled to any information regarding CMC clients, including products,

15 pricing, artwork, etc.; and 3) please inform me directly if either Mr. Verity or
   Ms. Chang request any information about or relating to CMC's current or past

16 clients."

17

18 Beginning on July 6, 2007, Defendants' counsel began sending letters demanding that CMC

19 retract its letter, alleging that it was a "misrepresentation" of the Court's Order.  On August 1, 2007,

20 CMC's counsel responded, confirming that the letter accurately depicted the Court's Order, with

21 detailed citations to the Court's June 1 TRO hearing transcript.  As CMC's counsel confirmed in that

22 August 1 letter, there is nothing false or misleading regarding the above language.[33]

23 As confirmed by the parties' correspondence, there is no genuine issue of material fact as to

24 whether the above statement is defamatory.  It is a true statement issued by one competitor regarding

25

26 _____

27 [32] A true and correct copy of the letter is attached as Exh. F to Lillge Decl.
   [33] Copies of counsel correspondence attached to Boyd Decl. ¶7, Exh. F.

28 –15–

1  another.  Defendants tacitly agree, for after receiving CMC's August 1 letter, they never sought any

2  formal redress from the Court, as threatened in their prior correspondence.

3    **B.  CMC's September 7, 2007 E-mail to Customers**

4    On September 7, 2007, CMC sent an e-mail to its customers which Defendants contend is

5  "false and misleading."[34]

6    The e-mail states in relevant part:

7    As you may be aware, Andy Verity and Christina Chang left CMC a few months
       back.  You should note that Judge Marilyn Hall Patel, of the United States
8      District Court for the Northern District of California, San Francisco Division,
       has granted CMC a Temporary Restraining Order on June 1, 2007 which
9      prohibits them not only from soliciting CMC clients but also restrains them from
       initiating contact with CMC clients.  If you would like additional information
10     about this situation, please contact me directly.

11

12  As confirmed by the Court's own Orders, and the transcript of the June 1, 2007 TRO hearing, there is

13  nothing false or misleading about CMC's statement.

14    **C.  Alleged Verbal Misrepresentations to Defendants' Customers**

15    Defendants also contend that there were various verbal misrepresentations made by CMC

16  personnel to its clients who were apparently also buying from Defendants.[35]  Defendants appear to

17  take issue with most of these alleged contacts because CMC had the temerity to solicit its own

18  (current or former) customers for business, and because it advised certain these customers of the

19  Court's Order.[36]

20    As a threshold issue, Defendants' allegations as to what CMC allegedly told third parties (and

21  not Defendants directly) is simply hearsay.  *See Courtney v. Canyon Television & Appliance Rental,*

22

23  _____

[34] A true and correct copy of this e-mail is attached hereto as Exh. G to Lillge Decl., ¶15.

24  [35] Boyd Decl. ¶8; Exh G (Chang's responses to CMC's Second Set of Interrogatories Nos. 4 through
     8 and Verity's responses to CMC's Second Set of Interrogatories Nos. 1 through 4).  Again, CMC
25  reserves the right to dispute (vigorously) whether Mr. Lillge or Mr. Molloy even made many of the
     statements attributed to them in Defendants' interrogatory responses.

26  [36] As noted *supra*, at the time of these interactions between CMC and the parties' mutual customers,
     CMC was unaware that Defendants had identified any of these individuals in discovery as current
27  customers of Defendants.

28                                                      –16–

*Inc.*, 899 F.2d 845 (9th Cir. 1990) (affirming summary judgment on defamation claim). There, the Ninth Circuit found that the plaintiff/appellant's only evidence of alleged third-party defamatory communications were "his own assertions to that effect. There assertions are not included within any exception to the hearsay rule, and therefore are inadmissible at summary judgment." *See also Walker v. Boeing Corp.,* 218 F. Supp. 2d 1177 (C.D. Cal. 2002) (hearsay evidence asserting defamation insufficient to defeat defendant's summary judgment motion). "When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made." *Id.* at 1193 n.9.

Defendants have no evidence of defamation regarding the purported verbal communications beyond hearsay. Accordingly, the Court should enter summary judgment regarding Defendants' defamation claim.

The Court should further enter judgment for CMC regarding the defamation claim because Defendants are unable to prove special damages regarding any of the alleged communications. *See Forsher v. Bugliosi*, 26 Cal. 3d 792 (1980) (finding that plaintiff failed to state a claim for libel, as "[u]nless there is a special damage as defined by Civil Code Section 48a, no cause of action arises.")

Each of the third parties who allegedly heard the defamatory statements directly from CMC is a customer of Defendants and continues to be a customer of Defendants. Defendants have been unable to offer any evidence of even one sale that it lost or could not complete because of the purported defamatory statements.

Both hearsay, and Defendants' inability to cite any damages arising from these communications, preclude Defendants' defamation claim as a matter of law.

## V. COUNTERCLAIMANTS FAIL TO MEET THEIR BURDEN OF PROOF REGARDING THEIR CLAIMS FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

To prevail on a claim for interference with prospective economic advantage, Defendants must allege: 1) an economic relationship between themselves and a third party that carries a probability of future economic benefit to the plaintiff; 2) CMC's knowledge of the relationship, 3) intentional acts by the CMC designed to disrupt the relationship, 4) actual disruption of the relationship, and 5)

–17–

1    economic harm to the Defendants proximately caused by the CMC's acts.  *Korea Supply Co. v.*

2    *Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1153-54, 1164-65.

3    This first element requires more than a mere hope to sell to the third party.  *See Blank v.*

4    *Kirwan*, 39 Cal. 3d 311, 330-31 (1985) (denying claim for intentional interference with prospective

5    economic advantage because "plaintiff has pleaded and can plead no protectable 'expectancy,' but at

6    most a hope for an economic relationship and a desire for future benefit.")  Moreover, "cases

7    generally agree it must be reasonably probable that the prospective economic advantage would have

8    been realized but for defendant's interference."  *Youst v. Longo* 43 Cal.3d 64, 71 (1987).

9    In addition, Defendants must prove CMC's conduct was "wrongful 'by some measure beyond

10   the fact of the interference itself.'"  *Della Penna v. Toyota Motor Sales, U.S.A., Inc*. (1995) 11 Cal.

11   4th 376, 392-93 (citations omitted).  The "act of interference with prospective economic advantage is

12   not tortious in and of itself," but requires proving "that a defendant has engaged in an act that was

13   independently wrongful" in order to distinguish "lawful competitive behavior from tortious

14   interference."  *Korea Supply*, 29 Cal.4th at 1159.  Accordingly, "a plaintiff prosecuting an

15   interference with prospective economic relations claim must prove that the defendant engaged in

16   wrongful conduct;" it is insufficient to "simply show intentional acts that disrupted the plaintiff's

17   prospective economic relations."  *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal.

18   App. 4th 464, 476 (1996).

19   Defendants have failed to produce evidence of even one economic relationship for which it

20   had a protectable expectancy which was disrupted by any conduct of CMC (in contrast with its

21   allegations that CMC, as a competitor, attempted to compete – apparently unsuccessfully – with

22   Defendants for these customers).  Similarly, Defendants have failed to establish the necessary

23   element of economic harm proximately caused by any act of CMC.

24   ///

25   ///

26   ///

27   ///

28
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT          Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

1    Defendants have further failed to establish any independent wrong in conjunction with their

2    claim for intentional interference with prospective economic advantage.  *See Arntz Contracting.*, 47

3    Cal. App. 4th 464.[37]

4        Defendants assert a counterclaim for intentional interference with prospective economic

5    advantage against CMC.  They allege "CMC has used the pending litigation to obtain the identities of

6    . [sic] CMC has contract [sic] those customers and falsely informed them that there is a court order

7    forbidding them to do business with . [sic]"  Amended Counterclaim ¶7.

8        Notably, Defendants amended their counterclaim on November 2, 2007 to add this claim.

9    Tellingly, however, CMC was not apprised by its counsel of the identities of customers disclosed by

10   Defendants in this litigation until well over two weeks after Defendants filed the amended

11   counterclaim.[38]  Accordingly, Defendants cannot meet the second element of their claim, which is

12   establishing CMC's actual knowledge of any such relationship between Defendants and these third

13   parties.

14       CMC has not unlawfully interfered with Defendants' relationships as alleged, but merely

15   conducted its normal business practices in attempting to revive customer accounts which have ceased

16   or decreased purchasing from it, including those accounts of course raided by Defendants.

17       Moreover, CMC and Defendants are competitors, and CMC's acts that may have affected

18   Defendants' prospective contracts are privileged.  "California law has long recognized a 'competition

19   privilege' which protects one from liability for inducing a third party to not enter into a prospective

20   contractual relation with a business competitor."  *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla*

21   *Village Square Venture Partners*, 52 Cal.App.4th 867, 880 (Cal. Ct. App. 1997).  "It is the plaintiff's

22   burden to prove, as an element of the cause of action itself, that the defendant's conduct was

23   _____

24   [37] As the appellate court noted, "our focus for determining the *wrongfulness* of those intentional acts
     should be on the defendant's objective conduct, and evidence of motive or other subjective states of
25   mind is relevant only to illuminating the nature of that conduct.  Thus, a defendant's intention to
     deceive is certainly relevant to proving wrongful misrepresentation, but a true representation does not
26   become wrongful just because the defendant is motivated by a black desire to hurt plaintiff's
     business."  *Arntz*, 47 Cal. App. 4th at 477.
27   [38] Boyd Decl., ¶6.

28                                           –19–

independently wrongful, and was <u>not</u> privileged, rather than the defendant's burden to prove, as an affirmative defense, that its conduct was <u>not</u> independently wrongful, and therefore <u>was</u> privileged." *Id*. at 881 (emphasis in original).  Defendants cannot meet their burden.  Their tortious interference claims fails.

## CONCLUSION

The majority of Defendants' counterclaims are ripe for summary judgment.  Defendants have already conceded the first prong of the two-part trade secret test, and under the applicable case law, there is no genuine issue of material fact as to whether CMC takes efforts that are reasonable under the circumstances to maintain the secrecy of such information.  Accordingly, Defendants' wrongful termination claim fails.

Defendant Chang's counterclaim for overtime pay and related waiting-time penalties similarly falls, because she did not provide any consideration for this "surprise" of five vacation days which she alleges CMC "threw in" upon her termination, nor did she have any expectation of receiving such compensation in performing her duties while at CMC.

Defendants cannot meet the threshold for their defamation claims because there is nothing defamatory in the written communications at issue, and the oral communications constitute hearsay.

Finally, Defendants' tortuous interference claim fails because they cannot show any protectable expectancy that was actually disrupted by CMC's conduct through an independent wrongful act, and Defendants further cannot establish any damages arising from this claim.

Accordingly, CMC respectfully submits that the Court enter judgment on behalf of CMC for the above counterclaims.

Respectfully submitted,

DATED:  January 28, 2008          HARVEY SISKIND LLP


By_____/s/_____
              Ian K. Boyd

Attorneys for Plaintiff
Mark Lillge d/b/a/ Creative Marketing Concepts

–20–