HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
Iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
Sappel@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone: (415) 354-0100
Facsimile: (415) 391-7124

Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW VERITY and CHRISTINA CHANG.<br><br>Defendants. | Case No. C 07-02748 MHP<br><br>**DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: March 3, 2008<br>Time: 2:00 p.m.<br>Court: Hon. Marilyn Hall Patel |

I, Mark Lillge, declare as follows:

1. I am over the age of eighteen years. I make this declaration freely and of my own personal knowledge. If I were called as a witness, I could and would competently testify to the matters set forth.

2. I am the owner of Creative Marketing Concepts ("CMC"), a California sole proprietorship with its principal place of business in San Francisco, California. CMC is an industry leading full service advertising specialty and corporate apparel firm that sells businesses goods

–1–

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S MOTION         Case No. C 07-02748 MHP
FOR PARTIAL SUMMARY JUDGMENT

1  branded with the latter's corporate logo. Such goods may be coffee cups, pens, shirts, or a countless number of items. CMC has over 500,000 such types of products that it may custom brand for its customers. I founded CMC in January 1992. In 2006, it realized approximately $4,000,000 in gross revenue. CMC typically spends approximately five percent of its annual gross revenue ($200,000) on such marketing efforts to assist in developing its customer base

3. CMC's customer list and specific customer information is not developed by its sales personnel. While there are exceptions, these sales personnel typically do not bring in "books" of business when CMC hires them. Rather, CMC independently develops this information and distributes it as necessary to its sales personnel.

4. This confidential information includes, but is not limited to: 1) the contact information for certain customers, including key decision making personnel, who CMC knows actually buy such products; 2) the purchasing history of certain customers and respective sales volume, including the knowledge of when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; 3) the knowledge of CMC's customers' particular requirements and buying habits, including needs, likes, dislikes, and limitations; and 4) the pricing which CMC charges its customers.

5. CMC provides its employees with an Employee Handbook that highlights the importance of protecting CMC's trade secrets, and sets forth rules that minimize trade secret theft, such as a prohibition on taking home customer files or forwarding company emails without prior written authorization. A true and correct copy of CMC's Employee Handbook is attached hereto as Exhibit A.

6. CMC requires every employee to sign an agreement that he or she will not improperly use the CMC Confidential Information ("Confidentiality Agreement"), or solicit CMC's customers for a limited period of time, entitled "Agreement Regarding Confidential Information, Intellectual Property Non-Solicitation." A true and correct copy of this agreement is attached hereto as Exhibit B.

–2–

7. To further ensure secrecy, CMC maintains separate shredding bins for proprietary materials, consistently shreds proprietary documents, and frequently converses with its employees both verbally and in writing about the need for this information to be confidential.

8. Attached hereto as Exhibit C is an e-mail that I received from Christina Chang on or about January 31, 2007. Ms. Chang's beliefs as stated in her e-mail, including her statement that "it is mandatory to shred all outdated artwork & paper containing client info" accurately recounts CMC's policies regarding how CMC employees are to handle client information.

9. In addition to instructing its employees to maintain CMC's trade secrets inviolate, CMC also undertakes efforts with its suppliers to ensure that CMC's competitors do not learn what types of products are purchased by CMC. For example, CMC has actively taken steps to preclude its suppliers from displaying samples of CMC customer orders at industry trade shows.

10. To further protect the secrecy of its trade secrets, CMC does not permit its suppliers to produce any overruns. CMC's purchase orders state: "Client does not want over-run pieces to be used and/or distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior written consent." CMC does not allow its suppliers to place CMC's product orders in these suppliers' catalogs. A true and correct copy of CMC's purchase order is attached hereto as Exhibit D.

11. In April 2001, CMC hired Andrew Verity as Sales Manager. In January 2005, CMC hired Christina Chang, Mr. Verity's wife. Ms. Chang started in accounting for CMC. As part of her job tasks, Ms. Chang prepared financial statements for the company, and had access to all customer account information. The following year, Ms. Chang transitioned to sales. At all times Ms. Chang was an at-will employee.

12. In April 2007, CMC and Mr. Verity parted ways. After Verity's departure from CMC in late April, I learned that the confidentiality agreements, signed by the employees, were missing. CMC immediately made a written inquiry to Verity about the status of the missing documents, but he never responded. A true and correct copy of CMC's letter to Mr. Verity is attached hereto as Exhibit E.

–3–

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S MOTION   Case No. C 07-02748 MHP
FOR PARTIAL SUMMARY JUDGMENT

1  13. After Mr. Verity's departure, CMC asked Ms. Chang to sign a confidentiality agreement, as was required of all remaining employees, especially in light of the disappearance of the prior agreements. Ms. Chang ultimately refused to sign the agreement. CMC terminated Ms. Chang's at-will employment on May 11, 2007. A true and correct copy of the agreement Ms. Chang refused to sign is attached hereto as Exhibit B.

14. A true and correct copy of the letter sent to suppliers on June 27, 2007, regarding the temporary restraining order is attached hereto as Exhibit F.

15. Attached hereto as Exhibit G is a true and correct copy of the email sent to CMC's customers on September 7, 2007.

16. I was not apprised of the individuals identified by Defendants as their customers in discovery until the week of November 19, 2007.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 28th day of January, 2008, in San Francisco, California.

/s/
―――――――――――――――
Mark Lillge

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this efiled document.

/s/
―――――――――――――――
Ian K. Boyd

–4–

DECLARATION OF MARK LILLGE IN SUPPORT OF PLAINTIFF'S MOTION   Case No. C 07-02748 MHP
FOR PARTIAL SUMMARY JUDGMENT