# EXHIBIT 2
## DECLARATION OF ROBERT CHARLES WARD IN OPPOSITION TO APPLICATION FOR ORDER TO SHOW CAUSE RE: CONTEMPT

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4   - - - - - - - - - - - - - - - - - - - -

5   MARK LILLGE d/b/a CREATIVE MARKETING    )

6   CONCEPTS,                               )    Case No.

7          Plaintiff,                       )    C07-02748

8   V.                                      )

9   ANDREW VERITY and CHRISTINA CHANG,      )

10         Defendants.                      )

11  - - - - - - - - - - - - - - - - - - - -

12  AND RELATED CROSS-ACTION.               )

13  - - - - - - - - - - - - - - - - - - - -

14

15          VIDEOTAPED DEPOSITION OF MARK LILLGE

16             TUESDAY, FEBRUARY 12, 2008

17            PAGES 236 - 321; VOLUME 3

18

19

20

21             BEHMKE REPORTING & VIDEO SERVICES

22      BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23             160 SPEAR STREET, SUITE 300

24          SAN FRANCISCO, CALIFORNIA 94105

25                 (415) 597-5600

1    such issues to Mr. Lillge in writing an e-mail or

2    note to the president?

3        MR. WARD:  No.

4   BY MR. WARD:

5        Q.   My question is with regard to any incidents

6    involving Mr. Verity --

7        A.   Yeah.

8        Q.   -- any problems, am I going to see in the files

9    of CMC an e-mail or a note with the information that's

10   outlined in the middle of the second page of Exhibit 10?

11       A.   I think there had been e-mails.  I think

12   there's some e-mail trails about complaints about

13   Andy's behavior.  So I believe so.  I'd have to look

14   deeper to find that out, but I believe that that is

15   the case.

16       THE REPORTER:  Exhibit 11.

17            (Lillge Exhibit 11 was marked for

18            identification.)

19   BY MR. WARD:

20       Q.   Do you recognize Exhibit 11, Mr. Lillge?

21       A.   I do.

22       Q.   Did you write this letter?

23       A.   I did.

24       Q.   To whom did you send this letter?

25       A.   Vendors, suppliers of CMC's -- suppliers of

1  promotional products.

2    Q.    Did anyone other than you participate in the

3  drafting of this letter?

4    A.    Counsel.

5    Q.    Did you rely on advice of counsel as to

6  propriety of this letter?

7    MR. BOYD:  "As to the propriety of the letter."

8    THE WITNESS:  Yes.  Very much so.

9  BY MR. WARD:

10    Q.    Why did you send this letter?

11    A.    As a way to let our suppliers know that both

12  Andy and Christina are no longer with -- were no

13  longer with Creative Marketing Concepts and also that

14  I did not want any of our past records, whether it be

15  what products were purchased by people, by clients,

16  what artwork was used, how much was paid, all the

17  other -- many of the other things we consider trade

18  secrets be passed onto them.

19          And I had some experience after Andy and

20  Christina left Creative Marketing Concepts of

21  Christina specifically contacting vendors in

22  reference to jobs that were placed with Creative

23  Marketing Concepts.

24    Q.    Why did you make reference to the court order by

25  Judge Patel in this letter?

1    A.    I thought it was very relevant that people

2  know that this is not just some story that I'm making

3  up.  This is the real deal.

4    Q.    Why didn't you enclose a copy of the court

5  order?

6    A.    Counsel didn't advise me to do it.  I would

7  have been happy --

8    MR. BOYD:  No, don't --

9    THE WITNESS:  -- to do it.

10    What's that?  Oops.  Sorry.

11    MR. BOYD:  That's fine.  That's all right.

12  BY MR. WARD:

13    Q.    So you relied -- did you rely on advice of

14  counsel as to the wording of the first paragraph of this

15  letter?

16    (The witness reviews the document.)

17    THE WITNESS:  Yes.

18  BY MR. WARD:

19    Q.    Why didn't you include reference in the

20  description of the court order to the portion of the

21  order that allowed Andy Verity and Christina Chang to do

22  business with clients who chose to initiate contact with

23  them?

24    A.    Let me reread this, but I don't think I said

25  anything about that they couldn't do business with

1    people.  I just was telling them how it was related

2    to us.

3        Q.    Well, you --

4        A.    "To prevent," duh, duh, duh, duh, "from

5    soliciting our clients or misappropriating any of our

6    secrets."  I made them aware they've established --

7    they've got their own business --

8              (The witness reviews the document.)

9        THE WITNESS:  -- which they have every right to

10   do.  I don't -- "lawsuit we have" ...

11             (The witness reviews the document.)

12   BY MR. WARD:

13       Q.    Mr. Lillge, do you recall that one part of the

14   temporary restraining order allows people to do business

15   with Andy and Christina if they choose to initiate

16   contact?

17       A.    I've never questioned that.

18       Q.    Okay.

19             Why didn't you include a description of that

20   part of the temporary restraining order --

21       A.    As --

22       Q.    -- in your description of the order?

23       A.    As I said, because that wasn't relevant to

24   what I was talking to the suppliers about.  If

25   they -- you've got to keep in mind, if they were

1    doing business with these people and they wanted to

2    supply fresh artwork and fresh contracts and fresh

3    everything, then they were free to do that.  We

4    weren't in their way.

5         We just didn't want them referencing our

6    artwork, our previous orders, our other particular

7    confidential information, our pricing.

8         Q.    So you chose to describe only the portions of

9    the temporary restraining order that helped you

10   competitively versus Andy and Christina; isn't that the

11   case?

12        A.    I didn't think of it in those terms, sir.

13        Q.    Okay.

14        And you acknowledge that you did not

15   describe the temporary restraining order in its

16   entirety in this communication, did you?

17        A.    I did not include a copy of it, but for no

18   ill reasons, number one; and, number two, it would

19   become an awfully long document, I believe.  I don't

20   know how long the restraining order is, but ...

21        Q.    Okay.

22        A.    But this conveyed the information that I

23   felt was relevant to protect our business.

24        Q.    It would have only required another sentence,

25   Mr. Lillge, to tell your suppliers that Andy Verity and

1    Christina Chang were free to do business with customers

2    who chose to initiate contact with them.

3        A.    I don't know how else I can tell you, sir.

4        MR. BOYD:   There's no question pending, so ...

5    BY MR. WARD:

6        Q.    Isn't that the case?

7        A.    "As you may be aware, Mr. Verity and

8    Ms. Chang have established their own promotional

9    products business, which they have every right to

10   do."

11           So I don't know what else I need to say.

12       Q.    So you didn't think it was necessary to make

13   reference to the part of the order that explicitly gave

14   Verity and Chang the right to do business with customers

15   who chose to initiate contact with them?

16       A.    Can you say that again, please.

17       MR. WARD:   Could you read it back, please.

18           (Record read as follows:

19           "QUESTION:  So you didn't think it was

20           necessary to make reference to the part of the

21           order that explicitly gave Verity and Chang

22           the right to do business with customers who

23           chose to initiate contact with them?")

24       THE WITNESS:  I didn't tell these folks that they

25   couldn't do business, that -- that Andy and Christina

1    couldn't do business with them so why should I tell

2    them that they should?  I'm not playing it either way

3    here, sir.

4    BY MR. WARD:

5        Q.   Well, take a look at the third paragraph, number

6    two, where you say, "Mr. Verity and Ms. Chang are not

7    entitled to any information regarding CMC clients,

8    including products, pricing, artwork, et cetera."

9        A.   Yes.

10       Q.   You see that?

11       A.   Yes.

12       Q.   Now, some of the artwork that you would have

13   submitted to your suppliers would have been artwork

14   actually owned by your clients; is that --

15       A.   That's not true.

16       Q.   Okay.

17            For example, if it was logos of some of your

18   clients?

19       A.   That's not true.

20       Q.   Okay.

21            So, for example, if Bingham McCutcheon

22   provides you its logo, you think you now own Bingham

23   McCutcheon's logo?

24       A.   We own the logo that was sent to the plant

25   on behalf of an order for us, for Creative Marketing

1    artwork very seriously.

2        THE REPORTER:  Exhibit 12.

3            (Lillge Exhibit 12 was marked for

4            identification.)

5            (The witness reviews the document.)

6    BY MR. WARD:

7        Q.    Do you recognize Exhibit 12 as an e-mail you

8    sent?

9        A.    I do.

10       Q.    Who did you send Exhibit 12 to?

11       A.    Creative Marketing Concepts' clients.

12       Q.    So this went out to hundreds of people?

13       A.    Correct.

14       Q.    Why did you send this e-mail?

15       A.    As you can see, there's a few reasons on

16   here.  There's an -- there's an announcement.  So we

17   want to apprise people of what's happening at

18   Creative Marketing Concepts.

19       Q.    Let's --

20       A.    And also to -- to tell them we appreciate

21   their business by offering them a 10 percent free

22   goods offer, as you can see on the bottom.

23       Q.    Let's focus on the second paragraph where you

24   talk about Andy Verity and Christina Chang.

25            Why did you include that paragraph in this

1    e-mail?

2        A.    So that our clients were apprised of what

3    was happening at Creative Marketing Concepts as it

4    relates to Andy and Christina.

5        Q.    Did you rely on advice of counsel as to the

6    propriety of the second paragraph of this e-mail?

7        A.    I did.

8        Q.    So you did run it by counsel?

9        A.    I did.

10       Q.    And you had a discussion with counsel as to

11   whether this was appropriate?

12       A.    I did.

13       Q.    Did counsel suggest to you you really ought to

14   quote the order rather than describe it?

15       A.    Did not.  No, he did not.

16       Q.    Did counsel suggest that you should include a

17   copy of the order rather than describe portions of it?

18       A.    No.

19       Q.    Did counsel suggest that you might want to

20   include the part of the order that made clear that

21   clients were free to do business with Andy and Christina

22   if they chose to initiate contact?

23       A.    I'm not sure I -- if your question is did

24   counsel advise me to say that people were free to

25   do -- that clients were free to do business with Andy

1    and Christina, no, counsel did not advise me to say

2    that.

3        Q.    Why didn't you include a description of that

4    portion of the court's order?

5        A.    Again, relevance.  Didn't seem very

6    relevant.

7        Q.    It didn't help you, did it, Mr. Lillge?

8        A.    Again, we're not saying anything in here

9    where they can't do business with them.  We're just

10   citing what the -- what the court's told us.

11       Q.    Well, you didn't tell them everything that the

12   court had told you, did you?

13       A.    I think we told them what was relevant.

14       Q.    You sent this e-mail to try and discourage

15   people from doing business with Andy Verity and Christina

16   Chang, didn't you?

17       A.    We sent this e-mail, as I stated earlier,

18   for a few reasons.

19       Q.    Okay.

20             And one of the reasons you sent it was to

21   discourage customers from doing business with Andy

22   Verity and Christina Chang?

23       A.    One of the reasons, as you're relating to

24   it, was to apprise them of what was going on.

25       Q.    Well, you didn't apprise them of everything that

290

BEHMKE REPORTING & VIDEO SERVICES
(415) 597-5600

1    was going on because you left out important portions of

2    the order, didn't you?

3        A.    Important piece of --

4        MR. BOYD:  Object to the characterization of the

5    term --

6        THE WITNESS:  -- irrelevant --

7        MR. BOYD:  -- what's important, what's not

8    regarding the court's order?

9            (Simultaneous speaking.)

10   BY MR. WARD:

11       Q.    Well, isn't one of the important parts of the

12   order, Mr. Lillge, that your customers are free to choose

13   to do business with Andy Verity or Christina Chang?

14       A.    What's important to me by way of judgment is

15   that they are restricted from soliciting our clients

16   or initiating contact.

17       Q.    Okay, but that's not my question.

18            Is it unimportant to you that Judge Patel

19   said that your customers are free to do business --

20       A.    It's a non- --

21       Q.    -- with Andy Verity and Christina Chang?

22       A.    It's a nonissue.  The law is the law.  So if

23   they -- if they can do business with them, then

24   that's fine.  You know, if -- again, if they want to

25   go out and do business, let them do business.  But

1    that's not our business.

2        Q.    But wasn't that in Judge Patel's order?

3        A.    I -- well, from memory I can't tell you

4    exactly what was in Judge Patel's order.

5        Q.    Okay.

6              Did you make a decision to selectively

7    describe Judge Patel's order in this e-mail?

8        A.    I made a decision to selectively put in what

9    I thought was relevant in this order as it relates to

10   what the clients should know.

11       Q.    Okay.

12             And what you wanted the clients to know is

13   that they shouldn't do business with Andy or

14   Christina?

15       A.    That's your characterization.

16   MR. BOYD:  Objection.  That misstates the

17   witness's testimony.

18   BY MR. WARD:

19       Q.    Where in your e-mail do you tell these customers

20   that they're free to do business with Andy and Christina

21   if they so choose?  Is that anywhere in this e-mail?

22       A.    I don't --

23   MR. BOYD:  Objection.  The document speaks for

24   itself.

25   THE WITNESS:  I -- I don't know if I have an

1    obligation to -- to get into something I don't find

2    relevant.

3    BY MR. WARD:

4        Q.    Why did you think you had an obligation -- or

5    strike that.

6            Why do you think you had a right to tell

7    your clients what you chose to think was relevant

8    about the court order?

9        A.    Because they're my clients.  And as people

10   were wondering what the status was, I thought this is

11   a great way to update people.

12       Q.    And did you think it was a great way to update

13   people because you had a court order that would prevent

14   Branding Boulevard from responding to this?

15       A.    I don't even know if that was an option.  I

16   don't -- that's not -- that was not a consideration.

17       Q.    Do you think Branding Boulevard has a right to

18   send an e-mail to all the valued clients stating that, By

19   way of clarification, you're free to do business with us

20   as long as you choose to initiate contact?

21       MR. BOYD:  Object to the extent that it calls for

22   the witness to make a legal conclusion with respect

23   to the court's order.

24       THE WITNESS:  I -- I wouldn't have a clue.

25       MR. WARD:  Okay.

1    BY MR. WARD:

2        Q.    Why did you choose not to include the name of

3    Andy Verity and Christina Chang's new business in your

4    September e-mail to customers, Branding Boulevard?

5        A.    Not relevant.

6        Q.    Well, you chose to include the name of their new

7    business in your letter to suppliers, right?

8        A.    People -- well, for good reason, right?

9        Q.    Well, the good reason is that you didn't want to

10   give your customers the name of Andy and Christina's

11   business out of fear that they might decide to contact

12   Andy and Christina; isn't that the case?

13       A.    Well, that's your characterization, sir.

14       Q.    I'm asking you why it's not in there,

15   Mr. Lillge.

16       A.    I have --

17       MR. BOYD:  Why what's not in there?

18       MR. WARD:  Brand- --

19   BY MR. WARD:

20       Q.    The name "Branding Boulevard," why it's not in

21   your September 7 e-mail --

22       A.    People weren't calling --

23           (Simultaneous speaking.)

24       THE REPORTER:  Wait, wait.

25

1    BY MR. WARD:

2        Q.    -- when it was in your June letter.

3        MR. BOYD:  Wait, wait, wait.

4        THE WITNESS:  I'm sorry.

5            People that wanted to know what was going

6    on, they weren't saying, "What's going on with

7    Branding Boulevard," they said, "What's going on with

8    Andy and Christina?"  And that's the issue that we

9    were addressing.  So Branding Boulevard is a

10   nonissue.

11   BY MR. WARD:

12       Q.    When people called you and asked what's going on

13   with Andy and Christina, your first response was that you

14   thought they were heading back to Canada; is that

15   correct?

16       A.    That's -- my first response when people

17   inquired about that is the -- about can they stay in

18   this country, as I said, my understanding in talking

19   to the attorney that Andy employed to handle his

20   immigration and Christina's immigration was that we

21   needed to withdraw their H1B petitions.  And by

22   virtue of that, they would have to go back to

23   China -- I'm sorry -- to Canada, and we in turn

24   needed to supply them with a one-way ticket each.

25       Q.    Eventually at some point in time you learned

1    they had not gone back to Canada; is that the case?

2        A.    Yes.

3        Q.    And so when you learned that, did you start

4    giving people who were asking about Andy and Christina a

5    different answer as to where they had gone?

6        MR. BOYD:   People who called and asked for --

7        MR. WARD:   Yes.

8        MR. BOYD:   -- Andy and Christina's contact- --

9        THE WITNESS:   I had --

10       MR. BOYD:   -- information?

11       MR. WARD:   Yes.

12       THE WITNESS:   I had no other information to give

13   them.

14   BY MR. WARD:

15       Q.    Well, you filed this lawsuit --

16       A.    Yes.

17       Q.    -- in June --

18       A.    Yeah.

19       Q.    -- on June 1.  Or actually --

20       A.    Yeah.

21       Q.    -- probably late May.

22       A.    Yeah.

23       Q.    I don't remember when it was.

24       A.    Yeah.

25       Q.    And you learned that they were doing business as

1   Branding Boulevard; is that correct?

2       A.    Correct.

3       Q.    When anyone after June of 2007 asked you --

4       A.    Yeah.

5       Q.    -- where have either Andy or Christina gone --

6       A.    Yes.

7       Q.    -- did you give them forwarding information that

8   they've gone to a company called Branding Boulevard?

9       A.    Some.

10      Q.    Okay.

11            Who did you give that information to?

12      A.    One in particular that I can remember was

13  Brenda Taylor, I think it is.

14      Q.    Brenda Jones of Taylor Made Travel?

15      A.    Correct.  Yes.

16      Q.    Okay.

17            And she specifically asked where Andy and

18  Christina had gone?

19      A.    Yeah, something to that effect or, "How do I

20  get" -- I think she asked, even, "How do I get in

21  touch with them?"

22      Q.    And did you tell them they've gone to a

23  competing business called Branding Boulevard?

24      A.    I did.

25      Q.    Anybody else you tell other than Brenda Jones?

1      A.    I can't remember anybody else off the top of

2  my head.

3      Q.    Did you try and suggest to Ms. Jones that she

4  shouldn't be doing business with Branding Boulevard?

5      A.    Not in the least.

6      Q.    Did you ever suggest that to any other customers

7  who had asked about Andy or Christina?

8      A.    Nope.

9      Q.    Now, you have characterized Exhibit 12, this

10  e-mail that you sent to your customers, as you wanted to

11  let people know what was going on.

12      A.    Correct.

13      Q.    Why did you need to let people know what was

14  going on with the litigation against Andy and Christina?

15      A.    So that they were apprised of the current

16  status, sir.

17      Q.    Why would they need to know?  What business

18  purpose did it serve to apprise them of the current

19  status?

20      A.    What business purpose did it serve?

21           It -- one business purpose that it served

22  is, is that it would stave off people asking us what

23  happened to Andy and Christina.

24      Q.    And so you wouldn't have to tell them they've

25  gone to Branding Boulevard?

1    A.    Not necessarily they haven't gone to

2 Branding Boulevard, but that this is where we stand

3 with them and that it's a way to bring this up in

4 a -- in a context that people can understand it

5 without having to go into great detail.  It's not

6 pleasant to talk to clients about all the, you know,

7 wranglings that we're going through right now.

8    Q.    If that was your goal, wanting to stave off

9 inquiries about where Andy and Christina had gone, why

10 didn't you just include in this e-mail, "Please,

11 everyone, be advised Andy Verity and Christina Chang can

12 now be found at Branding Boulevard; here's their contact

13 information"?  Why didn't you do that?

14    A.    I don't know.  Why don't I take out an

15 infomercial for them?  You're asking a ridiculous

16 question.

17    Q.    Well, no.  You told me that you're doing this to

18 try and stave off inquiry as to where Andy and Christina

19 have gone.  So why didn't you tell them where they went?

20    A.    As I -- I restate what I just said.  It's a

21 ridiculous question.  Why don't I take out an

22 infomercial for them?

23    Q.    Answer my question.

24    A.    I'm not looking to promote their business.

25    Q.    Okay.  So in other words, you want to discourage

1    people from contacting them; otherwise --

2        A.    I'm not --

3        Q.    -- you would have given their contact

4    information, wouldn't you?

5        A.    No.

6        MR. BOYD:  Objection.  That misstates the

7    witness's testimony.

8    BY MR. WARD:

9        Q.    Well, I'm sorry, do you want to recant what you

10   said about staving off questions about where Andy and

11   Christina have gone?

12       A.    No.

13       MR. BOYD:  That's a different inquiry --

14       THE WITNESS:  It is.

15       MR. BOYD:  -- from trying to discourage people

16   from buying from Andy and Christina.

17   BY MR. WARD:

18       Q.    Well, my question -- you just told me earlier

19   that part of why you included this in this e-mail is you

20   wanted to stave off further inquiry about where Andy and

21   Christina have gone.  Didn't you tell me that?

22       A.    I did.

23       Q.    So if that was your goal, why didn't you just

24   tell everybody where Andy and Christina had gone?

25       A.    I already answered that question two times.

1    Q.    No.    All you've done is characterize it as a

2    ridiculous question and say why didn't you take out an

3    infomercial.    Now I'd like a real answer to my question,

4    Mr. Lillge.

5    A.    I'm -- again, I'm not looking to promote

6    anyone else's business other than our own.

7    Q.    So you sent this paragraph regarding Andy and

8    Christina to promote your business versus theirs, didn't

9    you?

10    A.    I didn't say to promote my business.    I said

11    it in -- in the opposite way, and I would appreciate

12    it if you don't mischaracterize my testimony.    I'm

13    not looking to promote their business.

14    Q.    But if you were looking to stave off inquiry

15    about --

16    A.    Yes.

17    Q.    -- where they'd gone --

18    A.    Yes.

19    Q.    -- the reason you didn't include an answer to

20    that question, Where have Andy and Christina gone, is

21    because you didn't want to promote their business?

22    A.    That would be one way to put it, yeah.

23    Q.    Okay.

24         Is that the only reason you included the

25    second paragraph in this, to stave off inquiry as to