CHANDLER, WOOD, HARRINGTON & MAFFLY
RICHARD HARRINGTON (Bar #28099)
One Maritime Plaza, 4th Floor
San Francisco, CA 94111
Telephone: (415) 421-5484
Facsimile: (415) 986-4874

SHARTSIS FRIESE LLP
ROBERT CHARLES WARD (Bar #160824)
One Maritime Plaza, Eighteenth Floor
San Francisco, CA 94111
Telephone: (415) 421-6500
Facsimile: (415) 421-2922
Email: rward@sflaw.com

DE LA HOUSAYE & ASSOCIATES
C. ANGELA DE LA HOUSAYE (Bar #144218)
KARYNE T. GHANTOUS (Bar #191309)
1655 N. Main Street, Suite 395
Walnut Creek, CA 94596
Facsimile: (925) 944-3343
Phone: (925) 944-3300
Email: angela@delahousayelaw.com

Attorneys for Defendants and Counterclaimants
ANDREW VERITY and CHRISTINA CHANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>          Plaintiff,<br><br>v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>          Defendants. | Case No. C 07-02748<br><br>**DECLARATION OF CHRISTINA CHANG IN OPPOSITION TO APPLICATION FOR ORDER TO SHOW CAUSE RE: CONTEMPT**<br><br>Date:   March 3, 2008<br>Time:   2:00 p.m.<br>Dept:    15, Hon. Marilyn Hall Patel |

- 1 -

Case No. C 07-02748 — DECL OF CHRISTINA CHANG IN OPP TO APPLICATION FOR OSC RE: CONTEMPT

ANDREW VERITY and CHRISTINA CHANG,

        Counter-Claimants,

    v.

MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, and DOES 1 - 10,

        Counter-Defendants.

I, CHRISTINA CHANG, declare as follows:

1. I am a defendant in this action. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify thereto under oath.

2. I have done my best to comply with the Court's orders. The temporary restraining order issued on June 1, 2007 was not written, but I felt that I understood the Court's directive. I carefully read the Court's order granting the preliminary injunction and have been careful to observe its restrictions.

3. I have interpreted both Court orders to allow me to do at least the following: (1) provide one notification to my former customer contacts of my new business contact information; and (2) attempt to sell to customer contacts who either responded to my email giving them notice of my departure or initiated contact with me after I left CMC.

4. Based on my understanding of the Court's orders, I have not solicited anyone for business who I knew to be a customer of CMC at the time I was fired unless that person either responded to my email announcement or initiated contact with me later.

5. Gina Lee was one of my customer contacts who initiated contact with me after she learned that I was leaving CMC. Attached hereto as Exhibit 1 is a true and correct copy of a transcription of a voice mail message that she left on my cell phone on May 11, 2007. I called her back in response to this message. She and I had a continuing dialog throughout the rest of May 2007. At the time that the Court issued the temporary restraining order on June 1, 2007, I considered Gina Lee to be a CMC customer who had initiated contact with me and that, pursuant

to the Court order, we were entitled to attempt to do business with her. Had I believed that I was not allowed to continue my contact with Gina Lee, I would have discontinued communication with her.

6. Gina Lee is mistaken in her recollection that she told me she did not want to do business with me. She never made such an indication when we were talking. The timing of her email on May 22, 2007 is right after Ms. Lee apparently had a conversation with Mark Lillge.

7. I initially started working with Chevron Federal Credit Union in mid-2005 after Lillge told me it was a dead account and that he personally was unable to get any business out of it. Lillge told me he hoped I would be able to develop a personal rapport with the account. I successfully re-established the account but found that the orders dried up when I stopped working on the account during my maternity leave in 2006. At the end of 2006, I was on vacation and left Lillge to handle an order I had been promised. With Lillge's involvement the order was half what had been committed. Chevron Federal Credit Union has at least five promotional products vendors and would regularly get bids from all of them.

8. I talked to Gina Lee again on around November 28, 2007. The conversation described in paragraph 14 of Gina Lee's declaration mischaracterizes our conversation. Lee did tell me that she had been told by Lillge that there was a Court order that precluded me from contacting her. It was clear from her statement that Lillge had not accurately described the Court order to Lee. I told her that the Court order allowed me to contact her as she had initiated contact with me, leaving me a voicemail and asking me to call her back. She told me that this was not what she had been told (presumably by Lillge) and asked me to explain the injunction. I told her she was free to do business with me if she so chose. In response to her questions and statements, I did summarize some of our allegations in this lawsuit. I did so in response to Lee and certainly was not "malicious." My statements to Lee were far more neutral than what Lillge said in his June 2007 letter to suppliers or September 2007 email to customers.

9. One problem with the interpretation of the Court's prior orders has been the part of the order allowing me to announce my new business address, but not allowing me to do so more than once. When Lillge fired me, and I announced to my customer contacts that it was my last

- 3 -

day at CMC, I had no new business address to provide to my contacts at that time. It was only after I was fired that my husband Andrew Verity and I realized that we had to start a business in order to preserve our Visas. It was not until a couple of days after I had been fired that we were able to establish Branding Boulevard and have forwarding business contact information for my customer contacts. When I sent my announcement that it was my last day at CMC, the only forwarding contact information that I could provide was a personal email address, which did not suggest in any way that I was going to another business. Despite this, many of my customer contacts responded with kind words and requests to know where I was going and to stay in touch. To those contacts who responded to my announcement, I later sent my Branding Boulevard contact information after Andy Verity and I got that company up and running. I also think that I should have been able to announce my new business more broadly to all of my customer contacts. My one widespread announcement just said that it was my last day and I feel that I was, and still am, entitled to announce my employment at Branding Boulevard more broadly. However, because of threats from Lillge's counsel and out of fear that the Court would interpret such an announcement as a "second" announcement, I have refrained from a widespread announcement of my new affiliation with Branding Boulevard. My restraint in this regard, by doing even less than what I reasonably think the Court's order allows me to do, shows how seriously I have taken the Court's orders and how careful I have been.

10.     Another problem with the injunction is that a large proportion of customers in this industry come through referrals from other customers. This was true of Creative Marketing Concepts. Lillge has previously stated that a majority of CMC customers were given to sales reps. This was just not the case. Usually a rep would start with one contact in say the marketing department and they would recommend that the rep call a certain contact in the HR department and so on. The injunction does not make clear how a customer is defined. By way of example, I did the first order with Bingham at CMC in 2005. Over the years, those customers were so pleased with my service that they referred others to me. Those customers called and asked for me and not others at CMC. Such was the strength of these referrals that customers would usually wait for me rather than deal with someone else. This pattern was repeated across many

- 4 -

Case 3:07-cv-02748-MHP    Document 106    Filed 02/15/2008    Page 5 of 6

1  customers.

2  11. Plaintiff's suggestion that I violated the Court order in contacting Michelle Chan at Wells Fargo Bank is offensive because my dealings with Ms. Chan indicate the opposite – how I tried hard to obey the Court order and how Lillge has used this litigation abusively to compete with Branding Boulevard unfairly. When I sent my announcement of my last day at CMC, Michelle Chan – whom I had known even before she worked at Wells Fargo – sent me an email asking where I was going. She sent Andy Verity a similar email when he left. In response to Michelle's question, I called her a couple of days later to let her know of my new position at Branding Boulevard. Michelle and I spoke a couple of times during the Summer of 2007, during which she said that Wells Fargo had no orders for promotional products but that if she needed anything in the future, she would think of me. Michelle Chan had initiated contact with me in response to my departure announcement, and it was only for that reason that I had continued conversations with her. Then in November 2007, Michelle Chan asked me to take her off our contact list because of the litigation. She states that she did so in response to Lillge's September 7, 2007 email. Attached hereto as Exhibit 2 is a true and correct copy of my email correspondence with Ms. Chan dated November 8, 2007.

12. The suggestion that I violated the Court order in contacting Rebecca Gutfran is even more outrageous. Rebecca Gutfran did not purchase promotional products from CMC during my employment there. A purchase was made by her predecessor in that position. The main Bingham point of contact, Tess Pascual, had contacted me also immediately in response to my departure announcement and had indicated that Bingham would most likely continue to do business with me rather than CMC because she was very pleased with the service that I had provided to Bingham in the past. I had grown Bingham sales nationwide through referrals, after personally making the initial sale to them. Meanwhile Bingham continues to purchase from multiple vendors in addition to a primary contracted vendor on the East Coast. The email correspondence provided shows that there was a warm relationship with Rebecca Gutfran. In addition to the emails, we talked on the phone on May 22 and she was very concerned about me personally and specifically said that I was at the top of her list of vendors.

- 5 -

Case No.
C 07-02748
DECL OF CHRISTINA CHANG IN OPP TO APPLICATION FOR OSC RE: CONTEMPT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

13. Similarly, the accusation that I violated the Court order through my contact with Doug DiFranco at Kaiser Permanente is outrageous. Mr. DiFranco and I have established a personal and business relationship throughout the various projects we had worked on. I made the initial call to him that introduced him to CMC. He responded to my May 11 departure email and called me on my cell to find out whether I was all right and ask what had happened. He said he wanted to maintain contact with me and seemed pleased that I was staying in the same industry. I am attaching Exhibit 3, a true and correct copy of an email from Mr. DiFranco on May 11 asking me to keep him informed about my next employment.

Executed this 15th day of February 2008 at Berkeley, California.

*/s/ Christina Chang*
CHRISTINA CHANG

7475\001\RWARD\1491764.2

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111