HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
sappel@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone: (415) 354-0100
Facsimile: (415) 391-7124

Attorneys for Plaintiff
Mark Lillge d/b/a Creative Marketing Concepts

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>    Defendants. | Case No. C 07-02748 MHP<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FED. R. CIV. PRO. 56]**<br><br>Date: March 3, 2008<br>Time: 2:00 p.m.<br>Court: Hon. Marilyn Hall Patel |
| ANDREW VERITY and CHRISTINA CHANG,<br><br>    Counterclaimants,<br><br>    v.<br><br>MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, and DOES 1-10,<br><br>    Counterdefendants. | |

PLAINTIFF'S REPLY IN SUPPORT                                                    Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

Distilled of its hyperbole and allegations, Defendants' Opposition fails to establish <u>evidence</u> of a genuine issue of material fact in support of their counterclaims. Defendants rely on argument and inadmissible evidence, coupled with factual assertions which, while possibly in dispute, are not material to this motion. Defendants do not meet their burden.

Defendants acknowledge that CMC has trade secrets, as they must, given their admission in the Answer. They argue, however, that these trade secrets regarding CMC and its customers are somehow different from the trade secrets at issue in this litigation which also are coincidentally regarding CMC and its customers. Just how these respective trade secrets differ, Defendants do not say.

Moreover, Defendants wisely do not assert that CMC has not taken reasonable efforts to keep such information confidential. Defendants themselves, while at CMC, authored numerous e-mails stressing the need to keep such information confidential (and then shredded). Defendants are left only with an attempt to twist the agreement at issue into something that it is not, asserting that it "attempts to restrain employees from competing in the same business as CMC for a period of two years after termination" when it does no such thing. There is no genuine issue of material fact here. For this same reason, Defendants' Section 17200 claim falls.

Regarding Defendant Chang's vacation pay, Defendants again mischaracterize the relevant evidence. It is not the employer's state of mind that is at issue, but rather whether Defendant Chang had any expectation of receiving vacation pay when she originally began working part time for CMC. Her sworn testimony confirms that she did not. Consideration is absent, and so is a viable claim for unpaid vacation pay.

Recognizing that CMC's statements regarding the Court's Order are factually true, Defendants now take the tack that one of the statements to CMC's customers was defamatory because it did not also state that Defendants were free to do business with those customers who initiated contact with Defendants. Yet CMC was under no obligation to promote its competition.

Defendants' claim for tortious interference falls as there is no independent wrong, no actual relationship disruption, no damage, and the only "evidence" of any alleged interference is inadmissible hearsay. Accordingly, the Court should grant CMC's Motion for Partial Summary Judgment.

–1–

CMC need not disprove Defendants' counterclaims. Rather, since Defendants bear the burden of proof on their counterclaims, CMC must merely demonstrate the absence of any real issue of fact as to one or more elements essential to support such claims. *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *See Celotex*, 477 U.S. at 323.

**1. CMC Has Established Trade Secrets As a Matter of Law**

**A. Defendants do not dispute that CMC has confidential information regarding its customer relationships which are not generally known to the public or CMC's competitors and that CMC derives independent economic value from this information which it has developed through substantial time, effort and expense.**

Defendants contest only the first part of the two-part test to establish trade secrets under the California Trade Secrets Act. They do so by arguing that they merely made what they now term an "unremarkable" admission that "some details of CMC's relationships with its customers may be trade secrets."[1] Just what these details are, Defendants do not say, but they take the untenable position of assuring the Court that these are markedly different trade secrets regarding CMC's customer relationships than the ones at issue in this case -- a case that has its genesis in CMC's claim that Defendants had misappropriated CMC's trade secrets regarding these customer relationships.[2] Defendants' contention lacks both merit and logic. Their averment is binding. F.R.C.P. 8(d). The Court should disregard Defendants' contention. *See Milazzo v. United States*, 578 F. Supp. 248, 253 (S.D. Cal. 1984) (affirming motion for summary judgment and rejecting defendant's Constitution-based argument without further discussion: "Although it is rather colorful, the argument does not merit a reply.").

Moreover, even if they dispute the admissibility of their own admission, Defendants do not cite to any admissible facts disputing CMC's assertions. There is no genuine issue of material fact as to the first part of the two-part test to establish trade secrets under California law.

---

[1] Opp., 6, n.1. However, given the admission and FRCP 8(d), there is no "may" about it.
[2] It would perhaps be a different matter if Defendants had claimed that this admission had been in error and sought leave to amend immediately upon being on notice of their admission. However, CMC addressed this admission as early as July 2007, and not once have Defendants sought leave to amend their Answer, or to otherwise address this issue with the Court. The only reasonable inference is that such an admission was intentional and CMC has planned its case strategy accordingly.

–2–

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT                                    Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

### B. CMC maintained efforts to maintain the secrecy of this information

Defendants again do not offer any evidence (or argument) that CMC did not maintain reasonable efforts to keep such information confidential. These efforts are confirmed not only by Defendant Chang's e-mail cited in CMC's memorandum, along with the employee handbook, nondisclosure agreement, and shredding practices, but also by Defendant Verity's own conduct while at CMC.

For example, when one supplier misprinted an order for a CMC customer, Mr. Verity replied:

"I must ask that you destroy them. I know its tempting to use them as samples but this would be bad for both of us. We did a journal book job one time and the plant used an overrun at the PPAI [trade] show. Our client received 20 solicitation calls and was pissed."[3]

Another time, Defendant Verity complained to his sales staff:

"[W]hen I see sloppy files that are not coherently put together/customer paperwork in the garbage can and not the shredding bucket/I'm assuming people either don't care or don't understand what they are doing."[4]

Indeed, Defendant Verity instructed the CMC crew at one point that:

"We now have a new shredding bin – it's the grey box in back by the bins. All paper with client information must go in there without fail."[5]

Defendant Verity re-emphasized this point the following month:

"I just want to expand on what goes into the shredding box. Basically anything with a client name on, including ALL:
- email correspondence
- call-in sheets
- artwork pieces
- Invoice items
- Plant order documentation
- Fax headers
- Envelopes with client addresses

There really shouldn't be anything slipping through that has any kind of client name on it at all."[6]

---

[3] Supplemental Declaration of Ian K. Boyd, ¶2 and Ex. 1 attached thereto.
[4] Boyd Supp. Decl., ¶3 and Ex. 2 attached thereto.
[5] Boyd Supp. Decl., ¶4 and Ex. 3 attached thereto.
[6] Boyd Supp. Decl. ¶5 and Ex. 4 attached thereto.

–3–

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT                    Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

Defendants' own words, coming at a time prior to this dispute when they had no reason other than to be completely candid and forthcoming, confirm that there is no genuine issue of material fact that CMC took reasonable efforts to maintain the secrecy of this information.

### C. The Proprietary Information Agreement complies with California law

Recognizing that CMC does in fact have protectable trade secrets, Defendants are left to argue that the agreement Ms. Chang refused to sign is illegal and against public policy. Unfortunately for Defendants, they spend a fair amount of their brief arguing that the Confidentiality Agreement (signed copies of which disappeared from CMC after Mr. Verity's departure) are in violation of public policy. The problem with this argument is that the Confidentiality Agreement is <u>not</u> the document that Ms. Chang refused to sign which resulted in her termination.

Although Ms. Chang did in fact refuse to sign the Confidentiality Agreement, the agreement that resulted in her termination was the document provided to her by Bruce Molloy, CMC's General Manager at the time. That document was entitled Employee Proprietary Information and Inventions Agreement ("Proprietary Information Agreement"). A true and correct copy of that document, which was concurrently signed by all current CMC employees in the spring of 2007, and which Defendants produced previously in this action, is attached as Exhibit 1 to Mr. Molloy's declaration.[7]

On Friday, May 9, 2007, Mr. Molloy sent an e-mail (produced by Defendants in discovery) where he advised Ms. Chang that:

> On Friday May 4, 2007 I distributed the Company's new *Employee Proprietary Information and Inventions Assignment* to all employees in CMC, including you. These Agreements are non-negotiable, and are a condition of employment for all CMC employees. I asked that the Agreements be returned to me by 3PM on Monday, May 7, 2007.
> At this time, every CMC employee has returned a signed Agreement, except you.
> In our discussions on May 4th, May 7th, and May 9th, you requested additional time to have your attorney review the document, which I considered a fair request. I cannot advise you what to do about your attorney. However, I can tell you that the responsibility for signing the Agreement and remaining employed by CMC rests with you.

---

[7] While Mark Lillge's declaration correctly confirms that Ms. Chang refused to sign the Confidentiality Agreement (before they went missing), Mr. Molloy's declaration (and his concurrent May 9, 2007 e-mail) confirms that Ms. Chang was not terminated until she refused to sign the Proprietary Information Agreement.

–4–

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT    Case No. C 07-02748 MHP
OF MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]

1
2
3
4
> I feel that we have given you a reasonable amount of time to review and consider whether you will sign the Agreement. I am making one final request for you to return a signed document to me. Please be advised that I need your signed Agreement by 12 PM, Noon, May 10, 2007. If you do not plan to sign the Agreement, please inform me so that we can discuss the transition of your accounts.[8]

5
6
7
Ms. Chang refused to sign the Proprietary Information Agreement, and was terminated. Mr. Molloy promptly sent her a letter enclosing a one-way ticket to Canada, given CMC's legal obligation in the face of its required withdrawal of Ms. Chang's H1-B visa. Molloy Decl., Ex. 2.

8
9
10
11
The Proprietary Information Agreement merely precludes any CMC employees from using CMC's proprietary information. Neither Sections 1.1 and 1.2, nor any other provision of this Agreement, preclude Ms. Chang, or any other former CMC employee, from competing against CMC, for any specified length of time or in any geographic region.

12
13
14
15
The Proprietary Information Agreement is tailored to protect CMC's proprietary information, which is without dispute a practice permissible under California law, and not a violation of Business and Professions Code Section 16600. Accordingly, the Court should enter judgment for CMC regarding Defendants' wrongful termination counterclaim, and their related counterclaim under Section 17200.[9]

16
### 2. Defendant Chang failed to provide consideration for her vacation pay claim

17
18
19
20
21
Defendants do not contest that Ms. Chang received all of the vacation pay that she had earned as a full-time employee of CMC, pursuant to CMC's policies. Taking the evidence in the light most favorable to Defendants, however, they allege that "Chang was promised an extra five days of vacation in connection with and as part of her termination by Plaintiff." The issue for the Court is whether there is a genuine issue of material fact as to whether such a promise is enforceable.

22
23
24
25
Defendants contend that there are "factual issues" regarding the "employer's state of mind." Defendants cite only one case for this proposition, *Sischo-Nownejad v. Merced Comm. College Dist.*, 934 F.2d 1104 (9th Cir. 1991). This case fails to support Defendants' position in at least two respects. First, that was a Title VII case where the motive of the employer was germane to whether discrimination

---

[8] Boyd Supp. Decl., ¶6 and Ex 5 attached thereto.
[9] Similarly, the Court should deny Defendant's belated cross motion for summary judgment on Ms. Chang's wrongful termination claim.

–5–

1  existed. The issue here is not the presence of discrimination, but whether there is an enforceable
2  promise. More importantly, even if that case bore any relevance to this action, it was "*expressly*
3  *overruled*" by "Congress's 1991 Civil Rights Act Amendment to Title VII." *Dominguez- Curry v. Nev.*
4  *Transp. Dept.*, 424 F.3d 1027, 1041 (9th Cir. 2005) (emphasis added).

5      The relevant state of mind here is that of Christina Chang. Her sworn deposition testimony
6  confirms that there is no dispute that she did not expect to receive this pay while she performed her
7  services at CMC. Accordingly, even assuming that a subsequent promise was made to Ms. Chang upon
8  her departure, it is not enforceable. *See Dow v. River Farms Co.,* 110 Cal. App. 2d 403 (1952)
9  (resolution to pay executive in consideration of past services held unenforceable given absence of any
10 expectation of payment when services rendered). The Court should dismiss this counterclaim.

11     **3. CMC's statements regarding the Courts' Order were neither false nor misleading.**

12     Coming on the heels of CMC's discovery of disconnected computers, missing confidentiality
13 agreements, client artwork mysteriously downloaded to Mr. Verity's computer on his next-to-last day at
14 CMC, and a lost $20,000 sale to a client due to Defendants' interference and use of CMC's confidential
15 information, among other things, CMC was gravely concerned that Defendants would not comply with
16 the Court's Order. Accordingly, CMC issued a written statement to its suppliers (June 27, 2007 letter)
17 and customers (September 7, 2007 e-mail).[10]

18     **a. The written statements were truthful and not misleading**

19     Defendants do not contend that either the June 27 letter or the September 7 e-mail contains any
20 false statements about the Court's Order. Rather, they argue that the September 7 e-mail is misleading,
21 apparently because CMC did not advise its customers to do business with Defendants. Yet Defendants
22 offer no actual evidence that the statement was misleading, nor that other individuals were in fact misled
23 by this statement. It is true that this communication did not include any assurance from CMC
24 encouraging these customers to contact CMC's direct competitor. It is also true that CMC was under no
25 obligation to make such a statement. Simply because Defendants would have liked the notification

---

[10] As evidenced by CMC's pending application for order to show cause re contempt, these concerns were unfortunately well founded.

–6–

1  worded differently to make it more commercially advantageous to them does not make the statement
2  defamatory. Further, Defendants cannot point to evidence of even one lost sale arising from the
3  statements.
4  "Whether a statement is reasonably susceptible of a defamatory interpretation is a question of
5  law for the court." *Gilbert v. Sykes*, 147 Cal. App. 4th 13 (Cal. App. 2007). The Court should enter
6  judgment for CMC on Defendants' defamation counterclaim.

### b. The oral statement at issue is too vague to give rise to a defamation claim

8  Defendants also submit a portion of deposition testimony from a former customer of CMC, and
9  current customer of Defendants, regarding their claim of an alleged oral defamatory statement. The
10 witness "cannot remember if it was [CMC's principal, Mark Lillge] that called me or some other guy,
11 but this one is familiar." She received multiple follow-up sales calls from different individuals, but could
12 not recall with certainty the specific names of anyone to whom she spoke.[11] When pressed for specifics,
13 the witness confirmed that someone told her that Ms. Chang would now be returning to Canada after she
14 left CMC.[12] The witness then testified:

> I don't – I cannot recall the exact reason, the exact statement or what the answer to my question was, but it – I just heard, like, something, some sort of a visa. That's all I can remember now. It's just too, you know, vague now. I cannot even remember the conversation anymore.[13]

18 This testimony, from a witness uncertain not only as to whom purportedly made such statements,
19 but also what statements were actually made, fails as a matter of law to establish a claim for defamation.
20 *See Silicon Knights v. Crystal Dynamics*, 983 F. Supp. 1303, 1314 (N.D. Cal. 1997) (granting motion to
21 dismiss defamation claim because the complaint "contained only general allegations of the defamatory
22 statements and does not identify the substance of what was stated by the Defendants."). *See also*
23 *Romaneck v. Deutsche Asset Management,* 2005 U.S. Dist. LEXIS 33712, at *19 (N.D. Cal. 2005) ("The

---

[11] Ward Decl., Exhibit 1, 39:23-25
[12] *See* Ex. 2 to Molloy Decl.
[13] Ward Decl., Exhibit 1, 45:15-22

–7–

Court finds the alleged statement that Romaneck was terminated for 'performance' to be too vague to support a claim for defamation.").

In order to assess the truth or falsity of any statement at issue, one must know the entirety of what was allegedly communicated. Was the statement presented by someone at CMC as a belief that Ms. Chang was now legally required to return to Canada? Was the statement made to the witness that Ms. Chang had already returned to Canada, and presented as one of fact? We do not know, because the witness "cannot even remember the conversation anymore." All we do know is that the witness was already in communication with Ms. Chang by the Monday following the Friday when Ms. Chang left CMC (by which time Defendants had opened their doors for business), before anyone from CMC solicited the witness for her continuing patronage.

Defendants have not met their burden of putting forth a prima facie claim for defamation. The Court should summarily dismiss the defamation counterclaim.

**4. Defendants fail to supply any evidence of intentional interference with prospective economic advantage.**

As noted above, Defendants fail to establish an independent wrong beyond the measure of the interference itself. *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995). The mere fact that CMC, as a competitor, was seeking the same business as Defendants, from CMC's own customers, does not give rise to a cause of action. It gives rise to competition. *See Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 476 (1996).

Moreover, the only specific economic "relationship" that Defendants can point to in alleging a disruption is that with Ms. Chan. Defendant Chang alleges that Ms. Chan told her that she "had no

–8–

orders for promotional products but that if she needed anything in the future she would think of me." Chang Decl., ¶8. This statement is hearsay. Federal Rules of Evidence Rule 801(c). It is inadmissible.[14]

Defendants fail to meet their burden to establish evidence of (1) an independent wrong, (2) the actual disruption of any purported economic relationship, and (3) economic harm to the Defendants proximately caused by CMC's acts. The absence of any of these is fatal to Defendants' counterclaim. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153-54 (2003). Here, all three elements are absent. The Court should dismiss the tortious interference counterclaim.

**CONCLUSION**

Defendants do not meet their obligations here through allegations, innuendo and argument, or through their creation of a straw man which they then knock down. They must point to specific material <u>facts</u> in the record to sustain their counterclaims. They fail to do so. The Court should enter judgment for CMC on these counterclaims.

Respectfully submitted,

DATED: February 18, 2008                HARVEY SISKIND LLP

By _____/s/_____
Ian K. Boyd

Attorneys for Plaintiff
Mark Lillge d/b/a/ Creative Marketing Concepts

---

[14] Even if this statement was admissible, a polite "I will think of you" does not meet the requisite level of a "reasonable probability" that this customer would have ultimately purchased anything from Defendants. *See Youst v. Longo*, 43 Cal.3d 64, 71 (1987). In addition, as noted in CMC's application for order to show cause, these communications with Ms. Chan were in direct violation of the Court's Injunction.

–9–