1  HARVEY SISKIND LLP
   IAN K. BOYD (State Bar No. 191434)
2  iboyd@harveysiskind.com
   SETH I. APPEL (State Bar No. 233421)
3  sappel@harveysiskind.com
   RAFFI V. ZEROUNIAN (State Bar No. 236388)
4  rzerounian@harveysiskind.com
   Four Embarcadero Center, 39th Floor
5  San Francisco, California  94111
   Telephone:  (415) 354-0100
6  Facsimile:   (415) 391-7124

7

8  Attorneys for Plaintiff and Counterdefendant
   Mark Lillge d/b/a Creative Marketing Concepts

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
    MARK LILLGE d/b/a CREATIVE            Case No.  C 07-02748 MHP
14  MARKETING CONCEPTS,
                                          **DECLARATION OF IAN K. BOYD
15                Plaintiff,              IN SUPPORT OF MOTION TO STRIKE
                                          EXPERT REPORT OF MILES LOCKER**
16       v.

17
    ANDREW VERITY and CHRISTINA           **Date:    March 31, 2008**
18  CHANG,                                **Time:    2:00 p.m.**
                                          **Court:  Hon. Marilyn Hall Patel**
19
20                Defendants.

21
    ANDREW VERITY and CHRISTINA
22  CHANG,

23                Counterclaimants,

24       v.

25
    MARK LILLGE d/b/a CREATIVE
26  MARKETING CONCEPTS, and DOES 1-10,

27                Counterdefendants.

28

1    I, Ian K. Boyd, declare as follows:

2    1.    I am an attorney at the law firm of Harvey Siskind LLP, counsel of record for Plaintiff

3  and Counterdefendant Mark Lillge d/b/a Creative Marketing Concepts ("CMC").  I have personal

4  knowledge of the matters stated herein, and, if called as a witness, I could and would testify

5  competently thereto.

6    2.    Attached hereto as Exhibit A is a true and correct copy of the expert report of Miles

7  Locker, served by Defendants.

8    I declare under penalty of perjury under the laws of the State of California that the foregoing

9  is true and correct and that this declaration was executed this 25th day of February, 2008, in San

10 Francisco, California.

11

12    _____
              /s/
13           Ian K. Boyd

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

# EXHIBIT A

# TO THE DECLARATION OF IAN K. BOYD IN SUPPORT OF MOTION TO STRIKE EXPERT REPORT OF MILES LOCKER

# EXPERT WITNESS REPORT

To:    Richard Harrington

From:  Miles E. Locker

Date:  February 8, 2008

Re:    Mark Lillge dba Creative Marketing Concepts v. Andrew Verity and Christina Chang.


## SCOPE OF EXPERT ANALYSIS

I have been retained by plaintiffs' counsel in the above-captioned matter to provide an expert opinion on various issues that have arisen in this case, including (1) the method followed by the Division of Labor Standards Enforcement ("DLSE") for determining which Industrial Welfare Commission ("IWC") wage order applies to plaintiffs in this case, (2) the applicability of the commission sales exemption from overtime to plaintiffs in this case, and  (3) the nature of the employer's duty to comply with meal period requirements under Labor Code sections 226.7 and 512, and under the applicable IWC order, the manner in which the IWC, the DLSE and the courts have interpreted those requirements, and the evolution and current state of DLSE enforcement policies regarding the requirement for duty free meal periods.

## EXPERT QUALIFICATIONS

I am a graduate of Boalt Hall School of Law, and I have practiced exclusively in the area of labor and employment law since 1984.  I was employed as an attorney with the Division of Labor Standards Enforcement ("DLSE", also known as the Office of the State Labor Commissioner) of the Department of Industrial Relations of the State of California for sixteen years, from March 1990 through February 2006.  For the first eight years at DLSE, I served as a staff attorney in the San Francisco (headquarters) office, responsible for representing individual wage claimants in superior court proceedings on de novo employer appeals from Labor Commissioner orders, decisions or awards in which the DLSE had awarded unpaid wages and/or penalties to employees.  During this time, I represented wage claimants in over 400 de novo proceedings.  I was also responsible for the prosecution of several civil actions filed against employers, with the Labor Commissioner as the named plaintiff,  pursuant to Labor Code §98.3, seeking class-wide relief in the form of wages or penalties due to large groups of employees who were the victims of systemic unlawful wage and hour practices, including overtime violations.

In May 1998 I was appointed to the position of chief counsel for the DLSE.  I served as chief counsel until October 2001, supervising the DLSE Legal Section, advising the Labor Commissioner on legal issues, overseeing all DLSE litigation, and assisting in the development of DLSE enforcement policies.  I was also responsible for issuing DLSE opinion letters, setting

forth the agency's interpretations of Labor Code provisions and wage and hour regulations. Additionally, I was responsible for conducting training sessions and educational seminars for DLSE enforcement staff (attorneys, deputy labor commissioners, hearing officers, and labor standards investigators), and for various employer and employee organizations throughout the State. In the period following the enactment of AB 60 (the comprehensive state overtime law, which took effect on January 1, 2000), I was responsible for providing advice to the Industrial Welfare Commission ("IWC") as it held public hearings leading to the adoption of the post AB-60 IWC wage orders, and I testified at various IWC hearings on DLSE enforcement policies in regards to various issues that the IWC was addressing in the wage orders.

From October 2001 to February 2006, I served as a senior staff attorney (Industrial Relations Counsel IV) for DLSE, with lead attorney responsibilities in the areas of appellate litigation, civil litigation, anti-retaliation enforcement, and public education. During this period of time, I was assigned to handle DLSE's most complex or novel litigation. I drafted many sections of the DLSE Interpretations and Enforcement Policies Manual that was issued in 2002, and along with three other DLSE attorneys, was responsible for the overall editing of the Manual. I remained responsible for the issuance of opinion letters until November 2003, when the new Administration sharply curtailed the practice of issuing such letters. During the period from 1998 to 2003, I drafted approximately 40 opinion letters that were issued by the DLSE, covering a wide range of topics, including the DLSE's interpretation of overtime and meal and rest period requirements under the IWC orders.

Throughout my career at DLSE, I was routinely called upon to provide advice and guidance to top DLSE officials including the State Labor Commissioner, and to DLSE field investigators, hearing officers, and other DLSE attorneys on issues relating to enforcement policies and interpretations of IWC orders, including the issue of determining which IWC order applies to a particular employer or employees, the applicability of any potential exemptions from overtime, and the nature the employer's duty to comply with meal period requirements.

Over the past ten years, I have spoken at over 40 professional seminars on various topics in the field of wage and hour law, at seminars held by the American Bar Association, the Labor and Employment Law Section of the State Bar of California, the Bar Association of San Francisco, the Sacramento County Bar Association, the Orange County Bar Association, the Sonoma County Bar Association, the Santa Barbara County Bar Association, the Interstate Labor Standards Association, the National Labor Relations Board, the National Lawyers Guild, the AFL-CIO Lawyers Coordinating Committee, and the California Employment Lawyers Association. I have also spoken about wage and hour law on dozens of occasions at seminars held by various employee and employer organizations. Also, since 1991 I have guest lectured every semester at Bay Area law schools, including Boalt Hall, Hastings, and Golden Gate University, on substantive wage and hour law, and on DLSE enforcement policies and practices. Finally, throughout my employment at DLSE, I drafted briefs that were filed and/or argued in over 15 appellate and supreme court level cases, both in state and federal courts.

Since March 2006, I have maintained a solo practice, providing consulting services and advising

other attorneys in the wage and hour field, doing legal research and some drafting of memos and law and motion and appellate briefs. I have provided my services as an expert witness in a variety of employment law matters, testifying at depositions or in trial and/or providing testimony in the form of declarations.

LISTING OF OTHER CASES IN WHICH WITNESS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PAST FOUR YEARS

1. Dahlin v. Sav-On Drug Stores (Los Angeles County Superior Court, Case No.BC227551)
2. Staples Overtime Cases (Judicial Council Coordination Proceeding No. 4235, Orange County Superior Court, Lead Case No, 816121)
3. Duran v. U.S. Bank (Alameda County Superior Court, Case No. 2001-035537)
4. Amalgamated Transit Workers Union Local 1575 v. Golden Gate Transit District (arbitration)
5. Steiner v. Specialty Laboratories (Los Angeles Superior Court, Case No. BC344872)
6. Moreno v. Guerrero Mexican Food Products (United States District Court, Central District of California, Case No. CV05-7737 DSF)
7. Kirk v. Marquee Fire Protection (Sacramento Superior Court, Case No. 05 AS 04638)

ALL PUBLICATIONS AUTHORED BY WITNESS WITHIN THE PAST TEN YEARS

1. Authored "California Wage and Hour Law - A Twenty-Five Year Trajectory," published by the State Bar of California Labor & Employment Law Section, in September 2007 issue of the California Labor & Employment Law Review

2. Co-authored 2002 edition of DLSE Enforcement Policies and Interpretations Manual

3. Authored numerous DLSE opinion letters and enforcement memos during period from 1997 to 2003, including the following that were posted on the DLSE website:

    1998.09.08 (exemption –outside salespersons)
    1998.09.11  (charging applicants for training)
    1998..09.11-1 (work recesses – IWC Order 8-80)
    1998.09-14 (bonus provided in kind – Labor Code section 212)
    1998.09.15 (child labor –prohibited construction work)
    1998.09.17 (vacation "use it or lose it" clause)
    1998.10.05 (administrative exemption and its application to insurance claims adjusters)
    1998.11.04 (overtime – airport shuttle drivers)
    1998.11.09 (hours worked - sleep shifts under IWC Order 5)
    1998.11.12 (employment status – interns)
    1998.11.12-1 (hours worked – training time)
    1998.12.23 (hours worked – uniform changing time/effect of CBA)
    1998.12.28(hours worked – on-call time/apartment resident managers)
    1998.12.28-1(tip pooling)
    1999.01.09 (discharge – payment of commission wages upon termination)

3

1999.05.17 (third party beneficiary claims)
1999.07.19 (electronic pay stubs)
1999.07.26 (administrative exemption – recruiters of temporary employees)
1999.09.22-1(deductions for overpayment of wages)
1999.09.23 (Labor Code §202- contract for definite period of employment)
12/23/99 ("Understanding AB 60')
2000.01.19 (overtime – no pyramiding of hours)
2000.05.17 (employment status – culinary interns)
2000.05.17-1 (independent contractors v. employees – nursing registry)
2000.08.01 (deductions – debiting manager's pay for staff salaries and expenses)
2000.09.29 (Belo contracts)
2000.11.02 (service charges and gratuities)
2000.11.03 (compensation issues for ski industry employees)
2001.01.12 (hours worked – meal periods restricted to employer's premises)
2001.03.22 (stand-by time)
2001.04.02 (meal and rest period requirements for ready-mix drivers)
2001.04.09 (overtime payment for weekend work on public works job)
2001.04.25 (minimum wage – California State University employees)
2001.05.30 (salary basis test)
2001.06.22 (tips – dancers under IWC Orders 5 or 10)
2001.09.17 (rest periods – IWC Order 16)
2001.12.03 (log truck drivers – IWC Order 16)
2001.12.14 (meal and rest period requirements for ready-mix drivers)
2002.01.28 (rest period provisions)
2002.01.29 (hours worked – bus drivers who start and end shifts at different
        locations/obligation to pay hourly employee no less than minimum wage for each
        separate hour worked)
2002.02.21 (hours worked – time spent traveling out of town on business trip)
2002.05.17 (semi-monthly pay periods for non-exermpt employees – Labor Code §226)
2002.06.18 (definition of employer)
2002.08.12 (negative elections to participate in 401(k) plans)
2002.09.04 (requirements for on-duty meal period)
2003.05.23 (exemption from overtime –"key administrative personnel" employed by
        labor unions)
2003.10.17 (private right of action to enforce amounts owed under meal period
        provisions)
2003.11.03 (meal and rest period requirements for employee working alone at work site)

COMPENSATION TO BE PAID TO EXPERT:

$450 an hour for all services.

4

COMPLETE STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS THEREFOR

1) Determining Whether Christina Chang Was Entitled to Overtime Compensation During Her Employment at Creative Marketing Concepts

Opinion — Under both federal and state law, Ms. Chang was not exempt from the payment of overtime compensation for overtime hours worked, and was therefore entitled to payment of overtime compensation for all overtime hours worked.

Basis and Reasons Therefor — State overtime law is set out at California Labor Code section 510 and Industrial Welfare Commission ("IWC") Order 7-2001 (governing wages, hours and working conditions in the mercantile industry), section 3. Under California law, overtime is defined as all hours worked in excess of 8 hours in any workday, or all hours worked in excess of 40 in any workweek. Overtime must be paid at one and one-half times the employee's "regular rate of pay" for all hours worked in excess of 8 (and up to 12) in any workday, and for all hours worked in excess of 40 in any workweek. Overtime must be paid at the rate of twice the employee's "regular rate of pay" for all hours worked in excess of 12 in any workday. However, there is no "pyramiding" of overtime hours, meaning that once an hour is paid at one overtime rate (e.g., for daily overtime), it cannot be counted again for overtime purposes (e.g., for weekly overtime).

Federal overtime law, which is founded upon the Fair Labor Standards Act (29 U.S.C. section 201, et seq.) and implementing regulations (at 29 C.F.R. sections    ), requires overtime compensation at the rate of one and one half times the employee's regular rate of pay for all hours worked in excess of 40 in any workweek. In contrast to state law, federal law does not provide for daily overtime. But the FLSA expressly provides that it does not preempt more protective state or local laws, so that in California, employees are entitled to the best protections available under federal, state and local law. (29 USC §218(a), *Rui One Corporation v. City of Berkeley* (9th Cir. 2004) 371 F.3d 1137.)

Under both federal and state law, there is a presumption that every employee is non-exempt. The employer has the burden of disproving this presumption. (*Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 196-197.) Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms. (*Dalheim v. KDFW-TV* (5th Cir.1990) 918 F.2d 1220, 1224; *Nordquist v. McGraw-Hill Broadcasting* (1995) 32 Cal.App.4th 555, 562.)

I am not aware that Creative Marketing Concepts is contending that Ms. Chang is non-exempt, nor am I aware of any evidence presented by Creative Marketing Concepts ("CMC") that Ms. Chang meets the prerequisites for any exemption from overtime. Bruce Molloy, the general manager of CMC, testified in his deposition that it is his understanding that Ms. Chang, along with all of CMC's customer salespeople, were non-exempt. Sometime in 2007, all of these salespeople, with the exception of Ms. Chang, received overtime payments for overtime compensation that had been owed but was previously unpaid. Also, it is my understanding that

5

prior to January 1, 2005, during the time when Ms. Chang was employed by CMC on a part-time and hourly basis, she was intermittently paid overtime.  Moreover, a job performance review maintained by CMC for Ms. Chang dated March 4, 2004 acknowledges that she was working overtime, and was likely to continue working overtime for the foreseeable future:: "4 year push – then 8 hrs. day."  In January 2005, CMC started to pay her a salary, at which point she stopped receiving overtime pay for overtime hours worked.  But payment of a salary, though a prerequisite for most exemptions from overtime, is not by itself a sufficient ground for exempt status.  Additional factors are required which are not present here.  Under California law, for exempt status under the executive, administrative or professional exemptions, the employee must be "primarily engaged" (that is, spend more than 50% of his or her work-time engaged) in the performance of work that meets the test of the applicable exemption.  Under federal law, the employee's "primary duty" must consist of work that is exempt.  Ms. Chang was primarily engaged in (and her primary duty consisted of) non-exempt customer sales work.

Under state law, the executive, administrative and professional exemptions are set out at IWC Order 7-2001, section 1(A).  The executive exemption clearly does not apply here, as it requires, among other things, that the person must be primarily engaged in duties that involve the management of the enterprise or a customarily recognized department or sub-division thereof, and that the person customarily and regularly directs the work of two or more other employees therein, and that the person have the authority to hire or fire or make effective suggestions thereto.  Ms. Chang performed none of these duties, let alone all of them.

The administrative exemption requires, among other things, that the employee must be primarily engaged in the performance of  office or non-manual work "directly related to management policies or general business operations of his/her employer or his/her employer's customers."  The IWC order provides that "activities constituting exempt and non-exempt work shall be construed in the same manner as such terms are construed under the Fair Labor Standards Act effective as of the date of this order [the Order was adopted on June 30, 1999, and took effect three months thereafter as IWC Order 7-2000, relabeled 7-2001 effective 1/1/2000]." The IWC Order then lists various federal regualation that were then in effect to be used for this purpose, including 29 CFR section

*Martin v. Cooper Electric Supply Co.* (3rd Cir. 1991) 940 F.2d 896, holds that inside salespersons employed by a wholesale supplier are not engaged in administrative work, but are non-exempt "production employees."

2) Calculating the Amount of Overtime Compensation Owed to Christina Chang

Opinion – Ms. Chang is owed a total of **$85,245.43 for overtime** owed pursuant to Labor Code §510 and IWC Order7-2001,  **plus $12,789.60 in interest** on this unpaid overtime(as of 2/8/08) pursuant to Labor Code §218.6, with interest continuing to accrue at the rate of $23.36 per day.

6

Basis and Reasons Therefor — Although both the California Labor Code and the IWC orders expressly provide that overtime calculations are based on the employee's regular rate of pay, neither the Labor Code nor the IWC orders provide a definition of the term "regular rate of pay." The DLSE, as the agency charged with the enforcement of state overtime requirements (see Labor Code §§90.5, 98.3, 558, 1193.6, 1194.5), necessarily must interpret these requirements, and any such interpretations and enforcement policy guidelines are available to the public pursuant to Labor Code §1198.4. Many of DLSE's interpretations and enforcement policy guidelines, including the DLSE Enforcement Policies and Interpretations Manual are now available on the agency's website. Computation of the regular rate of pay and overtime calculations are covered extensively at Chapter 49 of the DLSE Manual, available at www.dir.ca.gov/dlse/Manual-Instructions.htm.

The DLSE takes the position that "in not defining the term 'regular rate of pay,' the Industrial Welfare Commission has manifested its intent to adopt the definition of 'regular rate of pay' set out in the Fair Labor Standards Act ("FLSA"), 29 USC §207(e)." (DLSE Manual, §49.1.2.) Section 207(e) states that the regular rate at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf, except for those forms of compensation that are expressly excluded, by this statute, from consideration in determining the regular rate. These excluded forms of compensation are set out at DLSE Manual §49.1.2.4, and may be summarized as follows:

    1. Sums paid as discretionary gifts, the amounts of which are not measured by or dependent on hours worked, production or efficiency.

    2. Payments made for occasional periods when no work is performed due to vacation, holiday, illness, etc., and payments made as reimbursements for business expenses incurred by the employee for the benefit of the employer.

    3. Sums paid for services performed if either (a) both the fact that payment is made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the pay period, and not pursuant to any prior agreement causing the employee to expect such payments regularly, or (b) the payments are made pursuant to a bona fide profit sharing plan, under which the amounts paid to the employee are determined without regard to hours of work, production or efficiency.

    4. Contributions irrevocably made by an employer to a trustee or third party pursuant to a bona fide pension, health insurance, or similar employee benefit plan.

    5. Extra compensation provided by a premium rate paid for hours worked in excess of 8 in a day or in excess of 40 in a week, or in excess of the employee's regular working hours.

6.  Extra compensation provided by a premium rate paid for work performed on Saturdays, Sundays, holidays or regular days of rest, or on the sixth or seventh day of any workweek, where such premium rate is not less than one and one-half times the rate established in good faith for work performed in non-overtime hours on other days.

7.  Extra compensation provided by a premium rate for work outside the hours established in good faith as the basic or regular workday (not exceeding 8 hours), or workweek (not exceeding 40 hours), where such premium rate is not less than one and one-half times the rate established in good faith for like work performed during such regular workday or workweek.

It should be noted that the DLSE Manual fails to list the eighth, and final form of compensation that must be excluded for regular rate calculations under the FLSA - - any income derived from employer-provided grants or rights provided pursuant to a stock option or employee stock purchase program, where such grants or stock options meet the detailed specifications set out at 29 USC §207(e)(8).  This subsection was added as a result of amendments to the FLSA that were enacted in 2000, and it appears that but for inadvertence, this now excludable form of compensation would have been listed in the DLSE Manual, as the DLSE's clear intent is to follow federal law with respect to the forms of compensation that are to be included or excluded in calculating the regular rate of pay.

The federal regulations, adopted by the Secretary of Labor implementing the FLSA, provide a detailed analysis at 29 CFR §§778.108-778.224, of the various forms of compensation that must be included or excluded in calculating the regular rate of pay.  According to the DLSE Manual, "in determining what payments are to be included or excluded from the calculation of the regular rate of pay, California law adheres to the standards adopted by the U.S. Department of Labor to the extent that those standards are consistent with California law."  (DLSE Manual §49.1.2.)  In fact, the DLSE Manual and related DLSE opinion letters do not identify any area of conflict between federal and state law with respect to what forms of compensation must be included or excluded in determining the regular rate of pay.  The difference that does exist between federal and state law is confined to the method of calculating the regular rate and the unpaid overtime rate when an employee is compensated, either in whole or in part, by payment of a fixed salary – i.e., a fixed payment for the work performed on a daily or weekly or longer basis of time.  (See Labor Code §515(d); *Skyline Homes, Inc. v. Department of Industrial Relations* (1985) 165 Cal.App.3d 239, disapproved on other grounds in *Tidewater Marine Western v. Bradshaw* (1996) 14 Cal.4th 557.)

Under both federal and state law, the regular rate is a rate per hour.  (29 CFR §778.109.)  Employers are not required to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission or other basis.  (See, e.g., Labor Code §200, defining "wages" as "all amounts for labor performed by employees ... whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.)  But when employees are paid on some basis other than hourly pay, the overtime

8

compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, it is therefor necessary to compute the regular hourly rate of such employees during each workweek. (29 CFR §778.109.)  The regular rate is determined by application of established legal principles, without regard to what may designated by the employer as the purported regular rate. (29 CFR §778.108.)  "Once the parties have decided upon the amount of wages and the mode of payment, the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the contracts." (*Walling v. Youngerman-Reynolds Hardware Co.* (1945) 65 S.Ct. 1242, 1245.)

Perhaps the most important principle expressed in these federal regulations with respect to computing the regular rate of pay is found at 29 CFR §778.200(c): "[A]ll remuneration for employment paid to employees which does not fall within one of these [now eight] exclusionary clauses [set out at 29 USC §207(e)] must be added into the total compensation received by the employee before his regular hourly rate of pay is determined."  This is, of course, consistent with the definition of the regular rate at 29 USC §207(e), i.e., that it "shall be deemed to include all remuneration for employment" except for the specified statutory exclusions.  Thus, the DLSE follows federal regulations under which amounts paid to employees as production bonuses, piece rates or commissions are included in computing the regular rate of pay.  This is true regardless of whether these sorts of "incentive pay" are the employee's sole source of compensation, or merely constitute a part of the employee's compensation package. (DLSE Manual §§49.1.1, 49.1.2.1; 29 CFR §§778.110(b), 778.111, 778.117, 778.208.)

29 CFR §778.208 expressly provides that "discretionary bonuses" (bonuses which are given as gifts rather than as the result of a previously made contractual promise to make such payments based on employee performance, employer profitability, or some other specified factor) are excludable from the regular rate, since such "discretionary bonuses" fall under one of the specified exclusions from the regular rate at 29 USC §207(e).  (The factors that distinguish a discretionary from a non-discretionary bonus are set out at 29 CFR §778.2111.)  Any "non-discretionary" bonus that does not fall under one of the other exclusions found at 29 USC §207(e) "must be totaled in with other earnings to determine the regular rate on which overtime pay must be based.

29 CFR §778.209 sets out the method for including non-discretionary bonus payments in the regular rate:  In situations where the bonus payments are made less frequently than each workweek, "the employer may disregard the bonus In computing the regular hourly rate until such time as the amount of the bonus can be ascertained.  Until that is done, he may pay compensation for overtime at one and one half times the hourly rate paid by the employee [sic], exclusive of the bonus.  When the amount of the bonus can be ascertained, it must be apportioned back over the workweeks of the period during which it may be said to have been earned.  The employee must then receive an additional amount of compensation for each workweek that he worked overtime during the period equal to one-half the hourly rate of pay allocable to the bonus for that week multiplied by the number of statutory overtime hours worked during the week." (29 CFR §778.209(a).)  If it is impossible to allocate the bonus among the

workweeks of the period in proportion to the amount of the bonus actually earned each week. "it may be reasonable and equitable to assume that the employee earned an equal amount of the bonus each hour of the pay period and the resulting hourly increase may be determined by dividing the total bonus by the number of hours worked by the employee during the period for which it was paid. The additional compensation due for the overtime workweeks in the period may then be computed by multiplying the total number of statutory overtime hours worked in each such workweek during the period with one-half this hourly increase." (29 CFR §778.209(b).)

Under California law, the salary component of a non-exempt employee's compensation serves as compensation only for non-overtime hours– i.e., the salary does not provide any compensation for the non-exempt employee's overtime hours. This so-called "non-fluctuating work week" is codified at Labor Code §515(d): "For the purpose of computing the overtime rate of compensation required to be paid to a nonexempt full-time salaried employee, the employee's regular hourly rate shall be 1/40th of the employee's weekly salary." The employee is then entitled to payment at the applicable overtime rate (one and one half times or twice the regular rate) for all overtime hours worked.   In contrast, under the FLSA, which uses a "fluctuating workweek method," the salary component is deemed to serve as straight-time compensation for all hours worked, including overtime hours. Thus, under federal law, the regular rate of a salaried employee is determined by dividing the employee's  weekly salary by the total number of hours worked that week, and the employee is then entitled to an additional one-half of the regular rate for all overtime hours worked that week.

While California and federal law differ as to how salary is factored into the regular rate of pay, there is no difference between state and federal law as to how a bonus is factored into the regular rate of pay – the bonus component is factored in using a fluctuating workweek method, i.e., dividing the bonus earned by the total number of hours worked (including overtime hours) in the relevant time period. Since the bonus is deemed to constitute straight time earnings for all hours worked, all that is owed for overtime compensation for the bonus is an additional one-half of the bonus regular rate for overtime that must be paid at one and a half times the regular rate, and an additional straight time bonus rate for overtime that, under California law, must be paid at twice the regular rate.

I have been provided with the following information concerning Ms,.Chang's hours worked and compensation earned under California law:

**During the period from January 1 to December 31, 2005**, she was not paid any overtime compensation. She routinely worked 5 days a week, Monday to Friday, 11 hours a day (from 9 or 9:30 am to 8 to 9 pm, with no meal breaks during the day), but once every 2 weeks on one weekday worked an extra 2.5 hours, for a 13.5 hour day (working until 11pm), and worked 4 additional hours every weekend. She did not take any vacation time in 2005, and took off for six holdays (New Years, Memorial Day, July 4, Labor Day, Thanksgiving and Christmas).

10

She therefore worked a total of 59 hours in a "normal" workweek (11 hours each day Mon-Fri, plus 4 hours during the weekend), with 19 hours of overtime, all of which should b paid at the rate of one and half times her regular rate of pay. In an "extended" workweek (every other week), she worked 61.5 hours, with 21.5 hours of overtime (of which 20 hours should be paid at one and one half times her regular rate of pay, and 1.5 hours should be paid at twice her regular rate of pay –based on the fact that she was working 13.5 hours on the "extended" day. However, there were six weeks in which, because of holidays, she only worked 49 hours, of which 12 hours count as overtime payable at one and a half times her regular rate (based on 4 weekdays with 11 hours worked each day, for a total 3 hours overtime each day).

Throughout 2005, she worked 23 "normal" 59 hour workweeks (during which she worked a total of 1,357 hours, of which 437 were overtime hours at one and one-half times the regular rate), 23 "extended" 61.5 hour workweeks (during which she worked 1,414.5 hours, of which 460 were overtime hours at one and one half times the regular rate and 34.5 were overtime hours at double the regular rate), and 6 "short" 49 hour workweeks (during which she worked 294 hours, of which 72 were overtime hours at one and one half times the regular rate), for a total of 3,065.5 hours worked in 2005 (of which 969 were overtime hours at one and one half times the regular rate, and 34.5 were overtime hours at double the regular rate).

In 2005, Ms. Chang was paid an annual salary of $52,000 plus she earned an annual non-discretionary bonus, computed at the end of the year based on her sales totals for the year, of $17,669. In order to compute the regular rate, we first start with the salary component, and divide $52,000 by 52 weeks of the year, and divide that by 40 non-overtime hours per week, resulting in the salary component of the regular rate at $25 per hour. The bonus component of the regular rate is computed by dividing the total bonus payments, $17,669, by the total number of hours worked during the year (3,065.5 hours), for a bonus component of the regular rate at $5.76 per hour. We will need to keep these components separate in calculating overtime compensation owed under California law. For the salary component, the overtime rate is $37.50 an hour for all overtime hours for which she is entitled to one and one half times the regular rate, and $50 an hour for all overtime hours for which she is entitled to double the regular rate. For the bonus component., the overtime rate is $2.88 an hour for all overtime hours for which she is entitled to one and a half times the regular rate, and $5.76 an hour for all overtime hours for which she is entitled to double the regular rate. We can now combine these components of the overtime rate, giving us $40.38 an hour for all overtime hours for which she is entitled to one and a half times the regular rate (969 hours), and $55.76 an hour for all overtime hours for which she is entitled to double the regular rate (34.5 hours). Computing the overtime compensation owed, we arrive at a total of **$41,051.94 overtime compensation owed for 2005.**

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) The overtime wages on the bonus component of her compensation became due on the pay

11

day for the pay period in which the bonus became ascertainable, i.e., very shortly after December 31, 2005. (See DLSE Opinion Letter 1986.12.23.) For ease of calculation, I will use December 31, 2005 as the date for payment of all 2005 overtime compensation (although it should be noted that this method decidedly benefits the employer, since the overwhelming majority of overtime compensation is based on Ms. Chang's salary component, and as such, was due regularly throughout the year). At 10% a year since December 31, 2005, Ms. Chang is presently owed (as of February 8, 2008) **$8,649.02 in interest on her unpaid 2005 overtime**, with interest accruing at the rate of $11.25 per day.

**During the period from January 1 to December 31, 2006**, she was again not paid any overtime compensation. In 2006, Ms. Chang was off on maternity leave from January 1 to April 22, a total of 16 weeks. She was also off on vacation from December 19 to December 31, a total of just under 2 weeks. She worked for 34 weeks that year, during which time she was off for four holidays (Memorial Day, July 4, Labor Day and Thanksgiving).

On "normal" weeks, she worked Monday to Friday, from between 9:30 or 10 am until 7:30 or 8 pm, with no time off for meal breaks, with 10 hours work each day, for a total of 50 hours, of which 10 hours were overtime at the rate of one and a half times her regular rate of pay. She worked 15 "normal" weeks that year, for a total of 750 hours worked in those weeks, of which 150 were overtime hours for which she was entitled to one and a half times her regular rate.

Prior to July, on "extended" weeks (every other week)., she worked until an additional 3.5 hours on one weekday (working until about 11pm), for a total 53.5 hours a week working 10 hours a day on four weekdays, and 13.5 hours on the other weekday), consisting of 12 overtime hours at time and a half, and 1.5 overtime hours at double the regular rate of pay. Prior to July, she worked 4 "extended" weeks, for a total of 214 hours worked in those weeks, of which 48 were overtime hours for which she was entitled to one and a half times the regular rate, and 6 were overtime hours at double the regular rate of pay.

Starting in July, she worked 4 hours every other weekend, so that her "extended" weeks for the remainder of 2006 consisted of 57.5 hours worked (10 hours each day for 4 weekdays, 13.5 hours on the other weekday, and 4 hours on the weekend), consisting of 16 hours of overtime at one and a half times the regular rate and 1.5 hours of overtime at double the regular rate. From July to the end of the year, she worked 11 "extended: weeks, for a total of 632.5 hours worked in those weeks, of which 176 were overtime hours at one and one half times the regular rate, and 16.5 were overtime hours at double the regular rate.

In 2006 she worked four "short" weeks, during which she worked only four days at 10 hours per day, for a total of 8 hours overtime each "short" week, at one and one half times her regular rate of pay. She worked a total of 160 hours in these "short weeks," of which 32 were overtime hours at the rate of time and a half.

12

For 2006, therefore, Ms. Chang worked a total of 1,756.5 hours, consisting of 428.5 overtime hours (of which 406 are payable at one and one half times her regular rate of pay, and 22.5 are payable at double her regular rate of pay).

For 2006, she was paid on the basis of a $64,000 annual salary plus she was paid an annual non-discretionary bonus, computed at the end of the year based on her sales totals for the year, of $24,525. In order to compute the regular rate, we first start with the salary component, and divide that into a weekly amount (here, $1,230.77), and divide that weekly amount by 40 non-overtime hours per week, resulting in the salary component of the regular rate at $30.77. per hour. The bonus component of the regular rate is computed by dividing the total bonus payments, $24,525, by the total number of hours worked during the year (1,756.5 hours), for a bonus component of the regular rate at $13.96 per hour. We will need to keep these components separate in calculating overtime compensation owed under California law. For the salary component, the overtime rate is $46.15 an hour for all overtime hours for which she is entitled to one and one half times the regular rate, and $61.54 an hour for all overtime hours for which she is entitled to double the regular rate. For the bonus component., the overtime rate is $6.98 an hour for all overtime hours for which she is entitled to one and a half times the regular rate, and $13.96 an hour for all overtime hours for which she is entitled to double the regular rate. We can now combine these components of the overtime rate, giving us $53.13 an hour for all overtime hours for which she is entitled to one and a half times the regular rate (406 hours), and $75.50 an hour for all overtime hours for which she is entitled to double the regular rate (22.5 hours). Computing the overtime compensation owed, we arrive at a total of **$23,269.53 overtime compensation owed for 2006.**

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) The overtime wages on the bonus component of her compensation became due on the pay day for the pay period in which the bonus became ascertainable, i.e., very shortly after December 31, 2006. (See DLSE Opinion Letter 1986.12.23.) For ease of calculation, I will use December 31, 2006 as the date for payment of all 2006 overtime compensation (although it should be noted that this method decidedly benefits the employer, since the overwhelming majority of overtime compensation is based on Ms. Chang's salary component, and as such, was due regularly throughout the year). At 10% a year since December 31, 2006, Ms. Chang is presently owed (as of February 8, 2008) **$2,575.59 in interest on her unpaid 2006 overtime**, with interest accruing at the rate of $6.38 per day.

**During the period from January 1 to May 11, 2007** (the date she was discharged), Ms. Chang worked 17 out of the 19 weeks (she was off on vacation for two weeks, from January 1-15). During the 17 weeks she worked, there were no holidays. For the first time in her employment, Ms. Chang began taking a 30 minute off-duty meal period, albeit only one day a week. She worked 10.5 hours per day 2 weekdays each week (9 am to 7:30 pm), 11.5 hours per day 2 other

days each week (9 am to 8:30 pm), and 14.5 hours on the other weekday each week. Also, during the period from January 15 to the end of March, she worked 4 hours every other weekend, for a total of 6 times.

On "normal" workweeks, she therefore worked 58 hours (58.5 hours less one half hour off-duty meal each workweek), consisting of 18 overtime hours, of which 15.5 or 16 are payable at time and a half and 2 or 2.5 are payable at double time. (The range is the result of some uncertainty, on my part as I failed to inquire, as to the day that the one off-duty meal period each week was taken. For now, I will resolve this uncertainty to the benefit of the defendant, and assume that the meal period was taken on the workday in which she worked the greatest number of hours, so as to minimize the defendant's liability for overtime at the double time rate. This assumption will result in 16 overtime hours payable at time and half, and 2 overtime hours payable at twice the regular rate.) During this 17 week period in 2007, Ms. Chang worked 11 "normal" workweeks, for a total of 638 hours worked, of which 176 are overtime hours payable at one and one half times her regular rate of pay, and 22 are overtime hours payable at double her regular rate of pay.

On "extended" workweeks, she worked the additional 4 hours on the weekend. These 4 hours were overtime hours payable at the rate of one and one half times her regular rate of pay. Thus, in an "extended" workweek, Ms. Chang worked 62 hours, with 20 overtime hours payable at one and a half times her regular rate of pay, and 2 overtime hours payable at double her regular rate of pay. She worked 6 "extended" workweeks during this period of time, resulting in a total of 372 hours worked for all such weeks, with 120 overtime hours at time and a half, and 12 overtime hours at double time. (Here too, I made the same assumption, to the benefit of the defendant, that Ms. Chang took her one off-duty meal period each week on the day that she worked the greatest number of hours.)

For 2007, we get these total amounts: 1010 hours worked, consisting of 330 overtime hours (296 of which are payable at one and one half times the regular rate, and 34 of which are payable at double the regular rate).

For 2007, Ms. Chang was paid on the basis of an annual salary of $85,000. (She was also promised an annual non-discretionary bonus, to be computed at the end of the year based on her sales totals for the year, she has not been paid any pro-rata share of this bonus, and I would expect the defendant to contend that an employee who is not employed at the end of the year is not eligible for the bonus. Without conceding that point, I will base my calculation of the regular rate for 2007 solely on the salary component of her compensation.) In order to compute the regular rate, we divide the annual salary by 52 to derive a weekly amount (here, $1,634.62), and divide that weekly amount by 40 non-overtime hours per week, resulting in a regular rate of $40.87. per hour. The overtime rate is $61.30 an hour for all overtime hours for which she is entitled to one and one half times the regular rate (296 hours), and $81.74 an hour for all overtime hours for which she is entitled to double the regular rate (34 hours). Computing the overtime compensation owed, we arrive at a total of **$20,923.96 overtime compensation owed for 2007.**

14

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) Moreover, any unpaid earned wages must be paid immediately at the time of discharge. (Labor Code §201.) For ease of calculation, I will use May 11, 2007 as the date for payment of all 2007 overtime compensation (although it should be noted that this method decidedly benefits the employer, since overtime compensation should have been paid regularly throughout the year pursuant to Labor Code §204). At 10% a year since May 11, 2007, Ms. Chang is presently owed (as of February 8, 2008) **$1,564.99 in interest on her unpaid 2007 overtime**, with interest accruing at the rate of $5.73 per day.

Adding up all of Ms. Chang's unpaid overtime compensation, she is owed a total of $85,245.43 for overtime owed pursuant to Labor Code §510 and IWC Order 7-2001, plus $12,789.60 in interest on this unpaid overtime (as of 2/8/08) pursuant to Labor Code §218.6, with interest continuing to accrue at the rate of $23.36 per day.

3) Determining Whether Christina Chang Is Owed Additional Wages for Missed Meal Breaks Under Labor Code section 226.7

Opinion — For almost her entire employment from January 1, 2005 until her discharge on May 11, 2007, the defendant failed to comply with the meal period provisions of IWC Order 7-2001, under which Ms. Chang was to have been completely relieved of all duty for an off-duty meal period for each day that she worked over 5 hours. The defendant violated the requirements of the IWC order by requiring, or suffering, or permitting Ms. Chang to work at her desk instead of taking this required off-duty meal period. The mandate of the IWC order is quite clear: "No employer shall employ any person for a work period of more than 5 hours without a meal period of not less than 30 minutes." The IWC order expressly defines the term employ to include to "suffer or permit to work." An on-duty meal period is only permitted "when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on the job meal period is agreed to." Otherwise, the required meal period must be one in which the employee is off-duty, and not performing any work. Here, these prerequisites for a lawful on-duty meal period were entirely absent, as the nature of the work was not such as to prevent Ms. Chang from being relieved of all duty, and there was nop written agreement between her and CMC agreeing to an on-duty meal period. Pursuant to Labor Code §226.7(b), "If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." Amounts owed pursuant to Labor Code §226.7 have ben characterized by the California Supreme Court as wages. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094.) Consequently, the defendant owes Ms. Chang wages pursuant to Labor Code §226.7(b) for each workday in which she did not have an off-duty meal period.

15

Basis and Reasons Therefor — Labor Code §512 was added to the Labor Code on January 1, 2000, with the enactment of AB 60. Section 512(a) states:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by the mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than ten hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived."

Section 512 applies to all employees employed by private employers in California except for persons employed in an "agricultural occupation," as defined by IWC Order 14-80. (See Labor Code §554(a).) As such, Section 512 was a codification of the basic requirement found in every other IWC order for the past several decades. (See *California Manufacturers Ass'n v. IWC* (1980) 109 Cal.App.3d 114-115 [noting that the meal period provisions in section 11 of IWC Order "have been substantially the same since 1947."]

Labor Code §226.7 was added to the Labor Code on January 1, 2001 with the enactment of AB 2509. It creates a statutory obligation for employers to comply with meal period requirements contained in the applicable IWC order, and mandates payments to employees for an employer's failure to comply with these requirements. It contains two subsections, and the requirements of the second subsection go beyond those of the first.

Subsection (a) states: "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission."

Subsection (b) states: "If an employer fails to provide an employee with a meal or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."

IWC Order 7-2001, section 11, provides, in relevant part:

> (A) No employer shall employ any person for a work period of more than five hours without a meal period of not less than 30 minutes, except that when a work period of not more than six hours will complete the day's work, the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work

16

prevents the employee from being relieved of all duty and when by written agreement between the parties an on-the-job meal agreement is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

Rest period requirements in these IWC orders are phrased differently than the meal period requirements. Rest period requirements, which are found at section 12 of these IWC orders, do not contain the "no employer shall employ" language. Rather, the standard for rest periods is that "Every employer shall authorize and permit all employees to take rest periods ...."

Also, the meal period requirements contained in IWC Order 14-2001, which governs wages, hours and working conditions for employees employed in "agricultural occupations," differ from the meal period requirements contained in every other wage order, in that while every other wage order uses the "no employer shall employ" language for meal periods, the meal period provisions in Order 14-2001 (and in its predecessor Order, 14-80) use the "authorize and permit" standard. Prior to 1980, the meal period provisions in Order 14, like those of the other wage orders, used the "no employer shall employ" language.

The word "provide" in Labor Code §226.7(b) cannot be interpreted in isolation, but must be read in context of the entire sentence in which it appears. The statute imposes a requirement of an extra hour of pay when "an employer fails to **provide** an employee a meal period or rest period **in accordance with an applicable order** of the Industrial Welfare Commission." The relevant inquiry is not whether meal periods were "provided" by the employer, but rather, whether meal periods were provided "in accordance with [the] applicable [IWC] order." Linguistic analysis of the meaning of the word "provide" is singularly unhelpful, as the IWC orders themselves tell us what an employer must do to provide a meal period under the requirements of each order. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["the meaning of a statute may not be determined from a single word; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."])

The "no employer shall employ" standard is stricter than the "authorize and permit" standard Section 11(A) of the various wage orders (except Order 14) begins with the words "No employer shall employ." The word "shall" invokes an affirmative obligation on the part of the employer not engage in the proscribed conduct. It is a standard of statutory construction in California that "shall" imposes an "affirmative obligation." (See *Wright v. Superior Court* (1997) 15 Cal.4th 521, 525-526; see also *Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 ["the word 'shall' is mandatory and the word 'may' is permissive, unless otherwise apparent from the context"].)

17

The term "employ" is defined in all of the IWC orders to mean "to engage, suffer or permit to work." (See IWC Order 7-2001, section 2(D).) Based upon this definition of the term "employ," Section 11(A) of the applicable wage order requires that no employer shall **suffer or permit** an employee to work over five hours without a meal period of not less than 30 minutes.. Given this definition of "employ," it is plain wrong to suggest that an employer is in compliance with the wage order if it merely makes meal periods available without ensuring that employees actually take these meal breaks. The IWC order's definition of "employ" makes it clear that non-compliance with the wage order is not limited to situations where an employer requires an employee to continue working beyond five hours without a meal period. Under every wage order except Order 14, an employer "shall" not suffer or permit an employee to keep working beyond five hours without a 30 minute meal period. This means that an employer has an affirmative obligation to ensure that the meal period is taken.

Section 11(A) of the various wage orders places an additional affirmative obligation on the employer – to relieve the employee of all duty during the thirty minute off-duty meal period. The only exception to this is if all of the following conditions exist which allow for an "on-duty" meal period: 1) "the nature of the work prevent the employee from being relieved of all duty," and 2) the employer and employee enter into a written agreement for an on-the-job meal period, and 3) the written agreement expressly states that the employee may, in writing, revoke the agreement at any time.

Under the wage orders, there are only two circumstances under which a required meal period can be waived by an employee. First, if a work period of no more than six hours will complete the days work, the meal period may be waived by the mutual consent of the employee and employer. Second, where the nature of the work prevents an employee from being relieved if all duty, the parties may enter into a written agreement for an on-the-job meal period (provided the agreement states that it may be revoked by the employee, in writing, at any time). (See, e.g., IWC Order 1-2001, section 11(A).) If, as some employers have argued, an employee can always choose to work during a required meal period (and the employer is not then subject to the extra hour of pay for suffering or permitting the employee to work during that required meal period), there would be absolutely no reason for the IWC to have set out in the wage orders any circumstances under which there could be a meal period waiver. If employers need do nothing more than make meal periods available to employees, then no purpose would have been served by the wage orders' strict requirements governing when, under what circumstances, and how a meal period can be waived. It is well established that "where exceptions to a general rule are specified by statute, other exceptions are not to be presumed unless a contrary legislative intent can be discerned." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 116.) The contention that employers may suffer or permit their employees to work during a required meal period without liability for the extra hour of pay violates this rule of statutory construction.

In short, under the applicable wage order, the employer has an affirmative obligation to relieve employees of all duty during the meal period, and if the employer suffers or permits the employees to perform work during the meal period (except when there has been a valid waiver under the two exceptions provided by the wage order), the employer is liable for the extra hour of

pay for failing to provide a meal period "in accordance with [the] applicable order of the Industrial Welfare Commission."

Turning to an analysis of the regulatory history, it is crystal clear that the IWC intended that all employers, other than employers of agricultural employees, must ensure that their employees are not working during required meal periods. The IWC's intent as to the meaning of "no employer shall employ" is readily apparent through an examination of the transcripts of the IWC's proceedings, in 1979, that resulted in the amendment of the "authorize and permit" meal period language in IWC Order 14, and the retention of the "no employer shall employ" language in all of the other wage orders.. A review of the transcripts of the public hearings conducted by the IWC on August 27, 1979 and September 9, 1979 on proposed revisions to the the wage orders provides irrefutable evidence of the IWC's legislative intent.

During the August 27, 1979 hearing, IWC Commissioner Howard P. Wackman II noted that "[u]nder [the proposed] Order 14, there has been a slight modification in the wording regarding meal periods." (Transcript of 8/27/79 IWC Hearing, p. 75:2-4) Richard Glade, an attorney representing Agricultural Producers, an association of citrus growers, spoke in support of this proposed modification:

> [W]hen people are on basically a piece rate ... frequently they will even come in early in the morning ahead of the normal starting time just to get in a full day's production - - and they will take their breaks as they want them. If they want to eat in the morning, they'll eat in the morning. Or if they want to stop for five minutes or ten minutes and have a second sandwich, they'll do that - - and that's pretty traditional in our industry. This is why we are urging that this meal period be modified to permit these people at their option to do that and not for the Commission to put us in the position where we have to tell such an individual, "Stop. You can't do that." (*Id.,* at 75:10-22)

IWC Chairperson Mike R. Elorduy then asked Mr. Glade to address the reverse situation, asking, "What about if the individual wants to" take a meal period "and is told not to have it?" (*Id.,* at 75:23-25.) Mr. Glade responded, "[W]e support the provision for a meal period. All we are saying is let's give the employee the option and the freedom to follow his wishes. If he has no individual wishes or no individual preference, of course, he gets the 30 minutes during the middle of the day." (*Id.,* at 76:1-7.)

During that same public hearing, Bill Marrs, an attorney for the California Farm Bureau Federation, and for various individual growers, expressed support for the proposed modification of the meal period requirement: "[T]here will be people at work in crews of four that pick grapes, and they will start at daylight, and they will quit about 1:00 o'clock in the afternoon, and then they will stop, and they will eat lunch, and they will go home - - and they don't want to stop and eat lunch and go back to work. So I would say that's a good proposal." (*Id.,* at 106:20-107:2.)

19

Another speaker, Jean-Mari Ullman, on behalf of the California Grape & Tree Fruit League, an organization that represents the growers and shippers of grapes and deciduous tree fruits, spoke about her uncertainty as the meaning of the proposed meal period language. She addressed her question to the IWC:

> I am not sure I am interpreting the way the Order reads correctly or not. Perhaps you could clarify this for me. But it was our interpretation when we read that section on Meal Periods that under Order 14 when you ave a situation where workers are working under a piece rate basis that the grower doesn't have to be there to enforce and make sure that his workers are taking a 30 minute lunch period. As was brought out, there are a lot of times when they are working on a piece rate and they want to hurry up and get back and start picking as fast as they can. So they might take a ten minute break here and a ten minute break there and a ten minute break somewhere else. So we want to make sure that there is that flexibility under Order 14 so that you don't actually have to stop the crews and take a break.... It was our understanding that [the proposed] change was going to allow that kind of flexibility. That was our interpretation. But I wanted to make sure our interpretation was correct on that. Was that the intent of that section? (*Id.*, at 132:11-133:8.)

IWC Commissioner Wackman responded, "...as the maker of the motion on that and in doing some work on the wording of it that it was the intent that the employer should allow the person to take the time off if that person desired it but that the employer was not mandatorily forcing that worker to take it off. My chief concern has been the case in point where you have an employee and you don't have actual control over him to say, 'You must take that time off.'" (*Id.*, at 134:6-14.)

In his second appearance as a speaker at this hearing, Richard Glade asked the IWC to consider the problem from the employer's point of view; "[W]e don't feel it is possible for us to be the policemen when we have people in the fields and the harvesters or irrigators are not there. Maybe the foreman isn't there. We should not be in the position where we have to police and order an employee to quit working when he is taking a ten minute meal period and then wants to continue working. So I urge you while you have this opportunity to be clear on this point...." (*Id.*, at 140:13-25-141.2-10)

IWC Chairperson Elorduy made clear that he opposed this proposal to change the meal period requirement, arguing for the continued necessity of "employer policing":

> I think the Commission's responsibility is the standards we have to set up in the interest of the health and welfare of the employee. What happens if someone does not police it and if you have a crew out there that because, as you say, the employee's desire is to work without a meal period or without a relief period because they are on piecework. My responsibility as I understand it is to correct that situation. The employee is not right just because he wants to do it. There has

20

to be some policing and somebody from the Division to enforce it. (*Id.,* at 142:1-10.)

This colloquy continued, with Mr. Glade asserting:

> [F]or an employer to mandate that an individual sit down and be quiet for 30 minutes when he only needs and he only wants 10 or 15 to finish his lunch, I think, is beyond the range of all reason, and I think it goes beyond the range of what this Commission should do. I think this Commission should recognize the individual desires of people when those desires are within the range of reason. I think people are within the range of reason when they only feel that they require 10 minutes or 15 minutes or 20 minutes for their lunch. Why should this Commission mandate to people that are working on their own time that "You must take 30 minutes..."? I think we have got to .... recognize the rights of individuals a little bit... (*Id.,* at 143:4-22.)

Chairperson Elorduy replied that "there are abuses" where employees who wish to take a meal or rest period are not permitted to do so. Mr. Glade acknowledged that "we accept your premise ... that a 30 minute meal period is proper.... We authorize 30 minutes. There is no question about that. All we are saying is be clear in your language, and I think you should be clear to let an employee who says, "I don't want to take 30 minutes. I'm happy to take 25," or "I'm happy to take 20." Why shouldn't you let the employee have that option if he wishes. That's all we are saying. We are not quarreling with the basic 30 minutes - - not at all." (*Id.,* at 144:3-21.)

At the next IWC hearing, on September 9, 1979, IWC secretary Margaret Miller informed the Commissioners who were about to vote on the adoption of proposed Order 14-80, that at section 11, dealing with meal periods, "the first sentence varies somewhat from the comparable provision in Order 1-80." (9/7/79 IWC hearing transcript, p. 161-162.) The Commission then voted 3-2 to adopt this new language for meal period requirements in Order 14. (*Id.,* at p. 165.) Significantly, these same Commissioners adopted revised 1980 wage orders governing all of the other industries and occupations (Orders 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 15), all of which continued to use the "no employer shall employ" meal period language which, as indicated by the discussion of the revision to Order 14, was construed by the IWC as a requirement for employer policing to ensure that employees actually stop working and take an off-duty meal period.

Various DLSE opinion letters also provide instructive guidance on the nature of an employer's duty to ensure that employees are relieved of all work during required meal periods. A letter issued by former Labor Commissioner Arthur S. Lujan on September 17, 2001, contrasts employer's affirmative duties relative to meal period requirements with the less strict requirements for rest periods: "Unlike meal periods, during which the employer has an affirmative obligation to ensure that workers are actually relieved of all duty, not performing any work, and free to leave the worksite; the employer is merely required to 'authorize and permit all

21

employees to take rest periods'" (DLSE OL 2001.09.17, p. 4. (This letter can be accessed at the DLSE's website at http://www.dir.ca.gov/dlse/DLSE_OpinionLetters.htm.)

Another DLSE opinion letter, dated November 3, 2003, similarly explained "As to meal periods, employers have an obligation to self-police, and to ensure that employees are in fact taking required meal periods .... And self-policing ... should present no practical difficulty in that the wage orders also provide, at section 7(A)(3), that every employer maintain accurate records showing when each employee begins and ends each work period, and that meal periods  shall also be reported." (This DLSE letter was initially posted on the DLSE website, but was "withdrawn" from the website in November 2004.)

Another opinion letter that remains on the DLSE website (and that was approvingly cited in *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963) was issued on January 28, 2002, and it provides: "[R]est periods differ from meal periods, during which an employer has an affirmative obligation to to ensure that workers are actually relieved of all duty, not performing any work, and (with the exception of health care workers under Wage Orders 4 and 5) free to leave the employer's premises."

Yet another opinion letter that can still be found at the DLSE website, was issued on September 4, 2002, and it deals with the characteristics of an off-duty meal period and the conditions under which an on-duty meal period is allowed. The letter provides: "[A]s a general rule, the required meal period must be an off-duty meal period, during which time the employee: 1) is not required to work, 2) is not suffered or permitted to work, 3) is not subject to the control of the employer so as to be free to leave the employer's premises and attend to his/her own personal affairs, 4) for a minimum of thirty minutes."  Interpreting the requirement for an on-duty meal period, that "the nature of the work" must prevent the employee from being relieved of all duty, the opinion letter notes: "In determining whether the nature of the work prevents an employee from being relieved of all duty, the Division of Labor Standards Enforcement starts from the premise that the general requirement for an off-duty meal period is remedial in nature, and any exceptions to the general requirement must be narrowly construed, so as to avoid frustrating the remedial purpose of the regulation.  The Division has always followed an enforcement policy that this determination must be made on the basis of a multi-factor objective test.  The factors that should be considered include the type of work, the availability of other employees to provide relief to an employee during a meal period, the potential consequences to the employer if the employee is relieved of all duty, the ability of the employer to anticipate and mitigate these consequences such as by scheduling work in a manner that would allow the employee to take an off-duty meal break, and whether the work product or process will be destroyed or damaged by relieving the employee of all duty.  The Division will conclude that an off-duty meal period must be provided unless these factors, taken as a whole, decisively point to the conclusion that the nature of the work makes it virtually impossible to for the employer to provide the employee with an off-duty meal period. Finally, the burden rests on the employer for establishing the facts that would justify an on-duty meal period."

Regulations were proposed by the DLSE in January 2005 that if adopted, among other things, would have defined the term "provide" in Labor Code section 226.7 to mean "to supply or make available a meal period to the employee and give the employee an opportunity to take the meal period." But this proposed regulation was never adopted., and never took effect, as it was ultimately withdrawn by the DLSE in January 2006, four months after the issuance of the *Cicairos* decision. Neither the DLSE nor the IWC have introduced any subsequent regulatory proposals regarding meal period requirements. Unfortunately, employers have seized upon this never enacted regulation as evidence of a change in DLSE's position regarding the nature of the duty to provide a meal break. (See, e.g., *Perez v. Safety-Kleen Systems, Inc.* (N.D. Cal. 6/27/07) 2007 WL 1848037 at *8 ["Safety-Kleen argues that ... DLSE subsequently changed its position" to the standard set out in the proposed regulation].) Insidiously, employers including Safety-Kleen that have made this argument neglect to mention that this purported change in position was never adopted, and that its only expression came in the form of a now withdrawn proposed regulation. Nor has DLSE issued a single opinion letter or precedent decision adopting any such purported enforcement policy.

We turn now to cases interpreting the nature of the employer's obligation to provide a meal period.. The only published state court decision on this subject is *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963, holding that an employer's "obligation to provide [non-exempt employees] with an adequate meal period is not satisfied by assuming that the meal period was taken, because 'employers have an affirmative obligation to ensure that workers are actually relieved of all duty.'"

In *Perez v. Safety-Kleen Systems* (N.D. Cal. 6/27/07) 2007 WL 1848037, Judge Hamilton applied *Cicairos* to the facts of the case to deny the employer's motion for summary judgment as to certain employees' meal and rest period claims. The employer argued that Labor Code §512 only requires that an employer "provide" an employee with a meal period, and that this should be interpreted to mean nothing more than "furnish, supply, make available, or afford" such breaks. The employer further argued that "the nature of plaintiffs' work" as truck drivers who worked away from the employer's premises "provided them with the opportunity to take breaks." The court rejected this contention, noting "[t]here is no authority to support [defendant's] argument that merely being away from management constitutes 'provision' of breaks." (*Id.*, at *6.) The court noted evidence of the lack of a policy for meal breaks (managers did not tell the workers to take breaks, nor did they tell them not to take breaks), the fact that one plaintiff testified that he did not even know that he had a right to take breaks, the general pressures of the position to reach certain productivity levels (which apparently discouraged employees from taking breaks), and the fact that plaintiffs were required to fill out a log stating that they were on duty all day long, all of which taken together reveal a dispute both as to whether defendant "provided meal periods to plaintiffs" and as to whether defendant "authorized and permitted rest periods." (*Id.*, at *6-7.) Adopting the same analysis as the state court in *Cicairos,* the federal district court explained, "Similar to the employer in *Cicairos,* Safety-Kleen assumed that plaintiffs knew they had the right to take a meal break without ever actively providing breaks (or even telling its employees they had that right) or monitoring whether breaks were taken.... [E]ven if Safety-Kleen is correct that it had no "affirmative obligation to ensure" that its workers are actually relieved of duty, it

was obligated to provide off-duty meal and rest breaks. See *Murphy* [v. Kenneth Cole Productions, Inc. (2007)] 40 Cal.4th 1094 (California's meal time provisions are to be "interpreted broadly in favor of protecting employees")." (*Perez v. Safety-Kleen Systems,* at *8.)

Because of this evidence that the employer didn't even meet its obligations under the less strict "authorize and permit" standard, the *Safety-Kleen* court decided it need not resolve the issue of whether California law requires employers to ensure their employees actually take required meal breaks that were purportedly made available to them. However, the court did note that "the applicable IWC Wage Order [7-2001] indicates that an employer must do something affirmative to provide a meal period, and may not merely assume that such breaks are taken." The court noted the "no employer shall employ" language of the Wage Order, and the requirement that the employee be "relieved of all duty during a 30 minute meal period." The court reasoned, "At the very least, consistent with Labor Code §512, the Wage Order requires the employer to affirmatively provide a meal period and provide the opportunity for the employee to be 'relieved of all duty during a 30 minute meal period.'"

The court therefore found it unnecessary to resolve the defendant's assertion that the stricter provisions of the IWC Order exceed the IWC's authority because the wage order's mandatory language is inconsistent with Section 512. (This is an issue that can be easily disposed of. First of all, it is not at all evident that there is anything inconsistent between Section 512 and the provisions of the IWC order. And even if the IWC meal period requirements are construed as stricter than the requirements established under Section 512, so what? Section 512 does not purport to limit the IWC from imposing stricter or more protective requirements. It establishes a floor, not a ceiling of protection. The IWC is authorized to adopt regulations that are more protective of employees, and impose more restrictions upon employers, than the statutory provisions which set a baseline for such protections and restrictions. In upholding the IWC's authority to adopt a regulation imposing a day of rest requirement for certain farm employees who were expressly exempted by Labor Code §554 from statutory day of rest provisions, the California Supreme Court observed that "the authorities have uniformly held that the Industrial Welfare Orders may provide *more restrictive provisions* than are provided by the general statutes adopted by the Legislature on this subject in sections 510-556." (*Industrial Welfare Commission v. Superior Court* (1980) 27 Cal.3d 690, 733 [internal quotations and citations omitted].) Conversely, *Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, held that because there is no exemption in Labor Code §512 for employees covered by collective bargaining agreements, the IWC could not exempt such employees from the meal period provisions of Order 16-2001 (covering on-site construction, drilling, logging and mining occupations). *Bearden* tells us that the Labor Code provisions establish a statutory floor, and that the IWC cannot adopt regulations which undercut this floor. *IWC v. Superior Court,* on the other hand, tells us that these Labor Code provisions are *not* a ceiling, and that the IWC can adopt regulations which offer protections to workers that have not granted under the statutory provisions. This is unquestionably true in the area of meal period regulations, where Labor Code §226(b) expressly ties the payment of the extra hour of pay to the failure to provide a meal period "in accordance with an applicable order of the Industrial Welfare Commission.," rather than in accordance with the requirements of Labor Code §512.)

In another recently decided federal case, *White v. Starbucks Corp.* (N.D. Cal. July 2, 2007) 497 F.Supp.2d 1080, Judge Walker granted defendant's motion for summary judgment as to various claims, including a claim that the defendant failed to provide meal and ret periods in violation of Labor Code §§ 226.7 and 512. Defendant argued that the meal and rest period claims fail as a matter of law because it made the breaks available, and the plaintiff voluntarily chose to forego those breaks. The employer argued that the use of the term "provide" in Labor Code §§ 226.7 and 512 demonstrates that the Legislature intended only for employers to offer meal periods – not to ensure that those meal periods were actually taken. In its decision, the court rejected reading these Labor Code sections, or IWC Order 7-2001, or *Cicairos* to impose an affirmative obligation on employers to ensure that employees refrain from working during their meal periods. The court reasoned that such an interpretation "would create a strict liability standard," and that "making employers ensurers of meal breaks ... would be impossible to implement for significant sectors of the mercantile industry (and other industries) in which large employers may have hundreds or thousands or employees working multiple shifts." Accordingly, Judge Vaughn Walker interpreted the meal period requirements to "require only that an employer *offer* meal breaks, without forcing employers actively to ensure that workers are taking those breaks." For liability to attach, according to Judge Walker, "the employee must show that he was *forced to forego* his meal breaks as opposed to merely showing that he did not take them regardless of the reason." In short, under this interpretation, nothing more is required than offering, or authorizing and permitting a meal period. The court distinguished *Cicairos,* by noting that there, the defendant knew that employees were driving while eating (that appears to be a misstatement of the evidence that was before the court in *Cicairos),* and that the management policies discussed in *Cicairos* "effectively deprived the drivers of their breaks."

The *Starbucks* decision is infected with flawed reasoning. Judge Walker's assertion that a violation does not exist unless the employee was required to work during a mandated meal period reflects the standard under subsection (a) of Labor Code §226.7; and utterly ignores the stricter requirement under subsection (b) of that statute. The decision completely ignores the distinction, under the IWC orders, *which are enforceable pursuant to Labor Code §226.7(b),* between the "no employer shall employ" requirement for meal periods in every wage order other than Order 14, and the "authorize and permit" language for meal periods under Order 14 and for rest periods in every wage order. The decision fails to give any consideration to the IWC's definition of the term "employ" to include not just an employer requiring an employee to work, but also an employer suffering or permitting an employee to work, even though the employee is not required to do so. Contrary to Judge Walker's opinion, this does not establish a "strict liability" standard, any more than an employee who is not required to work overtime, and who does so without the employer's actual or constructive knowledge, would be entitled to overtime pay. The standard for both overtime and meal periods, where the employee is not required to perform work., is whether the employer knew or should have known that the employee was working. (See, *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584-585.)

Judge Walker's concern that this non-existent "strict liability" standard could lead to situations where "employees would be able to manipulate the process and manufacture claims by skipping

breaks or taking breaks of fewer than 30 minutes" is belied by the facts that 1) there is no "strict liability" standard, and 2) as to the ability of employers to learn whether their employees are taking meal periods in accordance with the provisions of the applicable IWC order, every IWC order requires California employers to maintain daily time records showing the actual start and end times of meal breaks.  (See, e.g. IWC Order 1-2001, section 7(A).)

Here, there is no evidence that CMS even complied with the less strict "authorize and permit" standard.  Employers subject to the "authorize and permit" standard (for meal periods under IWC Order 14-2001, and for rest periods under all of the wage orders), still have affirmative obligations which must be met in order to avoid liability for the extra hour of pay under Labor Code §226.7(b).  It would be impossible to"authorize" a meal or rest period without effectively informing the employees of their right to take the break time.  This was the position taken by the DLSE in its opinion letter of November 3, 2003 on the subject of meal and rest breaks: "'Authorize' means that employers have some affirmative obligation to advise employees of the right to take rest periods in accordance with the provisions of the wage order." (OL 2003.11.03, p. 3..)  In the context of the unionized workplace in *Cicairos*, the court apparently assumed that the employer "authorized" the required rest periods through the execution of a written collective bargaining agreement which contained a provision stating that "drivers ... shall take a thirty minute lunch period no later than five hours from their regularly scheduled start time," and granting those employees the right to take "two 15 minute paid rest periods per eight or ten hour shift," with one rest break during the first half of the shift, and the other during the second half. (*Cicairos, supra,* at 955..)  In the context of a non-unionized workforce, it would of course be necessary for an employer to communicate such "authorization" directly to all of its employees. Whatever form of communication is chosen by the employer, in order to meet the "authorize" requirement, it must provide the employees with actual and clear notice of their right to take the full amount of break time provided to them under the applicable IWC order.  Anything short of that cannot be said to "authorize" the taking of the required break time.  Here, it does not appear that CMC ever informed Ms./ Chang of her right to take an off-duty meal period.

Finally, it is worth noting that CMC was under a mandatory duty to maintain records of the exact hours worked each day by Ms. Chang, including the time she started working, the time she started a meal period, the time she returned to work from a meal period, and the time she stopped work for the day.  (IWC Order 7-2001, section 7.)  CMC did not maintain these time records, and never informed Ms. Chang that she should make a record of her time.  The employer's failure to keep these required time records shifts the burden of proof, both woth respect to hours worked for overtime purposes, and with respect to whether the employee was relieved of all duty for a required off-duty meal period.  "[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages." (*Cicairos v. Summit Logistics, supra,* 133 Cal.App.4th at 961, citing *Hernandez v. Mendoza* (1988) 199 Calk.App.3d 721, 727.

4) Calculating the Amount of Wages Owed to Christina Chang for Missed Meal Breaks Under Labor Code section 226.7

26

Opinion — Ms. Chang is owed a total of **$18,060.54 in section 226.7 wages, plus interest on these wages in the amount of $2,680.58** (as of 2/8/08), with additional interest accruing at the rate of $4.95 for each day thereafter.

Basis and Reasons Therefor — Under Labor Code §226.7(b), Ms. Chang is owed one hour of pay at her "regular rate of compensation" for each day she did not have a required off-duty meal period in accordance with IWC Order 7-2001. She is therefore owed this extra hour of pay for each day she worked more than five hours without an off-duty meal period. The "regular rate of compensation" would include all forms of compensation that make up the regular rate for overtime purposes, i.e., it would include both the salary component and the non-discretionary bonus component of Ms. Chang's compensation. It must be expressed as an hourly rate of pay, calculated in the same manner as the "regular rate" is calculated for California overtime purposes.

In 2005, there were 254 days (5 days a week, 52 weeks, minus 6 holidays) in which she worked more than five hours without a required off-duty meal period. Her regular rate of pay consisted of a salary component at $25 an hour, and a non-discretionary bonus component at $5.76 an hour, resulting in a regular rate of compensation of $30.76 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$7,813.04 in wages pursuant to Labor Code §226.7 for 2005.** She is also entitled to interest on these unpaid wages, pursuant to labor Code §218.6, at 10% from the date these wages became due. For ease of calculation (in a manner that benefits the employer) we will use December 31, 2005 as the due date for calculating interest (despite the fact that under Labor Code §204, the overwhelming bulk of these wages became due at regular intervals at each regular pay period during 2005). As of today's date (2/8/08), a total of **$1,646.09 is owed as interest on these section 226.7 wages earned in 2005**, with an additional $2.14 accruing in daily interest each day.

In 2006, there were 166 days (5 days a week, 34 weeks, less 4 holidays) in which Ms. Chang worked more than five hours without a required off-duty meal period. Her regular rate of pay consisted of a salary component at $30.77 an hour, and a non-discretionary bonus component at $14.,22 an hour, resulting in a regular rate of compensation of $44.99 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$7,468.34 in wages pursuant to Labor Code §226.7 for 2006, plus $826.63 interest on these wages**, with an additional $2.05 accruing in daily interest each following day.

In 2007, there were 68 days (5 days a week, 17 weeks, less 17 days in which she had a required off-duty meal period) in which Ms, Chang worked more than five hours without a required off-duty meal period. Her regular rate of pay, based solely upon her salary, was $40.87 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$2,779.16 is wages pursuant to Labor Code §226.7 for 2007, plus $207.86 interest on these wages,** with an additional 76 cents accruing in daily interrest each following day.

Adding all of these amounts, Ms. Chang is owed a total of $18,060.54 in section 226.7 wages, plus interest on these wages in the amount of $2,680.58 (as of 2/8/08), with additional interest accruing at the rate of $4.95 for each day thereafter.

5) Determining Whether Christina Chang Is Entitled to Waiting Time Penalties Under :Labor Code section 203

Opinion — Ms. Chang is owed waiting time penalties under Labor Code §203 as a result of the defendant's willful failure to pay all of her unpaid earned wages immediately at the time of her termination, as required under Labor Code §201.

Basis and Reasons Therefor — Labor Code §201 provides: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Labor Code §203 provides: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wage of an employee who us discharged or who quits, the wages shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." The term "willfully" has been defined to mean only that the employee intended to pay, or not pay, whatever was paid or not paid. The statute does not require any evil motive or intent to defraud. (*Davis v. Morris* (1940) 37 Cal.App.2d 269.) Ignorance of the law is no defense and does not negate "willfulness." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 396.)

6) Calculating the Amount of Waiting Time Penalties Owed to Christina Chang Under Labor Code section 203

Opinion — Ms. Chang is owed **waiting time penalties under Labor Code section 203 in the amount of $16,428.00.**

Basis and Reasons Therefor — Penalties under Labor Code §203 are calculated on a calendar day basis, without regard to the number of days the employee would have worked in the 30 days following the due date of the employee's final wages. (*Mamika v. Barca* (1998) 68 Cal.App.4th 487.) As a general matter, the penalty is based on the employee's final per diem wage rate, which is multiplied by the number of days (capped at 30) until payment is made (or a lawsuit is filed). Here, the 30 days expired without payment of wages or the filing of an action for payment of these wages, so the penalties are imposed for the 30 day maximum.

From April 1, 2007 until the end of her employment, Ms. Chang was working 58 hours a week, and 5 days a week. Thus, on average, she was working 11.6 hours per day  The per diem wage rate includes all wages earned (not just those that were paid), so it includes required overtime compensation. At the time of her discharge, Ms. Chang was being paid on the basis of an annual salary of $85,000, from which we derive a weekly rate of $1,634.62, a daily rate of $326.92 (based on her 5 day workweek) and a regular hourly rate of $40.87 (computed in accordance with Labor Code §515(d). This results in an overtime rate (based on one and one half times the

regular rate of pay) of $61.30 per hour. Her per diem rate is calculated by adding the amount that was paid by the employer ($326.92 per day) plus the amount owed for unpaid overtime compensation ($220.68 per day, based on the overtime rate of $61.30 per hour multiplied by 3.6 hours, the average number of daily overtime hours), resulting a total daily wage of $547.60. Multiplying this daily wage by 30 days, we have a total penalty of $16,428.00 pursuant to labor Code §203..

7) Determining Whether Christina Chang Is Owed Liquidated Damages Under the FLSA

Opinion — Ms. Chang is entitled to liquidated damages under 29 USC §216(b) equal to the amount of the unpaid overtime compensation owed under the FLSA, with the imposition of such damages mandatory under controlling Ninth Circuit precedent unless the defendant can prove that it had an objectively reasonable basis for failing to pay overtime.

Basis and Reasons Therefor — The overtime requirements of the FLSA are set out at 29 USC §207. As indicated previously, the FLSA requires payment of overtime, at one and one half times the regular rate of pay, for all hours worked in excess of 40 in any workweek. Another provision of the FLSA, at 29 USC §216(b) provides: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages..... An action to recover the [liquidated damages] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 USC §260 provides that "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the failure to pay overtime] was in good faith or that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act if 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this tile."

"Liquidated damages represent compensation, and not a penalty. Double damages are the norm, single damages the exception." (*Local 246 Util. Workers Union v. S. Cal. Edison Co.* (9th Cir. 1996) 83 F.3d 292, 297.) The employer has the burden of establishing subjective and objective "good faith" in order to avoid imposition of liquidated damages. "If the employer fails to carry that burden, liquidated damages are mandatory." (*Id.*) "The employer's burden is to establish that it had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that its conduct complied with the Act." (*Id.* at 298.)

Considering the nature of the work performed by Ms., Chang, it is virtually inconceivable that the defendant can meet this burden of proving that he had "objectively reasonable grounds for believing that his conduct did not violate the FLSA." (*Chao v. A-One Medical Services, Inc.* (9th Cir. 2003) 346 F.3d 908, 920.)

8) Calculating the Amount of Liquidated Damages Owed to Christina Chang Under the FLSA

Opinion — Ms. Chang is entitled to a total of **$23,095.32 in liquidated damages owed under the FLSA**.

Basis and Reasons Therefor — In order to calculate liquidated damages under the FLSA, we must calculate the amount of overtime compensation that is owed under the FLSA. This amount is less than the amount of overtime owed under California law, so we cannot use the amounts found due above pursuant to Labor Code §510 and IWC Order 7-2001. (This is because the FLSA, unlike California law, does not have daily overtime, does not have a double rate for overtime, and uses a fluctuating workweek method to calculate the regular rate and overtime owed for salaried non-exempt employees) We will proceed to calculate overtime owed under the FLSA.

For 2005, Ms. Chang worked 23 "normal" 59 hour workweeks (19 hours of overtime each week for 23 weeks equals 437 overtime hours), and 23 "extended" 61.5 hour workweeks (21.5 hours overtime each week for 23 weeks equals 483 overtime hours), and 6 "short" 49 hour workweeks (9 hours of overtime each week for 6 weeks equals 54 overtime hours). Adding these figures, we arrive at 3,065.5 total hours worked in 2005, of which 974 constitute overtime hours under the FLSA. We calculate the regular rate under the FLSA by adding the salary she received ($52,000) plus the non-discretionary bonus ($17,669), for $69,669 in total compensation, divided by her total hours worked (3,065.5), resulting in the FLSA regular rate of $22.72 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $11.36 per hour. We then multiply the total overtime hours worked (974 hours) by the overtime rate ($11.36 per hour), resulting in a total of $11,064.64 of FLSA overtime liability for 2005. Ms. Chang is therefore entitled to **$11,064.64 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2005.**

For 2006, Ms. Chang worked 15 "normal" 50 hour workweeks (10 hours of overtime each week for 15 weeks equals 150 overtime hours), and 4 "partly extended" 53.5 hour workweeks (13.5 hours overtime for 4 weeks equals 54 overtime hours), and 11 "fully extended" 57.5 hour workweeks (17.5 hours overtime each week for 11 weeks equals 192.5 overtime hours), and 4 "short" 40 hour workweeks (with no FLSA overtime). Adding these figures, we arrive at 1,756.5 total hours worked in 2006, of which 396.5 constitute overtime hours under the FLSA. We calculate the regular rate under the FLSA by adding the salary she received ($41,846.15, her $64,000 annual salary pro-rated for the 34 weeks she worked) plus the non-discretionary bonus ($24,525), for $66,371.15 in total compensation, divided by her total hours worked (1,756.55), resulting in the FLSA regular rate of $37.79 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $18.89 per hour. We then multiply the total overtime hours worked (396.5 hours) by the overtime rate ($18.89 per hour), resulting in a total of $7,489.88 of FLSA overtime liability for 2006. Ms. Chang is therefore entitled to **$7,489.88 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2006.**

For 2007, Ms. Chang worked 11 "normal" 58 hour workweeks (18 hours of overtime each week for 11 weeks equals 198 overtime hours), and 6 "extended" 62 hour workweeks (22 hours overtime each week for 6 weeks equals 132 overtime hours). Adding these figures, we arrive at

1,010 total hours worked in 2007, of which 330 constitute overtime hours under the FLSA. We calculate the regular rate under the FLSA by dividing the total compensation she received ($27,788.46, her $85,000 annual salary pro-rated for the 17 weeks she worked) by her total hours worked (1,010), resulting in the FLSA regular rate of $27.51 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $13.76 per hour. We then multiply the total overtime hours worked (330 hours) by the overtime rate ($13.76 per hour), resulting in a total of $4,540.80 of FLSA overtime liability for 2007. Ms. Chang is therefore entitled to **$4,540.80 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2007.**

Adding these liquidated damages for the entire time period, we arrive at a total of $23,095.32 in liquidated damages owed under the FLSA.

DATA OR OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING OPINIONS

I considered information provided by counterclaimants' counsel Richard Harrington, and by counterclaimants Andrew Verity and Christina Chang in the course of telephone conversations regarding the facts of the case. I also considered information contained within the following documents: the Complaint for Misappropriation of Trade Secrets, the Answer to the Complaint and Counterclaim, the Reply to Counterclaim, the Amended and Supplemental Counterclaim, a chart summarizing hours worked and calculating overtime owed, excerpts of the depositions of Christina Chang, Andrew Verity, Mark Lillge, Bruce Molloy and Leanne Stein, defendant's job performance reviews for Christina Chang, and all of the other written materials referenced in the above Report, including copies of the various referenced Labor Code and United States Code sections, federal regulations contained in the CFR and state regulations contained in IWC Order 7-2001, IWC hearing transcripts, court decisions, DLSE opinion letters, the 2002 DLSE Enforcement Policies and Interpretations Manual, and the IWC's Statement as to the Basis for the 2001 Wage Orders.

EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR OPINIONS

I do not presently anticipate using any exhibits to summarize or support my opinions, other than the various written materials specified immediately above.

AUTHENTICATION

The above Expert Witness Report was prepared and drafted by the undersigned, and submitted to counterclaimants' counsel for disclosure as required by Rule 26 of the Federal Rules of Civil Procedure.

Dated: February 8, 2008

_____
MILES E. LOCKER

31

MILES E. LOCKER
Attorney at Law
4156 22nd Street
San Francisco, California 94114
telephone: (415) 826-0580
cell phone: (415) 786-5662
e-mail: mileselocker@yahoo.com


Professional Employment in the Area of Labor and Employment Law:

Law Offices of Miles E. Locker (March 2006-present)

    Solo practice, providing advice and consulting services to other attorneys in the fields of state and federal wage and hour law and retaliation law, drafting legal memos, law and motion and appellate briefs, and appearing at mediation proceedings. Serving as an expert witness in a variety of employment law matters, drafting expert declarations and reports, and providing deposition and trial testimony, particularly with respect to Division of Labor Standards Enforcement ("DLSE") enforcement policies and procedures. Designated as an expert witness, and submitted expert declarations or reports and/or testified in deposition or trial as an expert witness in the following cases:

    Dahlin v. Sav-On Drug Stores (Los Angeles County Superior Court, Case No. BC227551)

    In re Staples Overtime Litigation (Judicial Council Coordinated Proceeding No. 4235, Orange County Superior Court, Lead Case No. 816121)

    Duran v. U.S. Bank (Alameda County Superior Court, Case No. 2001-035537)

    Moreno v. Guerrero Mexican Food Products (United States District Court, Central District of California, Case No. CV05-7737 DSF)

    Franco v. Ecology Auto Parts (San Diego County Superior Court, Case No. GIC840600)

    Areas v. Pac Pizza (Contra Costa County Superior Court, Case No. CIV MSC05-01715)

    Larson v. Casual Male (San Diego County Superior Court, Case No. GIC862082)

    Evans v. Washington Mutual Bank (Orange County Superior Court, Case No. 02CC15415)


Page 1 of  9

Marinoff v. Howroyd Wright Employment Agency (Los Angeles County Superior Court, Case No. BC355901)

Rotz v. Risse & Sons, Inc. dba Risse Mechanical (Sacramento Superior Court, Case No. 04 AS 04386)

Amalgamated Transit Union, Local 1575 v. Golden Gate Transit District (arbitration)

Division of Labor Standards Enforcement ("DLSE"), Department of Industrial Relations, State of California (1990-2006)

2001-2006: Senior Attorney - Served as lead attorney, providing guidance to other DLSE attorneys, in the areas of appellate litigation, civil litigation, and anti-retaliation law. Handled the prosecution or defense of the most complex and significant cases involving the DLSE, drafted appellate briefs, and argued cases in state and federal appellate courts. Served as hearing officer and issued decisions in cases filed with DLSE under the Talent Agencies Act. Responsible for drafting opinion letters, and advising the Labor Commissioner on enforcement policy issues until change of Administration in November 2003. Drafted substantial portions of the 2002 DLSE Enforcement Policies and Interpretations Manual, and the 2005 Retaliation Complaint Investigation Manual.

1998-2001: Chief Counsel - Responsible for supervising the DLSE Legal Section and overseeing all litigation involving the DLSE. Advised the Labor Commissioner on legal issues and assisted in developing wage and hour law enforcement policies. Authored DLSE opinion letters, setting forth the agency's interpretation of statutes and Industrial Welfare Commission ("IWC") wage orders. Conducted wage and hour law training sessions for DLSE enforcement staff and for employer and employee organizations throughout the State. Drafted proposed legislation and regulations, and provided advice to legislators and IWC members on pending bills and wage orders. Drafted legal issue questions for attorney position civil service examinations; interviewed, rated, and hired applicants.

1990-1998: Staff Attorney - Responsible for representing wage claimants and the State Labor Commissioner in superior court proceedings on de novo employer appeals from Labor Commissioner orders, decisions or awards in which the DLSE had awarded unpaid wages and/or penalties to employees. Handled over 400 de novo cases under Labor Code section 98.2, prosecuted more than 100 trials. Represented the Labor Commissioner in prosecuting public works cases for prevailing wage under-payments, and civil actions filed under Labor Code section 98.3, and in defending petitions for administrative writs of mandate filed by employers challenging decisions upholding civil penalty citations. Prosecuted garment and farm labor contractor license revocations.

Division of Apprenticeship Standards ("DAS"), Department of Industrial Relations, State of California (1988-1990)

Staff Attorney - Responsible for prosecuting public works contractors for violations of state apprenticeship requirements in administrative debarment proceedings.  Served as hearing officer and issued decisions in cases filed against apprenticeship committees.

Carroll, Burdick & McDonough, San Francisco, California (1986-1988)

Attorney - Represented public safety employees and public safety employee organizations in arbitrations, administrative hearings involving discharge or other discipline, and court cases.  Clients included San Francisco Police Officers Association and Santa Clara County Deputy Sheriffs Association.

California Agricultural Labor Relations Board ("ALRB"), Salinas and Delano, California (1984-1986)

Attorney - Evaluated the merits of unfair labor practice charges filed by farm workers, labor organizations and growers, drafted unfair labor practice complaints, and litigated these complaints in administrative proceedings before administrative law judges, and on appeals to the Board.

Education:

Boalt Hall School of Law, University of California at Berkeley- graduated May 1981, J.D.

State University of New York at Binghamton, N.Y.- graduated May 1976, B.A.  Majored in history.

Professional Accomplishments:

Significant Cases Litigated While at DLSE -

*DLSE v. Brinker Restaurants* - resulted in a $10,000,000 settlement in 2002, the largest settlement in DLSE history, with proceeds paid to over 30,000 current and former employees for meal period violations.

*DLSE v. Abercrombie & Fitch* - resulted in a $2,200,000 settlement in 2003, for reimbursement of employees for compelled purchases of employer's merchandise.

*DLSE v. Denny's Restaurants* - action filed in Alameda County Superior Court resulted in a $7,000,000 settlement in 2005, for payment to employees of unlawfully forfeited accrued and unused

vacation time.   In an attempt to avert this state court lawsuit, Denny's filed an action against DLSE in federal court in South Carolina, seeking to enjoin DLSE from proceeding in state court on ground that ERISA preempted state regulation of its vacation plan.   Represented DLSE in oral argument before the 4th U.S. Circuit Court of Appeals in Richmond, Virginia, resulting in decision affirming district court's dismissal of Denny's action. Drafted successful opposition to Denny's petition for certiorari.

*Lujan v. Sears Corporation* – lawsuit for backpay, reinstatement and other injunctive relief in response to sales clerk's discharge for violating retailer's "moonlighting" policy resulted in settlement under which employee was reinstated with backpay and employer adopted new statewide policy allowing its non-exempt employees to work for other employers, including competitors; successfully opposed demurrer challenging whether Labor Code §98.6/96(k) protected employee's right to "moonlight."

*Lujan v. Minagar* – argued this case in the court of appeal, resulting in a published decision holding that Labor Code §6310 prohibits "preemptive discharge" of employee believed by employer to be likely to file OSHA complaint, thereby extending plain language of statute which only protects employees who have filed complaints.

*Lujan v. G&G Fire Sprinklers* – drafted successful petition for writ of certiorari to the United States Supreme Court, with the DLSE ultimately defeating a constitutional challenge to state law allowing DLSE to order withholding of unpaid prevailing wages and penalties from amounts owed to contractors on public works jobs.

*Morillion v. Royal Packing* – co-authored DLSE amicus brief filed with the California Supreme Court, successfully arguing that under California law, "hours worked" includes all time the employee is subject to the employer's control, with the result that farm workers must be paid for time during which they are required to wait for and ride in company buses taking them to and from fields.

*Viking Ready Mix v. Tramble* – opposed petition to compel arbitration seeking to prevent DLSE from holding wage adjudication hearings on meal period claims filed by employees covered by collective bargaining agreement that provided for arbitration of all claims arising under Labor Code or IWC orders, resulting in court of appeal decision holding no preemption under the LMRA, so that DLSE could adjudicate claims.

*Millan v. Restaurant Enterprises Group* – filed petition to enforce administrative subpoena, resulting in published court of appeal decision holding that ERISA does not preempt DLSE's right to subpoena records to enable it to make its own determination as

to whether employer has vacation plan that preempts state law prohibiting forfeiture of accrued vacation.

*Californians for Safe and Effective Dump Truck Transportation v. Mendonca* - resulted in Ninth Circuit decision holding that federal law prohibiting state regulation of motor carrier's prices, routes or services (the "FAAA Act") does not preempt enforcement of state prevailing wage law.

*Dunbar Armored v. Department of Industrial Relations* - resulted in district court decision that federal Motor Carrier Act and the FAAA Act do not preempt enforcement of state meal and rest period requirements for drivers of motor carriers.

*Williams v. FreedomCard, Inc.* - argued this case in the court of appeal, resulting in a published decision holding that a defendant against whom the Labor Commissioner issued an order, decision or award for unpaid wages cannot challenge the finding of employer status without posting the bond or undertaking required to maintain de novo appeal under Labor Code §98.2, and that relief from bond or undertaking can only be granted if defendant proves indigence.

Significant Opinion Letters Authored While At DLSE-

Court Decisions Citing and Approving Opinion Letters Which I Authored-

*Harris v. Superior Court* (2007) __ Cal.App.4th __, 2007 WL 2325580 - letters issued on 10/5/98 and 5/23/03 on the scope of the administrative exemption under the applicable IWC orders, and application of the exemption to insurance claims adjusters.

*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094 - letters issued on 9/17/01 and 10/17/03 characterizing extra hour of pay required under Labor Code section 226.7 for meal period violations as premium wage, not penalty.

*Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 - letter issued 1/29/02 on travel time as "hours worked," requirement under state law to pay an hourly paid employee no less than the minimum wage for each separate "hour worked" or portion thereof, in contrast to FLSA end of pay period averaging method, and prohibition against using any portion of contract wages for "productive work" as a credit for minimum wages owed for uncompensated "non-productive" work time.

*Zavala v. Scott Brothers Dairy* (2006) 143 Cal.App.4th 585 - letter issued on 5/17/02 on information that must be provided on pay stub pursuant to Labor Code §226.

*Koehl v. Verio* (2006) 142 Cal.App.4th 1313 - letter issued on 1/9/99 on post-termination payment of commissions.

*Cicairos v. Superior Court* (2005) 133 Cal.App.4th 949 - letter issued on 1/28/02 describing employer's obligation to ensure that employees are relieved of all duty and perform no work during required off-duty meal periods.

*Bell v. Farmers Insurance Exchange* (2001) 87 Cal.App.4th 805 - letter issued 10/5/98 on the administrative exemption and its application to insurance claims adjusters.


Subjects of Other Noteworthy Opinion Letters Which I Authored and That Have Been Posted on the DLSE Website-

Meal and rest period requirements for employee working alone at work site; analysis of requirements for on-duty meal period (11/3/03)

Requirements for on-duty meal period; factors for determining when the "nature of the work" prevents the employee from taking an off-duty meal period (9/4/02)

Negative elections to participate in 401(k) plans and Labor Code section 224 (8/12/02)

Definition of "employer" under IWC Orders; Labor Commissioner's imposition of personal liability against corporate officer responsible for failure to pay wages (6/18/02)

Compensability of travel time for out-of-town business trip; stricter requirements under state law than under FLSA (2/21/02)

Meal period requirements for ready mix drivers (12/14/01 and 4/2/01)

Exotic dancer compensation issues (6/22/01)

Salary Basis Test Under AB 60 (5/30/01)

Compensability of Stand-By Time (3/22/01)

Meal periods as "hours worked" when employee restricted to work site (1/12/01)

Service charges and gratuities (11/2/00)

Unlawful deductions - debiting manager's pay for staff salaries and expenses (8/1/00)

Determination of employee or independent contractor status of nurses working for so-called "nurses' registry" (5/17/00)

"Understanding AB 60," a detailed analysis and interpretation of the newly enacted provisions of the state's overtime law (12/23/99)

Deductions for overpayment of wages (9/22/99)

Use of electronic pay stubs (7/19/99)

Employee's right to maintain third party beneficiary action against contractor for prevailing wage violations (5/17/99)

Test for determining compensability of "on call time" (12/28/98)

Tip pooling (12/28/98)

Uniform changing time as compensable hours worked; effect of CBA on determination of hours worked (12/23/98)

Employment status – interns (11/12/98 and 5/17/00)

Outside Salesperson Exemption (9/8/98)


Teaching and Lecturing:

At Law Schools-

Boalt Hall School of Law – Guest lecturer from 2005 to the present, on California wage and hour law for class "Representing Low Wage Workers."

Hastings College of Law – Guest lecturer from 1991 to the present, on California wage and hour law and DLSE procedures, for students participating in Civil Justice Clinic.

Golden Gate School of Law – Guest lecturer from 1998 to the present, on California wage and hour law and DLSE procedures, for students participating in Women's Employment Rights Clinic.

At University Classes-

UC Berkeley Extension- Guest lectured in 2003 and 2005 on California wage and hour law at employment law class for human resource professionals.

San Francisco State University- Guest lectured from 1995 to 2000 on legal issues arising under the Talent Agencies Act at undergraduate class on artists and the law.

At Professional Seminars-

Panelist or featured speaker at over 40 professional seminars on various topics in the field of wage and hour law, from 1997 to the present.  Sponsoring organizations included:

>American Bar Association
>Labor and Employment Section of the State Bar of California
>Barristers' Club of the Bar Association of San Francisco
>Bar Association of San Francisco
>California Employment Lawyers Association
>Interstate Labor Standards Association
>Lawyers Coordinating Committee, AFL-CIO
>National Labor Relations Board
>National Lawyers Guild
>Orange County Bar Association
>Sacramento County Bar Association
>San Francisco Legal Aid Society, Employment Law Center
>Santa Barbara County Bar Association
>Sonoma County Bar Association

Also, served as the featured speaker over 30 times before non-attorney employer and employee groups (including human resource organizations, contractors' associations, and labor unions) on a variety of wage and hour law issues.

Legislation and Regulations:

Drafted several key provisions of AB 2509, a comprehensive bill passed in 2000, which, among other things, established the requirement that an employer post a bond or undertaking in order to maintain an appeal from a Labor Commissioner order, decision or award, created new requirements for information that must be listed on pay stubs, and prohibited employers from withholding any portion of credit card processing fees from tipped employees' wages or gratuities.

Drafted the garment manufacturing regulations (8 Cal Code of Regs §§13630-13659), adopted in September 2002, interpreting and implementing garment manufacturing statutes enacted with the passage of AB 633 (Labor Code §2675, et seq.), including provisions for liability of manufacturers for unpaid minimum wages and overtime owed to contractor's employees.

Provided legal assistance to persons drafting the San Francisco Minimum Wage Ordinance, enacted by the city's voters in November 2003.

Publications:

"California Wage and Hour Law - A Twenty-Five Year Trajectory," published by the State Bar of California Labor & Employment Law

Section, in the September 2007 issue of the California Labor &
Employment Law Review

"Enforcement of the California Talent Agencies Act: The
Procedures of the Labor Commissioner," published by the American
Bar Association in the fall 1996 issue of Entertainment and
Sports Lawyer.

Currently drafting various chapters of revised edition of
"California Workers' Rights" to be published by the University of
California at Berkeley, Center for Labor Research and Education,
Institute of Industrial Relations.