1    RICHARD HARRINGTON (SBN 28099)
     CHANDLER WOOD HARRINGTON & MAFFLY LLP
2    One Maritime Plaza, Fourth Floor
     San Francisco, California 94111 3404
3    Telephone:    415 421 5484
     Facsimile:    415 986 4874
4    Email:        harr@well.com

5    ROBERT CHARLES WARD (SBN 160824)
     SHARTSIS FRIESE LLP
6    One Maritime Plaza, Eighteenth Floor
     San Francisco, California 94111 3404
7    Telephone:    415 421 6500
     Facsimile:    415 421 2922
8    Email:        rward@sflaw.com

9    C. ANGELA DE LA HOUSAYE (SBN 144218)
     BRENDAN J. DOOLEY (SBN 162880)
10   KARYNE T. GHANTOUS (SBN 191309)
     DE LA HOUSAYE & ASSOCIATES, ALC
11   1655 N. Main Street, Suite 395
     Walnut Creek, California 94596
12   Telephone:    (925) 944-3300
     Facsimile:    (925) 944-3343
13   Email:        angela@delahousayelaw.com
                   brendan@delahousayelaw.com
14                 karyne@delahousayelaw.com

15   Attorneys for Defendants
     ANDREW VERITY AND CHRISTINA CHANG

16                 UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18

19                    SAN FRANCISCO DIVISION

20   MARK LILLGE D/B/A CREATIVE          )  Case No: C-07-02748 MHP
     MARKETING CONCEPTS,                 )
21                                       )  **DEFENDANT'S MEMORANDUM OF**
                    Plantiff,            )  **POINTS IN AUTHORITY IN SUPPORT OF**
22                                       )  **MOTION TO DISSOLVE INJUNCTION, OR,**
          v.                             )  **IN THE ALTERNATIVE, INCREASE BOND**
23                                       )  **AND FOR PRELIMINARY INJUNCTION**
     ANDREW VERITY AND CHRISTINA CHANG,  )  **AGAINST PLAINTIFF**
24                                       )
                    Defendants.          )  Date:    April 7, 2008
25   _____)  Time:    2:00 p.m.
                                            Dept:    Courtroom 15, 18th Floor
26                                          Judge:   Hon. Marilyn H. Patel

27                                          Complaint Filed: May 25, 2007
                                            Trial Date: None Set
28
                                                   Case No. C-07-02748 MHP
     DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
     INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
                                           PLAINTIFF

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS ..........................................................................1

      A.    Termination Of Verity And Chang And The Founding Of Branding
            Boulevard..................................................................................2

      B.    Lillge's Concocted Trade Secrets Claims.............................................3

      C.    Lillge's Abusive Misuse Of This Litigation To Inflict Competitive Injury
            On Verity And Chang ....................................................................4

      D.    Lillge Cannot Compensate Defendants If His Injunction Was Wrongfully
            Obtained....................................................................................5

III.  LEGAL ARGUMENT..............................................................................6

      A.    The Preliminary Injunction Should Be Dissolved ...................................6

            1.    The Evidence Now Demonstrates Just How Unlikely Plaintiff Is
                  To Prevail On His Trade Secrets Claim........................................7

            2.    The Change In Circumstances Here Warrants Modification Of
                  The Current Injunction.........................................................10

            3.    The Provisional Relief Has Been In Place Long Enough For
                  There To Be Little Or No Change Of Irreparable Injury.....................11

            4.    Lillge Has Abusively Misused The Court's Order, With Equity
                  Therefore Dictating That The Order Be Dissolved. ........................12

      B.    In The Alternative, The Court Should Increase The Bond And Enjoin
            Lillge From Engaging In The Same Conduct That Lillge Has Sought To
            Enjoin.....................................................................................13

            1.    The Amount Of Security Is Within Court's Discretion......................13

            2.    The Amount Of The Bond Should Be Increased............................14

            3.    Court Should Err on High Side In Setting Amount of Bond................14

      C.    The Court Should Enjoin Lillge From Contacting Branding Boulevard's
            Customers. ...............................................................................16

IV.   CONCLUSION ...................................................................................16

Case No. C-07-02748 MHP

**TABLE OF AUTHORITIES**

**Cases**

Aetna Building Maintenance Co. v. West

    39 Cal 2d. 198 (1952) .................................................................................... 10

Bellevue Manor Assocs. v. United States

    165 F.3d 1249 (9th Cir. 1999) ..................................................................... 10

Consumer Advisory Board v. Glover

    989 F.2d 65 .................................................................................................... 11

Continental Car-Na-Var Corp. v. Moseley

    24 Cal 2d. 104 (1994) .................................................................................. 10

Exxon Corp. v. Texas Motor Exch.

    628 F.2d 500 (5th Cir. 1980) ......................................................................... 6

Hoechst DialFoil Co. v. Nanya Plastics Corp.

    174 F 3d. 411 (4th Cir. 1999) ....................................................................... 14

Humble Oil & Refining Co. v. American Oil Co.

    405 F.2d 803 (8th Cir.) .................................................................................. 7

Jones v. Aero/Chem Corp.

    921 F.2d 875 (9th Cir. 1990). ....................................................................... 8

Mead Johnson & Company v. Abbott Laboratories

    201 F.3d 883; (7th Cir. 2000) ...................................................................... 15

New York State Ass'n for Retarded Children v. Carey

    706 F.2d 956 (2d Cir. 1983) ......................................................................... 7

Nicacio v. INS

    797 F.2d 700 (9th Cir. 1985) ........................................................................ 6

Patterson v. Newspaper & Mail Deliverers' Union

    13 F.3d 33 (2d Cir. 1993) ............................................................................. 11

Case No. C-07-02748 MHP

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

Rufo v. Inmates of Suffolk Jail
  502 U.S. 367 (1992)............................................................................................ 10, 11

The Continuum Company, Inc. v. Incept, Inc.
  873 F.2d 801 (5th Cir. 1989). ............................................................................. 13

Transgo, Inc. v. AJAC Transp. Parts Corp.
  911 F.2d 363 (9th Cir. 1990) ............................................................................... 7

W.R. Grace & Co. v. Local Union 759
  461 U.S. 757 (1983)........................................................................................... 13, 15


**Statutes**

California Code of Civil Procedure §2019 ............................................................... 3
Federal Rule of Civil Procedure 59 ..................................................................... 6
Federal Rule of Civil Procedure 60 ....................................................... 6, 7, 10, 11
Federal Rule of Civil Procedure 65 ..................................................................... 13


**Other Authorities**

Moore's Federal Practice, Civil §60.42 (2008) ...................................................... 8

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF

1    I.    **INTRODUCTION**

2        The Court explicitly stated at the hearing on Plaintiff's Motion for Preliminary Injunction that

3    Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("Lillge") had not shown a substantial

4    likelihood of prevailing on the question of whether Plaintiff had the trade secrets that he claims.  The

5    Court nonetheless, based on the possibility of irreparable harm, granted Plaintiff an injunction.  At this

6    point in the case, however, after the parties have had significant discovery and Plaintiff has engaged in a

7    pattern of abusive and tortuous misuse of this litigation, it is time for the Court to revisit the Preliminary

8    Injunction.  To this day, Plaintiff has failed to identify with requisite specificity legally cognizable trade

9    secrets.  Lillge has wrongfully exploited the Court's prior orders by publishing selective descriptions of

10   them to the marketplace and following up by systematically making deliberate damaging and

11   defamatory remarks on the telephone, while Andrew Verity ("Verity") and Christina Chang ("Chang")

12   were bound by the Orders.  It is time for the Court to dissolve or modify the injunction order.

13       In the alternative, Defendants request that the bond amount be increased.  When the Court

14   initially granted injunctive relief to Lillge, the Court set the bond for only $100,000.  This bond amount

15   was originally set at the time that Plaintiff obtained a Temporary Restraining Order ("TRO").

16   Circumstances have changed, specifically in two important ways.  First, when the Court granted an

17   injunction in this matter it was assumed by all to have only a temporary and transitory effect on the

18   parties' conduct of business, this matter, however, has dragged out for much longer than anticipated.

19   Second, given that Plaintiff Lillge has used information obtained through discovery in this action to

20   obtain a competitive advantage over Defendants while Defendants continue to be restrained by the

21   Preliminary Injunction, Lillge has exacerbated and increased the potential consequences of the

22   wrongfully obtained Injunction.  Under the circumstances presented, it would be appropriate for the

23   Court to increase the bond in this case to $500,000 as appropriate security should Plaintiff fail to prevail

24   a trial and the Court and the Jury determine that Plaintiff's trade secret case is without merit and the

25   Injunction wrongfully obtained.

26   II.    **STATEMENT OF FACTS**

27       One of the most important facts, which the Court should never lose sight of, is that Lillge fired

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

both Verity and Chang.  Verity Declaration ("Verity Decl.") ¶2; Chang Declaration ("Chang Decl.") ¶2.
This makes the case like no other good faith trade secrets case.  Verity and Chang did not plan their exit,
lay the foundation for their new business, and execute a surprise raid on customers and employees of
CMC.  They were fired on short notice and created Branding Boulevard as a basis to obtain a
replacement visa and remain in California with their young son.  Verity Decl., ¶3; Chang Decl., ¶3.
From the start, Lillge's trade secret claims have been asserted (1) as leverage to avoid paying Verity and
Chang what he owed them and (2) to avoid the consequences of firing two key employees who
possessed the ability and legal right to compete successfully for business from CMC's customers.

### A.    Termination Of Verity And Chang And The Founding Of Branding Boulevard

For several years, Verity had been CMC's sales manager, earning substantial deferred
compensation tied to the value of the business in exchange for his successful efforts and very long hours.
Verity Decl., ¶4.  Verity's wife Chang came to work for the business and became CMC's best
salesperson.  Verity Decl., ¶5; Chang Decl., ¶4.

Sadly, the personal relationship between Lillge and Verity, who had once been good friends,
deteriorated.  In January 2007, Lillge told Verity that he was fired.  Verity Decl., ¶6.  Verity pleaded for
two things: (1) employment at CMC through the end of 2007, so that he could find new employment and
transfer his visa, and (2) the deferred compensation that he had earned.   Initially Lillge agreed to both.
Lillge then tried to change the deal and force Verity to accept less than he was owed and only if he
agreed to an onerous non-compete.  Lillge gave Verity a short deadline to surrender to the changed and
disadvantageous deal and fired Verity when he would not surrender.  Id., Ex. C.

When he was fired, Verity immediately tried to find a new job with an employer who would
sponsor the transfer of his visa.  Verity Decl., ¶7.  The plan for Verity and Chang was for Chang to stay
at CMC to preserve both immigration status and ability to pay the mortgage.  Id.; Chang Declaration ¶5.
Unfortunately, within a couple of weeks, Lillge also fired Chang.  Lillge demanded, for the first time,
that Chang sign a confidentiality agreement that included an illegal non-compete clause.  Chang Decl.,
¶5.  The timing of Lillge's demand was not coincidental.  Lillge had just fired and refused to pay
Chang's husband Verity because he could not eliminate Verity as a potential competitor.  Chang was

1  afraid that she was next and felt she could not agree to severe restrictions on her ability to earn a living

2  should Lillge terminate her. Chang Decl., ¶5. Lillge fired Chang on short notice knowing that doing so

3  created a dire immigration problem for both Verity, Chang and their U.S. born child. Indeed, Lillge

4  responded to inquiries about Chang from customers by telling them that she had been forced to return to

5  Canada. Chang Decl., ¶¶5-6; Declaration of Robert Ward ("Ward Decl."), ¶8, Exhibit E; Lillge Depo. at

6  273:9 – 274:1;  295:12 - 24; 310:17 – 311:1; ¶10, Exhibit G, Pascual Depo. at 43:13 – 44:16; 73:19 –

7  74:10.

8       Shortly after he was fired, Verity was advised by his immigration attorney that, if he could not

9  find a new employer to sponsor his visa, he could obtain a visa as a business owner. For that reason,

10  Verity incorporated Verity Marketing Corp. Verity Marketing Corp. was a shell to which Verity

11  devoted no effort until Lillge fired Chang. With neither of them in possession of an employer-sponsored

12  visa any longer, Verity was forced to implement the backup plan to remain in California. Verity Decl.,

13  ¶8. Verity and Chang chose a name for the business - Branding Boulevard - and scrambled to launch a

14  legitimate business in the only field in which they could do so quickly (to avoid deportation) and

15  profitability (to pay the mortgage and for groceries). Verity Decl., ¶8.

16      **B.**    **Lillge's Concocted Trade Secrets Claims**

17       Within a couple of weeks, Lillge figured out that he had not succeeded in getting Verity and

18  Chang deported. Based on evidence of Chang's communications with a <u>single</u> customer contact (Gina

19  Lee of Chevron Federal Credit Union)[1], and based on non-existent trade secrets, Lillge convinced the

20  Court to issue a TRO and later a Preliminary Injunction. The Court ordered the Injunction despite

21  stating that Lillge had not carried his burden as to the likelihood of trade secrets. Ward Decl., ¶2, Ex. A.

22  The Court apparently based its ruling on a balancing off finding of irreparable harm.

23       Since the Injunction was granted, Plaintiff has failed to identify his trade secrets, as he is

24  obligated to do under California Code of Civil Procedure §2019. In a series of interrogatories,

25

26

_____

27  [1] Ms. Lee received a substantial discount on an order from CMC, which appears to be correlated to the
28  timing of her provision of a Declaration in this matter. Ward Declaration, ¶12, Exhibit I; Lee Depo.
P.76:17 – P. 77:15.

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

1    Defendant Chang asked Lillge to "state all facts" in support of each of the categories of information that

2    Plaintiff contends are trade secrets. Ward Decl., ¶4, Ex. B.  In response to the interrogatories, Plaintiff

3    restated general contentions about the trade secrets that are little more than copied language from his

4    Complaint.  Ward Decl., ¶5, Ex.C.  As part of an attempt to meet and confer over the inadequate

5    information provided regarding the supposed trade secrets, counsel for Plaintiff agreed only to provide

6    documents and did not agree to provide any further specificity with regard to identifying, describing or

7    elaborating on what Plaintiff contends is, and is not, a trade secret.  Ward Decl., ¶5.  Plaintiff has

8    produced thousands of pages of documents, which appear to comprise mostly the customer files for the

9    Plaintiff's business.  Almost all of these documents have been designated "confidential-attorneys eyes

10    only," despite most of these documents being mundane information that Plaintiff could not possible

11    assert as a trade secret.  Ward Decl., ¶5.  Furthermore, by designating the documents for "attorneys eyes

12    only", and by failing to provide satisfactory interrogatory responses, Plaintiff is apparently leaving it to

13    counsel for Defendants to wade through tens of thousands of documents in an attempt to guess what

14    exactly Plaintiff contends is a trade secret.

15        From the beginning, Lillge planned this trade secret case as a fall back plan, if his efforts to have

16    Verity and Chang deported did not work, and if he subsequently found they had entered the same

17    marketplace.  As such, his Application for a TRO must not be seen as a reaction to events, but as a pre-

18    emptive move to disable Verity and Chang's new company.  This pre-planning is evident in Lillge's

19    early on remark to Gina Lee of Chevron Federal Credit Union that he intended to sue Verity and Chang.

20    Ward Decl., ¶12, Exhibit I; Lee Depo. at 58:13 – 59:5.  This suit is a pre-planned lawsuit that has been

21    in pursuit of facts to justify it, however bogus those "facts" may have been.

22        **C.    Lillge's Abusive Misuse Of This Litigation To Inflict Competitive Injury On Verity**

23            **And Chang**

24        In addition to obtaining provisional relief from this Court based on misrepresentations about the

25    nature of his business and false statements regarding the existence of trade secrets, Lillge has

26    compounded the wrong by misrepresenting, with broadside communications to hundreds of customers,

27    that this Court's orders prevent Verity and Chang's former customer contacts from having any contact

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

1  with them. Ward Decl., ¶13, Ex. J; Hua Depo. at 76:19 - 77:3, 79:21 – 80:9; ¶12, Ex. I, Lee Depo. at

2  39:19 – 40:8; 74:18 – 75:2. To discourage customers from switching their business to Verity and

3  Chang, Lillge told potential customers that Defendants would be deported from the United States. In

4  Tess Pascual's deposition testimony, she related how she was told by the "president of CMC" [Mark

5  Lillge] that Defendant Chang would be departing for Canada shortly because of "visa issues." Ward

6  Decl., ¶10, Ex. G, Pascual Depo. Transcript at 73:8-23. Lillge also told Michelle Chan of Wells Fargo

7  that Wells Fargo was not allowed to do business with Verity and Chang. As a result of CMC's

8  misinformation, Chan asked Chang to take her off their contact list. Chang Decl., ¶¶5-6. Lillge told

9  Heidi Hua, who had already initiated contact and placed order with Chang before the Court Injunction

10 that Verity and Change were "not allowed to do business with her because of a Court Order". Ward

11 Decl., ¶13, Ex. J; Hua Depo. at 76:19 – 77:3; 79:21 – 80:9. Lillge made these comments even though

12 (and perhaps, because) the information that Hua was a customer of Verity and Chang's was available to

13 Lillge through the depositions of Verity and Chang.

14       Lillge has broadcast defamatory statements to suppliers and customers. Verity Decl., ¶9, Ex. A,

15 Lillge's June 28, 2007 letter to industry suppliers; Ex. B, Lillge's September 7, 2007 email to its

16 customer contacts. Lillge admitted that he "selectively" described the Court's orders to customer

17 contacts. Ward Decl., ¶8, Ex. E; Lillge Depo. at 289:19-292:10. Lillge chose specifically to omit

18 reference to any portion of the Court order that allowed customers to contact Verity and Chang because

19 that part of the order was not "relevant" to his business and because he did not want to "promote"

20 Defendants' business. *Id.* at 294:2-295:10; 298:9-299:24 [Lillge Depo.] Lillge's phone and e-mail

21 communications with persons in the industry suggested that people should not do business with

22 Defendants because the Court's Orders forbade it. Because of the Court Order, Lillge took liberties, by

23 taking uncontested potshots at Defendants in the marketplace.

24       **D.    Lillge Cannot Compensate Defendants If His Injunction Was Wrongfully Obtained**

25       Lillge was required to post a bond of only $100,000, as part of the Injunction. Lillge has

26 admitted that he lacks the financial wherewithal to satisfy any obligation in excess of the bond. Ward

27 Decl., ¶8, Ex. E; Lillge Depo. at 317:15 – 318:13.

28

1    The Injunction, by forbidding Verity and Chang from soliciting the customer contacts developed

2    through their years of hard work in the industry, has had a concrete deleterious effect on the new

3    business Branding Boulevard. Based on the sales figures achieved by Verity and Chang while working

4    for CMC, and what they have been able to achieve with Branding Boulevard, there is compelling

5    evidence that the damages for a wrongfully obtained injunction are going to be substantially higher than

6    $500,000, if the Injunction remains in place until trial. Verity Decl., ¶¶10-11, 13. Chang Decl. ¶6.

7

8    ## III.    LEGAL ARGUMENT

9        ### A.    The Preliminary Injunction Should Be Dissolved

10       Since Preliminary Injunctions are based on presumably temporary circumstances, the issuing

11   court is empowered to modify the injunctive relief to reflect changing events. A dissolution or

12   modification may be granted if the restrained party demonstrates to the court that the circumstances of

13   the case have changed or that it would be severely injured by the injunctive relief. If the non-movant is

14   able to demonstrate to the court that circumstances have changed so that there is no need for an

15   Injunction or that the movant abused the court's order, the court may dissolve or modify the order to

16   reflect those changed circumstances.

17       Federal Rule of Civil Procedure 60(b) provides the statutory authority for any modification or

18   dissolution of an existing Injunction: On motion and just terms, the court may relieve a party or its legal

19   representative from…[an], order for the following reasons:

20           (2) newly discovered evidence that, with reasonable diligence, could not have been

21           discovered in time to move for a new trial under Rule 59(b);

22           (5) …or applying it prospectively is no longer equitable; or

23           (6) any other reason that justifies relief. FRCP Rule 60 (b).

24       In Nicacio v. INS, 797 F.2d 700 (9th Cir. 1985), the Court stated that "[A] court which issues an

25   Injunction retains jurisdiction to modify the terms of the Injunction if a change in circumstances so

26   requires. Whatever burdens the order does impose cannot be regarded as inflexible". *Id. see* also Exxon

27   Corp. v. Texas Motor Exch., 628 F.2d 500, 503 (5th Cir. 1980) (court may modify Injunctive order in

28   trademark infringement action). In New York State Ass'n for Retarded Children v. Carey, 706 F.2d 956

-6-                    Case No. C-07-02748 MHP

1    (2d Cir. 1983), the Court stated that  an Injunction, as a final judgment with prospective application,

2    may be modified by the court upon motion by a party and a showing that continuation of the

3    Injunction would be inequitable.  F.R.Civ.P. 60(b)(5) expressly authorizes a district court to relieve a

4    party from a final judgment if "it is no longer equitable that the judgment should have prospective

5    application.  The power of a court of equity to modify a decree of Injunctive Relief is long-established,

6    broad, and flexible.  A continuing decree of injunction directed to events to come is subject always to

7    adaptation as events may shape the need. . . ."  The distinction is between restraints that give protection

8    to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and

9    those that involve the supervision of changing conduct or conditions and are thus provisional and

10   tentative.  Familiar equity procedure assures opportunity for modifying or vacating an Injunction when

11   its continuance is no longer warranted.  *Id.*

12          When a case involves drawing the line between legitimate interests on each side, modification

13   will be allowed on a lesser showing.  While changes in fact or in law afford the clearest bases for

14   altering an Injunction, the power of equity has repeatedly been recognized as extending also to cases

15   where a better appreciation of the facts in light of experience indicates that the decree is not properly

16   adapted to accomplishing its purposes.  *Id.* at 969.

17          Where, for example, a court viewed an Injunction as having served its purpose, it was willing to

18   take the "harm and benefits that maintenance of the Injunction would cause" into account as relevant

19   factors, along with such considerations as past compliance.  Transgo, Inc. v. AJAC Transp. Parts Corp.,

20   911 F.2d 363, 365 (9th Cir. 1990).

21          Modification is only cautiously to be granted; . . . some change is not enough; . . . the dangers

22   which the decree was meant to foreclose must almost have disappeared; . . . hardship and oppression,

23   extreme and unexpected, are significant.  Humble Oil & Refining Co. v. American Oil Co., 405 F.2d

24   803, 813 (8th Cir.), *cert. denied*, 395 U.S. 905, 89 S. Ct. 1745, 23 L. Ed. 2d 218 (1969).

25          **1.    The Evidence Now Demonstrates Just How Unlikely Plaintiff Is To Prevail**

26          **On His Trade Secrets Claim.**

27   Federal Rule of Civil Procedure §60(b)(2) permits a modification or dissolution of an existing

28

1  Injunction when new evidence is discovered. The Ninth Circuit has stated that to obtain relief, the

2  moving party must show: (1) that the evidence existed at the time of trial, (2) that it could not have been

3  discovered in time for a new trial motion despite due diligence, and (3) that the evidence is sufficiently

4  significant that it is likely to change the outcome of the case. <u>Jones v. Aero/Chem Corp.</u>, 921 F.2d 875,

5  878 (9th Cir. 1990).

6      Newly discovered evidence refers only to evidence that was not "discovered" by the moving

7  party in time to move for a new trial. "In order for evidence to be newly discovered, the party must have

8  been unaware of the existence of the evidence before or during the trial." There must be some concrete

9  facts presented demonstrating why the moving party was unaware that the evidence existed, concrete

10  facts that show that the moving party's ignorance was "excusable". To succeed on motion based on

11  newly discovered evidence, a movant must show that the evidence was "of such magnitude that the

12  production of it earlier would have been likely to change the disposition of the case". Proponents who

13  argue that newly discovered evidence would have produced a different result must "present a cogent

14  explanation as to *why*" the evidence would change the outcome. <u>Moore's Federal Practice</u>, Civil §60.42

15  (2008).

16      In this case, Defendants have only recently been able to discover that Plaintiff's contentions that

17  he possess Trade Secrets that are worthy of protection is completely meritless, since only time and

18  Plaintiff's repeated refusal to identify any such secrets by this stage in the litigation must be viewed as

19  crippling to their case.

20      Going through the general categories that Plaintiff claims are trade secrets, Plaintiff clearly has

21  not established the existing of legally cognizable trade secrets. This is put up or shut up time for the

22  Plaintiff. In opposition to this motion, Lillge needs to show the Court an actual trade secret. Not a label,

23  not a category, but some specific collection of trade secrets that would justify this lawsuit. Based on

24  what Plaintiff has provided or produced in this action, what Plaintiff claims to be trade secrets simply

25  are not.

26      The first category of trade secrets that are claimed by Plaintiff are his customers. The identify of

27  CMC's customers are not secrets. One can walk into CMC's showroom - - a public place - - and learn

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

1   the identity of <u>hundreds</u> of CMC customers.  *See* Declaration of Timothy Schmolder.  Most if not all

2   these customers do not consider themselves to be "secrets" possessed by Lillge.  For example, Tess

3   Pascual of Bingham McCutchen testified that she received solicitations from other promotional products

4   vendors and that her identify as a buyer for Bingham is not secret.  Ward Decl., ¶10, Ex. G; Pascual

5   Depo. at 18:21 - 25; 69:24 – 70:20 – 23:9.  Other witnesses deposed in this action, such as Gina Lee,

6   Business Development Officer of Chevron Federal Credit Union Business Development have also

7   provided more of the same testimony.  Ward Decl., ¶12, Ex. I; Lee Depo. at 19:24 – 20:9; P. 21; ¶11,

8   Exhibit H, Woods Depo. at 34:20 – 37:25; 61:17 – 62:8; ¶13, Ex. J; Hua Depo. at 62: 16 – 22.

9       The Court granted the Preliminary Injunction on the basis of Lillge's claims specifically that he

10   may be able to establish customer pricing as a trade secret.  Molloy's deposition makes a mockery of

11   Lillge's claim that pricing is a secret.  Ward Decl., ¶9, Ex. F, Molloy Depo. at 21:13 – 22:14; 59:18 –

12   62:1.  Additionally Lillge had failed to make the Court aware of a factual peculiarity of his computer

13   accounting system that it contains no database of client pricing by individual item, due to the fact the

14   item numbers are not either printed or collected on the client invoice.  Verity Decl., ¶12.  At trial, Lillge

15   will be specifically unable to establish a database of customer pricing because it simply does not exist.

16       The practice at CMC was not to print the product item number on invoices for clients.  This was

17   replaced by generic descriptions such as "Imprinted Mugs".  The accounting system used at CMC was

18   just a low technology bookkeeping system.  The data collected mirrored what was printed on the

19   invoice, so there was no collection of either item number or supplier, both essential items for a pricing

20   database.  The purchasing part of accounting system was not linked to the invoicing side in any way.  In

21   this way any claim that CMC has a database customer pricing is false.

22       Another category of information that Lillge pleads are trade secrets is the pricing for the

23   merchandise sold by CMC.  Yet Bruce Molloy, a senior manager at CMC, admitted that industry pricing

24   is typically based on catalogs provided by businesses other than distributors like CMC.

25   Ward Decl., ¶9, Exhibit F; Molloy Depo. at 21:13 – 22:14; 59:18 – 62:1.

26       Given California law that makes it very clear that Verity and Chang have a right to do business

27   with their former customers, the burden is on Lillge to draw the line between Defendants' right to

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

compete and trade secret information.  The identities of Verity's and Chang's customers as well as their

preferences, habits and other information naturally acquired in a business relationship is information that

is presumptively Verity's and Chang's to use.  <u>Continental Car-Na-Var Corp. v. Moseley</u>, 24 Cal 2d.

104, 110 (1994); <u>Aetna Building Maintenance Co. v. West</u>, 39 Cal 2d. 198, 203 (1952).  Lillge's abject

failure to make any reasonable effort to draw a line between what is a trade secret and what Verity and

Chang are entitled to use given the time elapsed and the efforts of Defendants to obtain this information

must be considered to satisfy the "new facts" section of Federal Rule of Civil Procedure §60(b) and is in

and of itself grounds to dissolve the Preliminary Injunction.

### 2.     The Change In Circumstances Here Warrants Modification Of The Current Injunction

Federal Rule of Civil Procedure 60(b)(5) provides that a party may obtain relief from a court

order when "it is no longer equitable that the judgment should have prospective application," *Id.*  There

are a number of factors that may be considered in determining whether there is a "significant change in

circumstances" that makes continued enforcement of the decree, without modification, inequitable. In

<u>Rufo v. Inmates of Suffolk Jail</u>, 502 U.S. 367, 380, 383, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992), the

Supreme Court held that any showing of a significant change in factual conditions or law would justify a

modification of an injunction.  The Supreme Court held that the factors may vary depending on whether

the relief sought is a complete dissolution of the Injunction or only a modification of the Injunction.

> A modification of an Injunction may be justified on a wide variety of circumstances…Furthermore, when a modification is warranted, the modification should be "tailored to resolve the problems created by the change in circumstances" and the court should do no more than is necessary to solve those problems.  In contrast, if a party seeks to have a decree set aside entirely, he or she has to show that the decree has served its purpose, and there is no longer any need for the Injunction.

*Id.* at 383.

An extended period of compliance with the injunction is a relevant factor. *Id.*  The Ninth Circuit

addressed this issue in the case of <u>Bellevue Manor Assocs. v. United States</u>, 165 F.3d 1249, 1253 (9th

Cir. 1999) when it held that the *Rufo* standard applied to a motion for relief from judgment based on

private commercial contract; there is no "commercial contract" exception to Fed. R. Civ. P. 60(b)(5).

3.    **The Provisional Relief Has Been In Place Long Enough For There To Be Little Or No Change Of Irreparable Injury.**

The Court has full power to terminate a continuing Injunction of the kind at issue here using the significant time period of compliance that has passed as a factor, upon a determination that it has achieved its purpose or no longer serves its intended purpose. As is self-evident from this language of Rule 60(b)(5), relief is available under this clause only as to a judgment that applies "prospectively," and only when that prospective application is inequitable. The standard to apply in determining whether an order or judgment has prospective application within the meaning of Rule 60(b)(5) is whether it is "executory" or involves "the supervision of changing conduct or conditions ... ." Injunctions directed to the future conduct of parties such as the Injunction here are the classic example of judgments that have prospective application. For this reason, traditional principles of equity permitted modification of the prospective features of those decrees, even before the federal rules were adopted and enacted. Today, the growth of litigation seeking to impose Injunctions governing the conduct of parties well into the future, has made the ability of a court to use Rule 60(b)(5) to modify a decree in response to changed circumstances all the more important.

In <u>Rufo</u>, the Supreme Court stated, "Modification of a decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous". *Id. See also,* <u>Consumer Advisory Board v. Glover</u>, 989 F.2d 65. [Change in factual circumstances that make compliance with decree substantially more onerous may justify simple modification of decree]. *See also* <u>Patterson v. Newspaper & Mail Deliverers' Union</u>, 13 F.3d 33, 38-39 (2d Cir. 1993) (injunctive relief may be modified or vacated when original objectives of injunction have been satisfied).

A TRO or Preliminary Injunction has been in effect continuously since June 1, 2007, for approximately ten months by the time that the time that the Court hears this motion. Defendants have missed any window of time to "poach" from Plaintiff their former clients. Plaintiff has had ten months to assign these accounts to new sales representatives and prove to the customers a continuing track record of service. If Lillge has not done so by now, he presumably never will and these dissatisfied former customers of Verity and Chang should be fair game. Essentially, in assessing whether to modify

1    an injunctive order, the court must consider whether the original purpose of the injunctive relief would

2    be facilitated.

3         When Lillge fired Verity and Chang, he, in his own words, fired "key employees" who were

4    important to CMC's continued success, he injured himself, and his stated damages are the result of poor

5    business decisions, not any improper acts by the Defendants he fired, and is now suing. Verity Decl.,

6    Exs. A and B. Lillge admitted that he is unable to distinguish between losses suffered by his business as

7    a result of Branding Boulevard's competition versus losses caused by his termination of two very key

8    sales employees. Ward Decl., ¶7, Ex. D, Lillge Depo. at 147:6 – 149:14.

9         The Defendants' claim that success in the industry is based upon personal relationship. Given

10   that Lillge is assuming he is allowed to take unrestricted potshots at the Defendants, their historical

11   relationship are undergoing irreparable damage. Lillge's behavior certainly supports the Defendants'

12   claim that it is personal relations that are the "secret" to success in the promotional products industry

13   rather than his own claim of the existence of trade secrets. Why else would he spend so much time

14   damaging the Defendants' names in front of his customers and so little time providing the defendants

15   with trade secrets that he claims exist.

16         **4.    Lillge Has Abusively Misused The Court's Order, With Equity Therefore**

17              **Dictating That The Order Be Dissolved.**

18         Lillge's behavior since the Court first granted provisional relief shows that he has misused the

19   Court's orders to obtain an unfair competitive advantage over Verity and Chang. The risk of irreparable

20   injury is now even more remote because Lillge has scared off customers from doing business with

21   Verity and Chang by selectively and misleadingly broadcasting references to the references in the Court

22   orders.

23         A court may grant relief from a final judgment, order, or proceeding, even though the case does

24   not fit into one of the other, more specific provisions of Rule 60(b), if there is "any other reason that

25   justifies relief." This provision, which provides for relief from a judgment based on "any other reason",

26   is a "grand reservoir of equitable power to do justice in a particular case." The provision "vests power

27   in courts adequate to enable them to vacate judgments whenever such action is appropriate to

28

1  accomplish justice."  A party asking for the Court's intercession with a Preliminary Injunction must

2  behave equitably and not abuse relief that a Court should be granting sparingly.

3    **B.    In The Alternative, The Court Should Increase The Bond And Enjoin Lillge From**

4          **Engaging In The Same Conduct That Lillge Has Sought To Enjoin**

5        If the Court will not dissolve or modify the injunction, the Court should at least increase the bond

6  and enjoin Lillge from abusing the Court's order.

7        **1.    The Amount Of Security Is Within Court's Discretion**

8        Fed. R. Civ. Proc. 65(c) provides that a bond must be posted before a Federal Court may issue an

9  interlocutory injunction and that the enjoined defendant may recover on the bond if a court later

10  determines that it was "wrongfully enjoined."  This bond requirement serves two functions: (1) it assures

11  the enjoined party that it may readily collect damages from the funds posted or the surety provided in the

12  event that it was wrongfully enjoined, without further litigation and without regard to the possible

13  insolvency of the assured, and (2) it provides the plaintiff with notice of the maximum extent of its

14  potential liability, since the amount of the bond "s the limit of the damages the defendant can obtain for

15  a wrongful injunction, . . . provided the plaintiff was acting in good faith."  The bond can thus be viewed

16  as a contract in which the court and plaintiff "agree" to the bond amount as the "price" of a wrongful

17  injunction.  The Continuum Company, Inc. v. Incept, Inc., 873 F.2d 801 (5th Cir. 1989).

18        In setting the amount of security for a Preliminary Injunction for the payment of such costs and

19  damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or

20  restrained, the trial court should err on the high side.  An error in setting the bond too high is not serious,

21  because the fee to post bond is usually a fraction of the amount of the bond and because any recovery on

22  the bond would have to be supported by proof of actual damages.  On the other hand, an error on the low

23  side may produce irreparable injury, because damages for an erroneous Preliminary Injunction may not

24  exceed the amount of the bond.  The Supreme Court declared in W.R. Grace & Co. v. Local Union 759

25  that "a party injured by the issuance of an injunction later determined to be erroneous has no action for

26  damages in the absence of a bond."  W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 770 n. 14,

27  103 S. Ct. 2177, 2185 n. 14, 76 L. Ed. 2d 298 (1983).

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

## 2.    The Amount Of The Bond Should Be Increased.

Based on discovery to date, the likelihood has increased substantially that Lillge will be liable for a wrongfully obtained injunction. Branding Boulevard's lost profits as a result of the TRO and Injunction will be much greater than $100,000, and in all likelihood over $500,000, by the time of trial. Verity Decl., ¶¶10-11, 13. For that reason alone, regardless of the merits of Lillge's claims, the Court should increase the bond. The amount of bond ordinarily depends on gravity of potential harm to enjoined party. In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for the harm it suffers as a result of an improvidently issued injunction or restraining order. The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party: The Judge usually will fix security in an amount that covers the potential incidental and consequential costs, as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities, or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained. Hoechst DialFoil Co. v. Nanya Plastics Corp., 174 F 3d. 411, 421 FN3 (4th Cir. 1999).

## 3.    Court Should Err on High Side In Setting Amount of Bond

When the Court first set the bond amount in June 2007, neither Defendants nor the Court had reason to believe that the provisional relief would remain in effect for almost an entire year. Resolution of this case was delayed by at least two months by a failed mediation. Ward Decl., ¶6.

The Court and Defendants also could not anticipate that Lillge would misrepresent the Court order to the marketplace and scare off customers. The long wait for trial and Lillge's misuse of the injunction weigh in favor of increasing the bond.

Another factor weighing in favor of increasing the bond is Lillge's admission that he would lack the financial wherewithal to pay damages for a wrongfully obtained injunction. Ward Decl., ¶9, Ex. E, Lillge Depo. at 317:15 – 318:13. Lillge effectively is being given a free shot at Verity and Chang's new business, and apparently is judgment proof to satisfy the damages that Verity and Chang would be entitled to if the injunction is wrongfully obtained.

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF

1    In <u>Mead Johnson & Company v. Abbott Laboratories</u>, the Court elaborated on the proper

2    calculation of potential dangers, it disavowed the district court's ruling which had calculated the

3    Defendants "costs and damages" solely by reference to the costs of printing new labels and promotional

4    literature [in a trademark case]. The Court ruled that the suit was not about out-of-pocket costs, but

5    principally the effect of the Injunction on the sales of their products. The principal reason the district

6    judge gave for ignoring this effect (and for disregarding most of the out-of-pocket costs) was that the

7    Defendant should have quantified its losses earlier, and the only earlier opportunity was at the

8    Preliminary Injunction hearing. "Nothing in the record suggests, however, that the district judge alerted

9    the Defendant to this requirement in advance of the hearing. A litigant naturally would suppose (in the

10   absence of notice) that a hearing on a request for a Preliminary Injunction will be devoted to the merits

11   of that request, rather than to fixing the amount of bond." <u>Mead Johnson & Company v. Abbott</u>

12   <u>Laboratories</u>, 201 F.3d 883; (7th Cir. 2000).

13   When setting the amount of security, district courts should err on the high side. If the district

14   judge had set the bond at $ 50 million, as the Defendant requested, this would not have entitled the

15   Defendant to that sum; the Defendant still would have had to prove its loss, converting the "soft"

16   numbers to hard ones. An error in setting the bond too high thus is not serious. (The fee for a solvent

17   firm to post a bond, a standby letter of credit, or equivalent security is a very small fraction of the sum

18   involved.) Unfortunately, an error in the other direction produces irreparable injury, because the

19   damages for an erroneous Preliminary Injunction cannot exceed the amount of the bond. [Citing <u>W.R.</u>

20   <u>Grace & Co. v. Rubber Workers</u>, 461 U.S. 757, 770 n.14, 76 L. Ed. 2d 298, 103 S. Ct. 2177 (1983)].

21           Commercial litigation [is] often characterized by firms' desire to heap
             costs on their rivals, imposing marketplace losses out of proportion to the
22           legal merits. That is why bonds must reflect full costs. Shifting back to
             the plaintiff the complete injury occasioned by the errors that sometimes
23           occur when preliminary relief is issued after an abridged judicial inquiry
             will hold in check the incentive business rivals have to pursue relief that
24           gives them a competitive edge even if, as in this case, they lose in the end.

25   <u>Mead Johnson & Company v. Abbott Laboratories</u>, 201 F.3d 883; (7th Cir. 2000).

26

27

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE
INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST
PLAINTIFF

**C.    The Court Should Enjoin Lillge From Contacting Branding Boulevard's Customers.**

Defendants contend that Plaintiff's entire case is a sham so that Lillge can avoid paying what he owes to Verity and Chang and to keep them from competing in the same industry. There should be no Court orders in place limiting either side from competing in the marketplace. If the Court should choose to leave the Preliminary Injunction in place, the Court should make it mutual. Lillge is trying to have it both ways. Plaintiff obtained an order forbidding Defendants from contacting CMC's customers, while Lillge has a free shot to try and take back the customers who voted with their feet and took their business to Branding Boulevard.

Lillge should be subject to a restriction similar to Verity and Chang - - no contacting Branding Boulevard customers unless those customers choose to initiate contact. Lillge is learning through discovery the identity of Branding Boulevard's customers. Lillge has contacted some of those customers. This is not fair. Lillge also should be enjoined from further mass communications about this litigation to the marketplace. If Lillge wants to send the Court's actual order - - that states that customers are free to initiate contact with and do business with Verity and Chang - - Defendants would be delighted of course. Lillge testified that he was not interested in doing so because that might "promote" someone else's business. In fairness, Lillge should be enjoined from his selective references to this litigation.

No bond should be required for the injunction requested. Lillge is only being asked to refrain from obviously abusive conduct. The Court's injunction against Verity and Chang limits their right to compete. Defendants' requested injunction would only limit Lillge's non-existent right to put Branding Boulevard out of business.

**IV.    CONCLUSION**

Based on the foregoing, Defendants pray that this Court dissolve and/or modify its preliminary injunction to even the playing field given Lillge's abuse of the Court's Order. In the alternative, Defendants pray that the Plaintiff be required to put up a security bond that reflects the potential damages that Defendant have and will continue to incur if it is found that Plaintiff has wrongfully

1  enjoined Defendant's right to unfettered access to the market and the customer relationship they have

2  innurtured.

3

4  Dated: March 3, 2008                    DE LA HOUSAYE & ASSOCIATES, ALC

5                                                        / S /

6                                          By:_____
                                                  BRENDAN J. DOOLEY

7                                          Attorneys for Defendants
8                                          ANDREW VERITY AND CHRISTINA CHANG

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MEMORANDUM OF POINTS IN AUTHORITY IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF