RICHARD HARRINGTON (SBN 28099)
CHANDLER WOOD HARRINGTON & MAFFLY LLP
One Maritime Plaza, Fourth Floor
San Francisco, California 94111 3404
Telephone:     415 421 5484
Facsimile:     415 986 4874
Email:         harr@well.com

ROBERT CHARLES WARD (SBN 160824)
SHARTSIS FRIESE LLP
One Maritime Plaza, Eighteenth Floor
San Francisco, California 94111 3404
Telephone:     415 421 6500
Facsimile:     415 421 2922
Email:         rward@sflaw.com

C. ANGELA DE LA HOUSAYE (SBN 144218)
BRENDAN J. DOOLEY (SBN 162880)
KARYNE T. GHANTOUS (SBN 191309)
DE LA HOUSAYE & ASSOCIATES, ALC
1655 N. Main Street, Suite 395
Walnut Creek, California 94596
Telephone:     (925) 944-3300
Facsimile:     (925) 944-3343
Email:         angela@delahousayelaw.com
               brendan@delahousayelaw.com
               karyne@delahousayelaw.com

Attorneys for Defendants
ANDREW VERITY AND CHRISTINA CHANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE D/B/A CREATIVE MARKETING CONCEPTS,<br><br>　　　　　　　Plantiff,<br><br>　　v.<br><br>ANDREW VERITY AND CHRISTINA CHANG,<br><br>　　　　　　　Defendants. | Case No: C-07-02748 MHP<br><br>**DECLARATION OF CHRISTINA CHANG IN SUPPORT OF MOTION TO DISSOLVE INJUCTION OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF**<br><br>Date:     April 7, 2008<br>Time:     2:00 p.m.<br>Dept:     Courtroom 15, 18th Floor<br>Judge:    Hon. Marilyn H. Patel<br><br>Complaint Filed: May 25, 2007<br>Trial Date: None Set |

I, CHRISTINA CHANG, declare as follows:

1. I am a defendant in this action. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify thereto under oath.

2. I was fired by Mark Lillge, as was my husband, Andrew Verity.

3. Andrew Verity and I <u>did not plan our exit</u>, lay the foundation for our new business, and execute a surprise raid on customers and employees of CMC. We were fired on short notice and created Branding Boulevard as the only way to obtain a replacement visa and remain in California with our young son.

4. After Andrew Verity was fired, I continued working for CMC and remained to be CMC's best salesperson.

5. I had given Lillge my intention to stay at CMC to preserve both our immigration status and ability to pay the mortgage. Unfortunately, within weeks, Lillge fired me also. Lillge demanded, for the first time, that I sign a confidentiality agreement that included an illegal non-compete clause. The timing of Lillge's demand was not coincidental. Lillge had just fired and refused to pay my husband Andrew Verity his deferred remuneration because he wanted to eliminate him as a potential competitor. I was concerned that I was going to be fired despite signing and felt I could not agree to severe restrictions on my ability to earn a living should Lillge terminate me. Lillge fired me on short notice knowing that doing so created a dire immigration problem for Andrew Verity, myself and our U.S.-born child. Indeed, Lillge responded to inquiries about me from customers by telling them that I had been forced to return to Canada.

6. Lillge has claimed that the confidentiality agreement did not contain non-compete provisions. This is factually incorrect. I was told to sign the document that contained a two year non-compete clause, otherwise I would be fired. Later I was given another document, but they had already told me I would be filed for not signing the first document

7. Lillge also emailed Michelle Chan of Wells Fargo that there is an injunction in place to prevent us from doing business her. Because of CMC's misinformation, Chan asked me to remove her from our mailing list, despite having initiated contact with us before the injunction.

8. Regarding our sales volumes: In 2006, at CMC, Andy Verity did $750,000 in sales and I did $600,000 in the 7 1/2 months after I returned from maternity, making my annual sales rate around $950,000. Our combined annual sales rate was therefore $1.7M at a gross margin in excess of 41%, which would result in $700,000 of gross profits.

9. At Branding Boulevard we achieved $600,000 in sales in our first 9 months in business, making the annual rate around $800,000 at around 36% gross margin, which would result in $288,000 of annual gross profits. The differential in gross profits is between the ability to procure sale before and after the Injunction is $412,000.00. Because 25% of our customers are not from CMC, the gross profit figure related to former CMC customers was approximately $216,000.00. Thus, the true result of the Injunction is $484, 000.00 in lost gross profits per year. I am aware that some customers are leaving CMC because of bad service, but not coming to us because of the restrictions they were told by CMC on contacting Branding Boulevard.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of March 2008 at San Francisco, California.

/ S /
_____
CHRISTINA CHANG

I hereby attest, pursuant to General Order 45, section X.B., that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this e-filed document.

/ S /
_____
BRENDAN J. DOOLEY