1  RICHARD HARRINGTON (SBN 28099)
   CHANDLER WOOD HARRINGTON & MAFFLY LLP
2  One Maritime Plaza, Fourth Floor
   San Francisco, California 94111 3404
3  Telephone:  415 421 5484
   Facsimile:  415 986 4874
4  Email:      harr@well.com

5  ROBERT CHARLES WARD (SBN 160824)
   SHARTSIS FRIESE LLP
6  One Maritime Plaza, Eighteenth Floor
   San Francisco, California 94111 3404
7  Telephone:  415 421 6500
   Facsimile:  415 421 2922
8  Email:      rward@sflaw.com

9  C. ANGELA DE LA HOUSAYE (SBN 144218)
   BRENDAN J. DOOLEY (SBN 162880)
10 KARYNE T. GHANTOUS (SBN 191309)
   DE LA HOUSAYE & ASSOCIATES, ALC
11 1655 N. Main Street, Suite 395
   Walnut Creek, California 94596
12 Telephone:  (925) 944-3300
   Facsimile:  (925) 944-3343
13 Email:      angela@delahousayelaw.com
               brendan@delahousayelaw.com
14             karyne@delahousayelaw.com

15 Attorneys for Defendants
   ANDREW VERITY AND CHRISTINA CHANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE D/B/A CREATIVE MARKETING CONCEPTS,<br><br>Plantiff,<br><br>v.<br><br>ANDREW VERITY AND CHRISTINA CHANG,<br><br>Defendants. | Case No: C-07-02748 MHP<br><br>**DECLARATION OF ROBERT CHARLES WARD IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF**<br><br>Date:  April 7, 2008<br>Time:  2:00 p.m.<br>Dept:  Courtroom 15, 18th Floor<br>Judge: Hon. Marilyn H. Patel<br><br>Complaint Filed: May 25, 2007<br>Trial Date: None Set |

-1-    Case No. C-07-02748 MHP

I, ROBERT CHARLES WARD, declare as follows:

1. I am a Partner with the Law Firm of Shartsis Friese, LLP, licensed to practice before all the courts in the State of California, and am the attorney of record for Plaintiffs Andrew Verity ("Verity") and Christina Chang ("Chang"). I have personal knowledge of all facts stated herein and if called to testify, could and would competently do so.

2. The Court explicitly stated at the hearing on Plaintiff's motion for preliminary injunction that Plaintiff Lillge had not shown a substantial likelihood of prevailing on the question of whether Plaintiff had the trade secrets that he claims. The Court nonetheless, based on the possibility of irreparable harm, granted Plaintiff an injunction. Attached hereto as Exhibit A is a true and correct copy of the Court's order.

3. Based on evidence of Chang's communications with a <u>single</u> customer contact (Gina Lee of Chevron Federal Credit Union), and based on non-existent trade secrets, Lillge convinced the Court to issue a TRO and later a Preliminary Injunction. The Court ordered the Injunction despite stating that Lillge had not carried his burden as to the likelihood of trade secrets. Exhibit A, p. 9, lns. 26-28; p. 10, lns. 1-2; p. 10, lns. 21-23. The Court apparently based its ruling on a balancing off finding of irreparable harm.

4. Since the injunction was granted, Plaintiff has failed to identify with requisite specificity legally cognizable trade secrets, as he is obligated to do under California Code of Civil Procedure section 2019. In a series of interrogatories, Defendant Chang asked Lillge to "state all facts" in support of each of the categories of information that Plaintiff contends are trade secrets. Attached hereto as Exhibit B is a true and correct copy of Defendants Interrogatories.

5. In response to the interrogatories, Plaintiff restated general contentions about the trade secrets that are little more than copied language from his Complaint. Attached hereto as Exhibit C are true and correct copies of Plaintiff's Responses to Interrogatories. As part of attempting to meet and confer over the inadequate information provided regarding the supposed trade secrets, counsel for Plaintiff agreed only to provide documents and did not agree to provide any further specificity with regard to identifying, describing or elaborating on what Plaintiff contends is and is not a trade secret. Plaintiff has produced thousands of pages of documents, which appear to comprise mostly the customer

files for the business. Almost all of these documents have been designated "confidential-attorneys eyes only," despite most of these documents being mundane information that Plaintiff could not possible assert as a trade secret. Furthermore, by designating the documents attorneys eyes only, and failing to provide satisfactory interrogatory responses, Plaintiff is leaving it to counsel for Defendants to wade through tens of thousands of documents to attempt to figure out what Plaintiff contends is a trade secret.

6. When the Court first set the bond amount in June 2007, neither Defendants nor the Court had reason to believe that the provisional relief would remain in effect for almost an entire year. Resolution of this case was delayed by at least two months by a failed mediation

7. Attached hereto as Exhibit D are true and correct copies of relevant parts of the Deposition of Mark Lillge (Volume II) taken on June 22, 2007.

8. Attached hereto as Exhibit E are true and correct copies of relevant parts of the Deposition of Mark Lillge (Volume III) taken on February 12, 2008.

9. Attached hereto as Exhibit F are true and correct copies of relevant parts of the Deposition of Bruce Molloy taken on November 14, 2007.

10. Attached hereto as Exhibit G are true and correct copies of relevant parts of the Deposition of Maria Teresa Pascual taken on February 8, 2008.

11. Attached hereto as Exhibit H are true and correct copies of relevant parts of the Deposition of Curshanda Woods taken on February 11, 2008.

12. Attached hereto as Exhibit I are true and correct copies of relevant parts of the Deposition of Gina Lee taken on February 22, 2008.

13. Attached hereto as Exhibit J are true and correct copies of relevant parts of the Deposition of Heidi Hua taken on February 12, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of March 2008 at San Francisco California.

_____
ROBERT CHARLES WARD

-3-                                             Case No. C-07-02748 MHP
DECLARATION OF ROBERT CHARLES WARD IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF

# EXHIBIT A

**EXHIBIT A**

Case 3:07-cv-02748-MHP   Document 125   Filed 03/03/2008   Page 5 of 16
Case 3:07-cv-02748-MHP   Document 86-4   Filed 02/04/2008   Page 2 of 13
Case 3:07-cv-02748-MHP   Document 61   Filed 10/02/2007   Page 1 of 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

    Plaintiff,

  v.

ANDREW VERITY and CHRISTINA
CHANG,

    Defendants.
_____/

AND RELATED COUNTERCLAIMS.
_____/

No. C 07-2748 MHP

**MEMORANDUM & ORDER**
Re: Plaintiff's Motion for Preliminary
Injunction

    On May 25, 2007, plaintiff Mark Lillge ("Lillge") d/b/a Creative Marketing Concepts ("CMC") (collectively "plaintiff") brought this action against defendants Andrew Verity ("Verity") and Christina Chang ("Chang") (together, "defendants") asserting claims for misappropriation of trade secrets, unfair competition, unjust enrichment and intentional interference with prospective economic advantage. Now before the court is plaintiff's motion for a preliminary injunction. Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

I.   Factual Background

    Plaintiff is a sole proprietorship with its principal place of business in San Francisco, California. Plaintiff's line of business is the sale of merchandise branded with corporate logos.

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 6 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 3 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 2 of 12

1  Lillge Dec. ¶ 2. Since its founding in January 1992, plaintiff has compiled a list of approximately
2  1,200 customers. Id. ¶ 3. According to plaintiff, plaintiff's customer base represents approximately
3  .02% of the total market in which plaintiff operates. Id. ¶ 5. Plaintiff's practice regarding its
4  customer list is to independently develop the information as a company and to distribute the
5  information to its sales personnel as needed. Id. ¶ 7. In addition to the identities of customers,
6  plaintiff's customer database contains information such as pricing, strategies, purchasing history,
7  sales volume, buying habits and preferences, information about prospective customers, suppliers and
8  business partners, and plans and proposals related to business, sales, marketing and finances. Id. ¶ 8.
9  Plaintiff asserts that this information has been developed over the past fifteen years through
10 substantial investments of time and resources. Id. ¶ 9.
11     Plaintiff has identified several measures that it takes to maintain the confidentiality of its
12 customer information, including restricting access to the database, marking the information as
13 "PRIVATE" and/or "CONFIDENTIAL," maintaining separate shredding bins, communicating the
14 need for confidentiality to employees, and requiring employees to sign confidentiality agreements.
15 Id. ¶¶ 11–12.
16     Defendant Verity was hired by plaintiff in April 2001 as a sales manager. Id. ¶ 13. In this
17 position, Verity had access to all of plaintiff's confidential information, and was the only individual
18 other than Lillge to have keys to the company safe and signatory access to the company checking
19 account. Id. ¶ 14. Defendant Chang, Verity's wife, was hired by plaintiff in January 2005 as a
20 member of the accounting staff. Id. ¶¶ 15 & 17. The following year, Chang transitioned to sales.
21 Id. ¶ 17. Subsequently, the combined sales functions of Verity and Chang accounted for
22 approximately one third of plaintiff's revenue in 2006. Id. ¶ 17.
23     In early 2006, plaintiff instructed Verity to work with plaintiff's attorneys to develop a
24 nondisclosure agreement ("NDA") for employees to sign. Id. ¶ 18. After the NDA was developed,
25 plaintiff instructed Verity to have each employee sign the agreement, agreeing to not improperly use
26 plaintiff's confidential information and to not solicit plaintiff's employees or customers for a finite
27 period of time. Id. ¶ 19. Verity informed plaintiff that he had obtained signed copies of the NDA
28 from all employees, including Verity himself, with the exception of Chang. Id. Because Chang was

2

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 7 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 4 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 3 of 12

on maternity leave at the time, Verity informed plaintiff that Chang would sign the agreement when she returned. Id. The NDAs signed by employees were maintained by Verity. Id.

In late 2006 or early 2007, plaintiff decided to terminate Verity's employment. Id. ¶ 20. Beginning in March 2007, plaintiff and Verity began negotiating a final compensation package. Id. ¶ 21. During these negotiations, Verity apparently expressed his belief that plaintiff would start losing clients once Verity left. Id. Ultimately, the parties were unable to reach an amicable resolution regarding Verity's final compensation package, and Verity left the company in late April 2007. Id. ¶ 22–23. Chang was terminated on May 11, 2007 after refusing to sign an NDA. Id. ¶ 24. Prior to her departure, Chang allegedly made statements to other employees that plaintiff would soon be losing its clients. Id. ¶ 25.

In April 2007, plaintiff claims to have made a number of discoveries suggesting improper conduct on the part of Verity. First, plaintiff asserts that Verity's computer had been intentionally disconnected from the company's automatic back-up system during the week prior to Verity's departure. Beery Dec. ¶¶ 4–5. As a result of this, Verity's activities involving his work computer during that time, including e-mails sent and received, data downloaded and printed, and other documents copied or created, were not backed up on the central system and are therefore unknown to plaintiff. Id. Additionally, after Verity's departure, plaintiff apparently discovered that all of the NDAs that had been signed by employees and maintained by Verity had gone missing. Lillge Dec. ¶ 23. Verity never responded to plaintiff's written inquiries regarding the missing documents. Id.

On May 1, 2007, Verity incorporated Verity Marketing Corporation. Verity Dec. ¶ 6. On May 14, 2007, Verity Marketing Corporation started in business under the name Branding Boulevard. Id. One of plaintiff's customers allegedly advised plaintiff of Verity's new business, which is in direct competition with plaintiff. Lillge Dec. ¶ 26. Plaintiff subsequently learned that either Verity or Chang had solicited one of plaintiff's top customers by speaking with one of plaintiff's contacts at the client and providing samples. Id. Plaintiff asserts that this client is expected not to consummate a transaction with plaintiff as a result of its contact with defendants. Id.

Verity and Chang acknowledge that each of them, at the times of their respective terminations, sent e-mails to plaintiff's clients notifying them that they were leaving CMC and

3

Case 3:07-cv-02748-MHP   Document 125   Filed 03/03/2008   Page 8 of 16
Case 3:07-cv-02748-MHP   Document 86-4   Filed 02/04/2008   Page 5 of 13
Case 3:07-cv-02748-MHP   Document 61   Filed 10/02/2007   Page 4 of 12

providing future contact information. Verity Dec. ¶ 3; Chang Dec. ¶ 2. Defendants characterize these messages as "neutrally worded." Defendants deny that either of them took any of plaintiff's property with them upon leaving CMC. Verity Dec. ¶ 4; Chang Dec. ¶ 3. Verity also denies that he has used plaintiff's customer list, including pricing data, strategies, or any other unique processes or techniques, in building his new business. Verity Dec. ¶¶ 6, 9–16. Defendants acknowledge that they have done business with plaintiff's customers, but claim that they did not seek orders from them unless the customers contacted Verity or Chang first.

II.   Procedural Background

Plaintiff filed this action on May 25, 2007, shortly after learning of defendants' new business. On May 29, 2007, plaintiff filed an ex parte application for a temporary restraining order. The court conducted a hearing on May 31, and granted plaintiff's motion. The court issued a temporary restraining order to "maintain the status quo," and ordered defendants not to transmit plaintiff's trade secrets or use plaintiff's trade secrets in acquiring new business, and "not to solicit customers of CMC." Boyd Dec., Exh. A at 16–17. The court further stated that "[i]f CMC's customers contact [defendants], that's another matter, but they better make sure that they can verify or substantiate the fact that those customers contacted them, not that they contacted the customers." Id. at 17. Now before the court is plaintiff's motion for preliminary injunction, following additional briefing on the matter by both parties.

LEGAL STANDARD

"A preliminary injunction is a provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss of rights prior to final disposition of the litigation." Napa Valley Publ'g Co. v. City of Calistoga, 225 F. Supp. 2d 1176, 1180 (N.D. Cal. 2002) (Chen, Mag. J.) (citing Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)). In light of these considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits [have been] raised and the balance of hardships tips sharply in [the

4

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 9 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 6 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 5 of 12

plaintiff's] favor." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir. 2003) (en banc) (per curiam) (citing Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003)); see also Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999). The components of these two tests, together with the added consideration of the public interest, operate on a sliding scale or "continuum." Southwest Voter Registration Educ. Project, 344 F.3d at 918. Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Id.; see also Miller v. California Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc).

DISCUSSION

Plaintiff seeks a preliminary injunction pursuant to both of the Ninth Circuit's alternate standards. The court will consider each standard in turn.

I.   Likelihood of Success and Irreparable Harm

To justify a preliminary injunction based on the first test, plaintiff must establish a likelihood of success in showing the existence of a trade secret and misappropriation thereof, along with the possibility of irreparable harm if an injunction is not granted.

A.   Existence of a Trade Secret

To show a likelihood of success on the merits, plaintiff must first show that its customer information constitutes a trade secret. Under California law,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 10 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 7 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 6 of 12

Cal. Civ. Code § 3426.1(d). Defendant does not appear to deny that the customer information was subject to reasonable efforts to maintain its secrecy. Rather, the core dispute is whether the customer information falls into the subject matter encompassed by section 3426.1(d).

Although defendants deny that the customer information fits within this definition in their opposition brief, defendants appear to have admitted that the customer information satisfies section 3426.1(d) in their answer. Paragraph 9 of plaintiff's complaint reads, in its entirety:

> While the fact that many of CMC's actual customers might be willing to purchase promotional goods is information possibly available to CMC's competitors, there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through substantial time, effort and expense.

In defendants' answer, defendants admit the allegations in paragraph 9 of the complaint. Answer ¶ 9. Because the failure to deny an allegation amounts to an admission, plaintiff may not be required to submit evidence to prove the allegations of paragraph 9. See Fed. R. Civ. P. 8(d); Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th Cir. 1980).

In any case, California courts have held that confidential customer information beyond the identities of customers may constitute a trade secret. In Western Electroplating Co. v. Henness, 180 Cal. App. 2d 442, 445 (1960), the court held that "[t]he value of the various accounts of customers and knowledge of the amount of business transacted by and between said customers and plaintiff did constitute secret information of plaintiff." The court further held that knowledge of customer preferences and characteristics that would aid the plaintiff in securing and retaining business were sufficient to secure protection against the use of the information by a former employee. Id. at 448. Likewise in Courtesy Temp. Serv., Inc. v. Camacho, 222 Cal. App. 3d 1278, 1288 (1990), the court held that a company's customer list and related proprietary information consisting of "billing rates, key contacts, specialized requirements and markup rates" satisfied the first prong of the trade secret test under section 3426.1.

Defendants nonetheless claim that plaintiff has not identified any information that constitutes a trade secret. Defendants raise a number of arguments in this regard. First, defendants assert that Verity is more knowledgeable than Lillge as to CMC's customer database. Even if this were true,

6

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 11 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 8 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 7 of 12

Verity's knowledge of CMC's customer database obviously arose through the course of his employment with CMC. Accordingly, revealing knowledge regarding the database to Verity did not constitute placing the information in the public domain.

Second, defendants claim that Lillge cannot identify anything unique or proprietary regarding CMC's customer list. In support of this broad claim, however, defendants cite only a portion of Lillge's deposition in which he stated that he did not know whether the arrangement of customer information in a report was unique and confidential. Ward Dec., Exh. A, Lillge Dep. at 28:16–29:1 (hereinafter "Lillge Dep."). This response had nothing to do with the substantive contents of the report.

Defendants also claim that CMC's pricing information is not a trade secret because Lillge admitted that pricing in the industry is standardized. Id. at 41:8–42:1. In this exchange, however, Lillge was referring only to what CMC pays suppliers, not what CMC is paid by its customers. Lillge also testified that variations in pricing are the result of managerial discretion rather than unique techniques or methodologies. Id. at 47:21–49:4, 52:22–53:24, 54:9–55:24. Regardless of how pricing is developed, however, the resulting pricing patterns and information may be protectable as a trade secret.

Defendants additionally assert that much of what plaintiff claims as trade secrets "appear to be information in the public domain." Opp. at 4. Defendants do not elaborate on this point or specifically identify which claimed trade secret information is actually in the public domain. Additionally, defendants cite authority stating that "[a] former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted." Continental Car-Na-Var Corp. v. Moseley, 24 Cal. 2d 104, 110 (1944). This does not help defendants' position, however, as competition with a former employer through misappropriation of that employer's trade secrets is not "fairly and legally conducted." Id. ("The courts regard as unfair competition, and will enjoin, the use by an employee to the prejudice of his former employer of the confidential information gained by the employee during his prior employment as to the business secrets of such employer.").[1]

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 12 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 9 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 8 of 12

1   In sum, plaintiff has shown a strong likelihood of success in establishing that its customer
2   information constitutes a trade secret.

3   

4       B.    <u>Misappropriation</u>

5   Defendants deny that they have used any of plaintiff's purported trade secrets in their new
6   business. First, defendants claim that their communications with CMC customers were limited to
7   notifying them of a change of employment, which is permissible under California law even where
8   the customer is prohibited from soliciting business. <u>Aetna Bldg. Maint. Co. v. West</u>, 39 Cal. 2d 198,
9   204 (1952). However, the court finds it curious that although each of the defendants states that at the
10  time of their firing or departure from CMC, they sent a "neutrally worded email" to their customer
11  contacts notifying them of "my departure and providing new contact information", Verity Dec. ¶ 3;
12  Chang Dec. ¶ 2, they do not provide copies of these emails. Without the emails the court is left with
13  the unacceptable solution of taking their hearsay statements as to the contents of the email.
14  According to defendants, certain of CMC's customers subsequently contacted them. Verity's
15  testimony also suggests that he was in possession of the customer list at some point after his
16  employment terminated, but that he deleted it. When asked about the statement in his declaration
17  that he had not used any of the purported trade secrets at issue, Verity responded: "I think they're
18  irrelevant to my business. We didn't — the customer list we deleted." Supp. Boyd Dec., Exh. C,
19  Verity Dep. at 145:4–5 (hereinafter "Verity Dep."). Verity testified that he and Chang "had enough
20  to go on" based on their relationships with CMC's clients. <u>Id.</u> at 145:16–17. Essentially, defendants
21  argue that soliciting business from CMC's clients would amount to a utilization of defendants' pre-
22  existing relationships with these clients rather than the improper use of any confidential information.
23  "One may do business with a former employer's customers with whom one became personally
24  acquainted and developed a business relationship while formerly employed." <u>Moss, Adams & Co.
25  v. Shilling</u>, 179 Cal. App. 3d 124, 128 (1986). Accordingly, to the extent that defendants may derive
26  advantages through their personal knowledge of CMC's customers rather than reliance on
27  confidential information, these advantages are not proscribed by trade secret law. Here, Verity has
28  testified that he has deleted whatever customer data he may have taken from CMC and has instead

8

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 13 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 10 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 9 of 12

sought to exploit the personal and professional relationships developed by Chang and himself before leaving CMC. "'Equity has no power to compel a man who changes employers to wipe clean the slate of his memory.'" Id. (quoting Peerless Pattern Co. v. Pictorial Review Co., 147 A.D. 715, 171 (N.Y. App. Div. 1911)). It is unclear on this record, however, how much of defendants' useful information derives from their own memory and how much derives from ongoing access to plaintiff's confidential information.

Apart from Verity's testimony regarding his use or non-use of the identified trade secrets, plaintiff cites some circumstantial evidence related to Verity's use of CMC's computer systems prior to his departure. Regarding the disconnection of Verity's computer from the company backup system, Verity testified to his belief that such disconnects were a frequent occurrence. Verity Dep. at 134:3–14. However, plaintiff's information technology consultant asserts that the disconnect of Verity's computer was a deliberate, one-of-a-kind occurrence. Supp. Beery Dec. ¶¶ 2–7. The fact that the disconnect occurred so close to Verity's termination from CMC constitutes additional evidence that Verity was covering his tracks as he obtained proprietary information from plaintiff. Finally, plaintiff has submitted foresnic evidence that on April 11, 2007, the day before Verity left CMC, Verity downloaded approximately 250 CMC customer art files onto his own computer. Berryhill Dec. ¶ 6. Plaintiff admits that these artwork files were not themselves proprietary or confidential, but claims that this act of downloading suggests that Verity intended to use confidential information. Verity appears to acknowledge downloading the files, but claims that the computer he used to do so is still at CMC, and that plaintiff has provided no evidence that the art files were copied or otherwise transmitted from the computer.

Finally, there is the matter of the missing NDAs. These documents have still not been located, and Verity has offered no reasonable explanation for their whereabouts. Although Verity insists that plaintiff simply is not looking hard enough for the agreements, the fact that Verity was in charge of maintaining the NDAs prior to his departure is significant.

Taken together, this evidence does not establish a strong likelihood of success on the merits as to misappropriation. Plaintiff has provided no direct evidence of ongoing possession or utilization of plaintiff's trade secrets. Plaintiff instead relies on a series of inferences drawn from

9

Case 3:07-cv-02748-MHP   Document 125   Filed 03/03/2008   Page 14 of 16
Case 3:07-cv-02748-MHP   Document 86-4   Filed 02/04/2008   Page 11 of 13
Case 3:07-cv-02748-MHP   Document 61   Filed 10/02/2007   Page 10 of 12

Verity's computer use and missing NDAs. While this evidence creates a serious question as to misappropriation that may be resolved through additional discovery, plaintiff has failed to show a strong likelihood of success.

C. <u>Irreparable Harm</u>

Plaintiff asserts that, unless defendants are enjoined from using plaintiff's trade secrets, plaintiff will suffer irreparable harm in the form of lost clients and disrupted client relationships. Plaintiff claims that this harm is already being realized based on the clients that defendants have contacted. Lillge testified that CMC has lost business since defendants left the company, but was unable to determine whether the drop in sales was a result of a competitive loss to defendants' business or simply the result of losing two members of CMC's sales staff. Lillge Dep. at 147:6–21, 149:9–14. Additionally, defendants claim that the one client identified by plaintiff has not become a customer of defendants' new business. Verity Dec. ¶ 7; Chang Dec. ¶ 5.

Although it is unclear whether plaintiff has already lost business as a result of defendants' alleged misappropriation, the risk of losing established customers to defendants' new business due to defendants' improper use of plaintiff's proprietary information would obviously create lasting, irreparable harm. However, because plaintiff has failed to demonstrate a strong likelihood of success on the merits, injunctive relief is not warranted on this basis.

II. <u>Balance of Hardships</u>

While plaintiff has not shown a likelihood of success on the merits, the court finds that injunctive relief is warranted under the Ninth Circuit's alternative test: serious questions going to the merits of the case combined with the balance of hardships tipping sharply in favor of the plaintiff. <u>Southwest Voter Registration Educ. Project</u>, 344 F.3d at 917. As discussed above, plaintiff has raised substantial questions going to the merits of its case. Additionally, the risk of losing business and being deprived of the benefit of its proprietary information constitutes a substantial hardship on the part of plaintiff. Conversely, Verity testified that he has no use for plaintiff's trade secrets, and will therefore suffer no prejudice at all if he is enjoined from using them. Additionally, because the

10

Case 3:07-cv-02748-MHP    Document 125    Filed 03/03/2008    Page 15 of 16
Case 3:07-cv-02748-MHP    Document 86-4    Filed 02/04/2008    Page 12 of 13
Case 3:07-cv-02748-MHP    Document 61    Filed 10/02/2007    Page 11 of 12

1  customers in CMC's database comprise an extremely small percentage of the total market for the
2  industry in which CMC and defendants compete, it will not be an undue hardship for defendant to
3  find its own customers. This is particularly true in light of the fact that defendants will be permitted
4  to work with CMC's customers so long as defendants do not solicit business from them. Defendant
5  identifies CMC as "a low-tech business successful because it out-hustles the competition." Opp. at
6  3. It is therefore reasonable to expect defendants to find success through their own hustling.[2] The
7  balance of hardships therefore tips sharply in favor of plaintiff, and injunctive relief is warranted.

CONCLUSION

For the reasons stated above, the court GRANTS plaintiff's motion for a preliminary injunction.

IT IS SO ORDERED.

Dated: October 1, 2007

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

11

Case 3:07-cv-02748-MHP   Document 125   Filed 03/03/2008   Page 16 of 16
Case 3:07-cv-02748-MHP   Document 86-4   Filed 02/04/2008   Page 13 of 13
Case 3:07-cv-02748-MHP   Document 61   Filed 10/02/2007   Page 12 of 12

### ENDNOTES

1. Plaintiff raises an additional argument related to the fact that defendants refused to testify in deposition as to information regarding their own customers without a protective order, and would disclose current customers and contacts who did not originate from CMC only on an "Attorneys' Eyes Only" basis. Supp. Boyd Dec. ¶ 5. Plaintiff asserts that this amounts to a recognition on the part of defendants that such information is valuable. In their sur-reply, defendants claim that this measure was taken only to level the playing field in the event that defendants were prohibited from initiating business with plaintiff's customers. Accordingly, the court assigns little weight to this argument. The court also assigns little weight to the numerous block-quotes in defendants' sur-reply related to California's general policy in favor of competition and California's hostility toward non-competition agreements, as these passages are wholly irrelevant to the issue at hand.

2. Defendants' sur-reply and supplemental declarations make the claim that Verity and Chang will be unable to work in the promotional products industry at all if plaintiff's motion is granted, and that defendants and their young child will therefore be forced to leave the Bay Area. It is not at all clear why this would be the case. Verity's inability to secure employment with other promotional firms has nothing to do with the instant motion, and does not justify allowing him to exploit plaintiff's trade secrets to build his own business. It is also unclear why being barred from *initiating contact with*, as opposed to doing business with, plaintiff's existing customers would be fatal to defendants' nascent enterprise. Even if defendants were barred from doing business with CMC's customers altogether, a condition this court does not impose, there are numerous additional companies with which defendants may develop their own relationships.