# EXHIBIT D

CONFIDENTIAL TESTIMONY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

MARK LILLGE d/b/a CREATIVE )

MARKETING CONCEPTS, )

)

Plaintiff, )

vs. )

)

ANDREW VERITY and CHRISTINA )

CHANG, )

)

Defendants. )

_____ )

**CERTIFIED COPY**

No. C 07-02748 MHP

**CONFIDENTIAL**

VOLUME II

DESIGNATED CONFIDENTIAL

Deposition of

MARK RAYMOND LILLGE

FRIDAY, JUNE 22, 2007

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

925-846-8831

Reported by:

DENISE WHEELER, CSR NO. 8254

JUL 0 2 2007

CONFIDENTIAL TESTIMONY

```
1                       MARK LILLGE,

2             having been duly sworn, testified as follows:

3                    EXAMINATION BY:

4             MR. WARD:  Q.   Good morning, Mr. Lillge.

5        A.   Good morning.

6        Q.   Are you aware of any sales that Creative Marketing

7   Concept would have obtained from customers because of

8   anything done by Andrew Verity or Christina Chang?

9        A.   Can you clarify as to timeframe?

10       Q.   Since they left employment of your company?

11       A.   I can only speculate at this point.

12       Q.   Okay.  So any observations that you would have

13  about potential lost sales to Christina Chang or Andrew

14  Verity would be speculation?

15       A.   Correct.

16       Q.   So as far as you know your business has not lost

17  any money because of the competitive efforts of Christina

18  Chang and Andrew Verity; is that correct?

19       A.   Perhaps.  By deduction I might be able to take

20  exception to that.  But as far as evidence as of right this

21  moment while we're here, no.

22       Q.   In the past month -- let's take May 2007, which

23  would be the last complete month -- has there been any

24  discernible drop-off of sales volume for your business in

25  the prior month?
```

147

CONFIDENTIAL TESTIMONY

1      A.  Yes.

2      Q.  By how much?

3      A.  I'd have to look at the records, but it's

4  noticeable.

5      Q.  Have you replaced Christina Chang as a salesperson?

6      A.  We're working on that as we speak.  We have brought

7  on a new person, and we're also transitioning her accounts.

8      Q.  Have the persons who have filled Ms. Chang's role

9  in the company achieved the same level of sales that she was

10  achieving prior to departing employment of Creative

11  Marketing Concepts?

12      A.  The accounts have not been fully transitioned at

13  this point, so that's impossible to answer.  I'm actually

14  trying to take the lead in following up with many of those

15  clients.

16      And due to the extraordinary circumstances of what

17  we're dealing with at this time, I have not had a chance to

18  contact all of them.

19      Q.  Okay.  And among the extraordinary circumstances

20  your company is dealing with at this time include that you

21  have lost one of your top salespeople and your former

22  operations manager; is that correct?

23      MR. BOYD:  Clarify who you're referring to as top

24  salespeople.

25      MR. WARD:  Q.  By that would you acknowledge that

148

1    Christina Chang was one of the top salespeople as Creative

2    Marketing Concepts?

3        A.  Yes.  Yes.

4        Q.  So one of the circumstances your business has had

5    to deal with over the last couple of months is the loss of a

6    top salesperson in Christina Chang and the loss of your

7    operations manager Andy Verity?

8        A.  Correct.

9        Q.  And can you attribute, in your mind, what among the

10   discernible drop in sales since their departure is

11   attributable to competitive loss in the marketplace versus

12   simply having lost two key employees who you haven't

13   replaced yet?

14       A.  No -- no way to measure that.

15       Q.  Okay.  Now, I want to turn specifically to

16   something you told me about in terms of when you identify a

17   product out of one of these catalogs for your customers.

18       And one of the things that you told me in the first

19   session of your deposition is that when you write the

20   invoice for that client, you do not identify specifically

21   the type of merchandise.

22       And by that I mean when we went through the example

23   of the Calder mug, you would not identify to the client that

24   it is a Calder mug from the Bullet Line catalog; is that

25   correct?

149

# EXHIBIT E

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - - - - - - -

5    MARK LILLGE d/b/a CREATIVE MARKETING    )

6    CONCEPTS,                              )    Case No.

7            Plaintiff,                     )    C07-02748

8    V.                                     )

9    ANDREW VERITY and CHRISTINA CHANG,     )

10           Defendants.                    )

11   - - - - - - - - - - - - - - - - - - - - -

12   AND RELATED CROSS-ACTION.              )

13   - - - - - - - - - - - - - - - - - - - - -

14

15           VIDEOTAPED DEPOSITION OF MARK LILLGE

16              TUESDAY, FEBRUARY 12, 2008

17            PAGES 236 - 321; VOLUME 3

18

19                                    **DOCKET**

                                    FEB 19 2008

20

21             BEHMKE REPORTING & VIDEO SERVICES

22      BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23                 160 SPEAR STREET, SUITE 300

24            SAN FRANCISCO, CALIFORNIA 94105

25                        (415) 597-5600

1    e-mail?

2        A.    So that our clients were apprised of what

3    was happening at Creative Marketing Concepts as it

4    relates to Andy and Christina.

5        Q.    Did you rely on advice of counsel as to the

6    propriety of the second paragraph of this e-mail?

7        A.    I did.

8        Q.    So you did run it by counsel?

9        A.    I did.

10        Q.    And you had a discussion with counsel as to

11    whether this was appropriate?

12        A.    I did.

13        Q.    Did counsel suggest to you you really ought to

14    quote the order rather than describe it?

15        A.    Did not.  No, he did not.

16        Q.    Did counsel suggest that you should include a

17    copy of the order rather than describe portions of it?

18        A.    No.

19        Q.    Did counsel suggest that you might want to

20    include the part of the order that made clear that

21    clients were free to do business with Andy and Christina

22    if they chose to initiate contact?

23        A.    I'm not sure I -- if your question is did

24    counsel advise me to say that people were free to

25    do -- that clients were free to do business with Andy

1    and Christina, no, counsel did not advise me to say

2    that.

3         Q.   Why didn't you include a description of that

4    portion of the court's order?

5         A.   Again, relevance.  Didn't seem very

6    relevant.

7         Q.   It didn't help you, did it, Mr. Lillge?

8         A.   Again, we're not saying anything in here

9    where they can't do business with them.  We're just

10   citing what the -- what the court's told us.

11        Q.   Well, you didn't tell them everything that the

12   court had told you, did you?

13        A.   I think we told them what was relevant.

14        Q.   You sent this e-mail to try and discourage

15   people from doing business with Andy Verity and Christina

16   Chang, didn't you?

17        A.   We sent this e-mail, as I stated earlier,

18   for a few reasons.

19        Q.   Okay.

20             And one of the reasons you sent it was to

21   discourage customers from doing business with Andy

22   Verity and Christina Chang?

23        A.   One of the reasons, as you're relating to

24   it, was to apprise them of what was going on.

25        Q.   Well, you didn't apprise them of everything that

1   was going on because you left out important portions of

2   the order, didn't you?

3       A.    Important piece of --

4       MR. BOYD:  Object to the characterization of the

5   term --

6       THE WITNESS:  -- irrelevant --

7       MR. BOYD:  -- what's important, what's not

8   regarding the court's order?

9           (Simultaneous speaking.)

10  BY MR. WARD:

11      Q.    Well, isn't one of the important parts of the

12  order, Mr. Lillge, that your customers are free to choose

13  to do business with Andy Verity or Christina Chang?

14      A.    What's important to me by way of judgment is

15  that they are restricted from soliciting our clients

16  or initiating contact.

17      Q.    Okay, but that's not my question.

18          Is it unimportant to you that Judge Patel

19  said that your customers are free to do business --

20      A.    It's a non- --

21      Q.    -- with Andy Verity and Christina Chang?

22      A.    It's a nonissue.  The law is the law.  So if

23  they -- if they can do business with them, then

24  that's fine.  You know, if -- again, if they want to

25  go out and do business, let them do business.  But

1    that's not our business.

2        Q.   But wasn't that in Judge Patel's order?

3        A.   I -- well, from memory I can't tell you

4    exactly what was in Judge Patel's order.

5        Q.   Okay.

6             Did you make a decision to selectively

7    describe Judge Patel's order in this e-mail?

8        A.   I made a decision to selectively put in what

9    I thought was relevant in this order as it relates to

10   what the clients should know.

11       Q.   Okay.

12            And what you wanted the clients to know is

13   that they shouldn't do business with Andy or

14   Christina?

15       A.   That's your characterization.

16       MR. BOYD:   Objection.   That misstates the

17   witness's testimony.

18   BY MR. WARD:

19       Q.   Where in your e-mail do you tell these customers

20   that they're free to do business with Andy and Christina

21   if they so choose?   Is that anywhere in this e-mail?

22       A.   I don't --

23       MR. BOYD:   Objection.   The document speaks for

24   itself.

25       THE WITNESS:   I -- I don't know if I have an

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4   - - - - - - - - - - - - - - - - - - - -

5   MARK LILLGE d/b/a CREATIVE MARKETING   )

6   CONCEPTS,                              )    Case No.

7          Plaintiff,                      )    C07-02748

8   V.                                     )

9   ANDREW VERITY and CHRISTINA CHANG,     )

10         Defendants.                     )

11  - - - - - - - - - - - - - - - - - - - -

12  AND RELATED CROSS-ACTION.              )

13  - - - - - - - - - - - - - - - - - - - -

14

15       VIDEOTAPED DEPOSITION OF MARK LILLGE

16          TUESDAY, FEBRUARY 12, 2008

17          PAGES 236 - 321; VOLUME 3

18

19                                    **DOCKET**

                                    FEB 1 9 2008

20

21          BEHMKE REPORTING & VIDEO SERVICES

22   BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23            160 SPEAR STREET, SUITE 300

24         SAN FRANCISCO, CALIFORNIA 94105

25                        (415) 597-5600

1          Is Creative Marketing Concepts your

2    principal source of income?

3          A.    I believe my only source of income.

4          Q.    Okay.

5                What was your income from Creative Marketing

6    Concepts for 2007?

7          A.    Effectively, zero.  I don't know if it

8    actually is going to reflect that way on a 1099, but

9    I'm pretty sure that it will.

10         Q.    Okay.

11               And what is your net worth at this time?

12         A.    I guess -- I don't know how you calculate

13   net worth so maybe you can give me a formula, and I

14   can try to give you a rough idea.

15         Q.    Let me ask it this way:  If Andy Verity and

16   Christina Chang were to obtain a judgment defending your

17   claims in finding that the trade secrets claims were

18   wrongfully asserted --

19         A.    Uh-huh.

20         Q.    -- and awards damages for defamation and other

21   causes of action for $500,000 --

22         A.    Uh-huh.

23         Q.    -- would you be able to satisfy such a judgment?

24         A.    No.

25         Q.    Okay.

1              If it is later determined that the $100,000

2      bond that you have posted for your trade secrets

3      claim does not adequately compensate Verity and Chang

4      for the loss of business for a wrongfully obtained

5      temporary restraining order and injunction --

6         A.    Uh-huh.

7         Q.    -- would you be able to satisfy a balance in

8      excess of $100,000?

9         A.    I'd be hard pressed.

10        Q.    Okay.

11             If it was $200,000, would you be able to

12     satisfy it?

13        A.    I doubt it.

14        MR. WARD:  All right.  Let's take a break.  I may

15     be done.

16        THE VIDEOGRAPHER:  Going off the record.  The

17     time is 12:02 p.m.

18             (Off the record.)

19        THE VIDEOGRAPHER:  We're back on the record.  The

20     time is 12:06 p.m.

21             Please begin.

22        MR. WARD:  I have no further questions today.  I

23     do not view this deposition as concluded.  We have

24     the issues on which counsel has instructed not to

25     answer, and we also have the issue of advice of

1          Well, for example, in Christina Chang's case

2   you decided to fire her because she wouldn't sign

3   this nondisclosure agreement.  Did you give her some

4   time to look for a new job so that her visa could be

5   transferred?

6       A.   I don't know if I'm the person that has the

7   right to do that.  I -- my understanding is that's an

8   INS issue, not a Creative Marketing Concepts issue.

9       Q.   Now, after you fired Christina Chang, did you

10  tell a number of her customer contacts that she had to

11  leave the country because of a visa issue?

12      A.   I reiterated to them what I heard from the

13  attorney, the immigration attorney, that Andy hired.

14  And that was -- this is Charles Aronowitz; he's the

15  attorney.  I talked to him around -- several times

16  around this time.  And he made it very clear to me

17  that Mr. Verity was going to -- and Ms. Chang were

18  going to have to leave the country because I was

19  forced to recall the petition for their visas.

20      Q.   So you did discuss Mr. Verity and Ms. Chang's

21  immigration status with customer contacts of theirs?

22      A.   To the extent when I was asked what --

23  what -- what -- how this impacted their visa, my

24  response was, My understanding is that because we've

25  withdrawn the petition for their visas, that they

1    will have to leave the country.

2        Q.    Okay.

3        A.    And in line with that, I was also told by

4    Mr. Aronowitz that I also needed to buy them one-way

5    airline tickets back to Canada, independent of how

6    expensive they were.  So we had to buy some very

7    expensive one-way tickets to comply with the

8    immigration laws.

9        Q.    Were these one-way tickets provided to Ms. Chang

10   and Mr. Verity?

11       A.    To my understanding they were.

12       THE REPORTER:   Exhibit 9.

13           (Lillge Exhibit 9 was marked for

14           identification.)

15           (The witness reviews the document.)

16   BY MR. WARD:

17       Q.    Have you seen Exhibit 9 before?

18       A.    Probably.

19       Q.    Do you see Mr. Molloy's reference in the second

20   paragraph to including an additional five paid time off

21   days in consideration of her part-time contracting work?

22       A.    Yes.

23       Q.    So Ms. Chang had worked part-time for CMC prior

24   to commencing her full-time employment?

25       A.    Very generally, that's my understanding.

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4   - - - - - - - - - - - - - - - - - - -

5   MARK LILLGE d/b/a CREATIVE MARKETING    )

6   CONCEPTS,                               )      Case No.

7            Plaintiff,                     )      C07-02748

8   V.                                      )

9   ANDREW VERITY and CHRISTINA CHANG,      )

10           Defendants.                    )

11  - - - - - - - - - - - - - - - - - - -

12  AND RELATED CROSS-ACTION.               )

13  - - - - - - - - - - - - - - - - - - -

14

15         VIDEOTAPED DEPOSITION OF MARK LILLGE

16           TUESDAY, FEBRUARY 12, 2008

17           PAGES 236 - 321; VOLUME 3

18

19

20

21          BEHMKE REPORTING & VIDEO SERVICES

22     BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23          160 SPEAR STREET, SUITE 300

24        SAN FRANCISCO, CALIFORNIA 94105

25              (415) 597-5600

DOCKET

FEB 19 2008

1   BY MR. WARD:

2       Q.   -- when it was in your June letter.

3       MR. BOYD:  Wait, wait, wait.

4       THE WITNESS:  I'm sorry.

5           People that wanted to know what was going

6   on, they weren't saying, "What's going on with

7   Branding Boulevard," they said, "What's going on with

8   Andy and Christina?"  And that's the issue that we

9   were addressing.  So Branding Boulevard is a

10  nonissue.

11  BY MR. WARD:

12      Q.   When people called you and asked what's going on

13  with Andy and Christina, your first response was that you

14  thought they were heading back to Canada; is that

15  correct?

16      A.   That's -- my first response when people

17  inquired about that is the -- about can they stay in

18  this country, as I said, my understanding in talking

19  to the attorney that Andy employed to handle his

20  immigration and Christina's immigration was that we

21  needed to withdraw their H1B petitions.  And by

22  virtue of that, they would have to go back to

23  China -- I'm sorry -- to Canada, and we in turn

24  needed to supply them with a one-way ticket each.

25      Q.   Eventually at some point in time you learned

1    occasions since this lawsuit was filed?

2        A.    I have spoken to her I -- I think three --

3    three or four times, something -- I'm not -- not many

4    times, but a few times, yes.

5        Q.    Tell me about the first time.

6        A.    The first time is -- my recollection is

7    shortly after Christina left, within a week plus or

8    minus, she called and indicated that she was

9    surprised at seeing Christina was -- had left, was

10   disappointed that Christina had not told her.

11   Apparently, she had found out at a trade show the

12   previous week.

13            And, um, what else?  I don't -- I don't know

14   what else there was to it.  Let me just think here.

15            There was some discussion -- I don't know if

16   this was this -- this conversation or a subsequent

17   one, but about how -- how could Andy and Christina be

18   staying in the country legally.  Apparently, she knew

19   that they were here on visas, and I told her what I

20   told you before.

21            I said, I don't know.  I can only tell you

22   what the immigration attorney that Andy hired told

23   me, and that is that they both need to leave the

24   country within ten days after termination of

25   employment.  And I probably told her that we sent

1    both of them one-way tickets.

2       Q.    At some point did you learn that Andy and

3    Christina had not used their one-way tickets?

4       A.    No.

5       Q.    What was the second time you spoke with Gina

6    Lee?

7       A.    I don't know if I talked to her after that

8    second conversation, you know, like a week or two

9    later.

10          Then I talked to her again, um -- actually,

11    I think she called me again.  She was -- I believe

12    this is the time she was upset that An- -- Christina

13    had been actively, or she might have said

14    aggressively; I don't want to put words in her mouth,

15    pursuing her even though she made it clear that she

16    didn't want to hear from her at this point.

17          She said Andy stopped by her place un- --

18    unsolicited and dropped off samples which, if I'm --

19    I got this correct, has never happened before in her

20    tenure at Chevron.

21          I think -- yeah, I think that was it.

22       Q.    Did you ask Ms. Lee at some point to sign a

23    declaration on your behalf?

24       A.    Well, that was it for that conversation.  So

25    if you're asking -- are you asking about for all of

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - - - - -

5    MARK LILLGE d/b/a CREATIVE MARKETING    )

6    CONCEPTS,                               )    Case No.

7           Plaintiff,                       )    C07-02748

8    V.                                      )

9    ANDREW VERITY and CHRISTINA CHANG,      )

10          Defendants.                      )

11   - - - - - - - - - - - - - - - - - - -

12   AND RELATED CROSS-ACTION.               )

13   - - - - - - - - - - - - - - - - - - -

14

15        VIDEOTAPED DEPOSITION OF MARK LILLGE

16            TUESDAY, FEBRUARY 12, 2008

17           PAGES 236 - 321; VOLUME 3

18

19                                DOCKET

                                  FEB 19 2008

20

21             BEHMKE REPORTING & VIDEO SERVICES

22       BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23                  160 SPEAR STREET, SUITE 300

24              SAN FRANCISCO, CALIFORNIA 94105

25                        (415) 597-5600

```
 1   BY MR. WARD:
 2       Q.   Why did you choose not to include the name of
 3   Andy Verity and Christina Chang's new business in your
 4   September e-mail to customers, Branding Boulevard?
 5       A.   Not relevant.
 6       Q.   Well, you chose to include the name of their new
 7   business in your letter to suppliers, right?
 8       A.   People -- well, for good reason, right?
 9       Q.   Well, the good reason is that you didn't want to
10   give your customers the name of Andy and Christina's
11   business out of fear that they might decide to contact
12   Andy and Christina; isn't that the case?
13       A.   Well, that's your characterization, sir.
14       Q.   I'm asking you why it's not in there,
15   Mr. Lillge.
16       A.   I have --
17       MR. BOYD:  Why what's not in there?
18       MR. WARD:  Brand- --
19   BY MR. WARD:
20       Q.   The name "Branding Boulevard," why it's not in
21   your September 7 e-mail --
22       A.   People weren't calling --
23            (Simultaneous speaking.)
24       THE REPORTER:  Wait, wait.
25
```

```
 1   BY MR. WARD:
 2       Q.    -- when it was in your June letter.
 3       MR. BOYD:  Wait, wait, wait.
 4       THE WITNESS:  I'm sorry.
 5           People that wanted to know what was going
 6   on, they weren't saying, "What's going on with
 7   Branding Boulevard," they said, "What's going on with
 8   Andy and Christina?"  And that's the issue that we
 9   were addressing.  So Branding Boulevard is a
10   nonissue.
11   BY MR. WARD:
12       Q.    When people called you and asked what's going on
13   with Andy and Christina, your first response was that you
14   thought they were heading back to Canada; is that
15   correct?
16       A.    That's -- my first response when people
17   inquired about that is the -- about can they stay in
18   this country, as I said, my understanding in talking
19   to the attorney that Andy employed to handle his
20   immigration and Christina's immigration was that we
21   needed to withdraw their H1B petitions.  And by
22   virtue of that, they would have to go back to
23   China -- I'm sorry -- to Canada, and we in turn
24   needed to supply them with a one-way ticket each.
25       Q.    Eventually at some point in time you learned
```

1     A.    I can't remember anybody else off the top of
2 my head.

3     Q.    Did you try and suggest to Ms. Jones that she
4 shouldn't be doing business with Branding Boulevard?

5     A.    Not in the least.

6     Q.    Did you ever suggest that to any other customers
7 who had asked about Andy or Christina?

8     A.    Nope.

9     Q.    Now, you have characterized Exhibit 12, this
10 e-mail that you sent to your customers, as you wanted to
11 let people know what was going on.

12    A.    Correct.

13    Q.    Why did you need to let people know what was
14 going on with the litigation against Andy and Christina?

15    A.    So that they were apprised of the current
16 status, sir.

17    Q.    Why would they need to know?  What business
18 purpose did it serve to apprise them of the current
19 status?

20    A.    What business purpose did it serve?

21          It -- one business purpose that it served
22 is, is that it would stave off people asking us what
23 happened to Andy and Christina.

24    Q.    And so you wouldn't have to tell them they've
25 gone to Branding Boulevard?

1    A.    Not necessarily they haven't gone to

2  Branding Boulevard, but that this is where we stand

3  with them and that it's a way to bring this up in

4  a -- in a context that people can understand it

5  without having to go into great detail.  It's not

6  pleasant to talk to clients about all the, you know,

7  wranglings that we're going through right now.

8    Q.    If that was your goal, wanting to stave off

9  inquiries about where Andy and Christina had gone, why

10  didn't you just include in this e-mail, "Please,

11  everyone, be advised Andy Verity and Christina Chang can

12  now be found at Branding Boulevard; here's their contact

13  information"?  Why didn't you do that?

14    A.    I don't know.  Why don't I take out an

15  infomercial for them?  You're asking a ridiculous

16  question.

17    Q.    Well, no.  You told me that you're doing this to

18  try and stave off inquiry as to where Andy and Christina

19  have gone.  So why didn't you tell them where they went?

20    A.    As I -- I restate what I just said.  It's a

21  ridiculous question.  Why don't I take out an

22  infomercial for them?

23    Q.    Answer my question.

24    A.    I'm not looking to promote their business.

25    Q.    Okay.  So in other words, you want to discourage