# EXHIBIT F

**EXHIBIT F**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--ooOoo--

| | | |
|---|---|---|
| Mark Lillge d/b/a Creative Marketing Concepts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. C 07 02748 MHP |
| | ) | |
| Andrew Verity and Christina Chang, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————— | ) | |
| | ) | |
| Andrew Verity and Christina Chang, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mark Lillge d/b/a Creative Marketing Concepts, et al., | ) | |
| | ) | |
| Counterdefendants. | ) | |

VIDEOTAPED DEPOSITION OF

BRUCE MOLLOY

WEDNESDAY, NOVEMBER 14, 2007

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California  94566

Reported by:

DIANA NOBRIGA, CSR 7071

DOCKET

ıFEB 12 2008

**Page 18**

1   A. Yes.

2   Q. Did you personally work on this portion, that

3   is to say, the promotional products portion of the Print

4   Network business?

5   A. Occasionally. It was more focused on the

6   printing side.

7   Q. And when you say occasionally, did you order

8   these promotional products from the manufacturers using

9   the catalogs?

10  A. I managed — I supervised and managed that

11  process. Other people were actually doing it.

12  Q. You had other people who were actually doing

13  it?

14  A. Yes.

15  Q. How many other people?

16  A. In promotional products —

17  Q. Yeah.

18  A. — or overall?

19  Q. In the promotional products.

20  A. Probably one half of one person.

21  Q. Okay. Do you remember the name of that

22  person?

23  A. We had several salespeople who were selling

24  printing, mostly printing, and they would all dabble in

25  promotional products from time to time. So there were

**Page 19**

1   several people that would spend a very small fraction of

2   their time.

3   Q. In your role as a supervisor, did you have

4   occasion to review the catalogs from which these —

5   A. Yes.

6   Q. And your employees that you supervised gave

7   you the catalogs; is that right?

8   A. Yes.

9   Q. And how many catalogs were there? Were there

10  one or more than one that you —

11  A. More than one.

12  Q. Can you tell me about how many?

13  A. Fifty. Again, this was a minor part of our

14  business.

15  Q. Was there anything secret about the catalogs

16  you used?

17      MR. BOYD: What do you mean by secret?

18      MR. HARRINGTON: Q. You can answer the

19  question.

20      MR. BOYD: I object to vague and ambiguous

21  with respect to the term secret.

22      But you can answer the question.

23      THE WITNESS: I'm not sure what you mean by

24  secret about the catalog. Can you explain that a little

25  more, please.

**Page 20**

1       MR. HARRINGTON: Q. When I was in the army,

2   we had something called top secret documents. They had

3   a cover on them that was red, half, white on the other

4   half, and it said top secret.

5   A. By that definition, no.

6   Q. That was a secret.

7   A. By your definition they were not secret.

8   Q. Okay. Do you know how your employees got the

9   catalogs from the manufacturers or suppliers?

10  A. They would e-mail them requests or called

11  people and asked, or we would be on a mailing list.

12  Q. Okay. How did you fix the pricing of the

13  promotional products while you were at Print Network?

14  A. Pricing was never fixed. It was a matter of

15  what the client needed, what they wanted, what the

16  traffic would bear. A lot of strategic thinking goes

17  into pricing. You need to worry about the company's

18  margins, the value of the client. So it wasn't one size

19  fits all.

20  Q. I'm sorry, I didn't hear that last --

21  A. The pricing wasn't like one size fits all. It

22  was very customized.

23  Q. Each customer?

24  A. Yes. And each product within each customer,

25  frequently.

**Page 21**

1   Q. So if you were selling mugs, if you sold 100

2   mugs, you might quote one price; is that right? And if

3   you sold 200 mugs, the customer might ask for 10 percent

4   off? Would that occur?

5   A. They might. They might ask for that. You

6   might comply with it or not, just depending on what —

7   Q. Depending on the customer; is that true?

8   A. That's one variable. Depending what the

9   customer needs and wants and what their history is and

10  what our margin targets are. Sometimes we would walk

11  away from business, if somebody wanted a bigger

12  discount, we wouldn't do it.

13  Q. Okay. Did the catalogs show the supplier's

14  price to you at Print Network for the items that you

15  were going to resell?

16  A. Usually. Sometimes it didn't. But usually it

17  did. I'm sorry, price to me or the retail price? I'm

18  not sure I understood the question.

19  Q. Did it show the price to you?

20  A. There were codes to show what our price would

21  be.

22  Q. Like A, B, C and D?

23  A. Correct.

24  Q. That would be a discount of what, 40 percent,

25  30 percent, 20 percent, 10 percent?

1    A.  Well, whatever.  There were various discounts
2  from 50 on down.
3    Q.  Fifty on down?
4    A.  To ten.
5    Q.  And those would be coded in the catalogs?
6    A.  Correct.
7    Q.  So the price indicated for the item such as a
8  mug in the catalog would be a manufacturer's suggested
9  retail price -- resale price?
10   A.  Suggested; correct.
11   Q.  Okay.  And then as you say it would be a
12 matter of all these factors to determine what your
13 actual resale price was?
14   A.  Correct.
15   Q.  But if the customer wanted it too cheap,
16 demand, you just wouldn't do the business; is that
17 right?
18   A.  There were times we would walk from business
19 because it wasn't profitable, or it wasn't strategically
20 smart to do that.
21   Q.  The customer for these products, were they
22 printing companies?
23   A.  No.  They were corporate clients.
24   Q.  I see.
25   A.  They were corporate clients.  They were
Page 22

1  high-tech companies, they were other businesses who
2  needed promotional products for trade shows, for
3  employee giveaways, that sort of thing.
4    Q.  How many customers did Print Network have for
5  promotional products?
6    A.  I don't remember exactly.  It was fairly
7  limited.  We had a very kind of limited client base.  We
8  had large corporate clients who wanted printing, and so
9  it was maybe a handful of clients who wanted promotional
10 products.
11   Q.  You say handful, would that be less than ten?
12   A.  I'd say ten or less.
13   Q.  Ten or less.  Who were some of the clients you
14 had there?
15   A.  Brocade, a big networking company.  It's been
16 a while now.  Pac Bell.  Cisco bought product from us.
17 A lot of focus on high-tech companies in the Bay Area.
18   Q.  Did Pac Bell have other suppliers of
19 promotional products?
20      MR. BOYD:  Object to the extent it calls for
21 speculation.
22      THE WITNESS:  I have no idea.
23      MR. HARRINGTON:  Q.  Did you yourself ever
24 talk to prospective customers about possible sale of
25 promotional products?
Page 23

1    A.  Very rarely.  Focused more on the printing
2  side.
3    Q.  In your sales experience when you're quoting a
4  proposed contract with a customer, does the customer
5  often say, "I can get a better price elsewhere, can't
6  you do better than that, Mr. Molloy?"
7    A.  Not frequently, no.  Does it happen?  Yes.
8  Does it happen regularly?  No.
9    Q.  Okay.  Do you have any knowledge whether Pac
10 Bell had promotional product suppliers other than Print
11 Network?
12   A.  I don't.
13   Q.  What about Cisco, did they have promotional
14 product suppliers other than Print Network?
15   A.  I don't --
16      MR. BOYD:  Objection to the extent it calls
17 for speculation.
18      THE WITNESS:  I don't know.
19      MR. HARRINGTON:  Q.  You don't know?
20   A.  I don't know.
21   Q.  Did Brocade have promotional product suppliers
22 other than Print Network?
23   A.  I don't know.
24   Q.  Did you ever ask any of your salespeople that
25 question, whether the customers had other suppliers?
Page 24

1    A.  As I mentioned earlier, I was very focused on
2  the printing side.  I had very little discussion about
3  promotional products.
4    Q.  Okay.
5    A.  But I would in the course of business always
6  ask our folks about the competition and how their
7  relationship is going with clients.
8    Q.  Did you ask your salespeople on that topic for
9  promotional materials?
10      MR. BOYD:  What's the question?
11      MR. HARRINGTON:  Q.  You said you would always
12 ask your salespeople about competition?
13   A.  In the promotional products area,
14 occasionally.  But that was -- we did promotional
15 products just to support the printing business,
16 basically.  It was not a big part of what we did.
17   Q.  Right.  But you did ask your salespeople about
18 the competition for sale of promotional products; right?
19   A.  From time to time we did.
20   Q.  Do you know who your competition was?
21   A.  I don't recall the names.  It was almost
22 inconsequential.  It was such a small part of the
23 business.
24   Q.  Did you keep a secret that Pac Bell was one of
25 your customers?
Page 25

The Souza Group
(925) 846-8831

7 (Pages 22 to 25)

1 of the person calling to determine if it is a current
2 client or a new prospect and what they are interested in
3 and who they might have worked with in the past, if they
4 are a client of ours. He collects the information.
5     Q. Okay, and so I'm Bill Molloy from Wells Fargo
6 Bank, and think I need to get some mugs.
7     And, "Who do you work with?"
8     "I've been working with Andy Verity."
9     Then does the telephone person jump up and run
10 into the file room and pull out the Wells Fargo file and
11 bring it out and give it to Andy?
12     **A. Frequently.**
13     Q. That's the idea; isn't it?
14     **A. That's the idea, to get the file in front of**
15 **the salesperson.**
16     Q. In front of the salesperson, and the
17 salesperson takes the details of the project, whatever
18 it is. If it is an employee picnic, you may want to
19 have giveaways like T-shirts or whatever it is. Is that
20 the idea?
21     **A. That's the idea.**
22     Q. And so if the file happens to have been filed
23 in Mr. Lillge's office, they would run in there and pull
24 it out and bring it to the salesperson so it would be
25 useful; is that right?

Page 58

1     **A. That's right.**
2     Q. Now, that file would have, say, the catalog --
3 if they sold T-shirts before, I presume the file would
4 have the catalog picture of the T-shirt; right?
5     **A. Typically.**
6     Q. Typically. And it would have the artwork that
7 says "Wells Fargo Bank" on it? Or Bingham and McCutchen
8 is another customer; isn't it?
9     **A. Yes.**
10     Q. And their T-shirts say "Bingham McCutchen," I
11 think. I've seen them.
12     **A. Um-hum.**
13     Q. So, then they would have an invoice for the
14 prior sale if there had been a prior sale; is that
15 right?
16     **A. There would be information about the prior**
17 **sale, yeah.**
18     Q. How would the salesperson fix the price?
19     **A. On a new order?**
20     Q. Yeah.
21     **A. There is several variables to consider.**
22     Q. What would they consider?
23     **A. The quantity, the — any rush time that might**
24 **be necessary, the date of the event, a previous buying**
25 **of the client, how important a client was, what our**

Page 59

1 costs are, therefore, what our margins are.
2     Q. So they get the cost and the margin from the
3 catalog page; right?
4     **A. Suggested.**
5     Q. Suggested price?
6     **A. Merely suggested.**
7     Q. And it shows the discount, normal discount --
8     I'm sorry, I've been interrupting you.
9 Mr. Boyd is right.
10     Let me finish, and I'm going to let you
11 finish.
12     **A. Okay, fair enough.**
13     Q. Because if we talk at the same time, we can be
14 in the opera, but we can't be in a deposition.
15     **A. Okay.**
16     Q. I don't know what I was asking you.
17     You were giving me the variables in pricing.
18 And I was saying the catalog shows you the discount on
19 that item, on the code, A, B, C or D?
20     **A. Suggested discount.**
21     Q. Suggested discount?
22     **A. Yeah.**
23     Q. That's the starting price for the salesperson;
24 right?
25     **A. It is a suggested price.**

Page 60

1     Q. And if the salesperson wants to give a
2 discount off the suggested price, it is up to the
3 salesperson; is that right?
4     **A. Generally.**
5     Q. Do they have to get your consent?
6     **A. Depends on the situation. They might have to**
7 **get approval from a manager.**
8     Q. Suppose they are selling T-shirts to Wells
9 Fargo Bank, do they have to get your consent to give
10 them a discount?
11     **A. Depends. Depends on —**
12     Q. How do they know what it depends on?
13     **A. Because it is very situational. It is Wells**
14 **Fargo, and the thinking is you just give the standard**
15 **discount. The rep might go ahead and do that, but if it**
16 **is a substantial discount and the order involves a**
17 **certain amount of money, they are supposed to review it**
18 **with a manager.**
19     Q. So what is the standard discount? It is the
20 suggested discount from the catalog?
21     **A. At 40 — 40 percent is, if you want to call it**
22 **standard, but that's a discount that was frequently in**
23 **the catalog.**
24     Q. From the suggested resale price?
25     **A. Correct. But it varies. It varies, it is**

Page 61

1  adjustable.
2      Q.  What makes it vary? Does it depend on the
3  product?
4      A.  Several things. The product, the quantities,
5  the time frame, the client, previous buying habits, what
6  the traffic will bear. There are lots of variables in
7  every case with every situation.
8      Q.  All right. And so it is up to the discretion
9  of the sales manager then, if it is not the standard
10  discount, then the salesperson may approach the sales
11  manager and say, "I need to give an extra discount"; is
12  that the way it goes?
13      A.  It could go that way, yeah.
14      Q.  Well, do the salespeople have authority to
15  give extra discounts without consulting the sales
16  manager?
17      A.  It depends. Sometimes they do. It depends on
18  how big the discount is and how big the volume is.
19      Q.  What kind of discount would the salespeople be
20  authorized to make without consulting the sales manager?
21      A.  Forty percent generally.
22      Q.  Generally?
23      A.  Yeah.
24      Q.  Was that the same standard that you had over
25  at Print Network?

Page 62

1      A.  It was similar.
2      Q.  Similar?
3      A.  Similar, yeah.
4      Q.  Each catalog has a different code; am I right
5  on that?
6      A.  Each catalog is unique to that supplier or
7  manufacturer, yes.
8      Q.  How many different suppliers does Creative
9  Marketing have?
10      A.  Hundreds.
11      Q.  Hundreds?
12      A.  We have hundreds of suppliers.
13      Q.  You have shelves full of catalogs; is that
14  right?
15      A.  We do.
16      Q.  So if the salesperson doesn't happen to have
17  the catalog on their desk, they can go over to the shelf
18  and pull it off; is that right?
19      A.  Yes.
20      Q.  And presumably you hope that your salespeople
21  are familiar with the catalogs?
22      A.  Yes.
23      Q.  As part of their learning experience; am I
24  right on that?
25      A.  Yes.

Page 63

1      Q.  Now, to go back to our file cabinets. Am I
2  right that Wells Fargo is one of the larger customers of
3  Creative Marketing?
4      A.  Large in terms of dollar volume?
5      Q.  Yes. And also different items purchased?
6      A.  It is one of our larger accounts, yes.
7      Q.  It actually has a whole separate cabinet full
8  of Wells Fargo files; isn't that true?
9      A.  I'm not aware of a corporate cabinet. There
10  is a separate cabinet where we keep large accounts. I'm
11  not aware of a Wells Fargo exclusive cabinet.
12      Q.  There is a large account cabinet?
13      A.  Yes.
14      Q.  Where is that located?
15      A.  It is out near the receptionist.
16      Q.  And so if it is a large account who is
17  calling, then it is closer to the receptionist to run
18  over and pull the right file; is that right?
19      A.  That file is closer, yes.
20      Q.  And that's not in Mr. Lillge's office, that's
21  outside?
22      A.  Correct.
23      Q.  Now, let me ask this. There is also a display
24  cabinet that has all of the Wells Fargo promotional
25  products in it; isn't that true? A separate display

Page 64

1  cabinet?
2      A.  I'm not aware —
3          MR. BOYD: When you say all professional
4  products, you're referring to all products that CMC has
5  ever sold?
6          MR. HARRINGTON: I accept your correction.
7      Q.  There are shelves; is that true?
8      A.  Yes.
9      Q.  Is there glass in front of the shelf or is it
10  open shelves?
11      A.  They are generally open.
12      Q.  And are they discrete units, like six feet
13  wide by, what, four feet high or something like that?
14      A.  I don't know the exact measurements, but they
15  are like bookshelves, if you will.
16      Q.  Right. And isn't there a whole separate
17  bookshelf dedicated to display in the showroom of Wells
18  Fargo promotional products?
19      A.  Not to my knowledge.
20      Q.  Are Wells Fargo products shown in the
21  showroom?
22      A.  There have been from time to time, yes.
23      Q.  And they are mixed in with all the other
24  products?
25      A.  Generally, yeah. Yes.

Page 65

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CERTIFIED COPY

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

            Plaintiff,

      vs.               Case No. C07-02748 MHP

ANDREW VERITY AND CHRISTINA CHANG,

            Defendants.

_____/

ANDREW VERITY and CHRISTINA CHANG,

            Counterclaimants,

      vs.

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS, and DOES 1-10

            Counterdefendants.

_____/


VIDEOTAPED DEPOSITION OF MARIA TERESA PASCUAL

Friday, February 8, 2008


Reported by:
CYNTHIA L. THOMAS
CSR 2950

NANCY SORENSEN
Court Reporting Services
41 Sutter Street, Suite 505
San Francisco, California  94104
(415) 986-4624

DOCKET
FEB 11 2008

MARIA PASCUAL

1    with her that Monday morning.  Is that correct, based on

2    Exhibit 2 when she e-mailed you that Monday morning?

3    A.        Uhm-hmm.

4    Q.        So did someone from Creative Marketing Concepts

5    call you over that weekend?

6    A.        No.  I mean after I got this e-mail from

7    Christina, I -- because I never got to talk to her,

8    because she wasn't telling me anything, so I wanted to

9    find out where she is -- where she was, even if in this

10   e-mail it was saying, you know, I am -- because I didn't

11   -- I didn't know, so I was just asking.  It was just a

12   general question -- question.

13   Q.        And do you recall what the -- what the people

14   at Creative Marketing Concepts said?

15   A.        I -- I remember they said she was going back to

16   Canada.

17   Q.        And do you recall who at Creative Marketing

18   Concepts told you that?

19   A.        I'm not really sure if Mr. Lil -- that I was

20   speaking with Mr. Lillge, but as far as I can remember,

21   he said he was the President of Creative Marketing

22   Concepts, and he told me that Christina is leaving for

23   Canada.

24   Q.        And did he say if she was coming back to

25   Creative Marketing Concepts?

43

MARIA PASCUAL

1    A.        That's when he said he -- Christina left

2    Creative Marketing Concepts.

3    Q.        And when -- and I believe you testified that

4    you received Miss Chang's e-mail that Monday, the 14th of

5    May, and then you spoke to her on the telephone that day

6    or the -- or the next day?

7    A.        I spoke -- yes, I did.  I called her, but she

8    was -- she didn't tell me anything.  I was just asking

9    her what happened, but she didn't tell me anything.  So

10   when I -- so when someone from Creative Marketing

11   Concepts -- I think it was just that week, too, when --

12   when all these e-mails and calls were coming, and so I

13   was asking where Christina is, and the President of

14   Creative Marketing Concept told me that Christina is

15   leaving -- left the company, because she was going back

16   to Canada.

17   Q.        And do you recall what you said in response to

18   that when you were told that?

19   A.        I cannot remember anymore, but that's -- as far

20   as I can remember, that was what -- that was the -- the

21   information that was given to me.

22   Q.        At some point, did you speak with Miss Chang

23   about whether she was going back to Canada?

24   A.        After I get -- I got the information, yes, I

25   did.  I ask her.

44

MARIA PASCUAL

1    A.        Because I liked working with her.  That's why I

2    wanted to find out what happened and what -- where she

3    was going.

4    Q.        And did you want to know where she was going

5    because you were interested in continuing the

6    relationship of buying promotional products from her?

7    A.        Definitely.

8    Q.        Now, you mentioned that shortly after learning

9    that she, Christina Chang, was leaving, that you got a

10   call from someone at CMC?

11   A.        Yes, I did.

12   Q.        And do you recall speaking to someone who you

13   recall being the President of CMC?

14   A.        Yes.

15   Q.        And you do recall the name Mark Lillge?

16   A.        The name is really familiar, but I -- I cannot

17   really recall the name, but I know that he said he is the

18   President of Creative Marketing Concepts.

19   Q.        And when you asked whoever this person was, the

20   President of CMC, where Ms. Chang had gone, you do recall

21   that he told you she's going to Canada because of a Visa

22   issue?

23   A.        Yes.

24   Q.        And did you understand that to be an

25   immigration problem?

73

MARIA PASCUAL

1  A.        I believe --

2            MR. BOYD:  Object to the extent of using the

3  word "problem."

4            THE WITNESS:  When he -- when I ask him, what

5  came to my mind was that she was having a problem with

6  the working visa.

7  BY MR. WARD:

8  Q.        So that was the implication that you understood

9  from the words of the President of CMC?

10  A.        Yes.

11  Q.        When you heard the President of CMC say that

12  she was going back to Canada because of a visa issue, did

13  that create some doubt in your mind as to whether

14  Miss Chang would be available to sell promotional

15  products to you?

16  A.        No, but I just wanted to find out what

17  happened.

18  Q.        Did Mr. Lillge ever suggest to you that you

19  should not do business with Miss Chang?

20  A.        I have to clip my mike.

21  Q.        And I'm going to rephrase the question so take

22  your time.

23            Did the President of CMC, whom you spoke with,

24  did -- did he ever suggest that you should not do

25  business with Christina Chang?

74

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CERTIFIED COPY

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

               Plaintiff,

      vs.                Case No. C07-02748 MHP

ANDREW VERITY AND CHRISTINA CHANG,

               Defendants.

_____/

ANDREW VERITY and CHRISTINA CHANG,

               Counterclaimants,

      vs.

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS, and DOES 1-10

               Counterdefendants.

_____/


VIDEOTAPED DEPOSITION OF MARIA TERESA PASCUAL

Friday, February 8, 2008


Reported by:
CYNTHIA L. THOMAS
CSR 2950


NANCY SORENSEN
Court Reporting Services
41 Sutter Street, Suite 505
San Francisco, California  94104
(415) 986-4624

DOCKET
FEB 1 1 2008

MARIA PASCUAL

1    A.        We rolled out our new brand in 2007.  And yes,

2    2007 or 2000 -- 2006.  Yeah, we rolled out our new brand

3    in 2006 or 2007.  I'm -- I'm not really very sure,

4    because we had two rollouts.  That's why.

5    Q.        Okay.

6    A.        Yeah.

7    Q.        All right.  And was there some reason that you

8    stopped purchasing from Creative Marketing Concepts?

9    A.        Like, what do you mean, some reason?

10   Q.        Is -- is the reason that you ceased purchasing

11   from Creative Marketing Concepts was because of the -- of

12   the -- of the brand -- of the branding change?

13   A.        From -- from Creative Marketing Concepts, no.

14   We -- I was just -- I was just asked to order from --

15   from Christina Chang, because I think she was the vendor

16   who was able to come up with the correct specs. of the

17   new brand, or -- or new logo.

18   Q.        And when you say she was able to come up with

19   the correct specs., what do you -- what do you mean by

20   that?

21   A.        We -- there were other vendors also who -- when

22   -- I'm not sure how they were able to find out, but a lot

23   of the different promotional companies find out that we

24   were changing our logo, so they presented to us different

25   items with the new logo, and so it was, I think,

18

MARIA PASCUAL

1    A.        Yes.

2    Q.        Did they make any difference to you in terms of

3    buying merchandise?

4    A.        No.

5    Q.        Did Creative Marketing Concepts have a Web

6    site?

7    A.        I have no idea.

8    Q.        So is it fair to say then that the Web site

9    didn't make any difference to you in buying products?

10   A.        No.

11   Q.        Did you know that Creative Marketing Concepts

12   has a showroom?

13   A.        What I -- I -- I think I only remembered it,

14   but it was only maybe, like, 2006 when I got the

15   invitation for open house.

16   Q.        Does the fact that Creative Marketing Concepts

17   have a showroom make any difference to you in terms of --

18   A.        I never attended those open houses.

19   Q.        But did it make any difference to you in --

20   A.        No.

21   Q.        -- deciding what merchandise to buy on behalf

22   of Bingham?

23   A.        No.

24   Q.        Now, was -- do you consider your identity as

25   someone who buys promotional goods on behalf of Bingham,

MARIA PASCUAL

1    as a contact person for Bingham --

2    A.        Yes.

3    Q.        -- do you consider that to be secret?

4             MS. ROCCA:  Tess, just wait until -- make sure

5    he finishes the question before you answer.

6             THE WITNESS:  Okay.  Uhm-hmm.

7             Secret, you mean confidential, you mean?

8    BY MR. WARD:

9    Q.        Yeah.  Is it -- is it confidential that you,

10   Tess Pascual, are a contact person for buying promotional

11   merchandize for Bingham?

12   A.        No.

13   Q.        So is that information that you think is

14   generally available to people who would like to sell

15   promotional products to Bingham?

16   A.        Yes.

17   Q.        And I believe you mentioned this earlier, but

18   does Bingham buy from more than one promotional products

19   firm?

20   A.        Yes.

21   Q.        Did Bingham ever have an exclusive relationship

22   with Creative Marketing Concepts?

23   A.        We didn't sign any contracts, so we don't have

24   any exclusivity rights with Creative Marketing Concept.

25   Q.        Did you consider it confidential what prices

MARIA PASCUAL

1    A.        Yes, maybe.  Maybe we did.  Just general

2    marketing items that you give.

3    Q.        Now, at some point did you have an

4    understanding that Miss Chang was leaving the employment

5    of Creative Marketing Concepts?

6    A.        The only time I found out when she sent an

7    e-mail about that particular day being her last day.

8              MR. BOYD:  Mark this.  That would be great.

9                        (E-mail chain between Chang and

10                       Pascual was marked Exhibit 1.)

11   BY MR. BOYD:

12   Q.        Now, Miss Pascual, I've just handed you an

13   e-mail that we've marked as Exhibit 1, and it appears to

14   be an e-mail from Miss Chang to various recipients, and

15   it appears that you responded to that.

16             Do you recall receiving the -- the e-mail at

17   the bottom of the page on May 11th from Miss Chang?

18             MS. ROCCA:  Why don't you just take your time

19   reading it.  Make sure you've read it and then you can

20   answer the question.

21             THE WITNESS:  He's talking about this e-mail

22   here.

23             MS. ROCCA:  You're talking about this bottom

24   e-mail?

25             MR. BOYD:  For start, yeah.

23

# EXHIBIT H

**EXHIBIT H**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

             Plaintiff,

        vs.                          Case No. C07-02748 MHP

ANDREW VERITY AND CHRISTINA CHANG,

             Defendants.`
_____/

ANDREW VERITY and CHRISTINA CHANG,

             Counterclaimants,

        vs.

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS, and DOES 1-10

             Counterdefendants.
_____/


CERTIFIED COPY


VIDEOTAPED DEPOSITION OF CURSHANDA CUSSEAUX WOODS

Monday, February 11, 2008


Reported by:
CYNTHIA L. THOMAS
CSR 2950


NANCY SORENSEN
Court Reporting Services
41 Sutter Street, Suite 505
San Francisco, California  94104
(415) 986-4624

DOCKET
FEB 1 5 2008

CURSHANDA CUSSEAUX WOODS

1  purchasing spa kits?

2  A.        I did get some spa masks.

3  Q.        Do you recall whether that was for this event,

4  the marathon, or for something else?

5  A.        It was for something else.

6  Q.        And what about fans?

7  A.        We did not get any fans.

8  Q.        Massage tools?

9  A.        No massage.  Hmm.  Well, that -- there was a

10  second -- there was a massage something in the spa kit.

11  Q.        Oh, okay.

12  A.        Yeah.  Actually I didn't -- I think I got those

13  from American Identity, so.

14  Q.        That's another vendor?

15  A.        Yes.

16  Q.        Of promotional products?

17  A.        Uhm-hmm.

18  Q.        And what's the name of that company?

19  A.        That is American Identity.

20  Q.        Other than Creative Marketing Concepts and

21  Branding Boulevard, can -- and American Identity, can you

22  give me the names of any other promotional products

23  companies that you personally have ordered products from

24  on behalf of Kaiser Permanente?

25  A.        Sure.  O2 Marketing, Mark West.  I think it's

34

CURSHANDA CUSSEAUX WOODS

1    West -- what's the name of his company?  It's like Mark

2    -- Mark West is the name of the --

3    Q.        Okay.

4    A.        -- owner.  Let's see.  Who else?  Mark West,

5    American Identity.  Those are the primary ones.  And

6    there was a T-shirt vendor, but I can't remember the

7    name.  And, yeah, and a vendor in Colorado somewhere.

8    Q.        And when you're purchasing goods, how do you

9    determine which -- which vendor to purchase from?

10   A.        Sometimes it's been because I've purchased from

11   them before and I just need that same item.  It depends

12   on if we're working with a certain -- actually, American

13   Identity is the -- is the Kaiser Permanente's kind of

14   official vendor.

15   Q.        Okay.

16   A.        So I try to go to them sometimes first, but if

17   I need it fast, or I don't go to them if I need it.

18   Q.        Okay.

19   A.        It just depends.

20   Q.        Okay.

21   A.        For some other ones, it was because I was

22   working with other departments and that's who they were

23   using so I had to purchase in order to get that same

24   products, so we just kind of bulked it together.

25   Q.        Okay.

35

CURSHANDA CUSSEAUX WOODS

1    A.        And I would have purchased from the other

2    vendor.

3    Q.        All right.  Do certain of these -- in your

4    experience, do you believe that certain of these vendors

5    are better at certain types of goods --

6    A.        Definitely.

7    Q.        -- over others?

8    A.        Yes.

9    Q.        And so what -- other than it's an approved

10   Kaiser vendor, what types of goods do you generally tend

11   to buy from American Identity?

12   A.        Well, they have a KP store, so it -- it varies

13   from T-shirts to speaker recognition gifts, what we might

14   call them, which might be a spa kit or something.

15   Q.        How about 02 Marketing?

16   A.        What did I order from them?  I can't -- I can't

17   even recall what I ordered from them.

18   Q.        Okay.  And Mark West?

19   A.        Mark West, I ordered T-shirts.  Oh, and there

20   is one more, Robin Welch.

21   Q.        Robin Welch.

22   A.        Welch Enterprises.  Uhm-hmm.

23   Q.        And with respect to Branding Boulevard, are

24   there certain -- if -- if you have a certain need, are

25   there certain times that Branding Boulevard comes to the

36

CURSHANDA CUSSEAUX WOODS

1  top of your mind as the first place to go?

2  A.      That's -- that's actually the company of my

3  preference.

4  Q.      Okay.

5  A.      Uhm--hmm.  And when I need something fast, when

6  I need good service, when I need somebody to submit, you

7  know, ideas for -- like -- like you see here in this

8  e-mail --

9  Q.      Right.

10  A.      -- for marathon, then I -- I choose Branding

11  Boulevard.

12  Q.      Okay.  And is that true regardless of the --

13  for the most part, of the product that you're looking to

14  obtain?

15  A.      Pretty much, yeah, pretty much across the

16  board.

17  Q.      How about the vendor in Colorado?

18  A.      I just have to purchase from that person for

19  one specific event, Martin Luther King event.

20  Q.      And Robin Welch, is it?

21  A.      Yes.  I purchased -- I purchased from her in

22  the past.  She had some great ideas and I used her.

23  Q.      Okay.  When Miss Chang was at CMC, did -- was

24  she your preferred vendor of choice?

25  A.      Yes.

CURSHANDA CUSSEAUX WOODS

1    Creative Marketing Concepts?

2    A.        No, because of my location.

3    Q.        Okay.  Now, do you -- you listed a number of

4    other promotional product suppliers --

5    A.        Uhm-hmm.

6    Q.        -- who Kaiser Permanente purchases from.

7              In addition to those suppliers of promotional

8    products that you listed --

9    A.        Uhm-hmm.

10   Q.        -- are there others who have solicited you for

11   business?

12   A.        In addition to the ones I listed?  You mean in

13   -- like, in all my years of working in public relations?

14   Q.        Yeah, exactly.  Well, no.  Just let's focus on

15   your time at Kaiser Permanente.

16   A.        Okay.

17   Q.        Have there been companies other than, for

18   example, CMC or Branding Boulevard or these other

19   companies you've listed who've either sent you flyers or

20   maybe even cold-called you?

21   A.        Oh, yes.

22   Q.        Okay.  And have you specifically been the

23   recipient of such communications?

24   A.        Yes.

25   Q.        Okay.  So people have been able to figure out

61

CURSHANDA CUSSEAUX WOODS

1   that you're someone who buys products on behalf of Kaiser

2   Permanente?

3   A.          Yes.

4   Q.          And so to your knowledge, is -- is your -- is

5   your position public information?

6   A.          To my knowledge, no.

7   Q.          Okay.  But people can figure it out?

8   A.          Yes.

9   Q.          Okay.  And is there anything about the pricing

10  that you agreed on for paying for promotional products

11  from Creative Marketing Concepts that you think was

12  unique or confidential in any way?

13  A.          Anything about the pricing, no.

14  Q.          Was it pretty much just you were quoted prices

15  and you either decided to buy or not?

16  A.          Correct.

17  Q.          Did you receive catalogs from Creative

18  Marketing Concepts?

19  A.          Yes.

20  Q.          Did they have prices in those catalogs?

21  A.          Yes, I believe so.

22  Q.          Okay.  Now, when Mr. Lillge contacted you after

23  Miss Chang left --

24  A.          Uhm-hmm.

25  Q.          -- you described a series of phone calls that