HARVEY SISKIND LLP
IAN K. BOYD (State Bar No. 191434)
iboyd@harveysiskind.com
SETH I. APPEL (State Bar No. 233421)
sappel@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California  94111
Telephone:  (415) 354-0100
Facsimile:    (415) 391-7124

Attorneys for Plaintiff and Counterdefendant
Mark Lillge d/b/a Creative Marketing Concepts

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>    Plaintiff,<br><br>  v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>    Defendants.<br><hr>ANDREW VERITY and CHRISTINA CHANG,<br><br>    Counterclaimants,<br><br>  v.<br><br>MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, and DOES 1-10,<br><br>    Counterdefendants. | Case No.  C 07-02748 MHP<br><br>**OPPOSITION TO MOTION TO DISSOLVE PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, INCREASE BOND AND FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF**<br><br>**Date:    April 7, 2008**<br>**Time:   2:00 p.m.**<br>**Court: Hon. Marilyn Hall Patel** |

# TABLE OF CONTENTS

Page

BRIEF SUMMARY OF FACTS ................................................................................................ 1

   A.  Creative Marketing Concepts ...................................................................................... 1

   B.  Defendants' Employment at CMC ............................................................................... 3

   C.  CMC First Discovers Defendants' Trade Secret Misappropriation ...................... 4

   D.  The Court Enjoins Defendants from Contacting CMC's Customers .................... 5

   E.  Defendants Continue to Contact CMC's Customers in Violation of the Court's Orders .... 5

ARGUMENT ......................................................................................................................... 6

   I.  The Preliminary Injunction Should Remain in Force, Unmodified ...................... 6

      A.  F.R.C.P. 60(b) Does Not Apply to Preliminary Injunctions ...................... 6

      B.  There Has Been No Change in Circumstances That Would Render the Preliminary Injunction Inequitable ................................................................ 7

      C.  CMC Has Protectable Trade Secrets ........................................................... 9

         1.  CMC Has Repeatedly Identified and Supported its Trade Secrets ........... 9

         2.  CMC's Stated Trade Secrets are Protectable Under California Law ....... 12

      D.  The Court Should Not Dissolve the Preliminary Injunction Simply Because It Has Been in Place for Ten Months ....................................... 17

      E.  CMC Has Not "Misused" the Court's Orders ............................................ 19

   II.  The Court Should Not Increase the Amount of the Bond ............................... 20

      A.  Defendants Have Not Previously Objected to the Amount of the Bond .............. 20

      B.  There is No Reasonable Basis for Increasing the Bond ........................... 21

   III.  There is No Basis for Enjoining CMC ............................................................ 21

CONCLUSION .................................................................................................................... 22

–i–

1

## TABLE OF AUTHORITIES

Page(s)

2

### CASES

3

4

*Aetna Building Maintenance Co. v. West*
    39 Cal. 2d 198 (1952) ........................................................................................ 16

5

6

*American Credit Indemnity Co. v. Sacks*
    213 Cal. App. 3d 622 (1989)............................................................................. 13

7

*Continental Car-Na-Var Corp. v. Moseley*
    24 Cal. 2d 104 (1944) ........................................................................................ 16

8

9

*Continuum Co. v. Incepts, Inc.*
    873 F.2d 801 (5th Cir. 1989)............................................................................. 21

10

11

*Courtesy Temporary Service, Inc. v. Camacho*
    222 Cal. App. 3d 1278 (1990)............................................ 12, 13, 14, 15, 16

12

13

*Gable-Leigh, Inc. v. North American Miss,* Case No. CV 01-01019 MMM (SHx)
    2001 U.S. Dist. LEXIS 25614 (C.D. Cal. April 9, 2001) .................................... 4, 9, 13

14

*George v. Burdusis*
    21 Cal. 2d 153 (1942) ........................................................................................ 12

15

16

*Greenly v. Cooper*
    77 Cal. App. 3d 382 (1978)............................................................................. 11, 15

17

18

*Hollingsworth Solderless Terminal Co. v. Turley*
    622 F.2d 1324 (9th Cir. 1980)........................................................................ 14, 15

19

20

*Huk-A-Poo Sportswear v. Little Lisa, Ltd.*
    74 F.R.D. 621 (S.D.N.Y. 1977) ......................................................................... 6

21

*Jones v. Aero/Chem Corp.*
    921 F.2d 875 (9th Cir. 1990)............................................................................. 7

22

23

*Liberty Mutual Insurance Co., v. J. Gallagher & Co.,* Case No. C94-3384 MHP
    1994 U.S. Dist. LEXIS 18412 (N.D. Cal. Dec. 19, 1994) ............................. 9

24

25

*Lockwood v. Wolf Corp.*
    629 F.2d 603 (9th Cir. 1980)............................................................................. 12

26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung,* Case No. No. CV 01-00659 CBM (RCx)
    2001 U.S. Dist. LEXIS 3248 (C.D. Cal. Feb. 2, 2001)............................... 9

27

28

–ii–

*Morlife, Inc. v. Perry*
 56 Cal. App. 4th 1514 (1997) ..................................................................... 11, 13, 15

*Neville v. Chudakoff*
 08 C.D.O.S. 2875 (Cal. Ct. App. March 11, 2008).................................................. 19

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*
 204 F.3d 867 (9th Cir. 2000)........................................................................ 6

*ReadyLink Healthcare v. Cotton*
 126 Cal. App. 4th 1006 (2005) ......................................................... 4, 13, 14, 15

*Rufo v. Inmates of Suffolk County Jail*
 502 U.S. 367 (1992)............................................................................... 7

*Western Electro-Plating Co. v. Henness*
 180 Cal. App. 2d 442 (1960).................................................................. 12, 13, 15

## RULES

Federal Rules of Civil Procedure, Rule 8(d) ................................................. 12

Federal Rules of Civil Procedure, Rule 59(e) ................................................ 1

Federal Rules of Civil Procedure, Rule 60(b) ........................................... 1, 6, 7

Federal Rules of Civil Procedure, Rule 65(c) ............................................. 22

## STATUTES

California Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq.* .................................. *passim*

OPPOSITION TO MOTION TO DISSOLVE
PRELIMINARY INJUNCTION

Case No. C 07-02748 MHP

1    Defendants and Counterclaimants Andrew Verity and Christina Chang ("Defendants") move

2    the Court to dissolve a preliminary injunction that was entered after extensive briefing and oral

3    argument.  The thrust of Defendants' argument is that they denied Plaintiff's allegations at the outset,

4    subsequently stipulated to the bond amount and May 6 trial date, and they still deny Plaintiffs'

5    allegations now.  Therefore, this case has allegedly gone just as Defendants anticipated when they

6    responded to the complaint.  Yet having remained silent on the bond for the past ten months,

7    Defendants somehow believe that they are now entitled to a second bite at the apple on the eve of

8    trial to again argue the merits of the preliminary injunction.  Defendants are incorrect.

9    Moreover, putting aside the inefficiency and failed logic of Defendants' motion, their brief is

10   fatally defective.  Defendants cite F.R.C.P. 60(b) as their sole basis for relief.  Yet F.R.C.P. 60(b) only

11   applies to permanent injunctions entered after trial.  F.R.C.P. 60(b) does not apply to a request to

12   modify or dissolve a preliminary injunction.

13   The Court has no reason to consider Defendants' tired arguments again so close to trial.  If

14   Plaintiff had truly failed to meet its evidentiary thresholds to date, Defendants would have moved for

15   summary judgment on these trade secret claims.  Yet again, Defendants remained silent, tacitly

16   admitting at minimum genuine issues of material fact.

17   The jury will assess this matter in full in just a matter of weeks.  In the interim, Defendants'

18   papers are simply a very untimely motion for reconsideration of the Court's October 2007

19   Preliminary Injunction Order.[1]

20   ## BRIEF SUMMARY OF FACTS

21   ### A.    Creative Marketing Concepts

22   Plaintiff will not belabor the Court by extensively reiterating the facts of this case which have

23   been addressed previously in numerous motions.  In short, Plaintiff and Counterdefendant Mark

24   Lillge d/b/a Creative Marketing Concepts ("CMC") is a promotional products company that sells

25

26   _____

27   [1] Under F.R.C.P. 59(e), a motion for reconsideration concerning an order granting a preliminary
     injunction must be filed within ten days of the order.

28                                                    –1–

OPPOSITION TO MOTION TO DISSOLVE                                        Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1    businesses goods branded with the latter's corporate logo.  (Decl. of Mark Lillge in Supp. of TRO

2    ("Lillge Decl."), ¶2).[2]

3        CMC has well over 1,200 clients.  This is a small number of contacts relative to the field of

4    potential buyers for both CMC and its competitors, as the universe is virtually limitless.  Such

5    potential contacts for company branded goods number in the hundreds of thousands, if not millions,

6    and include any organization, institution, company, or individual, which attends trade shows,

7    provides such goods to its employees or distributors, has customers or prospective customers to

8    whom it wishes to provide such goods, holds special events, or has any other reasons to supply goods

9    bearing a company logo to others.  (Lillge Decl., ¶¶4-5)

10       Defendants' own expert asserts that industry sales in 2006 totaled almost <u>$19 billion</u>.[3]  By

11   contrast, Plaintiff's annual revenues are in the neighborhood of $4 million -- approximately .02% of

12   the total market based on its annual gross revenue in comparison with total industry revenue. (Lillge

13   Decl., ¶5)

14       Defendants' expert further contends that only five percent of such promotional products

15   companies generate revenues over $2.5M annually.[4]  Therefore, according to Defendants, CMC is

16   lodged well within the top 5% of such companies.  As would be expected, CMC is able to exist in

17   this elite stratosphere by relying on confidential and proprietary information it develops concerning

18   its existing and prospective customers.  (Lillge Decl., ¶6)

19

20

21

22
_____

23   [2] The Declaration of Mark Lillge in Support of Plaintiff's *Ex Parte* Application for Temporary
     Restraining Order and Order to Show Cause Why Injunction Should Not Issue is included in the
24   Court's electronic docket as No. 9.

25   [3] Expert Report of Jeffry Meyer ("Meyer Report"), Page 1.  Mr. Meyer's report also asserts that there
26   are over 20,000 distributors serving the U.S. market, clearly confirming that there is ample room for
     legitimate competition.

27
     [4] Meyer Report, Page 2.
28
                                            –2–

1

**B.    Defendants' Employment at CMC**

2    CMC hired Defendant/Counterclaimant Andrew Verity ("Verity") to be its Sales Manager in

3    2001.    CMC hired Defendant/Counterclaimant Christina Chang ("Chang") in 2005 to work in

4    accounting; the following year she moved over to sales. (Lillge Decl., ¶¶13, 17).

5    In these roles, Verity and Chang had full access to CMC's full MYOB database as well as

6    hard copies of all customer files, which both house the specific customer information at issue in this

7    litigation.  (Lillge Decl., ¶¶14, 17)  Indeed, Plaintiff's own computer forensic expert, Jon Berryhill,

8    has confirmed that Mr. Verity secretly downloaded the MYOB database to his own workstation, and

9    then attempted to cover up his conduct by deleting the database from his computer (presumably after

10    making his own copy) before leaving CMC.

11    Mr. Verity's departure from CMC was far from sudden or unexpected.  In March 2007, CMC

12    and Verity began discussions regarding Verity's transition from the company, due primarily to Mr.

13    Verity's anger management issues.  For one month, the parties attempted to negotiate a final

14    compensation package acceptable to both sides.  CMC eventually agreed to the material terms of

15    everything Verity had originally asked for, only to see him then substantially escalate his demand.

16    The parties were then unable to come to an amicable resolution.  Verity and CMC parted ways in

17    late-April 2007.  (Lillge Decl., ¶¶21-23)

18    On May 1, 2007, Verity incorporated Verity Marketing Corporation, which soon began

19    business under the name Branding Boulevard.  (Decl. of Andrew Verity in Opp. to TRO, ¶6)[5]

20    Branding Boulevard is also a promotional products company that sells businesses goods

21    branded with the latter's corporate logo.  It is a direct competitor of CMC.

22    CMC remained willing to employ Chang, on the condition that she agree to sign a proprietary

23    information agreement.  CMC required all employees to sign these agreements in order to protect

24    CMC's trade secrets.  All of CMC's employees at this time signed the agreement with the exception

25

26    [5] The Declaration of Andrew Verity in Opposition to Motion for Temporary Protective Order is

27    included in the Court's electronic docket as No. 28.

28

–3–

of Ms. Chang. After initially indicating that she would sign the agreement, Chang refused to do so. Accordingly, CMC was forced to terminate her on May 11, 2007. (Lillge Decl., ¶¶23-24) Chang immediately went to work for Branding Boulevard. (*See* Lillge Decl., ¶26)

Defendants maintain that CMC fired both Defendants. This contention is irrelevant and incorrect. Yet assuming *arguendo* CMC fired both Defendants, this would not free them from liability. A terminated employee, just like an employee who quits, is properly enjoined from misappropriating his or her former employer's trade secrets. *See Gable-Leigh, Inc. v. North American Miss*, Case No. CV 01-01019 MMM (SHx), 2001 U.S. Dist. LEXIS 25614 (C.D. Cal. April 9, 2001); *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006 (2005).

### C.    CMC First Discovers Defendants' Trade Secret Misappropriation

In late-May 2007, CMC learned that Defendants were on the brink of using CMC's trade secrets to steal a $20,000 sale from CMC. Previously, in approximately May 2007, a customer notified CMC, through Chang, that it had a prompt need for certain health-related and youth-related promotional items, and a budget of $20,000 to spend on such items. The fact that this customer had this need, at this time, for these types of products, and the amount of money allocated for these purchases, was not information publicly known. (Decl. of Gina Lee in Supp. of Contempt App. ("Lee Decl."), ¶4)[6]

Immediately after leaving CMC, Defendants began aggressively pursuing the $20,000 deal with this CMC customer on behalf of Branding Boulevard. Chang contacted Ms. Lee several times, by telephone and email, attempting to persuade her to fill the order with products from Branding Boulevard, and Defendants continued to follow up with Ms. Lee in person and over the phone, despite Ms. Lee's requests to the contrary. (Lee Decl., ¶¶5-7, 8)

---

[6] The Declaration of Gina Lee in Support of CMC's Contempt Application is included in the Court's electronic docket as No. 87.

OPPOSITION TO MOTION TO DISSOLVE                                    Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1    CMC promptly filed a Complaint for trade secret misappropriation and related claims and

2    sought immediate injunctive relief.[7]

3    **D.    The Court Enjoins Defendants from Contacting CMC's Customers**

4    On May 31, 2007, the Court granted CMC's application for a temporary restraining order

5    ("TRO").   It ruled that Defendants were not to "initiate contact" with CMC's customers, and that

6    "they are not to solicit customers of CMC," until further order of the Court.[8]   The parties agreed that

7    CMC would post a bond in the amount of $100,000.[9]

8    On October 1, 2007, the Court issued its order granting CMC's motion for preliminary

9    injunction.   It found "serious questions going to the merits of the case combined with the balance of

10    hardships tipping sharply in favor of the plaintiff."  (Prelim. Inj. Order, 10:21-23)  Significantly, the

11    Court found that CMC "has shown a strong likelihood of success in establishing that its customer

12    information constitutes a trade secret."  (*Id*., 8:1-2)  The Court's order confirmed that among other

13    things, Defendants were "barred from *initiating contact with*" CMC's customers.[10]

14
15    **E.    Defendants Continue to Contact CMC's Customers in Violation of the Court's Orders**

16    Plaintiff will not reiterate the substantive – and quite serious – points addressed in its

17    Application for Order to Show Cause Why Defendants Should Not Be Adjudged in Contempt

18    ("Contempt Application"), which is now pending before the Court.  However, as CMC detailed in

19    its earlier filed papers, Defendants have violated the Court's injunctive Orders, and CMC is aware of

20    _____

21    [7] In late-May 2007, Chang also solicited Ms. Lee to purchase certain house-shaped note clips, which
22    were real-estate promotional products, because Chang knew that Ms. Lee had a current need for
23    such real-estate promotional products.  Again, Chang was only aware of this customer's needs for
     such products because Ms. Lee had disclosed this need to Chang while the latter was at CMC.  (Lee
24    Decl., ¶11)

25    [8] Appel Decl., Ex. A (TRO Tr., 16:5-17:15)

26    [9] Appel Decl., Ex. A (TRO Tr., 22:2-14)

27    [10] The Court's order granting CMC's motion for preliminary injunction is included in the Court's
28    electronic docket as No. 61.

–5–

1  these violations occurring as recently as the last three to four months.  See, e.g., Declaration of Gina

2  Lee, filed in support of CMC's Contempt Application.

3       CMC is of course unable to subpoena each of its over 1,200 customers to determine exactly

4  how many of them Defendants have contacted and solicited in violation of the Court's orders.

5  However, with well over 1,200 customers, it is certainly reasonable to presume that these six to

6  seven violations detailed in Plaintiff's Contempt Application are not the only infractions.   Yet

7  having blatantly flouted the Court's preliminary injunction, Defendants now seek to dissolve it.

8  **ARGUMENT**

9  **I.**    **The Preliminary Injunction Should Remain in Force, Unmodified.**

10      **A.**    **F.R.C.P. 60(b) Does Not Apply to Preliminary Injunctions.**

11       Defendants assert that the Court should dissolve or modify its preliminary injunction under

12  F.R.C.P. 60(b), which allows the Court to relieve a party from a "final judgment, order, or

13  proceeding."  Specifically, Defendants allege newly discovered evidence under F.R.C.P. 60(b)(2),

14  and changed circumstances under F.R.C.P. 60(b)(5).   Yet there is no "final judgment, order, or

15  proceeding" at issue here.

16       The entire relief sought by Defendants' motion is premised on F.R.C.P. 60(b).

17       F.R.C.P. 60(b) does not apply to a preliminary injunction.

18       Accordingly, Defendants' entire motion is fatally flawed.

19       As a threshold matter, "a preliminary injunction is not a 'final judgment, order, or proceeding'

20  that may be addressed by a motion under Rule 60(b)."  *Prudential Real Estate Affiliates, Inc. v. PPR*

21  *Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000).  *See Huk-A-Poo Sportswear v. Little Lisa, Ltd.*, 74

22  F.R.D. 621, 623 (S.D.N.Y. 1977) (defendants' reliance on F.R.C.P. 60(b) in support of motion to

23  dissolve preliminary injunction was "defective since it is well established that Rule 60(b) applies only

24  to final orders and not to interlocutory degrees").

25

26

27

28

OPPOSITION TO MOTION TO DISSOLVE            Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1    As would be expected, <u>none</u> of the cases cited by Defendants concerning F.R.C.P. 60(b)

2    involves an attempt to modify a preliminary injunction.[11]

3    Therefore, Defendants' motion should be denied in its entirety.

4    **B.    There Has Been No Change in Circumstances That Would Render the Preliminary Injunction Inequitable.**

5

6    Defendants rely on *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) for their

7    position that a change in circumstances renders the current injunction as inequitable.  Again, *Rufo*

8    involved a post-trial consent decree, not a preliminary injunction.  Accordingly, *Rufo* relies on

9    F.R.C.P. 60(b)(5), which is not applicable here.

10    Moreover, even if the Court chose to humor Defendants and disregard the limitations of

11    F.R.C.P. 60, Defendants would still bear the burden to establish that the existing injunction "is no

12    longer equitable" by establishing "a significant change in facts or law that warrants revision of the

13    decree," and "the proposed modification must be suitably tailored to the changed circumstance."

14    *Rufo*, 502 U.S. at 393.

15    Defendants do not and cannot contend that there has been any "significant change" in the

16    applicable law.  And merely taking issue with Plaintiff's discovery responses does not do the trick.

17    In granting the preliminary injunction, the Court emphasized the balance of hardships.  The

18    balance of hardships has not changed.

19    The Court explained in its order granting preliminary injunction:

20        [T]he risk of losing business and being deprived of the benefit of its proprietary

21        information constitutes a substantial hardship on the part of plaintiff. Conversely, Verity testified that he has no use for plaintiff's trade secrets, and

22

---

23    [11] *Jones v. Aero/Chem Corp.*, 921 F.2d 875 (9th Cir. 1990), on which Defendants rely heavily in

24    support of their "new discovered evidence" argument (Mot., 8:1, *et seq.*) did not involve an injunction at all.  In that case, a former U.S. Customs Inspector appealed the denial of her motion for

25    new trial following an adverse jury verdict in her products liability action against the manufacturer of a tear gas spraying device.  She pointed to recently discovered correspondence that demonstrated

26    defendant's knowledge of a potential design problem.  The Ninth Circuit found that these documents would not have affected the outcome of the case, and it affirmed the district court's denial of the new

27    trial motion.  *Jones* has no bearing on the present case.  It is puzzling that Defendants emphasize it in their brief.

28    –7–

will therefore suffer no prejudice at all if he is enjoined from using them. Additionally, because customers in CMC's database comprise an extremely small percentage of the total market for the industry in which CMC and defendants compete, it will not be an undue hardship for defendant to find its own customers.

(Order re Prelim. Inj., 10:25-11:3)  The Court added that "even if defendants were barred from doing business with CMC's customers altogether, a condition this court does not impose, there are numerous additional companies with which defendants may develop their own relationship." (*Id*., at 12:13-15)  The Court thus found that the balance of hardships "tips sharply in favor of plaintiff." (*Id*., at 11:7)

At his deposition, Verity conceded that the preliminary injunction has had and will have no impact on Defendants' business.  When asked why Branding Boulevard had not used any of CMC's trade secrets, Verity replied:  "I think they're irrelevant to my business." Appel Decl., Ex. C (Verity Depo. Tr., 145:4)

In a declaration filed earlier in this action, Verity stated that he recently purchased a mailing list of Bay Area companies and "discovered that the number of customers with revenue of over $1 million is less than 10,000." (Supp. Decl. of Andrew Verity in Opp. to TRO, ¶11)[12]  Approximately 600 of CMC's customers have revenue over $1 million.  Giving Defendants the full benefit of any doubt, and assuming both that all of these 600 CMC contacts are located in the Bay Area, and further that all of these CMC companies are on the mailing list obtained by Mr. Verity, then Defendants can still solicit approximately **94%** of their desired contacts in just this one instance.  There is no hardship here, and it further is not a hardship to assert that one is unable to use one's former employer's trade secrets to compete against it.

Verity stated in his declaration that Branding Boulevard has made $600,000 in sales in its first nine months of existence. (Verity Decl., ¶14)  Based on this figure, he estimates $288,000 of annual

---

[12] The Supplemental Declaration of Andrew Verity in Support of Supplemental Opposition to Motion for Temporary Restraining Order is included in the Court's electronic docket as No. 44.

OPPOSITION TO MOTION TO DISSOLVE                                                Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1    gross profits.[13] This is a substantial amount of profit for a new startup company after only nine

2    months of its existence.  And it is consistent with the Court's determination that Defendants are

3    enduring little hardship as a result of the Court's orders.

4            By contrast, allowing Defendants to use CMC's trade secrets would be devastating to CMC.

5    *See Gable-Leigh*, 2001 U.S. Dist. LEXIS 25614 at *67; *Merrill Lynch, Pierce, Fenner & Smith, Inc.*

6    *v. Chung*, Case No. No. CV 01-00659 CBM (RCx), 2001 U.S. Dist. LEXIS 3248, at *15 (C.D. Cal.

7    Feb. 2, 2001); *Liberty Mutual Insurance Co., v. J. Gallagher & Co.*, Case No. C94-3384 MHP, 1994

8    U.S. Dist. LEXIS 18412, at *18 (N.D. Cal. Dec. 19, 1994) ("The balance of hardships also tips

9    sufficiently in Liberty's favor.  This group of customers is sufficiently small in relation to the whole

10   of Wickstrom's potential customers that he will not be significantly harmed by being denied the

11   opportunity to compete for their business.  Liberty, on the other hand, faces the potential erosion of a

12   significant portion of its local business").

13           Defendants claim they have "missed any window of time to 'poach'" CMC's customers

14   (Mot., 11:23-24).  This is not true.  The fact that CMC may have continued selling products to certain

15   customers does not mean Defendants will not try to steal these customers in the future.  In fact, some

16   of CMC's customers purchase products on an annual basis (or every two or three years), and some of

17   these customers have of course not restocked since Defendants left CMC's employ.  Moreover, as

18   detailed in Plaintiffs' Contempt Application, Defendants improperly contacted Plaintiff's customers

19   as recently as last December.  The proper amount of time for the injunction to stay in force will be

20   determined after the full evidentiary record is presented to a jury.

21       **C.    CMC Has Protectable Trade Secrets.**

22           **1.    CMC Has Repeatedly Identified and Supported its Trade Secrets.**

23           Defendants allege that the Court should dissolve its preliminary injunction because they

24   recently learned that CMC does not have protectable trade secrets.  Yet Defendants omit to state that

25

---

26   [13] Given Defendants claim that they have not used CMC's trade secrets to date, it is difficult to
27   reconcile this projected annual income of at least approximately $385,000 with Defendants' claim
     that injunctive relief is preventing them from paying their mortgage and caring for their child.

28                                              –9–

1    it is their position that they have denied the existence of any trade secrets from day one in this

2    litigation.    While Defendants will rapidly have a chance at trial to argue that CMC does not have

3    protectable trade secrets, their alleged newfound *belief*[14] is no basis for dissolving the preliminary

4    injunction.    As noted *supra*, if it was truly "put up or shut up time," then Defendants would have

5    moved for summary judgment on CMC's trade secrets claim.    Yet they chose to shut up.

6         In support of their position, Defendants point to CMC's alleged "repeated refusal to identify

7    any such secrets." (Mot., 8:16-19)  This statement, which is rapidly becoming Defendants' mantra, is

8    a red herring.

9         First, CMC identified its trade secrets in its Complaint, filed on May 25, 2007.  Next, CMC

10   identified its trade secrets in its memorandum in support of its application for TRO, filed on May 29.

11   CMC's counsel reiterated some of CMC's trade secrets at the TRO hearing on May 31, and again at

12   the preliminary injunction hearing on August 27.[15]

13        On June 1, CMC filed and served its Identification of Trade Secrets.[16]  In that document,

14   CMC identified nine particular categories of trade secrets.    At no time, until the filing of the instant

15   motion, have Defendants formally objected to CMC's Identification of Trade Secrets.

16        CMC's identification of trade secrets was certainly sufficient for the Court, as it found that

17   "plaintiff has shown a strong likelihood of success in establishing that its customer information

18   constitutes a trade secret." (Order re Prelim. Inj., 8:1-2)

19        In their brief, Defendants challenge three of CMC's categories of trade secrets.    Tellingly,

20   however, *they neglect to even address the remaining six.* (*See* Mot., 8:26-10:8, challenging category

21   Nos. 1, 2, and 7 only).    Thus even Defendants concede that no "significant facts" have arisen

22   regarding two thirds of Plaintiff's identified trade secrets.

23

24   _____

25   [14] E.g., "Defendants <u>contend</u> that Plaintiff's entire case is a sham." Mot., 16:1

26   [15] Appel Decl., Ex. A (TRO Tr., 4:21-5:19); Appel Decl., Ex. B (Prelim. Inj. Tr., 4:7-5:2)

27   [16] CMC's Identification of Trade Secrets is included in the Court's electronic docket as No. 18.

28
                                                    –10–

Likewise, at the hearing concerning the preliminary injunction, Defendants contended that CMC had no protectable trade secrets without addressing why a majority of the categories noted above would not qualify. On the contrary, Defendants' counsel conceded that "renewal dates" and "past ordering history," some of the very customer information at issue here, "would certainly be the type of information that could qualify as a trade secret."[17]

At the hearing on CMC's motion for summary judgment on March 3, Defendants again stated that none of the trade secrets listed in CMC's Identification of Trade Secrets was protectable, but they again neglected to explain why. And they certainly did not cite any valid legal authority in support of their contention.

In fact, at no point in this litigation have Defendants made any serious attempt to refute that this customer information, such as the customer information conveyed by Ms. Lee in confidence to CMC in May 2007 (concerning a specific need of her employer at a specific time covered by a specific budget), constitutes a trade secret—even though Defendants' solicitation of Ms. Lee was the impetus for CMC's TRO application last May.

Further, in their Answer, Defendants <u>admitted</u> that "there are many details regarding CMC's relationships with its customers which are not generally known to the public or CMC's competitors, and CMC derives independent economic value from this information which it has developed through substantial time, effort and expense." (Answer, ¶9) This admission alone is sufficient to establish that CMC has established the first element of a trade secret under Cal. Civ. Code §3426.1(d).[18]

_____

[17] Appel Decl., Ex. B (Prelim. Inj. Tr. 7:23-25) Defendants argued that they could not be liable for misappropriation of these trade secrets because they did not make "photocopies of the files" revealing this information. This is a fact in dispute. Morever, as noted above, CMC contends that Verity downloaded CMC's MYOB database, which includes portions of each customer's purchasing history, onto his computer, when he had no legitimate work reason to do so. It is also well settled that a trade secret need not be in writing in order to be receive protection. *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997); *Greenly v. Coope*r, 77 Cal. App. 3d 382, 392 (1978).

[18] The second element—that the information is subject to reasonable efforts to maintain its secrecy— has never been disputed by Defendants. *See* Order re Prelim. Inj., 6:1-2 ("Defendant does not appear to deny that the customer information was subject to reasonable efforts to maintain its secrecy.").

1    *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980) ("Wolf's failure to deny the allegation in

2    its answer to the Trustee's complaint constitutes an admission. Fed.R.Civ.P. 8(d). Therefore, no

3    evidence on this element was required.").

4                          **2.    CMC's Stated Trade Secrets are Protectable Under California Law.**

5          California case law confirms that CMC's trade secrets, including the three categories

6    challenged by Defendants and the six categories which Defendants do not challenge, are protectable.

7          In *Western Electro-Plating Co. v. Henness*, 180 Cal. App. 2d 442 (1960) the court of appeal

8    affirmed a preliminary injunction prohibiting defendants from soliciting their former employer's

9    customers.  It reasoned that "[t]he value of the various accounts of customers and knowledge of the

10   amount of business transacted by and between said customers and plaintiff did constitute secret

11   information of plaintiff."  *Id*. at 445.  The court explained:

12            It is not merely the knowledge of the identity of the customers, but the friendly
              contact with them which is important to the solicitors.  Their personal
13            acquaintance with customers and knowledge of their respective places of
              residence, their peculiar likes and fancies and other characteristics, a knowledge
14            of which would greatly aid them in securing and retaining the business of said
              former customers, is sufficient to invoke equitable protection against the
15            subsequent use by a former employee of such information.

16

17   *Id*. at 448 (*quoting George v. Burdusis*, 21 Cal. 2d 153, 160 (1942)).

18         More recently, the court of appeal held that injunctive relief was appropriate in *Courtesy*

19   *Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990).  In that case, plaintiff alleged

20   trade secret misappropriation after one of its employees left to start a competing business.  Plaintiff

21   alleged, as does CMC here, that defendants misappropriated its confidential customer list, "including

22   such information as the volume of the customer's business, specific customer requirements, key

23   managerial customer contacts and billing rates for use in [defendants'] competing business."  *Id*., at

24   _____

25   Indeed, this point is beyond dispute.  Among other things, CMC limits access to this information, and
     CMC requires its employees to sign non-disclosure agreements in order to keep this information
26   confidential.  (Lillge Decl., ¶¶11, 19)  Furthermore, CMC's employee handbook specifically states
     that "an employee or former employee is prohibited from providing such confidential information to
27   our competitors."  (Lillge Decl., Ex. A)

28                                                   –12–

1281.  The appellate court held that Courtesy was entitled to a preliminary injunction restraining defendants from using its customer information.  *Id*. at 1292.  It explained that "the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors."  *Id*. at 1288.

*American Credit Indemnity Co. v. Sacks*, 213 Cal. App. 3d 622 (1989) is also illustrative.  The trade secrets at issue in that case were ACI's "client list, the expiration dates of ACI policies, lists of all leads for potential business, claims histories, and other information concerning the special needs of clients."  *Id*. at 626.  The court of appeal held that ACI was entitled to a preliminary injunction after defendant resigned from her job as an ACI agent and began soliciting ACI's clients for her new credit insurance underwriting company.  *Id*. at 638.  *See also Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) (finding customer contact information to be trade secret based in part on "the difficulty encountered by sales personnel in getting past the 'gatekeepers' and identifying and gaining access to the actual decisionmakers with the authority to purchase roofing services.").

In light of *Western Electro-Plating*, *Courtesy Temporary Service*, *American Credit Indemnity Co.* and many other California cases, the nine categories of trade secrets identified by CMC (or at least the majority of those categories) are protectable.

Defendants contend that "one of the most important facts, which the Court should never lose sight of, is that Lillge fired both Verity and Chang." (Mot., 1:27-2:1 (emphasis in original)).  It is unclear why Defendants place such great emphasis on this "fact" (which CMC disputes, at least with respect to Mr. Verity, and Ms. Chang willingly brought her own termination on herself when she refused to sign a standard proprietary information agreement).  It is well established that a fired employee is not allowed to misappropriate her former employer's trade secrets, and should be enjoined from doing so.  *See Gable-Leigh, Inc.*, 2001 U.S. Dist. LEXIS 25614; *ReadyLink*

–13–

1  *Healthcare*, 126 Cal. App. 4th 1006.  Indeed, it is the fired ones, who do not leave on good terms,

2  who are more likely to bear close monitoring.[19]

3         Furthermore, while almost all businesses are in the potential market for promotional products,

4  some businesses do in fact have exclusive agreements with particular promotional products

5  distributors.  Verity himself acknowledged this fact in a declaration filed earlier in this action. (Supp.

6  Decl. of Andrew Verity in Opp. to TRO, ¶11 ("many customers are locked into other vendors")).

7  Soliciting a business that already has in place an exclusive agreement with another promotional

8  products company would be pointless, and time consuming.  As long as Defendants rely on CMC's

9  customer list, they can avoid wasting valuable time and resources soliciting such a business.

10        Once again *Courtesy Temporary Service*, 222 Cal. App. 3d 1278 is instructive.  There, the

11  court held that a list of customers "built up by ingenuity, time, labor and expense of the owner over a

12  period of many years is property of the employer," and is protected by California's Uniform Trade

13  Secret Act.  *Id.* at 1287.  It explained, relying on Ninth Circuit precedent:

14         Employees, by appropriating only those customers who, after [the employer's]
           efforts, chose to patronize [the employer] and saving themselves comparable
15         efforts in screening those entities who declined [the employer's] patronage,
           have acquired commercially invaluable information.
16

17         This concept of "negative" research was emphasized in the case of
           *Hollingsworth Solderless Terminal Co. v. Turley* (9th Cir. 1980) 622 F.2d 1324.
18         If a customer list is acquired by lengthy and expensive efforts which, from a
           negative viewpoint, indicate those entities that have *not* subscribed to plaintiff's
19         services, it deserves protection as a "trade secret" under the act. According to
           *Hollingsworth*, even if the customers' names could be found in telephone or
20         trade directories, such public sources "'would not disclose the persons who

21
_____

22  [19]  Defendants argue that the identities of CMC's customers are not protectable. (Mot., 8:26-9:8)  In
23  support, they state that "one can walk into CMC's showroom – a public place – and learn the identity
    of hundreds of CMC customers." (Mot., 8:27-9:1)  This statement is false.  While CMC displays
24  corporate-branded promotional products in its lobby, these products reveal nothing about CMC's
    customer base.
25      The promotional products on display are given to CMC by its suppliers for the purpose of
26  showcasing them to potential customers.  To begin, approximately 80% of the items on display at any
    given time are not branded with the logos of customers of CMC.  In addition, for those products that
27  do actually bear logos of CMC's clients, e.g., Wells Fargo, one would generally have no idea which
    state, branch, or department of the bank purchased such goods.  Stein Decl., ¶¶2-3

28                                                    –14–

ultimately made up the list of plaintiff's customers.'" (*Id.* at p. 1333)  It is the list of persons who actually purchase Courtesy's services that constitute confidential information.

*Id.*, at 1287-1288.

Similarly, in *Morlife*, 56 Cal. App. 4th 1514, defendant was enjoined from using his former employer's customer list to solicit customers for his competing roof repair business.  The appellate court explained:

> [A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. [] Its use enables the former employee "to solicit both more selectively and more effectively."

*Id.*, at 1522 (citations omitted).  *See also ReadyLink Healthcare*, 126 Cal. App. 4th at 1019-1020.  Thus, CMC's customer list, developed over the past 15 years through substantial time, effort, and expense, is a protectable trade secret.

Defendants also take issue with the pricing implemented by CMC.  Yet the prices that CMC charges its customers are at the discretion of CMC's management, taking into account "all the . . . influences that . . . are coming to bear on that particular job."  Appel Decl., Ex. D (Lillge Depo., 47:21-49:12; 52:22-24).

.  Trade secret law clearly protects such pricing decisions, and whether such pricing procedures are memorialized in a special database, or the subject of some "secret mathematical formula," is irrelevant.  *Morlife,* 56 Cal. App. 4th at 1522 ("[T]o afford protection to the employer, the information need not be in writing but may be in the employee's memory.") (*quoting Greenly v. Coope*r, 77 Cal. App. 3d 382, 392 (1978)).

Defendants also vaguely assert that CMC's customers "preferences, habits, and other information naturally acquired in a business relationship is information that is presumptively Verity's and Chang's to use."  (Mot., 10:1-3).  CMC assumes this statement, which is of course not supported by California law, is an attempt to challenge the seventh category of trade secrets noted above.

OPPOSITION TO MOTION TO DISSOLVE
PRELIMINARY INJUNCTION

Case No. C 07-02748 MHP

1    *Western Electro-Plating*, *Courtesy Temporary Service*, and *American Credit Indemnity Co.*

2    (as well as myriad other cases) confirm that CMC's seventh category of trade secrets is protectable.

3    In support of their position, Defendants cite two cases, *Aetna Building Maintenance Co. v. West*, 39

4    Cal. 2d 198 (1952) and *Continental Car-Na-Var Corp. v. Moseley*, 24 Cal. 2d 104 (1944).  Each of

5    these cases is over half a century old and was decided before California's adoption of the Uniform

6    Trade Secrets Act.[20]   Moreover, as the Court confirmed in its Preliminary Injunction Order, neither

7    of these cases supports Defendants' position.

8        In *Aetna*, the court found that plaintiff, a building maintenance company, had no protectable

9    trade secrets given the nature of its business.  It reasoned that potential customers seeking plaintiff's

10   services, *i.e.*, janitorial services, all had the essentially the same needs and interests.  *See id.*, at 205-

11   206.  It distinguished plaintiff from other companies (such as CMC) with customers who have

12   specific preferences and buying habits.

13       Equitable protection may be invoked against the subsequent use by a former
         employee of knowledge of the "peculiar likes and fancies and other
14       characteristics" of the former employer's customers where such knowledge will
         aid him in securing and retaining their business. []  This rule applies . . . to
15       situations involving a knowledge of the customer's desire for specialized
         information, his preference for certain products, and his buying habits.
16

17   *Aetna*, 39 Cal. 2d. at 205 (citations omitted).

18       Similarly, in *Continental Car-Na-Var*, the court pointed out that the allegedly improper sales

19   "were not made because of [defendant's] personal acquaintance with customers and knowledge of

20   their respective places of residence, their peculiar likes and fancies and other characteristics, a

21   knowledge of which would greatly aid them in securing and retaining the business of said former

22   customers;" instead, they were based on defendant's own abilities.  *Continental Car-Na-Var*, 24 Cal.

23   2d at 111.

24

25   _____

26   [20] Defendants identify *Continental Car-Na-Var* as a case decided in 1994.  That case was in fact
     decided fifty years earlier, long before passage of the California UTSA.  The UTSA includes a
27   "broader definition" of trade secrets than the Restatement, thus expanding the scope of protection.
     *Courtesy Temporary Services*, 222 Cal. App. 3d at 1287.

28
                                              –16–

OPPOSITION TO MOTION TO DISSOLVE                                    Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

**D.    The Court Should Not Dissolve the Preliminary Injunction Simply Because It Has Been in Place for Ten Months.**

Defendants also contend that the preliminary injunction should be dissolved because of their alleged "extended period of compliance."  (Mot., 10:24; *see also* 11:3-5)  Mere compliance with a valid preliminary injunction is not a basis to dissolve it.  Indeed, this position is absurd.  There is no time off for good behavior here.  Moreover, there has been no good behavior.

Defendants have <u>not</u> complied with the preliminary injunction.  As discussed in CMC's Contempt Application, Defendants have repeatedly violated the terms of the preliminary injunction (as well as the TRO that preceded it) by contacting and soliciting CMC's customers.  While the injunction has been in place for only ten months, it remains necessary.

In addition, until the instant motion, Defendants have not once objected to the amount of bond nor the timing of trial.[21]

CMC filed and served (by hand) its application for TRO on May 29, 2007, and the court set the hearing for two days later.  Defendants neglected to file an opposition brief prior to the hearing. Instead, Defendants' counsel suggested that the Court allow him ten days to file a brief.[22]

The Court proposed holding a preliminary injunction hearing ten days later, and leaving the TRO in effect only until that hearing.  CMC's counsel consented to that schedule.  Defendants' counsel, on the other hand, sought more time to file an opposition brief. (Appel Decl., Ex. A (TRO Tr., 23:8-10 ("I'm just saying it seems to me it would be better if I had a little more time.")))

---

[21] Defendants also assert that Plaintiff will not be able to satisfy some large judgment which they envision.  Putting aside the amount of money that Mr. Lillge may have in his savings account, as the proprietor of a business with gross revenue of $4 million, he anticipates being able to satisfy any judgment, in the unlikely event that Defendants prevail at trial.

[22] Appel Decl., Ex. A (TRO Tr., 2:25-3:1)

OPPOSITION TO MOTION TO DISSOLVE
PRELIMINARY INJUNCTION

Case No. C 07-02748 MHP

1  Accordingly, the Court proposed giving Defendants ten days to file an opposition brief and holding

2  the preliminary injunction hearing on June 15.[23]

3      In order to accommodate both parties' counsel's travel schedules, the Court ultimately set the

4  hearing for July 9 and ordered that the TRO remain in effect until that date.[24]

5      After several <u>stipulations</u> extending dates, almost all at Defendants' request, the hearing

6  finally took place on August 27.

7      Three weeks later the Court set trial for March 4, 2008—only one day after the date proposed

8  by Defendants in the Case Management Statement.[25]

9      On December 6, CMC and Defendants participated in a mediation at which they reached a

10  settlement in principle.  The parties' counsel then exchanged several draft settlement agreements.

11  Just prior to the close of settlement, Defendants' counsel notified CMC's counsel in mid January that

12  Defendants were withdrawing from the settlement.

13      In light of Defendants' decision to back out of the settlement agreement, the parties <u>stipulated</u>

14  that the new trial date would be May 5, 2008.  The Court set the trial for the following day, May 6.[26]

15  At no point during this process, when a substantial portion of discovery had been completed, did

16  Defendants object to the amount of the bond, nor did they attempt to accelerate the trial date to a time

17  before May 6.

18      Defendants now feebly assert that "this matter, however, has dragged out longer than

19  anticipated." Mot., 1:18.  They further protest the "long wait for trial." (Mot., 14:21.)  Yet even with

20  the <u>stipulated</u> two-month continuance, this matter will proceed to trial in well under a year from the

---

[23] Appel Decl., Ex. A (TRO Tr., 17:16-23:25)

[24] Appel Decl., Ex. A (TRO Tr., 24:1-25:5)

[25] The Joint Case Management Statement is included in the Court's electronic docket as No. 53; the Court's Case Management Scheduling Order is included in the Court's electronic docket as No. 56.

[26] The Parties' Stipulation Continuing Case Management Dates, and the Court's resulting Order, are included in the Court's electronic docket as Nos. 78 and 79.

OPPOSITION TO MOTION TO DISSOLVE                    Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1  filing of the complaint.  There is nothing unanticipated here regarding the timing of trial, except

2  perhaps for the very fast track of this case.[27]

3       Defendants are in no position to belatedly complain about the length of time the preliminary

4  injunction has been in effect.

5       **E.    CMC Has Not "Misused" the Court's Orders.**

6       Finally, Defendants argue that the Court should dissolve its preliminary injunction because

7  CMC has "abusively misused" the Court's orders by notifying third parties of their contents. (Mot.,

8  12:16-22)  As Defendants point out, CMC sent a letter and email to third parties informing them of

9  the TRO.   As addressed in CMC's Motion for Partial Summary Judgment pending before the Court,

10  there is nothing defamatory or illegal in these communications.

11       Defendants further mislead the Court with respect to the evidence regarding CMC's supposed

12  improper communications regarding Defendants with certain contacts – Ms. Pascual, Ms. Hua, and

13  Ms. Chan.  As noted in CMC's Motion for Partial Summary Judgment, Ms. Pascual testified:

14       I don't – I cannot recall the exact reason, the exact statement or what the answer
to my question was, but it – I just heard, like, something, some sort of a visa.

15  That's all I can remember now.  It's just too, you know, vague now.  I cannot
even remember the conversation anymore.[28]

17       Ms. Hua similarly testified that she could not recall the conversation at issue in any detail.[29]

18       Regarding Ms. Chan, Defendants still refuse to offer any admissible testimony regarding any

19  alleged communications with CMC.

20

21  ───────────────

22  [27] Defendants also complain that "[w]hen the Court first set the bond amount in June 2007, neither

23  Defendant nor the Court had reason to believe that the provisional relief would remain in effect for
almost an entire year."  (Mot., 14:17-19)  It is unclear how Defendants know what the Court believed

24  at that time.  Yet surely Defendants knew that such a prospect was possible in July 2007, when they
submitted their Opposition to the Preliminary Injunction Motion, where such Motion, if granted,

25  would by definition stay in effect through trial.  However, Defendants for whatever reason failed to
address the bond amount at that time.

26  [28] Ward Decl., Exhibit G, 45:15-22

27

28  [29] Ward Decl., Exhibit J, 79:21-80:20.

–19–

1    Truthfully notifying customers and suppliers about a court order—which is itself a public

2    record—does not violate any legal or ethical rules.  It is simply an example of free speech and honest

3    competition.  *See Neville v. Chudakoff*, 08 C.D.O.S. 2875 (Cal. Ct. App. March 11, 2008) (affirming

4    judgment that no cause of action arose from notification by plaintiff to its customers concerning

5    claim that ex-employee had stolen customer lists and other proprietary information of plaintiff, and

6    improperly solicited plaintiff's customers, even where notification further advised that these

7    customers not do business with defendant's new business).

8    Additionally, as noted in CMC's Contempt Application, it was only because of this

9    notification that CMC learned of additional violations of the Court's Preliminary Injunction by

10    Defendants.

11    Defendants are able to spin a compelling yarn, but their story crumbles without a foundation

12    of favorable law and admissible evidence.

13    **II.    The Court Should Not Increase the Amount of the Bond.**

14    Defendants now argue, for the first time, that CMC's $100,000 bond is not sufficient.

15    Defendants' decision to wait until one month before trial (a trial date to which they stipulated) in

16    raising this argument confirms that it has no merit.

17    **A.    Defendants Have Not Previously Objected to the Amount of the Bond.**

18    The parties agreed to a $100,000 bond at the TRO hearing on May 31.  Since that time,

19    Defendants have not objected to this bond amount for ten months, until the eve of trial.

20    Defendants filed their opposition to CMC's motion for preliminary injunction on July 6.

21    Although it is customary to address any bond issues in a party's opposition papers, for whatever

22    reason, Defendants did not address the bond in any fashion in their opposition.[30]  Likewise, at the

23    preliminary injunction hearing on August 27, Defendants did not express any reservations about the

24    amount of the bond, even when the Court indicated that it was inclined to grant a preliminary

25    injunction.

26    ───────────────

27    [30] Defendants' Opposition Brief is included in the Court's electronic docket as No. 26.

28

−20−

OPPOSITION TO MOTION TO DISSOLVE                                    Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

1    Importantly, at the time of the preliminary injunction hearing, Defendants passed on any
2    opportunity to object to the amount of the bond, although they knew that the trial would not be for
3    several more months.  In the parties' Case Management Statement, filed only two weeks later,
4    Defendants proposed a trial date of March 3.

5    After the settlement fell apart, CMC and Defendants stipulated to a new trial date of May 5.
6    At no time did Defendants make this stipulation conditional on anything whatsoever having to do
7    with the existing bond.  They never mentioned their belief that the $100,000 bond was inadequate,
8    and they never suggested increasing this amount.

9    Now, nearly one month before trial, Defendants suddenly complain about the amount of the
10   bond.  The Court should ignore this argument, which appears to be in bad faith, and made solely to
11   cause Plaintiff to incur additional fees in opposing this motion.

12       **B.    There is No Reasonable Basis for Increasing the Bond.**

13   To try to justify increasing the amount of bond less than 30 days before trial, Defendants
14   submit only Verity's self-serving declaration, in which Verity offers little factual basis for his
15   conclusion that $100,000 is insufficient.  Defendants fail to meet their burden.  *See Continuum Co. v.*
16   *Incepts, Inc.*, 873 F.2d 801, 804 (5th Cir. 1989) (staying order increasing bond because defendant
17   "proffered little more than conclusory evidence to the district court to support its contention that the
18   bond should be increased").

19   As discussed above, Branding Boulevard has had a very impressive first year, with
20   Defendants on track to gross an income close to $400,000.  Moreover, Defendants are free to solicit
21   and do business with *thousands* of entities, and by their own admission, at least 94% of the target
22   market in the Bay Area alone.  Defendants fail to justify either dissolving or increasing the bond.

23   **III.    There is No Basis for Enjoining CMC.**

24   Defendants' final argument—that the Court should enjoin CMC from contacting Branding
25   Boulevard's customers—is just childish and merits little discussion.  Defendants have not alleged
26   trade secret misappropriation or any other cause of action that could possibly form the basis of an
27   injunction against CMC.  CMC has never had any access to Defendants' trade secrets (and

28
                                                    –21–
OPPOSITION TO MOTION TO DISSOLVE                                    Case No. C 07-02748 MHP
PRELIMINARY INJUNCTION

Defendants do not contend otherwise) – indeed, despite Defendants' claim that there are no trade secrets in this industry, Defendants insisted on disclosing their non-CMC customers on an attorneys' eyes only basis.  There is nothing unreasonable or unfair about the current situation.[31]

## CONCLUSION

For the reasons discussed above, the Court should deny Defendants' motion and leave the preliminary injunction in place, unmodified, until the trial begins in less than a month from the hearing on the instant motion.  Defendants have already lost the preliminary injunction motion.  They are not entitled to a second bite at the apple before trial.

DATED:  March 17, 2008                    Respectfully submitted,

HARVEY SISKIND LLP

By: _____/s/_____
                           Seth I. Appel

Attorneys for Plaintiff and Counterdefendant
Mark Lillge d/b/a/ Creative Marketing Concepts

---

[31] Defendants' request that the Court issue the injunction against CMC without a bond (Mot., 16:19)—a requirement under F.R.C.P. 65(c), as Defendants well know—confirms that Defendants are simply wasting the Court's time.

–22–