# EXHIBIT D

**EXHIBIT D**

CONFIDENTIAL TESTIMONY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

---oOo---

MARK LILLGE d/b/a CREATIVE  )
MARKETING CONCEPTS,         )
                            )
                            )
              Plaintiff,    )
                            )
vs.                         )   No. C 07-02748 MHP
                            )
                            )
ANDREW VERITY and CHRISTINA )
CHANG,                      )
                            )
              Defendants.   )
_____)

CERTIFIED COPY

CONFIDENTIAL

DESIGNATED CONFIDENTIAL

Deposition of

MARK RAYMOND LILLGE

WEDNESDAY, JUNE 6, 2007

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

925-846-8831

Reported by:
DENISE WHEELER, CSR NO. 8254

1

CONFIDENTIAL TESTIMONY

1  this machine intact, and nobody is re-ghosting it or
2  anything like that?
3       MR. BOYD: That's -- that's my understanding.
4       MR. WARD: Okay.
5       Q. Do you ever yourself ask for your customer list to
6  be printed out for you or reported to you in any particular
7  format?
8       A. Yes.
9       Q. In what format do you ask for your customer list to
10 be provided to you?
11      A. Various ways. One would be alphabetically. One
12 would be by sales in descending order. Another would be by
13 product buys.
14          Those would be a few of the most primary ways I
15 would request that information.
16      Q. Is there anything about the way that the customer
17 list information is reported to you that you consider to be
18 confidential business information?
19      MR. BOYD: Are you referring to the arrangement of
20 the customer list?
21      MR. WARD: Yes.
22      Q. In other words, is there anything about how you ask
23 for it to be arranged into a report that you consider to be
24 unique and confidential to your business rather than that of
25 your competitors?

28

```
1       Q.  Okay.  And of the four days that you would be in
2   the office, about how many hours on average would you be in
3   the office on any given day?
4       A.  Six to nine.
5       Q.  Now, getting back to the issue of pricing, is it
6   correct that there -- when you -- strike that.  Let me back
7   up.
8           When you look at a catalog like this Bullet Line
9   catalog, there are suggested retail prices; is that correct?
10      A.  Yes.
11      Q.  Okay.  And those don't reflect what Creative
12  Marketing Concepts actually pays to the -- pays to the
13  manufacturer for that merchandise; is that correct?
14      A.  There's codes that tell us what the cost is.  And
15  then we get special pricing from some of the supplier
16  vendors of ours.
17      Q.  There are industry standard letter codes in these
18  catalogs with regard to pricing; isn't that correct?
19      A.  Correct.
20      Q.  And they establish a certain percentage of markup
21  for the distributor on these items; isn't that correct?
22      A.  Yes.
23      Q.  And those are industry standards for all
24  distributors who are selling branded merchandise in your
25  business; is that correct?
```

41

CONFIDENTIAL TESTIMONY

```
1     A.  Yes.
2     Q.  Okay.  Do some of your clients inform you that they
3  have a better price available from another distributor?
4     A.  Sometimes.
5     Q.  And so does Creative marketing Concepts --
6         THE COURT REPORTER:  Whoa, whoa.
7         (Pause in proceedings.)
8         MR. WARD:  Okay.  Can we resume?
9         THE COURT REPORTER:  (Nodding head)
10        MR. WARD:  Q.  So I believe the last question and
11 answer is I asked you whether sometimes Creative Marketing
12 Concepts' customers inform you that they have been quoted a
13 better price by a competitor?
14    A.  Yes.
15    Q.  And when a customer asks Creative Marketing
16 Concepts to provide a better price than the suggested retail
17 price that's been quoted to them, what is the procedure for
18 Creative Marketing Concepts, in that situation?
19    A.  So what's your hypothetical?  So we've quoted
20 somebody a job?
21    Q.  Well, let -- let's do this as a hypothetical:
22 Let's say that you've got a customer who wants travel mugs,
23 and you've told him that you can get this customer a
24 thousand of them for $3.25.  The customer says we want to be
25 able to buy it for $3.  We don't want to pay 3.25.
```

47

CONFIDENTIAL TESTIMONY

```
 1   price, and we've charged the other person at this client
 2   firm another price?
 3          There's a lot of -- how much do they like us is an
 4   important component to determining the price.
 5      Q.  These considerations that go into pricing for
 6   perfection, does Creative Marketing Concepts have a list
 7   somewhere that identifies what the components to pricing for
 8   perfection are?
 9      A.  We have a first draft, a working draft, that we've
10   introduced at a sales meeting to lay out the key -- the
11   initial key areas that we would want considered relative to
12   a prospect or a new -- or -- or an existing client.
13      Q.  Now, these considerations that go into pricing for
14   perfection, are they developed based on the relationship
15   between the sales rep and the customer contact?
16          MR. BOYD:  To clarify, are you referring to the --
17   the specific points that would be taken into account on --
18   on sort of a case-by-case basis?  Or are you referring to
19   the actual working draft document that Mr. Lillge is
20   referring to.
21          MR. WARD:  I'm not referring to the working draft.
22      Q.  I'm going back to some of the criteria that you
23   identified earlier --
24      A.  Yes.
25      Q.  -- for example, the time sensitiveness of the --
```

49

CONFIDENTIAL TESTIMONY

```
 1   Christina Chang was one of the top salespeople as Creative
 2   Marketing Concepts?
 3       A.  Yes.  Yes.
 4       Q.  So one of the circumstances your business has had
 5   to deal with over the last couple of months is the loss of a
 6   top salesperson in Christina Chang and the loss of your
 7   operations manager Andy Verity?
 8       A.  Correct.
 9       Q.  And can you attribute, in your mind, what among the
10   discernible drop in sales since their departure is
11   attributable to competitive loss in the marketplace versus
12   simply having lost two key employees who you haven't
13   replaced yet?
14       A.  No -- no way to measure that.
15       Q.  Okay.  Now, I want to turn specifically to
16   something you told me about in terms of when you identify a
17   product out of one of these catalogs for your customers.
18           And one of the things that you told me in the first
19   session of your deposition is that when you write the
20   invoice for that client, you do not identify specifically
21   the type of merchandise.
22           And by that I mean when we went through the example
23   of the Calder mug, you would not identify to the client that
24   it is a Calder mug from the Bullet Line catalog; is that
25   correct?
```

The Souza Group
(925) 846-8831

<pre>
</pre>

```
 1                    UNITED STATES DISTRICT COURT
 2                   NORTHERN DISTRICT OF CALIFORNIA
 3                       SAN FRANCISCO DIVISION
 4    - - - - - - - - - - - - - - - - - - -
 5    MARK LILLGE d/b/a CREATIVE MARKETING   )
 6    CONCEPTS,                              )    Case No.
 7              Plaintiff,                   )    C07-02748
 8    V.                                     )
 9    ANDREW VERITY and CHRISTINA CHANG,     )
10              Defendants.                  )
11    - - - - - - - - - - - - - - - - - - -
12    AND RELATED CROSS-ACTION.              )
13    - - - - - - - - - - - - - - - - - - -
14
15           VIDEOTAPED DEPOSITION OF MARK LILLGE
16               TUESDAY, FEBRUARY 12, 2008
17               PAGES 236 - 321; VOLUME 3
18
19                                           DOCKET
                                           FEB 19 2008
20
21                          BEHMKE REPORTING & VIDEO SERVICES
22              BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR
23                              160 SPEAR STREET, SUITE 300
24                              SAN FRANCISCO, CALIFORNIA 94105
25                                          (415) 597-5600
```

236

```
 1                TUESDAY, FEBRUARY 12, 2008; 10:19 A.M.
 2
 3         THE VIDEOGRAPHER:  Here begins DVD No. 5 in the
 4    deposition of Mark Lillge in the matter of Mark
 5    Lillge vs. Andrew Verity and Christina Chang, in the
 6    United States District Court, Northern District of
 7    California, San Francisco Division, Case No.
 8    C07-02748.
 9         Today's date is February 12th, 2008.  The
10    time on the video monitor is 10:19 a.m.
11         The video operator today is Brian Monroe,
12    notary public, employed by Behmke Reporting & Video
13    Services, located at 160 Spear Street, Suite 300,
14    San Francisco, California.
15         This video deposition is taking place at One
16    Maritime Plaza, 18th Floor, San Francisco, California
17    and was noticed by Robert Charles Ward, Esquire, of
18    Shartsis Friese, LLP.
19         Counsel, please voice identify yourselves
20    and state whom you represent.
21         MR. WARD:  Robert Ward of Shartsis Friese on
22    behalf of Andrew Verity and Christina Chang.
23         MR. BOYD:  Ian Boyd on behalf of the plaintiff,
24    Mark Lillge, d/b/a Creative Marketing Concepts.
25         THE VIDEOGRAPHER:  The court reporter today is
```

243

1   Christine Jordan, certified shorthand reporter
2   contracted by Behmke Reporting & Video Services.
3        And would all others present please state
4   your name for the record.
5        MR. VERITY:  Andrew Verity.
6        THE VIDEOGRAPHER:  Would the court reporter
7   please swear in the witness.
8
9                    MARK LILLGE,
10  having been first duly sworn, was examined and further
11  testified as follows:
12       THE WITNESS:  I do.
13       THE VIDEOGRAPHER:  Please begin.
14                 EXAMINATION RESUMED
15  BY MR. WARD:
16       Q.   Mr. Lillge, you recall that you've testified
17  twice previously in this case?
18       A.   Yes.
19       Q.   Is there any reason, whether medical or under
20  the influence of any substances, that you cannot give
21  your best testimony today?
22       A.   No.
23       Q.   Have you reviewed your prior testimony?
24       A.   No.
25       Q.   Based on your recollection of your prior

244

```
 1        MR. BOYD:  Okay.
 2        THE REPORTER:  Exhibit 7.
 3            (Lillge Exhibit 7 was marked for
 4            identification.)
 5  BY MR. WARD:
 6   * Q.  Mr. Lillge, take a look at Exhibit 7 and
 7  tell me if you terminated Mr. Verity because he
 8  wouldn't sign this agreement.
 9            (The witness reviews the document.)
10        THE WITNESS:  So, I'm going to need a few minutes
11  to read this.
12            So the fast answer, to answer your question,
13  and -- so I'm acting in the spirit in which how these
14  sessions are conducted, so no is the answer.
15            And I would now like time with my counsel,
16  please.
17        MR. WARD:  Sure.
18        THE VIDEOGRAPHER:  Going off the record.  The
19  time is 10:38 a.m.
20            (Off the record.)
21        THE VIDEOGRAPHER:  We're back on the record.  The
22  time is 10:44 a.m.
23            Please begin.
24        MR. BOYD:  Having had a chance to review
25  Exhibit 7, this appears to be an attempt to settle
```

258

1  the dispute between Mr. Verity and Mr. Lillge so I'm
2  going to instruct Mr. Lillge not to answer any
3  questions regarding the document and, indeed, we
4  don't think it should be submitted into evidence.
5      MR. WARD:  All right.  Well, we strenuously
6  disagree --
7      MR. BOYD:  Sure.
8      MR. WARD:  -- because we think it is the reason
9  why Mr. Verity was fired.  It was before this lawsuit
10 arose.  We think that the entire trade secrets claim
11 is pretext for this plaintiff, Mr. Lillge, not
12 wanting to pay Mr. Verity what he was owed.  And so
13 we will get into this, and we will make the
14 appropriate motion if we have to.
15          And let's mark this next document as
16 Exhibit 8.
17          (Lillge Exhibit 8 was marked for
18           identification.)
19      THE WITNESS:  Mr. Verity wanted to say something
20 to me, it seems like.
21      MR. WARD:  Mr. Lillge, you only respond to
22 questions from me or directions --
23      THE WITNESS:  Then ask --
24      MR. WARD:  -- from your counsel.  You do not
25 engage in provocative behavior at deposition.

```
 1        THE WITNESS:  Then ask your client to not lip
 2   read to me, please -- lip talk to me, okay?
 3        MR. WARD:  If you wish to raise that issue, you
 4   may do so with --
 5        THE WITNESS:  I just did.
 6        MR. WARD:  -- your counsel.  You may do so with
 7   your counsel.
 8             Please take a look at Exhibit 8.
 9             (The witness reviews the document.)
10        MR. BOYD:  I'll reiterate the same objection to
11   Exhibit 8 as to Exhibit 7.
12        MR. WARD:  The objection is noted.  We disagree.
13             (The witness reviews the document.)
14        MR. BOYD:  Duly noted.
15        THE WITNESS:  Are we going to move forward with
16   this document or not?
17        MR. BOYD:  (Indicating.)
18        THE WITNESS:  Sorry?
19        MR. BOYD:  Wait.  Just wait, see.
20   BY MR. WARD:
21        Q.   When you're ready, I -- my first question is:
22   Do you know whether the attachment to Exhibit 8 --
23        A.   I need to finish reading this, then, if
24   we're --
25        THE WITNESS:  I didn't know if we're going to be
```

```
 1  talking about this.
 2       MR. BOYD:  It depends on what the question is.
 3       THE WITNESS:  Oh.
 4       MR. BOYD:  So go ahead and review it.
 5  BY MR. WARD:
 6       Q.  The first question is going to be whether the
 7  attachment to this e-mail -- you see that there's a 126
 8  kilobyte attachment that's referred to in an e-mail
 9  entitled "Final Offer" -- is in fact the agreement that
10  was marked as Exhibit 7.
11       A.  I wouldn't know.
12  *    Q.  Okay.
13           And my next question will relate to the
14  e-mail that you sent to Andy Verity that begins
15  toward the middle of the first page.  And I will be
16  asking you about things that appear on the second
17  page so read as much of this as you want.
18       MR. BOYD:  Again, I think that it's inappropriate
19  to ask Mr. Lillge questions about what was a
20  settlement proposal, and this clearly appears to be a
21  settlement communication so I'm going to instruct him
22  not to answer any questions about this document.
23       MR. WARD:  Well, my intent is to ask Mr. Lillge
24  about why he terminated the employment of Andy Verity
25  so why don't we look at that.
```

1    MR. BOYD: Well, you've asked him that question
2  several times already, but I don't believe this
3  document is an appropriate document to ask Mr. Lillge
4  questions about.
5    MR. WARD: Well --
6    MR. BOYD: The purpose of a settlement
7  communication is to try to get the parties to address
8  in good faith a resolution, not to have it used
9  against them later in an evidentiary hearing.
10 BY MR. WARD:
11   Q.  Well, let's take a look at the third paragraph
12 on the last page of this exhibit -- or, excuse me, the
13 second page of this exhibit where Mr. Lillge writes, "If
14 you do not accept this Agreement by 12 o'clock noon on
15 Friday, April 27, I will have no choice but to terminate
16 your employment at the end of the day." That's what I
17 want to focus on.
18      Do you see that statement by you,
19 Mr. Lillge?
20   A.  I do.
21   Q.  Did you write those words in this e-mail?
22   THE WITNESS: So, again, this is in the --
23   MR. BOYD: Yeah.
24   THE WITNESS: -- the spirit of the settlement.
25 So I don't understand how we should be talking about

```
 1   this.
 2   BY MR. WARD:
 3      * Q.   Well, Mr. Lillge, what I'm trying to figure
 4   out is why you fired Mr. Verity.  And you claim you
 5   didn't, and yet here's an e-mail from you saying, "I
 6   will terminate your employment on Friday, April 27,
 7   if you don't agree to this settlement agreement."
 8   And it also happens to be that his employment was
 9   terminated on April 27.
10           So a reasonable reader would read your words
11   and conclude that you fired Mr. Verity because he
12   wouldn't sign this agreement.  Tell me where I'm
13   wrong.
14      MR. BOYD:  I don't think Mr. Lillge has any
15   obligation to tell you where you're wrong.
16      MR. WARD:  Okay.  Well, if you're instructing him
17   not to answer, we'll take this up with Judge Patel.
18      MR. BOYD:  Sure.  I'm instructing him not to
19   answer.  It's a settlement communication.
20   BY MR. WARD:
21      Q.   Oh, I am obligated to ask you whether you're
22   going to follow your attorney's instruction.
23      A.   Yes.  Of course.
24      Q.   Now, I'm not going to ask you about the
25   particulars of it because it was marked attorneys' eyes
```