# EXHIBIT D

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
---oOo---

MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,

Plaintiff,

vs.

ANDREW VERITY and CHRISTINA CHANG,

Defendants.

CERTIFIED COPY

No. C 07-02748 MHP

CONFIDENTIAL

DESIGNATED CONFIDENTIAL
Deposition of
MARK RAYMOND LILLGE
WEDNESDAY, JUNE 6, 2007

THE SOUZA GROUP
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566
925-846-8831

Reported by:
DENISE WHEELER, CSR NO. 8254

this machine intact, and nobody is re-ghosting it or anything like that?

MR. BOYD: That's -- that's my understanding.

MR. WARD: Okay.

Q. Do you ever yourself ask for your customer list to be printed out for you or reported to you in any particular format?

A. Yes.

Q. In what format do you ask for your customer list to be provided to you?

A. Various ways. One would be alphabetically. One would be by sales in descending order. Another would be by product buys.

Those would be a few of the most primary ways I would request that information.

Q. Is there anything about the way that the customer list information is reported to you that you consider to be confidential business information?

MR. BOYD: Are you referring to the arrangement of the customer list?

MR. WARD: Yes.

Q. In other words, is there anything about how you ask for it to be arranged into a report that you consider to be unique and confidential to your business rather than that of your competitors?

Q. Okay. And of the four days that you would be in the office, about how many hours on average would you be in the office on any given day?

A. Six to nine.

Q. Now, getting back to the issue of pricing, is it correct that there -- when you -- strike that. Let me back up.

When you look at a catalog like this Bullet Line catalog, there are suggested retail prices; is that correct?

A. Yes.

Q. Okay. And those don't reflect what Creative Marketing Concepts actually pays to the -- pays to the manufacturer for that merchandise; is that correct?

A. There's codes that tell us what the cost is. And then we get special pricing from some of the supplier vendors of ours.

Q. There are industry standard letter codes in these catalogs with regard to pricing; isn't that correct?

A. Correct.

Q. And they establish a certain percentage of markup for the distributor on these items; isn't that correct?

A. Yes.

Q. And those are industry standards for all distributors who are selling branded merchandise in your business; is that correct?

A. Yes.
Q. Okay. Do some of your clients inform you that they have a better price available from another distributor?
A. Sometimes.
Q. And so does Creative marketing Concepts --
THE COURT REPORTER: Whoa, whoa.
(Pause in proceedings.)
MR. WARD: Okay. Can we resume?
THE COURT REPORTER: (Nodding head)
MR. WARD: Q. So I believe the last question and answer is I asked you whether sometimes Creative Marketing Concepts' customers inform you that they have been quoted a better price by a competitor?
A. Yes.
Q. And when a customer asks Creative Marketing Concepts to provide a better price than the suggested retail price that's been quoted to them, what is the procedure for Creative Marketing Concepts, in that situation?
A. So what's your hypothetical? So we've quoted somebody a job?
Q. Well, let -- let's do this as a hypothetical: Let's say that you've got a customer who wants travel mugs, and you've told him that you can get this customer a thousand of them for $3.25. The customer says we want to be able to buy it for $3. We don't want to pay 3.25.

price, and we've charged the other person at this client firm another price?

There's a lot of -- how much do they like us is an important component to determining the price.

Q. These considerations that go into pricing for perfection, does Creative Marketing Concepts have a list somewhere that identifies what the components to pricing for perfection are?

A. We have a first draft, a working draft, that we've introduced at a sales meeting to lay out the key -- the initial key areas that we would want considered relative to a prospect or a new -- or -- or an existing client.

Q. Now, these considerations that go into pricing for perfection, are they developed based on the relationship between the sales rep and the customer contact?

MR. BOYD: To clarify, are you referring to the -- the specific points that would be taken into account on -- on sort of a case-by-case basis? Or are you referring to the actual working draft document that Mr. Lillge is referring to.

MR. WARD: I'm not referring to the working draft.

Q. I'm going back to some of the criteria that you identified earlier --

A. Yes.

Q. -- for example, the time sensitiveness of the --

Christina Chang was one of the top salespeople as Creative Marketing Concepts?

A. Yes. Yes.

Q. So one of the circumstances your business has had to deal with over the last couple of months is the loss of a top salesperson in Christina Chang and the loss of your operations manager Andy Verity?

A. Correct.

Q. And can you attribute, in your mind, what among the discernible drop in sales since their departure is attributable to competitive loss in the marketplace versus simply having lost two key employees who you haven't replaced yet?

A. No -- no way to measure that.

Q. Okay. Now, I want to turn specifically to something you told me about in terms of when you identify a product out of one of these catalogs for your customers.

And one of the things that you told me in the first session of your deposition is that when you write the invoice for that client, you do not identify specifically the type of merchandise.

And by that I mean when we went through the example of the Calder mug, you would not identify to the client that it is a Calder mug from the Bullet Line catalog; is that correct?

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - - - -

MARK LILLGE d/b/a CREATIVE MARKETING )
CONCEPTS, ) Case No.
Plaintiff, ) C07-02748
V. )
ANDREW VERITY and CHRISTINA CHANG, )
Defendants. )

- - - - - - - - - - - - - - - - - - - -

AND RELATED CROSS-ACTION. )

- - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MARK LILLGE

TUESDAY, FEBRUARY 12, 2008

PAGES 236 - 321; VOLUME 3

DOCKET
FEB 19 2008

BEHMKE REPORTING & VIDEO SERVICES
BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR
160 SPEAR STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94105
(415) 597-5600

FEB 12 2008 10:22:15

TUESDAY, FEBRUARY 12, 2008; 10:19 A.M.

THE VIDEOGRAPHER: Here begins DVD No. 5 in the deposition of Mark Lillge in the matter of Mark Lillge vs. Andrew Verity and Christina Chang, in the United States District Court, Northern District of California, San Francisco Division, Case No. C07-02748.

Today's date is February 12th, 2008. The time on the video monitor is 10:19 a.m.

The video operator today is Brian Monroe, notary public, employed by Behmke Reporting & Video Services, located at 160 Spear Street, Suite 300, San Francisco, California.

This video deposition is taking place at One Maritime Plaza, 18th Floor, San Francisco, California and was noticed by Robert Charles Ward, Esquire, of Shartsis Friese, LLP.

Counsel, please voice identify yourselves and state whom you represent.

MR. WARD: Robert Ward of Shartsis Friese on behalf of Andrew Verity and Christina Chang.

MR. BOYD: Ian Boyd on behalf of the plaintiff, Mark Lillge, d/b/a Creative Marketing Concepts.

THE VIDEOGRAPHER: The court reporter today is

Christine Jordan, certified shorthand reporter contracted by Behmke Reporting & Video Services.

And would all others present please state your name for the record.

MR. VERITY: Andrew Verity.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

MARK LILLGE,

having been first duly sworn, was examined and further testified as follows:

THE WITNESS: I do.

THE VIDEOGRAPHER: Please begin.

EXAMINATION RESUMED

BY MR. WARD:

Q. Mr. Lillge, you recall that you've testified twice previously in this case?

A. Yes.

Q. Is there any reason, whether medical or under the influence of any substances, that you cannot give your best testimony today?

A. No.

Q. Have you reviewed your prior testimony?

A. No.

Q. Based on your recollection of your prior

MR. BOYD: Okay.

THE REPORTER: Exhibit 7.

(Lillge Exhibit 7 was marked for identification.)

BY MR. WARD:

* Q. Mr. Lillge, take a look at Exhibit 7 and tell me if you terminated Mr. Verity because he wouldn't sign this agreement.

(The witness reviews the document.)

THE WITNESS: So, I'm going to need a few minutes to read this.

So the fast answer, to answer your question, and -- so I'm acting in the spirit in which how these sessions are conducted, so no is the answer.

And I would now like time with my counsel, please.

MR. WARD: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 10:38 a.m.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:44 a.m.

Please begin.

MR. BOYD: Having had a chance to review Exhibit 7, this appears to be an attempt to settle

the dispute between Mr. Verity and Mr. Lillge so I'm going to instruct Mr. Lillge not to answer any questions regarding the document and, indeed, we don't think it should be submitted into evidence.

MR. WARD: All right. Well, we strenuously disagree --

MR. BOYD: Sure.

MR. WARD: -- because we think it is the reason why Mr. Verity was fired. It was before this lawsuit arose. We think that the entire trade secrets claim is pretext for this plaintiff, Mr. Lillge, not wanting to pay Mr. Verity what he was owed. And so we will get into this, and we will make the appropriate motion if we have to.

And let's mark this next document as Exhibit 8.

(Lillge Exhibit 8 was marked for identification.)

THE WITNESS: Mr. Verity wanted to say something to me, it seems like.

MR. WARD: Mr. Lillge, you only respond to questions from me or directions --

THE WITNESS: Then ask --

MR. WARD: -- from your counsel. You do not engage in provocative behavior at deposition.

THE WITNESS: Then ask your client to not lip read to me, please -- lip talk to me, okay?

MR. WARD: If you wish to raise that issue, you may do so with --

THE WITNESS: I just did.

MR. WARD: -- your counsel. You may do so with your counsel.

Please take a look at Exhibit 8.

(The witness reviews the document.)

MR. BOYD: I'll reiterate the same objection to Exhibit 8 as to Exhibit 7.

MR. WARD: The objection is noted. We disagree.

(The witness reviews the document.)

MR. BOYD: Duly noted.

THE WITNESS: Are we going to move forward with this document or not?

MR. BOYD: (Indicating.)

THE WITNESS: Sorry?

MR. BOYD: Wait. Just wait, see.

BY MR. WARD:

Q. When you're ready, I -- my first question is: Do you know whether the attachment to Exhibit 8 --

A. I need to finish reading this, then, if we're --

THE WITNESS: I didn't know if we're going to be

talking about this.

MR. BOYD: It depends on what the question is.

THE WITNESS: Oh.

MR. BOYD: So go ahead and review it.

BY MR. WARD:

Q. The first question is going to be whether the attachment to this e-mail -- you see that there's a 126 kilobyte attachment that's referred to in an e-mail entitled "Final Offer" -- is in fact the agreement that was marked as Exhibit 7.

A. I wouldn't know.

* Q. Okay.

And my next question will relate to the e-mail that you sent to Andy Verity that begins toward the middle of the first page. And I will be asking you about things that appear on the second page so read as much of this as you want.

MR. BOYD: Again, I think that it's inappropriate to ask Mr. Lillge questions about what was a settlement proposal, and this clearly appears to be a settlement communication so I'm going to instruct him not to answer any questions about this document.

MR. WARD: Well, my intent is to ask Mr. Lillge about why he terminated the employment of Andy Verity so why don't we look at that.

MR. BOYD: Well, you've asked him that question several times already, but I don't believe this document is an appropriate document to ask Mr. Lillge questions about.

MR. WARD: Well --

MR. BOYD: The purpose of a settlement communication is to try to get the parties to address in good faith a resolution, not to have it used against them later in an evidentiary hearing.

BY MR. WARD:

Q. Well, let's take a look at the third paragraph on the last page of this exhibit -- or, excuse me, the second page of this exhibit where Mr. Lillge writes, "If you do not accept this Agreement by 12 o'clock noon on Friday, April 27, I will have no choice but to terminate your employment at the end of the day." That's what I want to focus on.

Do you see that statement by you, Mr. Lillge?

A. I do.

Q. Did you write those words in this e-mail?

THE WITNESS: So, again, this is in the --

MR. BOYD: Yeah.

THE WITNESS: -- the spirit of the settlement. So I don't understand how we should be talking about

this.

BY MR. WARD:

* Q. Well, Mr. Lillge, what I'm trying to figure out is why you fired Mr. Verity. And you claim you didn't, and yet here's an e-mail from you saying, "I will terminate your employment on Friday, April 27, if you don't agree to this settlement agreement." And it also happens to be that his employment was terminated on April 27.

So a reasonable reader would read your words and conclude that you fired Mr. Verity because he wouldn't sign this agreement. Tell me where I'm wrong.

MR. BOYD: I don't think Mr. Lillge has any obligation to tell you where you're wrong.

MR. WARD: Okay. Well, if you're instructing him not to answer, we'll take this up with Judge Patel.

MR. BOYD: Sure. I'm instructing him not to answer. It's a settlement communication.

BY MR. WARD:

Q. Oh, I am obligated to ask you whether you're going to follow your attorney's instruction.

A. Yes. Of course.

Q. Now, I'm not going to ask you about the particulars of it because it was marked attorneys' eyes