UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

                 Plaintiff,

     v.

ANDREW VERITY and CHRISTINA
CHANG,

                 Defendants.

_____/

AND RELATED COUNTERCLAIMS.

_____/

No. C 07-02748 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiff's Motion for Partial**
**Summary Judgment; Plaintiff's Motion**
**for an Order to Show Cause Regarding**
**Contempt**

      On May 25, 2007 plaintiff Mark Lillge ("Lillge") d/b/a Creative Marketing Concepts ("CMC") brought this action against defendants Andrew Verity and Christina Chang asserting claims for misappropriation of trade secrets, unfair competition, unjust enrichment and intentional interference with prospective economic advantage.  On July 6, 2007 defendants answered and counterclaimed.  Now before the court is plaintiff's motion for partial summary judgment and plaintiff's motion for an order to show cause regarding contempt.  Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

Motion for Partial Summary Judgment

I.       BACKGROUND

      CMC is a full-service advertising specialty and corporate apparel firm that sells businesses goods branded with the business' corporate logo.  Joint Statement of Undisputed Facts ("JSUF"),

UNITED STATES DISTRICT COURT
For the Northern District of California

¶ 2.  CMC typically spends approximately five percent of its annual gross revenue, or $200,000, on marketing efforts to assist in developing its customer base.  Id., ¶ 7.  CMC's customer list and specific customer information are not developed by its sales personnel; rather, CMC independently develops this information and distributes it as necessary to its sales personnel.  Lillge Dec., ¶ 3.

This information includes, but is not limited to: 1) contact information for certain customers, including key decision makers who CMC knows actually buy its products; 2) purchasing history of certain customers and respective sales volume, including the knowledge of when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; 3) knowledge of CMC's customers' particular requirements and buying habits, including needs, likes, dislikes and limitations; and 4) what CMC charges its customers.  Id., ¶ 4.

In order to protect this confidential information, CMC provides its employees with an employee handbook that highlights the importance of protecting its trade secrets.  JSUF, ¶ 11.  The handbook sets forth rules addressing the issue of trade secret theft, such as a prohibition on taking home customer files or forwarding company emails without prior written authorization.  Id., ¶ 12.  It states that "CMC policy is that the company has invested significant resources to make contact with actual and potential clients. You will be required to sign a non-solicitation agreement to cover these relationships." Lillge Dec., Exh. A.  The provisions contained in the handbook applied to everyone at CMC.  JSUF, ¶¶ 14–15.

CMC also takes four additional steps to ensure confidentiality.  First, CMC requires every employee to sign an agreement that he or she will not improperly use CMC confidential information or solicit CMC's customers for up to two years after conclusion of their employment with CMC.  Lillge Dec., ¶ 6, Exh. B.  Second, CMC undertakes efforts to ensure that CMC's competitors do not learn what specific types and models of products are purchased by CMC by actively taking steps to preclude its suppliers from displaying samples of CMC customer orders at industry trade shows.  Id., ¶ 9.  Third, CMC does not permit its suppliers to produce any overruns.  Its purchase orders state: "Client does not want over-run pieces to be used and/or distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior written consent." Id., Exh. D.  Fourth, CMC maintains separate shredding bins for proprietary materials, consistently shreds proprietary

2

UNITED STATES DISTRICT COURT
For the Northern District of California

documents and frequently converses with its employees both verbally and in writing about the need

for this information to be confidential.  Id., ¶ 7, Exh. C (defendant Chang confirming the shredding

policy).  Nevertheless, it appears that the identity of many of CMC's customers and the items they

purchase is available to the public via a visit to CMC's office and through its catalogues, which

contain either samples or pictures of samples of CMC's work.  See generally Schmolder Dec.

        In April 2001 CMC hired Andrew Verity as Sales Manager.  JSUF, ¶ 19.  In January 2005 it

hired Christina Chang, Mr. Verity's wife.  Id., ¶ 20.  Ms. Chang started in accounting where she had

access to customer account information.  Id., ¶ 21.  The following year, Ms. Chang transitioned to

sales.  At all times Ms. Chang was an at-will employee.  Id., ¶ 22.

        Mr. Lillge asked Mr. Verity to acquire signatures of all CMC employees on a confidentiality

agreement.  This agreement contained the following clause:

> (b)Non-Solicitation of Customers, Vendors and Suppliers.  For a period of twenty-
> four (24) months from the date of termination of my employment with the Company
> for any reason, I shall not, either directly or indirectly, as a principal, agent,
> contractor, employee, employer, partner or shareholder (other than as an owner of 2%
> or less of a public corporation) or in any other capacity, either solicit or engage in the
> business engaged in by the Company as of the date of termination of my employment
> ('CMC Business') with any current or prospective client, vendor or supplier which
> was a current or prospective client, vendor or supplier, of the Company within the
> twelve (12) months immediately preceding my termination.

Lillge Dec., Exh. B.  Mr. Verity embarked upon this venture despite his misgivings.  Verity Dec.,

¶ 2.  Specifically, he was concerned about the legality of the above provision.  He discussed the

same with CMC's lawyer and the lawyer stated:

> All of this said, there is a fine line between a non-Solicitation Clause and a Non-
> Compete Clause.  Non-compete provisions are not enforceable in California, while
> non-solicitation clauses are often enforceable.  I say 'often' because the case law is
> not completely consistent on the enforceability of non-solicitation clauses, but they
> are the best you can do.  I always recommend them because, at a minimum, they
> generally deter former employees from soliciting current customers and employees
> and, if push comes to shove, the clause is in the agreement and must be
> addressed/overcome by the former employee in a dispute (i.e., the fact that the
> employee agreed to the restriction can always be raised before the court / arbitrator).

Id., Exh. 1.[1]

        In April 2007 CMC fired Mr. Verity.  Id., ¶ 5.  Upon Mr. Verity's departure, CMC was

unable to locate the confidentiality agreements that had been signed by its employees.  Id., Exh. E.

3

UNITED STATES DISTRICT COURT
For the Northern District of California

After Mr. Verity's departure, CMC asked Ms. Chang to sign a confidentiality agreement. JSUF, ¶ 23.  Ms. Chang refused and CMC terminated her on May 11, 2007.  Id., ¶¶ 24–25.  At the time of her departure, she advised CMC of certain customer information she had developed.  For instance, she went through her corporate client list and advised Mr. Lillge of the key buyers at each client and their individual preferences.  Boyd Dec., Exh. B at 46:22–48:16.  Based on her personal knowledge, she testified that one of her clients would likely need to place an order in June that would be "easily $15,000.  It's a no-brainer."  Id.

At the time of their firings, defendants were responsible for about a third of CMC's sales, approximately $1.65 million.  Verity Dec., ¶ 8.  Shortly thereafter, Mr. Verity and Ms. Chang started their own promotional products business known as Branding Boulevard, which has achieved sales of $600,000 in the nine months it has been operative.[2]  Id.

Plaintiff filed this action on May 25, 2007, shortly after learning of defendants' new business.  On June 1, 2007 this court entered a temporary restraining order against defendants.  See Docket No. 15.  Since leaving CMC, defendants have made sales to customers who formerly did business with CMC.  JSUF, ¶ 26.  They first disclosed the identities of these customers to CMC at their depositions on July 24, 2007.  They subsequently produced documentation regarding the transactions with former CMC customers.  Boyd Dec., ¶ 6.  On October 1, 2007 this court issued a preliminary injunction against defendants.  See Docket No. 61.  On November 13, 2007 this court entered an order confirming the scope of the temporary restraining order and preliminary injunction.  See id., No. 75.

Plaintiff now moves for summary judgment as to defendants' fifth, sixth, seventh, eighth, tenth and eleventh causes of action against CMC.[3]

II.      Legal Standard

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

4

1    genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

2    party. Id. The party moving for summary judgment bears the burden of identifying those portions

3    of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material

4    fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party

5    will have the burden of proof at trial, the moving party need only point out "that there is an absence

6    of evidence to support the nonmoving party's case." Id.

7        Once the moving party meets its initial burden, the nonmoving party must go beyond the

8    pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

9    genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

10    party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The

11    court may not make credibility determinations, and inferences to be drawn from the facts must be

12    viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker

13    Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

14

15    III.    Discussion

16        A.    Wrongful Termination; Business and Professions Code section 17200

17        The parties' dispute focuses on whether the agreement CMC asked its employees to sign as a

18    condition of continued employment unlawfully restricted the employees' post-termination right to

19    compete. The agreement stated, *inter alia*, "I shall not [for a period of two years] . . . solicit or

20    engage in the business engaged in by the Company as of the date of termination of my employment

21    . . . with any current or prospective client [of CMC] . . . within the twelve (12) months immediately

22    preceding my termination." Plaintiff admits that "[f]or purposes of this motion, CMC is not

23    disputing that Ms. Chang was fired for her refusal to sign the confidentiality agreement."[4]

24    See Plaintiff's Motion for Partial Summary Judgment, Docket No. 81 at 8 n. 26.

25        Defendant's argument that this provision is a wholesale restraint forbidding Chang from

26    working in the same business is simply untrue. Nevertheless, the "engage in" language could

27    arguably be void under California law as it disallows CMC's clients from choosing to do business

28    with Branding Boulevard. The question then becomes whether plaintiff's act of firing defendant

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Chang for refusing to sign the six-page agreement with multiple other provisions, including

2  protections of trade secrets, was illegal.  If plaintiff can establish that he has even one piece of

3  information that can qualify as a trade secret, then he would be justified in asking his employees to

4  adhere to a limited non-compete agreement that disallows using that trade secret for the employees'

5  personal benefit.

6      In order to establish that it has trade secrets, CMC must meet a two-part test. California has

7  adopted the Uniform Trade Secrets Act ("UTSA"), which defines a trade secret as follows:

8      'Trade secret' means information, including a formula, pattern, compilation, program,
       device, method, technique, or process, that:
9      (1) Derives independent economic value, actual or potential, from not being generally
       known to the public or to other persons who can obtain economic value from its
10     disclosure or use; and
       (2) Is the subject of efforts that are reasonable under the circumstances to maintain its
11     secrecy.

12  Cal. Civ. Code § 3426.1(d).

13     The parties devote most of their argument to whether defendants have admitted that plaintiff

14  possesses trade secrets.  See Fed. R. Civ. P. 8(d); Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th

15  Cir. 1980).  This court, however, does not find an admission on the part of defendants regarding the

16  trade secret issue merely because they admitted the following paragraph in the complaint:

17     While the fact that many of CMC's actual customers might be willing to purchase
       promotional goods is information possibly available to CMC's competitors, there are
18     many details regarding CMC's relationships with its customers which are not
       generally known to the public or CMC's competitors, and CMC derives independent
19     economic value from this information which it has developed through substantial
       time, effort and expense.

20
    JSUF, ¶ 10; see also Answer, ¶ 9.  Other than this purported admission, defendants have consistently
21
    and vehemently maintained that plaintiff does not possess any trade secrets.  See, e.g., Answer, ¶ 11
22
    (denying the existence of confidential information).
23
       As this court found in the order granting the preliminary injunction, California courts have
24
    held that confidential customer information beyond the identities of customers may constitute a trade
25
    secret.  See Docket No. 61; Western Electroplating Co. v. Henness, 180 Cal. App. 2d 442, 445
26
    (1960) ("[t]he value of the various accounts of customers and knowledge of the amount of business
27
    transacted by and between said customers and plaintiff did constitute secret information of
28

6

1    plaintiff."). The court further held that knowledge of customer preferences and characteristics that

2    would aid the plaintiff in securing and retaining business were sufficient to secure protection against

3    the use of the information by a former employee. Id. at 448; see also Courtesy Temp. Serv., Inc. v.

4    Camacho, 222 Cal. App. 3d 1278, 1288 (1990) (holding that a company's customer list and related

5    proprietary information consisting of "billing rates, key contacts, specialized requirements and

6    markup rates" met the first prong).

7         The information maintained by plaintiff—key decision makers at the client, purchasing

8    history, pricing, sales volume, when to contact client for replenishment and the client's particular

9    requirements and buying habits, including needs, likes, dislikes, and limitations—which is not

10   generally available, pertains to the value to CMC of the promotional product customers. See

11   Thompson v. Impaxx, Inc., 113 Cal. App. 4th 1425, 1429 (2003) ("'the list of customers, not

12   ordinarily entitled to judicial protection, may become a trade secret, if there is confidential

13   information concerning the value of these customers.'") (citing Gordon v. Schwartz, 147 Cal. App.

14   2d 213, 217 (1956)).

15        The information maintained by CMC is exactly the type of information intended to be

16   protected by California trade secret law. For example, the information Ms. Chang gave Mr. Lillge

17   upon her departure could qualify as trade secrets. She specifically notified Mr. Lillge as to a client

18   that would need replenishment to the tune of $15,000 at a specific time. There can be no doubt that

19   whatever value this information possesses is solely based on the fact that it is not generally known to

20   the public. For instance, other persons, such as CMC's competitors, could obtain economic value

21   from knowledge of this information because they could solicit CMC's clients immediately prior to

22   when CMC was intending to contact those clients. However, if this information was generally

23   known, nobody in the promotional products industry would have an advantage. Thus, the first prong

24   is met—plaintiff is able to demonstrate that he possesses at least some information from which he

25   derives independent economic value due to its secrecy. The court now turns to whether reasonable

26   efforts were undertaken to maintain secrecy of this information.

27        In light of the various safeguards undertaken by CMC—rules regarding computer files and

28   emails, confidentiality agreements, shredding bins and preclusion of suppliers displaying

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1    samples—the second prong is easily met.  This is further buttressed by a California court of appeal

2    decision finding reasonable efforts at secrecy under similar circumstances:

3        [T]here is no doubt that [the employer] intended its customer information to remain
         secret and undertook reasonable steps to secure that end. . . . [C]ustomer information
4        was stored on computer [sic] with restricted access.  Moreover, in its employment
         contract signed by [the employee], [the employer] included a confidentiality
5        provision expressly referring to its customer names and telephone numbers.  The
         [employer's] employee handbook contained an express statement that employees
6        shall not use or disclose [the employer's] secrets or confidential information
         subsequent to their employment including 'lists of present and future customers.'

7    Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1523 (1997).  The efforts at secrecy here were

8    far greater.

9        Finding that CMC does in fact have at least some trade secrets, the court must now determine

10   whether plaintiff may protect them via an agreement with an arguably anti-competitive provision.  In

11   Metro Traffic Control, Inc. v. Shadow Traffic Network, the California Court of Appeal dealt with a

12   similar situation.  22 Cal. App. 4th 853 (1994).   When discussing a one-year non-compete clause

13   and a prohibition on disclosure of trade secrets for two years, the court held:

14       The merit of [the employer's] claim depends on its ability to demonstrate that it has a
         protectible trade secret. Business and Professions Code section 16600 prohibits the
15       enforcement of [the employer's] noncompete clause except as is necessary to protect
         trade secrets.  One commentator closes this analytical circle neatly: 'Any attempt to
16       restrict competition by the former employee by contract appears likely to be doomed
         under section 16600 of the Business and Professions Code, unless the restriction is
17       carefully limited and the agreement protects merely a proprietary or property right of
         the employer recognized as entitled to protection under the general principles of
18       unfair competition.'

19   Id. at 860–61 (internal citations omitted).  Although that court eventually found no trade secrets

20   existed, its rationale regarding non-compete clauses is still valid.  Indeed, Metro was recently cited

21   approvingly by the California Supreme Court which adopted its rationale.  See Reeves v. Hanlon, 33

22   Cal. 4th 1140, 1150 (2004).

23       Here, the non-compete clause is narrowly tailored in both time and scope and designed to

24   protect plaintiff's trade secrets.  Specifically, the non-compete clause is limited to business with

25   "any current or prospective client, vendor or supplier which was a current or prospective client,

26   vendor or supplier, of the Company within the twelve (12) months immediately preceding [the

27   employee's] termination."  Lillge Dec., Exh. B.  Since CMC maintains as trade secrets its client-

28

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1   specific information that is not generally known in the industry, a non-compete clause with respect

2   to the current or prospective clients protects CMC's trade secrets.  For instance, it disallows former

3   employees from exploiting the client's needs, likes, dislikes and limitations—proprietary

4   information it gained through employment at CMC—to their benefit even if the client initiates

5   contact with the former employees.  This court thus affirms "the concomitant right to have the

6   ingenuity and industry one invests in the success of the business or occupation protected from the

7   gratuitous use of that 'sweat-of-the-brow' by others."  Morlife, 56 Cal. App. 4th at 1520.

8        In sum, CMC was well within its right to demand its employees sign a non-compete

9   agreement in order to protect its trade secrets.  Consequently, it was also well within its right to fire

10  Ms. Chang for insubordination upon refusing to sign the agreement.  Therefore, plaintiff's motion

11  for summary judgment regarding defendants' counterclaim for wrongful termination, count five, is

12  granted.  For the same reasons, plaintiff's motion for summary judgment regarding defendants'

13  counterclaim for a violation of Business and Professions Code section 17200, count eight, is also

14  granted.  Consequently, defendants' cross-motion for summary judgment on counts six and eight of

15  the counterclaim is denied.[5]

16

17       B.    Unpaid Vacation Pay

18       Under her sixth and seventh causes of action, defendant Chang seeks five days of vacation

19  pay from CMC.  CMC states that since Chang had no expectation of this pay when she rendered

20  services for CMC, she is not entitled to the same.  Thus, it argues, any offer by CMC was a

21  gratuitous promise.  As evidence of this, they point to her deposition.  Specifically:

22       Q: So it was your understanding that these five additional days were days that you
         hadn't necessarily earned pursuant to CMC's policy, but it was something that Mr.
23       Molloy [CMC's General Manager] agreed to add on to your termination?
         A: Yes.
24       . . .
         Q: And was it during this conversation with Mr. Molloy where he agreed to
25       essentially grant you five days of additional vacation pay?
         A: No.
26       Q: When did he actually agree to do that?
         A: The additional five days?
27       Q: Right.
         A: [In] the termination e-mail that I requested of him.
28

9

1    Q: Prior to receiving that e-mail, did you request that he grant you those additional
     five days or –
2    A: No.
     Q: Was that a surprise to you?
3    A: It was a surprise, yeah.
     . . .
4    Q: So in the e-mail that [Mr. Molloy] sent to you later that Friday, he agreed to pay
     you for the five days of vacation pay that you said you were entitled to, and your
5    understanding is that he threw an additional five days on top of that?
     A: Yes.
6
Boyd Dec., Exh. B at 153:18–22; 164:24–165:13; 168:18–23.

7
         However, defendant Chang states that she was given the five additional days of pay as

8   consideration for her part-time work at CMC, before she became a full-time employee.  Specifically,

9   when she was fired, CMC's general manager stated to her in an e-mail: "Additionally, in

10  consideration of your part time contracting work prior to your regular full time employment with

11  CMC, which commenced on January 1, 2005, we have also included an additional 5 PTO days in

12  your final paycheck."  Chang Dec., Exh. 1.  This statement, though supporting Chang's position,

13  also suggests that according to CMC, whatever vacation pay Ms. Chang was entitled to was included

14  in her final paycheck.

15       It is unclear what Chang's expectations were when she received the additional five

16  days—she could have been surprised at the fact that CMC capitulated or surprised that they offered

17  five days of pay as opposed to something else.  Further, the general manager's email demonstrates

18  an understanding had been reached between the two.  Drawing all inferences in the light most

19  favorable to Chang, this court cannot conclude that this promise was gratuitous.  Indeed, the five

20  additional days of pay, even though it may be *de minimis* can be viewed as a severance package of

21  sorts.  In light of this conflicting evidence, summary judgment is inappropriate.

22

23       C.    Defamation

24       Truth is a complete defense to all charges of defamation.  Smith v. Maldonado, 72 Cal. App.

25  4th 637, 646 (1999).  Defendants allege plaintiff defamed them in three ways: 1) a June 27, 2007

26  letter from CMC to its suppliers; 2) a September 7, 2007 e-mail from CMC to its customers; and

27  3) oral statements made by CMC.  Each is discussed in turn.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

10

1    On June 27, 2007 CMC sent a letter to its suppliers, which stated, *inter alia*:

2    This is to put you on notice that on June 1, 2007, Judge Marilyn Hall Patel, of the
     United States District Court for the Northern District of California, San Francisco
3    Division, granted a Temporary Restraining Order to prevent Andrew Verity and
     Christina Chang, former employees of Creative Marketing Concepts, from soliciting
4    our clients or misappropriating any of CMC's trade secrets.

5    As you may be aware, Mr. Verity and Ms. Chang have established their own
     promotional products business, which they have every right to do. We believe the
6    name of the company is Branding Boulevard. However, CMC filed a lawsuit against
     Mr. Verity and Ms. Chang because we have reason to believe that they have used or
7    threatened to use CMC trade secret information to solicit CMC's clients and acquire
     information about jobs that CMC has done in the past.

8
     Accordingly, we ask that you inform the appropriate people in your organization that:
9    1) Mr. Verity and Ms. Chang are no longer employees of CMC and do not represent
     CMC in any way; 2) Mr. Verity and Ms. Chang are not entitled to any information
10   regarding CMC clients, including products, pricing, artwork, etc.; and 3) please
     inform me directly if either Mr. Verity or Ms. Chang request any information about
11   or relating to CMC's current or past clients.

12   Lillge Dec., Exh. F.

13       Defendants claim this language is misleading because it neglects to mention that suppliers

14   are free to contact defendants. Not surprisingly, the language also neglects to mention that suppliers

15   are not free to contact defendants. Since plaintiff is under no obligation to inform its suppliers that

16   they are free to cease doing business with CMC, the court finds nothing misleading about this

17   communication.

18       Defendants cannot demonstrate that any of the statements contained in this communication

19   are untrue. In light of this failure to demonstrate any untruthfulness or mischaracterization of the

20   court's order, this communication is held to be non-defamatory as a matter of law.

21       On September 7, 2007 CMC sent an e-mail to its customers which defendants also contend is

22   false and misleading. The e-mail states, in relevant part:

23   As you may be aware, Andy Verity and Christina Chang left CMC a few months
     back. You should note that Judge Marilyn Hall Patel, of the United States District
24   Court for the Northern District of California, San Francisco Division, has granted
     CMC a Temporary Restraining Order on June 1, 2007 which prohibits them not only
25   from soliciting CMC clients but also restrains them from initiating contact with CMC
     clients. If you would like additional information about this situation, please contact
26   me directly.

27   Id., Exh. G. This e-mail is non-defamatory as a matter of law due to the reasons stated above.

28

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Finally, defendants claim that Lillge's statements that Chang had left the country are

2    defamatory *per se*.  They are correct in asserting that special damages need not be proven for

3    statements that are defamatory *per se*.  See Triton Ins. Underwriters, Inc. v. Cmte on Chiropractic

4    Welfare, 232 Cal. App. 2d 829, 833 (1965).

5    Lillge asserts that statements made by third parties regarding what Lillge told them are

6    inadmissible hearsay.  This is incorrect for two reasons.  First, statements made by a party are

7    considered party admissions and fall outside the definition of hearsay.  See Fed. R. Evid.

8    801(d)(2)(A).  Second, defendants are not attempting to demonstrate the truth of the statements

9    made by plaintiff—they merely offer to demonstrate that the statements were made by plaintiff.

10   Specifically, Ms. Pascual testified, "I'm not sure if Mr. Lil – that I was speaking with Mr. Lillge, but

11   as far as I can remember, he said he was the President of Creative Marketing Concepts, and he told

12   me that Christina is leaving for Canada."  Ward Dec., Exh. A at 43:13–23.  This statement is being

13   offered simply to demonstrate that someone at CMC made the assertion regarding Canada, not the

14   truth of the assertion.

15   Furthermore, Ms. Pascual specifically described the substance of the alleged defamatory

16   statements—that Ms. Chang had left for Canada due to a visa issue.  Although she could not "recall

17   the exact reason," Ms. Pascual "just heard, like, something, some sort of Visa."  Id. at 45:12–20; see

18   also id. at 73:19–74:10 ("Q: And when you asked whoever this person was, the President of CMC,

19   where Ms. Chang had gone, you do recall that he told you she's going to Canada because of a Visa

20   issue.?  A: Yes. . . . what came to my mind was that she was having a problem with the working

21   visa.").  Since plaintiff cannot demonstrate the truth of these statements, summary judgment is

22   unwarranted.

23   In sum, the court grants summary judgment in favor of plaintiff with respect to the two

24   written communications at issue, but denies plaintiff's motion for summary judgment with respect to

25   the allegedly slanderous statements.

26

27

28

12

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   D.   Intentional Interference with Prospective Economic Advantage

2   The eleventh count of defendants' counterclaim charges plaintiff with intentional

3   interference with prospective economic advantage.  To prevail on a claim for interference with

4   prospective economic advantage, defendants must allege: 1) an economic relationship between

5   themselves and a third party that carries a probability of future economic benefit to the plaintiff; 2)

6   CMC's knowledge of the relationship; 3) intentional acts by CMC designed to disrupt the

7   relationship; 4) actual disruption of the relationship; and 5) economic harm to defendants

8   proximately caused by CMC's acts.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134,

9   1153–54, 1164–65 (2003).

10   Defendants point to various conciliatory e-mails they received upon announcing their

11   departure from CMC.  Specifically, they state that many of CMC's customers would have preferred

12   to do business with defendants independent of the organization with which defendants were

13   affiliated.  The court has reviewed these e-mails and has found some communications which do in

14   fact demonstrate the same.[6]  Each of these statements, however, is inadmissible hearsay.  Although

15   defendants make many allegations of intentional interference in their response to the fourth

16   interrogatory of plaintiff's second set of interrogatories, see Boyd Dec., Exh. G, defendants have not

17   provided declarations or deposition testimony from any of these individuals.[7]  As such, they are

18   unable to meet the first prong above.

19   Furthermore, defendants have not provided any evidence that there was a disruption of

20   economic relationships due to plaintiff's acts.  Defendants point to an e-mail communication,

21   initiated by Ms. Chang, with Michelle Chan where Ms. Chan asks defendants to remove her from

22   their distribution lists because of CMC's e-mail regarding this lawsuit.  Chang Dec., Exh. 4.  Ms.

23   Chan knew that Ms. Chang was not allowed to initiate contact with her and declined Ms. Chang's

24   attempt to solicit her.  Ms. Chang avers that when she spoke with Ms. Chan during the summer of

25   2007—before the solicitation e-mail was sent—Ms. Chan had "said that Wells Fargo had no orders

26   for promotional products but that if she needed anything in the future she would think of me."

27   Chang Dec., ¶ 8.  This self-serving declaration with a vague statement regarding promotional

28   products is not enough to carry defendants' burden.  Defendants have failed to show that an

13

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    economic relationship with Ms. Chan existed such that it could be disrupted.

2          Finally, defendants are unable to show any economic harm proximately caused by CMC's

3    acts. They point to the fact that their business only has $600,000 in sales after nine months of

4    operation whereas they were responsible for $1.65 million in sales at CMC. The mere fact that they

5    have not been able to get their entire book of business to switch to their newly founded company

6    lacks the necessary nexus. There is no evidence that Branding Boulevard's business has been hurt

7    by plaintiff's actions. There are a myriad reasons why a fledgling company is unable to garner

8    business at levels it expects—the court does not go into those reasons here. Suffice it so say that no

9    proximate cause exists that links plaintiff's two non-defamatory written communications to

10   Branding Boulevard's alleged economic woes—no showing has been made that it was reasonably

11   probable that CMC's customers would have switched over to Branding Boulevard if the written

12   communications had not been sent. As discussed above, plaintiff did not engage in any wrongdoing

13   by sending the letter and e-mail.[8]

14         In sum, the court grants plaintiff's motion for summary judgment with respect to defendants'

15   eleventh cause of action in their counterclaim.

16

17   Motion for Civil Contempt

18   I.    Procedural Background

19         On May 31, 2007 this Court granted CMC's application for a Temporary Restraining Order

20   ("TRO") until the hearing on plaintiff's motion for a preliminary injunction. See Docket No. 15.[9]

21   The court ruled, in part, that defendants were not to initiate contact with CMC's customers until

22   further order of the court, and that they are not to solicit customers of CMC during this time. Appel

23   Dec., Exh. A [hereinafter "TRO hearing transcript"] at 16:5–17:15. Specifically, "[i]f CMC's

24   customers contact [defendants], that's another matter, but they better make sure that they can verify

25   or substantiate the fact that those customers contacted them, not that they contacted the customers."

26   Id. at 17:1–4. In addition, the court stated:

27          And if, in fact, those solicitations were not by defendants, in fact, it was a response to
            notification, then they can continue to do business with those companies.
28          [Defendants] had just better be able to have business records and accounts that they

14

1  can account for all of this at the end of the day, if, in fact, it turns out those
   representations are not true, so they better keep good books and records. The failure
2  to do so will, in fact, be interpreted against them when in doubt. So they're
   [defendants] sitting here, and I trust they understand that.

3  Id. at 20:21–21:6.

4        At the August 27, 2007 hearing on CMC's motion for preliminary injunction, the court ruled

5  that the TRO would remain in effect pending the court's order on the motion for the preliminary

6  injunction. See Docket No. 51.

7        On October 1, 2007 the court issued an order granting CMC a preliminary injunction. See

8  Docket No. 61. This order stated that "defendants will be permitted to work with CMC's customers

9  so long as defendants do not solicit business from them." Id. at 12. On November 9 the court issued

10 an order confirming the scope of the TRO and preliminary injunction. It held:

11

12     The Court's Preliminary Injunction Order confirmed that while defendants were
       "barred from *initiating contact with*" CMC's customers, defendants remained free to
       do business with those customers that contacted them (emphasis in original).
13
       This addendum confirms that more than one notification from defendants to CMC's
14     customers regarding their new business is not permitted under either the Temporary
       Restraining Order or the Preliminary Injunction Order (even when such notification
15     in isolation may not be viewed as a solicitation). As confirmed by both Orders,
       repeated notifications to a customer constitute a solicitation and improper initiation of
16     contact violating the injunctions which have been and are currently in force.

17 See Docket No. 75 at 2. This court's October 1 order currently remains in effect. Thus, at all times

18 since June 1, 2007 defendants have been enjoined in the above manner.

19

20 II.    Legal Standard

21     Judicial sanctions in civil contempt proceedings may, in a proper case, be employed
       for either or both of two purposes: to coerce the defendant into compliance with the
22     court's order, and to compensate the complainant for losses sustained. Where
       compensation is intended, a fine is imposed, payable to the complainant. Such fine
23     must of course be based upon evidence of complainant's actual loss, and his right, as
       a civil litigant, to the compensatory fine is dependent upon the outcome of the basic
24     controversy.

25     But where the purpose is to make the defendant comply, the court's discretion is
       otherwise exercised. It must then consider the character and magnitude of the harm
26     threatened by continued contumacy, and the probable effectiveness of any suggested
       sanction in bringing about the result desired.

27 United States v. United Mine Workers, 330 U.S. 258, 303–04 (1947) (internal citations omitted).

28

15

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The Supreme Court has stated that "a flat, unconditional [non-compensatory] fine even as

2    little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent

3    opportunity to reduce or avoid the fine through compliance." Int'l Union v. Bagwell, 512 U.S. 821,

4    829 (1994) (citing Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947)). Penfield, however, stated

5    that "one who is fined, unless by a day certain he [complies,] has it in his power to avoid any

6    penalty." 330 U.S. at 590.

7    The Ninth Circuit has held that when a consent decree is already in place, the party held in

8    contempt for violating the same "had the opportunity to avoid the fine by not engaging in the

9    prohibited conduct in the first place." NLRB v. Ironworkers Local 433, 169 F.3d 1217, 1221 (9th

10   Cir. 1999). The court found that "fines imposed without further opportunity to purge are not

11   punitive when those fines are prompted by a party's previous failure to purge." Id. (citing Hoffman

12   v. Beer Drivers and Salesman's Local Union No. 888, 536 F.2d 1268, 1273 (9th Cir. 1976)).

13   Specifically, the court held that "*Bagwell* does not undermine our conclusion in *Hoffman* that the

14   imposition of non-compliance fines following a failure to purge is a coercive, civil remedy." Id.

15   Nevertheless, the Ninth Circuit "recognize[s] that the Supreme Court has tended to classify

16   fines paid to the court as punitive fines, while fines payable to another party are remedial." Lasar v.

17   Ford Motor Co., 399 F.3d 1101, 1111 (9th Cir. 2005) (citing Hicks ex rel. Feiock v. Feiock, 485

18   U.S. 624, 632 (1988)). Moreover, the identity of the payee is not determinative. The Ninth Circuit

19   has also held that a fine payable to an opposing party was punitive when it was not designed "to

20   compensate [the opposing party] for any actual or estimated harm." Bingman v. Ward, 100 F.3d

21   653, 656 (9th Cir. 1996).

22   "The standard for finding a party in civil contempt is well settled: The moving party has the

23   burden of showing by clear and convincing evidence that the [nonmoving party] violated a specific

24   and definite order of the court." FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir.

25   1999) (quoting Stone v. City & County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

26   However, substantial compliance and good faith can negate sanctions. See In re Dual-Deck Video

27   Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (party seeking sanctions must

28

16

UNITED STATES DISTRICT COURT
For the Northern District of California

1    show (1) a violation of the order, (2) beyond substantial compliance, (3) not based on a good faith

2    and reasonable interpretation of the order, (4) by clear and convincing evidence).

3         The decision as to whether contempt sanctions should be imposed lies within the sound

4    discretion of the district court.  See Jerry's Famous Deli, Inc. v. Papanicolaou, 383 F.3d 998, 1004

5    (9th Cir. 2004).

6

7    III.    Discussion[10]

8         Defendants claim this court's order allowed them to both: 1) provide CMC's customers of

9    defendants' new business contact information; and 2) attempt to sell to CMC's customers that

10   responded to this e-mail notification or initiated contact with defendants.  Verity Dec., ¶ 3; Chang

11   Dec., ¶ 3.  It is unclear to this court how defendants interpreted the court as stating that any response

12   by CMC's customers allowed defendants *carte blanche* to solicit those customers.  As stated above,

13   the TRO hearing was replete with statements admonishing defendants not to initiate contact and

14   allowing contact with CMC's customers only if they contacted defendants.  Specifically, in the

15   context of solicitation, the court stated, "[a]nd if, in fact, those solicitations were not by defendants,

16   in fact, it was a response to notification, then they can continue to do business with those

17   companies."  TRO hearing transcript at 20:21–24.  Thus, the court limited its order to CMC's

18   customers that were amenable to doing business with defendants, as demonstrated through

19   communications from the customer to defendants.  The court specifically stated that the solicitation

20   could not be by defendants.  The court gave no indication that any and all benign contact from a

21   CMC customer would open the door to relentless efforts at solicitation by defendants.  Indeed, the

22   court could not have been clearer when it stated that "defendants will be permitted to work with

23   CMC's customers so long as defendants do not solicit them."  See Docket No. 61 at 11.  The court

24   finds no ambiguity in this language.

25        The court now discusses the various contacts defendants have had with CMC's customers in

26   light of the above defined scope of the injunction.

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    A.    Ms. Lee[11]

2    In May 2007, Ms. Lee—a customer of CMC—notified Ms. Chang of Ms. Lee's need for

3  promotional products. Lee Dec., ¶ 4. Also in May 2007, Ms. Chang sent Ms. Lee an e-mail

4  advising Ms. Lee that she was leaving CMC. Id., ¶ 5. Upon receipt of this e-mail, Ms. Lee called

5  Ms. Chang asking her to call Ms. Lee back. Id., ¶ 6; Chang Dec., Exh. 1. Ms. Lee wanted to know

6  who would be handling her account after Ms. Chang's departure. Lee Dec., ¶ 6. Ms. Chang called

7  Ms. Lee the following week to notify Ms. Lee of Ms. Chang's new business. Id. Ms. Lee, however,

8  preferred to stay with CMC. Id. Thereafter, Ms. Chang and Mr. Verity continued to solicit business

9  from Ms. Lee. Id., ¶¶ 7–9. Due to these unwanted solicitations, Ms. Lee decided to take $20,000

10  worth of business away from CMC and instead purchase from a third party. Id., ¶ 10. Though the

11  court does not have specific evidence, it appears that this transaction occurred in May 2007.

12    On May 22, 2007 Ms. Lee responded to another solicitation by Ms. Chang dated May 21,

13  2007 wherein she conclusively asked Ms. Chang to stop soliciting her. Id., Exh. A. Ms. Lee said

14  she was going to continue to do business with CMC, her preferred vendor. Id.

15    In August 2007 Ms. Chang contacted Ms. Lee by telephone about a Branding Boulevard

16  catalogue and also sent Ms. Lee a Branding Boulevard catalog. Id., ¶¶ 12–13. Finally, Ms. Chang

17  called Ms. Lee in December 2007 to solicit business. Id., ¶ 14.

18    While most of these contacts occurred prior to May 31, 2007, Ms. Chang has contacted Ms.

19  Lee to solicit business at least three times since May 31, 2007. Defendants have presented no

20  evidence negating these contacts nor have they demonstrated any necessity for the contacts. They

21  argue that since Ms. Lee had initiated contact with Ms. Chang by replying to the latter's neutrally

22  worded e-mail, Ms. Chang had *carte blanche* to solicit Ms. Lee. Specifically, Ms. Lee had left a

23  generic voicemail message asking Ms. Chang to call her back. There was no indication that Ms. Lee

24  intended to do business with Ms. Chang's new company. As discussed above, defendants'

25  contention is thus wrong as a matter of law.

26    Furthermore, at no point did the court state that defendants were allowed to solicit CMC's

27  customers that contacted them. The statement that while "defendants were 'barred from *initiating*

28  *contact with*' CMC's customers, defendants remained free to do business with those customers that

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1    contacted them," see Docket No. 75 at 2, necessarily only applied to CMC's customers that

2    contacted defendants about conducting business. Any other construction would effectively eliminate

3    the efficacy of the order by allowing defendants to contact any CMC customer that responded with a

4    courteous "good luck!" to their farewell e-mail.

5        In sum, this court finds Ms. Chang's three contacts with Ms. Lee on or after May 31, 2007 in

6    direct contravention to the court's orders. Ms. Lee's decision to hire a third party vendor for her

7    $20,000 worth of business, however, seems to have occurred before the court's May 31, 2007 order.

8

9        B.    Ms. Chan

10       On May 11, 2007 defendant Chang sent an e-mail to Ms. Chan—a customer of

11   CMC—notifying the latter of her departure from CMC. Ms. Chan replied the same day, asking:

12   "You're leaving too, huh? Where are going to?" Appel Dec., Exh. E. Ms. Chang replied a few

13   days later, on May 22, and: 1) provided her contact information; 2) stated that she offered branded

14   products and large volume direct import; and 3) offered "to help you with all your upcoming

15   projects." Id. There is no admissible evidence that Ms. Chan replied to this email.[12]

16       On November 8, 2007 defendant Chang sent an e-mail to Ms. Chan stating, "[a]s holidays

17   are just around the corner, thought I should send you a quick email/checking in. I am happy to get

18   you some year end gift materials or do project solution researches for you." Id. Ms. Chan replied

19   immediately, asking to be removed from Ms. Chang's distribution list. Id. Ms. Chang complied, but

20   stated, "[d]o try to think of me if you even [sic] need help on branded items or solutions." Id.

21       Defendants' arguments with respect to Ms. Chan fail for the same reasons as those with

22   respect to Ms. Lee. Consequently, the two November 8, 2007 contacts trying to solicit Ms. Chan are

23   in contravention of the court's order.

24

25       C.    Ms. Gutfran

26       On May 11, 2007 defendant Chang sent an e-mail to Ms. Gutfran—a customer of

27   CMC—notifying the latter of her departure from CMC. Id., Exh. F. Ms. Gutfran replied the same

28   day, stating: "Christina, Best of luck to you. Thank you for all of your help!" Id. Ms. Chang

19

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   replied on May 21 by: 1) providing her contact information; 2) stating she had started her own

2   promotional company; and 3) wanting "to be able to help you with your new projects." Id.

3       Ms. Chang presents self-serving declarations stating that Ms. Pascual, an associate of Ms.

4   Gutfran, contacted Ms. Chang in May 2007. Chang Dec., ¶ 12. Ms. Pascual has testified that she

5   wanted to continue to do business with Ms. Chang and her new company. Ward Dec., Exh. A at

6   72:24–73:7. Ms. Pascual, however, works in San Francisco, whereas Ms. Gutfran works in

7   Hartford, Connecticut, albeit for the same company.

8       On June 11, 2007 defendant Chang notified Ms. Gutfran that she had been working with the

9   California offices and would like Ms. Gutfran to call her so that she could help Ms. Gutfran with

10  logo items. Id.

11      In light of the evidence that Ms. Pascual intended to continue doing business with Ms.

12  Chang, the court does not find clear and convincing evidence that contacts with Ms. Gutfran—who

13  is an associate of Ms. Pascual—violated the court's order.

14

15      D.    Mr. DiFranco

16      Mr. DiFranco—a customer of CMC—contacted Ms. Chang on May 11, 2007 asking her

17  what she would be doing after CMC. DiFranco Dec., ¶ 3. He called her the following week asking

18  her to stay in contact. Id. On May 22, 2007 defendant Chang sent an e-mail to Mr. DiFranco

19  notifying him of: 1) her new contact information; 2) the fact that she now had her own promotional

20  product company; and 3) her ability to help him with all his projects. Appel Dec., Exh. G. On June

21  13, 2007 Ms. Chang contacted Mr. DiFranco again, giving him her contact information and

22  notifying him that her website was up. Id. In August 2007, Mr. DiFranco placed an order with

23  defendants. DiFranco Dec., ¶ 4.

24      Mr. DiFranco initiated contact with Ms. Chang and intended to do business with her. This is

25  apparent from the declaration he has submitted on defendants' behalf. His failure to testify that he

26  solicited business from defendants is far from the clear and convincing showing necessary to

27  demonstrate that defendants solicited him. Consequently, plaintiff has failed to present a violation

28  of the court's order with respect to Mr. DiFranco.

UNITED STATES DISTRICT COURT
For the Northern District of California

1

E.    Summary of Violations

2    The court finds violations with respect to Ms. Lee and Ms. Chan.  Defendants contend no

3    sanctions are warranted because the violations, if any, were in good faith.  See In re Dual-Deck, 10

4    F.3d at 695 ("a person should not be held in contempt if his action appears to be based on a good

5    faith and reasonable interpretation of the [court's order]." (internal quotations omitted)).  It is

6    unclear to the court how these violations were in good faith when Ms. Lee specifically asked Ms.

7    Chang to stop contacting her and Ms. Chang continued to do so.  The same goes for Ms. Chan, who

8    neglected to respond to defendants' contact, but was nevertheless contacted by Ms. Chang in

9    November 2007.  Indeed, even when responding to Ms. Chan's unequivocal statement asking Ms.

10    Chang to cease contact, Ms. Chang nevertheless asks Ms. Chan to "try to think of me if you even

11    need help on branded items or solutions."  Appel Dec., Exh. E.  There is no good faith attempt at

12    compliance with the court's orders here.

13    Similarly, defendants' conduct is not in substantial compliance with the court's orders either.

14    A few technical violations of the court's order are not actionable if every reasonable effort has been

15    made to comply.  See In re Dual-Deck, 10 F.3d at 695.  The contacts here are not technical, but

16    direct violations of conduct that the injunction sought to bar.  Furthermore, even if they were

17    considered technical violations, there is no indication that every reasonable effort was made to

18    comply.  For instance, defendants did not ask this court for clarification nor did they heed CMC

19    customers' requests to cease contact.  Indeed, defendants initiated contact after specifically having

20    been told both by the court and the client that solicitous contact was unwanted.

21    In sum, the court finds defendants in civil contempt.  Consequently, the court orders plaintiff

22    to submit an account of the actual or estimated harm it has suffered as a consequence of the above

23    violations.  Thereafter, defendants shall be liable, in the form of a compensatory fine, for the amount

24    approved by the court.

25

26

F.    Attorney's Fees

27    "An award of attorneys' fees for civil contempt is within the discretion of the trial court."

28    Harcourt Brace Jovanovich Legal & Professional Publications v. Multistate Legal Studies, Inc., 26

1    F.3d 948, 953 (9th Cir. 1994).  In light of defendants' brazen disregard of the court's order with

2    respect to Ms. Lee and Ms. Chan, attorneys fees are warranted in order to make plaintiff whole.

3    Accordingly, CMC is ordered to submit a bill for attorneys' fees and costs incurred in conjunction

4    with the memorandum of points and authorities, the reply brief and the hearing, insofar as they

5    related to the contempt issue.[13]

6

7    <u>CONCLUSION</u>

8          For the reasons stated above, the court grants plaintiff's motion for summary judgment with

9    respect to defendants' fifth, eight and eleventh causes of action.  The court also grants in part and

10   denies in part plaintiff's motion for summary judgment with respect to defendants' tenth cause of

11   action.

12         Further, within twenty (20) days of the date of the filing of this order, plaintiffs shall submit:

13   1) an account of the actual or estimated harm it has suffered as a consequence of the civil contempt

14   along with contemporaneous records in support thereof; and 2) a statement of attorneys' fees and

15   costs consistent with the above with contemporaneous records in support thereof.  Defendants may

16   respond within ten (10) days of the filing of the statement with respect only to the reasonableness of

17   the harm, fees and costs.

18         The court denies all other motions.

19         IT IS  SO ORDERED.

20

21   Dated: March 31, 2008

22                                                  _____
                                                   MARILYN HALL PATEL
23                                                 United States District Court Judge
                                                   Northern District of California

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**ENDNOTES**

1.      It is unclear whether the attorney-client privilege has been waived with respect to this e-mail communication.  Since the issue is not contested, the court assumes the e-mail is admissible.

2.      Defendants make much of their immigration status which, according to them, forced them to start a competing business in order to remain within the United States.  Their rationale for entering the promotional products field is irrelevant to the present motions.

3.      Defendants' sixth and seventh causes of action allege a failure to pay Ms. Chang both overtime and vacation pay.  This memorandum and order only discusses the vacation pay aspect of these causes of action.

4.      In its reply, CMC provides a Propriety Information Agreement ("PIA") which it claims Ms. Chang refused to sign and was the reason she was fired.  The PIA merely restricts her from disclosing CMC's trade secrets.  CMC, however, makes this argument after admitting for the purposes of this motion that Chang was fired for not signing the agreement with the purported non-compete clause.  As such, the court ignores this untimely argument made by CMC.

5.      Since the court has evaluated this issue on the merits, it does not reach plaintiff's undeveloped standing argument.

6.      The statements made to Ms. Chang are: 1) an e-mail from Carolyn Jacks stating "[i]s there someone else at CM on whom we may call now that you are no longer there? . . . Unless you're moving on to someplace where we can still use you ....  Let me know"; 2) an e-mail from Michael Alexander stating: "[y]ou have been great to work with.  I hope we can continue that relationship in the future.  Please stay in touch"; 3) an e-mail from Michael Ernst stating "[i]f you ever decide to continue in the promotions field, please let me know, I'd love to work on other projects with you"; 4) an e-mail from Celine Rose stating "[i]f they fired you or laid you off we won't use then anymore."  Chang Dec., Exh. 2.  Statements made to Mr. Verity include: 1) an e-mail from Karen Arvin stating "[I] was wondering if you were going to another promotional products company . . . In the past you proved to be very helpful and dependable.  If you will be staying in the same field, I'd welcome any information you could send me – my contact information is below"; 2) an e-mail from Sanam Kordestani stating "I wanted to deal with you only!  Tell me about your new/future adventures"; and 3) an e-mail from Nyla Starr stating "DO keep me posted if you become associated with a firm that offers goods or services we might need!"  Verity Dec., Exh. 2.

7.      The court is aware that defendants were barred from soliciting CMC's customers; however, defendants could have deposed these individuals in order to create a factual basis for their case.

8.      In light of the court's holding, it does not reach plaintiff's argument that it was unaware of Branding Boulevard's customers until after the complaint with this cause of action was filed.

9.      The parties then entered into several stipulations continuing the preliminary injunction hearing date.  Each of these stipulations confirmed that the TRO would remain in effect until the

23

court ruled on CMC's motion for a preliminary injunction.  <u>See</u> Docket No's. 21, 24, 32.

10.     The court declines plaintiff's invitation to, *sua sponte*, initiate criminal contempt proceedings.  Similarly, the court declines defendants' invitation to, *sua sponte*, consider sanctions against CMC due to CMC's contact with defendants' customers.  In this invitation, defendants re-hash their defamation arguments made elsewhere.  Furthermore, there is no injunction against CMC warranting sanctions.  As such, this invitation is in error.  Nevertheless, the court invites defendants to move for dissolution of the preliminary injunction if they believe the issuance of the injunction was based on plaintiff's falsities regarding its trade secrets.

11.     It appears that plaintiff has abandoned its efforts to maintain the names of its client contacts under seal.  Therefore, the court will use the names of plaintiff's client contacts in this order.

12.     The court refuses to consider Ms. Chang's wholly self-serving and hearsay testimony about her conversations with Ms. Chan during the summer of 2007.  As the court stated earlier, any questions as to solicitation are to be "interpreted against [defendants] when in doubt."  TRO hearing transcript at 20:25–21:6.

13.     CMC is to also submit a proposed order along with the bill of costs.