William R. Hill, #114954
  rock@donahue.com
Andrew S. MacKay, #197074
  andrew@donahue.com
SARA J. ROMANO, #227467
  sromano@donahue.com
DONAHUE GALLAGHER WOODS LLP
Attorneys at Law
300 Lakeside Drive, Suite 1900
Oakland, California  94612-3570
P.O. Box 12979
Oakland, California  94604-2979
Telephone:     (510) 451-0544
Facsimile:     (510) 832-1486

Attorneys for Plaintiff and
Counterdefendants
MARK LILLGE dba CREATIVE
MARKETING CONCEPTS

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE dba CREATIVE MARKETING CONCEPTS,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Defendants.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>Counterclaimants,<br><br>v.<br><br>MARK LILLGE dba CREATIVE MARKETING CONCEPTS, and DOES 1-10,<br><br>Counterdefendants. | CASE NO.  C 07 002748<br><br>TRIAL BRIEF OF PLAINTIFF AND COUNTERDEFENDANT MARK LILLGE<br><br>Date:        May 6, 2008<br>Time:        8:30 a.m.<br>Dept.:       Courtroom 15, 18th Floor<br>Judge:       Hon. Marilyn H. Patel |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF FACTS .................................................................. 1

    A.    Defendants.................................................................................................. 3

    B.    CMC's Efforts To Maintain The Secrecy Of Its Trade Secrets................... 4

    C.    Verity's Work-Related Problems .................................................................. 6

    D.    Chang's Refusal To Sign The Proprietary Information Agreement ............ 7

    E.    The CMC Employee Handbook And Other Steps To Protect The CMC Confidential Information..................................................................... 8

    F.    Facts Regarding Counterclaims ................................................................. 10

    G.    Subsequent Sales by Chang and Verity ..................................................... 10

    H.    Procedural History ...................................................................................... 11

ARGUMENT .................................................................................................................... 11

    I.    PLAINTIFF WILL PREVAIL ON THE TRADE SECRET CLAIM .................. 11

        A.    The CMC Confidential Information Constitutes Protectable Trade Secrets ........................................................................................................ 11

        B.    The CMC Confidential Information Derives Independent Economic Value From Not Being Generally Known. ................................................. 11

        C.    The CMC Confidential Information Is The Subject Of Efforts That Are Reasonable Under The Circumstances To Maintain Its Secrecy. ...... 14

        D.    Defendants Knew That They Were Not To Misappropriate The CMC Confidential Information, And Their Covert Conduct Confirms This Awareness. ....................................................................... 16

        E.    Damages Under UTSA ............................................................................... 19

        F.    CMC Is Entitled To An Injunction Restraining Defendants From Using The Confidential Information................................................................ 19

    II.    PLAINTIFF WILL PREVAIL ON ITS SECOND CAUSE OF ACTION FOR UNFAIR COMPETITION. ..................................................................... 20

    III.    PLAINTIFF IS ENTITLED TO RECOVER ON THE THIRD CAUSE OF ACTION FOR UNJUST ENRICHMENT. ......................................................... 20

    IV.    PLAINTIFF WILL PREVAIL ON THE FOURTH CAUSE OF ACTION FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE. ................................................................................................ 21

    V.    CMC IS ENTITLED TO JUDGMENT ON VERITY'S FIRST COUNTERCLAIM FOR BREACH OF CONTRACT. ................................... 22

    VI.    CMC IS ENTITLED TO JUDGMENT ON VERITY'S SECOND AND THIRD COUNTERCLAIMS FOR NON-PAYMENT OF WAGES AND WAITING TIME PENALTIES. ..................................................................... 24

    VII.    CMC IS ENTITLED TO JUDGMENT ON VERITY'S FOURTH COUNTERCLAIM FOR BREACH OF ORAL CONTRACT. .......................... 25

# TABLE OF CONTENTS
(continued)

Page

VIII.  CMC SHOULD PREVAIL ON CHANG'S SIXTH AND SEVENTH
COUNTERCLAIMS FOR UNPAID WAGES AND WAITING TIME
PENALTIES. ................................................................................................ 27

A.  Chang's Overtime Claim Is Now Moot ........................................... 27

B.  Chang's Claim for Five Days Vacation ........................................... 27

IX.  DEFENDANTS' NINTH COUNTERCLAIM FOR BREACH OF TRUST
WILL BE MOOT BY TRIAL ..................................................................... 28

X.  PLAINTIFF IS ENTITLED TO JUDGMENT ON DEFENDANTS'
TENTH CAUSE OF ACTION FOR DEFAMATION. ................................. 28

CONCLUSION .................................................................................................... 30

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Acoustics, Inc. v. Trepte Constr. Co.,*
  14 Cal. App. 3d 887 (1971) ..................................................................... 23

5

*American Loan Corporation v. California Commercial Corporation,*
  211 Cal. App. 2d 515 (1963) ................................................................... 18

6

*American Paper & Packaging Prods., Inc. v. Kirgan,*
  183 Cal. App. 3d 1318 (1986) ................................................................. 11

7

*Barnes-Hind, Inc. v. Superior Court,*
  181 Cal. App. 3d 377 (1986) ................................................................... 29

8

9

*Buxbom v. Smith,*
  23 Cal. 2d 535 (1944) ............................................................................. 22

10

*Courtesy Temporary Service, Inc. v. Camacho,*
  222 Cal. App. 3d 1278 (1990) ................................................................. 13

11

*Dow v. River Farms Co. of Cal.,*
  110 Cal. App. 2d 403 (1952) ................................................................... 26

12

13

*Duff v. Engelberg,*
  237 Cal. App. 2d 505 (1965) ................................................................... 21

14

*Eisenberg v. Alameda Newspapers, Inc.,*
  74 Cal. App. 4th 1359 (1999) ................................................................. 26

15

*Forsher v. Bugliosi,*
  26 Cal. 3d 792 (1980) ............................................................................. 29

16

17

*Foy v. Schantz, Shatzman & Aaronson,*
  108 F.3d 1347 (11th Cir. 1997) ................................................................. 4

18

*Funygin v. Yukos Oil Co.,*
  No. Civ. A.H-04-4821, 2005 WL 1840147 (S.D. Tex. July 28, 2005) ................... 4

19

*George v. Burdusis,*
  21 Cal. 2d 153 (1942) ............................................................................. 13

20

*Greenly v. Cooper,*
  77 Cal. App. 3d 382 (1978) ..................................................................... 18

21

22

*Guz v. Bechtel Nat'l, Inc.,*
  24 Cal. 4th 317 (2000) ............................................................................ 25

23

*Int'l News Serv. v. Assoc. Press,*
  248 U.S. 215 (1918) ............................................................................... 21

24

*Kato v. County of Westchester,*
  927 F. Supp. 2d 714 (S.D.N.Y. 1996) ......................................................... 4

25

26

*Khajavi v. Feather River Anesthesia Med. Group,*
  84 Cal. App. 4th 32 (2000) ...................................................................... 27

27

*Klamath-Orleans Lumber, Inc. v. Miller,*
  87 Cal. App. 3d 458 (1978) ..................................................................... 19

28

*Morlife v. Perry,*
  56 Cal. App. 4th 1514 (1997) ................................................................. 20

-iii-

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) ............................................................................. 21

*Passante v. McWilliam*,
  53 Cal. App. 4th 1240 (1997)..................................................................... 26

*Simmons v. Cal. Ins. of Tech.*,
  34 Cal. 2d 264 (1949) ................................................................................ 26

*Smith v. Maldonado*,
  72 Cal. App. 4th 637 (1999)....................................................................... 29

*State Farm Fire & Cas. Co. v. Superior Court*,
  45 Cal. App. 4th 1093 (1996)..................................................................... 20

*Telex Corp. v. IBM Corp.*,
  510 F.2d 894 (10th Cir. 1975).................................................................... 12

*Western Electroplating Company v. Henness*,
  180 Cal. App. 2d 442 (1960)................................................................. 12, 13

*Youst v. Longo*,
  43 Cal.3d 64 (1987) ................................................................................... 21

## STATUTES

Cal. Bus. & Prof. Code § 17203 ...................................................................... 20

Cal. Bus. & Prof. Code §§ 17203-17206 ......................................................... 20

Cal. Civ. Code § 1624(a)(1) ............................................................................. 23

Cal. Civ. Code § 3294 ...................................................................................... 22

Cal. Civ. Code § 3426(a) .................................................................................. 19

Cal. Civ. Code § 3426.1 ................................................................................... 12

Cal. Civ. Code § 3426.1(b)(2) .......................................................................... 16

Cal. Civ. Code § 3426.1(d) .............................................................................. 11

Cal. Civ. Code § 3426.4 ................................................................................... 19

Cal. Code Regs. tit. 8, § 13520 ................................................................... 24, 28

Cal. Lab. Code § 2922 ..................................................................................... 25

Cal. Lab. Code § 2924 ..................................................................................... 27

## OTHER AUTHORITIES

13 Witkin, Summary of California Law .......................................................... 20

5 Witkin, Summary of California Law ............................................................ 22

6 Witkin, Summary of California Law ............................................................ 21

## JURY INSTRUCTIONS

CACI 2202 ....................................................................................................... 21

CACI 303 ......................................................................................................... 23

-iv-

1    **INTRODUCTION AND STATEMENT OF FACTS**

2    Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("CMC") operates CMC as a sole

3    proprietorship with its principal place of business in San Francisco's financial district. CMC is an

4    industry-leading, full service advertising specialty and corporate apparel firm with over half a

5    million promotional products available for purchase. CMC sells products branded with its clients'

6    corporate logos. Such products run the gamut, from coffee cups, pens, and shirts, to items of all

7    shapes, sizes, and utility.

8    Mark Lillge founded CMC in January 1992. After 15 years of hard work and steady

9    growth, CMC realized approximately $4,000,000 in gross revenue in 2006 from a customer list of

10    approximately 1200. Yet despite the fact that CMC's customer list exceeds 1200 clients, this is a

11    relatively paltry number compared to the world of potential customers for both CMC and its

12    competitors. Potential customers for company-branded goods number in the hundreds of

13    thousands, if not millions, and include any organization, institution, or company that attends trade

14    shows, provides branded goods to its employees or distributors, has customers or prospective

15    customers to whom it wishes to provide such branded goods, holds special events, or has any

16    other reason (of which there are a multitude) to supply goods and apparel bearing a company logo

17    to others, internally or externally.

18    Accordingly, the market for CMC and its competitors is substantial, with estimated

19    industry revenue of over $18 billion in 2006. From financial institutions to realtors, law firms,

20    software companies, educational institutions, food and beverage companies, health care

21    providers, and government organizations, the list of potential customers is almost endless.

22    Indeed, CMC's own customer niche is the merest sliver of the available market, consisting of no

23    more than .02% of the total market based on annual gross revenue in comparison with total

24    industry revenue.

25    As with any company engaged in sales, one of the keys to CMC's success is the way it

26    develops its books of business and customer relationships, and the confidential and proprietary

27    information that it subsequently develops, both regarding its own business (e.g., confidential

28    pricing) and for each of its existing customers.

-1-

In contravention of the industry standard, the CMC customer list and specific customer information is not developed by its sales personnel, nor do these sales personnel typically bring in "books" of business when CMC hires them.   Rather, CMC independently develops this proprietary information and distributes it as necessary to its sales personnel.

This confidential information includes, but is not limited to, the pricing that CMC charges its customers, and CMC's actual and desired profit margin for each customer relying on CMC's complex pricing formula;[1] CMC's strategic plans regarding which customers it wishes to target (and not target); the purchasing history of CMC's customers and respective sales volume, including the knowledge of when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; the knowledge of CMC's customers' particular buying habits, needs, likes and dislikes; specific customer requirements, preferences, and limitations; negative knowledge regarding goods that certain customers have refused to purchase or no longer wish to purchase; confidential information about actual or prospective customers, suppliers and business partners; and CMC's confidential business, sales, marketing and financial plans, proposals, and projections (collectively, the "CMC Confidential Information").

CMC has developed the CMC Confidential Information over a substantial period of time (15 years) at tremendous expense.  CMC's extensive efforts over the years to develop the CMC Confidential Information have included trade shows, telemarketing, direct mail campaigns, e-mail blasts, signage, website exposure, yellow page advertising, and a prestigious San Francisco show room location in the city's financial district (where open houses also occur).[2]  Once customer contact is made, CMC typically follows up with the customer via a substantive dialogue and exchange of information regarding what the customer needs (and equally as important, what the customer does not need).  CMC typically spends about five percent of its annual gross revenue (approximately $200,000 per year) on such marketing efforts.  It is important to note that CMC

---

[1] Although certain pricing is listed in various catalogs, it is customary for CMC to deviate from this list based on the specifics of the client's needs, including timing and volume.

[2] CMC has also purchased another company, Ad Specialties Unlimited, in part to acquire its customer list and proprietary information.

1   would not incur such extensive time and expense if such customer information was freely and

2   efficiently available to it (and its competitors in the field) simply by working their way through a

3   phone book.

4       CMC's hard work and the substantial expenditures made to develop the CMC Confidential

5   Information have resulted in CMC learning many important and economically valuable details

6   about its customers that are not generally known to the public or to CMC's competitors, and CMC

7   derives independent economic value from the CMC Confidential Information, all of which has

8   been developed through substantial time, effort, and expense.

9       CMC takes reasonable efforts to maintain the secrecy of this proprietary information,

10  including restricting access to, and distribution of, the CMC Confidential Information, and

11  generally marking such information as "PRIVATE" and/or "CONFIDENTIAL."  CMC also

12  maintains separate shredding bins for proprietary materials, consistently shreds proprietary

13  documents (including envelopes), and frequently converses with its employees both verbally and

14  in writing about the need for this information to be confidential.[3]  The CMC Confidential

15  Information would be of substantial value to CMC's competitors if it became known to them and

16  would reward those competitors – including Defendants – with an unfair competitive advantage:

17  that is, they would enjoy the economic benefits of the CMC Confidential Information without

18  having to incur the substantial cost, time and trouble endured by CMC in developing the CMC

19  Confidential Information in the first place.

20  **A.    Defendants.**

21      In April 2001, CMC hired defendant Andrew Verity ("Verity") as Sales Manager.  Mr.

22  Verity is a Canadian citizen, and accordingly CMC sponsored an H1-B visa for Verity so that he

23  could legally reside in the United States as long as he was employed by CMC.

24      As CMC's Sales Manager, Verity reported only to the owner, Mark Lillge, and all sales

25

26  [3] As noted *infra*, CMC has provided its employees with an Employee Handbook regarding its
    proprietary information, and had each employee sign two documents entitled "Agreement
27  Regarding Confidential Information, Intellectual Property Non-Solicitation" and "Employee
    Proprietary Information and Inventions Agreement."  All originals of the former document, which
28  Verity and other CMC employees signed, turned up missing when Defendants left CMC.

-3-

representatives reported to Verity. As a necessary function of his role as Sales Manager, Verity had access to all CMC Confidential Information, including but not limited to financial records (used in part to prepare financial forecasts), client lists, client files, purchasing history, supplier lists, and pricing information. Verity was also the only person in addition to Mr. Lillge both to have the keys to the company safe and to be a signatory on CMC's checking account. It is no overstatement to say that Verity was entrusted with CMC's jewels.

In January 2005, CMC hired Christina Chang ("Chang"), Verity's wife. Chang is also a Canadian citizen, and CMC similarly sponsored an H1-B visa for her so that she could legally reside in the United States while working for CMC.[4]

Chang originally started in accounting at CMC. As part of her job tasks, Chang prepared financial statements for the company, and had access to all customer account information. The following year Chang transitioned to sales. Subsequently, Verity and Chang, in their respective sales functions, called on clients accounting for approximately one third of CMC's revenue in 2006.

It is undisputed that, at all times during their employment with CMC, Verity and Chang were at-will employees.

**B.    CMC's Efforts To Maintain The Secrecy Of Its Trade Secrets.**

In early 2006, CMC tasked Verity with the obligation to work with CMC's counsel to develop a nondisclosure agreement for company employees to sign (the "NDA"). Plaintiff's Exhibit ("Exh.") 15. Verity accepted the task and had substantial communications back and forth with the company attorney, playing a substantive role in creating, editing, and revising the NDA.

---

[4] The fact that neither defendant has been granted permanent residence in the United States creates diversity jurisdiction for this action. *See, e.g., Foy v. Schantz, Shatzman & Aaronson*, 108 F.3d 1347, 1349 (11th Cir. 1997) (holding that "the permanent resident alien provision of § 1332(a) applies only to aliens who have received permission from the INS to remain permanently in this country"); *see also Funygin v. Yukos Oil Co.*, No. Civ. A.H-04-4821, 2005 WL 1840147 (S.D. Tex. July 28, 2005) (finding that individual present in U.S. by virtue of H1-B visa considered alien for purposes of diversity jurisdiction since he was "[not] admitted to the United States for permanent residence."); *Kato v. County of Westchester*, 927 F. Supp. 2d 714, 716 (S.D.N.Y. 1996) ("As a Japanese citizen present in the United States on an E-2 visa, Isao Kato is not admitted for permanent residence in the United States. Therefore, he is treated as an alien for diversity purposes.").

-4-

1    Verity's acts confirm that he was well aware of the substance of the document and the employees'

2    obligations regarding CMC's trade secrets and the CMC Confidential Information.

3            CMC instructed Verity to have each employee sign the NDA, and by signing, agreed not

4    to engage in any improper use of the CMC Confidential Information and not to solicit

5    employees/customers for a finite period of time.  Verity advised CMC that he had obtained signed

6    copies of the agreement from all employees, including, importantly, himself.[5]   Verity later

7    backtracked, stating that the only exception was his wife (Chang), who was out of the office on

8    maternity leave at the time, and that she would be signing the NDA once she returned.  Verity, on

9    at least two distinct occasions after Chang returned to work, committed to CMC that he would

10   have Chang sign the agreement.  CMC personnel later saw certain executed copies of the NDAs

11   by various employees.    The signed NDAs were maintained by Verity as part of his job

12   responsibilities at CMC.

13           Among other things, the NDA – which Verity represented that he had signed and that

14   Chang would sign – stated:

15           "2.    Definition of Confidential Information.    *I realize that my position with the*

16   *Company creates a relationship of high trust and confidence with respect to Confidential*

17   *Information owned by the Company, its clients or suppliers that may be learned or developed by*

18   *me while employed by the Company.  I further acknowledge that my access to such Confidential*

19   *Information is contingent upon my execution of this Agreement.  For purposes of this Agreement,*

20   *'Confidential Information' includes all information that the Company desires to protect and keep*

21   *confidential or that the Company is obligated to third parties to keep confidential, including but*

22   *not limited to 'Trade Secrets' to the full extent of the definition of that term under California law.*

23   *It does not include 'general skills, knowledge and experience' as those terms are defined under*

24   *California law.*

25

26   _____

27   [5] For example, Plaintiff's Exhibit Nos. 402 and 403 are e-mails to and from Verity, in which he
     states that all CMC employees have signed the NDA; he does <u>not</u> exclude himself or his wife
28   from those who signed.

-5-

1        3.      Examples of Confidential Information.  *Confidential Information includes, but is*
2    *not limited to: computer programs; unpatented inventions, discoveries and improvements;*
3    *marketing, manufacturing, organizational, operating and business plans; the Company's internal*
4    *system guides; strategic models; research and development; the Company policies and manuals*
5    *and standard operating procedure; sales forecasts; personnel information (including the identity*
6    *of the Company employees, their responsibilities, competence and abilities, and compensation);*
7    *medical information about employees; pricing and nonpublic financial information; information*
8    *and lists regarding any current and prospective clients, vendors, suppliers employees or*
9    *contractors of the Company, as well as any clients that I know the Company is actively pursuing;*
10   *information concerning planned or pending acquisitions or divestitures; and information*
11   *concerning purchases of major equipment or property.*"

12       **C.    Verity's Work-Related Problems.**

13       During Verity's employment at CMC, he displayed a mercurial personality and frequently
14   erupted in angry outbursts, initiating confrontations at various times with his fellow employees,
15   the CMC principal (Mark Lillge), suppliers, vendors, bankers, consultants, and CMC clients.
16   CMC made several attempts to discuss the matter with Verity both verbally and in writing, and
17   contracted with three different business consultants specifically for the purpose of helping Verity
18   resolve his anger issues.  In January 2006, CMC advised Verity that he was required to undergo
19   anger management counseling as a condition of his continued employment.  Verity did not act on
20   this requirement, and CMC hired an anger management counselor in mid-2006 to work with
21   Verity on weekly basis for a period of several months.  Ultimately Verity, even with the help of
22   these counselors and advisors, was unable to control himself.  In late December 2006 and early
23   January 2007, after yet two additional incidents and a final warning, it became apparent to CMC
24   that Verity's temperament would preclude him from advancing in the company, and it so advised
25   Verity.

26       As a result, in March 2007, CMC and Verity began discussions regarding Verity's
27   transition from the company.  For about a month they attempted to negotiate a final compensation
28   package acceptable to both sides.  During these negotiations, Verity made several references to

-6-

1   his belief that CMC would start losing its clients once Verity left the company. Verity also made

2   several threats of a lawsuit that he would file against CMC for the compensation that he believed

3   he was entitled to regarding his alleged ownership percentage in the company.

4         CMC eventually agreed to the material terms of what Verity had originally asked for and,

5   as a show of CMC's good faith, paid Verity bonuses for 2006 and 2007, only to see Verity then

6   substantially increase his requirements. The parties were then unable to come to an amicable

7   resolution.

8         In early April 2007, CMC discovered that Verity's computer had been purposefully

9   disconnected from the automatic back-up system in place at the company. Accordingly, all uses

10   of Verity's computer, including e-mails sent and received, company information downloaded and

11   printed, and other documents copied or created, were not backed up on CMC's information

12   systems during this time. Verity had up to a week to work and appropriate information in an

13   unmonitored environment before CMC's information technology consultant, Dr. Richard Beery,

14   discovered and remedied the problem. Dr. Beery will testify that there were vast numbers of e-

15   mail messages that had been deleted from Verity's sent file in his e-mail program, meaning a

16   large number of e-mail messages had been sent, which someone had then deleted. Additionally,

17   Plaintiff's expert witness Jon Berryhill will testify that, on April 11, 2007, numerous CMC high-

18   resolution image files suitable for graphic reproduction, including clip art and company logos,

19   were downloaded to Verity's computer.

20         After Verity's departure from CMC in late April, CMC learned that all of the NDAs that

21   had been signed by the employees (including Verity) were missing. CMC immediately made a

22   written inquiry to Verity about the status of the missing documents, but tellingly he never

23   responded.

24      **D.**    **Chang's Refusal To Sign The Proprietary Information Agreement.**

25         Despite Verity's departure, CMC remained willing to employ Chang on the condition that

26   she sign an Employee Proprietary Information and Inventions Agreement ("Proprietary

27   Information Agreement") in May, 2007.[6] Plaintiff's Exh. 68. CMC presented the Proprietary

28

---

[6] The Proprietary Information Agreement was a different agreement than the NDA mentioned

1    Information Agreement to Chang and all other CMC employees in May, 2007 for signature.

2          On Wednesday, May 9, 2007, Bruce Molloy, CMC's General Manager at the time, sent an

3    e-mail to Chang where he advised her that,

4    
> On Friday, May 4, 2007 I distributed the Company's new *Employee Proprietary Information and Inventions Assignment [sic]* to all employees in CMC, including you. These Agreements are non-negotiable, and are a condition of employment for all CMC employees. I asked that the Agreements be returned to me by 3PM on Monday, May 7, 2007.

5    

6    

7    

> At this time, every CMC employee has returned a signed Agreement, except you. In our discussions on May 4th, May 7th, and May 9th, you requested additional time to have your attorney review the document, which I considered a fair request. I cannot advise you what to do about your attorney. However, I can tell you that the responsibility for signing the Agreement and remaining employed by CMC rests with you.

8    

9    

10    

11    

> I feel that we have given you a reasonable amount of time to review and consider whether you will sign the Agreement. I am making one final request for you to return a signed document to me. Please be advised that I need your signed Agreement by 12 PM, Noon, May 10, 2007. If you do not plan to sign the Agreement, please inform me so that we can discuss transition of your accounts.

12    

13    

14    

15    The Proprietary Information Agreement (the subject of Molloy's e-mail, above) merely precludes

16    CMC employees from using CMC proprietary information. Neither Sections 1.1 or 1.2 of the

17    Proprietary Information Agreement, nor any other provisions of the Proprietary Information

18    Agreement, preclude Chang, or any other CMC employee, from competing against CMC for any

19    specified length of time or in any geographic region. After initially indicating that she would sign

20    the agreement, Chang then refused to do so.

21         **E.    The CMC Employee Handbook And Other Steps To Protect The CMC Confidential Information.**

22    

23          CMC provides its employees with a handbook that highlights the importance of protecting

24    CMC's trade secrets ("Employee Handbook"). Plaintiff's Exh. 14. It sets forth rules addressing

25    the issue of trade secret theft, such as a prohibition on taking home customer files or forwarding

26    company emails without prior written authorization. The Employee Handbook expressly states

27    

28    above. The NDAs were the documents presented to CMC employees in the spring of 2006, which then mysteriously disappeared upon Verity's departure from CMC.

1   that, "CMC policy is that the company has invested significant resources to make contact with

2   actual and potential clients. You will be required to sign a non-solicitation agreement to cover

3   these relationships." Regarding the Employee Handbook, Defendant Verity testified: "It was my

4   understanding it applied to everyone's conduct at the company." Defendant Chang testified that

5   she also believed that the Employee Handbook applied to all of CMC's employees.

6       To further protect its trade secrets, CMC has at all times maintained shredding bins for

7   proprietary materials, consistently shreds proprietary documents and envelopes, and frequently

8   converses with its employees both verbally and in writing about the need for the CMC

9   Confidential Information to be confidential. Defendants' own conduct before the initiation of

10  this litigation confirms that there is no genuine dispute regarding CMC's efforts in this regard.

11  For example, as recently as January 31, 2007, while still employed by CMC, Defendant Christina

12  Chang sent an e-mail to Plaintiff's principal Mark Lillge stating that she was "shocked!!!" to come

13  across "2 pages of call-in [information] with tons of pertinent client project/quote info" in a

14  recycling bin, as a "lot of pertinent info was written all over for an important client of ours . . . . I

15  thought it is mandatory to shred all outdated artwork & paper containing client info." Plaintiff's

16  Exh. 24. At a time when Ms. Chang had no reason other than to be completely objective and

17  candid about CMC's actual policies, she accurately conveyed such policies. Likewise, in

18  Plaintiff's Exhibit 410, Verity expressed the same sentiment in a June 14, 2005 e-mail to his

19  fellow CMC employees: "I just want to expand on what goes into the shredding box. Basically

20  anything with a client name on [it] . . . There really shouldn't be anything slipping through that

21  has any kind of client name on it at all."

22      In addition to instructing its employees to maintain CMC's trade secrets inviolate, as

23  evidenced above, CMC also undertakes efforts with its suppliers to ensure that CMC's

24  competitors do not learn what specific types and models of products are purchased by CMC. For

25  example, CMC has actively taken steps to preclude its suppliers from displaying samples of CMC

26  customer orders at industry trade shows. Mr. Verity confirmed that he had removed such samples

27  at trade shows on behalf of CMC in furtherance of this objective.

28      To further protect its trade secrets, CMC does not permit its suppliers to produce any

-9-

1    overruns. CMC's purchase orders state: "Client does not want over-run pieces to be used and/or

2    distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior

3    written consent." Nor does CMC allow its suppliers to place CMC's product orders in these

4    suppliers' catalogs.

5    　　　Despite all of the above, Ms. Chang ultimately refused to sign the Proprietary Information

6    Agreement. CMC terminated Ms. Chang's at-will employment on May 11, 2007. Just before her

7    departure, Chang made statements to her fellow employees to the effect that CMC would soon be

8    "losing its clients."

9    　　**F.    Facts Regarding Counterclaims.**

10    　　　Chang's entire overtime claim has been tendered, including all penalties she claims. At

11    the time of her termination, CMC paid Chang all vacation time owed her plus an extra five days.

12    Chang admits that payment of an extra five days vacation surprised her. CMC also fully paid

13    Verity all vacation time and bonuses owed him at the end of his employment with CMC. Verity

14    and CMC prepared a memorandum regarding Verity's acquisition of an ownership share in CMC

15    over time based on one times the gross profits. As Verity recognized in an October 14, 2005 e-

16    mail to CMC's lawyer John Marlow, acquisition of ownership depended upon CMC's

17    incorporation or sale, neither of which has yet occurred. Verity has also engaged in the numerous

18    breaches of his employment agreement described above. CMC's tender of Chang's overtime

19    (along with other employee overtime claims) will reduce CMC's profits and thus, proportionately,

20    Verity's bonus by more than $60,000. CMC is entitled to at least this amount as an offset to

21    Verity's claims or as a reduction to the valuation of CMC.

22    　　　The Employee Handbook makes clear that Verity was an employee at will, which could

23    not be changed without a written agreement. There was no oral contract granting him

24    employment through the end of 2007. Finally, it is expected that the issue regarding pension

25    plans will be resolved by trial.

26    　　**G.    Subsequent Sales by Chang and Verity.**

27    　　　Since leaving CMC, Defendants Andrew Verity and Christina Chang have made

28    numerous sales to customers who formerly did business with CMC before Defendants' departure.

-10-

1   Defendants first disclosed the identities of these customers to CMC at their depositions on July

2   24, 2007.   Neither Mark Lillge, nor any other representative of CMC, was present at these

3   depositions, with the exception of CMC's counsel.   Defendants later produced documentation

4   regarding these transactions with former customers of CMC.

5       **H.**    **Procedural History.**

6       On June 1, 2007, the Court entered a Temporary Restraining Order against Defendants.

7   On October 2, 2007, the Court issued a Preliminary Injunction against Defendants.   On November

8   13, 2007, the Court entered an Order confirming the scope of the Temporary Restraining Order

9   and Preliminary Injunction.   On April 1, 2008, the Court found Verity and Chang in contempt of

10  the Preliminary Injunction and set a briefing schedule regarding damages and attorneys' fees

11  owed Lillge for their contempt.

12  **ARGUMENT**

13  **I.**    **PLAINTIFF WILL PREVAIL ON THE TRADE SECRET CLAIM.**

14      **A.**    **The CMC Confidential Information Constitutes Protectable Trade Secrets.**

15      The Uniform Trade Secrets Act ("UTSA") was adopted in California in 1985; it defines a

16  "trade secret" as follows:

17          "Trade secret" means information, including a formula, pattern,
    compilation, program, device, method, technique, or process,[7] that:

18

19          (1) Derives independent economic value, actual or potential, from
    not being generally known to the public or to other persons who can
    obtain economic value from its disclosure or use; and

20

21          (2) Is the subject of efforts that are reasonable under the
    circumstances to maintain its secrecy.

22  Cal. Civ. Code § 3426.1(d).

23      As shown below, the CMC Confidential Information easily satisfies all of the required

24  elements to constitute a "trade secret" under UTSA.

25

26  _____

27  [7] This list is non-exhaustive. *American Paper & Packaging Prods., Inc. v. Kirgan*, 183 Cal. App.
    3d 1318, 1323-24 (1986) ("The very language of Civil Code section 3426.1, subdivision (d), is

28  inclusive, not exclusive.").

-11-

**B.    The CMC Confidential Information Derives Independent Economic Value From Not Being Generally Known.**

CMC has developed and refined the CMC Confidential Information through years of hard work, substantial expense, and expertise. Numerous witnesses, including Mark Lillge, will testify regarding the time, effort, and cost involved to identify prospective customers, learn their buying idiosyncrasies, price points, budgets, contact information, and all other information that enables a sales force to do its job. In addition to its tireless work to develop this information, CMC has worked equally hard to foster good relationships with its clients and their key personnel; to develop client-specific strategies; to learn clients' special needs; to determine the most profitable pricing strategies and appropriate methods of price markup; and to otherwise advance clients' interests in its own unique fashion.

The CMC Confidential Information gives CMC a crucial edge over its competitors. If these competitors were to be provided with the CMC Confidential Information, CMC would lose this edge and CMC's competitors would unfairly benefit by receiving information *gratis* that CMC developed only after years of hard work and the expenditure of substantial sums of money. It was precisely to prevent this kind of unfair competition that the Legislature enacted UTSA in 1984. As stated in the Legislative Comment to UTSA, the developmental cost savings enjoyed by trade secret misappropriators is grounds for a finding of liability under the statutes. 1984 Leg. Comm. to Cal. Civ. Code § 3426.1 (citing *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 929-930 (10th Cir. 1975)).

Case law, both before and after UTSA's enactment, is consistent with this policy of protecting those who have expended substantial time and resources in developing their trade secrets. For example, *Western Electroplating Company v. Henness*, 180 Cal. App. 2d 442 (1960) is illustrative. Western was a business that chrome-plated automobile accessories. It employed the defendants (Henness and McCormick) as salesmen, assigned them certain territories, and, just like CMC here, gave them a list of Western's customers in those territories. The defendants eventually decided to join another chrome-plating business (Whetnall), a competitor of Western. The defendants told Western's "more valuable and preferred customers" about their plans, and

-12-

1    many of these customers became customers of Whetnall. The trial court issued a permanent

2    injunction, and the appellate court affirmed, prohibiting the defendants from soliciting Western's

3    customers. *Id.* at 450-51.

4    The appellate court found that "[t]he identity of certain of plaintiff's customers called upon

5    by Henness and McCormick did not constitute secret information," *but "[t]he value of the various*

6    *accounts of customers and knowledge of the amount of business transacted by and between said*

7    *customers and plaintiff did constitute secret information of plaintiff."* *Id.* at 445 (emphasis

8    added). The appellate further court noted:

9         It is not merely the knowledge of the identity of the customers, but
          the friendly contact with them which is important to the solicitors.
10        Their personal acquaintance with customers and knowledge of their
          respective places of residence, their peculiar likes and fancies and
11        other characteristics, a knowledge of which would greatly aid them
          in securing and retaining the business of said former customers, is
12        sufficient to invoke equitable protection against the subsequent use
          by a former employee of such information.
13

14    *Id.* at 4-48 (quoting *George v. Burdusis*, 21 Cal. 2d 153, 160 (1942)).

15    *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990) has many

16    similarities to the present case.[8]    Courtesy, a temporary agency, alleged trade secret

17    misappropriation after one of its employees (Camacho) left to start his own competing business,

18    Transworld Temporaries. Courtesy contended, as CMC avers in this case, that the defendants

19    misappropriated its confidential customer list, "including such information as the volume of the

20    customer's business, specific customer requirements, key managerial customer contacts and

21    billing rates for use in [defendants'] competing business." *Id.* at 1281. The appellate court held

22    that Courtesy was entitled to a preliminary injunction restraining the defendants from using

23    Courtesy's customer information.[9]  *Id.* at 1292.

24    _____

25    [8] While *Henness* and certain other cases cited herein pre-date UTSA (enacted in 1985), it is worth
       noting that "the Uniform Trade Secrets Act is meant to codify" these earlier cases by applying a
26    "*broader definition*" of the term "trade secret" than found under the Restatement of Torts (First)
       definition, the latter of which was traditionally used for trade secret cases prior to the enactment
27    of the UTSA. *Camacho*, 222 Cal. App. 3d at 1287 (emphasis added).

28    [9] The trial court had previously issued a temporary restraining order.

-13-

1    The court summarized the relevant facts as follows:

2        In order that [defendants] might effectively carry out their
          employment duties, Courtesy necessarily revealed to [defendants]
3         confidential and proprietary information regarding Courtesy's
          customers, including their sales volume, profit margins, special
4         employment needs, particular likes and dislikes and pay rates and
          markups. . . .
5
         [Defendants] were … intent upon diverting all of Courtesy's
6         preferred and valuable customers' business to Transworld
          Temporaries.  During the course of his deposition, Camacho
7         produced a … customer list which he prepared and used to solicit
          business for his new company.  The first two pages of this list
8         contain the names of all of Courtesy's major customers.  In each
          instance, for a Courtesy customer, the list contains a person to
9         contact in such company for temporary personnel needs. …
          [Defendants'] list also includes billing rates and/or markup
10        percentages for Courtesy's customers and only Courtesy's
          customers. . . . .
11
         [U]tilizing Courtesy's confidential and proprietary information
12        regarding the amount of business transacted by and between said
          customers and Courtesy, and Courtesy's mark up of these various
13        accounts, defendants' have solicited all of Courtesy's more valuable
          and preferred customers.
14
     *Id.* at 1283-85.
15
         Based on very similar facts to the instant action, that court readily found trade secret
16
     misappropriation.  It noted that "the nature and character of the subject customer information, i.e.,
17
     billing rates, key contacts, specialized requirements and markup rates, is sophisticated
18
     information and irrefutably of commercial value and not readily ascertainable to other
19
     competitors." *Id.* at 1288.
20
         This is the very same type of confidential and proprietary information belonging to CMC
21
     that is currently in the hands of Defendants.  They used this information to target Plaintiff's top
22
     clients within just a week of forming their new directly competitive venture, and have in fact
23
     disrupted a transaction that was almost completed between CMC and its customer.  Defendants
24
     were only aware of this pending transaction as a result of their possession of CMC Confidential
25
     Information.
26

27

28

                                    -14-

1    **C.    The CMC Confidential Information Is The Subject Of Efforts That Are**
     **Reasonable Under The Circumstances To Maintain Its Secrecy.**

2

3    CMC has adopted and enforced reasonably steps to maintain the secrecy of the CMC

4    Confidential Information.  For example, CMC restricts access to, and distribution of, the CMC

5    Confidential Information and generally marks such information as "PRIVATE" and/or

6    "CONFIDENTIAL."  It maintains secure shredders and frequently reminds its employees, both

7    verbally and in writing, of the need for secrecy.  *See* Plaintiff's Exhs. 24 & 410.

8    Moreover, CMC requires every employee to sign the Proprietary Information Agreement

9    confirming that he or she will not improperly use the CMC Confidential Information.  The

10   Proprietary Information Agreement provides:

11              At all times during my employment and thereafter, I will hold in
                strictest confidence and will not disclose, use, lecture upon or
12              publish any of the Company's Proprietary Information (defined
                below), except as such disclosure, use or publication may be
13              required in connection with my work for the Company, or unless an
                officer o the Company expressly authorizes such in writing . . . . I
14              hereby assign to the Company any rights I may have or acquire in
                such Proprietary Information and recognize that all Proprietary
15              Information shall be the sole property of the Company and its
                assigns.

16

17   Plaintiff's Exh. 68 at § 1.1.  The Proprietary Information Agreement includes a non-exhaustive

18   list of examples of confidential information, which includes "all trade secrets, inventions, mask

19   works, ideas, processes, formulas, source and object codes, data, programs, other works of

20   authorship . . . and information regarding . . . marketing and selling, business plans, budgets and

21   unpublished financial statement, licenses, prices and costs, suppliers and customers. . . .[10]  *Id.* at

22   § 1.2.

23   Even before the formation Proprietary Information Agreement, the NDA contained

24   clauses relevant to improper use of CMC's Confidential Information:

25   _____

26   [10] With these concerns in mind, the Proprietary Information Agreement requires employees, upon
     termination of their employment with CMC, to deliver to CMC "any and all drawings, notes,
27   memoranda, specifications, devices, formulas, and documents, together with all copies thereof,
     any other material containing or disclosing and Company Inventions, Third Party Information or
28   Proprietary Information of the Company." Plaintiff's Exh. 68 at § 6.

                                          -15-

1
2
3
4
5
6
7

> I realize that my position with the Company creates a relationship of high trust and confidence with respect to Confidential Information owned by the Company, its clients or suppliers that may be learned or developed by me while employed by the Company. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement. For purposes of this Agreement, "Confidential Information" includes all information that the Company desires to protect and keep confidential or that the Company is obligated to third parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under California law. It does not include "general skills, knowledge and experience" as those terms are defined under California law. . . .

8   Plaintiff's Exh. 15 at ¶ 2.

9   Protecting trade secrets is also a key issue in the Employee Handbook, and not just with

10  respect to CMC's own trade secrets.   The Employee Handbook states:

11
12
13

> [I]t is prohibited to hire an employee of a competitor to gain access to that competitor's trade secrets or proprietary information. Similarly, an employee or former employee is prohibited from providing such confidential information to our competitors.

14  Plaintiff's Exh. 14 at p. 8. The Handbook also notes that "written authorization is needed to take

15  customer files home and/or to forward company emails." *Id.* at 7.

16  **D.    Defendants Knew That They Were Not To Misappropriate The CMC**
17  **Confidential Information, And Their Covert Conduct Confirms This**
    **Awareness.**

18  UTSA defines "misappropriation" to include the following:

19
20

> Disclosure or use of a trade secret of another without express or implied consent by a person who: . . .

21  > (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: . . .

22
23

> ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

24  Cal. Civ. Code § 3426.1(b)(2).   Defendants acquired the CMC Confidential Information as a

25  result of their employment at CMC.  As discussed above, CMC shields this information from its

26  competitors and the public at large.

27  CMC was expressly concerned with employees and former employees using the

28  Confidential Information to solicit CMC's clients. The Employee Handbook states:

-16-

> CMC policy is that the company has invested significant resources to make contact with actual and potential clients. You will be required to sign a non-solicitation agreement to cover these relationships.

Plaintiff's Exh. 14 at p. 8. Defendants' duty to maintain the secrecy of the CMC Confidential Information has never been in doubt. Defendants have always been well aware that the CMC Confidential Information is an invaluable part of CMC's success, and that it gives CMC an edge over its competitors.

Defendants were uniquely familiar with the NDA, the Proprietary Information Agreement, and the Employee Handbook. Defendant Verity was in charge of ensuring that employees signed the NDA, and he represented to CMC that he himself had signed the NDA (which he himself helped revise and draft), and that Defendant Chang would sign the NDA upon return from her maternity leave. Verity either lied to CMC about his execution of the NDA, or he stole the agreement from CMC (along with the other signed employee agreements) when he left. Either way, he and Defendant Chang were without question on notice of their obligations. Notwithstanding the above, Defendants began using the CMC Confidential Information to solicit CMC's clients and erode CMC's customer base even before they left CMC's employment.[11]

Furthermore, all of the evidence points to the fact that in early April 2007 Defendant Verity purposefully disconnected his employee computer from the automatic back-up system in place at CMC. Accordingly, all uses of Verity's computer, including e-mails sent and received by his personal e-mail account, company information downloaded and printed, and other documents copied or created, were not backed up on CMC's information systems. Additionally, vast numbers of e-mail messages had been deleted from Verity's e-mail sent file, meaning a large number of e-mail messages had been sent, which someone had then gone through and deleted. An analysis of Verity's company computer also revealed that on April 11, 2007, numerous art files, including clip art and company logos, had been downloaded.

---

[11] For example, Chang began soliciting CMC's customers to leave CMC before her last day on Friday, May 11, 2007, and had already secured three orders for promotional products from CMC customers by the next business day, Monday May 14, 2007.

-17-

1    After Verity's departure from CMC in late April, CMC learned that all of the NDAs

2  signed by the employees were missing.  CMC immediately made a written inquiry to Verity about

3  the status of the missing documents, but he never responded.  By stealing all the signed NDAs

4  from CMC, Defendants clearly hoped to hide the fact that Verity and Chang had either never

5  signed the NDA, or had signed it but no longer wished to be held accountable to their legal

6  obligations under the NDA, in light of their future plans.  In addition, at the time of Verity's

7  departure, Chang began telling her co-workers that CMC would soon be "losing its clients."

8  Shortly thereafter, Chang voluntarily chose to be terminated from her job simply because she

9  refused to sign the Proprietary Information Agreement (despite earlier representations that she

10  would sign it).

11    On approximately May 20, 2007, just over a week after Chang's departure, CMC learned

12  from a supplier that Verity and Chang had already begun competing with CMC, and then learned

13  from a top twenty customer (a customer that CMC assigned to Chang while she was at CMC and

14  with whom the week before she had been negotiating a deal on CMC's behalf) that it had just

15  been solicited by Verity and/or Chang, resulting in the customer calling off the pending deal with

16  CMC.

17    Accordingly, it is beyond dispute that Defendants are guilty of misappropriating CMC's

18  trade secrets.  *Greenly v. Cooper*, 77 Cal. App. 3d 382 (1978) and the California Supreme Court

19  case on which it relies, *American Loan Corporation v. California Commercial Corporation*, 211

20  Cal. App. 2d 515 (1963), are illustrative.  Cooper and Weinberger, employees of Greenly's

21  mortgage loan brokerage business, left Greenly's employ to form their own competing firm.

22  Greenly brought suit alleging that the defendants, among other things, "appropriated for their own

23  use certain confidential lists and information regarding customers."  *Id.* at 385.  The trial court

24  issued a TRO and then a preliminary injunction.  The appellate court affirmed.  It rejected the

25  defendants' contention that the information contained in Greenly's customer lists was not a

26  protectable trade secret.  It reasoned:

27
> [T]he evidence that defendants had a secretary make copies of the
> lists shortly before they left the business, that they misrepresented
28  the purpose of making such copies, and that they took such copies

-18-

1  with them when they left permits the inference that the information
   contained in the lists was secret and not readily available elsewhere.
2  As noted in American Loan in reference to nearly identical
   circumstances, "if the list was easily obtainable there could have
3  been no reason for him to be at pains to take duplicate copies . . . ."
   [] It would also be reasonable to infer from such evidence and
4  evidence that some of the customers on the list were approached by
   defendants that defendants took the information intending to use it
5  to the prejudice of their former employer and did so.

6  *Id.* at 392-93.  *See also Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 463 (1978)

7  (granting injunction).

8      Similarly here, if Defendants intended to compete fairly with Plaintiff and abide by the

9  confidentiality/non-solicitation agreements, there would have been no reason for Defendants to

10 remove and/or destroy CMC documents and download CMC art files.  In addition, if Defendants

11 simply planned to use information generally available in the trade to compete against Plaintiff,

12 there would have been no need for Mr. Verity to disconnect his computer from CMC's backup

13 system so that he could work in an unmonitored environment just before his departure.  For these

14 reasons, CMC will prevail on its trade secret misappropriation claim.

15     **E.    Damages Under UTSA.**

16     Under Civil Code section 3426.3, CMC may recover damages for the actual loss caused

17 by the misappropriation and "also may recover for the unjust enrichment caused by

18 misappropriation that is not taken into account in computing damages for actual loss."  Cal. Civ.

19 Code § 3426.3(a).  If neither damages nor unjust enrichment can be proved, then "the court may

20 order payment of a reasonable royalty for no longer than the period of time the use could have

21 been prohibited."  *Id.* at § 3426.3(b).  If the misappropriation is willful and malicious, the court

22 may award exemplary damages in an amount not exceeding twice the amount awarded for

23 damages, unjust enrichment, or reasonable royalty.  *Id.* at § 3426.3(c).  *See generally* 13 Witkin,

24 Summary of California Law (10th Ed. 2005) Equity, § 90.[12]

25

26 ────────────────
   [12] CMC is also entitled to recover attorneys' fees if the Court finds that Defendants' motion to
27 terminate the preliminary injunction was made in bad faith, and/or if the Court finds that
   Defendants' misappropriation was willful and malicious."  Cal. Civ. Code § 3426.4.  Costs,
28 including expert witness fees, are also recoverable.  *Id.*

-19-

**F. CMC Is Entitled To An Injunction Restraining Defendants From Using The Confidential Information.**

As stated by Witkin, "Actual or threatened misappropriation may be enjoined." 13 Witkin, *supra*, "Equity," at § 89. And an injunction may be continued "for an additional period of time to eliminate [the] commercial advantage that otherwise would be derived from the misappropriation." *Id.* (citing Cal. Civ. Code § 3426(a); *Morlife v. Perry*, 56 Cal. App. 4th 1514, 1528 (1997)).

**II. PLAINTIFF WILL PREVAIL ON ITS SECOND CAUSE OF ACTION FOR UNFAIR COMPETITION.**

Plaintiff's second cause of action is for unfair competition under the Unfair Competition Law, California Business and Professions Code sections 17200, *et seq.* ("UCL"), pursuant to which "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." According to section 17203, "any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Persons aggrieved are also entitled to restitution. *Id.* §§ 17203-17206; *State Farm Fire & Cas. Co. v. Superior Court,* 45 Cal. App. 4th 1093, 1102 (1996). *See also* 13 Witkin, Summary of California Law (10th Ed. 2005) Equity, §§ 105-129.

Here, Defendants have violated all three prongs of the UCL: their conduct towards CMC has been unlawful, unfair, and fraudulent. Starting with the theft of CMC's Non-Disclosure Agreements, continuing with the theft of CMC's artwork and confidential trade secret information, and then culminating in the use of CMC resources in soliciting CMC's customers, all conducted while still employed at CMC, constitute violations of the UCL, giving rise to injunctive relief and restitution. *See id.* at § 125.

**III. PLAINTIFF IS ENTITLED TO RECOVER ON THE THIRD CAUSE OF ACTION FOR UNJUST ENRICHMENT.**

As set out above, UTSA specifically permits the Court to enter judgment requiring Defendants to disgorge any and all of their unjust and ill-gotten gains. Cal. Civ. Code § 3426.3(a). Here, Defendants' unjust enrichment includes all revenues received by them from

-20-

1     customers wrongfully solicited using CMC's Confidential Information.  Disgorgement should

2     also include all of the benefits realized by Defendants through their misappropriation, including

3     the revenues saved in not having to spend the substantial time, effort, and dollars to develop the

4     Confidential Information independently over many years as CMC was required to do.

5     **IV.**    **PLAINTIFF WILL PREVAIL ON THE FOURTH CAUSE OF ACTION FOR**

6           **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**

7        The elements of a cause of action for intentional interference with prospective economic

8     advantage are:

9         (1)    That CMC and its customers were in an economic relationship that probably

10     would have resulted in an economic benefit to CMC;

11         (2)    That Defendants knew of the relationship;

12         (3)    That Defendants intended to disrupt the relationship;

13         (4)    That Defendants engaged in wrongful conduct in attempting to disrupt the

14     relationship;

15         (5)    That the relationship was in fact disrupted;

16         (6)    That CMC was harmed; and

17         (7)    That Defendants' wrongful conduct was a substantial factor in causing CMC's

18     harm.[13]  Damages available to a prevailing plaintiff are all tort damages under California law,

19     including damages for the economic injury suffered by CMC (lost business, lost opportunity, out-

20     of-pocket expenses, etc.), and punitive damages.  *See generally Duff v. Engelberg*, 237 Cal. App.

21     2d 505, 509 (1965); 6 Witkin, Summary of California Law (10th Ed. 2005) Torts, §§ 1548-1549.

22        Here, Defendants knew full well, because of their employment with CMC, that CMC

23     enjoyed an economic relationship resulting in economic benefits to CMC with numerous

24     customers including, but not limited to, Chevron Credit.  With full knowledge of the relationship

25     and an intent to disrupt it, Defendants breached their duty of loyalty to CMC and, while employed

26     by CMC, solicited CMC's customers, including Chevron Credit, to terminate their economic

27

28     [13] CACI 2202 (citing *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990); *Youst v. Longo*, 43 Cal.3d 64, 71 n.6 (1987)).

1    relationship with CMC and commence purchasing through Defendants. As a result, CMC lost the

2    business of numerous customers, including Chevron Credit, and has suffered damages. *Compare*

3    *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215, 263-66 (1918) (at considerable expense, AP

4    gathered and packaged news bulletins for its customers, while INS simply misappropriated

5    information contained in the bulletins for distribution to its own users), *with Buxbom v. Smith*, 23

6    Cal. 2d 535, 547-49 (1944) (in awarding damages to plaintiff, the court found that, after plaintiff

7    had spent the time and money to build up and train his employees, defendants hired plaintiff's

8    crew, thereby stealing the fruits of plaintiff's labors). *See also* 5 Witkin, *supra*, Torts, §§ 747-

9    749.

10       In addition, because Defendants' conduct was oppressive, fraudulent, and malicious,

11   punitive damages should also be awarded to CMC. Cal. Civ. Code § 3294. *See also* 5 Witkin,

12   *supra*, Torts, at § 1558.

13   **V.    CMC IS ENTITLED TO JUDGMENT ON VERITY'S FIRST COUNTERCLAIM
         FOR BREACH OF CONTRACT.**

14

15       Despite the fact that CMC fully paid Verity all bonus payments due him for 2006, he

16   claims he is entitled to an additional bonus of between $4,000-$5,000 under a memorandum

17   summarizing various terms of his employment ("Memorandum"). Plaintiff's Exh. 30. He claims

18   that (1) CMC in 2006 took two improper deductions for business expenses, and (2) these business

19   expenses should not have been deducted from CMC's calculation of Verity's payment of 35% of

20   net profits for 2006. The deductions include a fee of approximately $10,000 made to Dr.

21   Chambers, a consultant hired by CMC, and a payment of approximately $2,000 made to a CMC

22   employee on a pension plan matter.

23       This claim can be dismissed out of hand. Verity admits that Dr. Chambers was a business

24   consultant for CMC on sales and general business structure, so this 2006 payment was clearly a

25   proper business expense. Any assertion by Verity that this expense should have been paid in

26   2007 is nothing but wishful thinking. CMC always pre-paid Dr. Chambers for the upcoming year

27   for tax purposes, and similarly, nothing precludes a business from prepaying an upcoming year's

28   expenses in late December. The payment to the employee to resolve the pension plan matter was

-22-

1    also made in 2006 and properly categorized as a 2006 business expense. Thus, Verity is owed no

2    additional bonus for 2006.

3        Verity's claim for an ownership share of CMC should also fail. To prevail on this breach

4    of contract claim, Verity must demonstrate that he either fully performed under the contract, or

5    that he was excused from having to perform. *See Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal.

6    App. 3d 887, 913 (1971); CACI 303. The evidence will show that Verity not only failed to

7    perform his duties as a senior manager at CMC, but that he was derelict in his duties and in fact

8    intended to cause harm to CMC in breaching his fiduciary duties of loyalty and confidentiality to

9    CMC. In addition, his misappropriation of CMC's trade secrets and other acts of unfair

10    competition, both individually and in conspiracy with Chang as detailed above, prevent Verity

11    from prevailing on his claim for breach of contract.[14]

12        The Memorandum also states that a decision to terminate the agreement after Verity has

13    worked at CMC two years will only necessitate the buyback of any "share ownership by AV." In

14    an October 14, 2005 e-mail from Verity to a CMC attorney, John Marlow, Verity stated that the

15    ownership offered to a prospective employee would have to wait until CMC incorporated and

16    actually issued shares. Plaintiff's Exh. 405. Mr. Marlow also separately advised Verity that

17    another CMC employee with a comparable contract provision merely had an interest in the sale

18    proceeds of CMC or a share interest once CMC incorporated. These statements clearly show the

19    parties' understanding regarding the interpretation of the phrase "share ownership;" that is, the

20    phrase was intended to provide Verity with rights to sell -- and CMC with rights to re-purchase --

21    at some point in the future when CMC incorporated and issued shares. Because CMC has not

22    been incorporated, the condition precedent to any buyback of Verity's shares has not yet occurred.

23        Even if Verity could establish a breach of contract claim, his damages are far less than he

24    claims. Verity asserts that the formula for any repurchase of his ownership interest should be one

25    times CMC's gross profits for the previous year, and that CMC's gross profits for 2006 were

26

27    [14] It is also notable that the alleged contract requires performance over a period of more than one
      year but is not signed by the party to be charged in violation of the statute of frauds, thus making

28    the contract unenforceable. *See* Cal. Civ. Code § 1624(a)(1).

1   approximately $1.6 million. Verity accordingly seeks 10% of this figure under the Memorandum

2   or $160,000.

3       However, CMC, which has pled the affirmative defense of offset, substantially overpaid

4   Verity's bonuses. Under the Memorandum, Verity claims a bonus of 35% of CMC's net profits.

5   But in fact, CMC's net profits have been substantially reduced because of Chang's (and other

6   employees') unpaid overtime and vacation pay claims.

7       As noted below, CMC has tendered $159,771.59 to Chang for her overtime claim. This

8   is an additional expense that reduces CMC's net profits by $159,771.59. This means that Verity's

9   bonuses were overpaid by 35% of $159,771.59, or by at least $55,920.05. CMC claims this

10   amount as an offset. The unpaid overtime and vacation pay claims also represent a substantial

11   contingent liability that decreases the value of CMC to a potential buyer

12       Verity has not repaid CMC for approximately $1,000 in expedite fees for his H1-B Visa

13   and for a personal airline ticket, and Verity and Chang have not repaid CMC for airline tickets

14   back to Canada. Any sums awarded Verity should be further reduced by these amounts.

15  **VI.   CMC IS ENTITLED TO JUDGMENT ON VERITY'S SECOND AND THIRD**
**COUNTERCLAIMS FOR NON-PAYMENT OF WAGES AND WAITING TIME**
16  **PENALTIES.**

17       Under the Memorandum, Verity claims he is entitled to 35% of CMC's net profits for

18   2007. Because CMC had no profits for 2007 by the time of Verity's departure on April 27, 2007,

19   Verity is not entitled to any 2007 bonus. Moreover, to be eligible for any bonus, Verity had to be

20   employed until the end of 2007, which he was not. Although not specifically plead as part of this

21   counterclaim, Verity is not entitled to any additional payments for a 2006 bonus, for the reasons

22   stated in the previous section.

23       Moreover, Verity is not entitled to pay for five vacation days. First, under the Employee

24   Handbook he was only entitled to carry three vacation days over into 2007. Verity admits taking

25   a week off at the beginning of 2007. Verity's last day was April 11, 2007, but CMC continued to

26   pay him through April 26, 2007, thus more than using up any vacation time he then had.

27   Moreover, he received an extra payment by CMC of approximately $13,000 at the time of this

28   termination that more than covered any *de minimus* vacation time he was owed.

1    A good faith dispute that any wages are due "will preclude imposition of waiting time

2    penalties under [Labor Code] Section 203." Cal. Code Regs. tit. 8, § 13520. The above

3    demonstrates that, at the very least, a good faith dispute exists that Verity is owed any wages for

4    unpaid vacation, thus making any imposition of waiting time penalties inappropriate.

5    **VII.    CMC IS ENTITLED TO JUDGMENT ON VERITY'S FOURTH
     COUNTERCLAIM FOR BREACH OF ORAL CONTRACT.**

6

7    "An employment, having no specified term, may be terminated at the will of either party

8    on notice to the other." Cal. Lab. Code § 2922. It is undisputed that CMC employed Verity as an

9    at-will employee. Neither Lillge nor CMC's general manager at the time Bruce Molloy ever

10   provided Verity with any guarantee of employment through the end of 2007, either at the

11   beginning of 2007 as Verity claims or otherwise.

12       The alleged written contract between Verity and CMC makes no mention of any guarantee

13   of employment through the end of 2007. Verity admits he was familiar with the Employee

14   Handbook that was revised on August 3, 2006. In fact, he was involved with its drafting. The

15   Employee Handbook clearly states

16           Employees of the Company are considered "at-will", and therefore,
             either the employee or the Company may terminate the employment
17           relationship at any time with or without cause or notice. No person
             other than the President or Sales Manager has authority to enter into
18           any agreement for employment for any specified period of time and
             any such agreement must be in writing.[15]
19

20   Plaintiff's Exh. 14 at p.2. The Employee Handbook further states in another section:

21           CMC does not require employees to commit to employment for any
             specific duration, and the Company does not commit to employees
22           that their employment will last for any specific duration.
             Consequently, all employment by the Company is considered at
23           will. This means that CMC may terminate your employment for
             any lawful reason and likewise you are free to resign your
24           employment at any time. Only the President can modify this
             relationship and, even then, only in writing.[16]
25

---

26   [15] Earlier versions of the Employee Handbook dated 7/3/06 and 9/25/05 contain identical

27   provisions.

28   [16] *Id.*

-25-

1    *Id.* No writing exists modifying Verity's status as an at-will employee.

2    The terms stated in employee handbooks are a "central focus" in analyzing whether the

3    employer has agreed to limit its power to terminate at-will. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th

4    317, 345 (2000). Thus, an at-will provision in an employee handbook cannot be ignored in

5    determining whether the parties intended to limit the employer's statutory right to terminate the

6    employment at will. *Id.* at 368.

7    In *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1388 (1999), the

8    employee signed an employment application and an employee's handbook stating both that his

9    employment was at-will and could not be changed except by written agreement. Although these

10   documents did not constitute a fully integrated employment contract, they were "strong evidence"

11   supporting *the statutory presumption* of at-will employment in the absence of any countervailing

12   factual evidence.

13   Here, the Employee Handbook and Verity's acknowledgement likewise constitute strong

14   evidence supporting application of the statutory presumption of at-will employment to Verity's

15   employment. Thus, CMC was free to terminate Verity's employment at any time for any reason.

16   Furthermore, Verity does not claim that the alleged guarantee of employment existed when CMC

17   hired him in April, 2001. Rather, he claims that this guarantee occurred in January, 2007, after he

18   had already been working at CMC for six years. No consideration exists to support any

19   modification of Verity's at-will employment status. There was no agreement at that time to

20   reduce Verity's compensation or increase his job responsibilities. It is a fundamental tenet of

21   contract law that consideration must result from a bargain. *See Simmons v. Cal. Ins. of Tech.*, 34

22   Cal. 2d 264, 272 (1949) ("But the consideration for a promise must be an act or a return promise,

23   bargained for and given in exchange for the promise."); *Dow v. River Farms Co. of Cal.*, 110 Cal.

24   App. 2d 403, 408 (1952) (holding corporate resolution to pay executive $50,000 in consideration

25   of past services unenforceable given absence of any expectation of payment when services were

26   rendered). Where there is "no expectation of payment by either party when the services were

27   rendered, the promise is a mere promise to make a gift and not enforceable." *Passante v.*

28   *McWilliam*, 53 Cal. App. 4th 1240, 1249 (1997). Verity's claimed guarantee of employment is

-26-

1    unsupported by consideration and thus unenforceable.

2    Finally, Verity admits that in January, 2007 he discussed with Lillge the possibility of

3    working in a totally separate import business for the next two or three years.  He also claims that

4    Lillge was supposed to send him a letter around this same period that presumably was to contain

5    terms associated with Verity's termination by year's end, but this letter never came.  These facts

6    demonstrate that Verity and Lillge may have had general discussions about different overall plans

7    for the future, but they never actually agreed on anything.  This is consistent with Lillge and

8    Molloy's testimony that Verity never received any oral promise of employment through the end of

9    2007.  Thus, Verity's claim for breach of oral contract must fail.[17]

10   **VIII.  CMC SHOULD PREVAIL ON CHANG'S SIXTH AND SEVENTH**

11   **COUNTERCLAIMS FOR UNPAID WAGES AND WAITING TIME PENALTIES.**

12   **A.    Chang's Overtime Claim Is Now Moot.**

13   CMC has made a full tender of all amounts claimed by Chang and her expert in

14   connection with her claim for overtime, including all penalties.  Chang's counsel has

15   acknowledged in writing that this tender entirely satisfies Chang's overtime claim.  Thus, there is

16   no issue for the jury to decide regarding Chang's overtime claim.

17   **B.    Chang's Claim for Five Days Vacation.**

18   CMC does not owe Chang any unpaid vacation.  Chang's official start date at CMC was

19   January 1, 2005.  Before that date, Chang provided part-time bookkeeping services and was not

20   considered an employee.  When Chang's employment with CMC ended, CMC gave Chang the

21   benefit of the doubt and gave her credit for all the time she had been associated with CMC, even

22   as a part-time bookkeeper when she was an independent contractor, not an employee.  This

23   additional five days "vacation" time, which covers the period of Chang's part time contracting

24   work, was paid in full by CMC at Chang's termination on May 11, 2007.

25   _____

26   [17] Even where an employment agreement specifies the length of employment, the employer may
     terminate employment due to a willful breach of duty by the employee, the habitual neglect of

27   duty, or continued incapacity to perform his or her duty.  Cal. Lab. Code § 2924.  *See also
     Khajavi v. Feather River Anesthesia Med. Group*, 84 Cal. App. 4th 32, 57 (2000).  Verity's anger

28   management issues, detailed above in the Statement of Facts, would justify such a termination.

1    CMC's General Manager Bruce Molloy never promised Chang a gratuitous five days

2    vacation on top of the vacation pay discussed above. Rather, Molloy stated in a May 11, 2007 e-

3    mail that "in consideration of your part time contracting work prior to your regular full time

4    employment with CMC, which commenced on January 1, 2005, we have also included an

5    additional 5 PTO days in your final paycheck." Plaintiff's Exh. 9. This statement indicates that

6    Chang's final paycheck included all vacation pay to which she was entitled. The additional five

7    vacation days were the result of her work as an independent contractor when she was not entitled

8    to any vacation. CMC out of an abundance of caution paid Chang for these five "vacation" days.

9    Chang's interpretation of this e-mail to mean that CMC threw in an extra, unearned five

10    days of vacation pay beyond any vacation associated with her contract work is incorrect. She

11    admits that she did not earn the additional five vacation days and was surprised at Molloy's e-

12    mail. As Molloy will testify, Chang misinterpreted his e-mail. Her interpretation makes no sense

13    in light of the entire context of her contracting work for CMC.[18] CMC should prevail on Chang's

14    claim for unpaid vacation time.

15    A good faith dispute that any wages are due "will preclude imposition of waiting time

16    penalties under [Labor Code] Section 203." Cal. Code Regs. tit. 8, § 13520. The above

17    demonstrates that a good faith dispute exists that Chang is owed any wages for unpaid vacation,

18    thus making any imposition of waiting time penalties inappropriate.

19    **IX.    DEFENDANTS' NINTH COUNTERCLAIM FOR BREACH OF TRUST WILL BE
         MOOT BY TRIAL.**

20

21    Defendants assert in their ninth counterclaim that their pension plan funds held by CMC

22    have not been transferred to their own separate retirement account. In fact, it is anticipated that

23    such transfer will take place before trial (assuming Defendants cooperate), rendering this cause of

24    action moot.

25

26    [18] Even if CMC did offer five additional days of vacation to Ms. Chang (which it did not), this
      "promise" was not bargained for and is therefore legally unenforceable. *See* authorities cited in
27    Section VII above. Here, Chang's unequivocal testimony confirms that she had absolutely no
      expectation of additional vacation pay above what she had earned pursuant to CMC's stated
28    policies.

-28-

X.    **PLAINTIFF IS ENTITLED TO JUDGMENT ON DEFENDANTS' TENTH CAUSE OF ACTION FOR DEFAMATION.**

"In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 646 (1999). Moreover, "[d]efamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damages as a proximate result thereof." *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986).

The Court granted partial summary judgment on the claims in the defamation counterclaim that relate to written communications by CMC, namely (a) a June 27, 2007 letter from CMC to its suppliers; and (b) a September 7, 2007 e-mail from CMC to its customer. Defendants' only allegations that remain pertain to an alleged oral statement by Lillge regarding Chang's need to leave the country due to visa issues. As noted below, Defendants cannot meet their burden of proof to establish that any of these communications were defamatory. Defendants also contend that there were various verbal misrepresentations made by CMC personnel to its clients regarding Chang leaving the country or having some sort of visa issue. These statements were both true and in no way defamatory. Such alleged statements do not constitute slander *per se* and Chang can prove no damages from them.

The Court should further enter judgment for CMC regarding the defamation claim because Defendants are unable to prove special damages regarding any of the alleged communications. *See Forsher v. Bugliosi*, 26 Cal. 3d 792, 807 (1980) (finding that plaintiff failed to state a claim for libel, as "[u]nless there is a special damage as defined by Civil Code Section 48a, no cause of action arises"). Each of the third parties who allegedly heard the defamatory statements directly from CMC is a customer of Defendants and continues to be a customer of Defendants. Defendants have been unable to offer any evidence of even one sale that it lost or could not complete because of the purported defamatory statements.

///

///

-29-

1

## CONCLUSION

2    Based on the above, CMC respectfully submits that the Court enter judgment on behalf of

3    CMC on its Complaint and on Defendants' counterclaims.

4    Dated:  April __, 2008                DONAHUE GALLAGHER WOODS LLP

5

6                                          By:_____/s/_____

7                                             William R. Hill
                                              Attorneys for Plaintiff and Counterdefendants
8                                             MARK LILLGE dba CREATIVE MARKETING
                                              CONCEPTS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-30-