1   WILLIAM R. HILL, #114954
    rock@donahue.com
2   ANDREW S. MACKAY, #197074
    andrew@donahue.com
3   SARA J. ROMANO, #227467
    sromano@donahue.com
4   DONAHUE GALLAGHER WOODS LLP
  Attorneys at Law
5   300 Lakeside Drive, Suite 1900
  Oakland, California  94612-3570
6   Mail:  P.O. Box 12979
        Oakland, California  94604-2979
7   Telephone:    (510) 451-0544
  Facsimile:    (510) 832-1486
8

9   Attorneys for Plaintiff and Counterdefendant
  MARK LILLGE d/b/a CREATIVE
  MARKETING CONCEPTS
10

11                UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14

15   MARK LILLGE d/b/a CREATIVE          CASE NO.  C 07-02748 MHP
  MARKETING CONCEPTS,

16                         **MOTION IN LIMINE NO. 1 TO EXCLUDE**
            Plaintiff,         **EVIDENCE OF ISSUES ALREADY**
17                         **DETERMINED**
      v.

18                         Trial Date:      May 6, 2008
  ANDREW VERITY and CHRISTINA       Pretrial Conf:    April 23, 2008
19   CHANG,                       Department:    Courtroom 15, 18th Floor
                        Judge:        Hon. Marilyn Hall Patel
20            Defendants.

21

22   ANDREW VERITY and CHRISTINA
  CHANG,

23            Counterclaimants,

24       v.

25   MARK LILLGE d/b/a CREATIVE
  MARKETING CONCEPTS, and DOES 1-
26   10,

27            Counterdefendant.

28

## **INTRODUCTION**

Plaintiff and counterdefendant, Mark Lillge d/b/a Creative Marketing Concepts ("CMC") hereby moves in limine for an order precluding defendants and counterclaimants ANDREW VERITY and CHRISTINA CHANG ("Defendants"), and each of them, from mentioning, referring to, suggesting or arguing to the jury, or introducing any evidence purporting to prove or suggest:

1.    That defendant Chang was terminated "wrongfully," "illegally," "unlawfully," "in violation of law," "in violation of public policy," or similar characterizations tending to suggest that Chang's termination from CMC was wrongful or unlawful;

2.    That CMC engaged in "unfair business practices," "unfair competition," or in conduct that violated Business and Professions Code section 17200;

3.    That CMC libeled Defendants in any manner (excluding also any reference to, mention of, or introduction into evidence of the June 27, 2007 letter from CMC to its customers and the September 7, 2007 e-mail message from CMC to its customers both found by the Court to be non-defamatory as a matter of law);

4.    That CMC "interfered with" or "disrupted" Defendants' economic relationships, or that CMC's conduct caused Defendants any economic harm; and/or

5.    That CMC owed or owes Defendants any unpaid overtime wages, interest, or penalties, including any evidence purporting to show the number of hours per day or days per week that Defendants, or either of them, worked and any evidence purporting to show that Defendants, or either of them, worked evenings or weekends, or missed meals or rest breaks.

The evidence referred to in items 1 through 4 is irrelevant to any issue in the case, since the Court has disposed of all claims to which such evidence could possibly apply by virtue of its April 1, 2008 Memorandum and Order granting summary judgment in CMC's favor on Defendants' fifth, eighth, tenth (as to libel), and eleventh counterclaims for relief.  The evidence referred to in item 5 is irrelevant to any issue in the case, since all of Defendants' counterclaims

-1-

1  for unpaid overtime wages, interest, and penalties (including missed break and meal penalties and

2  waiting time penalties under California law and statutory penalties under the Fair Labor Standards

3  Act) have been mooted by full tender of payment.  Therefore the evidence is inadmissible.

4  Moreover, the probative value of such evidence, if any, is slight when weighed against its

5  prejudicial effect, and its introduction would confuse and mislead the jury as well as waste

6  judicial resources.

7  **ARGUMENT**

8  **I.    THE   COURT   HAS   ALREADY   RULED   THAT   CHANG   WAS   NOT**
   **WRONGFULLY TERMINATED; THAT CMC DID NOT ENGAGE IN UNFAIR**
9  **BUSINESS PRACTICES; THAT CMC DID NOT LIBEL DEFENDANTS; AND**
   **THAT CMC DID NOT INTERFERE WITH DEFENDANTS' ECONOMIC**
10  **RELATIONSHIPS.**

11      On April 1, 2008, this Court granted CMC's motion for summary judgment as to

12  defendant Chang's counterclaim for wrongful termination (count 5) and unfair business practices

13  (count 8).  In entering summary judgment on these counts, the Court held that "CMC was well

14  within its right to demand its employees sign a non-compete agreement in order to protect its

15  trade secrets."  Memorandum and Order Re: Plaintiff's Motion for Partial Summary Judgment and

16  Plaintiff's Motion for an Order to Show Cause Regarding Contempt, filed April 1, 2008, at 9:8-9.[1]

17  The Court also held that CMC was "also well within its right to fire Ms. Chang for

18  insubordination upon refusing to sign the agreement."  *Id.* at 9:9-10.

19      The Court also granted CMC's summary judgment motion with respect to Defendants'

20  eleventh count for intentional interference with prospective economic advantage.  The Court

21  found that "defendants have not provided any evidence that there was a disruption of economic

22  relationships due to plaintiff's acts."  Memorandum and Order, Exhibit A, at 13:19-20.  The Court

23  also found that "defendants are unable to show any economic harm proximately caused by CMC's

24  acts."  *Id.* at 14:2-3.

25

26

27

28  _____

[1] A true and correct copy of the court's April 1, 2008 Memorandum and Order is attached hereto as
Exhibit A for the Court's convenience.

1    Because the Court has already found that CMC did not wrongfully terminate Chang; that

2    CMC did not engage in unfair business practices under Business and Professions Code section

3    17200, and did not interfere with Defendants' economic relationships, any mention or suggestion

4    to the contrary, and any evidence that Defendants may attempt to introduce to the contrary, would

5    not be relevant, admissible evidence under Rules 401 and 402 of the Federal Rules of Evidence.

6    Moreover, even if marginally relevant, such evidence would be unduly prejudicial under Rule 403

7    because of its slight, if any, probative value.  "Where the evidence is of very slight (if any)

8    probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair

9    prejudice or a small risk of misleading the jury."  *United States. v. Hitt*, 981 F.2d 422, 424

10   (9th Cir. 1992).

11    In addition, any such evidence or argument would confuse the issues, mislead the jury,

12   and cause undue delay and waste of time.  Because the Court has already ruled on Defendants'

13   wrongful termination, unfair business practices, and intentional interference counterclaims, the

14   facts alleged in those counterclaims must be "treated as established," and not subject to

15   determination by the jury. Fed. R. Civ. P. 56(d)(1).  *See also Alberty-Vélez v. Corporación de*

16   *Puerto Rico para la Difusión Pública*, 242 F.3d 418, 421-26 (1st Cir. 2001) (holding that trial

17   court erred in admitting evidence contrary to previous partial summary judgment order).

18   Therefore, allowing the introduction and presentation of such evidence or argument would waste

19   the jury's time, as there would be nothing for the jury to decide based on such evidence.

20   Furthermore, if such evidence were introduced to the jury, the jury would likely be confused or

21   misled by such evidence or argument, and would likely misapply such evidence or argument to

22   the claims that remain in the case.  This is precisely the circumstance that Rule 403 seeks to

23   avoid, and the reason why such evidence and argument should be excluded.

24   **II.    THE COURT HAS ALREADY RULED THAT CMC DID NOT LIBEL**
     **DEFEFNDANTS AND THAT THE JUNE 27 LETTER AND SEPTEMBER 7**
25   **LETTER WERE NOT DEFAMATORY AS A MATTER OF LAW.**

26    The Court granted summary judgment in favor of CMC with respect to Defendants'

27   defamation claims regarding (1) a June 27, 2007 letter from CMC to its suppliers, and (2) a

28

-3-

1    September 7, 2007 e-mail from CMC to its customers.  The Court held that each of these written

2    communications was non-defamatory as a matter of law because Defendants could not

3    demonstrate that any of the statements contained in the communications were untrue.

4    Memorandum and Order, Exhibit A, at 10-12.

5        Because the Court has ruled that the two written communications were non-defamatory as

6    a matter of law, these communications are inadmissible to prove defamation.  Therefore, if they

7    are admitted for any purpose, Defendants, and each of them, should be precluded from arguing

8    that they are defamatory.  Moreover, Defendants, and each of them, should be precluded from

9    mentioning, referring to, suggesting, or arguing to the jury that CMC has libeled Defendants,

10    since the Court has already ruled that CMC has not, thereby establishing those facts for purposes

11    of this action.  Fed. R. Civ. P. 56(d)(1); *Alberty-Vélez*, 242 F.3d at 422.  Even if such evidence

12    were relevant, which it is not, its introduction would be far more prejudicial than probative,

13    would confuse the issues and mislead the jury, and would waste judicial resources, and it should

14    therefore be excluded under Federal Rules of Evidence, Rule 403.

15    **III.    DEFENDANTS' COUNTERCLAIMS FOR UNPAID WAGES ARE MOOT.**

16        Defendants' second, third, sixth, and seventh counterclaims sought payment of overtime

17    wages and missed meal and rest break penalties alleged to be due under California law, plus

18    statutory penalties under California law and under the Fair Labor Standards Act.  These amounts

19    have been tendered in full, including all penalties and interest, and Defendants so acknowledge.

20    *See* Letter from Richard Harrington dated April 1, 2008, attached hereto as Exhibit B.  There is,

21    consequently, no remaining issue of fact for the jury to determine as to these counterclaims.

22    Defendants' counterclaims for unpaid vacation days and Verity's counterclaim for unpaid bonus

23    remain to be adjudicated, and no exclusion of evidence pertinent to those counterclaims is being

24    sought in this motion.[2]

25

26

---

27    [2] Defendants' claims for attorneys' fees also remain unadjudicated.  However, attorneys' fees for unpaid wages are statutory, and are not an element of damages.  Cal. Lab. Code §§ 218.5, 1194(a) (West 2003). Therefore, the jury will not decide the attorneys' fees claims, which must be presented to the Court in the form of a post-trial motion.  Fed. R. Civ. P. 54(d)(2); N.D. Cal. L.R. 54-6.

28

-4-

1    Defendants cannot contend that CMC's alleged failure to pay overtime wages or wages for

2   missed breaks and meal periods is relevant to any of Defendants' remaining claims.  Verity's

3   breach of written contract counterclaim (count 1) does not seek recovery of overtime wages or

4   wages for missed breaks and meal periods.  Verity's breach of oral contract counterclaim

5   (count 4) alleges breach of an alleged oral promise to continue to employ Verity in the future, not

6   breach of an obligation to pay wages already earned.  Defendants' breach of trust counterclaim

7   (count 9) seeks recovery of sums under a pension plan, not overtime wages or wage-related

8   penalties.  Finally, Defendants' defamation counterclaim (count 10) refers to conduct post-dating

9   their employment.

10    Since Defendants' counterclaims for unpaid overtime wages, missed meal and rest break

11   penalties, and statutory penalties under California and federal law have been mooted as to all

12   issues determinable by the jury, any evidence of CMC's alleged failure to pay overtime wages or

13   penalties is irrelevant to any issue remaining in the action, and is therefore inadmissible under

14   Federal Rules of Evidence, Rule 402.  Likewise, any testimony concerning the number of hours

15   per day or days per week that Defendants, or either of them, may have worked, or testimony that

16   Defendants, or either of them, worked evenings or weekends, or that Defendants, or either of

17   them, missed meals and rest breaks due to work, is irrelevant to any issue remaining in the action,

18   and inadmissble under Rule 402.

19    The only purpose that Defendants could have in attempting to introduce such evidence

20   would be to prejudice the jury against CMC.  The evidence should therefore also be excluded

21   under Federal Rules of Evidence, Rule 403.  Defendants should be precluded from introducing

22   any evidence of the hours they worked, of work on evenings or weekends, and of missed meals

23   and rest breaks, and Defendants should be precluded from mentioning, referring to, suggesting or

24   arguing to the jury that CMC failed to pay overtime wages or penalties.

25

26

27

28

1

**<u>CONCLUSION</u>**

2

For the reasons set forth above, CMC respectfully requests that the Court preclude

3

Defendants, and each of them, from introducing evidence at trial as set forth above, and from

4

referring to, mentioning, suggesting or arguing to the jury the existence of any such evidence.

5

Respectfully submitted,

6

Dated:  April 14, 2008                    DONAHUE GALLAGHER WOODS LLP

7

8

By: */s/ William R. Hill*

9

William R. Hill
Attorneys for Plaintiff and Counterdefendant
MARK LILLGE d/b/a CREATIVE MARKETING

10

CONCEPTS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

# EXHIBIT A

1
2
3
4
5
6
7
8          UNITED STATES  DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10
MARK LILLGE d/b/a CREATIVE
11  MARKETING CONCEPTS,
                                                    No. C 07-02748 MHP
12                     Plaintiff,

13          v.                                      **MEMORANDUM & ORDER**
                                                    **Re: Plaintiff's Motion for Partial**
ANDREW VERITY and CHRISTINA                         **Summary Judgment; Plaintiff's Motion**
14  CHANG,                                          **for an Order to Show Cause Regarding**
                                                    **Contempt**
15                     Defendants.
    _____/
16
AND RELATED COUNTERCLAIMS.
17  _____/

18          On May 25, 2007 plaintiff Mark Lillge ("Lillge") d/b/a Creative Marketing Concepts

19  ("CMC") brought this action against defendants Andrew Verity and Christina Chang asserting

20  claims for misappropriation of trade secrets, unfair competition, unjust enrichment and intentional

21  interference with prospective economic advantage.  On July 6, 2007 defendants answered and

22  counterclaimed.  Now before the court is plaintiff's motion for partial summary judgment and

23  plaintiff's motion for an order to show cause regarding contempt.  Having considered the parties'

24  arguments and for the reasons stated below, the court enters the following memorandum and order.

25

26  Motion for Partial Summary Judgment

27  I.          BACKGROUND

28          CMC is a full-service advertising specialty and corporate apparel firm that sells businesses

goods branded with the business' corporate logo.  Joint Statement of Undisputed Facts ("JSUF"),

**UNITED STATES DISTRICT COURT**
For the Northern District of California

¶ 2.  CMC typically spends approximately five percent of its annual gross revenue, or $200,000, on marketing efforts to assist in developing its customer base.  Id., ¶ 7.  CMC's customer list and specific customer information are not developed by its sales personnel; rather, CMC independently develops this information and distributes it as necessary to its sales personnel.  Lillge Dec., ¶ 3.

This information includes, but is not limited to: 1) contact information for certain customers, including key decision makers who CMC knows actually buy its products; 2) purchasing history of certain customers and respective sales volume, including the knowledge of when a customer will be due for replenishment/re-order based upon its prior transactions with CMC; 3) knowledge of CMC's customers' particular requirements and buying habits, including needs, likes, dislikes and limitations; and 4) what CMC charges its customers.  Id., ¶ 4.

In order to protect this confidential information, CMC provides its employees with an employee handbook that highlights the importance of protecting its trade secrets.  JSUF, ¶ 11.  The handbook sets forth rules addressing the issue of trade secret theft, such as a prohibition on taking home customer files or forwarding company emails without prior written authorization.  Id., ¶ 12.  It states that "CMC policy is that the company has invested significant resources to make contact with actual and potential clients. You will be required to sign a non-solicitation agreement to cover these relationships."  Lillge Dec., Exh. A.  The provisions contained in the handbook applied to everyone at CMC.  JSUF, ¶¶ 14–15.

CMC also takes four additional steps to ensure confidentiality.  First, CMC requires every employee to sign an agreement that he or she will not improperly use CMC confidential information or solicit CMC's customers for up to two years after conclusion of their employment with CMC.  Lillge Dec., ¶ 6, Exh. B.  Second, CMC undertakes efforts to ensure that CMC's competitors do not learn what specific types and models of products are purchased by CMC by actively taking steps to preclude its suppliers from displaying samples of CMC customer orders at industry trade shows.  Id., ¶ 9.  Third, CMC does not permit its suppliers to produce any overruns.  Its purchase orders state: "Client does not want over-run pieces to be used and/or distributed as samples nor shown in any printed materials, such as catalogs or flyers without prior written consent."  Id., Exh. D.  Fourth, CMC maintains separate shredding bins for proprietary materials, consistently shreds proprietary

2

1   documents and frequently converses with its employees both verbally and in writing about the need

2   for this information to be confidential.  Id., ¶ 7, Exh. C (defendant Chang confirming the shredding

3   policy).  Nevertheless, it appears that the identity of many of CMC's customers and the items they

4   purchase is available to the public via a visit to CMC's office and through its catalogues, which

5   contain either samples or pictures of samples of CMC's work.  See generally Schmolder Dec.

6         In April 2001 CMC hired Andrew Verity as Sales Manager.  JSUF, ¶ 19.  In January 2005 it

7   hired Christina Chang, Mr. Verity's wife.  Id., ¶ 20.  Ms. Chang started in accounting where she had

8   access to customer account information.  Id., ¶ 21.  The following year, Ms. Chang transitioned to

9   sales.  At all times Ms. Chang was an at-will employee.  Id., ¶ 22.

10         Mr. Lillge asked Mr. Verity to acquire signatures of all CMC employees on a confidentiality

11   agreement.  This agreement contained the following clause:

> (b)Non-Solicitation of Customers, Vendors and Suppliers.  For a period of twenty-four (24) months from the date of termination of my employment with the Company for any reason, I shall not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of a public corporation) or in any other capacity, either solicit or engage in the business engaged in by the Company as of the date of termination of my employment ('CMC Business') with any current or prospective client, vendor or supplier which was a current or prospective client, vendor or supplier, of the Company within the twelve (12) months immediately preceding my termination.

17   Lillge Dec., Exh. B.  Mr. Verity embarked upon this venture despite his misgivings.  Verity Dec.,

18   ¶ 2.  Specifically, he was concerned about the legality of the above provision.  He discussed the

19   same with CMC's lawyer and the lawyer stated:

> All of this said, there is a fine line between a non-Solicitation Clause and a Non-Compete Clause.  Non-compete provisions are not enforceable in California, while non-solicitation clauses are often enforceable.  I say 'often' because the case law is not completely consistent on the enforceability of non-solicitation clauses, but they are the best you can do.  I always recommend them because, at a minimum, they generally deter former employees from soliciting current customers and employees and, if push comes to shove, the clause is in the agreement and must be addressed/overcome by the former employee in a dispute (i.e., the fact that the employee agreed to the restriction can always be raised before the court / arbitrator).

25   Id., Exh. 1.[1]

26         In April 2007 CMC fired Mr. Verity.  Id., ¶ 5.  Upon Mr. Verity's departure, CMC was

27   unable to locate the confidentiality agreements that had been signed by its employees.  Id., Exh. E.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    After Mr. Verity's departure, CMC asked Ms. Chang to sign a confidentiality agreement.

2    JSUF, ¶ 23.  Ms. Chang refused and CMC terminated her on May 11, 2007.  Id., ¶¶ 24–25.  At the

3    time of her departure, she advised CMC of certain customer information she had developed.  For

4    instance, she went through her corporate client list and advised Mr. Lillge of the key buyers at each

5    client and their individual preferences.  Boyd Dec., Exh. B at 46:22–48:16.  Based on her personal

6    knowledge, she testified that one of her clients would likely need to place an order in June that

7    would be "easily $15,000.  It's a no-brainer."  Id.

8    At the time of their firings, defendants were responsible for about a third of CMC's sales,

9    approximately $1.65 million.  Verity Dec., ¶ 8.  Shortly thereafter, Mr. Verity and Ms. Chang started

10   their own promotional products business known as Branding Boulevard, which has achieved sales of

11   $600,000 in the nine months it has been operative.[2]  Id.

12   Plaintiff filed this action on May 25, 2007, shortly after learning of defendants' new

13   business.  On June 1, 2007 this court entered a temporary restraining order against defendants.  See

14   Docket No. 15.  Since leaving CMC, defendants have made sales to customers who formerly did

15   business with CMC.  JSUF, ¶ 26.  They first disclosed the identities of these customers to CMC at

16   their depositions on July 24, 2007.  They subsequently produced documentation regarding the

17   transactions with former CMC customers.  Boyd Dec., ¶ 6.  On October 1, 2007 this court issued a

18   preliminary injunction against defendants.  See Docket No. 61.  On November 13, 2007 this court

19   entered an order confirming the scope of the temporary restraining order and preliminary injunction.

20   See id., No. 75.

21   Plaintiff now moves for summary judgment as to defendants' fifth, sixth, seventh, eighth,

22   tenth and eleventh causes of action against CMC.[3]

23

24   II.    Legal Standard

25   Summary judgment is proper when the pleadings, discovery and affidavits show that there is

26   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

27   matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

28   case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

2   party. Id.  The party moving for summary judgment bears the burden of identifying those portions

3   of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material

4   fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party

5   will have the burden of proof at trial, the moving party need only point out "that there is an absence

6   of evidence to support the nonmoving party's case." Id.

7         Once the moving party meets its initial burden, the nonmoving party must go beyond the

8   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

9   genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

10  party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The

11  court may not make credibility determinations, and inferences to be drawn from the facts must be

12  viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker

13  Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

14

15  III.    Discussion

16        A.      Wrongful Termination; Business and Professions Code section 17200

17        The parties' dispute focuses on whether the agreement CMC asked its employees to sign as a

18  condition of continued employment unlawfully restricted the employees' post-termination right to

19  compete.  The agreement stated, *inter alia*, "I shall not [for a period of two years] . . . solicit or

20  engage in the business engaged in by the Company as of the date of termination of my employment

21  . . . with any current or prospective client [of CMC] . . . within the twelve (12) months immediately

22  preceding my termination."  Plaintiff admits that "[f]or purposes of this motion, CMC is not

23  disputing that Ms. Chang was fired for her refusal to sign the confidentiality agreement."[4]

24  See Plaintiff's Motion for Partial Summary Judgment, Docket No. 81 at 8 n. 26.

25        Defendant's argument that this provision is a wholesale restraint forbidding Chang from

26  working in the same business is simply untrue.  Nevertheless, the "engage in" language could

27  arguably be void under California law as it disallows CMC's clients from choosing to do business

28  with Branding Boulevard.  The question then becomes whether plaintiff's act of firing defendant

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Chang for refusing to sign the six-page agreement with multiple other provisions, including

2    protections of trade secrets, was illegal.  If plaintiff can establish that he has even one piece of

3    information that can qualify as a trade secret, then he would be justified in asking his employees to

4    adhere to a limited non-compete agreement that disallows using that trade secret for the employees'

5    personal benefit.

6         In order to establish that it has trade secrets, CMC must meet a two-part test. California has

7    adopted the Uniform Trade Secrets Act ("UTSA"), which defines a trade secret as follows:

8         'Trade secret' means information, including a formula, pattern, compilation, program,
          device, method, technique, or process, that:
9         (1) Derives independent economic value, actual or potential, from not being generally
          known to the public or to other persons who can obtain economic value from its
10        disclosure or use; and
          (2) Is the subject of efforts that are reasonable under the circumstances to maintain its
11        secrecy.

12   Cal. Civ. Code § 3426.1(d).

13        The parties devote most of their argument to whether defendants have admitted that plaintiff

14   possesses trade secrets.  See Fed. R. Civ. P. 8(d); Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th

15   Cir. 1980).  This court, however, does not find an admission on the part of defendants regarding the

16   trade secret issue merely because they admitted the following paragraph in the complaint:

17        While the fact that many of CMC's actual customers might be willing to purchase
          promotional goods is information possibly available to CMC's competitors, there are
18        many details regarding CMC's relationships with its customers which are not
          generally known to the public or CMC's competitors, and CMC derives independent
19        economic value from this information which it has developed through substantial
          time, effort and expense.
20
21   JSUF, ¶ 10; see also Answer, ¶ 9.  Other than this purported admission, defendants have consistently

22   and vehemently maintained that plaintiff does not possess any trade secrets.  See, e.g., Answer, ¶ 11

23   (denying the existence of confidential information).

24        As this court found in the order granting the preliminary injunction, California courts have

25   held that confidential customer information beyond the identities of customers may constitute a trade

26   secret.  See Docket No. 61; Western Electroplating Co. v. Henness, 180 Cal. App. 2d 442, 445

27   (1960) ("[t]he value of the various accounts of customers and knowledge of the amount of business

28   transacted by and between said customers and plaintiff did constitute secret information of

6

UNITED STATES DISTRICT COURT
For the Northern District of California

1   plaintiff."). The court further held that knowledge of customer preferences and characteristics that

2   would aid the plaintiff in securing and retaining business were sufficient to secure protection against

3   the use of the information by a former employee. Id. at 448; see also Courtesy Temp. Serv., Inc. v.

4   Camacho, 222 Cal. App. 3d 1278, 1288 (1990) (holding that a company's customer list and related

5   proprietary information consisting of "billing rates, key contacts, specialized requirements and

6   markup rates" met the first prong).

7        The information maintained by plaintiff—key decision makers at the client, purchasing

8   history, pricing, sales volume, when to contact client for replenishment and the client's particular

9   requirements and buying habits, including needs, likes, dislikes, and limitations—which is not

10   generally available, pertains to the value to CMC of the promotional product customers. See

11   Thompson v. Impaxx, Inc., 113 Cal. App. 4th 1425, 1429 (2003) ("'the list of customers, not

12   ordinarily entitled to judicial protection, may become a trade secret, if there is confidential

13   information concerning the value of these customers.'") (citing Gordon v. Schwartz, 147 Cal. App.

14   2d 213, 217 (1956)).

15        The information maintained by CMC is exactly the type of information intended to be

16   protected by California trade secret law. For example, the information Ms. Chang gave Mr. Lillge

17   upon her departure could qualify as trade secrets. She specifically notified Mr. Lillge as to a client

18   that would need replenishment to the tune of $15,000 at a specific time. There can be no doubt that

19   whatever value this information possesses is solely based on the fact that it is not generally known to

20   the public. For instance, other persons, such as CMC's competitors, could obtain economic value

21   from knowledge of this information because they could solicit CMC's clients immediately prior to

22   when CMC was intending to contact those clients. However, if this information was generally

23   known, nobody in the promotional products industry would have an advantage. Thus, the first prong

24   is met—plaintiff is able to demonstrate that he possesses at least some information from which he

25   derives independent economic value due to its secrecy. The court now turns to whether reasonable

26   efforts were undertaken to maintain secrecy of this information.

27        In light of the various safeguards undertaken by CMC—rules regarding computer files and

28   emails, confidentiality agreements, shredding bins and preclusion of suppliers displaying

UNITED STATES DISTRICT COURT
For the Northern District of California

samples—the second prong is easily met. This is further buttressed by a California court of appeal

decision finding reasonable efforts at secrecy under similar circumstances:

> [T]here is no doubt that [the employer] intended its customer information to remain secret and undertook reasonable steps to secure that end. . . . [C]ustomer information was stored on computer [sic] with restricted access. Moreover, in its employment contract signed by [the employee], [the employer] included a confidentiality provision expressly referring to its customer names and telephone numbers. The [employer's] employee handbook contained an express statement that employees shall not use or disclose [the employer's] secrets or confidential information subsequent to their employment including 'lists of present and future customers.'

Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1523 (1997). The efforts at secrecy here were

far greater.

Finding that CMC does in fact have at least some trade secrets, the court must now determine

whether plaintiff may protect them via an agreement with an arguably anti-competitive provision. In

Metro Traffic Control, Inc. v. Shadow Traffic Network, the California Court of Appeal dealt with a

similar situation. 22 Cal. App. 4th 853 (1994). When discussing a one-year non-compete clause

and a prohibition on disclosure of trade secrets for two years, the court held:

> The merit of [the employer's] claim depends on its ability to demonstrate that it has a protectible trade secret. Business and Professions Code section 16600 prohibits the enforcement of [the employer's] noncompete clause except as is necessary to protect trade secrets. One commentator closes this analytical circle neatly: 'Any attempt to restrict competition by the former employee by contract appears likely to be doomed under section 16600 of the Business and Professions Code, unless the restriction is carefully limited and the agreement protects merely a proprietary or property right of the employer recognized as entitled to protection under the general principles of unfair competition.'

Id. at 860–61 (internal citations omitted). Although that court eventually found no trade secrets

existed, its rationale regarding non-compete clauses is still valid. Indeed, Metro was recently cited

approvingly by the California Supreme Court which adopted its rationale. See Reeves v. Hanlon, 33

Cal. 4th 1140, 1150 (2004).

Here, the non-compete clause is narrowly tailored in both time and scope and designed to

protect plaintiff's trade secrets. Specifically, the non-compete clause is limited to business with

"any current or prospective client, vendor or supplier which was a current or prospective client,

vendor or supplier, of the Company within the twelve (12) months immediately preceding [the

employee's] termination." Lillge Dec., Exh. B. Since CMC maintains as trade secrets its client-

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1    specific information that is not generally known in the industry, a non-compete clause with respect

2    to the current or prospective clients protects CMC's trade secrets.  For instance, it disallows former

3    employees from exploiting the client's needs, likes, dislikes and limitations—proprietary

4    information it gained through employment at CMC—to their benefit even if the client initiates

5    contact with the former employees.  This court thus affirms "the concomitant right to have the

6    ingenuity and industry one invests in the success of the business or occupation protected from the

7    gratuitous use of that 'sweat-of-the-brow' by others."  Morlife, 56 Cal. App. 4th at 1520.

8         In sum, CMC was well within its right to demand its employees sign a non-compete

9    agreement in order to protect its trade secrets.  Consequently, it was also well within its right to fire

10   Ms. Chang for insubordination upon refusing to sign the agreement.  Therefore, plaintiff's motion

11   for summary judgment regarding defendants' counterclaim for wrongful termination, count five, is

12   granted.  For the same reasons, plaintiff's motion for summary judgment regarding defendants'

13   counterclaim for a violation of Business and Professions Code section 17200, count eight, is also

14   granted.  Consequently, defendants' cross-motion for summary judgment on counts six and eight of

15   the counterclaim is denied.[5]

16

17        B.    Unpaid Vacation Pay

18        Under her sixth and seventh causes of action, defendant Chang seeks five days of vacation

19   pay from CMC.  CMC states that since Chang had no expectation of this pay when she rendered

20   services for CMC, she is not entitled to the same.  Thus, it argues, any offer by CMC was a

21   gratuitous promise.  As evidence of this, they point to her deposition.  Specifically:

22        Q: So it was your understanding that these five additional days were days that you
          hadn't necessarily earned pursuant to CMC's policy, but it was something that Mr.
23        Molloy [CMC's General Manager] agreed to add on to your termination?
          A: Yes.
24        . . .
          Q: And was it during this conversation with Mr. Molloy where he agreed to
25        essentially grant you five days of additional vacation pay?
          A: No.
26        Q: When did he actually agree to do that?
          A: The additional five days?
27        Q: Right.
          A: [In] the termination e-mail that I requested of him.
28

9

Q: Prior to receiving that e-mail, did you request that he grant you those additional five days or –
A: No.
Q: Was that a surprise to you?
A: It was a surprise, yeah.
. . .
Q: So in the e-mail that [Mr. Molloy] sent to you later that Friday, he agreed to pay you for the five days of vacation pay that you said you were entitled to, and your understanding is that he threw an additional five days on top of that?
A: Yes.

Boyd Dec., Exh. B at 153:18–22; 164:24–165:13; 168:18–23.

However, defendant Chang states that she was given the five additional days of pay as consideration for her part-time work at CMC, before she became a full-time employee. Specifically, when she was fired, CMC's general manager stated to her in an e-mail: "Additionally, in consideration of your part time contracting work prior to your regular full time employment with CMC, which commenced on January 1, 2005, we have also included an additional 5 PTO days in your final paycheck." Chang Dec., Exh. 1. This statement, though supporting Chang's position, also suggests that according to CMC, whatever vacation pay Ms. Chang was entitled to was included in her final paycheck.

It is unclear what Chang's expectations were when she received the additional five days—she could have been surprised at the fact that CMC capitulated or surprised that they offered five days of pay as opposed to something else. Further, the general manager's email demonstrates an understanding had been reached between the two. Drawing all inferences in the light most favorable to Chang, this court cannot conclude that this promise was gratuitous. Indeed, the five additional days of pay, even though it may be *de minimis* can be viewed as a severance package of sorts. In light of this conflicting evidence, summary judgment is inappropriate.

C.      Defamation

Truth is a complete defense to all charges of defamation. Smith v. Maldonado, 72 Cal. App. 4th 637, 646 (1999). Defendants allege plaintiff defamed them in three ways: 1) a June 27, 2007 letter from CMC to its suppliers; 2) a September 7, 2007 e-mail from CMC to its customers; and 3) oral statements made by CMC. Each is discussed in turn.

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On June 27, 2007 CMC sent a letter to its suppliers, which stated, *inter alia*:

2    This is to put you on notice that on June 1, 2007, Judge Marilyn Hall Patel, of the
     United States District Court for the Northern District of California, San Francisco
3    Division, granted a Temporary Restraining Order to prevent Andrew Verity and
     Christina Chang, former employees of Creative Marketing Concepts, from soliciting
4    our clients or misappropriating any of CMC's trade secrets.

5    As you may be aware, Mr. Verity and Ms. Chang have established their own
     promotional products business, which they have every right to do. We believe the
6    name of the company is Branding Boulevard. However, CMC filed a lawsuit against
     Mr. Verity and Ms. Chang because we have reason to believe that they have used or
7    threatened to use CMC trade secret information to solicit CMC's clients and acquire
     information about jobs that CMC has done in the past.

8
     Accordingly, we ask that you inform the appropriate people in your organization that:
9    1) Mr. Verity and Ms. Chang are no longer employees of CMC and do not represent
     CMC in any way; 2) Mr. Verity and Ms. Chang are not entitled to any information
10   regarding CMC clients, including products, pricing, artwork, etc.; and 3) please
     inform me directly if either Mr. Verity or Ms. Chang request any information about
11   or relating to CMC's current or past clients.

12   Lillge Dec., Exh. F.

13       Defendants claim this language is misleading because it neglects to mention that suppliers

14   are free to contact defendants. Not surprisingly, the language also neglects to mention that suppliers

15   are not free to contact defendants. Since plaintiff is under no obligation to inform its suppliers that

16   they are free to cease doing business with CMC, the court finds nothing misleading about this

17   communication.

18       Defendants cannot demonstrate that any of the statements contained in this communication

19   are untrue. In light of this failure to demonstrate any untruthfulness or mischaracterization of the

20   court's order, this communication is held to be non-defamatory as a matter of law.

21       On September 7, 2007 CMC sent an e-mail to its customers which defendants also contend is

22   false and misleading. The e-mail states, in relevant part:

23   As you may be aware, Andy Verity and Christina Chang left CMC a few months
     back. You should note that Judge Marilyn Hall Patel, of the United States District
24   Court for the Northern District of California, San Francisco Division, has granted
     CMC a Temporary Restraining Order on June 1, 2007 which prohibits them not only
25   from soliciting CMC clients but also restrains them from initiating contact with CMC
     clients. If you would like additional information about this situation, please contact
26   me directly.

27   Id., Exh. G. This e-mail is non-defamatory as a matter of law due to the reasons stated above.

28

                                           11

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Finally, defendants claim that Lillge's statements that Chang had left the country are

2 defamatory *per se*. They are correct in asserting that special damages need not be proven for

3 statements that are defamatory *per se*. See Triton Ins. Underwriters, Inc. v. Cmte on Chiropractic

4 Welfare, 232 Cal. App. 2d 829, 833 (1965).

5    Lillge asserts that statements made by third parties regarding what Lillge told them are

6 inadmissible hearsay. This is incorrect for two reasons. First, statements made by a party are

7 considered party admissions and fall outside the definition of hearsay. See Fed. R. Evid.

8 801(d)(2)(A). Second, defendants are not attempting to demonstrate the truth of the statements

9 made by plaintiff—they merely offer to demonstrate that the statements were made by plaintiff.

10 Specifically, Ms. Pascual testified, "I'm not sure if Mr. Lil – that I was speaking with Mr. Lillge, but

11 as far as I can remember, he said he was the President of Creative Marketing Concepts, and he told

12 me that Christina is leaving for Canada." Ward Dec., Exh. A at 43:13–23. This statement is being

13 offered simply to demonstrate that someone at CMC made the assertion regarding Canada, not the

14 truth of the assertion.

15    Furthermore, Ms. Pascual specifically described the substance of the alleged defamatory

16 statements—that Ms. Chang had left for Canada due to a visa issue. Although she could not "recall

17 the exact reason," Ms. Pascual "just heard, like, something, some sort of Visa." Id. at 45:12–20; see

18 also id. at 73:19–74:10 ("Q: And when you asked whoever this person was, the President of CMC,

19 where Ms. Chang had gone, you do recall that he told you she's going to Canada because of a Visa

20 issue.? A: Yes. . . . what came to my mind was that she was having a problem with the working

21 visa."). Since plaintiff cannot demonstrate the truth of these statements, summary judgment is

22 unwarranted.

23    In sum, the court grants summary judgment in favor of plaintiff with respect to the two

24 written communications at issue, but denies plaintiff's motion for summary judgment with respect to

25 the allegedly slanderous statements.

26

27

28

12

**UNITED STATES DISTRICT COURT**
For the Northern District of California

D.    Intentional Interference with Prospective Economic Advantage

The eleventh count of defendants' counterclaim charges plaintiff with intentional interference with prospective economic advantage. To prevail on a claim for interference with prospective economic advantage, defendants must allege: 1) an economic relationship between themselves and a third party that carries a probability of future economic benefit to the plaintiff; 2) CMC's knowledge of the relationship; 3) intentional acts by CMC designed to disrupt the relationship; 4) actual disruption of the relationship; and 5) economic harm to defendants proximately caused by CMC's acts. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153–54, 1164–65 (2003).

Defendants point to various conciliatory e-mails they received upon announcing their departure from CMC. Specifically, they state that many of CMC's customers would have preferred to do business with defendants independent of the organization with which defendants were affiliated. The court has reviewed these e-mails and has found some communications which do in fact demonstrate the same.[6] Each of these statements, however, is inadmissible hearsay. Although defendants make many allegations of intentional interference in their response to the fourth interrogatory of plaintiff's second set of interrogatories, see Boyd Dec., Exh. G, defendants have not provided declarations or deposition testimony from any of these individuals.[7] As such, they are unable to meet the first prong above.

Furthermore, defendants have not provided any evidence that there was a disruption of economic relationships due to plaintiff's acts. Defendants point to an e-mail communication, initiated by Ms. Chang, with Michelle Chan where Ms. Chan asks defendants to remove her from their distribution lists because of CMC's e-mail regarding this lawsuit. Chang Dec., Exh. 4. Ms. Chan knew that Ms. Chang was not allowed to initiate contact with her and declined Ms. Chang's attempt to solicit her. Ms. Chang avers that when she spoke with Ms. Chan during the summer of 2007—before the solicitation e-mail was sent—Ms. Chan had "said that Wells Fargo had no orders for promotional products but that if she needed anything in the future she would think of me." Chang Dec., ¶ 8. This self-serving declaration with a vague statement regarding promotional products is not enough to carry defendants' burden. Defendants have failed to show that an

13

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  economic relationship with Ms. Chan existed such that it could be disrupted.

2      Finally, defendants are unable to show any economic harm proximately caused by CMC's

3  acts.  They point to the fact that their business only has $600,000 in sales after nine months of

4  operation whereas they were responsible for $1.65 million in sales at CMC.  The mere fact that they

5  have not been able to get their entire book of business to switch to their newly founded company

6  lacks the necessary nexus.  There is no evidence that Branding Boulevard's business has been hurt

7  by plaintiff's actions.  There are a myriad reasons why a fledgling company is unable to garner

8  business at levels it expects—the court does not go into those reasons here.  Suffice it so say that no

9  proximate cause exists that links plaintiff's two non-defamatory written communications to

10  Branding Boulevard's alleged economic woes—no showing has been made that it was reasonably

11  probable that CMC's customers would have switched over to Branding Boulevard if the written

12  communications had not been sent.  As discussed above, plaintiff did not engage in any wrongdoing

13  by sending the letter and e-mail.[8]

14      In sum, the court grants plaintiff's motion for summary judgment with respect to defendants'

15  eleventh cause of action in their counterclaim.

16

17  Motion for Civil Contempt

18  I.      Procedural Background

19      On May 31, 2007 this Court granted CMC's application for a Temporary Restraining Order

20  ("TRO") until the hearing on plaintiff's motion for a preliminary injunction.  See Docket No. 15.[9]

21  The court ruled, in part, that defendants were not to initiate contact with CMC's customers until

22  further order of the court, and that they are not to solicit customers of CMC during this time.  Appel

23  Dec., Exh. A [hereinafter "TRO hearing transcript"] at 16:5–17:15.  Specifically, "[i]f CMC's

24  customers contact [defendants], that's another matter, but they better make sure that they can verify

25  or substantiate the fact that those customers contacted them, not that they contacted the customers."

26  Id. at 17:1–4.  In addition, the court stated:

27          And if, in fact, those solicitations were not by defendants, in fact, it was a response to
            notification, then they can continue to do business with those companies.
28      [Defendants] had just better be able to have business records and accounts that they

14

1   can account for all of this at the end of the day, if, in fact, it turns out those
    representations are not true, so they better keep good books and records. The failure
2   to do so will, in fact, be interpreted against them when in doubt. So they're
    [defendants] sitting here, and I trust they understand that.
3
    Id. at 20:21–21:6.
4
         At the August 27, 2007 hearing on CMC's motion for preliminary injunction, the court ruled
5
    that the TRO would remain in effect pending the court's order on the motion for the preliminary
6
    injunction. See Docket No. 51.
7
         On October 1, 2007 the court issued an order granting CMC a preliminary injunction. See
8
    Docket No. 61. This order stated that "defendants will be permitted to work with CMC's customers
9
    so long as defendants do not solicit business from them." Id. at 12. On November 9 the court issued
10
    an order confirming the scope of the TRO and preliminary injunction. It held:
11
         The Court's Preliminary Injunction Order confirmed that while defendants were
12       "barred from *initiating contact with*" CMC's customers, defendants remained free to
         do business with those customers that contacted them (emphasis in original).
13
         This addendum confirms that more than one notification from defendants to CMC's
14       customers regarding their new business is not permitted under either the Temporary
         Restraining Order or the Preliminary Injunction Order (even when such notification
15       in isolation may not be viewed as a solicitation). As confirmed by both Orders,
         repeated notifications to a customer constitute a solicitation and improper initiation of
16       contact violating the injunctions which have been and are currently in force.
17   See Docket No. 75 at 2. This court's October 1 order currently remains in effect. Thus, at all times
18   since June 1, 2007 defendants have been enjoined in the above manner.
19
20   II.   Legal Standard
21       Judicial sanctions in civil contempt proceedings may, in a proper case, be employed
         for either or both of two purposes: to coerce the defendant into compliance with the
22       court's order, and to compensate  the complainant for losses sustained. Where
         compensation is intended, a fine is imposed, payable to the complainant. Such fine
23       must of course be based upon evidence of complainant's actual loss, and his right, as
         a civil litigant, to the compensatory fine is dependent upon the outcome of the basic
24       controversy.
25       But where the purpose is to make the defendant comply, the court's discretion is
         otherwise exercised. It must then consider the character and magnitude of the harm
26       threatened by continued contumacy, and the probable effectiveness of any suggested
         sanction in bringing about the result desired.
27
     United States v. United Mine Workers, 330 U.S. 258, 303–04 (1947) (internal citations omitted).
28

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The Supreme Court has stated that "a flat, unconditional [non-compensatory] fine even as

2    little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent

3    opportunity to reduce or avoid the fine through compliance." Int'l Union v. Bagwell, 512 U.S. 821,

4    829 (1994) (citing Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947)). Penfield, however, stated

5    that "one who is fined, unless by a day certain he [complies,] has it in his power to avoid any

6    penalty." 330 U.S. at 590.

7    The Ninth Circuit has held that when a consent decree is already in place, the party held in

8    contempt for violating the same "had the opportunity to avoid the fine by not engaging in the

9    prohibited conduct in the first place." NLRB v. Ironworkers Local 433, 169 F.3d 1217, 1221 (9th

10   Cir. 1999). The court found that "fines imposed without further opportunity to purge are not

11   punitive when those fines are prompted by a party's previous failure to purge." Id. (citing Hoffman

12   v. Beer Drivers and Salesman's Local Union No. 888, 536 F.2d 1268, 1273 (9th Cir. 1976)).

13   Specifically, the court held that "*Bagwell* does not undermine our conclusion in *Hoffman* that the

14   imposition of non-compliance fines following a failure to purge is a coercive, civil remedy." Id.

15   Nevertheless, the Ninth Circuit "recognize[s] that the Supreme Court has tended to classify

16   fines paid to the court as punitive fines, while fines payable to another party are remedial." Lasar v.

17   Ford Motor Co., 399 F.3d 1101, 1111 (9th Cir. 2005) (citing Hicks ex rel. Feiock v. Feiock, 485

18   U.S. 624, 632 (1988)). Moreover, the identity of the payee is not determinative. The Ninth Circuit

19   has also held that a fine payable to an opposing party was punitive when it was not designed "to

20   compensate [the opposing party] for any actual or estimated harm." Bingman v. Ward, 100 F.3d

21   653, 656 (9th Cir. 1996).

22   "The standard for finding a party in civil contempt is well settled: The moving party has the

23   burden of showing by clear and convincing evidence that the [nonmoving party] violated a specific

24   and definite order of the court." FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir.

25   1999) (quoting Stone v. City & County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

26   However, substantial compliance and good faith can negate sanctions. See In re Dual-Deck Video

27   Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (party seeking sanctions must

28

16

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    show (1) a violation of the order, (2) beyond substantial compliance, (3) not based on a good faith

2    and reasonable interpretation of the order, (4) by clear and convincing evidence).

3         The decision as to whether contempt sanctions should be imposed lies within the sound

4    discretion of the district court. See Jerry's Famous Deli, Inc. v. Papanicolaou, 383 F.3d 998, 1004

5    (9th Cir. 2004).

6

7    III.    Discussion[10]

8         Defendants claim this court's order allowed them to both: 1) provide CMC's customers of

9    defendants' new business contact information; and 2) attempt to sell to CMC's customers that

10   responded to this e-mail notification or initiated contact with defendants. Verity Dec., ¶ 3; Chang

11   Dec., ¶ 3. It is unclear to this court how defendants interpreted the court as stating that any response

12   by CMC's customers allowed defendants *carte blanche* to solicit those customers. As stated above,

13   the TRO hearing was replete with statements admonishing defendants not to initiate contact and

14   allowing contact with CMC's customers only if they contacted defendants. Specifically, in the

15   context of solicitation, the court stated, "[a]nd if, in fact, those solicitations were not by defendants,

16   in fact, it was a response to notification, then they can continue to do business with those

17   companies." TRO hearing transcript at 20:21–24. Thus, the court limited its order to CMC's

18   customers that were amenable to doing business with defendants, as demonstrated through

19   communications from the customer to defendants. The court specifically stated that the solicitation

20   could not be by defendants. The court gave no indication that any and all benign contact from a

21   CMC customer would open the door to relentless efforts at solicitation by defendants. Indeed, the

22   court could not have been clearer when it stated that "defendants will be permitted to work with

23   CMC's customers so long as defendants do not solicit them." See Docket No. 61 at 11. The court

24   finds no ambiguity in this language.

25        The court now discusses the various contacts defendants have had with CMC's customers in

26   light of the above defined scope of the injunction.

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

A.     Ms. Lee[11]

In May 2007, Ms. Lee—a customer of CMC—notified Ms. Chang of Ms. Lee's need for promotional products. Lee Dec., ¶ 4. Also in May 2007, Ms. Chang sent Ms. Lee an e-mail advising Ms. Lee that she was leaving CMC. Id., ¶ 5. Upon receipt of this e-mail, Ms. Lee called Ms. Chang asking her to call Ms. Lee back. Id., ¶ 6; Chang Dec., Exh. 1. Ms. Lee wanted to know who would be handling her account after Ms. Chang's departure. Lee Dec., ¶ 6. Ms. Chang called Ms. Lee the following week to notify Ms. Lee of Ms. Chang's new business. Id. Ms. Lee, however, preferred to stay with CMC. Id. Thereafter, Ms. Chang and Mr. Verity continued to solicit business from Ms. Lee. Id., ¶¶ 7–9. Due to these unwanted solicitations, Ms. Lee decided to take $20,000 worth of business away from CMC and instead purchase from a third party. Id., ¶ 10. Though the court does not have specific evidence, it appears that this transaction occurred in May 2007.

On May 22, 2007 Ms. Lee responded to another solicitation by Ms. Chang dated May 21, 2007 wherein she conclusively asked Ms. Chang to stop soliciting her. Id., Exh. A. Ms. Lee said she was going to continue to do business with CMC, her preferred vendor. Id.

In August 2007 Ms. Chang contacted Ms. Lee by telephone about a Branding Boulevard catalogue and also sent Ms. Lee a Branding Boulevard catalog. Id., ¶¶ 12–13. Finally, Ms. Chang called Ms. Lee in December 2007 to solicit business. Id., ¶ 14.

While most of these contacts occurred prior to May 31, 2007, Ms. Chang has contacted Ms. Lee to solicit business at least three times since May 31, 2007. Defendants have presented no evidence negating these contacts nor have they demonstrated any necessity for the contacts. They argue that since Ms. Lee had initiated contact with Ms. Chang by replying to the latter's neutrally worded e-mail, Ms. Chang had *carte blanche* to solicit Ms. Lee. Specifically, Ms. Lee had left a generic voicemail message asking Ms. Chang to call her back. There was no indication that Ms. Lee intended to do business with Ms. Chang's new company. As discussed above, defendants' contention is thus wrong as a matter of law.

Furthermore, at no point did the court state that defendants were allowed to solicit CMC's customers that contacted them. The statement that while "defendants were 'barred from *initiating contact with*' CMC's customers, defendants remained free to do business with those customers that

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1  contacted them," <u>see</u> Docket No. 75 at 2, necessarily only applied to CMC's customers that

2  contacted defendants about conducting business.  Any other construction would effectively eliminate

3  the efficacy of the order by allowing defendants to contact any CMC customer that responded with a

4  courteous "good luck!" to their farewell e-mail.

5       In sum, this court finds Ms. Chang's three contacts with Ms. Lee on or after May 31, 2007 in

6  direct contravention to the court's orders.  Ms. Lee's decision to hire a third party vendor for her

7  $20,000 worth of business, however, seems to have occurred before the court's May 31, 2007 order.

8

9       B.    <u>Ms. Chan</u>

10      On May 11, 2007 defendant Chang sent an e-mail to Ms. Chan—a customer of

11  CMC—notifying the latter of her departure from CMC.  Ms. Chan replied the same day, asking:

12  "You're leaving too, huh?  Where are going to?"  Appel Dec., Exh. E.  Ms. Chang replied a few

13  days later, on May 22, and: 1) provided her contact information; 2) stated that she offered branded

14  products and large volume direct import; and 3) offered "to help you with all your upcoming

15  projects."  <u>Id.</u>  There is no admissible evidence that Ms. Chan replied to this email.[12]

16      On November 8, 2007 defendant Chang sent an e-mail to Ms. Chan stating, "[a]s holidays

17  are just around the corner, thought I should send you a quick email/checking in.  I am happy to get

18  you some year end gift materials or do project solution researches for you."  <u>Id.</u>  Ms. Chan replied

19  immediately, asking to be removed from Ms. Chang's distribution list.  <u>Id.</u>  Ms. Chang complied, but

20  stated, "[d]o try to think of me if you even [sic] need help on branded items or solutions."  <u>Id.</u>

21      Defendants' arguments with respect to Ms. Chan fail for the same reasons as those with

22  respect to Ms. Lee.  Consequently, the two November 8, 2007 contacts trying to solicit Ms. Chan are

23  in contravention of the court's order.

24

25      C.    <u>Ms. Gutfran</u>

26      On May 11, 2007 defendant Chang sent an e-mail to Ms. Gutfran—a customer of

27  CMC—notifying the latter of her departure from CMC.  <u>Id.</u>, Exh. F.  Ms. Gutfran replied the same

28  day, stating: "Christina, Best of luck to you.  Thank you for all of your help!"  <u>Id.</u>  Ms. Chang

19

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    replied on May 21 by: 1) providing her contact information; 2) stating she had started her own

2    promotional company; and 3) wanting "to be able to help you with your new projects." Id.

3         Ms. Chang presents self-serving declarations stating that Ms. Pascual, an associate of Ms.

4    Gutfran, contacted Ms. Chang in May 2007. Chang Dec., ¶ 12. Ms. Pascual has testified that she

5    wanted to continue to do business with Ms. Chang and her new company. Ward Dec., Exh. A at

6    72:24–73:7. Ms. Pascual, however, works in San Francisco, whereas Ms. Gutfran works in

7    Hartford, Connecticut, albeit for the same company.

8         On June 11, 2007 defendant Chang notified Ms. Gutfran that she had been working with the

9    California offices and would like Ms. Gutfran to call her so that she could help Ms. Gutfran with

10   logo items. Id.

11        In light of the evidence that Ms. Pascual intended to continue doing business with Ms.

12   Chang, the court does not find clear and convincing evidence that contacts with Ms. Gutfran—who

13   is an associate of Ms. Pascual—violated the court's order.

14

15        D.    Mr. DiFranco

16        Mr. DiFranco—a customer of CMC—contacted Ms. Chang on May 11, 2007 asking her

17   what she would be doing after CMC. DiFranco Dec., ¶ 3. He called her the following week asking

18   her to stay in contact. Id. On May 22, 2007 defendant Chang sent an e-mail to Mr. DiFranco

19   notifying him of: 1) her new contact information; 2) the fact that she now had her own promotional

20   product company; and 3) her ability to help him with all his projects. Appel Dec., Exh. G. On June

21   13, 2007 Ms. Chang contacted Mr. DiFranco again, giving him her contact information and

22   notifying him that her website was up. Id. In August 2007, Mr. DiFranco placed an order with

23   defendants. DiFranco Dec., ¶ 4.

24        Mr. DiFranco initiated contact with Ms. Chang and intended to do business with her. This is

25   apparent from the declaration he has submitted on defendants' behalf. His failure to testify that he

26   solicited business from defendants is far from the clear and convincing showing necessary to

27   demonstrate that defendants solicited him. Consequently, plaintiff has failed to present a violation

28   of the court's order with respect to Mr. DiFranco.

1    E.    Summary of Violations

2        The court finds violations with respect to Ms. Lee and Ms. Chan.  Defendants contend no

3    sanctions are warranted because the violations, if any, were in good faith.  See In re Dual-Deck, 10

4    F.3d at 695 ("a person should not be held in contempt if his action appears to be based on a good

5    faith and reasonable interpretation of the [court's order]." (internal quotations omitted)).  It is

6    unclear to the court how these violations were in good faith when Ms. Lee specifically asked Ms.

7    Chang to stop contacting her and Ms. Chang continued to do so.  The same goes for Ms. Chan, who

8    neglected to respond to defendants' contact, but was nevertheless contacted by Ms. Chang in

9    November 2007.  Indeed, even when responding to Ms. Chan's unequivocal statement asking Ms.

10    Chang to cease contact, Ms. Chang nevertheless asks Ms. Chan to "try to think of me if you even

11    need help on branded items or solutions."  Appel Dec., Exh. E.  There is no good faith attempt at

12    compliance with the court's orders here.

13        Similarly, defendants' conduct is not in substantial compliance with the court's orders either.

14    A few technical violations of the court's order are not actionable if every reasonable effort has been

15    made to comply.  See In re Dual-Deck, 10 F.3d at 695.  The contacts here are not technical, but

16    direct violations of conduct that the injunction sought to bar.  Furthermore, even if they were

17    considered technical violations, there is no indication that every reasonable effort was made to

18    comply.  For instance, defendants did not ask this court for clarification nor did they heed CMC

19    customers' requests to cease contact.  Indeed, defendants initiated contact after specifically having

20    been told both by the court and the client that solicitous contact was unwanted.

21        In sum, the court finds defendants in civil contempt.  Consequently, the court orders plaintiff

22    to submit an account of the actual or estimated harm it has suffered as a consequence of the above

23    violations.  Thereafter, defendants shall be liable, in the form of a compensatory fine, for the amount

24    approved by the court.

25

26    F.    Attorney's Fees

27        "An award of attorneys' fees for civil contempt is within the discretion of the trial court."

28    Harcourt Brace Jovanovich Legal & Professional Publications v. Multistate Legal Studies, Inc., 26

UNITED STATES DISTRICT COURT
For the Northern District of California

1  F.3d 948, 953 (9th Cir. 1994).  In light of defendants' brazen disregard of the court's order with

2  respect to Ms. Lee and Ms. Chan, attorneys fees are warranted in order to make plaintiff whole.

3  Accordingly, CMC is ordered to submit a bill for attorneys' fees and costs incurred in conjunction

4  with the memorandum of points and authorities, the reply brief and the hearing, insofar as they

5  related to the contempt issue.[13]

6

7  CONCLUSION

8       For the reasons stated above, the court grants plaintiff's motion for summary judgment with

9  respect to defendants' fifth, eight and eleventh causes of action.  The court also grants in part and

10  denies in part plaintiff's motion for summary judgment with respect to defendants' tenth cause of

11  action.

12       Further, within twenty (20) days of the date of the filing of this order, plaintiffs shall submit:

13  1) an account of the actual or estimated harm it has suffered as a consequence of the civil contempt

14  along with contemporaneous records in support thereof; and 2) a statement of attorneys' fees and

15  costs consistent with the above with contemporaneous records in support thereof.  Defendants may

16  respond within ten (10) days of the filing of the statement with respect only to the reasonableness of

17  the harm, fees and costs.

18       The court denies all other motions.

19       IT IS  SO ORDERED.

20

21  Dated: March 31, 2008

22                                          _____
                                            MARILYN HALL PATEL
23                                          United States District Court Judge
                                            Northern District of California

24

25

26

27

28

22

**ENDNOTES**

1.      It is unclear whether the attorney-client privilege has been waived with respect to this e-mail communication.  Since the issue is not contested, the court assumes the e-mail is admissible.

2.      Defendants make much of their immigration status which, according to them, forced them to start a competing business in order to remain within the United States.  Their rationale for entering the promotional products field is irrelevant to the present motions.

3.      Defendants' sixth and seventh causes of action allege a failure to pay Ms. Chang both overtime and vacation pay.  This memorandum and order only discusses the vacation pay aspect of these causes of action.

4.      In its reply, CMC provides a Propriety Information Agreement ("PIA") which it claims Ms. Chang refused to sign and was the reason she was fired.  The PIA merely restricts her from disclosing CMC's trade secrets.  CMC, however, makes this argument after admitting for the purposes of this motion that Chang was fired for not signing the agreement with the purported non-compete clause.  As such, the court ignores this untimely argument made by CMC.

5.      Since the court has evaluated this issue on the merits, it does not reach plaintiff's undeveloped standing argument.

6.      The statements made to Ms. Chang are: 1) an e-mail from Carolyn Jacks stating "[i]s there someone else at CM on whom we may call now that you are no longer there? . . . Unless you're moving on to someplace where we can still use you ....  Let me know"; 2) an e-mail from Michael Alexander stating: "[y]ou have been great to work with.  I hope we can continue that relationship in the future.  Please stay in touch"; 3) an e-mail from Michael Ernst stating "[i]f you ever decide to continue in the promotions field, please let me know, I'd love to work on other projects with you"; 4) an e-mail from Celine Rose stating "[i]f they fired you or laid you off we won't use then anymore."  Chang Dec., Exh. 2.  Statements made to Mr. Verity include: 1) an e-mail from Karen Arvin stating "[I] was wondering if you were going to another promotional products company . . . In the past you proved to be very helpful and dependable.  If you will be staying in the same field, I'd welcome any information you could send me – my contact information is below"; 2) an e-mail from Sanam Kordestani stating "I wanted to deal with you only!  Tell me about your new/future adventures"; and 3) an e-mail from Nyla Starr stating "DO keep me posted if you become associated with a firm that offers goods or services we might need!"  Verity Dec., Exh. 2.

7.      The court is aware that defendants were barred from soliciting CMC's customers; however, defendants could have deposed these individuals in order to create a factual basis for their case.

8.      In light of the court's holding, it does not reach plaintiff's argument that it was unaware of Branding Boulevard's customers until after the complaint with this cause of action was filed.

9.      The parties then entered into several stipulations continuing the preliminary injunction hearing date.  Each of these stipulations confirmed that the TRO would remain in effect until the

23

UNITED STATES DISTRICT COURT
For the Northern District of California

court ruled on CMC's motion for a preliminary injunction.  <u>See</u> Docket No's. 21, 24, 32.

10.     The court declines plaintiff's invitation to, *sua sponte*, initiate criminal contempt proceedings.  Similarly, the court declines defendants' invitation to, *sua sponte*, consider sanctions against CMC due to CMC's contact with defendants' customers.  In this invitation, defendants re-hash their defamation arguments made elsewhere.  Furthermore, there is no injunction against CMC warranting sanctions.  As such, this invitation is in error.  Nevertheless, the court invites defendants to move for dissolution of the preliminary injunction if they believe the issuance of the injunction was based on plaintiff's falsities regarding its trade secrets.

11.     It appears that plaintiff has abandoned its efforts to maintain the names of its client contacts under seal.  Therefore, the court will use the names of plaintiff's client contacts in this order.

12.     The court refuses to consider Ms. Chang's wholly self-serving and hearsay testimony about her conversations with Ms. Chan during the summer of 2007.  As the court stated earlier, any questions as to solicitation are to be "interpreted against [defendants] when in doubt."  TRO hearing transcript at 20:25–21:6.

13.     CMC is to also submit a proposed order along with the bill of costs.

24

# EXHIBIT B

LAW OFFICES OF

## CHANDLER, WOOD, HARRINGTON & MAFFLY LLP

ROBERT R. WOOD
RICHARD HARRINGTON
ROBERT ELLIOTT

ONE MARITIME PLAZA
FOURTH FLOOR
SAN FRANCISCO, CA 94111
TELEPHONE (415) 421-5484
TELEFAX (415) 986-4874

1 April 2008

Fax and US Mail

Andrew S McKay Esq
William R Hill Esq
Donahue Gallagher Woods LLP
300 Lakeside Drive
Suite 1900
Oakland CA 94612 3570

      Overtime claims of Christina Chang
      Mark Lillge dba Creative Marketing Concepts and Christina Chang and related
      counterclaim, US District Court Case No. CO7-02748 MHP

This letter confirms in writing that your tender of $159,771.59 dated March 31 2008 fully
satisfies the overtime claim of Christina Chang and claims for penalties related thereto, and that
this sum will be paid less all applicable withholdings by wire.

Any claims by Chang for attorneys fees' to the date of your your tender on her overtime claim
and penalties related thereto are excluded from this acceptance, are reserved by Chang, and can
be resolved either by settlement or post-trial motion. No further attorneys' fees related to the
claims in Items 1 through 6 of your letter will be claimed for the period after the date of your
tender.

Our wire instructions are:

Trust Account
Chandler Wood Harrington & Maffly LLP
Union Bank of California
400 California Street
San Francisco, CA 94104
Trust Account: 0012100160

Union Bank's Routing Number: 122000496

                    Sincerely yours

                    Richard Harrington

cc Robert Charles Ward Esq
   Brendan J Dooley Esq

1   WILLIAM R. HILL, #114954
      rock@donahue.com
2   ANDREW S. MACKAY, #197074
      andrew@donahue.com
3   SARA J. ROMANO, #227467
      sromano@donahue.com
4   DONAHUE GALLAGHER WOODS LLP
    Attorneys at Law
5   300 Lakeside Drive, Suite 1900
    Oakland, California  94612-3570
6   Mail:   P.O. Box 12979
            Oakland, California  94604-2979
7   Telephone:    (510) 451-0544
    Facsimile:    (510) 832-1486
8

    Attorneys for Plaintiff and Counterdefendant
9   MARK LILLGE d/b/a CREATIVE
    MARKETING CONCEPTS
10

11              UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15  MARK LILLGE d/b/a CREATIVE          CASE NO.  C 07-02748 MHP
    MARKETING CONCEPTS,
16                                      **MOTION IN LIMINE NO. 2 TO EXCLUDE**
                                        **REPORT AND TESTIMONY OF JEFFRY**
                   Plaintiff,           **MEYER PERTAINING TO TRADE**
17                                      **SECRETS**
          v.
18                                      Trial Date:        May 6, 2008
    ANDREW VERITY and CHRISTINA         Pretrial Conf:     April 23, 2008
19  CHANG,                              Department:        Courtroom 15, 18th Floor
                                        Judge:             Hon. Marilyn Hall Patel
20                 Defendants.

21
    ANDREW VERITY and CHRISTINA
22  CHANG,

23                 Counterclaimants,

24        v.

25  MARK LILLGE d/b/a CREATIVE
    MARKETING CONCEPTS, and DOES 1-
26  10,

27                 Counterdefendant.

28

**INTRODUCTION**

Plaintiff and counterdefendant, Mark Lillge d/b/a Creative Marketing Concepts ("CMC") hereby moves in limine for an order precluding defendants and counterclaimants ANDREW VERITY and CHRISTINA CHANG ("Defendants"), and each of them, from introducing into evidence: the portion of Jeffrey Meyer's report entitled "Trade Secrets"; any testimony from Meyer that CMC does not have any trade secrets; and any testimony from Meyer to the effect that Promotional Products Distributors such as CMC do not have trade secrets; as well as precluding Defendants, and each of them, from referring to, mentioning, suggesting or arguing to the jury that CMC does not have trade secrets or that Promotional Products Distributiors such as CMC do not have trade secrets. In addition to being inadmissible legal conclusions, any such testimony would directly contradict the court's findings, set forth in its Memorandum and Order Re: Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion for an Order to Show Cause Regarding Contempt, filed April 1, 2008, that CMC does have trade secrets.

**ARGUMENT**

**I.    THE COURT HAS ALREADY DETERMINED THAT CMC HAS PROTECTIBLE TRADE SECRETS.**

On February 8, 2008, Defendants' expert Jeffrey C. Meyer submitted his report in this action. The report contains a section entitled "Trade Secrets," in which Meyer purports to conclude that CMC has no trade secrets and that Promotional Products Distributors like CMC have no trade secrets.[1]

The conclusions reached in Meyer's report with regard to trade secrets are inadmissible legal conclusions. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 (9th Cir. 2002). Moreover, they are not helpful to the jury in determining an issue of fact, as required by Federal Rules of Evidence, Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). But even if these impediments did not apply, the Court would still have to strike those portions of Meyer's report and testimony concluding that CMC does not have trade secrets, because the court has explicitly found to the

---

[1] A true and correct copy of Meyer's report is attached hereto as exhibit A for the court's convenience.

1    contrary.

2         Under California law,  a "trade secret" means information, including a formula, pattern,

3    compilation, program, device, method, technique, or process, that satisfies a two-prong test.  Cal.

4    Civ. Code § 3426.1(d) (West 1997).  First, the information must derive independent economic

5    value, actual or potential, from not being generally known to the public or to other persons who

6    can obtain economic value from its disclosure or use.  *Id.*  Second, the information must be the

7    subject of efforts that are reasonable under the circumstances to maintain its secrecy.  *Id.*

8         On April 1, 2008, subsequent to Meyer's report, the court issued its Memorandum and

9    Order Re: Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion for an Order to

10   Show Cause Regarding Contempt.[2]   In the Memorandum and Order, the court found, after

11   reviewing factual submissions, that both prongs of the California test had been met.  The court

12   found that CMC's information indeed derives independent economic value, actual or potential,

13   from not being generally known to the public or to other persons who can obtain economic value

14   from its disclosure or use.  The court, noting "key decision makers at the client, purchasing

15   history, pricing, sales volume, when to contact client for replenishment and the client's particular

16   requirements and buying habits, including needs likes, dislikes, and limitations" found that "[t]he

17   information maintained by CMC is exactly the type of information intended to be protected by

18   California trade secret law."  Memorandum and Order, exhibit B, at 7:15-16.  The court further

19   recognized that "whatever value this information possesses is solely based on the fact that it is not

20   generally known to the public," *id.* at 7:18-20, and that CMC had at least some information from

21   which it derives independent economic value due to its secrecy.  *Id.* at 7:24-25.

22        The court also examined whether CMC's information was the subject of efforts that are

23   reasonable under the circumstances to maintain its secrecy.  The court concluded that "[i]n light

24   of the various safeguards undertaken by CMC -- rules regarding computer files and emails,

25   confidentiality agreements, shredding bins and preclusion of suppliers displaying samples -- the

26   second prong is easily met."  *Id.* at 7:27-8:1.

27

28   [2] A true and correct copy of the court's April 1, 2008 Memorandum and Order is attached hereto as
     exhibit B for the court's convenience.

1    Based on this analysis, the Court explicitly found that "CMC does in fact have at least

2    some trade secrets." *Id.* at 8:9-10.

3    **II.    MEYER'S REPORT AND TESTIMONY ARE INADMISSIBLE TO**
     **CONTRADICT THE COURT'S FINDING.**

4

5    The Court's Memorandum and Order finding that CMC does possess trade secrets was

6    made in the context of a motion for partial summary judgment. The finding is therefore "treated

7    as established," and is no longer an issue for the jury to determine. Fed. R. Civ. P. 56(d)(1). *See*

8    *also Deimer v. Cincinnati Sub-Zero Prods.,* 990 F.2d 342, 344 (7th Cir. 1993) (trial court

9    excluded expert testimony where issue had already been determined by partial summary

10   judgment motion).

11   Since the court has determined that CMC does indeed have trade secrets, the portion of

12   Meyer's report concluding that CMC does not have trade secrets is no longer admissible to prove

13   or disprove any disputed fact. As such, it is irrelevant, and must be excluded under Federal Rules

14   of Civil Procedure, Rule 402. Even if such evidence were relevant, which it is not, its

15   introduction would be far more prejudicial than probative, would confuse the issues and mislead

16   the jury into thinking that it may determine what the Court has already determined, and would

17   therefore waste judicial resources. The portion of Meyer's report pertaining to trade secrets

18   should also, therefore, be excluded under Federal Rules of Evidence, Rule 403.

19   Finally, Defendants should not be allowed to introduce by testimony what they are barred

20   from introducing by report. Meyer should be barred from testifying that CMC does not have

21   trade secrets, or that "Promotional Products Distributors like CMC" do not have trade secrets.

22   Further, Defendants, and each of them, should be barred from referring to, mentioning,

23   suggesting or arguing to the jury that CMC does not have trade secrets, since the court has

24   explicitly ruled otherwise.

25   <u>**CONCLUSION**</u>

26   For the foregoing reasons, the court should exclude the report and testimony of Jeffry

27   Meyer to the effect that CMC does not have trade secrets (including the portion of Meyer's report

28

-3-

1  captioned "Trade Secrets"), and should preclude Defendants, and each of them, from referring to,

2  mentioning, suggesting or arguing to the jury that CMC does not have trade secrets.

3                                    Respectfully submitted,

4  Dated:  April 14, 2008            DONAHUE GALLAGHER WOODS LLP

5

6                                    By: /s/ William R. Hill

7                                        William R. Hill
                                         Attorneys for Plaintiff and Counterdefendant
8                                        MARK LILLGE d/b/a CREATIVE MARKETING
                                         CONCEPTS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

# EXHIBIT A

## REPORT OF JEFFRY C. MEYER, MAS, CPA

### Background on the Promotional Products Industry

The Promotional Products Industry (also known as the Advertising Specialty Industry) is comprised of companies that produce/manufacture (suppliers), sell (distributors), or purchase (consumers) items that are imprinted with the name or logo of an advertiser and are typically given away to customers or employees as incentives or gifts. Although Promotional Products constitute a relatively small portion of total United States advertising expenditures (5%-8%), the industry is nonetheless very large with industry sales* as follows:

| | |
|---|---|
| 1990 | $5.01 billion |
| 1991 | $5.13 billion |
| 1992 | $5.22 billion |
| 1993 | $6.22 billion |
| 1994 | $7.01 billion |
| 1995 | $8.04 billion |
| 1996 | $9.49 billion |
| 1997 | $11.87 billion |
| 1998 | $13.12 billion |
| 1999 | $14.94 billion |
| 2000 | $17.85 billion |
| 2001 | $16.55 billion |
| 2002 | $15.63 billion |
| 2003 | $16.34 billion |
| 2004 | $17.31 billion |
| 2005 | $18.01 billion |
| 2006 | $18.78 billion |

*PPA

This historically strong and steady growth rate is expected to resume and continue well into the 21st century because the industry has one fundamental advantage over many other forms of advertising: it enables an advertiser to target its marketing expenditures more directly (thus more cost effectively) to specific audiences while maintaining a significantly longer "shelf life" than broadcast or print advertising expenditures. This longer shelf life is due to the inherent nature of a Promotional Product item: it is designed to be utilized by the recipient and the message delivered by the item enjoys repeated exposure.

### Industry Composition

#### Suppliers

The 590,000 or so products manufactured or imported for the industry are done so by Promotional Products manufacturers also known as suppliers in industry parlance. The number of companies is quite large (in excess of 3,700) and includes office products companies, apparel manufacturers and plastic and metal molders among many others. Some of the leading suppliers to the industry are large, experienced enterprises that specialize in meeting the unique needs (large in-stock inventory holdings and rapid order turnaround) of the industry. There are also several large consumer product manufacturers such as A.T. Cross (pens) and Titleist (golf balls) that have developed distinct, highly profitable channels of distribution in the industry and support those channels with specialized marketing and support programs. Finally, there are thousands of small enterprises that have specialized niche-oriented product and/or manufacturing expertise.

The most significant evolution for suppliers over the last few years has been the rapid increase in import competition and virtually no category has been immune. As foreign manufacturers become more adept at the manufacturing process providing high quality product, the price-quality differential grows which places increasing pressure on domestic suppliers. Consequently, suppliers have to devote an increasing level of

© Certified Marketing Consultants, Ltd.

their capital and human resources to developing foreign sources of supply. With additional design, quality control requirements and inventory levels, the skills to manage in the supplier end of the business have also increased considerably.

## End Users

While virtually all businesses and organizations utilize Promotional Products in one capacity or another, the end user or buyer (the consumers) are also rapidly splitting into two segments: larger corporate buyers with specialized needs and the traditional Promotional Products users with smaller more standardized product needs. This segmentation has been fueled by many end users desire to reduce the number of Promotional Products suppliers and instead focus on sole-source, full service distributors. Consequently, these needs are compelling the industry to make many changes in its conventions and creating many new opportunities as noted below.

## Distributors

One very noteworthy aspect of the industry as it pertains to distributors is that its competitive structure is highly fragmented. There are over 20,000 distributors serving the U.S. market and over 95% of these distributors generate revenues less than $2.5 million annually. Most distributors tend to be closely held entities with a local or regional focus and range from a one person, few products operation where sample cases and catalogs are brought to the end user to larger entities which maintain showrooms, warehouses and other sizable investments in their businesses. It is estimated that there are only 900 or so Promotional Products distributors that generate more than $2.5 million in annual sales and they account for 47.3% of the industry's total sales. More significantly, the 40 largest distributors in the U.S. accounted for $3.8 billion in sales, which is 20.2% of the industry's total sales last year. There are only twelve distributors in the industry with sales in excess of $100 million.

As noted above, changing end user needs along with a growing sophistication in the industry (led by professional management) has altered the model for what is needed to be successful as a distributor. These changing needs are characterized by a strong emphasis being placed on cost, quality and responsiveness as well as certain full service capabilities including design, customization and the ability to develop marketing programs. Finally, demand for corporate program support (warehousing and fulfillment) is at an all time high. The warehousing, fulfillment and inventory carrying costs can create additional operational and financial requirements on the distributor that are best managed by those distributors with sufficient size, capabilities and financial resources to meet these demands.

## Products and Services

As previously noted, Promotional Products are generally articles of merchandise imprinted or otherwise customized with an advertiser's name, logo or message which are then used for marketing, sales incentives/awards and development of goodwill for a targeted audience. There are 20 primary industry categories and the top 10 are: Apparel; Writing Instruments; Calendars ; Desk/Office/Business Accessories; Bags; Drinkware; Recognition Awards/Trophies/Jewelry; Sporting Goods/Leisure Products/Travel Accessories; Housewares; and Stickers & Decals. These top 10 categories constitute 75.7% of the total industry sales

The services typically provided to create a "value-added" component to these products include: art work such as illustration, graphics, typography and corporate logo design production which includes engraving, hot stamping and silk screening for both samples and finished products; and corporate warehousing programs where an end user contractually purchases large quantities or customized products that are warehoused by the distributor and shipped at the instruction of the end user. These programs are generally implemented in conjunction with a customer catalog or brochure featuring the type of customized products available for shipment. These programs enable large customers to enjoy lower per unit costs along with the ability to receive immediate delivery of small quantities. Augmenting these programs with automated

© Certified Marketing Consultants, Ltd.

inventory tracking further distinguishes distributors from one another since the tracking assists the customer in monitoring the success of its program and also automatically reorders product at predetermined levels.

<u>Trade Secrets</u>

The value driver for promotional product distributors is the customer list and the relationship of the salespeople to customers. This is supported by the vast diversification of the industry as described above. Since the salespeople's relationships drive the sale there are many distributors and approximately 200,000 salespeople in the industry. This dynamic has prevented significant consolidation that has occurred in other industries like office supplies. If the salespeople's relationships were not critical, there are a number of direct marketing and web based companies that would quickly render salespeople obsolete. But salespeople develop loyalty with customers through hard work, perseverance, creativity, reliability, availability, etc. These qualities are not trade secrets.

There are significant education opportunities through PPAI and ASI that teach people how to run successful distributorships; sell corporate promotional programs, web based company stores, etc.; how to create artwork for customer orders; provide trends in end user purchasing; importing; and many others. Nothing about a distributor's operation is a trade secret.

While I am not qualified to render a legal opinion, it is my understanding that customers names may be considered trade secrets in the State of California to the extent that they are not "generally known to the public." Users of promotional products are generally known to the public by the very nature of promotional products. That is, promotional products carry the name, logo and contact information of the companies that use them. And those products are in fact given to the public free of charge. As such not only does the public know the "customers names," competitors know the "customers names." It would not be unusual for a customer to routinely request and receive proposals from ten or more promotional product distributors. Free competition prevails because of the absence of trade secret customer lists. Therefore, in my opinion there are no trade secrets within a promotional product distributor.

<u>Creative Marketing Concepts valuation as of 4/27/07</u>

In conjunction with the preparation of the report, I obtained information from Andy Verity. This information provided important perspective to my understanding of the information reviewed and analyzed in the preparation of this valuation opinion. Information reviewed relative to the Company is:

Exhibit I    Distributor Valuation and/or Sale Confidential Questionnaire (8 pages)
Exhibit II    Profit & Loss Statement (Cash), January 2007 through April 2007 (4 pages)
Exhibit III    Profit & Loss Statement (Cash), January 2006 through December 2006 (3 pages)
Exhibit IV    CMC P&L Projection 2006 (1 page)
Exhibit V    Profit & Loss Statement (Cash), January 2005 through December 2005 (6 pages)

In all cases, we have relied upon the referenced information without independent verification. This report is, therefore, dependent on the information provided. A material change in critical information relied upon in the report would be cause for a reassessment to determine the effect, if any, upon the estimated value.

The information received was limited. I did not receive or review any balance sheets. Some of the statements were on a cash basis rather than on an accrual basis necessary in order to conform for Generally Accepted Accounting Principles. There was limited opportunity to inquire about any excess or discretionary expenses, unusual or non-recurring income and/or expenses, reasons for any financial fluctuations, etc.

Although valuation is a range concept, current valuation theory suggests that there are three basic "levels" of value applicable to a business or business interest. The levels of value are respectively:

**Controlling interest**: The value of the enterprise as a whole

© Certified Marketing Consultants, Ltd.

**As-if-freely tradable minority interest**: The value of a minority interest, lacking control, but enjoying the benefit of market liquidity.

**Non-marketable minority interest**: The value of a minority interest, lacking both control and market liquidity.

This valuation is prepared on a controlling interest basis.

Fair market value is defined as follows:

> *The amount at which property would change hands between a willing seller and a willing buyer when neither is under compulsion and when both have reasonable knowledge of the relevant facts.*

Fair market value is similarly defined in various sections of the Internal Revenue Code, related regulations and interpretations (e.g., Revenue Ruling 59-60).

Fair Value is defined as follows:

> *Also knows as intrinsic value, fair value is that value which is justified by the facts such as assets, earnings, dividends, etc.*

Investment value is defined as:

> *The value of a business or business interest to a specific owner or prospective owner.*

There are three basic approaches to value:

**Asset Based Approach**: *A general way of determining a value indication of a business's assets and/or equity using one or more methods based directly on the value of the assets of the business less liabilities.*

**Income Approach**: *A general way of determining a value indication of a business's assets and/or equity using one or more methods wherein a value is determined by converting anticipated benefits.*

**Market Approach**: *A general way of determining a value indication of a business's assets and/or equity using one or more methods that compare the subject to similar investments that have been sold.*

The various methods of valuation that appraisers use in practice are typically considered as subdivisions of these broad approaches. Valuation methods under the Market and Income Approaches generally contain common characteristics such as measures of earning power, discount rates and/or capitalization rates and multiples.

Because of the limited data available for the valuation, I relied solely on the Market Approach. I have found from the many transactions I have facilitated in the promotional products industry that the market approach is the method used exclusively by buyers. Industry market ratios method is one in which private business sale transactions are analyzed and applied to the subject company being valued utilizing one or more of two basic methods: Price to Earnings and Price to Gross Margin.

Using these two methods I have arrived at a value for Creative Marketing Concepts as of 4/27/07 of $2,010,000 assuming the company had no debt other than current trade payables.

The value arrived at above is a cash value representing the amount of cash and the discounted present value of cash equivalents and contingent future payments. In most sale transactions for promotional product distributors, buyers pay a negotiated amount of cash at closing along with an interest-bearing note or a contractual obligation to pay additional amounts of cash over two to three years after the acquisition based

upon a negotiated formula of continued revenues. In most transactions that call for formula based future payments, the gross amount of the future payments added to the amount of cash at closing would allow the seller to realize more in gross dollars than the cash value at closing. A reasonable discount rate would result in a net present value of the true cash value at closing. Transactions are structured this way in order to assure the buyer that revenues will continue in the future, not solely as a method to finance the transaction.

Some of the relevant assumptions, representations and observations used to arrive at this value include:

1 The financial results in Exhibit II are similar to those for the period from January 1, 2006 to April 30, 2006 indicating no significant improvement or degradation in the business from the previous year.
2 There was no material change in the business from April 27, 2007 (the effective date of the valuation) and April 30, 2007 (the date of the schedules in Exhibit II.)
3 The largest customer accounted for approximately 6% of total sales indicating a relatively diverse customer base.
4 The salespeople were responsible for similar sales levels reducing the reliance on any one salesperson.
5 Gross profit margins were good compared with the industry average of 35%.

I will also calculate the value of lost profits from the date of the injunction until resolution. But at this time I do not have sufficient data to do so.

Compensation

I am being compensated at a rate of $2,000 per day for the preparation of this statement and any subsequent advisory services including depositions and trial testimony.

Availability

I will be available to testify on this issue from May 12, 2008 through May 13, 2008.

Respectfully submitted,

Jeffry C. Meyer, CPA, MAS
CEO
Certified Marketing Consultants

# CERTIFIED MARKETING CONSULTANTS, LTD.

## DISTRIBUTOR
## VALUATION AND/OR SALE
## CONFIDENTIAL QUESTIONNAIRE

Name of Company: _CREATIVE  MARKETING  CONCEPTS_

Address: _____

City: _____ State: _____ Zip: _____

Phone No.: ( ____ ) _____ Fax No.: ( ____ ) _____

E-mail address: _____

Owner: _____

Title: _____ Age: _____ Year Business was Started: _____

Business Organization: (check only one)

A) _____ Regular "C" Corporation    B) _____ Sub Chapter S Corporation

Number of Common Stock shares outstanding: _____

Number of Preferred Stock shares outstanding: _____

List names of all shareholders and percentage of Company owned by each shareholder:

ANDREW  VERITT    12-6 %
MARK  LILLGE    87-4 %

C) _____ Partnership    D) _____ Sole Proprietorship

List names of all partners and percentage of Company owned by each partner:

List the Product Category as a percentage of total sales for your most recent year.  Also list prior year if most recent year results have changed significantly.  (Product Category examples are:  wearables, calendars, writing instruments, etc.)

| PRODUCTS *ESTIMATED* | % OF SALES (Most Recent Yr.) | % OF SALES (Previous Yr.) |
|---|---|---|
| WEARABLES | 12 % | |
| WRITING INSTRUMENTS | 8 % | |
| TRADESHOW / GIFT | 74 % | |
| BAGS | 5 % | |
| CALENDARS | 1% | |
| | | |
| | | |
| | | |
| Total (should equal 100%) | 100% | 100% |

What is your total geographic market and what are the areas that have your greatest concentration of sales?  _____

_____

List your ten largest accounts by industry type (financial, service, manufacturing, etc.) and their percentage of your company's total sales in the most recent year.  Also list prior year if most recent year results have changed significantly.

| CUSTOMER | % OF SALES (Most Recent Yr.) | % OF SALES (Previous Yr.) |
|---|---|---|
| TELECOM SERVICES | 3.75 | 2.5 |
| TELECOM SERVICES | 3.75 | 2.5 |
| HEALTH INSURANCE | 3.75 | 2.5 |
| FINANCIAL | 3.0 | 4.0 |
| HEALTHCARE | 2.5 | 4.00 |
| FEDERAL GOV | 1.2 | 1.0 |
| AD AGENCY | 1.2 | 1.5% |
| SERVICES | 1.5 | 2.00 |
| SERVICES | 1.2% | 1.2% |
| HEALTHCARE | 6.00 | 5.00 |

FYI
TOP INDUSTRIES SOLD TO
HEALTHCARE / FINANCIAL / GOVERNMENT.

## SALES AND COMPENSATION

List the sales results by salesperson in most recent year (i.e., salesperson #1, $200,000, 32% gross profit, 47 years old, 5 years with company, IC).  **We must have this section completed entirely.**

| SALESPERSON | SALES | GROSS PROFIT % | AGE | YEARS W/ CO. | STATUS* |
|---|---|---|---|---|---|
| *1 A VERLEY | 750 000 | 40.00 | 36 | 5 | |
| 2 | 700 000 | 38.00 | 22 | 3 | |
| 3 CHRISTINA CHIN | 550 00 | 41.00 | 35 | 3 | |
| *4 | 550 00 | 41.50 | 36 | 3 | SE |
| 5 | 500,000 | 42.00 | 59 | <1 | |
| 6 | 250 000 | 42 | 25 | <1 | |
| 7 | 150 000 | 42 | 23 | <1 | |
| *8 | 550 000 | 39.00 | 46 | 1 | |
| BALANCE | 500,000 | — LOST 1 in | 2006 | | |

* Identify Status of each salesperson as either Independent Contractor (IC), Commissioned Employee (CE) or Salaried Employee (SE)

If you have HOUSE ACCOUNTS, how much were they in the most recent year? *THE REST WAS INDIRECT COMMISSION*
$ *2 MILL OUT OF 4 MILL*
How are they determined? *THIS IS OPEN FOR DISCUSSION*
Does anyone receive any commission on these accounts (other than the house)?   Y   **N**
If so, who and why? *STANDARD REMUNERATION WAS SALARY OF*
$ *30 - 40,000 P.A. + BONUS — TOTAL PACKAGE WAS AROUND 11-12% OF GROSS SALES*
Number of orders in most recent year: *2000*
Average order size ($): *2000*
Do you utilize contracts with the Independent Contractors/Commissioned Employees (either or both)?   Y  (**N**)   If so, please attach a copy of these contracts.

What is your standard commission split: _____
Do you have a sliding commission scale?   Y  (**N**)  If so, please attach copy of scale.
Do you have a different commission structure on Co-Op Program business?   Y  (**N**)
If so, please explain: _____
_____

When is commission paid?
_____ On Order
_____ On Shipment
_____ On Payment

*SO SOME SELLING 700K MIGHT GET 40K SALARY + 20K BONUS = 60K PACKAGE*

When are commissions paid on calendar orders?  *N/A*

What percentage of commissions do you withhold against bad debts?  *NONE*

Do you have a draw policy?    Y    (N)    If so, please describe: _____

_____

How do you charge your salespeople for the following (check the appropriate column):

|  | 100% | SPLIT COST BETWEEN HOUSE & SALESPERSON | NO CHARGE |
|---|---|---|---|
| Sample Kits | ___ | ___ | ___ |
| Catalogs | ___ | ___ | ___ |
| Random Samples | ___ | ___ | ___ |
| Personalized Samples | ___ | ___ | ___ |
| Samples with Distributor Imprint Only | ___ | ___ | ___ |
| Business Gifts | ___ | ___ | ___ |
| Speculative Samples | ___ | ___ | ___ |

*ALL HOUSE COST*

What are your other charge-back policies on samples?  *NONE*

_____

What is your minimum annual volume for experienced salespeople?  $ *500,000*
How many years experience is required for this minimum to be enforced (2, 3 or 4 yrs)? *NOT ENFORCED*
New salespeople? $ *250,000*

What is the house gross profit minimum?  _____  %

What is your policy regarding personnel sales expenses?  *NONE*

What is your show expense policy for salespeople?  *HOUSE PAYS*

Do you have a bonus policy?    Y    N    If so, please describe: *SALES PEOPLE WOULD GET 11-12% OF GROSS BOOKINGS (INCLUDING THEIR SALARY + END OF YEAR BONUS + SMALLER QUARTERLY BONUSES)*

Do your salespeople participate in the following:

End Quantity Pricing:  (Y)  N    If yes, please describe: _____

Volume Rebates:  Y  (N)    If yes, please describe: _____

Other Incentives:  (Y)  N    If yes, please describe: *QUARTERLY BONUS WORTH*
*$25 000 P.A. FOR COMPANY*

How do you reconcile mistakes on orders:

Manufacturer's mistake:  *MANUFACTURER MADE TO PAY.*

Company's mistake:  *EAT IT*

Salesperson's mistake:  *FACTORED BACK INTO GROSS SALES.*

Describe any Corporate Co-Op Programs currently in operation or expected to be in operation in the next six months. (Address the following: customer's industry type, products included, whether catalog is published, are products warehoused, are you required to own inventory, is there a buy-back agreement in place, and if so, include a copy.): ___ *NONE* ___

Describe any Safety Programs currently in operation or expected to be in operation in the next 6 months. (Address the following: customer's industry type and products included):

*NONE*

Describe any Recognition Programs currently in operation (include nature of program and products included): ___

*NONE*

Do you have any multi-year contracts in operation with any customer?    Y    (N)

If so, please describe (i.e., terms of the contract, special pricing, etc.): _____

_____

_____

_____

_____

_____

_____

Do you have any special licensing rights or proprietary products or services? (Y) / N

If so, please describe in detail and the contribution these special items provide to your sales:  LICENSING

MINIMUM RIGHTS WORTH AROUND $8000 - 10000

PER YEAR $0 FOR A PRODUCT (LICENSED) TO

PRIME

_____

_____

Number of franchised lines? ___0___    Please describe: ACCESS TO

ALL STANDARD ASI VENDORS

## SPECIAL SERVICES

Do you offer the following services to your customers:

| | YES or NO | SOURCE In-House / Outsource | | Are Customer Charges at Cost or Marked Up * |
|---|---|---|---|---|
| Art Work | Y | ✓ | | USUALLY NO CHARGE |
| Copywriting | N | | — | |
| Layout/Paste Up | Y | ✓ | . | USUALLY NO CHARGE |
| Catalog Printing | N | | — | |
| Fulfillment | Y | ✓ | ✓ | MARK UP |
| Warehousing | N | | | |
| Gift Wrapping | Y | ✓ | ✓ | MARK UP |
| Decorating | Y | | ✓ | MARK UP |
| Delivery | Y | | ✓ | MARK UP. |

*  If marked up, identify how much. ___20___ %

Do you provide creative services?    (Y)    N    If so, please describe: _____
_____ SOME ART CREATION    ( < ? ,000 PER YEAR )

How do you bill for them?    NOMINAL HOURLY RATE

## CREDIT AND COLLECTIONS

Do you require advance payment on new orders?    (Y)    N    If so, how much, and if
only on certain orders, what criteria determines advance payment?
_____ 50 – 75% for NON – "NAME" CLIENTS _____

Do you require credit applications on new accounts?    Y    (N)
Do you hold orders until applications are approved?    Y    (N)
How many days past due is an account considered delinquent?    30
Do you hold orders on delinquent accounts?    Y    (N)

Do you charge customers for late payment?    (Y)    N    If so, what rate? 1½%
Do you charge salespeople on their customer's late payment?    Y    (N)
If so, what rate? _____
Do you charge-back a customer's bad debt to salespeople?    Y    (N)
If so, on what basis? _____

## STAFFING AND OFFICE

**In lieu of completing the following section, a summary of all employees should be attached that includes title, functional responsibilities, years with company, and annual salary.**

Please indicate the number of employees in the following functions:

|  | NO. OF EMPLOYEES | WAGE RATE |
|---|---|---|
| Sales Support | 1 | 35,000 |
| Order Processing |  | SUB CONTRACT |
| Computer Processing | 0 |  |
| Accounting | 1 | 50,000 |
| Office Management | ½ | 50,000 |
| Sales Management | 1½ | 150,000 |
| Special Services  (ARTWORK) | 2 | 90,000 |
| Other ___ 6 SALARIED | 6 | 350,000 |
| SALES / CUSTOMER SERVICE |  |  |

Do you offer a group insurance plan?  (Y)  N   If so, please describe: _____

_100% PAID BENEFIT_

_____

Size of your office & showroom facility:

Office _2000_ sq. ft.   Showroom _1000_ sq. ft.

Size of warehouse facility (if applicable): _N/A_ sq. ft.

Do you own or lease your facility (ies)?   Own   (Lease)

If you own the facility, is it owned personally by you (individually), through a real estate partnership in which you are a partner, or through a corporation? _____

How much is your rent?   Office   $ _2 $1/PM_ per square foot   (*3000 p.m. TO TM*)

Showroom   $ _____ per square foot (if applicable)

Warehouse   $ _____ per square foot (if applicable)

How long have you occupied this facility (ies)? _6_ yrs./mos.

How much more can you increase sales before your current facility is not adequate?

$ _____

Is this rent (check only one):   _LEASE EXTENDED APRIL '07 To $6000/p.m. FOR 5000 SQUARE FEET_

At Market Rates   _____

Above Market Rates   _____

Below Market Rates   __✓__

Do these rates include:  Real estate taxes: (Y) N   Common area maintenance: (Y) N

If you do not own the facility, what is the expiration date of the lease and is the lease assumable without a fee?   Expiration date: _2009_

Assumable:  Y  (N)   Fee:  Y  N   _NOT SURE._

## OWNER COMPENSATION

_LILLGB_   _VEILITY_

Salary   $ _2500 00_   _85 000_

Commissions _PROFIT SHARES_ $ _170, 000_   _PG, 000_

✓ Pension Contributions   $ . _____

Expenses   $ _30, 000_   _2, 000_

Other   $ _____

TOTAL COMPENSATION   $ _450, 000_   _172, 000_

_PENSION FUNDED FROM LILLGIE SHARE — NOT SURE OF BENEFICIARY OF PLAN_

CMC, LTD. Confidential Distributor Valuation/Sale Questionnaire ©1996

**Creative Marketing Concepts**
*572 Market Street*
*San Francisco, CA. 94104*

# Profit & Loss Statement [Cash]

# January 2007 through April 2007

4/9/07
12:55:43 PM

Income
  Product Sales

| | |
|---|---|
| Award/Plaque/Medal | $29,850.53 |
| Badge Holder/Lanyard | $13,971.38 |
| Bags-Woven/Tote/Businss/Cooler | $34,336.72 |
| Bags-Plastic & Paper | $9,676.50 |
| Banners/Pennants | $1,239.50 |
| Journalbook/Jotter | $32,685.79 |
| Bookmark/Magnifier | $675.84 |
| Balloons/Buttons/Ribbons | $11,464.56 |
| Calendars-ALL/Calendar Cards | $15,548.63 |
| Edible Item | $45,698.35 |
| Kitchenware/Cookware/Coasters | $4,428.56 |
| Computer Product/Mouse Pad | $96,042.28 |
| Desktop Item/Electronic | $77,444.53 |
| Drinkware | $44,896.87 |
| Wallet/Findx/BusCards(NOT CAL) | $3,465.00 |
| Gift Set/Box | $78.00 |
| Matchbooks/Matches/Napkins | $374.00 |
| Lapel Pins/Patches/Medal | $13,899.43 |
| Key Chain/Luggage Tag | $10,180.50 |
| Magnets-All | $7,000.86 |
| Magnets-Calendars | $22,779.14 |
| Paper-All | $27,841.40 |
| Personal Care/Medical Items | $16,489.92 |
| Stickers/Decals/Labels | $12,858.69 |
| Sports/Outdoor Items | $12,047.93 |
| Stress Balls | $20,475.60 |
| Tools/Knives/Flashlights | $11,554.25 |
| Toys/Games/Puzzles | $9,891.07 |
| Vinyl/Leather Padfolio | $4,745.28 |
| Wearables-Embroidered | $70,739.48 |
| Wearable-Imprinted | $67,432.28 |
| Wearables-Cap/Hat | $9,192.22 |
| Wearables-Other | $3,066.00 |
| Writing Instruments | $144,587.39 |
| Freight Collected | $88,832.99 |
| Misc. Sales | $93,685.35 |
| Umbrellas | $1,318.04 |
| Art Fees/Proof | $1,401.55 |

Creative Marketing Concepts

# Profit & Loss Statement [Cash]

# January 2007 through April 2007

4/9/07
12:55:43 PM

| | |
|---|---:|
| Set Up Fee | $24,542.34 |
| Addt'l Production Charges | $2,678.88 |
| Embroidery Tape | $1,426.22 |
| Late Fees Collected | $376.60 |
| Description | ($0.01) |
| Bad Debt/Forgive | ($21,232.49) |
| Total Product Sales | $1,079,687.95 |
| Vendor Rebate | |
| Vendors Commission | $1,095.00 |
| Adjustment for Deferred Income | ($16,697.12) |
| Total Income | $1,064,085.83 |
| | |
| Cost of Sales | |
| Product Purchases | |
| Award/Plaque/Medal | $27,746.64 |
| Badge Holder/Lanyard | $7,525.34 |
| Bags-Woven | $23,356.52 |
| Bags-Plastic & Paper | $5,212.55 |
| Banners/Pennant | $2,628.95 |
| Journalbook/Jotter | $19,298.69 |
| Balloons/Buttons/Ribbons | $5,476.45 |
| Calendars-All Sizes | $11,453.03 |
| Edible Item | $16,318.33 |
| Kitchenware/Cookware | $1,333.93 |
| Computer Products/Mousepads | $69,246.64 |
| Desktop Item/Electronic | $74,518.11 |
| Drinkware | $30,126.73 |
| Wallet/Findex/Business Cards | $1,329.26 |
| Gift Set/Box | $278.56 |
| Gift Boxes-Limoges | $719.00 |
| Matchbooks/Matches/Napkins | $211.80 |
| Lapel Pins/Patches/Medals | $3,513.18 |
| Key Chain/Luggage Tag | $9,183.07 |
| Magnets-All | $1,087.01 |
| Magnets-Calendars | $15,230.82 |
| Paper-All | $13,074.11 |
| Personal Care/Medical Items | $3,380.17 |
| Sticker/Decals/Labels | $9,415.74 |
| Sports/Outdoor Items | $10,651.65 |
| Stress Balls | $12,631.40 |
| Tools/Knives/Flashlights | $12,245.66 |
| Toys/Games/Puzzles | $6,353.82 |

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

# January 2007 through April 2007

4/9/07
12:55:44 PM

| | | |
|---|---|---|
| Vinyl/Leather Padfolio | | $8,017.70 |
| Wearables-Embroidered | | $41,376.29 |
| Wearables-Imprinted | | $38,301.10 |
| Wearables-Cap/Hat | | $3,337.56 |
| Wearables-Other | | $3,735.21 |
| Writing Instruments | | $82,346.84 |
| Freight Paid | | $66,137.57 |
| Import Freight/Customs Duty | | $434.50 |
| Misc. Purchases | | $33,268.31 |
| Umbrellas | | $13,637.76 |
| Art Fees/Proof | | $397.63 |
| Set Up Fee | | $19,127.86 |
| Addt'l Production Charges | | $1,241.42 |
| Embroidery Tape | | $2,063.00 |
| Samples-General/Corporate | | $1,454.30 |
| Sample Items | | |
| Sample Items | | |
|    Samples-Christina | $369.49 | |
|    Samples-Jocy/Mark | $414.42 | |
|    Samples-Lizanina | $63.54 | |
|    Samples-Jeff | $233.22 | |
|    Sample-Paola | $67.37 | |
|    Samples-Zachary | $413.40 | |
|    Sample-Leanne | $981.63 | |
|    Samples-Mischa | $309.93 | |
| Vendor Credits | ($3,497.41) | |
| Total Cost of Sales | | $707,779.80 |
| | | |
| Gross Profit | | $356,306.03 |
| | | |
| Expenses | | |
|    Accounting & Legal Fees | | $9,097.09 |
|    Retirement Plan Expense | | $13,753.75 |
|    Worker's Comp. Ins. | | $3,201.00 |
|    Health Plan | | $14,210.00 |
|    Medical Reimbursement | | $100.00 |
|    Advertising/Self Promo | | $25,195.06 |
|    Auto Expense | | $30.00 |
|    Finder's Fee | | $100.00 |
|    Bank Charges | | $49.08 |
|    Merchant Fees (Credit Card) | | $3,041.00 |
|    Merchant Fees (AmEx) | | $79.94 |

Creative Marketing Concepts

# Profit & Loss Statement [Cash]

# January 2007 through April 2007

4/9/07
12:55:44 PM

| | | |
|---|---:|---:|
| Finance Charges | | $528.63 |
| Dues/ Subscription | | $256.95 |
| Meetings/Cont. Ed | | $50.09 |
| Office Expenses | | $6,870.66 |
| Furniture/Computer Hardware | | $256.46 |
| Postage | | $1,000.00 |
| Rent | | $19,499.78 |
| Travel | | $369.52 |
| Employee Transportation | | $4,498.65 |
| Uncategorized/Suspense | | ($1,350.00) |
| Donations | | ($7.00) |
| Maintenance & Repairs | | $1,147.92 |
| Payroll | | |
| Wages | $214,570.58 | |
| Employer Payroll Taxes Exp. | $22,510.98 | |
| Phone | | $4,465.15 |
| SF Business & Payroll Taxes | | $6,595.65 |
| ADP-Payroll Fees | | $626.28 |
| Consulting | | $19,250.00 |
| Adjustment for Deferred Expenses | | ($36,311.24) |
| Total Expenses | | $333,685.98 |
| | | |
| Operating Profit | | $22,620.05 |
| | | |
| Other Income | | |
| Interest Income | | $236.67 |
| Total Other Income | | $236.67 |
| | | |
| Other Expenses | | |
| | | |
| Net Profit / (Loss) | | $22,856.72 |

Creative Marketing Concepts
*572 Market Street*
*San Francisco, CA. 94104*

# Profit & Loss Statement [Cash]

## January 2006 through December 2006

3/30/07
6:37:26 PM

Income
  Product Sales

| | |
|---|---:|
| Award / Plaque / Medal | $67,346.18 |
| Badge Holder / Lanyard | $52,615.33 |
| Bags-Woven / Tote / Businss / Cooler | $191,301.14 |
| Bags-Plastic & Paper | $39,676.29 |
| Banners / Pennants | $18,278.25 |
| Journalbook / Jotter | $81,519.40 |
| Bookmark / Magnifier | $32,348.24 |
| Balloons / Buttons / Ribbons | $18,421.08 |
| Calendars-ALL / Calendar Cards | $61,910.73 |
| Edible Item | $34,850.83 |
| Kitchenware / Cookware / Coasters | $22,207.04 |
| Computer Product / Mouse Pad | $174,408.76 |
| Desktop Item / Electronic | $176,715.90 |
| Drinkware | $133,616.88 |
| Wallet / Findx / BusCards (NOT CAL) | $17,224.26 |
| Gift Set / Box | $8,866.66 |
| Matchbooks / Matches / Napkins | $3,216.93 |
| Lapel Pins / Patches / Medal | $32,717.67 |
| Key Chain / Luggage Tag | $105,420.12 |
| Magnets-All | $67,678.51 |
| Magnets-Calendars | $10,779.50 |
| Paper-All | $89,574.30 |
| Personal Care / Medical Items | $291,842.42 |
| Stickers / Decals / Labels | $33,079.91 |
| Sports / Outdoor Items | $79,123.91 |
| Stress Balls | $48,149.14 |
| Tools / Knives / Flashlights | $49,914.22 |
| Toys / Games / Puzzles | $27,874.05 |
| Vinyl / Leather Padfolio | $58,283.92 |
| Wearables-Embroidered | $334,752.76 |
| Wearables-Imprinted | $146,265.02 |
| Wearables-Cap / Hat | $75,127.44 |
| Wearables-Other | $21,273.33 |
| Writing Instruments | $333,223.42 |
| Freight Collected | $270,003.72 |
| Misc. Sales | $378,830.01 |
| Umbrellas | $18,380.31 |
| Art Fees / Proof | $2,541.21 |
| Set Up Fee | $80,493.28 |
| Addt'l Production Charges | $31,360.88 |
| Embroidery Tape | $4,045.15 |
| Late Fees Collected | $3,187.79 |
| Miscellaneous Income | $591.55 |
| Bad Debt / Forgive | $267.00 |
| Total Product Sales | $3,749,304.44 |
| Vendor Rebate | |
| Prime Cache Commission | $4,957.00 |
| Vendors Commission | $935.00 |
| Adjustment for Deferred Income | $5,181.24 |
| Total Income | $3,760,377.68 |

Cost of Sales

Creative Marketing Concepts

# Profit & Loss Statement [Cash]

## January 2006 through December 2006

3/30/07
6:37:29 PM

| Product Purchases | |
|---|---|
| Award/Plaque/Medal | $42,156.31 |
| Badge Holder/Lanyard | $24,403.08 |
| Bags-Woven | $115,069.49 |
| Bags-Plastic & Paper | $21,763.60 |
| Banners/Pennant | $8,213.58 |
| Journalbook/Jotter | $40,593.51 |
| Bookmark/Magnifier | $15,653.50 |
| Balloons/Buttons/Ribbons | $10,465.94 |
| Calendars-All Sizes | $31,160.09 |
| Edible Item | $44,863.97 |
| Kitchenware/Cookware | $12,618.64 |
| Computer Products/Mousepads | $63,111.69 |
| Desktop Item/Electronic | $121,085.28 |
| Drinkware | $67,449.38 |
| Wallet/Findex/Business Cards | $9,066.42 |
| Gift Set/Box | $3,304.54 |
| Gift Boxes-Limoges | $1,562.50 |
| Matchbooks/Matches/Napkins | $2,167.41 |
| Lapel Pins/Patches/Medals | $10,057.73 |
| Key Chain/Luggage Tag | $54,390.53 |
| Magnets-All | $21,736.77 |
| Magnets-Calendars | $5,226.09 |
| Paper-All | $50,857.76 |
| Personal Care/Medical Items | $184,999.60 |
| Sticker/Decals/Labels | $14,169.68 |
| Sports/Outdoor Items | $43,366.68 |
| Stress Balls | $29,497.34 |
| Tools/Knives/Flashlights | $28,427.21 |
| Toys/Games/Puzzles | $16,267.28 |
| Vinyl/Leather Padfolio | $35,074.06 |
| Wearables-Embroidered | $162,291.13 |
| Wearables-Imprinted | $108,895.02 |
| Wearables-Cap/Hat | $37,996.84 |
| Wearables-Other | $18,243.88 |
| Writing Instruments | $224,048.99 |
| Freight Paid | $219,612.48 |
| Import Freight/Customs Duty | $7,336.57 |
| Misc. Purchases | $265,145.92 |
| Umbrellas | $9,308.69 |
| Art Fees/Proof | $774.89 |
| Set Up Fee | $54,038.65 |
| Addt'l Production Charges | $39,737.55 |
| Embroidery Tape | $3,820.75 |
| Contract Screen Printing | $75.00 |
| Samples-General/Corporate | $3,990.89 |
| Sample Items | |
| Sample Items | |
| Samples-Christina | $913.39 |
| Samples-Jocy/Mark | $4,471.64 |
| Samples-Lizanina | $80.33 |
| Samples-Jeff | $1,291.34 |
| Sample-Paola | $168.60 |
| Samples-Zachary | $2,061.16 |
| Sample-Leanne | $1,013.56 |
| Samples-Mischa | $16.61 |

Creative Marketing Concepts

# Profit & Loss Statement [Cash]

## January 2006 through December 2006

3/30/07
6:37:31 PM

| | | |
|---|---:|---:|
| Vendor Credits | | ($2,645.24) |
| Total Cost of Sales | | $2,293,468.30 |
| | | |
| Gross Profit | | $1,466,909.38 |
| | | |
| Expenses | | |
| Accounting & Legal Fees | | $6,549.00 |
| Retirement Plan Expense | | $20,900.00 |
| Worker's Comp. Ins. | | $7,054.00 |
| Health Plan | | $33,970.61 |
| Medical Reimbursement | | $1,356.95 |
| Advertising/Self Promo | | $87,104.54 |
| Auto Expense | | $2,883.56 |
| Finder's Fee | | $1,981.87 |
| Bank Charges | | $1,050.89 |
| Merchant Fees (Credit Card) | | $8,300.95 |
| Merchant Fees (AmEx) | | $1,401.50 |
| Finance Charges | | $872.23 |
| Business Meal/ Entertainment | | $2,048.12 |
| Dues/ Subscription | | $8,081.02 |
| Meetings/ Cont. Ed | | $11,076.80 |
| Business Insurance | | $1,670.00 |
| Office Expenses | | $39,637.30 |
| Furniture/ Computer Hardware | | $17,643.90 |
| Postage | | $13,358.00 |
| Rent | | $32,540.86 |
| Travel | | $17,851.84 |
| Employee Transportation | | $14,876.86 |
| Uncategorized/ Suspense | | $1,465.00 |
| Donations | | $3,100.00 |
| Maintenance & Repairs | | $6,912.53 |
| Payroll | | |
| Wages | $727,134.94 | |
| Employer Payroll Taxes Exp. | $62,314.36 | |
| Phone | | $18,537.69 |
| SF Business & Payroll Taxes | | $11,056.76 |
| ADP-Payroll Fees | | $2,782.93 |
| Consulting | | $42,010.36 |
| Adjustment for Deferred Expenses | | $17,659.88 |
| Total Expenses | | $1,225,185.25 |
| | | |
| Operating Profit | | $241,724.13 |
| | | |
| Other Income | | |
| Interest Income | | $4,439.27 |
| Total Other Income | | $4,439.27 |
| | | |
| Other Expenses | | |
| Retirement Plan Contribution | | $130,000.00 |
| Total Other Expenses | | $130,000.00 |
| | | |
| Net Profit / (Loss) | | $116,163.40 |

GMC P&L Projection 2006

| | 2005 | 2006-Budget | % Change | @12/21/06 | Estimated Changes | Estimated Final | FINAL 3/30/07 |
|---|---|---|---|---|---|---|---|
| Income | 3200000 | 3997000 | 24.9% | 3955700 | 25000 | 3980700 | 3987814 |
| | | | | | | | |
| Total Cost of Sales | 1888000 | 2338245 | 23.8% | 2356200 | | | |
| | 41.0% | 41.5% | | | | | |
| | | | | | | | |
| Gross Profit | 1312000 | 1658755 | 26.4% | 1599500 | 10000 | 1609500 | 1615915 |
| Freight Profit | 19000 | 24700 | 30.0% | 40813 | | | 50388 |
| | | | | | | | |
| Expenses | | | | | | | |
| Accounting & Legal | 10405 | 12000 | 15.3% | 6549 | 5000 | 11549 | 6549 |
| Retirement Plan Expense | 18700 | 20000 | 7.0% | 18400 | 6000 | 24400 | 20900 |
| Worker's Comp. Ins. | 5338 | 7206 | 35.0% | 7054 | | 7054 | 7054 |
| PacAdvantage Health Plan | 28532 | 37200 | 30.4% | 33772 | | 33772 | 33970 |
| Medical Reimbursement | 797 | 1000 | 25.5% | 1356 | 250 | 1606 | 1356 |
| Advertising/Self Promo | 92421 | 120000 | 29.8% | 80071 | 5000 | 85071 | 87104 |
| Auto Expense | 1599 | 1900 | 18.8% | 2373 | 200 | 2573 | 2803 |
| Finders Fee | | | | 1305 | 700 | 2005 | 1987 |
| Bank Charges | 8340 | 9174 | 10.0% | 970 | 87 | 1057 | 1050 |
| Merchant Fees (Credit Card) | 7049 | 8106 | 15.0% | 6894 | 620 | 7514 | 8300 |
| Merchant Fees (AmEx) | 760 | 874 | 15.0% | 1229 | 111 | 1340 | 1401 |
| Finance Charges | 355 | 300 | -15.5% | 872 | 0 | 872 | 872 |
| NFS Checks | -100 | 0 | -100.0% | | | | |
| Cash Over/Short | -11 | 0 | -100.0% | | | | |
| Bad Debt/Forgive | 221 | 0 | -100.0% | | 20000 | 20000 | |
| Business Meal/ Entertainment | 5581 | 6000 | 7.5% | 2862 | 258 | 3120 | 2048 |
| Dues/ Subscription | 2833 | 3500 | 23.5% | 7891 | 710 | 8601 | 8081 |
| Meetings/Cont. Ed | 5770 | 6924 | 20.0% | 7740 | 4000 | 11740 | 11076 |
| Business Insurance | 1604 | 1800 | 12.2% | 1670 | | 1670 | 1670 |
| Office Expenses | 25628 | 31266 | 22.0% | 39119 | 3521 | 42640 | 39637 |
| Furniture/Computer Hardware | 18823 | 15000 | -20.3% | 17043 | 1534 | 18577 | 17643 |
| Postage | 26568 | 27000 | 1.6% | 11358 | 1022 | 12380 | 13358 |
| Rent | 34489 | 36500 | 5.8% | 32540 | 3200 | 35740 | 32540 |
| Travel | 18768 | 20000 | 6.6% | 15101 | 1359 | 16460 | 17851 |
| Employee Transportation | 13855 | 16500 | 19.1% | 14816 | 1333 | 16149 | 14876 |
| Uncategorized/Suspense | 4962 | 0 | -100.0% | 5570 | | 5570 | 1465 |
| Donations | 2600 | 3000 | 15.4% | 1100 | 1900 | 3000 | 3100 |
| Maintenance & Repairs | 3640 | 4000 | 9.9% | 6830 | 615 | 7445 | 6912 |
| Payroll | | | | | | | |
| Wages | 522999 | 710000 | 35.8% | 647276 | 92461 | 739737 | 727135 |
| Employer Payroll Taxes Exp. | 43285 | 50000 | 15.5% | 55293 | 6010 | 61303 | 62314 |
| Phone | 15006 | 16500 | 10.0% | 18374 | 1654 | 20028 | 18537 |
| SF Business & Payroll Taxes | 7612 | 8500 | 11.7% | 11056 | | 11056 | 11056 |
| ADP-Payroll Fees | 1784 | 2000 | 12.1% | 2554 | 230 | 2784 | 2783 |
| Consulting | 50399 | 60000 | 19.0% | 39910 | 6280 | 46190 | 42010 |
| Adjustment & Other | | | | 7228 | 651 | 7879 | 17660 |
| | | | | | | | |
| Total Expenses | 980611 | 1236250 | 26.1% | 1106176 | 164705 | 1270881 | 1225178 |
| | | | | | | | |
| Operating Profit | 350389 | 447205 | 27.6% | 534137 | | 338619 | 441125 |
| Owners Draw | 250000 | 250000 | 0.0% | 250000 | | 250000 | 250000 |
| | | | | | | | |
| Other Income | | | | | | | |
| Interest | | | | | | 3248 | |
| Late Fees Collected | | | | | | 1600 | 3187 |
| Bad Debt collected | | | | DOCTORS MEDICAL | | -282 | -16836 |
| Prime Cache | | | | | | 4957 | 4957 |
| Tradenet Rebate | | | | | | 935 | 935 |
| Misc | | | | | | 11027 | 591 |
| Other Total | | | | | | | -7166 |
| | | | | | | | |
| | | | | | | | 183959 |
| | | | | | | | |
| Add: AV Bonus Received (2006) | | | | | | 13000 | 15500 |
| Add: ML Personal Expenses | | | | | | 15000 | 26010 |
| Add: AV Personal Expenses | | | | | | 1500 | 1500 |
| | | | | | | | |
| Distributable Profit | | | | | | 129146 | 226969 |
| | | | | | | | |
| AV Share @ 35% | | | | | | 45201 | 79439 |
| Less: AV Bonus pd 2006 | | | | | | | -15500 |
| Less: Av Bonus Pd 2007 for 2006 | | | | | | | -28950 |
| AV Final (Less 14500) | | | | | | 30701 | 34989 |

**Creative Marketing Concepts**
*572 Market Street*
*San Francisco, CA. 94104*

# Profit & Loss Statement [Cash]

# January 2005 through December 2005

4/3/07
10:34:23 AM

| | | |
|---|---|---|
| 4-0000 | Income | |
| 4-0001 | Product Sales | |
| 4-0100 | Award/Plaque/Medal | $52,327.86 |
| 4-0150 | Badge Holder/Lanyard | $61,201.30 |
| 4-0200 | Bags-Woven | $100,587.27 |
| 4-0210 | Bags-Luggage/Duffel | $2,978.75 |
| 4-0220 | Bags-Business/PC Case | $3,724.32 |
| 4-0230 | Bags-Insulated/Coolers | $6,079.16 |
| 4-0250 | Bags-Plastic & Paper | $44,748.89 |
| 4-0260 | Bags-Paper/Kraft | $840.00 |
| 4-0270 | Bags-Other | $1,108.50 |
| 4-0300 | Banners/Pennants | $3,905.30 |
| 4-0303 | Journalbook/Jotter | $93,859.96 |
| 4-0305 | Bookmark/Magnifier | $19,237.71 |
| 4-0400 | Bottles | $2,765.05 |
| 4-0500 | Balloons/Buttons/Ribbons | $9,787.93 |
| 4-0502 | Business Cards | $801.00 |
| 4-0600 | Calendar Cards | $192.18 |
| 4-0610 | Calendars-ALL | $82,555.96 |
| 4-0645 | Edible Item | $41,228.57 |
| 4-0650 | Calculator | $1,508.64 |
| 4-0670 | Kitchenware/Cookware | $37,411.49 |
| 4-0685 | Corkscrew | $4,500.00 |
| 4-0687 | Coasters | $122.50 |
| 4-0690 | Clocks | $2,964.80 |
| 4-0700 | Computer Product | $105,058.53 |
| 4-0800 | Desktop Item/Electronic | $190,516.39 |
| 4-0900 | Electronics | $2,008.80 |
| 4-0901 | Drinkware | $106,579.83 |
| 4-0902 | Flashlights | $3,627.00 |
| 4-0904 | Wallet/Findx/BusCards(NOT CAL) | $16,557.49 |
| 4-0908 | Gift Set/Box | $8,736.71 |
| 4-0995 | Matchbooks/Matches/Napkins | $5,007.69 |
| 4-1000 | Mugs | $2,028.93 |
| 4-1010 | Mugs-Insulated | $3,779.27 |
| 4-1011 | Knives | $408.20 |
| 4-1020 | Lanyards | $3,341.20 |
| 4-1050 | Lapel Pins/Patches | $41,373.78 |
| 4-1060 | Letter Openers | $325.00 |
| 4-1200 | Key Chain/Luggage Tag | $109,766.29 |

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

# January 2005 through December 2005

4/3/07
10:34:25 AM

| | | |
|---|---|---|
| 4-1340 | Magnets-All | $84,811.32 |
| 4-1341 | Magnets-Calendars | $11,610.12 |
| 4-1380 | Mouse Pads | $1,002.00 |
| 4-1400 | Paper-All | $140,543.05 |
| 4-1410 | Paper-Non Adhesive Notes | ($176.38) |
| 4-1430 | Paper-Other | $7,207.23 |
| 4-1435 | Paperweights | $189.00 |
| 4-1500 | Personal Care/Medical Items | $60,770.81 |
| 4-1509 | Photo Frame | $41.90 |
| 4-1550 | Stickers/Decals/Labels | $33,027.99 |
| 4-1650 | Sports/Outdoor Items | $41,100.95 |
| 4-1651 | Stress Balls | $56,675.27 |
| 4-1700 | Tools/Knives/Flashlights | $27,935.26 |
| 4-1705 | Towel/Blanket | $1,281.80 |
| 4-1710 | Toys/Games/Puzzles | $35,673.49 |
| 4-2200 | Vinyl/Leather Padfolio | $58,892.65 |
| 4-2300 | Wearables-Embroidered | $253,350.46 |
| 4-2310 | Wearable-Imprinted | $157,105.77 |
| 4-2320 | Wearables-Cap/Hat | $64,976.34 |
| 4-2330 | Wearables-Other | $224,929.28 |
| 4-2360 | Wearables-Aprons | $1,720.56 |
| 4-2370 | Wearables-Other | $7,058.87 |
| 4-2400 | Writing Instruments | $299,803.11 |
| 4-2410 | Writing-Pens | $49,779.36 |
| 4-2420 | Writing-H-liter,Marker,Crayon | $880.00 |
| 4-2600 | Freight Collected | $227,925.54 |
| 4-2700 | Misc. Sales | $110,471.62 |
| 4-2800 | Umbrellas | $22,031.72 |
| 4-5000 | Art Fees/Proof | $4,101.83 |
| 4-5010 | Die Charge | $663.77 |
| 4-5015 | Copy Change | $347.50 |
| 4-5020 | Set Up Fee | $84,405.27 |
| 4-5030 | 2nd Color/Location Imprint | $610.79 |
| 4-5040 | Addt'l Production Charges | $14,787.74 |
| 4-5060 | Proof | $371.09 |
| 4-5070 | Upcharge | $63.56 |
| 4-5080 | PMS Color Match | $105.91 |
| 4-6000 | Rush,<Min Charge | $1,436.71 |
| 4-6030 | Embroidery Tape | $9,136.61 |
| 4-6040 | Contract Embroidery | $208.60 |
| 4-6060 | Personalizations | $30.37 |
| 4-6070 | Engraving/Oxidation | $54.65 |

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

# January 2005 through December 2005

4/3/07
10:34:25 AM

| | | |
|---|---|---:|
| 4-6080 | Running Charge | $3,030.05 |
| 4-6090 | Size/Stitch Upcharge | $496.23 |
| 4-7000 | Late Fees Collected | $2,272.57 |
| 4-9600 | Bad Debt/Forgive | ($57.77) |
| 4-9700 | Client Credit | ($8,471.83) |
| | Total Product Sales | $3,267,764.99 |
| 4-9900 | Vendor Rebate | |
| 4-9901 | Prime Cache Commission | $4,117.00 |
| 4-9902 | Vendors Commission | $806.37 |
| | Adjustment for Deferred Income | $12,930.70 |
| | Total Income | $3,285,619.06 |
| | | |
| 5-0000 | Cost of Sales | |
| 5-0001 | Product Purchases | |
| 5-0100 | Award/Plaque/Medal | $25,755.10 |
| 5-0150 | Badge Holder/Lanyard | $25,846.94 |
| 5-0200 | Bags-Woven | $55,541.52 |
| 5-0210 | Bags-Luggage/Duffel | $82.80 |
| 5-0250 | Bags-Plastic & Paper | $17,720.64 |
| 5-0260 | Bags-Paper/Kraft | $131.40 |
| 5-0300 | Banners/Pennant | $2,015.30 |
| 5-0303 | Journalbook/Jotter | $46,902.01 |
| 5-0305 | Bookmark/Magnifier | $10,918.81 |
| 5-0500 | Balloons/Buttons/Ribbons | $4,817.54 |
| 5-0502 | New Account | $1,449.60 |
| 5-0600 | Calendar Cards | $624.48 |
| 5-0610 | Calendars-All Sizes | $27,945.98 |
| 5-0645 | Edible Item | $23,030.25 |
| 5-0650 | Calculator | $468.59 |
| 5-0670 | Kitchenware/Cookware | $20,052.79 |
| 5-0690 | Clocks | $104.40 |
| 5-0700 | Computer Products | $66,597.65 |
| 5-0800 | Desktop Item/Electronic | $113,171.81 |
| 5-0901 | Drinkware | $81,832.32 |
| 5-0902 | Flashlights | $134.40 |
| 5-0903 | Fans | $51.31 |
| 5-0904 | Wallet/Findex/Business Cards | $9,059.45 |
| 5-0908 | Gift Set/Box | $4,505.36 |
| 5-0909 | Gift Boxes-Limoges | $2,222.00 |
| 5-0955 | Matchbooks/Matches/Napkins | $3,205.87 |
| 5-1000 | Mugs | $1,027.11 |
| 5-1010 | Mugs-Insulated | $144.43 |

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

## January 2005 through December 2005

4/3/07
10:34:26 AM

| | | |
|---|---|---|
| 5-1011 | Knives | $76.80 |
| 5-1020 | Lanyards | $1,402.50 |
| 5-1050 | Lapel Pins/Patches | $12,625.81 |
| 5-1060 | Letter Openers | $121.50 |
| 5-1100 | Holiday/Greeting Cards | $2,885.63 |
| 5-1200 | Key Chain/Luggage Tag | $48,220.57 |
| 5-1340 | Magnets-All | $53,175.60 |
| 5-1341 | Magnets-Calendars | $6,524.05 |
| 5-1400 | Paper-All | $67,738.30 |
| 5-1430 | Paper-Other | $84.20 |
| 5-1440 | Patches | $210.00 |
| 5-1500 | Personal Care/Medical Items | $45,088.55 |
| 5-1509 | Photo Frame | $2,962.43 |
| 5-1550 | Sticker/Decals/Labels | $12,372.50 |
| 5-1650 | Sports/Outdoor Items | $26,552.12 |
| 5-1651 | Stress Balls | $29,345.81 |
| 5-1700 | Tools/Knives/Flashlights | $18,927.40 |
| 5-1710 | Toys/Games/Puzzles | $23,831.93 |
| 5-2200 | Vinyl/Leather Padfolio | $23,687.79 |
| 5-2300 | Wearables-Embroidered | $146,655.76 |
| 5-2310 | Wearables-Imprinted | $108,997.16 |
| 5-2320 | Wearables-Cap/Hat | $23,329.40 |
| 5-2330 | Wearables-Other | $124,557.04 |
| 5-2370 | Wearables-Other | $10.41 |
| 5-2400 | Writing Instruments | $188,775.77 |
| 5-2410 | Writing-Pens | $1,405.74 |
| 5-2420 | Writing-H-liter,Marker,Crayon | $516.60 |
| 5-2600 | Freight Paid | $216,574.79 |
| 5-2610 | Import Freight | $4,078.07 |
| 5-2700 | Misc. Purchases | $80,752.37 |
| 5-2800 | Umbrellas | $7,496.71 |
| 5-5000 | Art Fees/Proof | $2,083.79 |
| 5-5015 | Copy Change | $9.00 |
| 5-5020 | Set Up Fee | $67,751.33 |
| 5-5030 | 2nd Color/Location Imprint | $135.62 |
| 5-5040 | Addt'l Production Charges | $22,975.77 |
| 5-5060 | Proof | $141.72 |
| 5-6000 | Rush,<Min Charge | $202.82 |
| 5-6030 | Embroidery Tape | $8,725.00 |
| 5-6040 | Contract Embroidery | $1,844.93 |
| 5-6050 | Contract Screen Printing | $2,177.30 |
| 5-6060 | Personalizations | $50.00 |

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

# January 2005 through December 2005

4/3/07
10:34:26 AM

| | | | |
|---|---|---|---|
| 5-6080 | Running Charge | | $1,202.15 |
| 5-6090 | Size/Stitch Upcharge | | $0.87 |
| 5-7000 | Samples-General/Corporate | | $5,351.12 |
| 5-7001 | Sample Items | | |
| 5-7100 | Sample Items | | |
| 5-7101 | Samples-Christina | $1,474.31 | |
| 5-7102 | Samples-Jocy/Mark | $885.10 | |
| 5-7103 | Samples-Joy | $231.22 | |
| 5-7104 | Samples-Jeff | $818.77 | |
| 5-7105 | Sample-Paola | $49.55 | |
| 5-7106 | Samples-Zachary | $1,386.42 | |
| 5-9800 | Vendor Credits | | ($4,176.00) |
| 5-9900 | Sales Commission | | $1,016.50 |
| | Total Cost of Sales | | $1,938,680.46 |
| | | | |
| | Gross Profit | | $1,346,938.60 |
| | | | |
| 6-0000 | Expenses | | |
| 6-1000 | Accounting & Legal | | $10,404.83 |
| 6-1005 | Retirement Plan Expense | | $18,700.00 |
| 6-1007 | Worker's Comp. Ins. | | $5,338.00 |
| 6-1011 | PacAdvantage Health Plan | | $28,531.61 |
| 6-1015 | Medical Reimbursement | | $847.67 |
| 6-1051 | Advertising/Self Promo | | $92,804.16 |
| 6-1100 | Auto Expense | | $2,321.87 |
| 6-1150 | Bank Charges | | $541.72 |
| 6-1160 | Merchant Fees (Credit Card) | | $7,095.23 |
| 6-1161 | Merchant Fees (AmEx) | | $759.66 |
| 6-1180 | Cash Over/Short | | ($10.51) |
| 6-1190 | Bad Debt/Forgive | | ($18.25) |
| 6-1200 | Business Meal/ Entertainment | | $5,680.62 |
| 6-1300 | Dues/ Subscription | | $3,173.37 |
| 6-1350 | Meetings/Cont. Ed | | $6,392.74 |
| 6-1401 | Business Insurance | | $1,604.00 |
| 6-1600 | Office Expenses | | $31,127.27 |
| 6-1610 | Supplies | | $1,302.80 |
| 6-1615 | Furniture/Computer Hardware | | $24,211.67 |
| 6-1650 | Postage | | $26,568.41 |
| 6-1700 | Rent | | $34,489.38 |
| 6-1800 | Travel | | $19,980.71 |
| 6-1810 | Employee Transportation | | $13,935.42 |
| 6-1850 | Uncategorized/Suspense | | $2,880.38 |

Exhibit V (cont'd)

**Creative Marketing Concepts**

# Profit & Loss Statement [Cash]

# January 2005 through December 2005

4/3/07
10:34:27 AM

| | | | |
|---|---|---|---|
| 6-1950 | Donations | | $2,600.00 |
| 6-2000 | Maintenance & Repairs | | $3,640.05 |
| 6-5100 | Payroll | | |
| 6-5110 | Wages | $590,932.35 | |
| 6-5190 | Employer Payroll Taxes Exp. | $48,279.66 | |
| 6-5450 | Phone | | $15,112.44 |
| 6-5551 | SF Business & Payroll Taxes | | $7,612.32 |
| 6-5553 | ADP-Payroll Fees | | $1,962.29 |
| 6-9500 | Consulting | | $50,399.17 |
| | Adjustment for Deferred Expenses | | ($11,295.02) |
| | Total Expenses | | $1,047,906.02 |
| | | | |
| | Operating Profit | | $299,032.58 |
| | | | |
| 8-0000 | Other Income | | |
| 8-1000 | Interest Income | | $978.59 |
| | Total Other Income | | $978.59 |
| | | | |
| 9-0000 | Other Expenses | | |
| 9-2000 | Retirement Plan Contribution | $107,374.00 | |
| | Total Other Expenses | | $107,374.00 |
| | | | |
| | Net Profit / (Loss) | | $192,637.17 |

## QUALIFICATIONS OF JEFFRY C. MEYER

Jeffry C. Meyer has been involved in various aspects of Finance for over 30 years. He earned his Bachelor of Science Degree in Accounting and Finance from Manchester College. He qualified as a CPA in the state of Indiana where he worked for the Big Eight international accounting firm of Ernst & Young (formerly Ernst & Ernst). He has been active in the Promotional Products Industry for twenty-six years in various CFO and CEO capacities during which time he consolidated the largest group of companies in the industry. He earned the MAS (Master Advertising Specialist) designation from PPAI. During his career he has evaluated, negotiated and consummated many acquisitions in the Promotional Products Industry and performed valuations on many more. He joined Certified Marketing Consultants, Ltd. in 1998. CMC only serves companies in the Promotional Products Industry. Services include Mergers and Acquisitions, Business Valuations, Strategic Planning, Business Plans, Marketing Plans, General Consulting and he also teaches education seminars for the Advertising Specialties Institute. He is currently the CEO and partner of CMC. In 2006 Meyer was voted as one of the 50 most powerful people in the Promotional Products Industry.

Meyer has not testified or given depositions as an expert witness in the last four years.

# EXHIBIT B

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS,

                    Plaintiff,

          v.

ANDREW VERITY and CHRISTINA
CHANG,

                    Defendants.
_____/

AND RELATED COUNTERCLAIMS.
_____/

No. C 07-02748 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiff's Motion for Partial**
**Summary Judgment; Plaintiff's Motion**
**for an Order to Show Cause Regarding**
**Contempt**

On May 25, 2007 plaintiff Mark Lillge ("Lillge") d/b/a Creative Marketing Concepts

("CMC") brought this action against defendants Andrew Verity and Christina Chang asserting

claims for misappropriation of trade secrets, unfair competition, unjust enrichment and intentional

interference with prospective economic advantage.  On July 6, 2007 defendants answered and

counterclaimed.  Now before the court is plaintiff's motion for partial summary judgment and

plaintiff's motion for an order to show cause regarding contempt.  Having considered the parties'

arguments and for the reasons stated below, the court enters the following memorandum and order.

Motion for Partial Summary Judgment

I.        BACKGROUND

          CMC is a full-service advertising specialty and corporate apparel firm that sells businesses

goods branded with the business' corporate logo.  Joint Statement of Undisputed Facts ("JSUF"),

1   ¶ 2.  CMC typically spends approximately five percent of its annual gross revenue, or $200,000, on

2   marketing efforts to assist in developing its customer base.  Id., ¶ 7.  CMC's customer list and

3   specific customer information are not developed by its sales personnel; rather, CMC independently

4   develops this information and distributes it as necessary to its sales personnel.  Lillge Dec., ¶ 3.

5        This information includes, but is not limited to: 1) contact information for certain customers,

6   including key decision makers who CMC knows actually buy its products; 2) purchasing history of

7   certain customers and respective sales volume, including the knowledge of when a customer will be

8   due for replenishment/re-order based upon its prior transactions with CMC; 3) knowledge of CMC's

9   customers' particular requirements and buying habits, including needs, likes, dislikes and

10  limitations; and 4) what CMC charges its customers.  Id., ¶ 4.

11       In order to protect this confidential information, CMC provides its employees with an

12  employee handbook that highlights the importance of protecting its trade secrets.  JSUF, ¶ 11.  The

13  handbook sets forth rules addressing the issue of trade secret theft, such as a prohibition on taking

14  home customer files or forwarding company emails without prior written authorization.  Id., ¶ 12.  It

15  states that "CMC policy is that the company has invested significant resources to make contact with

16  actual and potential clients. You will be required to sign a non-solicitation agreement to cover these

17  relationships."  Lillge Dec., Exh. A.  The provisions contained in the handbook applied to everyone

18  at CMC.  JSUF, ¶¶ 14–15.

19       CMC also takes four additional steps to ensure confidentiality.  First, CMC requires every

20  employee to sign an agreement that he or she will not improperly use CMC confidential information

21  or solicit CMC's customers for up to two years after conclusion of their employment with CMC.

22  Lillge Dec., ¶ 6, Exh. B.  Second, CMC undertakes efforts to ensure that CMC's competitors do not

23  learn what specific types and models of products are purchased by CMC by actively taking steps to

24  preclude its suppliers from displaying samples of CMC customer orders at industry trade shows.  Id.,

25  ¶ 9.  Third, CMC does not permit its suppliers to produce any overruns.  Its purchase orders state:

26  "Client does not want over-run pieces to be used and/or distributed as samples nor shown in any

27  printed materials, such as catalogs or flyers without prior written consent."  Id., Exh. D.  Fourth,

28  CMC maintains separate shredding bins for proprietary materials, consistently shreds proprietary

**UNITED STATES DISTRICT COURT**
For the Northern District of California

2

UNITED STATES DISTRICT COURT
For the Northern District of California

documents and frequently converses with its employees both verbally and in writing about the need for this information to be confidential.  Id., ¶ 7, Exh. C (defendant Chang confirming the shredding policy).  Nevertheless, it appears that the identity of many of CMC's customers and the items they purchase is available to the public via a visit to CMC's office and through its catalogues, which contain either samples or pictures of samples of CMC's work.  See generally Schmolder Dec.

In April 2001 CMC hired Andrew Verity as Sales Manager.  JSUF, ¶ 19.  In January 2005 it hired Christina Chang, Mr. Verity's wife.  Id., ¶ 20.  Ms. Chang started in accounting where she had access to customer account information.  Id., ¶ 21.  The following year, Ms. Chang transitioned to sales.  At all times Ms. Chang was an at-will employee.  Id., ¶ 22.

Mr. Lillge asked Mr. Verity to acquire signatures of all CMC employees on a confidentiality agreement.  This agreement contained the following clause:

> (b)Non-Solicitation of Customers, Vendors and Suppliers.  For a period of twenty-four (24) months from the date of termination of my employment with the Company for any reason, I shall not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of a public corporation) or in any other capacity, either solicit or engage in the business engaged in by the Company as of the date of termination of my employment ('CMC Business') with any current or prospective client, vendor or supplier which was a current or prospective client, vendor or supplier, of the Company within the twelve (12) months immediately preceding my termination.

Lillge Dec., Exh. B.  Mr. Verity embarked upon this venture despite his misgivings.  Verity Dec., ¶ 2.  Specifically, he was concerned about the legality of the above provision.  He discussed the same with CMC's lawyer and the lawyer stated:

> All of this said, there is a fine line between a non-Solicitation Clause and a Non-Compete Clause.  Non-compete provisions are not enforceable in California, while non-solicitation clauses are often enforceable.  I say 'often' because the case law is not completely consistent on the enforceability of non-solicitation clauses, but they are the best you can do.  I always recommend them because, at a minimum, they generally deter former employees from soliciting current customers and employees and, if push comes to shove, the clause is in the agreement and must be addressed/overcome by the former employee in a dispute (i.e., the fact that the employee agreed to the restriction can always be raised before the court / arbitrator).

Id., Exh. 1.[1]

In April 2007 CMC fired Mr. Verity.  Id., ¶ 5.  Upon Mr. Verity's departure, CMC was unable to locate the confidentiality agreements that had been signed by its employees.  Id., Exh. E.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    After Mr. Verity's departure, CMC asked Ms. Chang to sign a confidentiality agreement.

2    JSUF, ¶ 23.  Ms. Chang refused and CMC terminated her on May 11, 2007.  Id., ¶¶ 24–25.  At the

3    time of her departure, she advised CMC of certain customer information she had developed.  For

4    instance, she went through her corporate client list and advised Mr. Lillge of the key buyers at each

5    client and their individual preferences.  Boyd Dec., Exh. B at 46:22–48:16.  Based on her personal

6    knowledge, she testified that one of her clients would likely need to place an order in June that

7    would be "easily $15,000.  It's a no-brainer."  Id.

8    At the time of their firings, defendants were responsible for about a third of CMC's sales,

9    approximately $1.65 million.  Verity Dec., ¶ 8.  Shortly thereafter, Mr. Verity and Ms. Chang started

10   their own promotional products business known as Branding Boulevard, which has achieved sales of

11   $600,000 in the nine months it has been operative.[2]  Id.

12   Plaintiff filed this action on May 25, 2007, shortly after learning of defendants' new

13   business.  On June 1, 2007 this court entered a temporary restraining order against defendants.  See

14   Docket No. 15.  Since leaving CMC, defendants have made sales to customers who formerly did

15   business with CMC.  JSUF, ¶ 26.  They first disclosed the identities of these customers to CMC at

16   their depositions on July 24, 2007.  They subsequently produced documentation regarding the

17   transactions with former CMC customers.  Boyd Dec., ¶ 6.  On October 1, 2007 this court issued a

18   preliminary injunction against defendants.  See Docket No. 61.  On November 13, 2007 this court

19   entered an order confirming the scope of the temporary restraining order and preliminary injunction.

20   See id., No. 75.

21   Plaintiff now moves for summary judgment as to defendants' fifth, sixth, seventh, eighth,

22   tenth and eleventh causes of action against CMC.[3]

23

24   II.    Legal Standard

25   Summary judgment is proper when the pleadings, discovery and affidavits show that there is

26   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

27   matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

28   case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

UNITED STATES DISTRICT COURT
For the Northern District of California

1   genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

2   party.  Id.  The party moving for summary judgment bears the burden of identifying those portions

3   of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material

4   fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party

5   will have the burden of proof at trial, the moving party need only point out "that there is an absence

6   of evidence to support the nonmoving party's case."  Id.

7          Once the moving party meets its initial burden, the nonmoving party must go beyond the

8   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

9   genuine issue for trial."  Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

10  party's allegations.  Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The

11  court may not make credibility determinations, and inferences to be drawn from the facts must be

12  viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker

13  Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

14

15  III.    Discussion

16          A.       Wrongful Termination; Business and Professions Code section 17200

17          The parties' dispute focuses on whether the agreement CMC asked its employees to sign as a

18  condition of continued employment unlawfully restricted the employees' post-termination right to

19  compete.  The agreement stated, inter alia, "I shall not [for a period of two years] . . . solicit or

20  engage in the business engaged in by the Company as of the date of termination of my employment

21  . . . with any current or prospective client [of CMC] . . . within the twelve (12) months immediately

22  preceding my termination."  Plaintiff admits that "[f]or purposes of this motion, CMC is not

23  disputing that Ms. Chang was fired for her refusal to sign the confidentiality agreement."[4]

24  See Plaintiff's Motion for Partial Summary Judgment, Docket No. 81 at 8 n. 26.

25          Defendant's argument that this provision is a wholesale restraint forbidding Chang from

26  working in the same business is simply untrue.  Nevertheless, the "engage in" language could

27  arguably be void under California law as it disallows CMC's clients from choosing to do business

28  with Branding Boulevard.  The question then becomes whether plaintiff's act of firing defendant

                                                    5

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Chang for refusing to sign the six-page agreement with multiple other provisions, including

2  protections of trade secrets, was illegal.  If plaintiff can establish that he has even one piece of

3  information that can qualify as a trade secret, then he would be justified in asking his employees to

4  adhere to a limited non-compete agreement that disallows using that trade secret for the employees'

5  personal benefit.

6        In order to establish that it has trade secrets, CMC must meet a two-part test. California has

7  adopted the Uniform Trade Secrets Act ("UTSA"), which defines a trade secret as follows:

8        'Trade secret' means information, including a formula, pattern, compilation, program,
         device, method, technique, or process, that:
9        (1) Derives independent economic value, actual or potential, from not being generally
         known to the public or to other persons who can obtain economic value from its
10       disclosure or use; and
         (2) Is the subject of efforts that are reasonable under the circumstances to maintain its
11       secrecy.

12  Cal. Civ. Code § 3426.1(d).

13        The parties devote most of their argument to whether defendants have admitted that plaintiff

14  possesses trade secrets.  See Fed. R. Civ. P. 8(d); Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th

15  Cir. 1980).  This court, however, does not find an admission on the part of defendants regarding the

16  trade secret issue merely because they admitted the following paragraph in the complaint:

17        While the fact that many of CMC's actual customers might be willing to purchase
         promotional goods is information possibly available to CMC's competitors, there are
18       many details regarding CMC's relationships with its customers which are not
         generally known to the public or CMC's competitors, and CMC derives independent
19       economic value from this information which it has developed through substantial
         time, effort and expense.

20  JSUF, ¶ 10; see also Answer, ¶ 9.  Other than this purported admission, defendants have consistently

21  and vehemently maintained that plaintiff does not possess any trade secrets.  See, e.g., Answer, ¶ 11

22  (denying the existence of confidential information).

23        As this court found in the order granting the preliminary injunction, California courts have

24  held that confidential customer information beyond the identities of customers may constitute a trade

25  secret.  See Docket No. 61; Western Electroplating Co. v. Henness, 180 Cal. App. 2d 442, 445

26  (1960) ("[t]he value of the various accounts of customers and knowledge of the amount of business

27  transacted by and between said customers and plaintiff did constitute secret information of

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  plaintiff."). The court further held that knowledge of customer preferences and characteristics that

2  would aid the plaintiff in securing and retaining business were sufficient to secure protection against

3  the use of the information by a former employee. Id. at 448; see also Courtesy Temp. Serv., Inc. v.

4  Camacho, 222 Cal. App. 3d 1278, 1288 (1990) (holding that a company's customer list and related

5  proprietary information consisting of "billing rates, key contacts, specialized requirements and

6  markup rates" met the first prong).

7       The information maintained by plaintiff—key decision makers at the client, purchasing

8  history, pricing, sales volume, when to contact client for replenishment and the client's particular

9  requirements and buying habits, including needs, likes, dislikes, and limitations—which is not

10  generally available, pertains to the value to CMC of the promotional product customers. See

11  Thompson v. Impaxx, Inc., 113 Cal. App. 4th 1425, 1429 (2003) ("'the list of customers, not

12  ordinarily entitled to judicial protection, may become a trade secret, if there is confidential

13  information concerning the value of these customers.'") (citing Gordon v. Schwartz, 147 Cal. App.

14  2d 213, 217 (1956)).

15       The information maintained by CMC is exactly the type of information intended to be

16  protected by California trade secret law. For example, the information Ms. Chang gave Mr. Lillge

17  upon her departure could qualify as trade secrets. She specifically notified Mr. Lillge as to a client

18  that would need replenishment to the tune of $15,000 at a specific time. There can be no doubt that

19  whatever value this information possesses is solely based on the fact that it is not generally known to

20  the public. For instance, other persons, such as CMC's competitors, could obtain economic value

21  from knowledge of this information because they could solicit CMC's clients immediately prior to

22  when CMC was intending to contact those clients. However, if this information was generally

23  known, nobody in the promotional products industry would have an advantage. Thus, the first prong

24  is met—plaintiff is able to demonstrate that he possesses at least some information from which he

25  derives independent economic value due to its secrecy. The court now turns to whether reasonable

26  efforts were undertaken to maintain secrecy of this information.

27       In light of the various safeguards undertaken by CMC—rules regarding computer files and

28  emails, confidentiality agreements, shredding bins and preclusion of suppliers displaying

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1    samples—the second prong is easily met.  This is further buttressed by a California court of appeal

2    decision finding reasonable efforts at secrecy under similar circumstances:

> [T]here is no doubt that [the employer] intended its customer information to remain secret and undertook reasonable steps to secure that end. . . . [C]ustomer information was stored on computer [sic] with restricted access.  Moreover, in its employment contract signed by [the employee], [the employer] included a confidentiality provision expressly referring to its customer names and telephone numbers.  The [employer's] employee handbook contained an express statement that employees shall not use or disclose [the employer's] secrets or confidential information subsequent to their employment including 'lists of present and future customers.'

8    Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1523 (1997).  The efforts at secrecy here were

     far greater.

10           Finding that CMC does in fact have at least some trade secrets, the court must now determine

11   whether plaintiff may protect them via an agreement with an arguably anti-competitive provision.  In

12   Metro Traffic Control, Inc. v. Shadow Traffic Network, the California Court of Appeal dealt with a

13   similar situation.  22 Cal. App. 4th 853 (1994).   When discussing a one-year non-compete clause

14   and a prohibition on disclosure of trade secrets for two years, the court held:

> The merit of [the employer's] claim depends on its ability to demonstrate that it has a protectible trade secret. Business and Professions Code section 16600 prohibits the enforcement of [the employer's] noncompete clause except as is necessary to protect trade secrets.  One commentator closes this analytical circle neatly: 'Any attempt to restrict competition by the former employee by contract appears likely to be doomed under section 16600 of the Business and Professions Code, unless the restriction is carefully limited and the agreement protects merely a proprietary or property right of the employer recognized as entitled to protection under the general principles of unfair competition.'

20   Id. at 860–61 (internal citations omitted).  Although that court eventually found no trade secrets

21   existed, its rationale regarding non-compete clauses is still valid.  Indeed, Metro was recently cited

22   approvingly by the California Supreme Court which adopted its rationale.  See Reeves v. Hanlon, 33

23   Cal. 4th 1140, 1150 (2004).

24           Here, the non-compete clause is narrowly tailored in both time and scope and designed to

25   protect plaintiff's trade secrets.  Specifically, the non-compete clause is limited to business with

26   "any current or prospective client, vendor or supplier which was a current or prospective client,

27   vendor or supplier, of the Company within the twelve (12) months immediately preceding [the

28   employee's] termination."  Lillge Dec., Exh. B.  Since CMC maintains as trade secrets its client-

                                                    8

UNITED STATES DISTRICT COURT
For the Northern District of California

1   specific information that is not generally known in the industry, a non-compete clause with respect

2   to the current or prospective clients protects CMC's trade secrets.  For instance, it disallows former

3   employees from exploiting the client's needs, likes, dislikes and limitations—proprietary

4   information it gained through employment at CMC—to their benefit even if the client initiates

5   contact with the former employees.  This court thus affirms "the concomitant right to have the

6   ingenuity and industry one invests in the success of the business or occupation protected from the

7   gratuitous use of that 'sweat-of-the-brow' by others."  Morlife, 56 Cal. App. 4th at 1520.

8        In sum, CMC was well within its right to demand its employees sign a non-compete

9   agreement in order to protect its trade secrets.  Consequently, it was also well within its right to fire

10  Ms. Chang for insubordination upon refusing to sign the agreement.  Therefore, plaintiff's motion

11  for summary judgment regarding defendants' counterclaim for wrongful termination, count five, is

12  granted.  For the same reasons, plaintiff's motion for summary judgment regarding defendants'

13  counterclaim for a violation of Business and Professions Code section 17200, count eight, is also

14  granted.  Consequently, defendants' cross-motion for summary judgment on counts six and eight of

15  the counterclaim is denied.[5]

16

17        B.     Unpaid Vacation Pay

18        Under her sixth and seventh causes of action, defendant Chang seeks five days of vacation

19  pay from CMC.  CMC states that since Chang had no expectation of this pay when she rendered

20  services for CMC, she is not entitled to the same.  Thus, it argues, any offer by CMC was a

21  gratuitous promise.  As evidence of this, they point to her deposition.  Specifically:

22        Q: So it was your understanding that these five additional days were days that you
          hadn't necessarily earned pursuant to CMC's policy, but it was something that Mr.
23        Molloy [CMC's General Manager] agreed to add on to your termination?
          A: Yes.
24        . . .
          Q: And was it during this conversation with Mr. Molloy where he agreed to
25        essentially grant you five days of additional vacation pay?
          A: No.
26        Q: When did he actually agree to do that?
          A: The additional five days?
27        Q: Right.
          A: [In] the termination e-mail that I requested of him.
28

9

Q: Prior to receiving that e-mail, did you request that he grant you those additional five days or –
A: No.
Q: Was that a surprise to you?
A: It was a surprise, yeah.
. . .
Q: So in the e-mail that [Mr. Molloy] sent to you later that Friday, he agreed to pay you for the five days of vacation pay that you said you were entitled to, and your understanding is that he threw an additional five days on top of that?
A: Yes.

Boyd Dec., Exh. B at 153:18–22; 164:24–165:13; 168:18–23.

However, defendant Chang states that she was given the five additional days of pay as consideration for her part-time work at CMC, before she became a full-time employee.  Specifically, when she was fired, CMC's general manager stated to her in an e-mail: "Additionally, in consideration of your part time contracting work prior to your regular full time employment with CMC, which commenced on January 1, 2005, we have also included an additional 5 PTO days in your final paycheck."  Chang Dec., Exh. 1.  This statement, though supporting Chang's position, also suggests that according to CMC, whatever vacation pay Ms. Chang was entitled to was included in her final paycheck.

It is unclear what Chang's expectations were when she received the additional five days—she could have been surprised at the fact that CMC capitulated or surprised that they offered five days of pay as opposed to something else.  Further, the general manager's email demonstrates an understanding had been reached between the two.  Drawing all inferences in the light most favorable to Chang, this court cannot conclude that this promise was gratuitous.  Indeed, the five additional days of pay, even though it may be *de minimis* can be viewed as a severance package of sorts.  In light of this conflicting evidence, summary judgment is inappropriate.

C.    Defamation

Truth is a complete defense to all charges of defamation.  Smith v. Maldonado, 72 Cal. App. 4th 637, 646 (1999).  Defendants allege plaintiff defamed them in three ways: 1) a June 27, 2007 letter from CMC to its suppliers; 2) a September 7, 2007 e-mail from CMC to its customers; and 3) oral statements made by CMC.  Each is discussed in turn.

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On June 27, 2007 CMC sent a letter to its suppliers, which stated, *inter alia*:

2    This is to put you on notice that on June 1, 2007, Judge Marilyn Hall Patel, of the
3    United States District Court for the Northern District of California, San Francisco
     Division, granted a Temporary Restraining Order to prevent Andrew Verity and
     Christina Chang, former employees of Creative Marketing Concepts, from soliciting
4    our clients or misappropriating any of CMC's trade secrets.

5    As you may be aware, Mr. Verity and Ms. Chang have established their own
     promotional products business, which they have every right to do. We believe the
6    name of the company is Branding Boulevard. However, CMC filed a lawsuit against
     Mr. Verity and Ms. Chang because we have reason to believe that they have used or
7    threatened to use CMC trade secret information to solicit CMC's clients and acquire
     information about jobs that CMC has done in the past.
8
     Accordingly, we ask that you inform the appropriate people in your organization that:
9    1) Mr. Verity and Ms. Chang are no longer employees of CMC and do not represent
     CMC in any way; 2) Mr. Verity and Ms. Chang are not entitled to any information
10   regarding CMC clients, including products, pricing, artwork, etc.; and 3) please
     inform me directly if either Mr. Verity or Ms. Chang request any information about
11   or relating to CMC's current or past clients.

12   Lillge Dec., Exh. F.

13       Defendants claim this language is misleading because it neglects to mention that suppliers

14   are free to contact defendants. Not surprisingly, the language also neglects to mention that suppliers

15   are not free to contact defendants. Since plaintiff is under no obligation to inform its suppliers that

16   they are free to cease doing business with CMC, the court finds nothing misleading about this

17   communication.

18       Defendants cannot demonstrate that any of the statements contained in this communication

19   are untrue. In light of this failure to demonstrate any untruthfulness or mischaracterization of the

20   court's order, this communication is held to be non-defamatory as a matter of law.

21       On September 7, 2007 CMC sent an e-mail to its customers which defendants also contend is

22   false and misleading. The e-mail states, in relevant part:

23   As you may be aware, Andy Verity and Christina Chang left CMC a few months
     back. You should note that Judge Marilyn Hall Patel, of the United States District
24   Court for the Northern District of California, San Francisco Division, has granted
     CMC a Temporary Restraining Order on June 1, 2007 which prohibits them not only
25   from soliciting CMC clients but also restrains them from initiating contact with CMC
     clients. If you would like additional information about this situation, please contact
26   me directly.

27   Id., Exh. G. This e-mail is non-defamatory as a matter of law due to the reasons stated above.

28

                                             11

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Finally, defendants claim that Lillge's statements that Chang had left the country are

2    defamatory *per se*.  They are correct in asserting that special damages need not be proven for

3    statements that are defamatory *per se*.  See Triton Ins. Underwriters, Inc. v. Cmte on Chiropractic

4    Welfare, 232 Cal. App. 2d 829, 833 (1965).

5    Lillge asserts that statements made by third parties regarding what Lillge told them are

6    inadmissible hearsay.  This is incorrect for two reasons.  First, statements made by a party are

7    considered party admissions and fall outside the definition of hearsay.  See Fed. R. Evid.

8    801(d)(2)(A).  Second, defendants are not attempting to demonstrate the truth of the statements

9    made by plaintiff—they merely offer to demonstrate that the statements were made by plaintiff.

10   Specifically, Ms. Pascual testified, "I'm not sure if Mr. Lil – that I was speaking with Mr. Lillge, but

11   as far as I can remember, he said he was the President of Creative Marketing Concepts, and he told

12   me that Christina is leaving for Canada."  Ward Dec., Exh. A at 43:13–23.  This statement is being

13   offered simply to demonstrate that someone at CMC made the assertion regarding Canada, not the

14   truth of the assertion.

15   Furthermore, Ms. Pascual specifically described the substance of the alleged defamatory

16   statements—that Ms. Chang had left for Canada due to a visa issue.  Although she could not "recall

17   the exact reason," Ms. Pascual "just heard, like, something, some sort of Visa."  Id. at 45:12–20; see

18   also id. at 73:19–74:10 ("Q: And when you asked whoever this person was, the President of CMC,

19   where Ms. Chang had gone, you do recall that he told you she's going to Canada because of a Visa

20   issue.?  A: Yes. . . . what came to my mind was that she was having a problem with the working

21   visa.").  Since plaintiff cannot demonstrate the truth of these statements, summary judgment is

22   unwarranted.

23   In sum, the court grants summary judgment in favor of plaintiff with respect to the two

24   written communications at issue, but denies plaintiff's motion for summary judgment with respect to

25   the allegedly slanderous statements.

26

27

28

12

UNITED STATES DISTRICT COURT
For the Northern District of California

D.    Intentional Interference with Prospective Economic Advantage

The eleventh count of defendants' counterclaim charges plaintiff with intentional interference with prospective economic advantage. To prevail on a claim for interference with prospective economic advantage, defendants must allege: 1) an economic relationship between themselves and a third party that carries a probability of future economic benefit to the plaintiff; 2) CMC's knowledge of the relationship; 3) intentional acts by CMC designed to disrupt the relationship; 4) actual disruption of the relationship; and 5) economic harm to defendants proximately caused by CMC's acts. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153–54, 1164–65 (2003).

Defendants point to various conciliatory e-mails they received upon announcing their departure from CMC. Specifically, they state that many of CMC's customers would have preferred to do business with defendants independent of the organization with which defendants were affiliated. The court has reviewed these e-mails and has found some communications which do in fact demonstrate the same.[6] Each of these statements, however, is inadmissible hearsay. Although defendants make many allegations of intentional interference in their response to the fourth interrogatory of plaintiff's second set of interrogatories, see Boyd Dec., Exh. G, defendants have not provided declarations or deposition testimony from any of these individuals.[7] As such, they are unable to meet the first prong above.

Furthermore, defendants have not provided any evidence that there was a disruption of economic relationships due to plaintiff's acts. Defendants point to an e-mail communication, initiated by Ms. Chang, with Michelle Chan where Ms. Chan asks defendants to remove her from their distribution lists because of CMC's e-mail regarding this lawsuit. Chang Dec., Exh. 4. Ms. Chan knew that Ms. Chang was not allowed to initiate contact with her and declined Ms. Chang's attempt to solicit her. Ms. Chang avers that when she spoke with Ms. Chan during the summer of 2007—before the solicitation e-mail was sent—Ms. Chan had "said that Wells Fargo had no orders for promotional products but that if she needed anything in the future she would think of me." Chang Dec., ¶ 8. This self-serving declaration with a vague statement regarding promotional products is not enough to carry defendants' burden. Defendants have failed to show that an

13

1   economic relationship with Ms. Chan existed such that it could be disrupted.

2           Finally, defendants are unable to show any economic harm proximately caused by CMC's

3   acts. They point to the fact that their business only has $600,000 in sales after nine months of

4   operation whereas they were responsible for $1.65 million in sales at CMC. The mere fact that they

5   have not been able to get their entire book of business to switch to their newly founded company

6   lacks the necessary nexus. There is no evidence that Branding Boulevard's business has been hurt

7   by plaintiff's actions. There are a myriad reasons why a fledgling company is unable to garner

8   business at levels it expects—the court does not go into those reasons here. Suffice it so say that no

9   proximate cause exists that links plaintiff's two non-defamatory written communications to

10  Branding Boulevard's alleged economic woes—no showing has been made that it was reasonably

11  probable that CMC's customers would have switched over to Branding Boulevard if the written

12  communications had not been sent. As discussed above, plaintiff did not engage in any wrongdoing

13  by sending the letter and e-mail.[8]

14          In sum, the court grants plaintiff's motion for summary judgment with respect to defendants'

15  eleventh cause of action in their counterclaim.

16

17  Motion for Civil Contempt

18  I.      Procedural Background

19          On May 31, 2007 this Court granted CMC's application for a Temporary Restraining Order

20  ("TRO") until the hearing on plaintiff's motion for a preliminary injunction. See Docket No. 15.[9]

21  The court ruled, in part, that defendants were not to initiate contact with CMC's customers until

22  further order of the court, and that they are not to solicit customers of CMC during this time. Appel

23  Dec., Exh. A [hereinafter "TRO hearing transcript"] at 16:5–17:15. Specifically, "[i]f CMC's

24  customers contact [defendants], that's another matter, but they better make sure that they can verify

25  or substantiate the fact that those customers contacted them, not that they contacted the customers."

26  Id. at 17:1–4. In addition, the court stated:

27          And if, in fact, those solicitations were not by defendants, in fact, it was a response to
            notification, then they can continue to do business with those companies.
28          [Defendants] had just better be able to have business records and accounts that they

                                                    14

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2

> can account for all of this at the end of the day, if, in fact, it turns out those
> representations are not true, so they better keep good books and records. The failure
> to do so will, in fact, be interpreted against them when in doubt. So they're
> [defendants] sitting here, and I trust they understand that.

3

Id. at 20:21–21:6.

4
5

At the August 27, 2007 hearing on CMC's motion for preliminary injunction, the court ruled

6

that the TRO would remain in effect pending the court's order on the motion for the preliminary

7

injunction. See Docket No. 51.

8

On October 1, 2007 the court issued an order granting CMC a preliminary injunction. See

9

Docket No. 61. This order stated that "defendants will be permitted to work with CMC's customers

10

so long as defendants do not solicit business from them." Id. at 12. On November 9 the court issued

11

an order confirming the scope of the TRO and preliminary injunction. It held:

12

> The Court's Preliminary Injunction Order confirmed that while defendants were
> "barred from *initiating contact with*" CMC's customers, defendants remained free to
> do business with those customers that contacted them (emphasis in original).

13
14
15
16

> This addendum confirms that more than one notification from defendants to CMC's
> customers regarding their new business is not permitted under either the Temporary
> Restraining Order or the Preliminary Injunction Order (even when such notification
> in isolation may not be viewed as a solicitation). As confirmed by both Orders,
> repeated notifications to a customer constitute a solicitation and improper initiation of
> contact violating the injunctions which have been and are currently in force.

17

See Docket No. 75 at 2. This court's October 1 order currently remains in effect. Thus, at all times

18

since June 1, 2007 defendants have been enjoined in the above manner.

19

20   II.    Legal Standard

21

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed
> for either or both of two purposes: to coerce the defendant into compliance with the
> court's order, and to compensate the complainant for losses sustained. Where
> compensation is intended, a fine is imposed, payable to the complainant. Such fine
> must of course be based upon evidence of complainant's actual loss, and his right, as
> a civil litigant, to the compensatory fine is dependent upon the outcome of the basic
> controversy.

22
23
24

25

> But where the purpose is to make the defendant comply, the court's discretion is
> otherwise exercised. It must then consider the character and magnitude of the harm
> threatened by continued contumacy, and the probable effectiveness of any suggested
> sanction in bringing about the result desired.

26

27

United States v. United Mine Workers, 330 U.S. 258, 303–04 (1947) (internal citations omitted).

28

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The Supreme Court has stated that "a flat, unconditional [non-compensatory] fine even as

2    little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent

3    opportunity to reduce or avoid the fine through compliance." Int'l Union v. Bagwell, 512 U.S. 821,

4    829 (1994) (citing Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947)). Penfield, however, stated

5    that "one who is fined, unless by a day certain he [complies,] has it in his power to avoid any

6    penalty." 330 U.S. at 590.

7    The Ninth Circuit has held that when a consent decree is already in place, the party held in

8    contempt for violating the same "had the opportunity to avoid the fine by not engaging in the

9    prohibited conduct in the first place." NLRB v. Ironworkers Local 433, 169 F.3d 1217, 1221 (9th

10   Cir. 1999). The court found that "fines imposed without further opportunity to purge are not

11   punitive when those fines are prompted by a party's previous failure to purge." Id. (citing Hoffman

12   v. Beer Drivers and Salesman's Local Union No. 888, 536 F.2d 1268, 1273 (9th Cir. 1976)).

13   Specifically, the court held that "*Bagwell* does not undermine our conclusion in *Hoffman* that the

14   imposition of non-compliance fines following a failure to purge is a coercive, civil remedy." Id.

15   Nevertheless, the Ninth Circuit "recognize[s] that the Supreme Court has tended to classify

16   fines paid to the court as punitive fines, while fines payable to another party are remedial." Lasar v.

17   Ford Motor Co., 399 F.3d 1101, 1111 (9th Cir. 2005) (citing Hicks ex rel. Feiock v. Feiock, 485

18   U.S. 624, 632 (1988)). Moreover, the identity of the payee is not determinative. The Ninth Circuit

19   has also held that a fine payable to an opposing party was punitive when it was not designed "to

20   compensate [the opposing party] for any actual or estimated harm." Bingman v. Ward, 100 F.3d

21   653, 656 (9th Cir. 1996).

22   "The standard for finding a party in civil contempt is well settled: The moving party has the

23   burden of showing by clear and convincing evidence that the [nonmoving party] violated a specific

24   and definite order of the court." FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir.

25   1999) (quoting Stone v. City & County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

26   However, substantial compliance and good faith can negate sanctions. See In re Dual-Deck Video

27   Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (party seeking sanctions must

28

16

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  show (1) a violation of the order, (2) beyond substantial compliance, (3) not based on a good faith

2  and reasonable interpretation of the order, (4) by clear and convincing evidence).

3       The decision as to whether contempt sanctions should be imposed lies within the sound

4  discretion of the district court. See Jerry's Famous Deli, Inc. v. Papanicolaou, 383 F.3d 998, 1004

5  (9th Cir. 2004).

6

7  III.    Discussion[10]

8       Defendants claim this court's order allowed them to both: 1) provide CMC's customers of

9  defendants' new business contact information; and 2) attempt to sell to CMC's customers that

10  responded to this e-mail notification or initiated contact with defendants. Verity Dec., ¶ 3; Chang

11  Dec., ¶ 3. It is unclear to this court how defendants interpreted the court as stating that any response

12  by CMC's customers allowed defendants *carte blanche* to solicit those customers. As stated above,

13  the TRO hearing was replete with statements admonishing defendants not to initiate contact and

14  allowing contact with CMC's customers only if they contacted defendants. Specifically, in the

15  context of solicitation, the court stated, "[a]nd if, in fact, those solicitations were not by defendants,

16  in fact, it was a response to notification, then they can continue to do business with those

17  companies." TRO hearing transcript at 20:21–24. Thus, the court limited its order to CMC's

18  customers that were amenable to doing business with defendants, as demonstrated through

19  communications from the customer to defendants. The court specifically stated that the solicitation

20  could not be by defendants. The court gave no indication that any and all benign contact from a

21  CMC customer would open the door to relentless efforts at solicitation by defendants. Indeed, the

22  court could not have been clearer when it stated that "defendants will be permitted to work with

23  CMC's customers so long as defendants do not solicit them." See Docket No. 61 at 11. The court

24  finds no ambiguity in this language.

25       The court now discusses the various contacts defendants have had with CMC's customers in

26  light of the above defined scope of the injunction.

27

28

17

**UNITED STATES DISTRICT COURT**
For the Northern District of California

A.    Ms. Lee[11]

In May 2007, Ms. Lee—a customer of CMC—notified Ms. Chang of Ms. Lee's need for promotional products. Lee Dec., ¶ 4. Also in May 2007, Ms. Chang sent Ms. Lee an e-mail advising Ms. Lee that she was leaving CMC. Id., ¶ 5. Upon receipt of this e-mail, Ms. Lee called Ms. Chang asking her to call Ms. Lee back. Id., ¶ 6; Chang Dec., Exh. 1. Ms. Lee wanted to know who would be handling her account after Ms. Chang's departure. Lee Dec., ¶ 6. Ms. Chang called Ms. Lee the following week to notify Ms. Lee of Ms. Chang's new business. Id. Ms. Lee, however, preferred to stay with CMC. Id. Thereafter, Ms. Chang and Mr. Verity continued to solicit business from Ms. Lee. Id., ¶¶ 7–9. Due to these unwanted solicitations, Ms. Lee decided to take $20,000 worth of business away from CMC and instead purchase from a third party. Id., ¶ 10. Though the court does not have specific evidence, it appears that this transaction occurred in May 2007.

On May 22, 2007 Ms. Lee responded to another solicitation by Ms. Chang dated May 21, 2007 wherein she conclusively asked Ms. Chang to stop soliciting her. Id., Exh. A. Ms. Lee said she was going to continue to do business with CMC, her preferred vendor. Id.

In August 2007 Ms. Chang contacted Ms. Lee by telephone about a Branding Boulevard catalogue and also sent Ms. Lee a Branding Boulevard catalog. Id., ¶¶ 12–13. Finally, Ms. Chang called Ms. Lee in December 2007 to solicit business. Id., ¶ 14.

While most of these contacts occurred prior to May 31, 2007, Ms. Chang has contacted Ms. Lee to solicit business at least three times since May 31, 2007. Defendants have presented no evidence negating these contacts nor have they demonstrated any necessity for the contacts. They argue that since Ms. Lee had initiated contact with Ms. Chang by replying to the latter's neutrally worded e-mail, Ms. Chang had *carte blanche* to solicit Ms. Lee. Specifically, Ms. Lee had left a generic voicemail message asking Ms. Chang to call her back. There was no indication that Ms. Lee intended to do business with Ms. Chang's new company. As discussed above, defendants' contention is thus wrong as a matter of law.

Furthermore, at no point did the court state that defendants were allowed to solicit CMC's customers that contacted them. The statement that while "defendants were 'barred from *initiating contact with*' CMC's customers, defendants remained free to do business with those customers that

18

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    contacted them," <u>see</u> Docket No. 75 at 2, necessarily only applied to CMC's customers that

2    contacted defendants about conducting business. Any other construction would effectively eliminate

3    the efficacy of the order by allowing defendants to contact any CMC customer that responded with a

4    courteous "good luck!" to their farewell e-mail.

5         In sum, this court finds Ms. Chang's three contacts with Ms. Lee on or after May 31, 2007 in

6    direct contravention to the court's orders. Ms. Lee's decision to hire a third party vendor for her

7    $20,000 worth of business, however, seems to have occurred before the court's May 31, 2007 order.

8

9         B.   <u>Ms. Chan</u>

10        On May 11, 2007 defendant Chang sent an e-mail to Ms. Chan—a customer of

11   CMC—notifying the latter of her departure from CMC. Ms. Chan replied the same day, asking:

12   "You're leaving too, huh? Where are going to?" Appel Dec., Exh. E. Ms. Chang replied a few

13   days later, on May 22, and: 1) provided her contact information; 2) stated that she offered branded

14   products and large volume direct import; and 3) offered "to help you with all your upcoming

15   projects." <u>Id.</u> There is no admissible evidence that Ms. Chan replied to this email.[12]

16        On November 8, 2007 defendant Chang sent an e-mail to Ms. Chan stating, "[a]s holidays

17   are just around the corner, thought I should send you a quick email/checking in. I am happy to get

18   you some year end gift materials or do project solution researches for you." <u>Id.</u> Ms. Chan replied

19   immediately, asking to be removed from Ms. Chang's distribution list. <u>Id.</u> Ms. Chang complied, but

20   stated, "[d]o try to think of me if you even [sic] need help on branded items or solutions." <u>Id.</u>

21        Defendants' arguments with respect to Ms. Chan fail for the same reasons as those with

22   respect to Ms. Lee. Consequently, the two November 8, 2007 contacts trying to solicit Ms. Chan are

23   in contravention of the court's order.

24

25        C.   <u>Ms. Gutfran</u>

26        On May 11, 2007 defendant Chang sent an e-mail to Ms. Gutfran—a customer of

27   CMC—notifying the latter of her departure from CMC. <u>Id.</u>, Exh. F. Ms. Gutfran replied the same

28   day, stating: "Christina, Best of luck to you. Thank you for all of your help!" <u>Id.</u> Ms. Chang

19

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    replied on May 21 by: 1) providing her contact information; 2) stating she had started her own

2    promotional company; and 3) wanting "to be able to help you with your new projects." Id.

3         Ms. Chang presents self-serving declarations stating that Ms. Pascual, an associate of Ms.

4    Gutfran, contacted Ms. Chang in May 2007. Chang Dec., ¶ 12. Ms. Pascual has testified that she

5    wanted to continue to do business with Ms. Chang and her new company. Ward Dec., Exh. A at

6    72:24–73:7. Ms. Pascual, however, works in San Francisco, whereas Ms. Gutfran works in

7    Hartford, Connecticut, albeit for the same company.

8         On June 11, 2007 defendant Chang notified Ms. Gutfran that she had been working with the

9    California offices and would like Ms. Gutfran to call her so that she could help Ms. Gutfran with

10   logo items. Id.

11        In light of the evidence that Ms. Pascual intended to continue doing business with Ms.

12   Chang, the court does not find clear and convincing evidence that contacts with Ms. Gutfran—who

13   is an associate of Ms. Pascual—violated the court's order.

14

15        D.    Mr. DiFranco

16        Mr. DiFranco—a customer of CMC—contacted Ms. Chang on May 11, 2007 asking her

17   what she would be doing after CMC. DiFranco Dec., ¶ 3. He called her the following week asking

18   her to stay in contact. Id. On May 22, 2007 defendant Chang sent an e-mail to Mr. DiFranco

19   notifying him of: 1) her new contact information; 2) the fact that she now had her own promotional

20   product company; and 3) her ability to help him with all his projects. Appel Dec., Exh. G. On June

21   13, 2007 Ms. Chang contacted Mr. DiFranco again, giving him her contact information and

22   notifying him that her website was up. Id. In August 2007, Mr. DiFranco placed an order with

23   defendants. DiFranco Dec., ¶ 4.

24        Mr. DiFranco initiated contact with Ms. Chang and intended to do business with her. This is

25   apparent from the declaration he has submitted on defendants' behalf. His failure to testify that he

26   solicited business from defendants is far from the clear and convincing showing necessary to

27   demonstrate that defendants solicited him. Consequently, plaintiff has failed to present a violation

28   of the court's order with respect to Mr. DiFranco.

20

UNITED STATES DISTRICT COURT
For the Northern District of California

E.    Summary of Violations

The court finds violations with respect to Ms. Lee and Ms. Chan.  Defendants contend no sanctions are warranted because the violations, if any, were in good faith.  See In re Dual-Deck, 10 F.3d at 695 ("a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the [court's order]." (internal quotations omitted)).  It is unclear to the court how these violations were in good faith when Ms. Lee specifically asked Ms. Chang to stop contacting her and Ms. Chang continued to do so.  The same goes for Ms. Chan, who neglected to respond to defendants' contact, but was nevertheless contacted by Ms. Chang in November 2007.  Indeed, even when responding to Ms. Chan's unequivocal statement asking Ms. Chang to cease contact, Ms. Chang nevertheless asks Ms. Chan to "try to think of me if you even need help on branded items or solutions."  Appel Dec., Exh. E.  There is no good faith attempt at compliance with the court's orders here.

Similarly, defendants' conduct is not in substantial compliance with the court's orders either.  A few technical violations of the court's order are not actionable if every reasonable effort has been made to comply.  See In re Dual-Deck, 10 F.3d at 695.  The contacts here are not technical, but direct violations of conduct that the injunction sought to bar.  Furthermore, even if they were considered technical violations, there is no indication that every reasonable effort was made to comply.  For instance, defendants did not ask this court for clarification nor did they heed CMC customers' requests to cease contact.  Indeed, defendants initiated contact after specifically having been told both by the court and the client that solicitous contact was unwanted.

In sum, the court finds defendants in civil contempt.  Consequently, the court orders plaintiff to submit an account of the actual or estimated harm it has suffered as a consequence of the above violations.  Thereafter, defendants shall be liable, in the form of a compensatory fine, for the amount approved by the court.


F.    Attorney's Fees

"An award of attorneys' fees for civil contempt is within the discretion of the trial court." Harcourt Brace Jovanovich Legal & Professional Publications v. Multistate Legal Studies, Inc., 26

21

F.3d 948, 953 (9th Cir. 1994). In light of defendants' brazen disregard of the court's order with respect to Ms. Lee and Ms. Chan, attorneys fees are warranted in order to make plaintiff whole. Accordingly, CMC is ordered to submit a bill for attorneys' fees and costs incurred in conjunction with the memorandum of points and authorities, the reply brief and the hearing, insofar as they related to the contempt issue.[13]

CONCLUSION

For the reasons stated above, the court grants plaintiff's motion for summary judgment with respect to defendants' fifth, eight and eleventh causes of action. The court also grants in part and denies in part plaintiff's motion for summary judgment with respect to defendants' tenth cause of action.

Further, within twenty (20) days of the date of the filing of this order, plaintiffs shall submit: 1) an account of the actual or estimated harm it has suffered as a consequence of the civil contempt along with contemporaneous records in support thereof; and 2) a statement of attorneys' fees and costs consistent with the above with contemporaneous records in support thereof. Defendants may respond within ten (10) days of the filing of the statement with respect only to the reasonableness of the harm, fees and costs.

The court denies all other motions.

IT IS  SO ORDERED.

Dated: March 31, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

22

**UNITED STATES DISTRICT COURT**
For the Northern District of California

# ENDNOTES

1.      It is unclear whether the attorney-client privilege has been waived with respect to this e-mail communication.  Since the issue is not contested, the court assumes the e-mail is admissible.

2.      Defendants make much of their immigration status which, according to them, forced them to start a competing business in order to remain within the United States.  Their rationale for entering the promotional products field is irrelevant to the present motions.

3.      Defendants' sixth and seventh causes of action allege a failure to pay Ms. Chang both overtime and vacation pay.  This memorandum and order only discusses the vacation pay aspect of these causes of action.

4.      In its reply, CMC provides a Propriety Information Agreement ("PIA") which it claims Ms. Chang refused to sign and was the reason she was fired.  The PIA merely restricts her from disclosing CMC's trade secrets.  CMC, however, makes this argument after admitting for the purposes of this motion that Chang was fired for not signing the agreement with the purported non-compete clause.  As such, the court ignores this untimely argument made by CMC.

5.      Since the court has evaluated this issue on the merits, it does not reach plaintiff's undeveloped standing argument.

6.      The statements made to Ms. Chang are: 1) an e-mail from Carolyn Jacks stating "[i]s there someone else at CM on whom we may call now that you are no longer there? . . . Unless you're moving on to someplace where we can still use you ....  Let me know"; 2) an e-mail from Michael Alexander stating: "[y]ou have been great to work with.  I hope we can continue that relationship in the future.  Please stay in touch"; 3) an e-mail from Michael Ernst stating "[i]f you ever decide to continue in the promotions field, please let me know, I'd love to work on other projects with you"; 4) an e-mail from Celine Rose stating "[i]f they fired you or laid you off we won't use then anymore."  Chang Dec., Exh. 2.  Statements made to Mr. Verity include: 1) an e-mail from Karen Arvin stating "[I] was wondering if you were going to another promotional products company . . . In the past you proved to be very helpful and dependable.  If you will be staying in the same field, I'd welcome any information you could send me – my contact information is below"; 2) an e-mail from Sanam Kordestani stating "I wanted to deal with you only!  Tell me about your new/future adventures"; and 3) an e-mail from Nyla Starr stating "DO keep me posted if you become associated with a firm that offers goods or services we might need!"  Verity Dec., Exh. 2.

7.      The court is aware that defendants were barred from soliciting CMC's customers; however, defendants could have deposed these individuals in order to create a factual basis for their case.

8.      In light of the court's holding, it does not reach plaintiff's argument that it was unaware of Branding Boulevard's customers until after the complaint with this cause of action was filed.

9.      The parties then entered into several stipulations continuing the preliminary injunction hearing date.  Each of these stipulations confirmed that the TRO would remain in effect until the

court ruled on CMC's motion for a preliminary injunction. <u>See</u> Docket No's. 21, 24, 32.

10.     The court declines plaintiff's invitation to, *sua sponte*, initiate criminal contempt proceedings. Similarly, the court declines defendants' invitation to, *sua sponte*, consider sanctions against CMC due to CMC's contact with defendants' customers. In this invitation, defendants re-hash their defamation arguments made elsewhere. Furthermore, there is no injunction against CMC warranting sanctions. As such, this invitation is in error. Nevertheless, the court invites defendants to move for dissolution of the preliminary injunction if they believe the issuance of the injunction was based on plaintiff's falsities regarding its trade secrets.

11.     It appears that plaintiff has abandoned its efforts to maintain the names of its client contacts under seal. Therefore, the court will use the names of plaintiff's client contacts in this order.

12.     The court refuses to consider Ms. Chang's wholly self-serving and hearsay testimony about her conversations with Ms. Chan during the summer of 2007. As the court stated earlier, any questions as to solicitation are to be "interpreted against [defendants] when in doubt." TRO hearing transcript at 20:25–21:6.

13.     CMC is to also submit a proposed order along with the bill of costs.

24

1   WILLIAM R. HILL, #114954
      rock@donahue.com
2   ANDREW S. MACKAY, #197074
      andrew@donahue.com
3   SARA J. ROMANO, #227467
      sromano@donahue.com
4   DONAHUE GALLAGHER WOODS LLP
    Attorneys at Law
5   300 Lakeside Drive, Suite 1900
    Oakland, California  94612-3570
6   Mail:  P.O. Box 12979
             Oakland, California  94604-2979
7   Telephone:     (510) 451-0544
    Facsimile:      (510) 832-1486
8
    Attorneys for Plaintiff and Counterdefendant
9   MARK LILLGE d/b/a CREATIVE
    MARKETING CONCEPTS
10

11                 UNITED STATES DISTRICT COURT

12         FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

15  MARK LILLGE d/b/a CREATIVE              CASE NO.  C 07-02748 MHP
    MARKETING CONCEPTS,
16                                          **MOTION IN LIMINE NO. 3 TO EXCLUDE**
                                            **REPORT AND TESTIMONY OF MILES**
17                   Plaintiff,             **LOCKER**

17         v.
                                            Trial Date:          May 6, 2008
18                                          Pretrial Conf:      April 23, 2008
    ANDREW VERITY and CHRISTINA             Department:       Courtroom 15, 18th Floor
19  CHANG,                                  Judge:               Hon. Marilyn Hall Patel

20                   Defendants.

21
    ANDREW VERITY and CHRISTINA
22  CHANG,

23                   Counterclaimants,

24         v.

25  MARK LILLGE d/b/a CREATIVE
    MARKETING CONCEPTS, and DOES 1-
26  10,

27                   Counterdefendant.

28

1

**INTRODUCTION**

2        Plaintiff and counterdefendant, Mark Lillge d/b/a Creative Marketing Concepts ("CMC")

3   hereby moves in limine for an order precluding defendants and counterclaimants ANDREW

4   VERITY and CHRISTINA CHANG ("Defendants"), and each of them, from introducing into

5   evidence the reports or testimony of Miles Locker and from referring to, mentioning, suggesting

6   or arguing to the jury the existence of or the contents of such reports and testimony.  Locker's

7   reports and testimony relate solely to claims that have been mooted and are no longer at issue in

8   this action.

9

**ARGUMENT**

10  **I.       LOCKER'S REPORTS AND TESTIMONY ARE NOT RELEVANT TO ANY
             ISSUE IN THIS ACTION.**

11

12       Earlier in this litigation, Defendants designated Miles Locker as an expert witness.

13  Locker prepared a February 8, 2008 report, supplemented on February 13, 2008.[1]  Both of

14  Locker's reports address solely Defendants' claims for unpaid wages (overtime and meal breaks),

15  waiting time penalties under California law, and statutory penalties under the Fair Labor

16  Standards Act.  Locker's reports do not address any other issues in the case, including the

17  existence or nonexistence of trade secrets, Verity's contract counterclaims, Defendants' pension

18  plan counterclaims, or Defendants' defamation counterclaims.  Locker's reports also do not

19  address Defendants' counterclaims for unpaid vacation days or Verity's counterclaim for unpaid

20  bonus.

21       The conclusions reached in Locker's report are inadmissible legal conclusions.  *Mukhtar v.*

22  *Cal. State Univ.*, 299 F.3d 1053, 1066 (9th Cir. 2002).  Moreover, they are not helpful to the jury

23  in determining an issue of fact, as required by Fed. R. Evid. 702.  *Daubert v. Merrell Dow*

24  *Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147

25  (1999).  For these reasons, the court should exclude Locker's report in its entirety, as well as his

26  testimony.  But even if Locker's report and testimony were composed of other than strictly legal

27
28

[1] A true and correct copy of Locker's February 13, 2008 supplemental report, which was intended to correct and supersede his February 8, 2008 report, is attached hereto as Exhibit A for the Court's convenience.

-1-

1   conclusions, the court would still have to strike the report and testimony because none of the

2   issues addressed in Locker's report remain to be adjudicated.

3       All of Defendants' unpaid overtime wage counterclaims, including all claims for overtime,

4   missed meal breaks, interest, and penalties under California law and under the Fair Labor

5   Standards Act, have been tendered in full, and Defendants so acknowledge.  *See* Letter from

6   Richard Harrington dated April 1, 2008, attached hereto as Exhibit B.  There is, consequently, no

7   remaining issue of fact for the jury to determine as to these claims, and Locker's testimony is

8   therefore irrelevant.  Both his reports and his testimony should therefore be excluded under Fed.

9   R. Evid. 402.[2]

10      In the alternative, Locker's reports and testimony should be excluded under Fed R. Evid.

11  403.  Whatever remote relevance they might have to Defendants' remaining counterclaims is far

12  outweighed by their potential to cause jury confusion as to what issues remain to be determined

13  by the jury, and by the substantial amount of time that would be wasted with Locker's expert

14  testimony on claims that are no longer at issue in the case.  Therefore, the reports and testimony

15  should also be excluded as more prejudicial than probative under Rule 403.

16                              **CONCLUSION**

17      For the foregoing reasons, the court should exclude the reports and testimony of Miles

18  Locker, and should preclude Defendants, and each of them, from referring to, mentioning,

19  suggesting or arguing to the jury the existence or contents of such reports and testimony.

20                          Respectfully submitted,

21  Dated:  April 14, 2008          DONAHUE GALLAGHER WOODS LLP

22

23                          By:/s/ *William R. Hill*

24                              William R. Hill
                                Attorneys for Plaintiff and Counterdefendant

25                              MARK LILLGE d/b/a CREATIVE MARKETING
                                CONCEPTS

26

27  _____
    [2] The issue of CMC's entitlement to attorneys' fees remains unadjudicated.  Harrington Letter, Exhibit B,

28  at ¶ 1.  However, Locker's reports do not address attorneys' fees.  Moreover, the issue of attorneys' fees is
    for the Court.  Fed. R. Civ. P. 54 (d)(2); N.D. Cal. L.R. 54-6.

# EXHIBIT A

FEB 1 3 2008

# REVISED EXPERT WITNESS REPORT

To:     Richard Harrington

From:  Miles E. Locker

Date:  February 8,  2008

Re:     Mark Lillge dba Creative Marketing Concepts v. Andrew Verity and Christina Chang.


NECESSITY FOR REVISION:

After submitting the initial Expert Witness Report dated February 8, 2008, I realized that due to a
computer or clerical error, I had mistakenly downloaded and submitted the next to final version
of the Report, and as a result of inadvertence, I failed to submit the final version that I had
prepared.  This Revised Report is the final version that should have been downloaded and
submitted.  It is identical to the version that was submitted, except for corrected and additional
material from the last paragraph at page 6 to the end of page 8.  Everything prior to the last
paragraph of page 6 (except for this introductory paragraph), and everything after the end of page
8 (to page 34), is unchanged from the initial Report (except for resulting changes in pagination)..

SCOPE OF EXPERT ANALYSIS

 I have been retained by plaintiffs' counsel in the above-captioned matter to provide an expert
opinion on various issues that have arisen in this case, including (1) the method followed by the
Division of Labor Standards Enforcement ("DLSE") for determining which Industrial Welfare
Commission ("IWC") wage order applies to plaintiffs in this case,  (2) the applicability of the
commission sales exemption from overtime to plaintiffs in this case, and  (3) the nature of the
employer's duty to comply with meal period requirements under Labor Code sections 226.7 and
512, and under the applicable IWC order, the manner in which the IWC, the DLSE and the courts
have interpreted those requirements, and the evolution and current state of DLSE enforcement
policies regarding the requirement for duty free meal periods.

EXPERT QUALIFICATIONS

I am a graduate of Boalt Hall School of Law, and I have practiced exclusively in the area of labor
and employment law since 1984.  I was employed as an attorney with the Division of Labor
Standards Enforcement ("DLSE", also known as the Office of the State Labor Commissioner) of
the Department of Industrial Relations of the State of California for sixteen years, from March
1990 through February 2006.  For the first eight years at DLSE, I served as a staff attorney in the
San Francisco (headquarters) office, responsible for representing individual wage claimants in
superior court proceedings on de novo employer appeals from Labor Commissioner orders,

1

decisions or awards in which the DLSE had awarded unpaid wages and/or penalties to employees. During this time, I represented wage claimants in over 400 de novo proceedings. I was also responsible for the prosecution of several civil actions filed against employers, with the Labor Commissioner as the named plaintiff, pursuant to Labor Code §98.3, seeking class-wide relief in the form of wages or penalties due to large groups of employees who were the victims of systemic unlawful wage and hour practices, including overtime violations.

In May 1998 I was appointed to the position of chief counsel for the DLSE. I served as chief counsel until October 2001, supervising the DLSE Legal Section, advising the Labor Commissioner on legal issues, overseeing all DLSE litigation, and assisting in the development of DLSE enforcement policies. I was also responsible for issuing DLSE opinion letters, setting forth the agency's interpretations of Labor Code provisions and wage and hour regulations. Additionally, I was responsible for conducting training sessions and educational seminars for DLSE enforcement staff (attorneys, deputy labor commissioners, hearing officers, and labor standards investigators), and for various employer and employee organizations throughout the State. In the period following the enactment of AB 60 (the comprehensive state overtime law, which took effect on January 1, 2000), I was responsible for providing advice to the Industrial Welfare Commission ("IWC") as it held public hearings leading to the adoption of the post AB-60 IWC wage orders, and I testified at various IWC hearings on DLSE enforcement policies in regards to various issues that the IWC was addressing in the wage orders.

From October 2001 to February 2006, I served as a senior staff attorney (Industrial Relations Counsel IV) for DLSE, with lead attorney responsibilities in the areas of appellate litigation, civil litigation, anti-retaliation enforcement, and public education. During this period of time, I was assigned to handle DLSE's most complex or novel litigation. I drafted many sections of the DLSE Interpretations and Enforcement Policies Manual that was issued in 2002, and along with three other DLSE attorneys, was responsible for the overall editing of the Manual. I remained responsible for the issuance of opinion letters until November 2003, when the new Administration sharply curtailed the practice of issuing such letters. During the period from 1998 to 2003, I drafted approximately 40 opinion letters that were issued by the DLSE, covering a wide range of topics, including the DLSE's interpretation of overtime and meal and rest period requirements under the IWC orders.

Throughout my career at DLSE, I was routinely called upon to provide advice and guidance to top DLSE officials including the State Labor Commissioner, and to DLSE field investigators, hearing officers, and other DLSE attorneys on issues relating to enforcement policies and interpretations of IWC orders, including the issue of determining which IWC order applies to a particular employer or employees, the applicability of any potential exemptions from overtime, and the nature the employer's duty to comply with meal period requirements.

Over the past ten years, I have spoken at over 40 professional seminars on various topics in the field of wage and hour law, at seminars held by the American Bar Association, the Labor and Employment Law Section of the State Bar of California, the Bar Association of San Francisco, the Sacramento County Bar Association, the Orange County Bar Association, the Sonoma

County Bar Association, the Santa Barbara County Bar Association, the Interstate Labor Standards Association, the National Labor Relations Board, the National Lawyers Guild, the AFL-CIO Lawyers Coordinating Committee, and the California Employment Lawyers Association. I have also spoken about wage and hour law on dozens of occasions at seminars held by various employee and employer organizations. Also, since 1991 I have guest lectured every semester at Bay Area law schools, including Boalt Hall, Hastings, and Golden Gate University, on substantive wage and hour law, and on DLSE enforcement policies and practices. Finally, throughout my employment at DLSE, I drafted briefs that were filed and/or argued in over 15 appellate and supreme court level cases, both in state and federal courts.

Since March 2006, I have maintained a solo practice, providing consulting services and advising other attorneys in the wage and hour field, doing legal research and some drafting of memos and law and motion and appellate briefs. I have provided my services as an expert witness in a variety of employment law matters, testifying at depositions or in trial and/or providing testimony in the form of declarations.

LISTING OF OTHER CASES IN WHICH WITNESS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PAST FOUR YEARS

1. Dahlin v. Sav-On Drug Stores (Los Angeles County Superior Court, Case No.BC227551)
2. Staples Overtime Cases (Judicial Council Coordination Proceeding No. 4235, Orange County Superior Court, Lead Case No, 816121)
3. Duran v. U.S. Bank (Alameda County Superior Court, Case No. 2001-035537)
4. Amalgamated Transit Workers Union Local 1575 v. Golden Gate Transit District (arbitration)
5. Steiner v. Specialty Laboratories (Los Angeles Superior Court, Case No. BC344872)
6. Moreno v. Guerrero Mexican Food Products (United States District Court, Central District of California, Case No. CV05-7737 DSF)
7. Kirk v. Marquee Fire Protection (Sacramento Superior Court, Case No. 05 AS 04638)

ALL PUBLICATIONS AUTHORED BY WITNESS WITHIN THE PAST TEN YEARS

1. Authored "California Wage and Hour Law - A Twenty-Five Year Trajectory," published by the State Bar of California Labor & Employment Law Section, in September 2007 issue of the California Labor & Employment Law Review

2. Co-authored 2002 edition of DLSE Enforcement Policies and Interpretations Manual

3. Authored numerous DLSE opinion letters and enforcement memos during period from 1997 to 2003, including the following that were posted on the DLSE website:

> 1998.09.08 (exemption –outside salespersons)
> 1998.09.11 (charging applicants for training)
> 1998..09.11-1 (work recesses – IWC Order 8-80)
> 1998.09-14 (bonus provided in kind – Labor Code section 212)

3

1998.09.15 (child labor –prohibited construction work)
1998.09.17 (vacation "use it or lose it" clause)
1998.10.05 (administrative exemption and its application to insurance claims adjusters)
1998.11.04 (overtime – airport shuttle drivers)
1998.11.09 (hours worked - sleep shifts under IWC Order 5)
1998.11.12 (employment status – interns)
1998.11.12-1 (hours worked – training time)
1998.12.23 (hours worked – uniform changing time/effect of CBA)
1998.12.28(hours worked – on-call time/apartment resident managers)
1998.12.28-1(tip pooling)
1999.01.09 (discharge – payment of commission wages upon termination)
1999.05.17 (third party beneficiary claims)
1999.07.19 (electronic pay stubs)
1999.07.26 (administrative exemption – recruiters of temporary employees)
1999.09.22-1(deductions for overpayment of wages)
1999.09.23 (Labor Code §202- contract for definite period of employment)
12/23/99 ("Understanding AB 60')
2000.01.19 (overtime – no pyramiding of hours)
2000.05.17 (employment status – culinary interns)
2000.05.17-1 (independent contractors v. employees – nursing registry)
2000.08.01 (deductions – debiting manager's pay for staff salaries and expenses)
2000.09.29 (Belo contracts)
2000.11.02 (service charges and gratuities)
2000.11.03 (compensation issues for ski industry employees)
2001.01.12 (hours worked – meal periods restricted to employer's premises)
2001.03.22 (stand-by time)
2001.04.02 (meal and rest period requirements for ready-mix drivers)
2001.04.09 (overtime payment for weekend work on public works job)
2001.04.25 (minimum wage – California State University employees)
2001.05.30 (salary basis test)
2001.06.22 (tips – dancers under IWC Orders 5 or 10)
2001.09.17 (rest periods – IWC Order 16)
2001.12.03 (log truck drivers – IWC Order 16)
2001.12.14 (meal and rest period requirements for ready-mix drivers)
2002.01.28 (rest period provisions)
2002.01.29 (hours worked – bus drivers who start and end shifts at different
    locations/obligation to pay hourly employee no less than minimum wage for each
    separate hour worked)
2002.02.21 (hours worked – time spent traveling out of town on business trip)
2002.05.17 (semi-monthly pay periods for non-exemrpt employees – Labor Code §226)
2002.06.18 (definition of employer)
2002.08.12 (negative elections to participate in 401(k) plans)
2002.09.04 (requirements for on-duty meal period)
2003.05.23 (exemption from overtime –"key administrative personnel" employed by

labor unions)
2003.10.17 (private right of action to enforce amounts owed under meal period provisions)
2003.11.03 (meal and rest period requirements for employee working alone at work site)

COMPENSATION TO BE PAID TO EXPERT:

$450 an hour for all services.

COMPLETE STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS THEREFOR

1) Determining Whether Christina Chang Was Entitled to Overtime Compensation During Her Employment at Creative Marketing Concepts

Opinion — Under both federal and state law, Ms. Chang was not exempt from the payment of overtime compensation for overtime hours worked, and was therefore entitled to payment of overtime compensation for all overtime hours worked.

Basis and Reasons Therefor — State overtime law is set out at California Labor Code section 510 and Industrial Welfare Commission ("IWC") Order 7-2001 (governing wages, hours and working conditions in the mercantile industry), section 3. Under California law, overtime is defined as all hours worked in excess of 8 hours in any workday, or all hours worked in excess of 40 in any workweek. Overtime must be paid at one and one-half times the employee's "regular rate of pay" for all hours worked in excess of 8 (and up to 12) in any workday, and for all hours worked in excess of 40 in any workweek. Overtime must be paid at the rate of twice the employee's "regular rate of pay" for all hours worked in excess of 12 in any workday. However, there is no "pyramiding" of overtime hours, meaning that once an hour is paid at one overtime rate (e.g., for daily overtime), it cannot be counted again for overtime purposes (e.g., for weekly overtime).

Federal overtime law, which is founded upon the Fair Labor Standards Act (29 U.S.C. section 201, et seq.) and implementing regulations (at 29 C.F.R. sections    ), requires overtime compensation at the rate of one and one half times the employee's regular rate of pay for all hours worked in excess of 40 in any workweek. In contrast to state law, federal law does not provide for daily overtime. But the FLSA expressly provides that it does not preempt more protective state or local laws, so that in California, employees are entitled to the best protections available under federal, state and local law. (29 USC §218(a), *Rui One Corporation v. City of Berkeley* (9th Cir. 2004) 371 F.3d 1137.)

Under both federal and state law, there is a presumption that every employee is non-exempt. The employer has the burden of disproving this presumption. (*Corning Glass Works v. Brennan*

(1974) 417 U.S. 188, 196-197.) Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms. (*Dalheim v. KDFW-TV* (5th Cir.1990) 918 F.2d 1220, 1224; *Nordquist v. McGraw-Hill Broadcasting* (1995) 32 Cal.App.4th 555, 562.)

I am not aware that Creative Marketing Concepts is contending that Ms. Chang is non-exempt, nor am I aware of any evidence presented by Creative Marketing Concepts ("CMC") that Ms, Chang meets the prerequisites for any exemption from overtime. Bruce Molloy, the general manager of CMC, testified in his deposition that it is his understanding that Ms. Chang, along with all of CMC's customer salespeople, were non-exempt. Sometime in 2007, all of these salespeople, with the exception of Ms. Chang, received overtime payments for overtime compensation that had been owed but was previously unpaid. Also, it is my understanding that prior to January 1, 2005, during the time when Ms. Chang was employed by CMC on a part-time and hourly basis, she was intermittently paid overtime. Moreover, a job performance review maintained by CMC for Ms. Chang dated March 4, 2004 acknowledges that she was working overtime, and was likely to continue working overtime for the foreseeable future:: "4 year push – then 8 hrs. day." In January 2005, CMC started to pay her a salary, at which point she stopped receiving overtime pay for overtime hours worked. But payment of a salary, though a prerequisite for most exemptions from overtime, is not by itself a sufficient ground for exempt status. Additional factors are required which are not present here. Under California law, for exempt status under the executive, administrative or professional exemptions, the employee must be "primarily engaged" (that is, spend more than 50% of his or her work-time engaged) in the performance of work that meets the test of the applicable exemption. Under federal law, the employee's "primary duty" must consist of work that is exempt. Ms. Chang was primarily engaged in (and her primary duty consisted of) non-exempt customer sales work.

Under state law, the executive, administrative and professional exemptions are set out at IWC Order 7-2001, section 1(A). The executive exemption clearly does not apply here, as it requires, among other things, that the person must be primarily engaged in duties that involve the management of the enterprise or a customarily recognized department or sub-division thereof, and that the person customarily and regularly directs the work of two or more other employees therein, and that the person have the authority to hire or fire or make effective suggestions thereto. Ms. Chang performed none of these duties, let alone all of them.

The administrative exemption requires, among other things, that the employee must be primarily engaged in the performance of office or non-manual work "directly related to management policies or general business operations of his/her employer or his/her employer's customers." The IWC order provides that "activities constituting exempt and non-exempt work shall be construed in the same manner as such terms are construed under the Fair Labor Standards Act effective as of the date of this order [the Order was adopted on June 30, 2000, and took effect three months thereafter as IWC Order 7-2000, relabeled 7-2001 effective 1/1/2001]." The IWC Order then lists various federal regulations that were then in effect to be used for this purpose, including 29 CFR section 541.205(a), which provided (prior to the amendment of the federal regulations in 2004): "The phrase 'directly and closely related to management policies or general business operations of his employer or his employer's customers' describes those types of

activities relating to the administrative operations of a business **as distinguished from** 'production,' or in a retail or service establishment, **'sales' work**. In addition to describing the types of activities, the phrase limits the exemption to perssons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." This distinction between "administrative" and production or sales work is critical. Thus, *Martin v. Cooper Electric Supply Co.* (3rd Cir. 1991) 940 F.2d 896, holds that inside salespersons employed by a wholesale supplier are not engaged in administrative work, but are non-exempt "production employees."

The professional exemption is equally inapplicable. Under IWC Order 7-2001, the professional exemption will not apply unless the employee is primarily engaged in the practice of certain enumerated licensed professions, such as law or medicine (obviously not applicable here), or unless the employee is primarily engaged in a "learned or artistic profession," defines as "work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education," or "work that is original and creative in character in a recognized field of artistic endeavor."

Nor is Ms. Chang covered by the "outside sales exemption," which only applies to employees who spend more than half their work-time away from the employer's premises engaged in sales activities. (Order 7-2001, section 2(M); *Ramirez v. Yosemite Water* (1999) 20 Cal.4th 785.) The so-called "commission sales exemption," found at IWC Order 7-2001, section 3(D), which provides that overtime compensation shall not be required for any employee "whose earnings exceed one and one-half times the minimum wage if more than half that employee's compensation represents commissions." Ms. Chang was paid a salary plus an annual bonus. She received no commission payments. Commissions constitute wages that must be paid in accordance with Labor Code §204, i.e., no less frequently than twice a month (except for commissioned employees of motor vehicle dealers., whose commissions can be paid monthly pursuant to Labor Code §204.1). In contrast, a bonus can be calculated and paid at the frequency established by contract, and annual bonuses are not uncommon. Morever, even if we were to erroneously construe her annual bonus as a commission, her annual bonus payments always amounted to less than half her total annual compensation, a level that falls below the prerequisite for the exemption.

In short, there is not a single exemption from overtime that can defeat Ms. Chang's claim for overtime compensation under state law. Turning to federal law, as mentioned above, there were to amendments in the federal regulations in 2004, however, none of these amendments defeats her right to overtime compensation under the FLSA. Under the current federal regulations, there are special rules (under which the test for exempt status is less strict) for "highly compensated employees," defined as employees who receive a total annual compensation of at least $100,000 in salary, commissions, non-discretionary bonuses, and other non-discretionary compensation, not including fringe benefits such a s payments for medical insurance or contributions to retirement plans. (29 CFR §541.601.) Ms. Chang received less than this required amount of compensation, so the relaxed rules for "highly compensated employees" do not apply to her.

And under the rules for non-highly compensated employees, she did not come within the executive exemption (which, as before, requires that the employee's primary duty consist of management of the enterprise or of a customarily recognized department or subdivision, and that she customarily and regularly direct the work of at least two other employees, and that she have the authority to hire, or fire, or make effective recommendations thereto). (29 CFR §541.100(a).) The administrative exemption is not applicable because, as before, it requires that the employee's primary duty consist of "performance of work directly related to the management or general business operations of the employer or the employer's customers," and the regulation continues to specify that: "To meet this requirement, the employee "must perform work directly related to assisting with the running or servicing of the business **as distinguished,** for example, **from** working on a manufacturing production line or **selling a product in a retail or service establishment."** (29 CFR §541.301(a).)   The federal "learned professional" exemption continues to use virtually the same language as the state exemption, requiring te employee to perform "work requiring advanced knowledge...in a field of science or learning...customarily acquired by a prolonged course of specialized intellectual instruction." (29 CFR §541.301(a).)

The federal outside sales exemption, though not as exacting as the state's version, still requires that the employee must be "customarily and regularly engaged away from the employer's place or places of business" in obtaining orders for contracts or services (29 CFR §541.500.)  The regulation explains: "Outside sales does not include sales made the mail, telephone or the internet unless such contact is used as an adjunct to personal calls.  Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitations of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property." (29 CFR §541.502.) Ms. Chang did not meet the requirements of this exemption.  Finally, under the federal "commission sales" exemption, an employee employed in a retail or service establishment will be exempt from overtime if the employee's regular rate of pay exceeds one and one half times the federal minimum wage and "more than half his compensation for a representative period (not less than one month) represents commissions on goods and services." (29 USC §207(i).) The federal commission sales exemption only applies to "bona fide" commission plans, and under the federal regulations "a commission plan is not bona fide if the formula for computing the commissions is such that the employee always, or almost always, earns the same fixed amount of compensation for each workweek." (29 CFR §779.416(c).)  It goes without saying that a plan under which an employee is paid a salary plus an annual bonus (where the bonus is calculated and paid out once a year), or even a quarterly bonus (where the bonus is calculated and paid out once every quarter) cannot be a "bona  fide commission plan," within the meaning of these regulations, because on 51 weeks of the year (if there is an annual bonus) or 48 weeks of the year (if there's a quarterly bonus), the employee will "earn the same fixed amount of compensation for each workweek," here, the weekly pro-rata portion of Ms. Chang's fixed annual salary.  As such, she does not fall under the federal commission sales exemption.

Having determined that Ms. Chang is not exempt from overtime under state or federal law, we conclude that by failing to pay her overtime for her overtime hours worked, CMC violated both state and federal overtime law.

2) Calculating the Amount of Overtime Compensation Owed to Christina Chang

Opinion – Ms. Chang is owed a total of **$85,245.43 for overtime** owed pursuant to Labor Code §510 and IWC Order7-2001, **plus $12,789.60 in interest** on this unpaid overtime(as of 2/8/08) pursuant to Labor Code §218.6, with interest continuing to accrue at the rate of $23.36 per day.

Basis and Reasons Therefor — Although both the California Labor Code and the IWC orders expressly provide that overtime calculations are based on the employee's regular rate of pay, neither the Labor Code nor the IWC orders provide a definition of the term "regular rate of pay." The DLSE, as the agency charged with the enforcement of state overtime requirements (see Labor Code §§90.5, 98.3, 558, 1193.6, 1194.5), necessarily must interpret these requirements, and any such interpretations and enforcement policy guidelines are available to the public pursuant to Labor Code §1198.4. Many of DLSE's interpretations and enforcement policy guidelines, including the DLSE Enforcement Policies and Interpretations Manual are now available on the agency's website. Computation of the regular rate of pay and overtime calculations are covered extensively at Chapter 49 of the DLSE Manual, available at www.dir.ca.gov/dlse/Manual-Instructions.htm.

The DLSE takes the position that "in not defining the term 'regular rate of pay,' the Industrial Welfare Commission has manifested its intent to adopt the definition of 'regular rate of pay' set out in the Fair Labor Standards Act ("FLSA"), 29 USC §207(e)." (DLSE Manual, §49.1.2.) Section 207(e) states that the regular rate at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf, except for those forms of compensation that are expressly excluded, by this statute, from consideration in determining the regular rate. These excluded forms of compensation are set out at DLSE Manual §49.1.2.4, and may be summarized as follows:

    1. Sums paid as discretionary gifts, the amounts of which are not measured by or dependent on hours worked, production or efficiency.

    2. Payments made for occasional periods when no work is performed due to vacation, holiday, illness, etc., and payments made as reimbursements for business expenses incurred by the employee for the benefit of the employer.

    3. Sums paid for services performed if either (a) both the fact that payment is made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the pay period, and not pursuant to any prior agreement causing the employee to expect such payments regularly, or (b) the payments are made pursuant to a bona fide profit sharing plan, under which the amounts paid to the employee are determined without regard to hours of work, production or efficiency.

4. Contributions irrevocably made by an employer to a trustee or third party pursuant to a bona fide pension, health insurance, or similar employee benefit plan.

5. Extra compensation provided by a premium rate paid for hours worked in excess of 8 in a day or in excess of 40 in a week, or in excess of the employee's regular working hours.

6. Extra compensation provided by a premium rate paid for work performed on Saturdays, Sundays, holidays or regular days of rest, or on the sixth or seventh day of any workweek, where such premium rate is not less than one and one-half times the rate established in good faith for work performed in non-overtime hours on other days.

7. Extra compensation provided by a premium rate for work outside the hours established in good faith as the basic or regular workday (not exceeding 8 hours), or workweek (not exceeding 40 hours), where such premium rate is not less than one and one-half times the rate established in good faith for like work performed during such regular workday or workweek.

It should be noted that the DLSE Manual fails to list the eighth, and final form of compensation that must be excluded for regular rate calculations under the FLSA - - any income derived from employer-provided grants or rights provided pursuant to a stock option or employee stock purchase program, where such grants or stock options meet the detailed specifications set out at 29 USC §207(e)(8). This subsection was added as a result of amendments to the FLSA that were enacted in 2000, and it appears that but for inadvertence, this now excludable form of compensation would have been listed in the DLSE Manual, as the DLSE's clear intent is to follow federal law with respect to the forms of compensation that are to be included or excluded in calculating the regular rate of pay.

The federal regulations, adopted by the Secretary of Labor implementing the FLSA, provide a detailed analysis at 29 CFR §§778.108-778.224, of the various forms of compensation that must be included or excluded in calculating the regular rate of pay. According to the DLSE Manual, "in determining what payments are to be included or excluded from the calculation of the regular rate of pay, California law adheres to the standards adopted by the U.S. Department of Labor to the extent that those standards are consistent with California law." (DLSE Manual §49.1.2.) In fact, the DLSE Manual and related DLSE opinion letters do not identify any area of conflict between federal and state law with respect to what forms of compensation must be included or excluded in determining the regular rate of pay. The difference that does exist between federal and state law is confined to the method of calculating the regular rate and the unpaid overtime rate when an employee is compensated, either in whole or in part, by payment of a fixed salary – i.e., a fixed payment for the work performed on a daily or weekly or longer basis of time. (See Labor Code §515(d); *Skyline Homes, Inc. v. Department of Industrial Relations* (1985) 165 Cal.App.3d 239, disapproved on other grounds in *Tidewater Marine Western v. Bradshaw* (1996) 14 Cal.4th 557.)

Under both federal and state law, the regular rate is a rate per hour. (29 CFR §778.109.) Employers are not required to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission or other basis. (See, e.g., Labor Code §200, defining "wages" as "all amounts for labor performed by employees ... whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.) But when employees are paid on some basis other than hourly pay, the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, it is therefor necessary to compute the regular hourly rate of such employees during each workweek. (29 CFR §778.109.) The regular rate is determined by application of established legal principles, without regard to what may designated by the employer as the purported regular rate. (29 CFR §778.108.) "Once the parties have decided upon the amount of wages and the mode of payment, the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the contracts." (*Walling v. Youngerman-Reynolds Hardware Co.* (1945) 65 S.Ct. 1242, 1245.)

Perhaps the most important principle expressed in these federal regulations with respect to computing the regular rate of pay is found at 29 CFR §778.200(c): "[A]ll remuneration for employment paid to employees which does not fall within one of these [now eight] exclusionary clauses [set out at 29 USC §207(e)] must be added into the total compensation received by the employee before his regular hourly rate of pay is determined." This is, of course, consistent with the definition of the regular rate at 29 USC §207(e), i.e., that it "shall be deemed to include all remuneration for employment" except for the specified statutory exclusions. Thus, the DLSE follows federal regulations under which amounts paid to employees as production bonuses, piece rates or commissions are included in computing the regular rate of pay. This is true regardless of whether these sorts of "incentive pay" are the employee's sole source of compensation, or merely constitute a part of the employee's compensation package. (DLSE Manual §§49.1.1, 49.1.2.1; 29 CFR §§778.110(b), 778.111, 778.117, 778.208.)

29 CFR §778.208 expressly provides that"discretionary bonuses" (bonuses which are given as gifts rather than as the result of a previously made contractual promise to make such payments based on employee performance, employer profitability, or some other specified factor) are excludable from the regular rate, since such "discretionary bonuses" fall under one of the specified exclusions from the regular rate at 29 USC §207(e). (The factors that distinguish a discretionary from a non-discretionary bonus are set out at 29 CFR §778.2111.) Any "non-discretionary" bonus that does not fall under one of the other exclusions found at 29 USC §207(e) "must be totaled in with other earnings to determine the regular rate on which overtime pay must be based.

29 CFR §778.209 sets out the method for including non-discretionary bonus payments in the regular rate: In situations where the bonus payments are made less frequently than each workweek, "the employer may disregard the bonus In computing the regular hourly rate until such time as the amount of the bonus can be ascertained. Until that is done, he may pay compensation for overtime at one and one half times the hourly rate paid by the employee [sic],

exclusive of the bonus.  When the amount of the bonus can be ascertained, it must be apportioned back over the workweeks of the period during which it may be said to have been earned.  The employee must then receive an additional amount of compensation for each workweek that he worked overtime during the period equal to one-half the hourly rate of pay allocable to the bonus for that week multiplied by the number of statutory overtime hours worked during the week."  (29 CFR §778.209(a).)  If it is impossible to allocate the bonus among the workweeks of the period in proportion to the amount of the bonus actually earned each week. "it may be reasonable and equitable to assume that the employee earned an equal amount of the bonus each hour of the pay period and the resulting hourly increase may be determined by dividing the total bonus by the number of hours worked by the employee during the period for which it was paid.  The additional compensation due for the overtime workweeks in the period may then be computed by multiplying the total number of statutory overtime hours worked in each such workweek during the period with one-half this hourly increase."  (29 CFR §778.209(b).)

Under California law, the salary component of a non-exempt employee's compensation serves as compensation only for non-overtime hours– i.e., the salary does not provide any compensation for the non-exempt employee's overtime hours.  This so-called "non-fluctuating work week" is codified at Labor Code §515(d): "For the purpose of computing the overtime rate of compensation required to be paid to a nonexempt full-time salaried employee, the employee's regular hourly rate shall be 1/40th of the employee's weekly salary."  The employee is then entitled to payment at the applicable overtime rate (one and one half times or twice the regular rate) for all overtime hours worked.   In contrast, under the FLSA, which uses a "fluctuating workweek method," the salary component is deemed to serve as straight-time compensation for all hours worked, including overtime hours.  Thus, under federal law, the regular rate of a salaried employee is determined by dividing the employee's  weekly salary by the total number of hours worked that week, and the employee is then entitled to an additional one-half of the regular rate for all overtime hours worked that week.

While California and federal law differ as to how salary is factored into the regular rate of pay, there is no difference between state and federal law as to how a bonus is factored into the regular rate of pay – the bonus component is factored in using a fluctuating workweek method, i.e., dividing the bonus earned by the total number of hours worked (including overtime hours) in the relevant time period. Since the bonus is deemed to constitute straight time earnings for all hours worked, all that is owed for overtime compensation for the bonus is an additional one-half of the bonus regular rate for overtime that must be paid at one and a half times the regular rate, and an additional straight time bonus rate for overtime that, under California law, must be paid at twice the regular rate.

I have been provided with the following information concerning Ms,.Chang's hours worked and compensation earned under California law:

**During the period from January 1 to December 31, 2005**, she was not paid any overtime compensation.  She routinely worked 5 days a week, Monday to Friday, 11 hours a day (from 9

12

or 9:30 am to 8 to 9 pm, with no meal breaks during the day), but once every 2 weeks on one weekday worked an extra 2.5 hours, for a 13.5 hour day (working until 11pm), and worked 4 additional hours every weekend.  She did not take any vacation time in 2005, and took off for six holidays (New Years, Memorial Day, July 4, Labor Day, Thanksgiving and Christmas).

She therefore worked a total of 59 hours in a "normal" workweek (11 hours each day Mon-Fri, plus 4 hours during the weekend), with 19 hours of overtime, all of which should b paid at the rate of one and half times her regular rate of pay.  In an "extended" workweek (every other week), she worked 61.5 hours, with 21.5 hours of overtime (of which 20 hours should be paid at one and one half times her regular rate of pay, and 1.5 hours should be paid at twice her regular rate of pay –based on the fact that she was working 13.5 hours on the "extended" day.  However, there were six weeks in which, because of holidays, she only worked 49 hours, of which 12 hours count as overtime payable at one and a half times her regular rate (based on 4 weekdays with 11 hours worked each day, for a total 3 hours overtime each day).

Throughout 2005, she worked 23 "normal" 59 hour workweeks (during which she worked a total of 1,357 hours, of which 437 were overtime hours at one and one-half times the regular rate), 23 "extended" 61.5 hour workweeks (during which she worked 1,414.5 hours, of which 460 were overtime hours at one and one half times the regular rate and 34.5 were overtime hours at double the regular rate), and 6 "short" 49 hour workweeks (during which she worked 294 hours, of which 72 were overtime hours at one and one half times the regular rate), for a total of 3,065.5 hours worked in 2005 (of which 969 were overtime hours at one and one half times the regular rate, and 34.5 were overtime hours at double the regular rate).

In 2005, Ms. Chang was paid an annual salary of $52,000 plus she earned an annual non-discretionary bonus, computed at the end of the year based on her sales totals for the year, of $17,669.  In order to compute the regular rate, we first start with the salary component, and divide $52,000 by 52 weeks of the year, and divide that by 40 non-overtime hours per week, resulting in the salary component of the regular rate at $25 per hour.  The bonus component of the regular rate is computed by dividing the total bonus payments, $17,669, by the total number of hours worked during the year (3,065.5 hours), for a bonus component of the regular rate at $5.76 per hour. We will need to keep these components separate in calculating overtime compensation owed under California law.  For the salary component, the overtime rate is $37.50 an hour for all overtime hours for which she is entitled to one and one half times the regular rate, and $50 an hour for all overtime hours for which she is entitled to double the regular rate.  For the bonus component., the overtime rate is $2.88 an hour for all overtime hours for which she is entitled to one and a half times the regular rate, and $5.76 an hour for all overtime hours for which she is entitled to double the regular rate.  We can now combine these components of the overtime rate, giving us $40.38 an hour for all overtime hours for which she is entitled to one and a half times the regular rate (969 hours), and $55.76 an hour for all overtime hours for which she is entitled to double the regular rate (34.5 hours).  Computing the overtime compensation owed, we arrive at a total of **$41,051.94 overtime compensation owed for 2005.**

13

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) The overtime wages on the bonus component of her compensation became due on the pay day for the pay period in which the bonus became ascertainable, i.e., very shortly after December 31, 2005. (See DLSE Opinion Letter 1986.12.23.) For ease of calculation, I will use December 31, 2005 as the date for payment of all 2005 overtime compensation (although it should be noted that this method decidedly benefits the employer, since the overwhelming majority of overtime compensation is based on Ms. Chang's salary component, and as such, was due regularly throughout the year). At 10% a year since December 31, 2005, Ms. Chang is presently owed (as of February 8, 2008) **$8,649.02 in interest on her unpaid 2005 overtime**, with interest accruing at the rate of $11.25 per day.

**During the period from January 1 to December 31, 2006**, she was again not paid any overtime compensation. In 2006, Ms. Chang was off on maternity leave from January 1 to April 22, a total of 16 weeks. She was also off on vacation from December 19 to December 31, a total of just under 2 weeks. She worked for 34 weeks that year, during which time she was off for four holidays (Memorial Day, July 4, Labor Day and Thanksgiving).

On "normal" weeks, she worked Monday to Friday, from between 9:30 or 10 am until 7:30 or 8 pm, with no time off for meal breaks, with 10 hours work each day, for a total of 50 hours, of which 10 hours were overtime at the rate of one and a half times her regular rate of pay. She worked 15 "normal" weeks that year, for a total of 750 hours worked in those weeks, of which 150 were overtime hours for which she was entitled to one and a half times her regular rate.

Prior to July, on "extended" weeks (every other week)., she worked until an additional 3.5 hours on one weekday (working until about 11pm), for a total 53.5 hours a week working 10 hours a day on four weekdays, and 13.5 hours on the other weekday), consisting of 12 overtime hours at time and a half, and 1.5 overtime hours at double the regular rate of pay. Prior to July, she worked 4 "extended" weeks, for a total of 214 hours worked in those weeks, of which 48 were overtime hours for which she was entitled to one and a half times the regular rate, and 6 were overtime hours at double the regular rate of pay.

Starting in July, she worked 4 hours every other weekend, so that her "extended" weeks for the remainder of 2006 consisted of 57.5 hours worked (10 hours each day for 4 weekdays, 13.5 hours on the other weekday, and 4 hours on the weekend), consisting of 16 hours of overtime at one and a half times the regular rate and 1.5 hours of overtime at double the regular rate. From July to the end of the year, she worked 11 "extended: weeks, for a total of 632.5 hours worked in those weeks, of which 176 were overtime hours at one and one half times the regular rate, and 16.5 were overtime hours at double the regular rate.

14

In 2006 she worked four "short" weeks, during which she worked only four days at 10 hours per day, for a total of 8 hours overtime each "short" week, at one and one half times her regular rate of pay. She worked a total of 160 hours in these "short weeks," of which 32 were overtime hours at the rate of time and a half.

For 2006, therefore, Ms. Chang worked a total of 1,756.5 hours, consisting of 428.5 overtime hours (of which 406 are payable at one and one half times her regular rate of pay, and 22.5 are payable at double her regular rate of pay).

For 2006, she was paid on the basis of a $64,000 annual salary plus she was paid an annual non-discretionary bonus, computed at the end of the year based on her sales totals for the year, of $24,525. In order to compute the regular rate, we first start with the salary component, and divide that into a weekly amount (here, $1,230.77), and divide that weekly amount by 40 non-overtime hours per week, resulting in the salary component of the regular rate at $30.77. per hour. The bonus component of the regular rate is computed by dividing the total bonus payments, $24,525, by the total number of hours worked during the year (1,756.5 hours), for a bonus component of the regular rate at $13.96 per hour. We will need to keep these components separate in calculating overtime compensation owed under California law. For the salary component, the overtime rate is $46.15 an hour for all overtime hours for which she is entitled to one and one half times the regular rate, and $61.54 an hour for all overtime hours for which she is entitled to double the regular rate. For the bonus component., the overtime rate is $6.98 an hour for all overtime hours for which she is entitled to one and a half times the regular rate, and $13.96 an hour for all overtime hours for which she is entitled to double the regular rate. We can now combine these components of the overtime rate, giving us $53.13 an hour for all overtime hours for which she is entitled to one and a half times the regular rate (406 hours), and $75.50 an hour for all overtime hours for which she is entitled to double the regular rate (22.5 hours). Computing the overtime compensation owed, we arrive at a total of **$23,269.53 overtime compensation owed for 2006.**

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) The overtime wages on the bonus component of her compensation became due on the pay day for the pay period in which the bonus became ascertainable, i.e., very shortly after December 31, 2006. (See DLSE Opinion Letter 1986.12.23.) For ease of calculation, I will use December 31, 2006 as the date for payment of all 2006 overtime compensation (although it should be noted that this method decidedly benefits the employer, since the overwhelming majority of overtime compensation is based on Ms. Chang's salary component, and as such, was due regularly throughout the year). At 10% a year since December 31, 2006, Ms. Chang is presently owed (as of February 8, 2008) **$2,575.59 in interest on her unpaid 2006 overtime**, with interest accruing at the rate of $6.38 per day.

**During the period from January 1 to May 11, 2007** (the date she was discharged), Ms. Chang worked 17 out of the 19 weeks (she was off on vacation for two weeks, from January 1-15). During the 17 weeks she worked, there were no holidays. For the first time in her employment, Ms. Chang began taking a 30 minute off-duty meal period, albeit only one day a week. She worked 10.5 hours per day 2 weekdays each week (9 am to 7:30 pm), 11.5 hours per day 2 other days each week (9 am to 8:30 pm), and 14.5 hours on the other weekday each week. Also, during the period from January 15 to the end of March, she worked 4 hours every other weekend, for a total of 6 times.

On "normal" workweeks, she therefore worked 58 hours (58.5 hours less one half hour off-duty meal each workweek), consisting of 18 overtime hours, of which 15.5 or 16 are payable at time and a half and 2 or 2.5 are payable at double time. (The range is the result of some uncertainty, on my part as I failed to inquire, as to the day that the one off-duty meal period each week was taken. For now, I will resolve this uncertainty to the benefit of the defendant, and assume that the meal period was taken on the workday in which she worked the greatest number of hours, so as to minimize the defendant's liability for overtime at the double time rate. This assumption will result in 16 overtime hours payable at time and half, and 2 overtime hours payable at twice the regular rate.) During this 17 week period in 2007, Ms. Chang worked 11 "normal" workweeks, for a total of 638 hours worked, of which 176 are overtime hours payable at one and one half times her regular rate of pay, and 22 are overtime hours payable at double her regular rate of pay.

On "extended" workweeks, she worked the additional 4 hours on the weekend. These 4 hours were overtime hours payable at the rate of one and one half times her regular rate of pay. Thus, in an "extended" workweek, Ms. Chang worked 62 hours, with 20 overtime hours payable at one and a half times her regular rate of pay, and 2 overtime hours payable at double her regular rate of pay. She worked 6 "extended" workweeks during this period of time, resulting in a total of 372 hours worked for all such weeks, with 120 overtime hours at time and a half, and 12 overtime hours at double time. (Here too, I made the same assumption, to the benefit of the defendant, that Ms. Chang took her one off-duty meal period each week on the day that she worked the greatest number of hours.)

For 2007, we get these total amounts: 1010 hours worked, consisting of 330 overtime hours (296 of which are payable at one and one half times the regular rate, and 34 of which are payable at double the regular rate).

For 2007, Ms. Chang was paid on the basis of an annual salary of $85,000. (She was also promised an annual non-discretionary bonus, to be computed at the end of the year based on her sales totals for the year, she has not been paid any pro-rata share of this bonus, and I would expect the defendant to contend that an employee who is not employed at the end of the year is not eligible for the bonus. Without conceding that point, I will base my calculation of the regular rate for 2007 solely on the salary component of her compensation.) In order to compute the regular rate, we divide the annual salary by 52 to derive a weekly amount (here, $1,634.62), and divide that weekly amount by 40 non-overtime hours per week, resulting in a regular rate of

16

$40.87. per hour. The overtime rate is $61.30 an hour for all overtime hours for which she is entitled to one and one half times the regular rate (296 hours), and $81.74 an hour for all overtime hours for which she is entitled to double the regular rate (34 hours). Computing the overtime compensation owed, we arrive at a total of **$20,923.96 overtime compensation owed for 2007.**

Ms. Chang is also owed interest on this unpaid overtime, at the rate of 10% per year from the date the overtime compensation became due. (See Labor Code §218.6.) The overtime wages on the salary component of her compensation became due on the pay day for the pay period following the pay period in which she worked the overtime, i.e., not later than approximately three weeks after the close of the pay period in which she worked the overtime. (See Labor Code §204.) Moreover, any unpaid earned wages must be paid immediately at the time of discharge. (Labor Code §201.) For ease of calculation, I will use May 11, 2007 as the date for payment of all 2007 overtime compensation (although it should be noted that this method decidedly benefits the employer, since overtime compensation should have been paid regularly throughout the year pursuant to Labor Code §204.) At 10% a year since May 11, 2007, Ms. Chang is presently owed (as of February 8, 2008) **$1,564.99 in interest on her unpaid 2007 overtime**, with interest accruing at the rate of $5.73 per day.

Adding up all of Ms. Chang's unpaid overtime compensation, she is owed a total of $85,245.43 for overtime owed pursuant to Labor Code §510 and IWC Order7-2001, plus $12,789.60 in interest on this unpaid overtime(as of 2/8/08) pursuant to Labor Code §218.6, with interest continuing to accrue at the rate of $23.36 per day.

3) Determining Whether Christina Chang Is Owed Additional Wages for Missed Meal Breaks Under Labor Code section 226.7

Opinion — For almost her entire employment from January 1, 2005 until her discharge on May 11, 2007, the defendant failed to comply with the meal period provisions of IWC Order 7-2001, under which Ms. Chang was to have been completely relieved of all duty for an off-duty meal period for each day that she worked over 5 hours. The defendant violated the requirements of the IWC order by requiring, or suffering, or permitting Ms. Chang to work at her desk instead of taking this required off-duty meal period. The mandate of the IWC order is quite clear: "No employer shall employ any person for a work period of more than5 hours without a meal period of not less than 30 minutes." The IWC order expressly defines the term employ to include to "suffer or permit to work." An on-duty meal period is only permitted "when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on the job meal period is agreed to." Otherwise, the required meal period must be one in which the employee is off-duty, and not performing any work. Here, these prerequisites for a lawful on-duty meal period were entirely absent, as the nature of the work was not such as to prevent Ms. Chang from being relieved of all duty, and there was nop written agreement between her and CMC agreeing to an on-duty meal period. Pursuant to Labor Code §226.7(b), "If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall

17

pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." Amounts owed pursuant to Labor Code §226.7 have ben characterized by the California Supreme Court as wages. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094.) Consequently, the defendant owes Ms. Chang wages pursuant to Labor Code §226.7(b) for each workday in which she did not have an off-duty meal period.

Basis and Reasons Therefor — Labor Code §512 was added to the Labor Code on January 1, 2000, with the enactment of AB 60. Section 512(a) states:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by the mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than ten hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived."

Section 512 applies to all employees employed by private employers in California except for persons employed in an "agricultural occupation," as defined by IWC Order 14-80. (See Labor Code §554(a).) As such, Section 512 was a codification of the basic requirement found in every other IWC order for the past several decades. (See *California Manufacturers Ass'n v. IWC* (1980) 109 Cal.App.3d 114-115 [noting that the meal period provisions in section 11 of IWC Order "have been substantially the same since 1947."]

Labor Code §226.7 was added to the Labor Code on January 1, 2001 with the enactment of AB 2509. It creates a statutory obligation for employers to comply with meal period requirements contained in the applicable IWC order, and mandates payments to employees for an employer's failure to comply with these requirements. It contains two subsections, and the requirements of the second subsection go beyond those of the first.

Subsection (a) states: "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission."

Subsection (b) states: "If an employer fails to provide an employee with a meal or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."

IWC Order 7-2001, section 11, provides, in relevant part:

18

(A) No employer shall employ any person for a work period of more than five hours without a meal period of not less than 30 minutes, except that when a work period of not more than six hours will complete the day's work, the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents the employee from being relieved of all duty and when by written agreement between the parties an on-the-job meal agreement is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

Rest period requirements in these IWC orders are phrased differently than the meal period requirements. Rest period requirements, which are found at section 12 of these IWC orders, do not contain the "no employer shall employ" language. Rather, the standard for rest periods is that "Every employer shall authorize and permit all employees to take rest periods ...."

Also, the meal period requirements contained in IWC Order 14-2001, which governs wages, hours and working conditions for employees employed in "agricultural occupations," differ from the meal period requirements contained in every other wage order, in that while every other wage order uses the "no employer shall employ" language for meal periods, the meal period provisions in Order 14-2001 (and in its predecessor Order, 14-80) use the "authorize and permit" standard. Prior to 1980, the meal period provisions in Order 14, like those of the other wage orders, used the "no employer shall employ" language.

The word "provide" in Labor Code §226.7(b) cannot be interpreted in isolation, but must be read in context of the entire sentence in which it appears. The statute imposes a requirement of an extra hour of pay when "an employer fails to **provide** an employee a meal period or rest period **in accordance with an applicable order** of the Industrial Welfare Commission." The relevant inquiry is not whether meal periods were "provided" by the employer, but rather, whether meal periods were provided "in accordance with [the] applicable [IWC] order." Linguistic analysis of the meaning of the word "provide" is singularly unhelpful, as the IWC orders themselves tell us what an employer must do to provide a meal period under the requirements of each order. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["the meaning of a statute may not be determined from a single word; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."])

19

The "no employer shall employ" standard is stricter than the "authorize and permit" standard Section 11(A) of the various wage orders (except Order 14) begins with the words "No employer shall employ." The word "shall" invokes an affirmative obligation on the part of the employer not engage in the proscribed conduct. It is a standard of statutory construction in California that "shall" imposes an "affirmative obligation." (See *Wright v. Superior Court* (1997) 15 Cal.4th 521, 525-526; see also *Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 ["the word 'shall' is mandatory and the word 'may' is permissive, unless otherwise apparent from the context"].)

The term "employ" is defined in all of the IWC orders to mean "to engage, suffer or permit to work." (See IWC Order 7-2001, section 2(D).) Based upon this definition of the term "employ," Section 11(A) of the applicable wage order requires that no employer shall **suffer or permit** an employee to work over five hours without a meal period of not less than 30 minutes.. Given this definition of "employ," it is plain wrong to suggest that an employer is in compliance with the wage order if it merely makes meal periods available without ensuring that employees actually take these meal breaks. The IWC order's definition of "employ" makes it clear that non-compliance with the wage order is not limited to situations where an employer requires an employee to continue working beyond five hours without a meal period. Under every wage order except Order 14, an employer "shall" not suffer or permit an employee to keep working beyond five hours without a 30 minute meal period. This means that an employer has an affirmative obligation to ensure that the meal period is taken.

Section 11(A) of the various wage orders places an additional affirmative obligation on the employer – to relieve the employee of all duty during the thirty minute off-duty meal period. The only exception to this is if all of the following conditions exist which allow for an "on-duty" meal period: 1) "the nature of the work prevent the employee from being relieved of all duty," and 2) the employer and employee enter into a written agreement for an on-the-job meal period, and 3) the written agreement expressly states that the employee may, in writing, revoke the agreement at any time.

Under the wage orders, there are only two circumstances under which a required meal period can be waived by an employee. First, if a work period of no more than six hours will complete the days work, the meal period may be waived by the mutual consent of the employee and employer. Second, where the nature of the work prevents an employee from being relieved if all duty, the parties may enter into a written agreement for an on-the-job meal period (provided the agreement states that it may be revoked by the employee, in writing, at any time). (See, e.g., IWC Order 1-2001, section 11(A).) If, as some employers have argued, an employee can always choose to work during a required meal period (and the employer is not then subject to the extra hour of pay for suffering or permitting the employee to work during that required meal period), there would be absolutely no reason for the IWC to have set out in the wage orders any circumstances under which there could be a meal period waiver. If employers need do nothing more than make meal periods available to employees, then no purpose would have been served by the wage orders' strict requirements governing when, under what circumstances, and how a meal period can be waived. It is well established that "where exceptions to a general rule are specified by statute, other exceptions are not to be presumed unless a contrary legislative intent can be discerned."

(*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 116.)  The contention that employers may suffer or permit their employees to work during a required meal period without liability for the extra hour of pay violates this rule of statutory construction.

In short, under the applicable wage order, the employer has an affirmative obligation to relieve employees of all duty during the meal period, and if the employer suffers or permits the employees to perform work during the meal period (except when there has been a valid waiver under the two exceptions provided by the wage order), the employer is liable for the extra hour of pay for failing to provide a meal period "in accordance with [the] applicable order of the Industrial Welfare Commission."

Turning to an analysis of the regulatory history, it is crystal clear that  the IWC intended that all employers, other than employers of agricultural employees, must ensure that their employees are not working during required meal periods.  The IWC's intent as to the meaning of "no employer shall employ" is readily apparent through an examination of the transcripts of the IWC's proceedings, in 1979, that resulted in the amendment of the "authorize and permit" meal period language in IWC Order 14, and the retention of the "no employer shall employ" language in all of the other wage orders..  A review of the transcripts of the public hearings conducted by the IWC on August 27, 1979 and September 9, 1979 on proposed revisions to the the wage orders provides irrefutable evidence of the IWC's legislative intent.

During the August 27, 1979 hearing, IWC Commissioner Howard P. Wackman II noted that "[u]nder [the proposed] Order 14, there has been a slight modification in the wording regarding meal periods." (Transcript of 8/27/79 IWC Hearing, p. 75:2-4) Richard Glade, an attorney representing Agricultural Producers, an association of citrus growers, spoke in support of this proposed modification:

> [W]hen people are on basically a piece rate ... frequently they will even come in
> early in the morning ahead of the normal starting time just to get in a full day's
> production - - and they will take their breaks as they want them.  If they want to
> eat in the morning, they'll eat in the morning.  Or if they want to stop for five
> minutes or ten minutes and have a second sandwich, they'll do that - - and that's
> pretty traditional in our industry.  This is why we are urging that this meal period
> be modified to permit these people at their option to do that and not for the
> Commission to put us in the position where we have to tell such an individual,
> "Stop.  You can't do that." (*Id.*, at 75:10-22)

IWC Chairperson Mike R. Elorduy then asked Mr. Glade to address the reverse situation, asking, "What about if the individual wants to" take a meal period "and is told not to have it?" (*Id.*, at 75:23-25.)  Mr. Glade responded, "[W]e support the provision for a meal period.  All we are saying is let's give the employee the option and the freedom to follow his wishes.  If he has no individual wishes or no individual preference, of course, he gets the 30 minutes during the middle of the day." (*Id.*, at 76:1-7.)

During that same public hearing, Bill Marrs, an attorney for the California Farm Bureau Federation, and for various individual growers, expressed support for the proposed modification of the meal period requirement: "[T]here will be people at work in crews of four that pick grapes, and they will start at daylight, and they will quit about 1:00 o'clock in the afternoon, and then they will stop, and they will eat lunch, and they will go home - - and they don't want to stop and eat lunch and go back to work. So I would say that's a good proposal." (*Id.*, at 106:20-107:2.)

Another speaker, Jean-Mari Ullman, on behalf of the California Grape & Tree Fruit League, an organization that represents the growers and shippers of grapes and deciduous tree fruits, spoke about her uncertainty as the meaning of the proposed meal period language. She addressed her question to the IWC:

> I am not sure I am interpreting the way the Order reads correctly or not. Perhaps you could clarify this for me. But it was our interpretation when we read that section on Meal Periods that under Order 14 when you ave a situation where workers are working under a piece rate basis that the grower doesn't have to be there to enforce and make sure that his workers are taking a 30 minute lunch period. As was brought out, there are a lot of times when they are working on a piece rate and they want to hurry up and get back and start picking as fast as they can. So they might take a ten minute break here and a ten minute break there and a ten minute break somewhere else. So we want to make sure that there is that flexibility under Order 14 so that you don't actually have to stop the crews and take a break.... It was our understanding that [the proposed] change was going to allow that kind of flexibility. That was our interpretation. But I wanted to make sure our interpretation was correct on that. Was that the intent of that section? (*Id.*, at 132:11-133:8.)

IWC Commissioner Wackman responded, "...as the maker of the motion on that and in doing some work on the wording of it that it was the intent that the employer should allow the person to take the time off if that person desired it but that the employer was not mandatorily forcing that worker to take it off. My chief concern has been the case in point where you have an employee and you don't have actual control over him to say, 'You must take that time off.'" (*Id.*, at 134:6-14.)

In his second appearance as a speaker at this hearing, Richard Glade asked the IWC to consider the problem from the employer's point of view; "[W]e don't feel it is possible for us to be the policemen when we have people in the fields and the harvesters or irrigators are not there. Maybe the foreman isn't there. We should not be in the position where we have to police and order an employee to quit working when he is taking a ten minute meal period and then wants to continue working. So I urge you while you have this opportunity to be clear on this point...." (*Id.*, at 140:13-25-141.2-10)

IWC Chairperson Elorduy made clear that he opposed this proposal to change the meal period requirement, arguing for the continued necessity of "employer policing":

> I think the Commission's responsibility is the standards we have to set up in the interest of the health and welfare of the employee. What happens if someone does not police it and if you have a crew out there that because, as you say, the employee's desire is to work without a meal period or without a relief period because they are on piecework. My responsibility as I understand it is to correct that situation. The employee is not right just because he wants to do it. There has to be some policing and somebody from the Division to enforce it. (*Id.*, at 142:1-10.)

This colloquy continued, with Mr. Glade asserting:

> [F]or an employer to mandate that an individual sit down and be quiet for 30 minutes when he only needs and he only wants 10 or 15 to finish his lunch, I think, is beyond the range of all reason, and I think it goes beyond the range of what this Commission should do. I think this Commission should recognize the individual desires of people when those desires are within the range of reason. I think people are within the range of reason when they only feel that they require 10 minutes or 15 minutes or 20 minutes for their lunch. Why should this Commission mandate to people that are working on their own time that "You must take 30 minutes..."? I think we have got to .... recognize the rights of individuals a little bit... (*Id.*, at 143:4-22.)

Chairperson Elorduy replied that "there are abuses" where employees who wish to take a meal or rest period are not permitted to do so. Mr. Glade acknowledged that "we accept your premise ... that a 30 minute meal period is proper.... We authorize 30 minutes. There is no question about that. All we are saying is be clear in your language, and I think you should be clear to let an employee who says, "I don't want to take 30 minutes. I'm happy to take 25," or "I'm happy to take 20." Why shouldn't you let the employee have that option if he wishes. That's all we are saying. We are not quarreling with the basic 30 minutes - - not at all." (*Id.*, at 144:3-21.)

At the next IWC hearing, on September 9, 1979, IWC secretary Margaret Miller informed the Commissioners who were about to vote on the adoption of proposed Order 14-80, that at section 11, dealing with meal periods, "the first sentence varies somewhat from the comparable provision in Order 1-80." (9/7/79 IWC hearing transcript, p. 161-162.) The Commission then voted 3-2 to adopt this new language for meal period requirements in Order 14. (*Id.*, at p. 165.) Significantly, these same Commissioners adopted revised 1980 wage orders governing all of the other industries and occupations (Orders 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 15), all of which continued to use the "no employer shall employ" meal period language which, as indicated by the discussion of the revision to Order 14, was construed by the IWC as a requirement for employer policing to ensure that employees actually stop working and take an off-duty meal period.

Various DLSE opinion letters also provide instructive guidance on the nature of an employer's duty to ensure that employees are relieved of all work during required meal periods. A letter

issued by former Labor Commissioner Arthur S. Lujan on September 17, 2001, contrasts employer's affirmative duties relative to meal period requirements with the less strict requirements for rest periods: "Unlike meal periods, during which the employer has an affirmative obligation to ensure that workers are actually relieved of all duty, not performing any work, and free to leave the worksite; the employer is merely required to 'authorize and permit all employees to take rest periods'" (DLSE OL 2001.09.17, p. 4. (This letter can be accessed at the DLSE's website at http://www.dir.ca.gov/dlse/DLSE_OpinionLetters.htm.)

Another DLSE opinion letter, dated November 3, 2003, similarly explained "As to meal periods, employers have an obligation to self-police, and to ensure that employees are in fact taking required meal periods .... And self-policing ... should present no practical difficulty in that the wage orders also provide, at section 7(A)(3), that every employer maintain accurate records showing when each employee begins and ends each work period, and that meal periods shall also be reported." (This DLSE letter was initially posted on the DLSE website, but was "withdrawn" from the website in November 2004.)

Another opinion letter that remains on the DLSE website (and that was approvingly cited in *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963) was issued on January 28, 2002, and it provides: "[R]est periods differ from meal periods, during which an employer has an affirmative obligation to to ensure that workers are actually relieved of all duty, not performing any work, and (with the exception of health care workers under Wage Orders 4 and 5) free to leave the employer's premises."

Yet another opinion letter that can still be found at the DLSE website, was issued on September 4, 2002, and it deals with the characteristics of an off-duty meal period and the conditions under which an on-duty meal period is allowed. The letter provides: "[A]s a general rule, the required meal period must be an off-duty meal period, during which time the employee: 1) is not required to work, 2) is not suffered or permitted to work, 3) is not subject to the control of the employer so as to be free to leave the employer's premises and attend to his/her own personal affairs, 4) for a minimum of thirty minutes." Interpreting the requirement for an on-duty meal period, that "the nature of the work" must prevent the employee from being relieved of all duty, the opinion letter notes: "In determining whether the nature of the work prevents an employee from being relieved of all duty, the Division of Labor Standards Enforcement starts from the premise that the general requirement for an off-duty meal period is remedial in nature, and any exceptions to the general requirement must be narrowly construed, so as to avoid frustrating the remedial purpose of the regulation. The Division has always followed an enforcement policy that this determination must be made on the basis of a multi-factor objective test. The factors that should be considered include the type of work, the availability of other employees to provide relief to an employee during a meal period, the potential consequences to the employer if the employee is relieved of all duty, the ability of the employer to anticipate and mitigate these consequences such as by scheduling work in a manner that would allow the employee to take an off-duty meal break, and whether the work product or process will be destroyed or damaged by relieving the employee of all duty. The Division will conclude that an off-duty meal period must be provided unless these factors, taken as a whole, decisively point to the conclusion that the nature of the work makes it

virtually impossible to for the employer to provide the employee with an off-duty meal period. Finally, the burden rests on the employer for establishing the facts that would justify an on-duty meal period."

Regulations were proposed by the DLSE in January 2005 that if adopted, among other things, would have defined the term "provide" in Labor Code section 226.7 to mean "to supply or make available a meal period to the employee and give the employee an opportunity to take the meal period." But this proposed regulation was never adopted., and never took effect, as it was ultimately withdrawn by the DLSE in January 2006, four months after the issuance of the *Cicairos* decision. Neither the DLSE nor the IWC have introduced any subsequent regulatory proposals regarding meal period requirements. Unfortunately, employers have seized upon this never enacted regulation as evidence of a change in DLSE's position regarding the nature of the duty to provide a meal break. (See, e.g., *Perez v. Safety-Kleen Systems, Inc.* (N.D. Cal. 6/27/07) 2007 WL 1848037 at *8 ["Safety-Kleen argues that ... DLSE subsequently changed its position" to the standard set out in the proposed regulation].) Insidiously, employers including Safety-Kleen that have made this argument neglect to mention that this purported change in position was never adopted, and that its only expression came in the form of a now withdrawn proposed regulation. Nor has DLSE issued a single opinion letter or precedent decision adopting any such purported enforcement policy.

We turn now to cases interpreting the nature of the employer's obligation to provide a meal period.. The only published state court decision on this subject is *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963, holding that an employer's "obligation to provide [non-exempt employees] with an adequate meal period is not satisfied by assuming that the meal period was taken, because 'employers have an affirmative obligation to ensure that workers are actually relieved of all duty.'"

In *Perez v. Safety-Kleen Systems* (N.D. Cal. 6/27/07) 2007 WL 1848037, Judge Hamilton applied *Cicairos* to the facts of the case to deny the employer's motion for summary judgment as to certain employees' meal and rest period claims. The employer argued that Labor Code §512 only requires that an employer "provide" an employee with a meal period, and that this should be interpreted to mean nothing more than "furnish, supply, make available, or afford" such breaks. The employer further argued that "the nature of plaintiffs' work" as truck drivers who worked away from the employer's premises "provided them with the opportunity to take breaks." The court rejected this contention, noting "[t]here is no authority to support [defendant's] argument that merely being away from management constitutes 'provision' of breaks." (*Id.,* at *6.) The court noted evidence of the lack of a policy for meal breaks (managers did not tell the workers to take breaks, nor did they tell them not to take breaks), the fact that one plaintiff testified that he did not even know that he had a right to take breaks, the general pressures of the position to reach certain productivity levels (which apparently discouraged employees from taking breaks), and the fact that plaintiffs were required to fill out a log stating that they were on duty all day long, all of which taken together reveal a dispute both as to whether defendant "provided meal periods to plaintiffs" and as to whether defendant "authorized and permitted rest periods." (*Id.,* at *6-7.) Adopting the same analysis as the state court in *Cicairos,* the federal district court explained,

"Similar to the employer in *Cicairos,* Safety-Kleen assumed that plaintiffs knew they had the right to take a meal break without ever actively providing breaks (or even telling its employees they had that right) or monitoring whether breaks were taken.... [E]ven if Safety-Kleen is correct that it had no "affirmative obligation to ensure" that its workers are actually relieved of duty, it was obligated to provide off-duty meal and rest breaks. See *Murphy* [v. Kenneth Cole Productions, Inc. (2007)] 40 Cal.4th 1094 (California's meal time provisions are to be "interpreted broadly in favor of protecting employees")." (*Perez v. Safety-Kleen Systems,* at *8.)

Because of this evidence that the employer didn't even meet its obligations under the less strict "authorize and permit" standard, the *Safety-Kleen* court decided it need not resolve the issue of whether California law requires employers to ensure their employees actually take required meal breaks that were purportedly made available to them. However, the court did note that "the applicable IWC Wage Order [7-2001] indicates that an employer must do something affirmative to provide a meal period, and may not merely assume that such breaks are taken." The court noted the "no employer shall employ" language of the Wage Order, and the requirement that the employee be "relieved of all duty during a 30 minute meal period." The court reasoned, "At the very least, consistent with Labor Code §512, the Wage Order requires the employer to affirmatively provide a meal period and provide the opportunity for the employee to be 'relieved of all duty during a 30 minute meal period.'"

The court therefore found it unnecessary to resolve the defendant's assertion that the stricter provisions of the IWC Order exceed the IWC's authority because the wage order's mandatory language is inconsistent with Section 512. (This is an issue that can be easily disposed of. First of all, it is not at all evident that there is anything inconsistent between Section 512 and the provisions of the IWC order. And even if the IWC meal period requirements are construed as stricter than the requirements established under Section 512, so what? Section 512 does not purport to limit the IWC from imposing stricter or more protective requirements. It establishes a floor, not a ceiling of protection. The IWC is authorized to adopt regulations that are more protective of employees, and impose more restrictions upon employers, than the statutory provisions which set a baseline for such protections and restrictions. In upholding the IWC's authority to adopt a regulation imposing a day of rest requirement for certain farm employees who were expressly exempted by Labor Code §554 from statutory day of rest provisions, the California Supreme Court observed that "the authorities have uniformly held that the Industrial Welfare Orders may provide *more restrictive provisions* than are provided by the general statutes adopted by the Legislature on this subject in sections 510-556." (*Industrial Welfare Commission v. Superior Court* (1980) 27 Cal.3d 690, 733 [internal quotations and citations omitted].) Conversely, *Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, held that because there is no exemption in Labor Code §512 for employees covered by collective bargaining agreements, the IWC could not exempt such employees from the meal period provisions of Order 16-2001 (covering on-site construction, drilling, logging and mining occupations). *Bearden* tells us that the Labor Code provisions establish a statutory floor, and that the IWC cannot adopt regulations which undercut this floor. *IWC v. Superior Court,* on the other hand, tells us that these Labor Code provisions are *not* a ceiling, and that the IWC can adopt regulations which offer protections to workers that have not granted under the statutory provisions. This is unquestionably true in the

area of meal period regulations, where Labor Code §226(b) expressly ties the payment of the
extra hour of pay to the failure to provide a meal period "in accordance with an applicable order
of the Industrial Welfare Commission.," rather than in accordance with the requirements of
Labor Code §512.)

In another recently decided federal case, *White v. Starbucks Corp.* (N.D. Cal. July 2, 2007) 497
F.Supp.2d 1080, Judge Walker granted defendant's motion for summary judgment as to various
claims, including a claim that the defendant failed to provide meal and ret periods in violation of
Labor Code §§ 226.7 and 512. Defendant argued that the meal and rest period claims fail as a
matter of law because it made the breaks available, and the plaintiff voluntarily chose to forego
those breaks. The employer argued that the use of the term "provide" in Labor Code §§ 226.7 and
512 demonstrates that the Legislature intended only for employers to offer meal periods – not to
ensure that those meal periods were actually taken. In its decision, the court rejected reading
these Labor Code sections, or IWC Order 7-2001, or *Cicairos* to impose an affirmative
obligation on employers to ensure that employees refrain from working during their meal
periods. The court reasoned that such an interpretation "would create a strict liability standard,"
and that "making employers ensurers of meal breaks ... would be impossible to implement for
significant sectors of the mercantile industry (and other industries) in which large employers may
have hundreds or thousands or employees working multiple shifts." Accordingly, Judge Vaughn
Walker interpreted the meal period requirements to "require only that an employer *offer* meal
breaks, without forcing employers actively to ensure that workers are taking those breaks." For
liability to attach, according to Judge Walker, "the employee must show that he was *forced to
forego* his meal breaks as opposed to merely showing that he did not take them regardless of the
reason." In short, under this interpretation, nothing more is required than offering, or authorizing
and permitting a meal period. The court distinguished *Cicairos,* by noting that there, the
defendant knew that employees were driving while eating (that appears to be a misstatement of
the evidence that was before the court in *Cicairos),* and that the management policies discussed
in *Cicairos* "effectively deprived the drivers of their breaks."

The *Starbucks* decision is infected with flawed reasoning. Judge Walker's assertion that a
violation does not exist unless the employee was required to work during a mandated meal period
reflects the standard under subsection (a) of Labor Code §226.7; and utterly ignores the stricter
requirement under subsection (b) of that statute. The decision completely ignores the distinction,
under the IWC orders, *which are enforceable pursuant to Labor Code §226.7(b),* between the
"no employer shall employ" requirement for meal periods in every wage order other than Order
14, and the "authorize and permit" language for meal periods under Order 14 and for rest periods
in every wage order. The decision fails to give any consideration to the IWC's definition of the
term "employ" to include not just an employer requiring an employee to work, but also an
employer suffering or permitting an employee to work, even though the employee is not required
to do so. Contrary to Judge Walker's opinion, this does not establish a "strict liability" standard,
any more than an employee who is not required to work overtime, and who does so without the
employer's actual or constructive knowledge, would be entitled to overtime pay. The standard
for both overtime and meal periods, where the employee is not required to perform work., is

27

whether the employer knew or should have known that the employee was working.  (See, *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584-585.)

Judge Walker's concern that this non-existent "strict liability" standard could lead to situations where "employees would be able to manipulate the process and manufacture claims by skipping breaks or taking breaks of fewer than 30 minutes" is belied by the facts that 1) there is no "strict liability" standard, and 2) as to the ability of employers to learn whether their employees are taking meal periods in accordance with the provisions of the applicable IWC order, every IWC order requires California employers to maintain daily time records showing the actual start and end times of meal breaks.  (See, e.g. IWC Order 1-2001, section 7(A).)

Here, there is no evidence that CMS even complied with the less strict "authorize and permit" standard.  Employers subject to the "authorize and permit" standard (for meal periods under IWC Order 14-2001, and for rest periods under all of the wage orders), still have affirmative obligations which must be met in order to avoid liability for the extra hour of pay under Labor Code §226.7(b).  It would be impossible to "authorize" a meal or rest period without effectively informing the employees of their right to take the break time.  This was the position taken by the DLSE in its opinion letter of November 3, 2003 on the subject of meal and rest breaks: "'Authorize' means that employers have some affirmative obligation to advise employees of the right to take rest periods in accordance with the provisions of the wage order." (OL 2003.11.03, p. 3..)  In the context of the unionized workplace in *Cicairos*, the court apparently assumed that the employer "authorized" the required rest periods through the execution of a written collective bargaining agreement which contained a provision stating that "drivers ... shall take a thirty minute lunch period no later than five hours from their regularly scheduled start time," and granting those employees the right to take "two 15 minute paid rest periods per eight or ten hour shift," with one rest break during the first half of the shift, and the other during the second half.  (*Cicairos, supra,* at 955..)  In the context of a non-unionized workforce, it would of course be necessary for an employer to communicate such "authorization" directly to all of its employees.  Whatever form of communication is chosen by the employer, in order to meet the "authorize" requirement, it must provide the employees with actual and clear notice of their right to take the full amount of break time provided to them under the applicable IWC order.  Anything short of that cannot be said to "authorize" the taking of the required break time.  Here, it does not appear that CMC ever informed Ms./ Chang of her right to take an off-duty meal period.

Finally, it is worth noting that CMC was under a mandatory duty to maintain records of the exact hours worked each day by Ms. Chang, including the time she started working, the time she started a meal period, the time she returned to work from a meal period, and the time she stopped work for the day.  (IWC Order 7-2001, section 7.)  CMC did not maintain these time records, and never informed Ms. Chang that she should make a record of her time.  The employer's failure to keep these required time records shifts the burden of proof, both woth respect to hours worked for overtime purposes, and with respect to whether the employee was relieved of all duty for a required off-duty meal period.  "[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages."

(*Cicairos v. Summit Logistics, supra,* 133 Cal.App.4th at 961, citing *Hernandez v. Mendoza* (1988) 199 Calk.App.3d 721, 727.

4) Calculating the Amount of Wages Owed to Christina Chang for Missed Meal Breaks Under Labor Code section 226.7

Opinion — Ms. Chang is owed a total of **$18,060.54 in section 226.7 wages, plus interest on these wages in the amount of $2,680.58** (as of 2/8/08), with additional interest accruing at the rate of $4.95 for each day thereafter.

Basis and Reasons Therefor — Under Labor Code §226.7(b), Ms. Chang is owed one hour of pay at her "regular rate of compensation" for each day she did not have a required off-duty meal period in accordance with IWC Order 7-2001. She is therefore owed this extra hour of pay for each day she worked more than five hours without an off-duty meal period. The "regular rate of compensation" would include all forms of compensation that make up the regular rate for overtime purposes, i.e., it would include both the salary component and the non-discretionary bonus component of Ms. Chang's compensation It must be expressed as an hourly rate of pay, calculated in the same manner as the "regular rate" is calculated for California overtime purposes.

In 2005, there were 254 days (5 days a week, 52 weeks, minus 6 holidays) in which she worked more than five hours without a required off-duty meal period. Her regular rate of pay consisted of a salary component at $25 an hour, and a non-discretionary bonus component at $5.76 an hour, resulting in a regular rate of compensation of $30.76 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$7,813.04 in wages pursuant to Labor Code §226.7 for 2005.** She is also entitled to interest on these unpaid wages, pursuant to labor Code §218.6, at 10% from the date these wages became due. For ease of calculation (in a manner that benefits the employer) we will use December 31, 2005 as the due date for calculating interest (despite the fact that under Labor Code §204, the overwhelming bulk of these wages became due at regular intervals at each regular pay period during 2005). As of today's date (2/8/08), a total of **$1,646.09 is owed as interest on these section 226.7 wages earned in 2005**, with an additional $2.14 accruing in daily interest each day.

In 2006, there were 166 days (5 days a week, 34 weeks, less 4 holidays) in which Ms. Chang worked more than five hours without a required off-duty meal period. Her regular rate of pay consisted of a salary component at $30.77 an hour, and a non-discretionary bonus component at $14.,22 an hour, resulting in a regular rate of compensation of $44.99 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$7,468.34 in wages pursuant to Labor Code §226.7 for 2006, plus $826.63 interest on these wages**, with an additional $2.05 accruing in daily interest each following day.

In 2007, there were 68 days (5 days a week, 17 weeks, less 17 days in which she had a required off-duty meal period) in which Ms, Chang worked more than five hours without a required off-

duty meal period. Her regular rate of pay, based solely upon her salary, was $40.87 an hour. Multiplying that regular hourly rate by the number of days for which she is entitled to this payment, she is owed a total of **$2,779.16 is wages pursuant to Labor Code §226.7 for 2007, plus $207.86 interest on these wages,** with an additional 76 cents accruing in daily interrest each following day.

Adding all of these amounts, Ms. Chang is owed a total of $18,060.54 in section 226.7 wages, plus interest on these wages in the amount of $2,680.58 (as of 2/8/08), with additional interest accruing at the rate of $4.95 for each day thereafter.

5) Determining Whether Christina Chang Is Entitled to Waiting Time Penalties Under :Labor Code section 203

Opinion — Ms. Chang is owed waiting time penalties under Labor Code §203 as a result of the defendant's willful failure to pay all of her unpaid earned wages immediately at the time of her termination, as required under Labor Code §201.

Basis and Reasons Therefor — Labor Code §201 provides: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Labor Code §203 provides: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wage of an employee who us discharged or who quits, the wages shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." The term "willfully" has been defined to mean only that the employee intended to pay, or not pay, whatever was paid or not paid. The statute does not require any evil motive or intent to defraud. (*Davis v. Morris* (1940) 37 Cal.App.2d 269.) Ignorance of the law is no defense and does not negate "willfulness." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 396.)

6) Calculating the Amount of Waiting Time Penalties Owed to Christina Chang Under Labor Code section 203

Opinion — Ms. Chang is owed **waiting time penalties under Labor Code section 203 in the amount of $16,428.00.**

Basis and Reasons Therefor — Penalties under Labor Code §203 are calculated on a calendar day basis, without regard to the number of days the employee would have worked in the 30 days following the due date of the employee's final wages. (*Mamika v. Barca* (1998) 68 Cal.App.4th 487.) As a general matter, the penalty is based on the employee's final per diem wage rate, which is multiplied by the number of days (capped at 30) until payment is made (or a lawsuit is filed). Here, the 30 days expired without payment of wages or the filing of an action for payment of these wages, so the penalties are imposed for the 30 day maximum.

From April 1, 2007 until the end of her employment, Ms. Chang was working 58 hours a week, and 5 days a week. Thus, on average, she was working 11.6 hours per day  The per diem wage rate includes all wages earned (not just those that were paid), so it includes required overtime compensation. At the time of her discharge, Ms. Chang was being paid on the basis of an annual salary of $85,000, from which we derive a weekly rate of $1,634.62, a daily rate of $326.92 (based on her 5 day workweek) and a regular hourly rate of $40.87 (computed in accordance with Labor Code §515(d).  This results in an overtime rate (based on one and one half times the regular rate of pay) of $61.30 per hour.  Her per diem rate is calculated by adding the amount that was paid by the employer ($326.92 per day) plus the amount owed for unpaid overtime compensation ($220.68 per day, based on the overtime rate of $61.30 per hour multiplied by 3.6 hours, the average number of daily overtime hours), resulting a total daily wage of $547.60. Multiplying this daily wage by 30 days, we have a total penalty of $16,428.00 pursuant to labor Code §203..

7) Determining Whether Christina Chang Is Owed Liquidated Damages Under the FLSA

Opinion — Ms. Chang is entitled to liquidated damages under 29 USC §216(b) equal to the amount of the unpaid overtime compensation owed under the FLSA, with the imposition of such damages mandatory under controlling Ninth Circuit precedent unless the defendant can prove that it had an objectively reasonable basis for failing to pay overtime.

Basis and Reasons Therefor — The overtime requirements of the FLSA are set out at 29 USC §207. As indicated previously, the FLSA requires payment of overtime, at one and one half times the regular rate of pay, for all hours worked in excess of 40 in any workweek. Another provision of the FLSA, at 29 USC §216(b) provides: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages..... An action to recover the [liquidated damages] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 USC §260 provides that "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the failure to pay overtime] was in good faith or that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act if 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this tile."

"Liquidated damages represent compensation, and not a penalty.  Double damages are the norm, single damages the exception." (*Local 246 Util. Workers Union v. S. Cal. Edison Co.* (9th Cir. 1996) 83 F.3d 292, 297.) The employer has the burden of establishing subjective and objective "good faith" in order to avoid imposition of liquidated damages. "If the employer fails to carry that burden, liquidated damages are mandatory." (*Id.*)  "The employer's burden is to establish that it had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that its conduct complied with the Act." (*Id.* at 298.)

31

Considering the nature of the work performed by Ms., Chang, it is virtually inconceivable that the defendant can meet this burden of proving that he had "objectively reasonable grounds for believing that his conduct did not violate the FLSA." (*Chao v. A-One Medical Services, Inc.* (9th Cir. 2003) 346 F.3d 908, 920.)

8) Calculating the Amount of Liquidated Damages Owed to Christina Chang Under the FLSA

Opinion — Ms. Chang is entitled to a total of **$23,095.32 in liquidated damages owed under the FLSA**.

Basis and Reasons Therefor — In order to calculate liquidated damages under the FLSA, we must calculate the amount of overtime compensation that is owed under the FLSA. This amount is less than the amount of overtime owed under California law, so we cannot use the amounts found due above pursuant to Labor Code §510 and IWC Order 7-2001. (This is because the FLSA, unlike California law, does not have daily overtime, does not have a double rate for overtime, and uses a fluctuating workweek method to calculate the regular rate and overtime owed for salaried non-exempt employees) We will proceed to calculate overtime owed under the FLSA.

For 2005, Ms. Chang worked 23 "normal" 59 hour workweeks (19 hours of overtime each week for 23 weeks equals 437 overtime hours), and 23 "extended" 61.5 hour workweeks (21.5 hours overtime each week for 23 weeks equals 483 overtime hours), and 6 "short" 49 hour workweeks (9 hours of overtime each week for 6 weeks equals 54 overtime hours). Adding these figures, we arrive at 3,065.5 total hours worked in 2005, of which 974 constitute overtime hours under the FLSA. We calculate the regular rate under the FLSA by adding the salary she received ($52,000) plus the non-discretionary bonus ($17,669), for $69,669 in total compensation, divided by her total hours worked (3,065.5), resulting in the FLSA regular rate of $22.72 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $11.36 per hour. We then multiply the total overtime hours worked (974 hours) by the overtime rate ($11.36 per hour), resulting in a total of $11,064.64 of FLSA overtime liability for 2005. Ms. Chang is therefore entitled to **$11,064.64 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2005.**

For 2006, Ms. Chang worked 15 "normal" 50 hour workweeks (10 hours of overtime each week for 15 weeks equals 150 overtime hours), and 4 "partly extended" 53.5 hour workweeks (13.5 hours overtime for 4 weeks equals 54 overtime hours), and 11 "fully extended" 57.5 hour workweeks (17.5 hours overtime each week for 11 weeks equals 192.5 overtime hours), and 4 "short" 40 hour workweeks (with no FLSA overtime). Adding these figures, we arrive at 1,756.5 total hours worked in 2006, of which 396.5 constitute overtime hours under the FLSA. We calculate the regular rate under the FLSA by adding the salary she received ($41,846.15, her $64,000 annual salary pro-rated for the 34 weeks she worked) plus the non-discretionary bonus ($24,525), for $66,371.15 in total compensation, divided by her total hours worked (1,756.55), resulting in the FLSA regular rate of $37.79 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $18.89 per hour. We then multiply the total overtime hours worked

(396.5 hours) by the overtime rate ($18.89 per hour), resulting in a total of $7,489.88 of FLSA overtime liability for 2006.  Ms. Chang is therefore entitled to **$7,489.88 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2006.**

For 2007, Ms. Chang worked 11 "normal" 58 hour workweeks (18 hours of overtime each week for 11 weeks equals 198 overtime hours), and 6 "extended" 62  hour workweeks (22  hours overtime each week for 6 weeks equals 132 overtime hours).  Adding these figures, we arrive at 1,010 total hours worked in 2007, of which 330 constitute overtime hours under the FLSA.  We calculate the regular rate under the FLSA by dividing the total compensation she received ($27,788.46, her $85,000 annual salary pro-rated for the 17 weeks she worked) by her total hours worked (1,010),  resulting in the FLSA regular rate of $27.51 per hour, with a resulting FLSA overtime rate (one half the regular rate) of $13.76 per hour.  We then multiply the total overtime hours worked (330 hours) by the overtime rate ($13.76 per hour), resulting in a total of $4,540.80 of FLSA overtime liability for 2007.  Ms. Chang is therefore entitled to **$4,540.80 as liquidated damages under the FLSA, based on the defendant's failure to pay for overtime earned in 2007.**

Adding these liquidated damages for the entire time period, we arrive at a total of $23,095.32 in liquidated damages owed under the FLSA.

DATA OR OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING OPINIONS

I considered information provided by counterclaimants' counsel Richard Harrington, and by counterclaimants Andrew Verity and Christina Chang in the course of telephone conversations regarding the facts of the case.  I also considered information contained within the  following documents: the Complaint for Misappropriation of Trade Secrets, the Answer to the Complaint and Counterclaim, the Reply to Counterclaim, the Amended and Supplemental Counterclaim, a chart summarizing hours worked and calculating overtime owed, excerpts of the depositions of Christina Chang, Andrew Verity, Mark Lillge, Bruce Molloy and Leanne Stein, defendant's job performance reviews for Christina Chang, and all of the other written materials referenced in the above Report, including  copies of the various referenced Labor Code and United States Code sections, federal regulations contained in the CFR and state regulations contained in IWC Order 7-2001, IWC hearing transcripts, court decisions, DLSE opinion letters, the 2002 DLSE Enforcement Policies and Interpretations Manual, and the IWC's Statement as to the Basis for the 2001 Wage Orders.

EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR OPINIONS

I do not presently anticipate using any exhibits to summarize or support my opinions, other than the various written materials specified immediately above.

AUTHENTICATION

The above Expert Witness Report was prepared and drafted by the undersigned, and submitted to counterclaimants' counsel for disclosure as required by Rule 26 of the Federal Rules of Civil Procedure.

Dated: February 8, 2008

_____
MILES E. LOCKER

# EXHIBIT B

LAW OFFICES OF

## CHANDLER, WOOD, HARRINGTON & MAFFLY LLP

ROBERT R. WOOD
RICHARD HARRINGTON
ROBERT ELLIOTT

ONE MARITIME PLAZA
FOURTH FLOOR
SAN FRANCISCO, CA 94111
TELEPHONE (415) 421-5484
TELEFAX (415) 986-4874

1 April 2008

Fax and US Mail

Andrew S McKay Esq
William R Hill Esq
Donahue Gallagher Woods LLP
300 Lakeside Drive
Suite 1900
Oakland CA 94612 3570

Overtime claims of Christina Chang
Mark Lillge dba Creative Marketing Concepts and Christina Chang and related
counterclaim, US District Court Case No. CO7-02748 MHP

This letter confirms in writing that your tender of $159,771.59 dated March 31 2008 fully
satisfies the overtime claim of Christina Chang and claims for penalties related thereto, and that
this sum will be paid less all applicable withholdings by wire.

Any claims by Chang for attorneys fees' to the date of your your tender on her overtime claim
and penalties related thereto are excluded from this acceptance, are reserved by Chang, and can
be resolved either by settlement or post-trial motion. No further attorneys' fees related to the
claims in Items 1 through 6 of your letter will be claimed for the period after the date of your
tender.

Our wire instructions are:

Trust Account
Chandler Wood Harrington & Maffly LLP
Union Bank of California
400 California Street
San Francisco, CA 94104
Trust Account: 0012100160

Union Bank's Routing Number: 122000496

Sincerely yours

*Richard Harrington*

Richard Harrington

cc Robert Charles Ward Esq
Brendan J Dooley Esq

WILLIAM R. HILL, #114954
  rock@donahue.com
ANDREW S. MACKAY, #197074
  andrew@donahue.com
SARA J. ROMANO, #227467
  sromano@donahue.com
DONAHUE GALLAGHER WOODS LLP
Attorneys at Law
300 Lakeside Drive, Suite 1900
Oakland, California  94612-3570
Mail:   P.O. Box 12979
          Oakland, California  94604-2979
Telephone:     (510) 451-0544
Facsimile:      (510) 832-1486

Attorneys for Plaintiff and Counterdefendant
MARK LILLGE d/b/a CREATIVE
MARKETING CONCEPTS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS,<br><br>              Plaintiff,<br><br>      v.<br><br>ANDREW VERITY and CHRISTINA CHANG,<br><br>              Defendants. | CASE NO.  C 07-02748 MHP<br><br>**MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF DEFENDANTS' SON**<br><br>Trial Date:        May 6, 2008<br>Pretrial Conf:     April 23, 2008<br>Department:      Courtroom 15, 18th Floor<br>Judge:            Hon. Marilyn Hall Patel |
| ANDREW VERITY and CHRISTINA CHANG,<br><br>              Counterclaimants,<br><br>      v.<br><br>MARK LILLGE d/b/a CREATIVE MARKETING CONCEPTS, and DOES 1-10,<br><br>              Counterdefendant. | |

**INTRODUCTION**

Plaintiff and counterdefendant Mark Lillge d/b/a Creative Marketing Concepts ("CMC") hereby moves in limine for an order precluding defendants and counterclaimants ANDREW VERITY and CHRISTINA CHANG ("Defendants"), and each of them, from mentioning, referring to, suggesting or arguing to the jury, or introducing any evidence of Defendants' son: The existence of Defendants' son is not relevant to any issue in this case. The son is not a party, and no claim of damage is alleged to or on behalf of the son. The son is not a witness to any of the facts alleged in the case. Moreover, Defendants' son is approximately two years of age. His tender years render him incapable of testifying in a manner that the jury could understand and from comprehending the nature of the testimonial obligation to tell the truth. Therefore, he would not be a competent witness.

Under these circumstances, the only reason that Defendants could have for introducing evidence of their son's existence would be to attempt to arouse sympathy for themselves as the parents of a small child in the hopes of prejudicing the jury favorably towards them. The evidence should therefore be excluded under Federal Rules of Evidence, Rule 403.

**ARGUMENT**

**I.      THE EXISTENCE OF DEFENDANTS' SON IS NOT RELEVANT TO ANY ISSUE IN THIS ACTION.**

In this action, plaintiff CMC alleges that defendants Verity and Chang misappropriated trade secrets, engaged in unfair competition under California law, were unjustly enriched as a result of the aforesaid conduct, and intentionally interfered with CMC's existing and prospective economic relationships with its customers. In response, defendants Verity and Chang alleged: that CMC owes them unpaid wages and penalties under California law; that CMC breached a written agreement with Verity to repurchase shares of ownership allegedly conveyed to Verity; that CMC breached an oral agreement to continue employing Verity through the end of calendar year 2007; and that CMC violated California public policy by terminating Chang. Defendants also allege that CMC owes Verity certain amounts under a pension plan; that CMC allegedly defamed Chang through untrue written and oral statements; and that CMC intentionally interfered

-1-

1   with Defendants' economic relations with their customers.  Of these counterclaims, only the

2   breach of written and oral contract, pension plan, and an oral defamation claim remain.

3   Defendants' wage and penalties claims have been mooted by payment of the amounts alleged to

4   have been owed, and the remaining counterclaims have been summarily adjudicated in CMC's

5   favor.

6        Defendants' son is not a party to any of these counterclaims.  Further, no allegations of

7   damage to Defendants' son are made in any of the counterclaims.  Defendants cannot legally

8   allege damages to their son, because he was not a party to the written or oral agreements alleged

9   to have been breached, nor is he a named beneficiary of the pension plan in which Defendants are

10  alleged to be participants.  Defendants' son is not the person allegedly defamed by the alleged oral

11  statement to the effect that Defendants are not legally in the United States and cannot legally

12  work in the United States.  Moreover, Defendants cannot claim damages themselves for

13  defamation based on what their son may or may not have heard, since under California law,

14  damages for defamation are personal to the individual defamed.  *Polygram Records, Inc. v.*

15  *Superior Court*, 170 Cal. App. 3d 543, 549 (1985).  In short, the existence of Defendants' son is

16  irrelevant to any issue in these proceedings: he neither adds to Defendants' claims nor to their

17  damages.  Consequently, any evidence of his existence is irrelevant and should be excluded under

18  Federal Rules of Evidence, Rule 402, which makes irrelevant evidence inadmissible.

19       Defendants' son is also not a witness with any relevant personal knowledge.  He has not

20  been identified as a percipient witness in discovery.  Even if he might have some personal

21  knowledge, his tender years render him incapable of testifying.  Since the claims before the court

22  are California law claims, California law regarding the competency of witnesses governs.  Fed. R.

23  Evid. 601.   Under California law, a person is disqualified as a witness if the person cannot

24  express himself or herself so as to be understood.  Cal. Evid. Code § 701(a)(1) (West 1995).  A

25  person is also disqualified as a witness if the person cannot understand the duty of a witness to

26  tell the truth.  *Id.* § 701(a)(2); *see also* Fed. R. Evid. 603 (witness must declare intent to testify

27  truthfully).  A two-year-old child manifestly fails to meet both of these tests.

28

-2-

1    Since the existence of Defendants' son is not relevant to any issue in this case, and since

2    the son is and cannot be a competent witness, the only reason for Defendants to introduce

3    evidence of his existence would be to arouse sympathy from the jury for themselves as parents of

4    a small child.  This is not a proper basis for introduction of evidence, and such evidence should

5    therefore be excluded as prejudicial.  Fed. R. Evid. 403.

6    **CONCLUSION**

7    For the foregoing reasons, plaintiff respectfully requests that the court exclude any

8    evidence of the existence of Defendants' son, and that the court further order that Defendants, and

9    each of them, be precluded from referring to, mentioning, suggesting, or arguing to the jury the

10   existence of Defendants' son.

11                              Respectfully submitted,

12   Dated:  April 14, 2008              DONAHUE GALLAGHER WOODS LLP

13

14                              By: /s/ William R. Hill

15                                  William R. Hill
                                    Attorneys for Plaintiff and Counterdefendant
16                                  MARK LILLGE d/b/a CREATIVE MARKETING
                                    CONCEPTS

17

18

19

20

21

22

23

24

25

26

27

28

-3-