1   WILLIAM R. HILL, #114954
        rock@donahue.com
2   ANDREW S. MACKAY, #197074
        andrew@donahue.com
3   SARA J. ROMANO, #227467
        sromano@donahue.com
4   DONAHUE GALLAGHER WOODS LLP
    Attorneys at Law
5   300 Lakeside Drive, Suite 1900
    Oakland, California  94612-3570
6   P.O.  Box 12979
    Oakland, California  94604-2979
7   Telephone:     (510) 451-0544
    Facsimile:     (510) 832-1486
8
    Attorneys for Plaintiff/Counterdefendant
9   MARK LILLGE d/b/a CREATIVE
    MARKETING CONCEPTS
10

11                  UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15  MARK LILLGE d/b/a CREATIVE          CASE NO.  C 07-02748 MHP
    MARKETING CONCEPTS,
16                                      PLAINTIFF'S DEPOSITION EXCERPTS TO
                                        BE USED IN ADDITION TO LIVE
17              Plaintiff,              TESTIMONY

18         v.                           Date:       May 6, 2008
                                        Time:       8:30 a.m.
19  ANDREW VERITY and CHRISTINA         Dept.:      Courtroom 15, 18th Floor
    CHANG,                              Judge:      Hon. Marilyn H. Patel
20
                Defendants.
21

22  ANDREW VERITY and CHRISTINA
    CHANG,
23
                Counterclaimants,
24
           v.
25
    MARK LILLGE d/b/a CREATIVE
26  MARKETING CONCEPTS, and DOES 1-
    10,
27
                Counterdefendants.
28

1    Plaintiff Mark Lillge d/b/a Creative Marketing Concepts ("CMC") submits the following

2    marked deposition excerpts to be used in addition to live testimony:

3    Deposition of Andrew Verity attached as Exhibit A; and

4    Deposition of Christina Chang attached as Exhibit B.

5

6    Dated:  April 14, 2008                    Respectfully submitted,

7                                              DONAHUE GALLAGHER WOODS LLP

8

9                                             By:_____/s/_____

10                                              William R. Hill
                                               Attorneys for Plaintiff
11                                              MARK LILLGE d/b/a CREATIVE MARKETING
                                               CONCEPTS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

# ANDREW VERITY

## DEPOSITION EXCERPTS

| | | |
|---|---|---|
| 1 | Q.    Okay.  So let me start then with American | 09:44:51 |
| 2 | International Group. | 09:45:07 |
| 3 | Was this a party that you sent your, as you put it, | 09:45:10 |
| 4 | neutrally worded e-mail to when you left CMC? | 09:45:15 |
| 5 | A.    Correct. | 09:45:21 |
| 6 | Q.    And when was the next time that you had any | 09:45:22 |
| 7 | contact with American International Group after sending | 09:45:24 |
| 8 | that e-mail? | 09:45:28 |
| 9 | A.    She sent me an e-mail saying how much she | 09:45:28 |
| 10 | missed me and that she'd been on vacation.  It was a week | 09:45:31 |
| 11 | or two later, but she said how much she missed me.  A very | 09:45:34 |
| 12 | positively worded e-mail. | 09:45:41 |
| 13 | Q.    And this was Mary Hancock? | 09:45:42 |
| 14 | A.    Yes. | 09:45:45 |
| 15 | Q.    When you say it was "positively worded," | 09:45:45 |
| 16 | what's your recollection of how it was positively worded? | 09:45:53 |
| 17 | A.    Well, she said, "I really miss you already," | 09:45:56 |
| 18 | or something like that.  It was more than a working | 09:45:57 |
| 19 | relationship.  It was a good friendship. | 09:46:03 |
| 20 | Q.    And this was an e-mail sent to your SBC | 09:46:04 |
| 21 | e-mail? | 09:46:09 |
| 22 | A.    Correct. | 09:46:10 |
| 23 | Q.    Okay.  And do you recall approximately how | 09:46:10 |
| 24 | long from the time you sent your e-mail to when you | 09:46:16 |
| 25 | received that from her? | 09:46:19 |

13

ANDREW VERITY

| | | |
|---|---|---|
| 1 | A.    Probably a couple of weeks.  She explained | 09:46:20 |
| 2 | she'd been on vacation in the e-mail. | 09:46:24 |
| 3 | Q.    So this is late April?  Somewhere around | 09:46:27 |
| 4 | there? | 09:46:29 |
| 5 | A.    It may be early May.  I can't remember. | 09:46:29 |
| 6 | Q.    Do you recall whether Ms. Hancock said | 09:46:32 |
| 7 | anything else in her e-mail? | 09:46:41 |
| 8 | A.    Not specifically, no. | 09:46:42 |
| 9 | Q.    And when was the next time that you had any | 09:46:43 |
| 10 | contact with anyone from American International Group? | 09:46:46 |
| 11 | A.    Given how positive her e-mail was, I called | 09:46:49 |
| 12 | her after we'd been in business about a week.  So around | 09:46:53 |
| 13 | the 19th, 20th of May. | 09:46:58 |
| 14 | Q.    What did you say to her when you called her? | 09:47:01 |
| 15 | A.    I just said, "Hi.  It's Andy," and she | 09:47:08 |
| 16 | immediately said, "Thank goodness you've called.  I've | 09:47:13 |
| 17 | just decided I'm not doing business with Creative | 09:47:18 |
| 18 | Marketing Concepts anymore.  Jeff Goldstein calls me three | 09:47:22 |
| 19 | times a day.  I can't stand him.  I find him creepy.  I | 09:47:26 |
| 20 | hope you've got good news for me because I'm about to look | 09:47:33 |
| 21 | for a new vendor." | 09:47:35 |
| 22 | Q.    And what did you say in response? | 09:47:44 |
| 23 | A.    I said, "Well, hopefully, you'll find this is | 09:47:45 |
| 24 | good news.  I have set up my own business doing the same | 09:47:50 |
| 25 | products." | 09:47:54 |

14

ANDREW VERITY

| | | |
|---|---|---|
| 1 | Q.    And when -- let me see here. | 09:47:59 |
| 2 | And what was Ms. Hancock's response? | 09:48:07 |
| 3 | A.    She said, "Great, great.  That will save me | 09:48:08 |
| 4 | the trouble of having to go through the Yellow Pages." | 09:48:11 |
| 5 | Q.    And why did you call -- you said you called | 09:48:24 |
| 6 | Ms. Hancock around maybe the 19th or the 20th of May. | 09:48:28 |
| 7 | Why did you call her at that time? | 09:48:30 |
| 8 | A.    Because her e-mail had been so strong.  I | 09:48:32 |
| 9 | would say it's more than just a straight buy/sell.  It was | 09:48:35 |
| 10 | a warm relationship.  I've met her personally a few times. | 09:48:41 |
| 11 | So the intimation in the e-mail that I read was that she | 09:48:48 |
| 12 | wanted to stay in contact. | 09:48:53 |
| 13 | Q.    And when you followed up with your call to | 09:48:54 |
| 14 | her, was it with the hope that she would become a customer | 09:49:16 |
| 15 | of Branding Boulevard? | 09:49:19 |
| 16 | MR. HARRINGTON:  I'm going to object to the form of | 09:49:21 |
| 17 | the question. | 09:49:23 |
| 18 | MR. BOYD:  In what way? | 09:49:24 |
| 19 | MR. HARRINGTON:  I don't think that hope has any | 09:49:25 |
| 20 | bearing on anything.  It's what he said is, something to | 09:49:29 |
| 21 | do with it. | 09:49:34 |
| 22 | BY MR. BOYD: | 09:49:34 |
| 23 | Q.    Please answer the question. | 09:49:34 |
| 24 | A.    So yes.  We are in business to get customers | 09:49:36 |
| 25 | and make money. | 09:49:43 |

15

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 12:15:56 | A.  There was a handbook we implemented in the |
| 2 | 12:16:01 | summer of 2005.  2005-2006, I think. |
| 3 | 12:16:08 | Q.  Is that -- is the vacation time accrual |
| 4 | 12:16:12 | policy that you're referring to here, is it your |
| 5 | 12:16:15 | belief that's reflected in that handbook? |
| 6 | 12:16:17 | A.  The policy, yes.  My -- the agreement on |
| 7 | 12:16:21 | the amount of time I got was not in the handbook. |
| 8 | 12:16:23 | That was a pre-standing agreement. |
| 9 | 12:16:26 | Q.  Okay.  So it's your understanding that if |
| 10 | 12:16:28 | any employee handbook issued after that time, that |
| 11 | 12:16:32 | your preexisting deal with Mr. Lillge superseded |
| 12 | 12:16:37 | anything -- |
| 13 | 12:16:38 | A.  Correct. |
| 14 | 12:16:38 | Q.  -- in the employee handbook? |
| 15 | 12:16:41 | A.  Correct.  It's pretty standard practice |
| 16 | 12:16:42 | for vacation to accrue on a month by month basis |
| 17 | 12:16:46 | and to pay it out when people leave the company. |
| 18 | 12:16:49 | Q.  Is there anything else that you recall in |
| 19 | 12:16:52 | the employee handbook that you believe did not |
| 20 | 12:16:55 | apply to you? |
| 21 | 12:16:55 | A.  Not specifically. |
| 22 | 12:17:13 | MR. BOYD:  Let's mark this as Exhibit 5, |
| 23 | 12:17:14 | please. |
| 24 | 12:17:15 | (Exhibit No. 5 marked for |
| 25 | 12:17:18 | identification.) |

71

ANDREW VERITY

| 1 | 12:17:18 | MR. BOYD:  Q.  Mr. Verity, I've just |
| 2 | 12:17:21 | handed you a document we've marked as Exhibit 5. |
| 3 | 12:17:24 | Are you familiar with this document? |
| 4 | 12:17:26 | A.  Yes, I am, although the font has changed |
| 5 | 12:17:30 | at the top of the page since I last saw it, so I'm |
| 6 | 12:17:36 | not sure.  It says Revised 2006.  If the font's |
| 7 | 12:17:41 | changed, someone has changed it.  It looks |
| 8 | 12:17:43 | familiar. |
| 9 | 12:17:43 | Q.  Is the timing of August, 2006, does that |
| 10 | 12:17:47 | jibe with your recollection as to when this |
| 11 | 12:17:49 | handbook was revised? |
| 12 | 12:17:53 | A.  I'm sure it was revised at that time.  I |
| 13 | 12:17:56 | don't recognize the font at the top of the page |
| 14 | 12:17:58 | from that time. |
| 15 | 12:17:59 | Q.  And with respect to the employee handbook, |
| 16 | 12:18:02 | did you play any role in drafting it? |
| 17 | 12:18:06 | A.  Yes, I did. |
| 18 | 12:18:07 | Q.  What role did you play? |
| 19 | 12:18:14 | A.  We bought a pro forma handbook from the |
| 20 | 12:18:18 | web.  You can buy these things pretty much fully |
| 21 | 12:18:18 | formed, and I edited it. |
| 22 | 12:18:22 | Q.  And did you work with any attorneys in |
| 23 | 12:18:26 | drafting this? |
| 24 | 12:18:28 | A.  I think we sent it to the attorney when we |
| 25 | 12:18:30 | finished the draft.  They made some comments. |

72

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 12:18:33 | Q.  And did you believe that this employee |
| 2 | 12:18:44 | handbook applied to your conduct of the company as |
| 3 | 12:18:47 | well? |
| 4 | 12:18:47 | A.  It was my understanding it applied to |
| 5 | 12:18:50 | everyone's conduct at the company. |
| 6 | 12:18:53 | Q.  And that would include the code of conduct |
| 7 | 12:18:58 | referenced on page six -- |
| 8 | 12:19:05 | A.  Correct. |
| 9 | 12:19:06 | Q.  -- regarding the net profits and the |
| 10 | 12:19:23 | profit share calculation for each year of this |
| 11 | 12:19:25 | agreement that you had with Mr. Lillge.  Who |
| 12 | 12:19:28 | calculated the net profits at the end of each year? |
| 13 | 12:19:33 | A.  I calculated them using the P&L from the |
| 14 | 12:19:39 | computer and then it was agreed to by Mr. Lillge. |
| 15 | 12:19:43 | He also had a substantial amount of personal |
| 16 | 12:19:46 | expenses going through the books that we tried to |
| 17 | 12:19:49 | take out. |
| 18 | 12:19:49 | Q.  Did you have any personal expenses that |
| 19 | 12:19:52 | went through as well, too? |
| 20 | 12:19:54 | A.  I had a few, yeah. |
| 21 | 12:20:00 | Q.  Do you recall Mr. Lillge ever taking issue |
| 22 | 12:20:11 | with any expenses that you were charging to the |
| 23 | 12:20:15 | company that he believed should be a personal |
| 24 | 12:20:17 | expense for you? |
| 25 | 12:20:19 | A.  Yes, I do. |

73

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 12:20:20 | Q.  And what expenses were those? |
| 2 | 12:20:23 | A.  When I was terminated, in my termination |
| 3 | 12:20:26 | email, Mr. Lillge mentioned two expenses. |
| 4 | 12:20:30 | Q.  And which expenses were those? |
| 5 | 12:20:32 | A.  I think one related to an air flight in |
| 6 | 12:20:37 | '06 and one was a Visa -- a charge from the -- from |
| 7 | 12:20:45 | the lawyer, the immigration lawyer. |
| 8 | 12:20:47 | Q.  And do you recall how much the charge was |
| 9 | 12:20:49 | from the immigration lawyer? |
| 10 | 12:20:51 | A.  It was a thousand dollars. |
| 11 | 12:20:53 | Q.  And was this something that the company |
| 12 | 12:20:54 | had paid for? |
| 13 | 12:20:56 | A.  The company paid for it.  The -- it was |
| 14 | 12:21:01 | agreed that any expenses I had that were personal |
| 15 | 12:21:05 | expenses would be taken out of the profit share at |
| 16 | 12:21:07 | the end of the year, that was a standing agreement, |
| 17 | 12:21:09 | so Mr. Lillge never paid the profit, I never had a |
| 18 | 12:21:12 | chance to deduct any expenses.  It was an |
| 19 | 12:21:17 | outstanding expense. |
| 20 | 12:21:17 | Q.  Did Mr. Lillge ever advise you prior to |
| 21 | 12:21:20 | you charging it to the company that the company |
| 22 | 12:21:22 | would not pay that charge? |
| 23 | 12:21:23 | A.  Yeah. |
| 24 | 12:21:25 | Q.  But it was charged to the company |
| 25 | 12:21:26 | nonetheless? |

74

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 12:21:27 | A.  That was -- that was in line with standard |
| 2 | 12:21:31 | practice, yeah.  We would then deduct the expenses |
| 3 | 12:21:36 | at the end of -- when we did the profit share.  Mr. |
| 4 | 12:21:39 | Lillge did the same thing.  We agreed this wouldn't |
| 5 | 12:21:42 | be a personal expense, he would run it through the |
| 6 | 12:21:44 | books, and then we would take it out at the end of |
| 7 | 12:21:47 | the year. |
| 8 | 12:21:47 | Q.  Was it CMC's practice to pay for any |
| 9 | 12:21:52 | charges or fees you might accrue with respect to |
| 10 | 12:21:55 | immigration or visa issues? |
| 11 | 12:21:57 | A.  It's a legal requirement for the H1B for |
| 12 | 12:22:01 | the company to pay for immigration expenses. |
| 13 | 12:22:04 | Q.  So was it your belief that CMC had an |
| 14 | 12:22:06 | obligation to pay this charge? |
| 15 | 12:22:08 | A.  That particular charge, I made an |
| 16 | 12:22:11 | agreement with Mr. Lillge that I would pay it, |
| 17 | 12:22:12 | because it was an expedite fee. |
| 18 | 12:22:42 | Q.  Turning to -- if you could look at page |
| 19 | 12:22:58 | eight of Exhibit 4, and looking at what's entitled |
| 20 | 12:23:08 | Fourth Count, breach of oral contract, paragraph 78 |
| 21 | 12:23:11 | through 82, I want to ask you about this oral |
| 22 | 12:23:16 | agreement in January 2007 that you allege you |
| 23 | 12:23:20 | entered into with Mr. Lillge.  And what I would |
| 24 | 12:23:23 | like to, again, get an understanding of all of the |
| 25 | 12:23:27 | things that you agreed to do under this agreement |

75

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 14:00:06 | Q.  And is it your recollection that that was |
| 2 | 14:00:10 | the last contact you had with these parties until |
| 3 | 14:00:14 | they contacted you in response to your email? |
| 4 | 14:00:18 | A.  Yeah, that's correct. |
| 5 | 14:00:24 | Q.  Do you still have any copies of these |
| 6 | 14:00:29 | emails that you sent out to these third parties? |
| 7 | 14:00:33 | A.  You mean their responses -- |
| 8 | 14:00:33 | Q.  NO. |
| 9 | 14:00:35 | A.  -- or my original email? |
| 10 | 14:00:38 | Q.  What your attorney refers to as these |
| 11 | 14:00:41 | "neutrally worded emails." |
| 12 | 14:00:42 | A.  I'm sure we have a copy somewhere, I |
| 13 | 14:00:44 | suspect.  Mr. Lillge still has one as well. |
| 14 | 14:00:49 | Q.  Why do you suspect that? |
| 15 | 14:00:51 | A.  I copied it not just customers but |
| 16 | 14:00:55 | suppliers, and I think Mike Corolla commented he |
| 17 | 14:00:59 | had received one. |
| 18 | 14:00:59 | Q.  Was it the same email -- |
| 19 | 14:01:01 | A.  It was the same email, yeah. |
| 20 | 14:01:03 | Q.  How many, approximately, current clients |
| 21 | 14:01:39 | does Branding Boulevard have now? |
| 22 | 14:01:41 | A.  I would say around 30. |
| 23 | 14:01:47 | Q.  And how many of these clients do you |
| 24 | 14:01:51 | believe are not past or current clients of CMC? |
| 25 | 14:01:56 | A.  Approximately ten. |

113

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 14:09:13 | Q.  Did you consult -- let me back up.  Did |
| 2 | 14:09:17 | Mr. Lillge consult with you about whether to hire |
| 3 | 14:09:20 | Mr. Weinstein? |
| 4 | 14:09:21 | A.  He did. |
| 5 | 14:09:22 | Q.  And do you recall expressing any opinion |
| 6 | 14:09:25 | on that? |
| 7 | 14:09:29 | A.  I was neutral, but I went along with it, |
| 8 | 14:09:34 | so I acquiesced, yeah. |
| 9 | 14:09:38 | Q.  Do you recall any discussions with Mr. |
| 10 | 14:09:41 | Lillge about your concern that Mr. Weinstein could |
| 11 | 14:09:47 | use CMC's client list when he left CMC? |
| 12 | 14:09:52 | A.  Not particularly. |
| 13 | 14:09:55 | Q.  I'll show you a document -- |
| 14 | 14:09:55 | (Exhibit No. 6 was marked |
| 15 | 14:09:55 | for identification.) |
| 16 | 14:10:18 | Mr. Verity, I've just handed you a |
| 17 | 14:10:20 | document we've marked as Exhibit 6.  Have you seen |
| 18 | 14:10:26 | this document before? |
| 19 | 14:10:29 | A.  Yes, I have. |
| 20 | 14:10:31 | Q.  Can you describe for me what it is. |
| 21 | 14:10:35 | A.  It's the -- it's the nondisclosure, |
| 22 | 14:10:43 | non-solicitation, non-compete we gave our employees |
| 23 | 14:10:47 | starting in April-May 2006. |
| 24 | 14:10:51 | Q.  Do you know who drafted this document? |
| 25 | 14:10:56 | A.  John Marlow did, Mr. Lillge's attorney. |

119

ANDREW VERITY

| | | |
|---|---|---|
| 1 | 14:12:20 | with CMC. |
| 2 | 14:12:20 | Q. And who was that employee? |
| 3 | 14:12:23 | A. Julianna Mehren. |
| 4 | 14:12:25 | Q. Did Mr. Lillge task you with the |
| 5 | 14:12:34 | assignment of ensuring that CMC's employees signed |
| 6 | 14:12:37 | this document? |
| 7 | 14:12:38 | A. Yes, he did. |
| 8 | 14:12:39 | Q. And did you undertake that assignment? |
| 9 | 14:12:42 | A. Yes, I did. |
| 10 | 14:12:43 | Q. And did all of the CMC employees sign this |
| 11 | 14:12:46 | document? |
| 12 | 14:12:47 | A. Yes, they did. |
| 13 | 14:12:48 | Q. Did Mr. Weinstein sign this document? |
| 14 | 14:12:56 | A. I don't remember. |
| 15 | 14:12:57 | Q. Did Ms. Chang? |
| 16 | 14:13:00 | A. No, she didn't. |
| 17 | 14:13:01 | Q. Do you have any understanding as to why |
| 18 | 14:13:05 | she didn't sign. |
| 19 | 14:13:06 | A. I didn't ask her to. She wasn't in the |
| 20 | 14:13:09 | office at the time. When she came back, she wasn't |
| 21 | 14:13:12 | reporting to me. It wasn't my responsibility. |
| 22 | 14:13:16 | Q. So it was your understanding that you were |
| 23 | 14:13:18 | only to have employees that were reporting to you |
| 24 | 14:13:22 | sign the document? |
| 25 | 14:13:22 | A. Well, Mr. Weinstein became the HR manager |

121

ANDREW VERITY

```
 1    14:14:43    Weinstein that you had, in fact, signed this

 2    14:14:45    document?

 3    14:14:45         A.  No, I never represented to Mr. Weinstein

 4    14:14:48    that, no.

 5    14:14:48         Q.  What did you do with these documents once

 6    14:14:52    they were signed by the other employees?

 7    14:14:55         A.  They were put in a filing cabinet in the

 8    14:14:57    office.

 9    14:14:57         Q.  And where was that filing cabinet located?

10    14:14:59         A.  It was near my desk.

11    14:15:02         Q.  Do you recall the last time you saw those

12    14:15:05    documents?

13    14:15:07         A.  A few days before I left the office they

14    14:15:10    were there.  I saw them in a folder in the drawer.

15    14:15:12         Q.  And do you understand that CMC is now

16    14:15:20    claiming that they are unable to locate those

17    14:15:22    documents?

18    14:15:23         A.  Yes, they are.

19    14:15:24         Q.  And do you have any understanding as to

20    14:15:27    why CMC can't locate those documents?

21    14:15:31         A.  I suspect they're not looking very hard.

22    14:15:36    It's not clear to me who's looking for them.  I

23    14:15:39    received a letter from Mr. Molloy saying he looked

24    14:15:42    for them.  I think in the declaration Mr. Lillge

25    14:15:44    said he looked for them, so it's not clear to me
```

123

# CHRISTINA CHANG

## DEPOSITION EXCERPTS

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | with the transition slowly getting into customer service | 10:39:12 |
| 2 | and sales role.  So in the very beginning, in terms of | 10:39:17 |
| 3 | position, I didn't have any business cards.  So it was not | 10:39:21 |
| 4 | clear, but it just -- I did the best I could to help them. | 10:39:25 |
| 5 | Q.    And you were employed by CMC until | 10:39:29 |
| 6 | approximately what date? | 10:39:35 |
| 7 | A.    May 11th of 2007. | 10:39:37 |
| 8 | Q.    And you were terminated at that time? | 10:39:39 |
| 9 | A.    Yes. | 10:39:44 |
| 10 | Q.    Now, Mr. Verity's testimony is still fresh in | 10:39:44 |
| 11 | your memory? | 10:39:56 |
| 12 | A.    Sure. | 10:39:56 |
| 13 | Q.    I wanted to ask you first with respect to the | 10:39:57 |
| 14 | approximate 20 or so customers -- to be more accurate 20 | 10:40:02 |
| 15 | contacts -- that Branding Boulevard has, which were also | 10:40:07 |
| 16 | past or existing customers of CMC. | 10:40:11 |
| 17 | Do you have any additional customers or contacts to | 10:40:15 |
| 18 | add to the list that Mr. Verity provided? | 10:40:18 |
| 19 | A:    Yes. | 10:40:20 |
| 20 | Q.    Who was that? | 10:40:21 |
| 21 | A.    Would you like to start as company, like how | 10:40:22 |
| 22 | Mr. Verity has started, or within the company individual | 10:40:26 |
| 23 | contacts? | 10:40:29 |
| 24 | Q.    It would probably be easier to keep track of | 10:40:30 |
| 25 | it if we start with the company, and then we'll break it | 10:40:32 |

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | Andy, there used to be another rep.  So every time that | 10:46:54 |
| 2 | rep forget something, I'm the one who keep her and her -- | 10:46:58 |
| 3 | like the schedule intact.  So Heidi Wua knew that I'm very | 10:47:03 |
| 4 | much, like, detail oriented.  So she knew -- like, "Hey, | 10:47:09 |
| 5 | Christina, what's the current status," I'll give her a | 10:47:13 |
| 6 | rundown.  So that's how long ago they knew. | 10:47:15 |
| 7 | Q.    When you left Creative Marketing Concepts, | 10:47:18 |
| 8 | what was your last day in the office?  Do you recall? | 10:47:23 |
| 9 | A.    May 11th. | 10:47:24 |
| 10 | Q.    And was that a Friday? | 10:47:26 |
| 11 | A.    It was a Friday, yes. | 10:47:27 |
| 12 | Q.    Did you also send out an e-mail similar to the | 10:47:28 |
| 13 | e-mail that Mr. Verity sent out when you left? | 10:47:35 |
| 14 | A.    Yes.  I sent a neutral e-mail indicating that | 10:47:38 |
| 15 | Friday was my last day.  I thanked everybody for the | 10:47:42 |
| 16 | opportunity and support and my -- I can be reached at my | 10:47:48 |
| 17 | cell number and home e-mail.  That's it. | 10:47:53 |
| 18 | Q.    And who did you send the e-mail to? | 10:47:55 |
| 19 | A.    Everybody in my e-mail box, vendor, incoming | 10:47:57 |
| 20 | -- everybody who I ever sent an e-mail to. | 10:48:02 |
| 21 | Q.    And did you do one big group e-mail? | 10:48:06 |
| 22 | A.    Yes. | 10:48:11 |
| 23 | Q.    Yes? | 10:48:12 |
| 24 | A.    Like nondisclose. | 10:48:13 |
| 25 | Q.    Other than the e-mail that we've discussed, | 10:48:23 |

17

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | A.     Yes. | 11:01:41 |
| 2 | Q.     And when you sent this group e-mail out, | 11:01:41 |
| 3 | similar to what, I believe, Mr. Verity testified to, did | 11:01:43 |
| 4 | you set it up so that a reply would come to your personal | 11:01:46 |
| 5 | SBC Global account? | 11:01:54 |
| 6 | A.     Yes. | 11:01:54 |
| 7 | Q.     And I believe you testified that Ms. Pascual | 11:01:54 |
| 8 | sent you this e-mail, and she also left you a voice mail? | 11:01:57 |
| 9 | A.     Yes. | 11:02:00 |
| 10 | Q.     Was that the same day, Friday the 11th? | 11:02:01 |
| 11 | A.     It was the same day. | 11:02:03 |
| 12 | Q.     And what did she say in her voice e-mail? | 11:02:05 |
| 13 | A.     "Call me." | 11:02:07 |
| 14 | Q.     Okay.  When was your next communication with | 11:02:08 |
| 15 | Ms. Pascual? | 11:02:14 |
| 16 | A.     Towards the -- either towards the end of the | 11:02:14 |
| 17 | following week or the week after.  I didn't call her | 11:02:22 |
| 18 | immediately.  In fact, I had to turn my cellular phone off | 11:02:26 |
| 19 | that Friday simply because I was trying to focus on | 11:02:32 |
| 20 | passing my accounts project to other reps and some of the | 11:02:35 |
| 21 | orders that I had to transact.  I just couldn't spare any | 11:02:40 |
| 22 | more time talking, answering phone calls.  So I just | 11:02:44 |
| 23 | turned it off. | 11:02:47 |
| 24 | Q.     So you believe you followed up with Ms. | 11:02:52 |
| 25 | Pascual towards the end of the following week? | 11:02:58 |

28

CHRISTINA CHANG

| | |
|---|---|
| 1 | did you have any communications with anyone on this | 10:48:26 |
| 2 | customer list that we've discussed about your leaving CMC | 10:48:29 |
| 3 | before you actually left? | 10:48:33 |
| 4 | A.    Before Friday? | 10:48:34 |
| 5 | Q.    Right. | 10:48:37 |

1  did you have any communications with anyone on this          10:48:26

2  customer list that we've discussed about your leaving CMC    10:48:29

3  before you actually left?                                    10:48:33

4       A.    Before Friday?                                    10:48:34

5       Q.    Right.                                            10:48:37

6       A.    One customer -- that's Delta Dental -- because    10:48:38

7  she called me up.  She said, "Hey, Christina, would you be   10:48:44

8  coming in Thursday?  It's the San Francisco Small Business   10:48:48

9  Expo."  I attended that last year, and she hosts there.      10:48:54

10 Me, too.  So she said, "Would I be seeing you there          10:48:57

11 tonight?"  I said, "Most likely not."  She goes, "Why        10:49:00

12 not?"  I was like, "Well, I've been fired.  Friday is my     10:49:03

13 last day."  She was shocked.                                 10:49:06

14      Q.    And who was she?                                  10:49:09

15      A.    Sharyan Nantuna, S-h-a-r-y-a-n.                    10:49:10

16      Q.    And her last name?                                10:49:19

17      A.    Nantuna, N-a-n-t-u-n-a.  She was the only         10:49:20

18 person who I mentioned before that Friday.                   10:49:31

19      Q.    And this was the day before?                      10:49:33

20      A.    Yes.  It was Wednesday evening.                   10:49:34

21      Q.    Wednesday evening.  Okay.                         10:49:39

22      A.    Yeah.                                             10:49:41

23      Q.    Right.                                            10:49:41

24      After you left CMC on the 11th of May, when was the     10:49:44

25 next time that you had any communications with anyone from   10:49:49

18

CHRISTINA CHANG

```
1    Federal Occupational Health?                          10:49:53

2         A.    The following Monday, the 14th.  Heidi called   10:49:55

3    me bright and early in the morning.                   10:50:01

4         Q.    And what did she say?                      10:50:05

5         A.    "I tried to look for you."  That Friday, I had  10:50:06

6    a lot of phone calls, and I had to basically say sorry.  I  10:50:10

7    couldn't take any more, yeah, like just phone calls.  I  10:50:14

8    have to transition.  So Friday -- that Monday morning, she  10:50:17

9    called bright and early.  "Christina, what's going on?"  10:50:21

10   Yeah.                                                 10:50:25

11        Q.    And what did you tell her?                 10:50:27

12        A.    I just say, "Wow, I'm fired.  I was fired.  10:50:29

13   Here I am at home."  She said, "Wow, you and Andy both  10:50:34

14   gone?"  She asked me what am I doing.  I said, "Well,  10:50:42

15   right now I'm trying to set up a business."  Well, Andy  10:50:46

16   was doing -- that was in the morning, as our business  10:50:49

17   wasn't fully set up yet.                              10:50:52

18        Q.    And what did Heidi say in response?        10:50:56

19        A.    "Wow.  So you'll be doing the same thing?"  10:51:00

20   She was, like, wow, just wow all the way because it was a  10:51:03

21   sudden shock for her.                                 10:51:06

22        Q.    And what did you say in response?          10:51:07

23        A.    I actually said, "We have a few names.  Would  10:51:12

24   you be an honor to give me some review of the business  10:51:18

25   name choices?"  So she was the one who actually       10:51:22
```

19

CHRISTINA CHANG

| | |
|---|---|
| 1 | contributed to the Branding Boulevard. | 10:51:26 |
| 2 | Q.    Did she coin the term? | 10:51:27 |
| 3 | A.    Hm? | 10:51:30 |
| 4 | Q.    Did she come up with the term? | 10:51:31 |
| 5 | A.    No.  With the family, we basically went | 10:51:33 |
| 6 | through a whole long list.  I went through that one at a | 10:51:35 |
| 7 | time.  So she said, "Branding Boulevard.  It's my | 10:51:39 |
| 8 | favorite."  So I talked to Andy.  "What do you think?"  I | 10:51:42 |
| 9 | talked to my mother and called his parents, and we just | 10:51:48 |
| 10 | thought, okay, I guess that's it. | 10:51:53 |
| 11 | Q.    Did Heidi place an order with you during this | 10:51:57 |
| 12 | telephone call? | 10:52:01 |
| 13 | A.    No.  She was actually asking me, "Would you be | 10:52:01 |
| 14 | able to actually provide any part that I want?"  I said, | 10:52:08 |
| 15 | "Yes.  Basically, anything.  I can put your logo or any | 10:52:13 |
| 16 | logo on.  I should be able to get them as a distributor." | 10:52:16 |
| 17 | Q.    Right. | 10:52:22 |
| 18 | A.    Yeah.  So she said, "Okay, good." | 10:52:23 |
| 19 | Q.    And when was the next time that you had any | 10:52:25 |
| 20 | communications with Heidi? | 10:52:28 |
| 21 | A.    Basically, every day during that week. | 10:52:29 |
| 22 | Q.    Did you speak to her later that same day, that | 10:52:36 |
| 23 | Monday? | 10:52:39 |
| 24 | A.    Yes. | 10:52:40 |
| 25 | Q.    And what occurred during that conversation? | 10:52:40 |

20

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | A.    She says, "I have a list of projects.  Can you | 10:52:42 |
| 2 | look at this?  Can you look at that?"  And she basically | 10:52:47 |
| 3 | just gave me, like, a request.  "I have this artwork." | 10:52:50 |
| 4 | You know, "Look for some pen for me and then just here." | 10:52:53 |
| 5 | Just whenever she comes through a project, she'll say, | 10:52:58 |
| 6 | "Here.  You know, I want something just like this artwork | 10:53:01 |
| 7 | and then put it in a pen as cheap as possible."  Stuff | 10:53:03 |
| 8 | like that.  So whatever she's given a project, that | 10:53:07 |
| 9 | springs up.  And then she just gave me the information, | 10:53:10 |
| 10 | and she just came to my mind.  She was very thrilled, very | 10:53:13 |
| 11 | happy.  Because she was under pressure, that she has to | 10:53:19 |
| 12 | buy from other vendors because of federal mandate, which | 10:53:22 |
| 13 | is the fact, because at Creative Marketing Concepts, I | 10:53:26 |
| 14 | used to deal with other federal people as well. | 10:53:29 |
| 15 | Q.    Right. | 10:53:32 |
| 16 | A.    So anything, I guess, over a certain limit, | 10:53:32 |
| 17 | you have to go for five bids. | 10:53:35 |
| 18 | Q.    Okay. | 10:53:38 |
| 19 | A.    Yeah. | 10:53:38 |
| 20 | Q.    When did Federal Occupational Health place its | 10:53:39 |
| 21 | first order with you? | 10:53:47 |
| 22 | A.    Probably middle, towards the end of the last | 10:53:47 |
| 23 | week -- I mean, that week. | 10:53:53 |
| 24 | Q.    Of that week? | 10:53:54 |
| 25 | A.    Yeah. | 10:53:54 |

21

CHRISTINA CHANG

```
 1        Q.      That first week you were in business?        10:53:54

 2        A.      The first week, yes.                          10:53:57

 3        Q.      And what did they order from you at that time?  10:53:58

 4        A.      She ordered some mini tape measure and -- some  10:54:02

 5   plastic ones, and she ordered some plastic pens.  She       10:54:12

 6   ordered lunch bags, yeah.  She ordered some Post-it          10:54:18

 7   notepads.                                                    10:54:28

 8        Q.      And what's your -- was this all in the first  10:54:32

 9   order, or were these --                                      10:54:36

10        A.      It was all like this project, that project.  10:54:37

11   So it's not all one order.  It was, "Here, do this.  Oh,    10:54:40

12   do that."  It was finalized.  Okay.  Run with it.  So it's  10:54:45

13   not all one order.                                           10:54:49

14        Q.      I got it.                                      10:54:50

15        What's your approximation as to the total amount of    10:54:51

16   these orders with respect to -- let me back up.             10:55:00

17        What's your estimation as to how much money Federal    10:55:06

18   Occupational Health has spent with Branding Boulevard to     10:55:10

19   date?                                                        10:55:14

20        A.      It's about $10,000 and some change.           10:55:14

21        Q.      Sure.                                          10:55:20

22        Do you have any understanding as to whether Federal    10:55:21

23   Occupational Health is still buying any products from CMC?   10:55:23

24        A.      I wouldn't know.  I'm not talking to anybody  10:55:28

25   from CMC.                                                    10:55:31
```

22

CHRISTINA CHANG

```
 1      Q.      And how did you bring Bechtel back into the        01:21:33

 2  fold at CMC?                                                   01:21:38

 3      A.      I tried to upsale new ideas, new products, and     01:21:40

 4  what I can provide that her current vendor could not,         01:21:46

 5  yeah.  So I give her reasons, and what can be done, what      01:21:51

 6  cannot be done, what's the limitation, the real              01:21:57

 7  limitation, and she was very pleased.  So I did one little   01:22:00

 8  order and probably $400 only, but that's a start.            01:22:05

 9      Q.      And was Ms. Coriola on your e-mail that you        01:22:12

10  sent out on May 11 notifying individuals that you had left   01:22:22

11  CMC?                                                          01:22:25

12      A.      She responded to me, yes.                         01:22:25

13      Q.      How did she respond?                              01:22:27

14      A.      She said, "Oh, my word.  So who is going to       01:22:28

15  take care of my account," because she had a list of          01:22:35

16  events.  Not immediately, but all planned out.  I gave her   01:22:41

17  so many ideas.  What can be done, what could be done,        01:22:45

18  yeah.  And then just something related to what she was       01:22:48

19  using these and then the recipients of those little          01:22:53

20  giveaways.  So I basically -- I gave her a solution.  And    01:22:58

21  all this information was given to Lisanina and Mark          01:23:02

22  Lillge.  And I told them every single specific product       01:23:09

23  that had actually presented to her, the sample, what's in    01:23:13

24  the works, and just don't drop the ball because the love     01:23:18

25  will not last if you don't kind of pick up the business.     01:23:24
```

86

CHRISTINA CHANG

```
 1        Q.      Right.  Okay.                              01:23:28

 2        A.      Yeah.                                      01:23:33

 3        Q.      And did you pass along to others at CMC the   01:23:33

 4   customers' reaction to the samples and the products and   01:23:37

 5   the ideas that you had presented and so forth?         01:23:40

 6        A.      Yes.                                       01:23:43

 7        Q.      Okay.                                      01:23:44

 8        A.      Because normally ideas and then feedback from   01:23:45

 9   the customer, I will write in the file because otherwise   01:23:48

10   there is no way I'm going to remember that many.       01:23:51

11        Q.      Right.                                     01:23:53

12        A.      Yeah.                                      01:23:53

13        Q.      And did you provide Ms. Coriola with the name   01:23:58

14   of anyone at CMC in response to her inquiry of who would   01:24:02

15   be taking care of her account?                         01:24:07

16        A.      Yes.                                       01:24:09

17        Q.      And what names or name did you give her?   01:24:09

18        A.      I told her I got her information on her   01:24:10

19   project to the owner of the company, Mark Lillge, and   01:24:14

20   there should be a system sales rep helping her out.  Her   01:24:17

21   name is Lisanina Nu, and the reach number is the same as   01:24:21

22   Creative Marketing's main number.  And I guess probably   01:24:28

23   after about even a week -- I only talked to her in   01:24:31

24   response to her e-mail, like towards the end of the   01:24:33

25   following week.  And I said, "Well, thank you very much.   01:24:35
```

87

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | And has any of the Creative Marketing contacted you?" She | 01:24:39 |
| 2 | goes, "No." I go, "That's surprising." And she goes, | 01:24:43 |
| 3 | "What are you doing now? Can you help me?" I was like, | 01:24:48 |
| 4 | "Well, if you want to, sure." | 01:24:54 |
| 5 | Q. And that was via telephone? | 01:24:54 |
| 6 | A. Yes, via telephone. | 01:24:56 |
| 7 | Q. Okay. | 01:24:58 |
| 8 | A. She e-mailed me right after my e-mail to home | 01:24:59 |
| 9 | and I didn't respond. I basically just take my time and | 01:25:04 |
| 10 | do my things. | 01:25:07 |
| 11 | Q. So the reason you called her later the | 01:25:07 |
| 12 | following week was just to see whether someone from CMC | 01:25:10 |
| 13 | had followed up with her? | 01:25:14 |
| 14 | A. Yes. Because she asked me, "So what do I do?" | 01:25:15 |
| 15 | Rather than typing all the information -- imagine, I have | 01:25:18 |
| 16 | to do to so many people -- saying it is so much faster | 01:25:22 |
| 17 | than me typing. | 01:25:27 |
| 18 | Q. And at some point, did Ms. Coriola place an | 01:25:28 |
| 19 | order with you? | 01:25:34 |
| 20 | A. Yes. | 01:25:35 |
| 21 | Q. And what did she order? | 01:25:35 |
| 22 | A. Bic pens. | 01:25:37 |
| 23 | Q. Do you recall the quantity and dollar amount | 01:25:43 |
| 24 | of the order? | 01:25:46 |
| 25 | A. Her budget could not go over $999. So it | 01:25:46 |

88

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | would be $998, including sales taxes and all that stuff. | 01:25:53 |
| 2 | Q.    Okay.  Has Ms. Coriola placed any additional | 01:26:01 |
| 3 | orders with Branding Boulevard besides that one? | 01:26:09 |
| 4 | A.    No. | 01:26:11 |
| 5 | Q.    Has anyone else at Bechtel placed any orders | 01:26:12 |
| 6 | with Branding Boulevard? | 01:26:14 |
| 7 | A.    I didn't know anybody else other than her. | 01:26:16 |
| 8 | Q.    Again, just to confirm, the same question I've | 01:26:22 |
| 9 | asked you with respect to some of these other parties, | 01:26:25 |
| 10 | it's your recollection that Ms. Coriola was the first one | 01:26:28 |
| 11 | to ask you for your business as opposed to you being the | 01:26:33 |
| 12 | first one to ask Ms. Coriola for her business? | 01:26:37 |
| 13 | A.    Yes.  She asked me for help. | 01:26:40 |
| 14 | MR. HARRINGTON:  Hold on one second.  Belatedly, may | 01:26:46 |
| 15 | I mention that that's a compound question because you put | 01:26:48 |
| 16 | it into an "or" as opposed to? | 01:26:51 |
| 17 | MR. BOYD:  Sure. | 01:26:55 |
| 18 | MR. HARRINGTON:  And if you would do it just one or | 01:26:56 |
| 19 | the other, then it wouldn't be compound. | 01:26:59 |
| 20 | MR. BOYD:  Sure. | 01:27:01 |
| 21 | THE WITNESS:  What does that really mean? | 01:27:01 |
| 22 | MR. BOYD:  I'm supposed to -- | 01:27:02 |
| 23 | MR. HARRINGTON:  Are you black or white?  The answer | 01:27:04 |
| 24 | is yes.  It doesn't tell you whether you are black or you | 01:27:05 |
| 25 | are white because it's compound.  But if you say, are you | 01:27:09 |

89

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | Q.    Okay.  What about vacation pay? | 03:25:33 |
| 2 | A.    Vacation pay will be a couple of weeks, | 03:25:37 |
| 3 | something like that, in a year.  Both Mr. Lillge and I | 03:25:41 |
| 4 | didn't have much concern because I worked long hours, | 03:25:50 |
| 5 | 60 hours per week.  In the beginning, it was minimum. | 03:25:54 |
| 6 | Q.    There is another document we've already marked | 03:26:16 |
| 7 | as Exhibit 4, but I'll give you a fresh copy to look at. | 03:26:19 |
| 8 | So I won't mark it again, but I'll ask you to turn to page | 03:26:24 |
| 9 | -- I have extra copies.  Sorry. | 03:26:37 |
| 10 | MR. HARRINGTON:  Thank you. | 03:26:39 |
| 11 | BY MR. BOYD: | 03:26:39 |
| 12 | Q.    I'll ask you to turn to page nine of that | 03:26:48 |
| 13 | exhibit and look under where it says, "Sixth count: | 03:26:50 |
| 14 | Nonpayment of wages.  Chang against CMC." | 03:26:54 |
| 15 | A.    Right. | 03:26:58 |
| 16 | Q.    And it says -- paragraph 89 says, "Pursuant to | 03:26:58 |
| 17 | the policies and practices of CMC, Chang accrued vacation | 03:27:01 |
| 18 | time during the course of her employment."  Then it | 03:27:07 |
| 19 | appears to go on to state your belief that you had accrued | 03:27:09 |
| 20 | five days of paid vacation time prior to being terminated | 03:27:15 |
| 21 | on May 11. | 03:27:18 |
| 22 | My question is:  How did you calculate that period of | 03:27:19 |
| 23 | five days of vacation time, which you believe is due to | 03:27:23 |
| 24 | you? | 03:27:23 |
| 25 | A.    I didn't have to calculate it.  That's on my | 03:27:28 |

152

| | | |
|---|---|---|
| 1 | official termination e-mail/letter.  And Bruce Malloy, who | 03:27:30 |
| 2 | was the person who sent that e-mail of termination to me, | 03:27:37 |
| 3 | and he indicated he will be giving me additional five days | 03:27:41 |
| 4 | on the e-mail. | 03:27:50 |
| 5 |     Q.    So on the e-mail that Mr. Malloy sent to you | 03:27:51 |
| 6 | -- | 03:27:54 |
| 7 |     A.    Yes. | 03:27:54 |
| 8 |     Q.    -- it's your recollection that he stated there | 03:27:54 |
| 9 | was this five-day period of vacation pay that CMC owed to | 03:27:56 |
| 10 | you, but hadn't paid you yet? | 03:28:01 |
| 11 |     A.    No, not like that. | 03:28:03 |
| 12 |     Q.    Okay. | 03:28:04 |
| 13 |     A.    He is giving me on top of whatever it was | 03:28:05 |
| 14 | agreed, that I'm entitled, and he is giving me an | 03:28:08 |
| 15 | additional five days over and on top of whatever I had -- | 03:28:12 |
| 16 |     Q.    Okay. | 03:28:16 |
| 17 |     A.    -- on the termination e-mail letter. | 03:28:16 |
| 18 |     Q.    So is it your understanding that these five | 03:28:19 |
| 19 | additional days were days that you hadn't necessarily | 03:28:21 |
| 20 | earned pursuant to CMC's policy, but it was something that | 03:28:24 |
| 21 | Mr. Malloy agreed to add on to your termination? | 03:28:28 |
| 22 |     A.    Yes. | 03:28:30 |
| 23 |     Q.    And this was added on by Mr. Malloy in an | 03:28:31 |
| 24 | e-mail that he sent to you? | 03:28:35 |
| 25 |     A.    Yes.  And that's actually responding to my | 03:28:37 |

153

CHRISTINA CHANG

| | | |
|---|---|---|
| 1 | request.  I asked him to give me an official termination | 03:28:41 |
| 2 | letter, encompassing letterhead, indicating all the terms, | 03:28:46 |
| 3 | so he did. | 03:28:51 |
| 4 | Q.    Do you have -- | 03:28:52 |
| 5 | A.    Which paragraph? | 03:29:13 |
| 6 | Q.    Oh, sorry.  I haven't -- I'll tell you what, | 03:29:13 |
| 7 | why don't we look on -- the next page, on page ten, | 03:29:19 |
| 8 | paragraphs 97 through 99. | 03:29:24 |
| 9 | A.    Sure. | 03:29:26 |
| 10 | Q.    It says, "Ninth count:  Breach of trust."  It | 03:29:26 |
| 11 | says, "CMC holds in trust certain funds beneficially owned | 03:29:28 |
| 12 | by Verity and Chang as part of a pension plan." | 03:29:33 |
| 13 | Do you have any understanding as to the amount of the | 03:29:38 |
| 14 | funds that are held on this plan that you believe are due | 03:29:41 |
| 15 | to you? | 03:29:45 |
| 16 | A.    There was never a report that was generated by | 03:29:45 |
| 17 | the company, nor Mr. Lillge.  Everyone basically knows | 03:29:48 |
| 18 | there is pension there, but there wasn't any update how | 03:29:55 |
| 19 | the pension was managed, or how much money that we have in | 03:29:59 |
| 20 | the pool or anything. | 03:30:03 |
| 21 | Q.    So Do you have any understanding as to what | 03:30:04 |
| 22 | amount is in that pension that you believe is due to you? | 03:30:09 |
| 23 | A.    No. | 03:30:12 |
| 24 | Q.    Has anyone provided you with the contact | 03:30:12 |
| 25 | information for the plan or the plan administrator? | 03:30:17 |

154

CHRISTINA CHANG

```
 1          Q.      -- if I understand you now, it was your belief    03:50:14

 2     that as of your termination date, you had accrued           03:50:17

 3     five days of vacation days that weren't paid?               03:50:21

 4          A.      Yes.                                            03:50:24

 5          Q.      And did Mr. Malloy disagree with this when you  03:50:24

 6     told him this?                                              03:50:28

 7          A.      He says, "I don't know why you came out with    03:50:28

 8     this," and then he e-mailed me back and given me what he   03:50:30

 9     has calculated.  And then I said, "Where is" -- and I      03:50:33

10     e-mailed him back, "Where is my additional five days that  03:50:36

11     you indicated on my termination official letter."  And he  03:50:39

12     says, "I don't know where the confusion comes in."  And as 03:50:44

13     far as his belief, the case is closed.  And I just         03:50:48

14     thought, gee, very unclassy, and then what's the point of  03:50:51

15     dealing with somebody like that, wasting my energy.        03:50:57

16          Q.      So --                                          03:51:00

17          A.      So he still owes me.                           03:51:01

18          Q.      So in the e-mail that he sent to you later     03:51:03

19     that Friday, he agreed to pay you for the five days of     03:51:06

20     vacation pay that you said you were entitled to, and your  03:51:09

21     understanding is he threw an additional five days on top   03:51:12

22     of that?                                                   03:51:15

23          A.      Yes.                                           03:51:16

24          Q.      And when you left that Friday, were you paid   03:51:16

25     for that first five days of vacation that you believed you 03:51:19
```

                                                                    168

CHRISTINA CHANG

```
1    were entitled to?                                  03:51:24

2         A.    I was only paid for the five hours of that   03:51:25

3    five days that I was entitled to because the bookkeeper --   03:51:27

4    I don't know how she miscalculated it.            03:51:31

5         Q.    Okay.  And you have not received any     03:51:33

6    compensation from CMC since you left; is that correct?   03:51:37

7         A.    Correct.                              03:51:39

8         Q.    Okay.                                 03:51:40

9         A.    Compensation as in the four days and then   03:51:44

10   whatever the balance that they owe?               03:51:47

11        Q.    Right.                                03:51:49

12        A.    For the balance of the five days that I   03:51:50

13   accrued, they have paid in the following week.    03:51:54

14        (Brief pause in proceedings.)               03:51:54

15        THE WITNESS:  Even this copy is different from what   03:52:43

16   Bruce Malloy gave me.                             03:52:45

17   BY MR. BOYD:                                      03:52:45

18        Q.    And how is it different?              03:52:45

19        A.    You are supposed to have vacation calculation   03:52:48

20   addendum, all that stuff.  It's not here.         03:52:52

21        Q.    Okay.  That was an addendum on the version   03:52:54

22   that Mr. Malloy had --                            03:52:57

23        A.    Yes.                                  03:52:59

24        Q.    Okay.                                 03:52:59

25        A.    So did I finish the question that you asked   03:53:14
```

CHRISTINA CHANG

1    me?                                                          03:53:17

2        Q.      Yes.  Well --                                    03:53:17

3        A.      No.  I didn't answer it.                         03:53:20

4        Q.      -- I think you did.  Let me back up.  Sorry.     03:53:21

5    Too distracted about the elevators.                          03:53:24

6        So when you left CMC, they had paid you, instead for     03:53:27

7    the original five vacation days, they paid you for           03:53:31

8    five hours of vacation?                                      03:53:34

9        A.      Right.                                           03:53:35

10       Q.      And did they pay you anything after that?        03:53:35

11       A.      Yes.  The balance of the actual five days that   03:53:37

12   I accrued, they paid the following week for whatever --      03:53:41

13   that accrued dates.                                          03:53:46

14       Q.      So what you are alleging in here refers to the   03:53:48

15   five days that Mr. Malloy --                                 03:53:51

16       A.      Surprisingly threw in on my official             03:53:54

17   termination letter.                                          03:53:58

18       Q.      I got you.                                       03:53:58

19       A.      Yeah.                                            03:53:59

20       Q.      Okay.  Do you currently have a salary at         03:54:01

21   Branding Boulevard?                                          03:54:03

22       A.      Yes.                                             03:54:04

23       Q.      What is that salary?                             03:54:05

24       A.      $65,000 per year, subject to bonuses at the      03:54:07

25   end of the year.                                             03:54:16

170