1    CHANDLER, WOOD, HARRINGTON & MAFFLY
     RICHARD HARRINGTON (Bar #28099)
2    One Maritime Plaza, 4th Floor
     San Francisco, CA 94111
3    Telephone:  (415) 421-5484
     Facsimile:  (415) 986-4874
4
5    SHARTSIS FRIESE LLP
     ROBERT CHARLES WARD (Bar #160824)
6    One Maritime Plaza, Eighteenth Floor
     San Francisco, CA  94111
7    Telephone:  (415) 421-6500
     Facsimile:  (415) 421-2922
8    Email:  rward@sflaw.com

9    DE LA HOUSAYE & ASSOCIATES
     C. ANGELA DE LA HOUSAYE (Bar #144218)
10   BRENDAN J. DOOLEY (Bar #162880)
     1655 N. Main Street, Suite 395
11   Walnut Creek, CA 94596
     Facsimile:  (925) 944-3343
12   Phone:  (925) 944-3300
     Email:  angela@delahousayelaw.com
13
     Attorneys for Defendants and Counterclaimants
14   ANDREW VERITY and CHRISTINA CHANG

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19   MARK LILLGE d/b/a CREATIVE              Case No.  C 07-02748 MHP
     MARKETING CONCEPTS,
20                                           **DEFENDANTS' TRIAL BRIEF**
                    Plaintiff,
21                                           Date:      May 6, 2008
     v.                                      Time:      8:30 a.m.
22                                           Dept:      15, Hon. Marilyn Hall Patel
     ANDREW VERITY and CHRISTINA
23   CHANG,

24                  Defendants.

25
     AND RELATED COUNTERCLAIMS.
26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................................... 1

    A.    Verity's Employment History With Plaintiff............................................ 1

    B.    Chang's Employment History With Plaintiff........................................... 2

    C.    Deterioration Of The Relationship Between Verity And Lillge And Lillge's Refusal To Honor The Terms Of Verity's Employment ....................... 2

    D.    Lillge's Firing Of Verity And Then Chang.............................................. 3

    E.    Verity And Chang's Establishment Of Branding Boulevard As A Means To Earn A Living And Remain In The United States.................................... 3

III.    VERITY IS ENTITLED TO SUBSTANTIAL DEFERRED COMPENSATION ............ 3

IV.     LILLGE HAS ADMITTED OWING CHANG A PAYMENT FOR SUBSTANTIAL UNCOMPENSATED OVERTIME ...................................................... 4

V.      LILLGE HAS DEFAMED VERITY AND CHANG IN AN ATTEMPT TO STIFLE THEIR BUSINESS .................................................................................. 4

VI.     LILLGE'S TRADE SECRETS CLAIMS WERE MANUFACTURED AS LEVERAGE TO AVOID PAYING VERITY WHAT HE IS OWED...................... 4

    A.    To The Extent That Plaintiff Has Properly Identified Any Trade Secrets, Such Information Does Not Constitute Legally Cognizable Trade Secrets........... 4

        1.    Customer List ............................................................................. 5

        2.    Pricing ....................................................................................... 6

        3.    Strategic Plans .......................................................................... 6

        4.    Purchasing History .................................................................... 7

        5.    Renewal Order Timing............................................................... 7

        6.    Specific Customer Requirements, Preferences, Limitations, Buying Habits, Needs And Dislikes ........................................................ 8

    B.    Defendants Did Not Take, Use, Or Otherwise Misappropriate Any Of The Supposed Trade Secrets ............................................................. 8

VII.    PLAINTIFF CANNOT PROVE DAMAGES .............................................................. 9

VIII.   CONCLUSION ........................................................................................................ 9

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
C 07-02748                          DEFENDANTS' TRIAL BRIEF

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Continental Car-Na-Var Corp. v. Moseley,*
    24 Cal.2d 104 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . .5

5

*Thompson v. Impaxx, Inc.,*
    113 Cal.App.4th 1425 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

6

**STATUTES**

7

8

California Code of Civil Procedure section 2019.210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
C 07-02748

DEFENDANTS' TRIAL BRIEF

## I.    **INTRODUCTION**

Defendants Andrew Verity and Christina Chang submit this trial brief to present a short outline of the factual and legal issues expected to be resolved at trial.

The focus of this case to date has been Plaintiff Lillge's trade secret claims.  At trial, however, the facts will show that this case is really an employment dispute in which Lillge has not paid Verity and Chang what they are owed and that Lillge has asserted his trade secrets and other claims in order to acquire leverage to try to avoid paying Verity and Chang what they are owed.

## II.    **FACTUAL BACKGROUND**

### A.    **Verity's Employment History With Plaintiff**

Plaintiff Lillge and Defendant Verity had been long-time friends.  Lillge recruited Verity, who was living in Montreal, to move to the Bay Area to become sales manager for Creative Marketing Concepts.  Chang later moved to San Francisco and married Verity.  CMC is a sole proprietorship of Lillge.  Verity had been successful in the marketing field prior to joining CMC and Lillge recruited him to grow the business and eventually to take over day-to-day management of CMC.  After Verity joined CMC, Lillge put less and less time into the work while Verity worked 60+ hours per week and succeeded in increasing the sales and profits of the business.

Early in the employment relationship - - while Lillge and Verity were still good friends - - they negotiated an employment agreement.  That agreement was partially reduced to writing.  Lillge and Verity performed for years under the terms of the agreement they had made.  The employment terms included a base salary, reimbursement of expenses, and a percentage of the business's profits.  To reflect Verity's increasingly larger commitment to CMC and responsibility for its success, Lillge also promised that Verity would receive deferred compensation, should he ever resign or be terminated, in an amount tied to a percentage of the value of CMC.  This percentage increased with every year worked by Verity.  Lillge and Verity also agreed on a formula for deferred compensation purposes to value CMC as equal to one year's gross revenues.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**B.**    **Chang's Employment History With Plaintiff**

Chang moved to California and married Verity after he became CMC's sales manager in 2001.  Chang also had been successful in marketing and was also recruited to work for CMC. Chang worked briefly in accounting for CMC before becoming one of the sales representatives. Chang's sales skills quickly made her one of CMC's top sales reps.

As will be demonstrated by the employment history and success of both Verity and Chang, the notion that CMC's sales representatives do not develop the customers of the business is false.  CMC is a very low-tech, labor-intensive enterprise that depends heavily on the gumption and hustle of its sales employees.  Chang and Verity increased the sale of CMC and developed strong relationships with many customers.

**C.**    **Deterioration Of The Relationship Between Verity And Lillge And Lillge's Refusal To Honor The Terms Of Verity's Employment**

Unfortunately, despite the success of the business, the personal and professional relationship between Lillge and Verity descended into hostility and recrimination.  By late 2006, communications between Lillge and Verity had largely broken down.  Lillge decided to demote Verity and hired a replacement for Verity as sales manager.  In January 2007, during a particularly heated exchange, Lillge fired Verity.  Verity, living in the United States on an H1-B visa and with an infant son, asked Lillge for time to find another employer who would sponsor his visa.  In part because Verity was a key employee and his firing had been intemperate, Lillge agreed to employ Verity through the end of 2007.

Lillge did not keep his promise.  During the first few months of 2007, relations between the two worsened as Verity asked Lillge to confirm that he would be paid his deferred compensation as part of his termination.  Lillge admitted that Verity was owed an amount tied to an ownership percentage of CMC.  Lillge refused to pay, however, unless Verity agreed to new terms that had never previously been discussed between them.  For example, Lillge demanded a three year non-compete and payment of the amount owed over three years.  The combination was unworkable and Lillge fired Verity in early April 2007 when Verity would not agree to Lillge's terms.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**D.    Lillge's Firing Of Verity And Then Chang**

Lillge's termination of Verity - - in contravention of his agreement to employ Verity through end of 2007, was done on short notice.  Verity had just days apply for other jobs, and did submit applications.  On the advice of his immigration attorney, Verity created a corporation, Verity Marketing Corporation, as a shell for a new business that might be sued as a way to preserve his immigration status.

After Lillge fired Verity, Chang's income was the sole support for her family.  Chang hoped to keep her job with CMC, despite the termination of her husband, because remaining employed by CMC was the easiest way for Chang and Verity to remain in the United States.  Their young son was born in California and is a U.S. citizen and Verity and Chang did not want to be forced to move back to Canada.  Chang was to continue working for CMC while Verity tried to find another job.

Lillge, however, used Chang's employment as more leverage against Verity.  Lillge asked Chang to sign a non-competition agreement that, if Chang was fired by CMC, would have prevented Chang from working in the promotional products industry for two years.  With her husband already out of work, Chang did not believe she could sign such an agreement and was fired by Lillge.

**E.    Verity And Chang's Establishment Of Branding Boulevard As A Means To Earn A Living And Remain In The United States**

Now both out of work, the immigration status of both Verity and Chang was in serious jeopardy.  Verity had to implement his backup plan:  founding a new business as a basis to keep his visa.  After both had been fired, Verity and Chang scrambled to turn Verity Marketing Corporation into a real business, and launched Branding Boulevard within a few days of their departure.  They founded Branding Boulevard as a way to earn a living and remain, with their son, in the United States.

**III.    VERITY IS ENTITLED TO SUBSTANTIAL DEFERRED COMPENSATION**

Rather than a genuine trade secrets dispute, this case was born out of Lillge's refusal to honor the compensation terms of his employment agreement with Verity.  Lillge also promised to

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

employ Verity through the end of 2007.  Verity seeks damages for his unpaid interest in CMC, for salary through the end of 2007, and for unpaid bonuses through the present which have accrued because Lillge has not bought out Verity's interest in the business.

The proof of the employment agreement will come from three sources of evidence:  (1) testimony of Verity, (2) a written memorandum reflecting most of the terms of the employment agreement, and (3) admissions by Lillge with regard to Verity's interest in CMC.  Also, the fact that the parties performed in accord with the terms of the employment agreement for several years will establish the existence and terms of the agreement for the jury.

## IV.     LILLGE HAS ADMITTED OWING CHANG A PAYMENT FOR SUBSTANTIAL UNCOMPENSATED OVERTIME

Lillge also owes substantial back pay to Chang for uncompensated overtime hours worked.  Proof on this issue will be simple:  Lillge has admitted liability in a certain amount and that admission can be presented to the jury.  The only issues remaining for the Court are the award of interest and attorneys fees.

## V.     LILLGE HAS DEFAMED VERITY AND CHANG IN AN ATTEMPT TO STIFLE THEIR BUSINESS

While the Court ruled on partial summary judgment that two written announcements by Lillge were not defamatory, the rest of the defamation cause of action must be presented to the jury.  The key evidence of defamation will come from customer contact who will testify as to statements by Lillge that suggest that Chang had been deported and that Verity and Chang were not allowed to do business with CMC customers.

## VI.     LILLGE'S TRADE SECRETS CLAIMS WERE MANUFACTURED AS LEVERAGE TO AVOID PAYING VERITY WHAT HE IS OWED

The issue of trade secrets arose relatively late in the story, and only after discussions had broken down between Lillge and Verity over payment of what Verity was owed.

### A.     To The Extent That Plaintiff Has Properly Identified Any Trade Information, Such Information Does Not Constitute Legally Cognizable Trade Secrets

Plaintiff never complied with California Code of Civil Procedure section 2019.210, obligating a trade secret plaintiff to identify all claimed trade secrets with reasonable particularity at the outset of the case and before obtaining discovery.  That failure is the subject of Defendants'

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 4 -

1   motion in limine.  Rather than identify the claimed trade secrets with reasonable particularity,

2   Plaintiff has provided a list of categories of potential trade secrets.  None of the information in

3   those categories, to the extent that Defendants and the Court can figure out what information with

4   be are trade secrets.

5               **1.    Customer List**

6        This dispute is first and foremost a customer list case.  CMC is an unremarkable low-tech

7   business without any special business formulas or methods or other innovations.  CMC's methods

8   of gaining customers - - mass mailings, showroom - - are not different or innovative and would be

9   meaningless without the individual efforts of sales reps.  One of the biggest falsehoods is that

10  CMC's customer list is some sort of select, unique, and permanent stable of customers developed

11  over many years without the efforts of CMC's sales force.

12       First, the evidence will show the jury that CMC's customers are not constant or exclusive.

13  *See Thompson v. Impaxx, Inc.*, 113 Cal.App.4th 1425 (2003) (readily ascertainable customers are

14  not a trade secret).  About one-third of the customer list turns over - - changes - - every year.  If

15  CMC's customer list were some sort of exclusive property, it is unlikely that the list would be so

16  ephemeral.  The reason for the customer list's volatility is simple: CMC kept customers not based

17  on any special methods, processes or trade secrets but rather based on the service provided by its

18  sales reps.  The promotional products business is a hustle industry and, as Lillge himself often

19  said, customers prefer to buy from people they like.  CMC's best sales representatives - - like

20  Chang - - invested their time in developing personal relationships with customer contracts.  Such

21  customer relationships belong to the salesperson and those employees are free to build on such

22  relationships to compete with their former employer.  *See, e.g., Continental Car-Na-Var Corp. v.*

23  *Moseley*, 24 Cal.2d 104, 110 (1944).

24       Another problem with claiming the "customer list" to be a trade secret is that CMC will

25  struggle to prove that it has compiled any actual, useable, valuable customer list.  CMC's

26  customer list does not exist in any useful form in which Verity or Chang could have taken it.  In

27  Plaintiff's Amended Identification of Trade Secrets, Plaintiff identifies the customer list as

28  "known by Plaintiff and Defendants" - - a tall order given that Plaintiff alleges that CMC has

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

- 5 -

1  1200 customers.  Rather than compiled in a discrete customer list, to find CMC's customers one

2  must hunt through "contracts . . . invoices . . . call in or intake sheets . . . and purchase orders . . ."

3  - - in other words, thousands of pages of paper files.  Plaintiff also alleges that such information -

4  - from which a discreet customer list does not actually exist but might be gleaned - - is located on

5  CMC's "MYOB for 2006."  "MYOB" is a reference to <u>accounting software</u>.  *See* Exhibit A.  the

6  MYOB application used by CMC, call AccountEdge, is not a program through which CMC could

7  compile a sortable accessible customer list that might have some ingredient value.   Contrast

8  features of AccountEdge, is summarized in Exhibit A to this trial brief, with the features of the

9  Xebra software package that Verity and Chang used for their new business, Branding Boulevard.

10  Compare Exhibit B to this trial brief to Exhibit A.  CMC's customer database consists primarily

11  of accounting records.   A customer list and customer information might eventually rise to the

12  level of protectable trade secrets if they are compiled, annotated, and accessible in a way that

13  creates independent economic value.  CMC's customer list did not rise to that level.

### 2.    Pricing

15       The evidence at trial is going to show that there is nothing remarkable or secret about

16  pricing in the promotional products industry.  Most promotional products are ordered through a

17  handful of manufacturers who provide standard pricing in their catalogs or on their websites and

18  which is transparent to the customers.  If CMC attempts to prove that pricing is a trade secret at

19  trial, Defendants will offer into evidence in rebuttal a number of the catalogs that demonstrate the

20  standard 40% margin on which the overwhelming majority of sales in the promotional products

21  industry are made.   To the extent that sales are not made based on the standard pricing, the

22  pricing is simply a matter of negotiation with the customer.  As Lillge admitted in his deposition,

23  there is no formula or process or technique that is unique and valuable to CMC.  Rather, pricing is

24  simply a matter of discretion on the part of the sales manager.  There is nothing particular unique

25  or secret about the pricing.

### 3.    Strategic Plans

27       Whether CMC's "strategic plans" can go to the jury is an issue that the Judge should

28  resolve based on the pending motion in limine by Defendants.  Even given the opportunity to

Sᴜᴀʀᴛsɪs Fʀɪᴇsᴇ ʟʟᴘ
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1  provide an amended identification of trade secrets, Plaintiff failed particularly egregiously with

2  regard to "strategic plans" to identify with any reasonable particularity what the strategic plans

3  might be.  Rather, CMC identified the strategic plans as "regarding which customers it wishes to

4  target, and those it does not wish to target."  CMC when on to state that the "information was

5  known and discussed by Plaintiff and Defendants."   Plaintiff and Defendants obviously on

6  multiple occasions discussed the business of CMC and no doubt had strategic discussions about

7  targeting customers.  Such discussions in the ordinary course of business would not be trade

8  secrets and CMC has failed to identify anything about these discussions that would rise to the

9  level of a trade secret.

### 4.    Purchasing History

11  Like the customer list discussed in subsection VII.A.1 above, the "purchasing history" or

12  CMC's customers is not compiled in any useful and accessible format in which is might derive

13  some independent value or constitute a tangible trade secret that Defendants could have

14  misappropriated.  "Purchasing history" is hardly a valuable trade secret if someone would have to

15  comb through many pages of hard copy files in order to glean the purchasing history for a

16  particular customer.  Plaintiff will fail to introduce persuasive evidence that specific "purchasing

17  history" for any particular client was maintained in some format that made it a valuable secret

18  that Verity or Chang could have misappropriated.

### 5.    Renewal Order Timing

20  CMC has a practice of sending out, on the first anniversary of certain orders, a postcard

21  that serves as a "reminder" to the customer to place a reorder of products.  The reminder cards are

22  not customized to the specific order previously placed by the customer and are not a particularly

23  unique or innovative form of mass mailing.  Plaintiff is correct that many customers in the

24  promotional products industry order merchandise on a cyclical basis, although the key cycle - -

25  Christmas season - - is hardly much of a trade secret.  As with other supposed trade secrets, CMC

26  does not maintain the information regarding renewal orders in some useful, manageable and

27  tangible format that would make it even remotely feasible for Verity or Chang to

28  "misappropriate" the information regarding when renewal orders might be due.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
C 07-02748                    DEFENDANTS' TRIAL BRIEF

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

6.    **Specific Customer Requirements, Preferences, Limitations, Buying Habits, Needs And Dislikes**

Plaintiff has not identified the "specific customer requirements" in such a manner that fairly allows Defendants to defend against misappropriation of whatever these customer requirements might be.  Defendants acknowledge the <u>possibility</u> that such information <u>might</u> rise to the level of trade secrets.  For example, if CMC had compiled a Xebra database such as that used by Branding Boulevard, which has useful features that allow Branding Boulevard to compile, sort, arrange, and access customer preferences or other such information, such a database might constitute a trade secret.  *See* Exhibit B to this trial brief for examples of the features of a Xebra database and compare those features to the more limited features of a MYOB AccountEdge database.  CMC, however, has not built and does not possess any such compilation of useful and valuable customer information that might rise to the level of a trade secret.  Something is not a useful trade secret if a CMC employee must consume substantial amounts of time to retrieve information that might be of some use.  One key criteria and for something to be a trade secret is that it must be <u>valuable</u>.  Information buried in voluminous paper files that cannot be retrieved efficiently is hardly valuable.  Defendants will establish at trial, by comparing the business model for their new business Branding Boulevard with the inefficient, low-tech business model of CMC, that CMC fails to possess any legally cognizable trade secrets that may relate to customer requirements or preferences.

B.    <u>**Defendants Did Not Take, Use, Or Otherwise Misappropriate Any Of The Supposed Trade Secrets**</u>

Even if the jury could get past the frailties of Plaintiff's claimed trade secrets, there is no evidence of misappropriation.  Plaintiff's entire case for misappropriation is based on supposition and innuendo rather than any actual evidence.

Much of California's trade secret law arose out of the misappropriation of customer lists - - Rolodexes or other hard copies of the customers of the business.  In all such cases in which the plaintiff prevailed, the plaintiff established that the defendant took the actual physical customer list.  Such proof is necessary because, as discussed above, the identities of the customers alone cannot constitute a trade secret.  To the extent that CMC might have a complied customer list in

- 8 -

1  some form in which it might derive independent economic value, that list would be CMC's

2  MYOB database.  There will be a complete failure of proof at trial that Defendants took or used

3  either an electronic or hard copy of this date.

4  The failure of proof will be the same for other supposedly confidential information.

5  Defendants took no copies of the physical customer files with them.  There will be no

6  documentary or other physical evidence whatsoever of any information having been actually

7  taken or used by Verity or Chang.

8  Because none of the information that exists in any tangible form was taken or used,

9  Plaintiff will attempt to prove that Defendants misappropriated trade secrets that were "known"

10  by Plaintiff and Defendants - - even though such information exists in no compilation database, or

11  other format that would allow CMC to transfer such supposedly important and valuable

12  information to other employees should Defendants leave CMC's employment.

13  **VII.  PLAINTIFF CANNOT PROVE DAMAGES**

14  Lillge chose to fire his two most important employees - - his swales manager and his top

15  salesperson.  Predictably, CMC's business has suffered.  Lillge has admitted that he cannot

16  distinguish between CMC's drop in profits that were caused by losing two key employees versus

17  any business that Verity or Chang may have taken.  Also, since shortly after they launched their

18  new business, Verity and Chang have been subject to a draconian injunction that has largely

19  prevented them from doing business with their former CMC customers.  Even if Plaintiff could

20  prove misappropriation of trade secrets, any damages will be paltry.

21  Plaintiff reveals his hand with his last proposed jury instruction, for set-off.  Plaintiff owes

22  several hundred thousand dollars to Verity and Chang.  Plaintiff has asserted his trade secrets

23  claims, and is taking this case to trial, in the hope of getting a material discount on what he owes

24  to Verity and Chang.

25  **VIII.  CONCLUSION**

26  Once witnesses actually begin testifying, and once the Court realizes that Plaintiff has no

27  case beyond the slivers of evidence presented in declarations to date, it should become visible that

28  this case was not filed in good faith and has existed to gain leverage to avoid paying what Verity

- 9 -

1  and Chang are owed.

2

3  DATED:  April 22, 2008                          SHARTSIS FRIESE LLP

4

5                                                  By: */s/ Robert Charles Ward*
                                                         ROBERT CHARLES WARD

6                                                  Attorneys for Defendants
7                                                  ANDREW VERITY and CHRISTINA
                                                   CHANG

8
   7475\001\RWARD\1505737.1
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.                    DEFENDANTS' TRIAL BRIEF
C 07-02748