RICHARD HARRINGTON (SBN 28099)
CHANDLER WOOD HARRINGTON & MAFFLY LLP
One Maritime Plaza, Fourth Floor
San Francisco, California 94111 3404
Telephone:    415 421 5484
Facsimile:    415 986 4874
Email:        harr@well.com

ROBERT CHARLES WARD (SBN 160824)
SHARTSIS FRIESE LLP
One Maritime Plaza, Eighteenth Floor
San Francisco, California 94111 3404
Telephone:    415 421 6500
Facsimile:    415 421 2922
Email:        rward@sflaw.com

C. ANGELA DE LA HOUSAYE (SBN 144218)
BRENDAN J. DOOLEY (SBN 162880)
KARYNE T. GHANTOUS (SBN 191309)
DE LA HOUSAYE & ASSOCIATES, ALC
1655 N. Main Street, Suite 395
Walnut Creek, California 94596
Telephone:    (925) 944-3300
Facsimile:    (925) 944-3343
Email:        angela@delahousayelaw.com
              brendan@delahousayelaw.com
              karyne@delahousayelaw.com

Attorneys for Defendants and Counter-Claimants,
ANDREW VERITY AND CHRISTINA CHANG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK LILLGE D/B/A CREATIVE MARKETING CONCEPTS,<br><br>                    Plaintiff,<br><br>     v.<br><br>ANDREW VERITY AND CHRISTINA CHANG,<br><br>                    Defendants.<br><br>AND RELATED CROSS-ACTIONS | Case No: C-07-02748 MHP<br><br>**DECLARATION OF ANDREW VERITY IN SUPPORT OF DEFENDANT'S SUPPLEMENTAL MOTION TO INCREASE THE AMOUNT OF THE BOND**<br><br>Date:    April 23, 2008<br>Time:    3:00 p.m.<br>Dept:    Courtroom 15, 18th Floor<br>Judge:   Hon. Marilyn H. Patel<br><br>Complaint Filed: May 25, 2007<br>Trial Date: May 6, 2008 |

I, ANDREW VERITY, declare as follows:

1. I am a defendant in this action. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify thereto under oath.

2. After my wife, Christina Chang and I were fired by Plaintiff, we scrambled to launch a legitimate business in the only field in which we could do so quickly (to avoid deportation) and profitability (to pay the mortgage and for groceries).

3. The Preliminary Injunction, by forbidding Christina Chang and I from soliciting the customer contacts developed through our years of hard work in the industry, has had a concrete deleterious effect on the new business Branding Boulevard. Based on the sales figures achieved by Christina Chang and I while working for Creative Marketing Concepts ("CMC"), and what we have been able to achieve with Branding Boulevard, there is compelling evidence that the damages for a wrongfully obtained injunction are going to be substantially higher than the amount of the current bond, which is $100,000.

4. Regarding our sales volumes: In 2006, at CMC, I did $750,000 in sales and Christina Chang did $600,000 in the 7 1/2 months after she returned from maternity, making her annual sales rate around $950,000. Our combined annual sales rate was therefore $1.7M at a gross margin in excess of 41%, which would result in $700,000 of gross profits.

5. At Branding Boulevard we achieved $600,000 in sales in our first 9 months in business, making the annual rate around $800,000 and around 36% gross margin, which would result in $288,000 of annual gross profits. The differential between the ability to procure sales before and after the Injunction is $412,000.00. Because 25% of our customers are not from CMC, the gross profit figure related to former CMC customers was approximately $216,000.00. Thus, the true result of the Injunction is $484, 000.00 in lost gross profits per year. I am aware that some customers are leaving CMC because of bad service, but not coming to us because of the restrictions on contacting them, other customers such as AC Transit need to get multiple bids on items and must buy from the lowest bidder, but Branding Boulevard is not allowed to even contact them to get on the quote list.

6. UCSF Medical Center: It is understood that this customer did a purchase of around $300,000 with CMC in the Spring of 2008. CMC would have realized gross profits of $50,000 -

$100,000 alone on this purchase. There are no secrets pertaining to this customer. It was not a repeat order; the customer had not dealt with CMC for a year when I left. The customer required solicited multiple bids on the job. In 2006, I dealt with the customer and they asked that they not deal with Mr. Lillge because they found him too intense. The Injunction has prevented me from soliciting this customer, however CMC is clearly protecting no secrets, instead they have created a non-competitive situation.

7. Wells Fargo is known to purchase millions of dollars of promotional products each year and to deal with dozens of vendors. Wells Fargo even has a corporate preferred vendor out of Wisconsin that produces an internal catalog called the "Wells Ware" catalog detailing products they can buy. CMC managed no more than $100,000 of business per year from Wells Fargo most of which was new products for each order. By taking out the Injunction, CMC has prevented us from soliciting the vast majority of the business that they are not even quoting on. The Injunction has prevented us from dealing with one of the biggest customers in the Bay Area where CMC has a negligible market share.

8. USPS: It is well known that the Postal Service has a mandate to purchase logoed items for all of it's 600,000 plus employees. To date Branding Boulevard has been limited to dealing with certain employees at the Oakland facility who contacted us after my wife and I were terminated from CMC. The Injunction prevents us from soliciting other Bay Area facilities even though these facilities are under the expectation to get multiple bids for each project so there can be no trade secrets attached to such business. The lost opportunity could easily amount to more that $50,000.00 - $100,000.00 in lost sales to Branding Boulevard and potentially be many multiples higher.

9. In 2007, Christina Chang started winning significant orders from the company CT Summation from San Francisco. CT Summation stated that they were using a vendor in San Jose but started switching business to Christina Chang because they liked the relationship. They spent $15,000.00 in a few months and the account could easily be worth $50,000.00 - $100,000.00 per year. Because most of their purchasing history was either at another vendor or competing with another vendor it is hard to understand what trade secrets CMC is protecting with this client.

10. Red Oak Realty is known to use multiple vendors. CMC frequently lost business in competitive situations. They were known to spend $15,000.00 - $25,000.00 per annum. Christina

1 Chang and I purchased our houses through Red Oak and are personal friends with a number of realtors, one of whom has bought product from Branding Boulevard. Despite this relationship, we have been prevented from soliciting the marketing manager of the account by the Injunction in place.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of April 2008 at Walnut Creek, California.

/ S /
_____
ANDREW VERITY